**Exhibit Index for**

**Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and Sternberg & Associates, P.C.**

A.  First Amended Complaint
B.  Sale and Purchase Agreement
C.  Wire Documents, 1/21/2022
D.  Bill of Sale Email, 2/8/2022
E.  Shipping Emails, 2/15/2022
F.  Refund Demand Email, 2/16/2022
G.  Sternberg Answer, 8/23/2023
H.  AGC Decision *In Re: Zekaria,* 2/18/2024
I.  Sternberg Deposition Transcript, 2/7/2024

    I-1. Exhibits to Sternberg Deposition

J.  Weiss Deposition Transcript 1, 2/16/2024
K.  Weiss Deposition Transcript 2, 7/16/2024

    K-1. Exhibits to Weiss Depositions

L.  Scully Deposition Transcript, 7/23/2024
M.  Zekaria Deposition Transcript, 4/2/2024
N.  Sternberg Letter disclosing expert reports, 8/16/2024
O.  Angstreich Report, 8/16/2024
P.  Lesovitz Report, 8/16/2024
Q.  CHG-Sternberg Fee Agreement
R.  Plaintiff 9-29-22 Reply to Sternberg Interrogatories
S.  Plaintiff 9-29-22 Reply to Sternberg Request for Production
T.  Plaintiff 4-22-24 Reply to Sternberg Interrogatories
U.  Plaintiff 4-22-24 Reply to Sternberg Request for Production

# EXHIBIT J

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                          - - -

4    AMERICAN ENVIRONMENTAL        : No. 2:22-CV-0688 (JMY)
     ENTERPRISES, INC. d/b/a       :
5    THESAFETYHOUSE.COM            :

6              vs.                 :
                                   :
7    MANFRED STERNBERG, ESQUIRE,   :
     et al                        :

8

9

10

11                         -----

12           Deposition of GARY WEISS, taken at

13      Bluestone Country Club, 711 Boehms Church

14      Road, Blue Bell, Pennsylvania on Friday,

15      February 16, 2024, commencing at 9:34 a.m.

16      before Kimberly A. Bursner, Registered

17      Professional Reporter and Notary Public.

18                         -----

19

20

21

22                    TATE & TATE
                 Certified Court Reporters
                825 Route 73 North, Suite G
23               Marlton, New Jersey 08053
             (856) 983-8484 - (800) 636-8283
24                   www.tate-tate.com

**Page 2**

```
 1   COUNSEL APPEARED AS FOLLOWS:
 2          Lightman & Manochi
            BY:  GARY P. LIGHTMAN, ESQUIRE
 3          600 Germantown Pike, Suite 400
            Plymouth Meeting, PA 19422
 4          (215) 760-3000
                for the Plaintiff
 5
            Goldberg & Segalla
 6          BY:  SETH LAVER, ESQUIRE
            1700 Market Street, Suite 1418
 7          Philadelphia, PA 19103-3907
            (267) 519-6800
 8              for Defendants Manfred
                Sternberg, Esquire and
 9              Manfred Sternberg &
                Associates, P.C.
10
            Rebar Kelly
11          BY:  PATRICK HEALEY, ESQUIRE
            470 Norristown Road, Suite 201
12          Blue Bell, PA 19422
            (484) 344-5340
13              for Defendants Sokolski
                & Zekaria, P.C. & Daphna
14              Zekaria
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1   GW-9       One-page photocopy of        213
            email dated 7/19/23
 2
     GW-10      Three-page photocopy         231
 3          of declaration of Gary
            Weiss
 4
     GW-11      Two-page photocopy of        246
 5          declaration of Sam Gross
 6   GW-12      One-page photocopy,          264
            front and back, of emails
 7
     GW-13      One-page color photocopy     269
 8          of text message
     GW-14      One-page color photocopy     269
 9          of text message
10
     GW-17B     One-page list of wire        189
11          transfers
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1               I N D E X
 2               - - - - -
 3   WITNESS:                    PAGE:
 4   GARY WEISS
 5     By Mr. Lightman            6
 6               - - -
 7             E X H I B I T S
 8   NUMBER:                     PAGE:
 9   GW-1     Seven-page photocopy of     10
            notice of deposition,
10          front and back, with
            request for production
11          of documents
12   GW-2     Two-page photocopy, front   27
            and back, of certificate
13          of formation
14   GW-3     One-page color photograph   35
15   GW-4     Nine-page photocopy,        39
            front and back, of motion
16          to reconsider Court's order
            allowing plaintiff to
17          amend the caption of their
            complaint
18
     GW-5     One-page photocopy of       57
19          letter dated 2/6/22
20   GW-6     One-page photocopy of invoice  64
21   GW-7     Twenty-one-page photocopy,  158
            front and back, of answer
22          to first amended complaint
23   GW-8     Four-page photocopy of A.   208
            Solar Diamond Wells Fargo
24          record excerpts
```

**Page 5**

```
 1           REQUESTS MARKED
 2   PAGE           LINES
 3   114            3-6
 4   164            5-7
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 6**

1    (It is hereby stipulated by and
2    among counsel that the signing, sealing and
3    certification are waived; and that all
4    objections, except as to the form of the
5    question, are reserved until the time of
6    trial.)
7                        - - -
8        GARY WEISS, after having been duly
9    sworn, was examined and testified as
10   follows:
11                       - - -
12   BY MR. LIGHTMAN:
13   Q   Good morning, Mr. Weiss.  As you are aware, my
14   name is Gary Lightman.  I'm the attorney for the
15   plaintiff in this case, American Environmental
16   Enterprises, Inc. doing business as The Safety
17   House.  I'll call them Safety House or TSH today.
18   Okay.
19       I'm going to be asking you a series
20   of questions today.  Please make sure you
21   understand the question.  If you don't, let me know
22   and I'll do whatever is necessary to make my
23   question clear.
24   A   Okay.

**Page 7**

1    Q   When you answer, please verbalize your answers
2    so that the court reporter sitting between us can
3    transcribe it?
4    A   I understand.
5    Q   Please tell the truth.  Please answer each
6    question as fully and completely as possible.
7    Don't guess.  If you don't remember the answer to a
8    question or don't know, it's perfectly acceptable
9    to say "I don't remember" or "I don't know,"
10   unless, of course, you do?
11   A   Okay.
12   Q   You're aware that you are under oath today and
13   what you say may have other repercussions outside
14   of this case if you are not telling the truth under
15   oath.  Are you aware of that?
16   A   I understand.
17   Q   You have the absolute right in response to any
18   question to say, "I invoke my fifth amendment right
19   against self-incrimination and refuse to answer."
20   Unlike the criminal context where they can't use
21   that against you, if I say to you, did you steal my
22   water bottle and you say "I invoke my fifth
23   amendment right against incrimination.  I refuse to
24   answer", the civil court can make an adverse

**Page 8**

1    inference that you did, in fact, steal the water
2    bottle.  That's the difference between civil
3    proceedings like this and criminal.  They can't
4    hold it against you in a criminal case.  We can
5    hold it against you in a civil case.  Do you
6    understand that?
7    A   Yes.
8    Q   Are you under the influence of any drugs,
9    intoxicants, medications or are you suffering from
10   any physical, mental or other disability that would
11   affect your ability to think logically and clearly
12   and recall past events?
13   A   I take every day blood pressure medication.
14   Q   What kind of blood pressure medication?
15   A   Olmesartan.
16   Q   Does that affect your ability to think
17   logically and clearly and recall past events?
18   A   I really don't know.  I just know that it
19   helps my blood pressure.  Without it, could be --
20   Q   Your blood goes high?
21   A   I also take Indocin.  Indomethacin.
22   Indomethacin that I take daily also.  That's a drug
23   that reduces pain due to inflammation.  I'm about
24   to have knee replacement surgery, so my two bones

**Page 9**

1    are clashing and without that, I cannot have the
2    day.
3    Q   A partial or a total knee replacement?
4    A   I don't know how they call it, but what they
5    do is they shave the two up and down and put
6    something in the middle.
7    Q   I've had a total knee replacement.  Whatever
8    they tell you to do, do exercise and rehab because
9    it will cut your recovery time down from three to
10   six months to one to three months.
11       MR. LAVER:  Pardon me.  When is the
12   procedure?
13       THE WITNESS:  On the 29th.
14       MR. LAVER:  Of this month?
15       THE WITNESS:  Yeah.
16   BY MR. LIGHTMAN:
17   Q   Other than those medications, none of those
18   medications fog your mind?
19   A   I don't think so.  I don't think so.
20   Q   So, if I ask you a question and you give me an
21   answer, I'm going to assume that, first, you
22   understood it and, second, you answered it in
23   accordance with these instructions?
24   A   If I don't understand, I'll ask you again and

3 (Pages 6 to 9)

Page 10

1    I will force to think about it.
2    Q   Have you ever been deposed before?
3    A   Yes.
4    Q   How many times?
5    A   Once.
6    Q   Where?  What was the case?
7    A   It was maybe 15 years ago.
8    Q   Were you a party in that case?
9    A   Yeah.
10   Q   Defendant or plaintiff?
11   A   My wife sued me for support.  Ex-wife.
12          MR. LIGHTMAN:  Ask you to mark this
13   a Gary Weiss-1, please.  GW-1.
14          (Seven-page photocopy of notice of
15   deposition, front and back, with request for
16   production of documents marked GW-1, for
17   identification.)
18          THE WITNESS:  Mr. Lightman, I asked
19   you a copy of the deposition for Mr. Manfred.
20   Do you have it with you?
21   BY MR. LIGHTMAN:
22   Q   Not yet.  As soon as it is transcribed and
23   available, I will get in touch with the court
24   reporter.

Page 11

1    A   I'll appreciate it.
2    Q   Deposition Exhibit GW-1 is a copy of the
3    deposition notice that we served on you scheduling
4    your deposition for today.  We copied all opposing
5    parties and interested parties in this case with a
6    production of documents.  You received this when we
7    sent it to you; correct?
8    A   (Nods heads up and down.)
9    Q   We sent this to you on or about January 12th.
10   You received this in the mail in an e-mail from me
11   enclosing your deposition notice.  If you look at
12   the first page, it says to Gary Weiss individually
13   as the designated representative --
14   A   How many pages did you send me?
15   Q   Fourteen pages.
16   A   Then I did not read 14 pages.
17   Q   But you got this deposition notice; right?
18   A   I cannot say for sure, you know.  I have to
19   read it for one and I don't remember really what I
20   read.  I read so much material, so you are asking
21   me to look over a document that is very long.
22   That's the truth here, so...
23   Q   Hold on a second.
24   A   You sent it to me in an e-mail.  Nope.  I

Page 12

1    don't remember it.
2    Q   So showing you my computer.  There is an
3    e-mail dated January 13, '24, to Gary Weiss.  Gary
4    Weiss, you are hereby served with the attached
5    notice of oral deposition of Gary Weiss and A.
6    Solar Diamond.  Do you see that?
7    A   Mr. Lightman, you asked me if I read the whole
8    thing.
9    Q   First I asked you if you received it?
10   A   I don't remember, so...
11   Q   Is this your right e-mail address
12   monipair@aol.com at Gary Weiss?
13   A   Yes.  I am just telling you that I don't
14   remember reading it.  I didn't say you didn't send
15   it.  Do you understand?
16   Q   Yes.
17   A   I read just the first page, so I am here
18   individually and nobody.
19   Q   Are you here on behalf of A. Solar Diamond?
20   A   No.
21   Q   Then we are going to have to bring you back a
22   second time to testify for A. Solar and A. Solar
23   Diamond?
24   A   Okay.

Page 13

1    Q   There is two ways to proceed.
2    A   Okay.
3    Q   You can either say, I agree that the testimony
4    I'm giving is on behalf of me and my LLC, or you
5    can say, I just want to testify personally in which
6    case I will have to reschedule another deposition?
7    A   Let me -- let me tell you why I say that.  I
8    understand you.
9    Q   Okay.
10   A   I was told that a corporation, an entity like
11   this is to be represented by a lawyer.  I do not
12   have a lawyer.  You brought it in front of the
13   judge and he ruled that there's no more testimony
14   by A. Solar Diamond.  As far as I'm -- to say
15   anything about A. Solar Diamond, there is a order
16   of not to continue with the testimony.  There is an
17   order for A. Solar Diamond.  A. Solar Diamond
18   doesn't have anybody to represent or defend it.
19   I'm not a lawyer and I can talk only for myself.
20   Just for that.  I have to look exactly what is --
21   which order it was and to tell you where the Judge
22   Young closed any proceedings right now until the
23   trial itself regarding A. Solar Diamond.
24   Q   Okay.  I hear you, but I disagree with your --

4 (Pages 10 to 13)

Page 14

1    **A   You know what I mean, though?**
2    Q   I hear what you are saying, but I disagree
3    with your interpretation of it. I agree. The
4    judge said A. Solar Diamond, LLC has to have an
5    attorney to do things in court, but A. Solar
6    Diamond, LLC does not have to have a lawyer
7    representing in order to give deposition testimony.
8            Just so it's clear, you have the
9    right to give testimony deposition both on behalf
10   of yourself and your entity. If you choose just to
11   give it on behalf of yourself individually, we have
12   the right to schedule another deposition of A.
13   Solar Diamond, LLC and/or A. Solar, LLC.
14           So, with that understanding, are you
15   giving testimony today just on your behalf
16   individually or on behalf of your LLC as well?
17   **A   I came here to give as much information as --**
18   Q   I understand.
19   **A   You understand? So I just --**
20   Q   If you agree to give testimony both
21   individually and on behalf of your LLC, it will not
22   be necessary to bring you back for a second
23   deposition. So it's up to you. I don't really
24   care.

Page 15

1        **MR. LAVER:** Let's go off the record
2    for a second.
3               - - -
4          (Discussion off the record.)
5               - - -
6        **MR. LIGHTMAN:** Let's go back on the
7    record.
8    BY MR. LIGHTMAN:
9    Q   So during the record, all three attorneys
10   explained to you the difference in concept. You
11   are willing to give testimony today, the truth as
12   you know it, both for yourself and for your LLC;
13   correct?
14   **A   Exactly.**
15   Q   Okay. I'm going to hand you a piece of paper.
16   I don't want this to become part of the public
17   record. Could you take your pen that's in front of
18   you and write your Social Security number on that
19   piece of paper?
20   **A   I will tell you my Social Security number.**
21   Q   I don't want to -- if you want, you can, but
22   it becomes part of the deposition record. What is
23   your Social Security number?
24   **A   Why do you want me to write it down?**

Page 16

1    Q   So it does not become part of a public
2    deposition transcript. We did this with Manfred
3    Sternberg as well. He wrote it down. I don't
4    care. If you want it to be part of the deposition
5    transcript, that's fine, too.
6            What's your Social Security number?
7    **A   I mean, is this a necessary thing for the
8    proceedings?**
9    Q   Yes.
10   **A   Can you tell me why?**
11   Q   I'm entitled to have that information. I'm
12   going to ask you for your date of birth and for
13   your Social Security number. Let me guess. Is
14   your date of birth 2/28/1951?
15   **A   My date of birth is 2/28/1951.**
16   Q   And your Social Security number?
17   **A   Is 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.**
18   Q   Can I see your driver's license? Can you take
19   out your wallet and let me see your driver's
20   license?
21   **A   At this point I don't think that we need the
22   driver's license.**
23   Q   Does your driver's license show that you live
24   at 437 1st Avenue in Elizabeth?

Page 17

1    **A   Yes.**
2    Q   Your cell phone number is (908) 546-2649?
3    **A   Yes.**
4    Q   Are you aware that that's the same number that
5    someone who identified themselves as Shraga when
6    they called Dan Scully?
7    **A   I'm not aware.**
8    Q   What's the name on your driver's license?
9    **A   Let me take a look.**
10   Q   Okay.
11   **A   My name says, Gary Weiss.**
12   Q   Can you give me your driver's license number
13   from that?
14   **A   Yeah. W231127400.**
15   Q   And --
16   **A   02514.**
17   Q   W23112740002514; correct?
18   **A   Yes.**
19   Q   New Jersey?
20   **A   New Jersey driver's license.**
21   Q   And your e-mail address is
22   Wgary4109@gmail.com?
23   **A   Yes.**
24   Q   And you have a second e-mail address

5 (Pages 14 to 17)

Page 18

1  monipair@aol.com?
2  **A   Correct.**
3  Q   Do you have any other e-mail addresses that
4  you use?
5  **A   No.**
6  Q   Why do you have two different e-mail
7  addresses?
8  **A   (Shrugs.)**
9  Q   You can't shrug.  You can say "I don't know,"
10 but a shrug of the shoulder will not be --
11 **A   One of them is a g-mail.  One of them is AOL.**
12 **That's basically what it is.**
13 Q   Do you use -- is there a special purpose used
14 for monipair?
15 **A   No.**
16 Q   Do you have a website?
17 **A   I have a website.**
18 Q   What's the website address?
19 **A   Jewelformeblue.com.**
20 Q   Jewelformeblue.com.  Do you own that website?
21 **A   Yeah.**
22 Q   And do you have any other websites?
23 **A   No.**
24 Q   Does A. Solar or A. Solar Diamond, LLC have a

Page 19

1  website?
2  **A   No.**
3  Q   Are there any other websites that you maintain
4  in any other name or capacity?
5  **A   No.**
6  Q   Have you ever been convicted of a crime?
7  **A   No.**
8  Q   You are under oath.  It's easy to find out, so
9  your testimony is --
10 **A   Mr. Lightman, the answer is no.**
11 Q   Do you have a criminal record?
12 **A   No.**
13 Q   Were you aware that Sam Gross is a convicted
14 felon?
15 **A   Yes.**
16 Q   How did you --
17 **A   Do you want to take a copy of my driver's**
18 **license?  Is this going to help you?**
19 Q   Thanks.
20 **A   Can I put this away?**
21 Q   Yeah.  You can put that away.  How are you
22 aware that Sam Gross is a convicted felon?
23 **A   I Google his name and he told me that he's**
24 **embroiled in to two cases in downtown, New York.**

Page 20

1  Q   Did he tell you what the cases are about?
2  **A   Something about fraud.**
3  Q   Something about fraud.  Okay.  Were you aware
4  of this before you got involved with him in these
5  transactions involving the test kits?
6  **A   Okay.  I -- I met Sam Gross in 2002, I think.**
7  **He was selling diamonds and I was his first**
8  **customer and we have been doing business since**
9  **then.**
10 Q   So you were aware he got charged in connection
11 with fraud involving diamonds embezzlement and went
12 to jail for that?
13 **A   No.  I found out later.**
14 Q   Did you find out before you did business with
15 him involving the test kits?
16 **A   I found out about six months or eight months**
17 **or a year, something like that.**
18 Q   So after you did business with him with the
19 test kits?
20 **A   Yes.**
21 Q   Don't get offended by my next questions
22 because I'm a Jewish person.  Are you a practicing
23 Jew?
24 **A   No.**

Page 21

1  Q   So you don't go to services?
2  **A   No.**
3  Q   Do you keep Kosher?
4  **A   No.**
5  Q   Do you observe the Sabbath?
6  **A   No.**
7  Q   What's your residence address?  Where do you
8  live?
9  **A   I live at 650 Fairway Drive, Union, New Jersey**
10 **07083.**
11 Q   How long have you lived there?  How long have
12 you lived there?
13 **A   Several weeks.**
14 Q   So just recently?
15 **A   Yeah.  And I have another address.**
16 Q   What's your other address?
17 **A   277 Taquitahuana.**
18 Q   Can you spell it, please?
19 **A   That's what I'm going to do now.**
20 Q   Okay.
21 **A   T-a-q-u-i-t-a-h-u-a-n-a.**
22 Q   T or a D to start?
23        MR. LAVER:  T.
24        THE WITNESS:  T with a T.  Thomas.

6 (Pages 18 to 21)

Page 22

1  BY MR. LIGHTMAN:
2  Q  T-a-q-u-i-t-a-h-u-a-n-a Drive?
3  A  Just --
4  Q  And where is that?
5  A  That's San Miquel, Lima, Peru.
6  Q  How long have you -- do you own that?
7  A  My wife owns.
8  Q  Your wife.  What's her name?
9  A  Mirtha Pantoja.
10  M-i-r-t-h-a P-a-n-t-o-j-a?
11  A  Correct.
12  Q  So she owns it.  How long has she owned the
13  San Miquel, Lima, Peru property?
14  A  We are married 13 years, so way before that.
15  Q  So she owned it before you married her?
16  A  Yeah.  About 35 years.
17  Q  So she owned it about 35 years.  And that's
18  your second address because you vacation there with
19  her?
20  A  I live there.
21  Q  Part of the time?
22  A  Yeah.
23  Q  And so you live in Peru half of the year and
24  here half of the year?

Page 23

1  A  On and off, yeah.
2  Q  And you recently went to Peru; right?  Did you
3  recently go to Peru?
4  A  No.
5  Q  When's the last time you were in Peru?
6  A  Last year.
7  Q  In 2023?
8  A  Yeah.
9  Q  What month?
10  A  I have to look exactly.
11  Q  Is it the first half of the year or the last
12  half of the year?
13  A  The first half of the year probably.
14  Q  Are you planning to go down to Peru soon?
15  A  Well, maybe after my operation, yeah.
16  Q  You don't have any tickets or travel plans
17  now?
18  A  No.
19  Q  And your operation is the 29th of January,
20  right, for a knee replacements?
21  A  Right.
22  Q  When you moved to Fairway Drive, why didn't
23  you get the address on your license changed from
24  437 one half 1st Avenue, Elizabeth to your Fairway

Page 24

1  Drive?
2  A  I may not live there very long so...
3  Q  Do you rent that or own it?
4  A  Yeah.  Rent.
5  Q  You rent it.  Okay.  Who did you rent it from?
6  A  Alberto Herrera.
7  Q  Why do you say "I may not live there very
8  long"?
9  A  We plan to live in warmer weather a little
10  bit.
11  Q  Does your wife live at the Fairway Drive
12  address with you?
13  A  She just came back, yes, but she's not going
14  to be there --
15  Q  What?
16  A  She is going to Peru.
17  Q  To live full time?
18  A  Probably, yeah.
19  Q  Who lives at 437 1st Avenue?
20  A  I used to live there.
21  Q  Did you -- does anyone live there right now?
22  A  Right now, it's for rent.
23  Q  You still own it?
24  A  No.

Page 25

1  Q  Who owns the property?
2  A  I'm trying to remember his name.  Frank -- I
3  don't remember his last name right now.  I'll
4  remember later on, I'll tell you.
5  Q  How long has he owned the property?
6  A  I believe 30 years.
7  Q  Thirty years?
8  A  Yeah.
9  Q  And when you lived there, did you pay him
10  rent?
11  A  Of course.
12  Q  How much was your rent?
13  A  About 1,400.
14  Q  And you said your wife's name is Mirtha,
15  M-i-r-t-h-a.  Pantoja, P-a-n-t-o-j-a?
16  A  Yes.
17  Q  What's Irate, I-r-a-t-e?  Is that her last
18  name or maiden name or --
19  A  I think maiden name.
20  Q  Do you have any children?
21  A  Yeah.
22  Q  How many children?
23  A  Four.
24  Q  And what are their names?

7 (Pages 22 to 25)

Page 26

1  A  Edmond.
2  Q  E-d-m-o-n-d?
3  A  Yeah.  Galit.
4  Q  G-a-l-a-t?
5  A  G-a-l-i-t.  Yael, Y-a-e-l.  And Efrat,
6  E-f-r-a-t.
7  Q  Is Efrat the youngest?
8  A  Excuse me?
9  Q  Is Efrat the youngest?
10  A  Efrat is the youngest.
11  Q  How old is she?
12  A  Twenty.
13  Q  And is Edmond the oldest?
14  A  Yes.
15  Q  How old is he?
16  A  Thirty.  No.  He's not the oldest.  Galit is
17  the oldest.
18  Q  How old is Galit?
19  A  Thirty-five.
20  Q  Do they have the same last name as yours?
21  Weiss?
22  A  Yes.
23  Q  All of them?
24  A  All of them.

Page 27

1  Q  And is your wife, does she have any interest
2  in A. Solar, LLC either as an owner, member,
3  shareholder, officer, partner, director, employee
4  or otherwise of A. Solar, LLC?
5  A  Yeah.  She -- the LLC was formed in her name.
6  Q  A. Solar, LLC or A. Solar Diamond, LLC?
7  A  A. Solar Diamond, LLC.
8        MR. LIGHTMAN:  Can we have this
9  marked as Gary Weiss-2.
10        (Two-page photocopy, front and back,
11  of certificate of formation marked GW-2, for
12  identification.)
13  BY MR. LIGHTMAN:
14  Q  Mr. Weiss, I'll represent to you that the
15  document marked as Gary Weiss-2, G W-2, is the
16  certificate of formation for A. Solar Diamond, LLC
17  and the certificate of amendment for A. Solar
18  Diamond, LLC.
19        Before we get to this -- well, let's
20  do this now.  This shows the address for A. Solar
21  Diamond, LLC.  Strike that.
22        This shows that this document -- this
23  states that A. Solar Diamond, LLC was duly formed
24  in accordance with New Jersey State Law on June 24,

Page 28

1  2015.  Do you see that?  Very first paragraph?
2  A  Yeah.
3  Q  And the registered agent is your wife, Mirtha
4  Pantoja; correct?
5  A  Yes.
6  Q  And the registered office is 739 Vine Street,
7  Elizabeth, New Jersey; correct?
8  A  Correct.
9  Q  What is 739 Vine Street?
10  A  I used to live there.
11  Q  You used to live there.  Do you still own that
12  property?
13  A  I used to live there.
14  Q  Do you -- did you live there -- you didn't
15  live there as of 2015, did you, or what --
16  A  I lived there 20 --
17  Q  You lived there 2015?
18  A  Yeah.
19  Q  When did you move out of 739 Vine Street?
20  A  I don't remember exactly.  I'm trying to
21  calculate.  Maybe 2018.
22  Q  And did you own 739 Vine Street?
23  A  No.
24  Q  Who owned it?

Page 29

1  A  It used to be Miguel Tixi.  Miguel.  Tixi,
2  T-i-x-i, that was the name.
3  Q  And you paid rent to him?
4  A  Yeah.
5  Q  Who did the formation of this LLC?
6  A  My wife.
7  Q  Did she actually fill out the paperwork and
8  file it with the State of New Jersey?
9  A  Probably I helped her.
10  Q  And did A. Solar Diamond have any addresses --
11  where is A. Solar Diamond based now?
12  A  It does not operate right now.
13  Q  When did it stop operating?
14  A  Sometime in 2017.
15  Q  When -- in 2015 did A. Solar Diamond file tax
16  returns?
17  A  I don't remember.
18  Q  Do you remember if A. Solar Diamond filed any
19  tax returns?
20  A  I don't remember if we filed it separately for
21  A. Solar Diamond.
22  Q  Does your wife, Mirtha, know she's the
23  registered agent of this entity?
24  A  I think she does, yeah.

8 (Pages 26 to 29)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

---

Page 30

1   Q   Who is Mike Wilson?
2   A   **I don't know.**
3   Q   On here it says signatures, Mike Wilson,
4   authorized representative?
5   A   **I have no idea.**
6   Q   You have no idea.  Who were the owners of A.
7   Solar Diamond, LLC?
8   A   **It was registered in Mirtha's name.**
9   Q   So Mirtha's the owner of A. Solar Diamond,
10  LLC?
11  A   **Yeah.**
12  Q   Is there any other owners?
13  A   **No.**
14  Q   This states that Mirtha is the member and
15  manager of A. Solar Diamond when it was formed.  Do
16  you see that under number five?
17  A   **Yeah.**
18  Q   Are there any other members or managers of A.
19  Solar Diamond, LLC?
20  A   **Well, I used to help her with the business,**
21  **yeah.**
22  Q   Were you a member of A. Solar Diamond, LLC?
23  A   **By "member," you mean what?**
24  Q   A --

---

Page 31

1   A   **I'm not registered on papers as member.**
2   Q   So, you just helped her out.  In what capacity
3   did you help her out?  As an employee?
4   A   **No.**
5   Q   Just because --
6   A   **We used to sell jewelry, so...**
7   Q   A. Solar Diamond used to sell jewelry?
8   A   **Yeah.**
9   Q   And you used to help her in those jewelry
10  sales?
11  A   **Yeah.**
12  Q   Did Mirtha ever sell jewelry?
13  A   **Yes.**
14  Q   Does she do now?  Does she sell jewelry now?
15  A   **I don't think so.**
16  Q   When is the last time she sold jewelry?
17  A   **Oh, some years.**
18  Q   Does A. Solar Diamond have any other members
19  or employees or personnel, other than you and your
20  wife?
21  A   **No.**
22  Q   At any time, did it have anything, other than
23  you and your wife?
24  A   **No.**

---

Page 32

1   Q   So it never had employees?
2   A   **No.**
3   Q   Or other personnel, other than you and your
4   wife?
5   A   **Right.**
6   Q   Where did A. Solar Diamond bank when it was
7   operating?
8   A   **Wells Fargo.**
9   Q   It had a Wells Fargo bank account.  And who
10  were the signatory on the -- were you a signatory
11  on the Wells Fargo bank account?
12  A   **I was.**
13  Q   What?
14  A   **I was.**
15  Q   You were.  So, even though you had no official
16  position with A. Solar Diamond, you were signatory
17  to the bank?
18  A   **Yes.**
19  Q   And was your wife a signatory to the bank
20  account?
21  A   **Well, it was opened in her name.  It was of**
22  **this --**
23  Q   Okay.  So, it was opened A. Solar Diamond, LLC
24  and she was authorized signatory and you were an

---

Page 33

1   authorized signatory?
2   A   **Yes.**
3   Q   When Manfred Sternberg transferred 219,000,
4   wired it to you on February 1st, did it go in to
5   the A. Solar Diamond bank account at Wells Fargo?
6   A   **Correct.**
7   Q   Hu?
8   A   **Correct.  Yes.**
9   Q   And the money that Daphna Zekaria wired to
10  you, the three wires she made to you, that went in
11  to the A. Solar Diamond bank account at Wells
12  Fargo?
13  A   **Correct.**
14  Q   Do you have a personal account at Wells Fargo?
15  A   **Yes.**
16  Q   Did any of the money get wired to your
17  personal account?
18  A   **No.**
19  Q   Was A. Solar Diamond involved in any aspect in
20  the test kit transactions of the subject matter of
21  The Safety House complaint?
22  A   **No.**
23  Q   None at all?
24  A   **No.**

---

9 (Pages 30 to 33)

Page 34

1  Q   No, none at all or, no, that is not correct?
2  That is correct or --
3  A   **No. A. Solar Diamond was not involved in your**
4  **question.**
5  Q   The test kit transactions?
6  A   **Yes.**
7  Q   And does A. Solar Diamond have a phone number?
8  A   **No.**
9  Q   And does it have a website address?
10 A   **No.**
11 Q   Does it have an employee identification
12 number?
13 A   **It does.**
14 Q   Does A. Solar Diamond have an accountant?
15 A   **No.**
16 Q   Do you have an accountant?
17 A   **No.**
18 Q   Does your wife have an accountant?
19 A   **No.**
20 Q   Let's talk about -- let's go to the second
21 page of this Gary Weiss-2. It's a certificate of
22 amendment for A. Solar Diamond. If you look at
23 number five it says, this was filed -- if you look
24 at the stamp with the state treasurer on August 11,

Page 35

1  2015; correct? Top right there is a file block
2  right there. Second page. Not the formation.
3  That's it. The amendment. This is a certificate
4  of amendment filed with the state treasurer
5  August 15, 2015; correct?
6  A   **Oh, number five, yes, I see.**
7  Q   And it says, number five -- number five, to
8  add a member Morena Menjibar. Who is Morena
9  Menjibar?
10 A   **Morena Menjibar is a friend of my wife and me.**
11 Q   Just a friend?
12 A   **Yeah.**
13 Q   And she lives at 441 1st Avenue; correct?
14 A   **Correct. Yeah.**
15 Q   That's next door to 437; correct?
16 A   **Yeah.**
17 Q   Is she a young person? An old person?
18 A   **I would say she's about 50 -- yeah. About 50.**
19 **In her 50s.**
20     **MR. LIGHTMAN:** Mark this as Gary
21 Weiss-3, please.
22     (One-page color photograph marked
23 GW-3, for identification.)
24 BY MR. LIGHTMAN:

Page 36

1  Q   I will represent to you, Mr. Weiss, that this
2  is a picture of a posting made by -- made on the
3  Morena Menjibar Facebook page that I looked at
4  yesterday and made a copy of in terms of the
5  exhibit.
6      Do you recognize Morena Menjibar?
7  A   **No.**
8  Q   She's not one of these two people?
9  A   **No.**
10 Q   So even though you made her a member of A.
11 Solar Diamond, you can't recognize her from this
12 picture?
13     **MR. LAVER:** Objection to form.
14     THE WITNESS: Okay. I'm sorry.
15 BY MR. LIGHTMAN:
16 Q   From time to time one of the attorneys may
17 object --
18 A   **I will make it --**
19 Q   Hold on a second. From time to time, one of
20 the attorneys may interpose an objection. Don't
21 let that bother you. Okay?
22 A   **None of this ladies is Morena Menjibar.**
23 **Morena Menjibar is my friend. I know exactly how**
24 **she looks.**

Page 37

1  Q   So none of these pictures is Morena Menjibar?
2  A   **No.**
3  Q   Okay. My bad.
4  A   **So let me put it here. Okay.**
5      **MR. LAVER:** Pardon me. Do you know
6  either of the two individuals in this photo?
7      THE WITNESS: No.
8      **MR. LAVER:** No?
9      THE WITNESS: No. This is none of
10 them is anybody that I know. Okay. So we
11 put this story.
12 BY MR. LIGHTMAN:
13 Q   So why was Morena Menjibar added as a member
14 to A. Solar Diamond in August of 2015?
15 A   **Because Mirtha Pantoja and Morena Menjibar,**
16 **they used to sell jewelry together.**
17 Q   Your wife and Morena?
18 A   **Yes. They friends. Members of the church,**
19 **so...**
20 Q   Who is Imelda Vasquez? If you look at this
21 Gary Weiss-2 at the bottom of the certificate of
22 amendment it says signature name, I-m-e-l-d-a
23 Vasquez, V-a-s-q-u-e-z, authorized representative?
24 A   **I don't know. This is probably the formation.**

10 (Pages 34 to 37)

Page 38

1  Q   You don't know who that is.  Now, let's talk
2  about A. Solar, LLC.  Is it your contention that A.
3  Solar, LLC is an entity separate and apart from A.
4  Solar Diamond, LLC?
5  **A   Can you explain the question, please?**
6  Q   Yes.  You --
7  **A   Can you answer -- ask the question again.**
8  Q   I'll ask it again.
9  **A   Sure.**
10 Q   When we were in court on November 9th in front
11 of Judge Young and we told the judge that we could
12 not find any documents showing that A. Solar, LLC
13 was an entity, but we found documents showing A.
14 Solar Diamond, LLC was an entity, you stood up and
15 swore under oath to Judge Young that A. Solar, LLC
16 was a separate entity separate and apart from A.
17 Solar Diamond, LLC.
18       Do you remember saying that statement
19 under oath?
20 **A   Most likely.  I'm sure that you are not
21 inventing it, so the answer would be yes.**
22 Q   Okay.
23       MR. LIGHTMAN: Can we have this
24 marked as Gary Weiss-4, please.

Page 39

1       (Nine-page photocopy, front and back,
2       of motion to reconsider Court's order
3       allowing plaintiff to amend the caption of
4       their complaint marked GW-4, for
5       identification.)
6       MR. LIGHTMAN: My apologies to
7  counsel for the header not appearing on the
8  top.  For some reason, I don't know why it
9  didn't, but --
10 BY MR. LIGHTMAN:
11 Q   Mr. Weiss, Gary Weiss -- the document marked
12 as Gary Weiss-4 is a filing that your attorney made
13 while you had an attorney ECF 104 filed
14 September 12, 2023.  And this was filed by Rebecca
15 Price.  She was the attorney for you and A. Solar;
16 correct?
17 **A   Correct.**
18 Q   And when she would make filings, she would
19 send you copies of the drafts and say, I would
20 like -- and let you review those before they were
21 filed; correct?
22 **A   Yes.**
23 Q   And if there was something incorrect or you
24 needed to change, you would change that so that the

Page 40

1  information was correct before it was filed; right?
2  **A   I would tell her if something is incorrect.**
3  Q   So your general practice was that you would
4  review drafts of pleadings that she filed while she
5  was your attorney and you would either tell her
6  this is fine or correct it; right?
7  **A   Correct.**
8  Q   And if you look at paragraph 25 of this
9  document, it says, quote, simply put, A. Solar
10 Diamond, LLC and A. Solar, LLC are not the same
11 entity; correct?
12 **A   Correct.**
13 Q   So why did she write that in a pleading that
14 was presented to the judge?
15 **A   She wrote the right thing.  A. Solar Diamond,
16 LLC and A. Solar, LLC is not the same.  It's very
17 clear.**
18 Q   So, you told the judge on November 9th that A.
19 Solar, LLC is a separate entity; correct?  You told
20 Judge Young that A. Solar Diamond, LLC is a
21 separate entity from A. Solar Diamond, LLC;
22 correct?
23 **A   I don't know, but A. Solar, LLC does not
24 exist.**

Page 41

1  Q   It does not exist?
2  **A   I have no knowledge of A. Solar, LLC.**
3  Q   Is there an entity known as A. Solar, LLC or
4  A.SOLAR, LLC?
5  **A   Not that I know.  There is no A.SOLAR, LLC.**
6  Q   So there are no formation documents because
7  that company doesn't exist; right?
8  **A   Again, I am repeating.  A.SOLAR, LLC does not
9  exist, to my knowledge.**
10 Q   Okay.  So, when I ask -- when I refer to A.
11 Solar or A. Solar Diamond in this deposition I will
12 be referring to A. Solar Diamond, LLC.  Okay?
13 **A   I understand.**
14 Q   Let's talk about your first involvement with
15 the I-Health COVID-19 test kit transactions
16 involving safety masks?
17 **A   Is this finished?**
18 Q   Yes.  When were you first contacted to become
19 involved in these transactions?
20 **A   I believe it was the 24th of January 2022.**
21 Q   And who contacted you?
22 **A   Two persons.**
23 Q   Who were they?
24 **A   One by the name of Zadik and one by the name**

11 (Pages 38 to 41)

Page 42

1  of Levon.
2  Q   Z-a --
3  A   Z-a-d-i-k.
4  Q   And what is the second person's name?
5  A   Levon, L-e-v-o-n.
6  Q   And who were they with?
7  A   Who are they with?
8  Q   Yes.  Were they with a company or an entity or
9  just contacted you individually?
10  A   They contacted me.
11  Q   Individually?
12  A   Individually.
13  Q   Who is Zadik's last name?
14  A   I don't know.
15  Q   What is Levon's last name?
16  A   I don't know.
17  Q   Why did they contact you?
18  A   I believe that they were dealing with COVID
19  stuff and they met me and they ask me about -- if I
20  know anybody that deals with that stuff.
21  Q   Okay.  So this is before you knew that Sam
22  Gross was dealing in this?
23  A   Sam Gross told me that he's dealing with that
24  in the middle of 2020.

Page 43

1  Q   '20.  So in the middle of -- even before you
2  became involved with Zadik and Levon, Sam Gross
3  told you mid-2020 that -- what did he tell you in
4  mid-2020?
5  A   He told me that he's doing business with this
6  type of merchandise.
7  Q   Meaning I-COVID test kits?
8  A   Yes.
9  Q   How about masks?
10  A   Everything that has to do with COVID.
11  Q   So PPE, personal protection equipment?
12  A   Everything that has to do with COVID, yeah.
13  Q   And when Sam told you this, was it in a
14  meeting?  Was it in a phone call?
15  A   I believe it was a phone call.
16  Q   And what did he -- did he ask you at that time
17  to become involved in any capacity?
18  A   He ask me if I want to invest money in to
19  buying any material like that like gloves and test
20  kits or whatever.
21  Q   And what did you say?
22  A   I said no thanks.
23  Q   So when did Sam Gross then next contact you?
24  A   It was the year 2000.  I didn't hear from him

Page 44

1  for several months, and I think in December --
2  Q   Of 2020?
3  A   I think.  December or November of 2020.
4  Q   He called you or was it a personal visit or
5  another phone call?
6  A   No.  No.  He called me.
7  Q   And what did -- what happened during that
8  phone call in November, December of 2020?
9  A   He was telling me about stories about issues
10  that he has with his wife and things like that.
11  Q   How did the subject of test kits or --
12  A   Didn't come up.
13  Q   This conversation in November, December was
14  just about his wife?
15  A   Yeah.  His wife.  And he told me that he has
16  to go to court and he has cases against him and
17  things like that.
18  Q   And what kind of case?  Did you ask him what
19  kind of cases?
20  A   He told me that somebody is accusing him of
21  taking a diamond and not paying for it.
22  Q   That's the criminal case pending in New York?
23  A   Yeah.
24  Q   During that phone call, November or December,

Page 45

1  did he mention anything to you about test kits?
2  A   No.
3  Q   When was the next time you -- when was the
4  first time you spoke to Sam Gross involving sales
5  of test kits?
6  A   On the 24th.
7  Q   The 24th of January?
8  A   Yeah.  I called him.
9  Q   And what did you say to him?
10  A   I ask him if he still in the business of test
11  kits.
12          MR. LAVER:  What year?
13          THE WITNESS:  2022.
14  BY MR. LIGHTMAN:
15  Q   And was this before or after the phone call
16  from Zadik and Levon?
17  A   No.
18  Q   Before or after?
19  A   Zadik and Levon was not phone call.
20  Q   What was it?
21  A   Zadik and Levon was a personal meeting.
22  Q   Oh.  Where was that personal meeting?
23  A   It was in a coffee shop that is called Pret.
24  I don't remember the full name, but they have more

12 (Pages 42 to 45)

Page 46

1  stores in Manhattan and the store is on 6th Avenue
2  between 47 and 48. P-r-e-t. Munger or Manger.
3  M-a-n-g-e-r, I believe that's Manger.
4  Q  Was that before, that coffee shop meeting was
5  that before or after your phone call with Sam?
6  A  No. The coffee shop is where I made the
7  stupid -- you ask me if they called me. No. They
8  did not call me. They met me in the coffee shop.
9  Q  Was your meeting in the coffee shop with Zadik
10  and Levon before or after you spoke to Sam?
11  A  No. That was in January of '24.
12  Q  You said on January 24 you had a meeting?
13  A  Of 2022.
14  Q  In 2022 you had a meeting with these people in
15  a coffee shop?
16  A  Yes.
17  Q  And you also said that Sam Gross spoke to you
18  on January 24, 2022?
19  A  I called him.
20  Q  Did you call him before or after this meeting?
21  A  After the meeting.
22  Q  So you met with Zadik and Levon at the coffee
23  shop; right?
24  A  Yes.

Page 47

1  Q  And what was discussed in that meeting at the
2  coffee shop?
3  A  Well, they said that they have kits.
4  Q  I-COVID test kits. I-Health I-COVID test
5  kits?
6  A  I don't remember what they used exactly the
7  language, but it was test kits.
8  Q  And how did Zadik and Levon contact you? Did
9  they have your phone numbers?
10  A  No. They met me in the coffee shop.
11  Q  You just ran into them in the coffee shop or
12  was the meeting prearranged?
13  A  I ran into them, but I have seen them there
14  before and that's the place where we hang out
15  sometimes when we have coffee.
16  Q  So this wasn't a prearranged meeting. You
17  just met them there; right?
18  A  Exactly.
19  Q  When they said to you, they have these test
20  kits, what did you say to them?
21  A  I said, I may know somebody that can use it.
22  Q  And how did the -- what else happened at that
23  meeting?
24  A  I called Sam and he said that he has an order.

Page 48

1  Q  Well, wait. Stop. Before the meeting ended,
2  did you say to Zadik and Levon give me a phone
3  number or an e-mail? How can I get in touch with
4  you?
5  A  No. No. No. No. They were sitting there.
6  Q  Right. You called Sam from the coffee shop?
7  A  I saw -- I called Sam from the coffee shop.
8  Q  So, while you are meeting with Zadik and Levon
9  in the coffee shop when they said, are you
10  interested in test kits, you said I may know
11  someone who is interested in this. You called Sam
12  Gross from the coffee shop with Zadik and Levon
13  there; correct?
14  A  Yes.
15  Q  Do you have Zadik or Levon's phone numbers?
16  A  I think I do.
17  Q  Can you take out your cell phone and see if
18  you can give them to me?
19  A  Yeah.
20  Q  All right.
21  A  I am not sure this is their phone number.
22  Okay. 201-575-0193.
23  Q  Can I see the screen that you are looking at,
24  please?

Page 49

1  A  (Witness complies with request.)
2  Q  Is Levon and Zadik. You have it as Levon and
3  Zadik; right?
4  A  Right.
5  Q  Is that one person?
6  A  No.
7  Q  And it shows that you last or recent it shows
8  your last phone call to them was December 8, 2023.
9  Do you see that?
10  A  Right.
11  Q  And before that it was August 27, 2023?
12  A  Right.
13  Q  So you're in a coffee shop. They're telling
14  you about this. You call Sam Gross and say what to
15  him? What do you say to Sam?
16  A  Sam, are you in this business still and
17  buying. And he said, yeah, of course.
18  Q  And tell me what happened during the phone
19  call.
20  A  He says, yes, I can use. I ask him how much.
21  And he says, I have a lot of customers.
22  Q  Did he tell you how many?
23  A  He said, I need several hundred thousand.
24  Q  Sam Gross tells you he needs several hundred

13 (Pages 46 to 49)

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.      Friday
No. 2:22-CV-0688 (JMY)          Deposition of Gary Weiss          February 16, 2024

---

Page 50

1  thousand and you say to Levon or Zadik, I have a
2  guy here who is interested in buying several
3  hundred thousand; right?
4  **A   I told them that I could use several hundred**
5  **thousand if they can get it for me.**
6  Q   What did they say?
7  **A   Yeah. They had it.**
8  Q   And then what else happened after they said
9  that?
10  **A   I asked them how much.**
11  Q   You ask Levon and Zadik how much?
12  **A   Yeah.**
13  Q   And what did they say?
14  **A   They said that we will work out a deal.**
15  **That's what they said.**
16  Q   When you said how much, were you referring to
17  quantity or price?
18  **A   No. Price.**
19  Q   And did they give you a ballpark figure or a
20  range or --
21  **A   No.**
22  Q   They said, we will work it out; right?
23  **A   We will work it out, right.**
24  Q   Was this Sam on the phone during this

Page 51

1  conversation?
2  **A   I called him I think again or would have -- I**
3  **said, Sam, how much do you want to pay for it. And**
4  **he mentioned something around $5 a test kit.**
5  Q   And then what else happened during that phone
6  call?
7  **A   I told him, they said it's too little.**
8  Q   So they were still there when you are talking
9  to Sam; right?
10  **A   Yeah.**
11  Q   So they say we can work it out. You call Sam.
12  Sam says $5. They said that's too little. And
13  then what happens?
14  **A   And they wanted more.**
15  Q   And what was the price that was agreed upon?
16  **A   Eventually we agreed something in the range --**
17  **I told Sam, first of all, I talk to him later. Let**
18  **me work it out here. I started to negotiate with**
19  **them. And then I asked them, can I see the test**
20  **kits. They said, yeah. I can show it to you. I**
21  **said, okay. Where are they? And they said, you'll**
22  **see them soon. Do you want to see it now? I said,**
23  **yeah. And they took me to a truck in an hour,**
24  **something like an hour after that, and the truck**

Page 52

1  was full of boxes.
2  Q   What boxes were they?
3  **A   I don't know, but I -- I opened one of the**
4  **boxes and was test kits.**
5  Q   What color was the box?
6  **A   I think -- I think they are orange or**
7  **something like that.**
8  Q   Okay. So you open the box, saw a test kit.
9  And then when was the price agreed upon?
10  **A   I'm trying to remember when.**
11  Q   Go back. Where was the truck?
12  **A   48th Street between 6th Avenue to 5th Avenue**
13  **on the south side of the street on the right side**
14  **of the street.**
15  Q   How big was the truck?
16  **A   Big.**
17  Q   And who's truck was it?
18  **A   I don't know.**
19  Q   So they opened the truck. They showed you all
20  these test kits. You opened one of them?
21  **A   I opened only one box, yes.**
22  Q   And then what happened?
23  **A   I told them we will negotiate about a price.**
24  Q   And when did you get the phone number, the 201

Page 53

1  phone number?
2  **A   I don't remember. I don't remember. That's**
3  **what I had noted and I just don't remember when I**
4  **get this phone number.**
5  Q   So when was the price finally agreed upon?
6  **A   I think we agreed later on that day.**
7  Q   How much was the price? $6?
8  **A   No. I think it was a little bit less than $5,**
9  **I think.**
10  Q   So initially when Sam said, I would like $5,
11  they said it was too little. They then turned
12  around and gave you a price less than $5?
13  **A   Yes.**
14  Q   What was the price?
15  **A   I believe it was 4.75, something like that.**
16  Q   Why would they agree to a price less than $5
17  when they first told you that --
18  **A   I don't know. They negotiate.**
19  Q   You must be a very good negotiator.
20  **A   No. They wanted to sell. I wanted to buy.**
21  Q   When is the next time you contacted Sam about
22  that?
23  **A   That day.**
24  Q   Same day?

14 (Pages 50 to 53)

Page 54

1    A   Same day.
2    Q   What did you say to Sam when you talked to
3    him?
4    A   I don't remember any more.
5        MR. LAVER:  Excuse me.  We are still
6    on January 24, 2022?
7        THE WITNESS:  Yeah.
8        MR. LAVER:  Okay.  Thank you.
9    BY MR. LIGHTMAN:
10   Q   So when you talk to Sam --
11   A   Yeah.
12   Q   -- did you tell Sam 4.75 or did you tell him
13   $6?
14   A   No.  I -- I started with seven and Sam went
15   down I think to six.  We agreed on six or something
16   like that.
17   Q   So, when you called Sam back, you said I can
18   get these test kits for you for $6 a box.  You
19   didn't tell him that you were buying them for 4.75;
20   correct?
21   A   He didn't ask me really.
22   Q   And you didn't tell him; right?
23   A   (Shakes head from side to side.)
24   Q   You can't shake your head.  You have to say

Page 55

1    yes or no.  Is it true you didn't tell him?
2    A   I don't know what I told him about what price
3    I buy, you know.
4    Q   So you and Sam agreed on $6 a box; right?
5    A   Yes.
6    Q   And how many test kits did Levon and Zadik say
7    they can get for you?
8    A   They said they can get about 400,000.
9    Q   Did you tell that to Sam?
10   A   I don't remember if I told him.
11   Q   And Sam said, I'll take them all?
12   A   No.  I don't remember that.  No.
13   Q   When was the first time that the same Manfred
14   Sternberg surfaced?
15   A   I don't remember.  Sometime after that.  I'm
16   trying to think about the date.  Must have been few
17   days after that.
18   Q   Okay.  And how -- how did his name come in
19   to --
20   A   I don't know yet.
21   Q   When is the --
22   A   I'm trying think when it came up.  Must be a
23   day or two after that.
24   Q   Okay.  And when is the first -- so you spoke

Page 56

1    to Sam and you had these conversations with Levon
2    and Zadik, saw a truck filled with boxes, saw an
3    actual I-Health COVID-19 test kit.  Talked to --
4    negotiated a price of 4.75 with Levon and Zadik.
5    Called Sam and negotiated a price of $6 with Sam
6    all on January 24th?
7    A   I don't remember when was the last time I
8    negotiated with Sam about the price.  I know that I
9    closed with those two guys for 4.75.
10   Q   So a day or two after that you spoke to
11   Manfred?
12       MR. LAVER:  Objection to form.
13       THE WITNESS:  No.  I did not speak
14   to Manfred.  I heard the name Manfred.
15   BY MR. LIGHTMAN:
16   Q   From Sam?
17   A   From Sam.
18   Q   And what did Sam tell you about Manfred?
19   A   That Manfred is his lawyer.
20   Q   And what else was discussed?
21   A   I didn't ask.
22   Q   So, after you and Sam agreed upon $6 a box,
23   how many boxes of test kits did he say he wanted?
24   A   Sam told me that he want something like

Page 57

1    400,000.  I have to look in my memory and remember.
2    Something around 400,000.
3    Q   Okay.  Who did you end up purchasing the test
4    kits from?
5    A   From these two gentlemen.
6    Q   Individually?
7    A   What do you mean by "individually?"
8    Q   Did they sell you the test kits
9    individually -- let me make it -- I'll make it
10   easier.
11   A   Yeah.  Okay.
12       MR. LIGHTMAN:  I will have this
13   marked as five.
14       (One-page photocopy of letter dated
15   2/6/22 marked GW-5, for identification.)
16   BY MR. LIGHTMAN:
17   Q   Tell me what the document marked as Gary
18   Weiss-5 is.
19   A   It's a receipt that they gave me.
20   Q   Who is "they"?  Zadik and --
21   A   Zadik and Levon.
22   Q   So you don't know who -- Zadik's last name?
23   A   No.
24   Q   You don't know Levon's last name?

15 (Pages 54 to 57)

Page 58

1  A   No.
2  Q   Do you have an e-mail for them?
3  A   No.
4  Q   Do you have an address for them?
5  A   No.
6  Q   So all you have for Zadik and Levon is this
7  201 phone number; correct?
8  A   Yes.
9  Q   And just on the basis of the meeting in the
10  coffee shop and this phone number, you agreed to
11  buy 365,790 COVID-19 test kits I-Health at 4.95
12  each?
13  A   So it's 4.95 each, yeah.
14  Q   That was the price?
15  A   Yes.
16  Q   And before you -- and it says total paid cash
17  in merchandise, $1,810,660 U.S. dollars; right?
18  A   Yes.
19  Q   And it says, final sale; right?
20  A   Yes.
21  Q   And below the word final sale is your
22  signature; right?
23  A   Correct.
24  Q   And then there is numbers 02281951. Do you

Page 59

1  see that?
2  A   Yes.
3  Q   That's a pretty good guess of me that that was
4  your birthday, hu?
5  A   I didn't think about it.
6  Q   Why did you put your birthday down there?
7  A   I think one of them asked me to put it.
8  Q   And on the right, who is the writing on the
9  right?
10  A   One says Z, so I have to guess that Zadik was
11  the Z and the L.
12  Q   That is Zadik and Levon?
13  A   Yes.
14  Q   Where was this document signed?
15  A   This was signed in Elizabeth, New Jersey.
16  Q   On February 6th?
17  A   On February 6th.
18  Q   And they came down and presented you with
19  this?
20  A   I asked them --
21  Q   For a receipt?
22  A   -- for a receipt to bring with them a receipt
23  that I'm buying it.
24  Q   Before we get to this, you had conversation --

Page 60

1  did you have conversations with Sam Gross and/or
2  Manfred Sternberg regarding how they were going to
3  pay you for the kits you were selling them at $6?
4       MR. LAVER:  Objection to form.
5       THE WITNESS:  This is February 6th?
6  BY MR. LIGHTMAN:
7  Q   Right.
8  A   I started with Sam on the 24th.
9  Q   Of January?
10  A   Yeah.  We had a lot of conversations.
11  Q   Tell me those conversations.
12  A   I cannot tell you.
13  Q   Well, before -- when is the first time you
14  spoke to Manfred Sternberg?
15  A   Verbally?
16  Q   Yes.  How soon in relation to January 24th did
17  you speak to him?
18  A   I'm trying to think if I ever spoke to
19  Mr. Manfred altogether verbally on the phone or
20  anything.
21  Q   Before this February 6th; right?
22  A   No.  At any time.  I don't remember ever
23  speaking to Mr. Manfred.
24  Q   Really?

Page 61

1  A   Really.
2  Q   How did it -- how did Sam make arrangements
3  with you for him to pay you for the kits he was
4  buying?
5  A   I don't know what he does for arrangements.
6  Q   So it's your testimony you went out and paid
7  someone a million eight in cash and merchandise for
8  test kits without figuring out how you were going
9  to get paid from Sam for them?  Tell me the
10  transaction.
11  A   You are putting it --
12  Q   Putting the cart before the horse?
13  A   We said that we start to on the 24th.
14  Q   Right.
15  A   And we ended the last payment --
16  Q   In February?
17  A   -- on the delivery is in February, so many
18  days before and Sam made the arrangements.
19  Q   What arrangements were made?
20  A   That I would get paid.
21  Q   How were those arrangements made?
22  A   Okay.  So he told me that he's going to buy.
23  Q   All of these test kits?
24  A   Yeah.  And he gave me a list the next day or

Page 62

1   he sent me a list through text or e-mail or
2   whatever about the numbers of test kits that he
3   will need or have an order for.
4   Q   I would like to show you what was previously
5   marked as Manfred Sternberg Deposition Exhibit-24.
6   A   Okay. Exactly.
7   Q   That's the list that he provided to you?
8   A   That's what we sent me.
9   Q   He meaning Sam?
10  A   I don't -- I don't know if this is the only
11  one, but they look like that.
12  Q   If you look at the bottom, it says, total kits
13  $365,320?
14  A   Yes.
15  Q   And, if you look at your Mask and Eldiven
16  receipt, it's 365,790. Do you see that?
17  A   Yes.
18  Q   Why is there an extra 400 and --
19  A   No. This is what I bought from them.
20  Q   Why did you buy an extra 460 --
21  A   I didn't buy. That was the deal. That's what
22  they're selling, the whole number.
23  Q   So one whole lot?
24  A   Yeah. One whole lot. That's what they had

Page 63

1   and I wanted to buy the whole lot from them. They
2   didn't want to sell less. That's what it is. As
3   far as your question with arranging payments, you
4   were there. Right? You ask how.
5   Q   Yes. Let's talk about that.
6   A   Okay. So Sam told me that he is going to pay
7   me. I said, okay. So how are we going to work it
8   out, you know. He told me, I'm going to have
9   arrangements for you and can you send me like an
10  invoice.
11          MR. LAVER: Did you complete your
12  answer?
13  BY MR. LIGHTMAN:
14  Q   Keep going.
15  A   No, not yet.
16  Q   Keep going.
17  A   Based on the numbers which I don't think this
18  was the first number that they gave me on the
19  number of kits that he wants.
20  Q   Was that the final number?
21  A   This is the final number.
22  Q   Okay. So he gave you a different number first
23  and keep going on your answer.
24  A   I think he gave me different numbers, so it

Page 64

1   kept on changing several times that I know for sure
2   and also this names kept on changing sometimes.
3   You have one, two, three, four, five, six. Again,
4   one, two, three, four, five, six. So this is not
5   like --
6   Q   It kept changing. This became the final list
7   that Sam wanted?
8   A   I'm not sure now that this is the final list.
9   Q   Okay.
10  A   I have to look in my final list.
11  Q   Your list. So Sam said, give you an invoice;
12  right?
13  A   This was like a list of kits that he needs,
14  that he presented to me. Okay.
15  Q   And then you said he said send me an invoice;
16  right?
17  A   Yeah. Send me an invoice.
18  Q   Well, hold on. Let's stop there. Let's mark
19  this as Gary Weiss-6.
20          (One-page photocopy of invoice marked
21  GW-6, for identification.)
22  BY MR. LIGHTMAN:
23  Q   Gary Weiss-6 is the invoice you then sent to
24  Sam after he requested one?

Page 65

1   A   Excuse me?
2   Q   This document marked as Gary Weiss-6 is the
3   invoice that you sent to Sam when he said send me
4   an invoice?
5   A   It may have been one of them.
6   Q   Okay.
7          MR. LAVER: Let's go off the record
8   a second, Gary. I need to talk to you a
9   minute.
10          - - -
11          (Discussion off the record.)
12          - - -
13  BY MR. LIGHTMAN:
14  Q   So, if you take this Deposition Exhibit
15  Manfred-24 and put it next to Gary Weiss-6, the
16  test kit delivery addresses that Sam gave you match
17  the numbers set forth in your invoice to him that
18  you sent him; correct? If you look, it says,
19  nationwide medical services 15,120. There is a
20  line item number two here for 5,200. Do you see
21  that? The first item on Exhibit-24 for 15,120 is
22  close enough -- is --
23  A   Not close enough. Where is the number 15,200?
24  Q   Right. On number -- the second line item on

17 (Pages 62 to 65)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)            Deposition of Gary Weiss            February 16, 2024

---

Page 66

1  your bill?
2  **A   In document six; right?**
3  Q   On document six you have 15,200.  Do you see
4  that?
5  **A   Yes.  15,200.**
6  Q   If you look at the second item on Exhibit-24
7  you have 181,440 test kits?
8  **A   Mr. Lightman, don't confuse me.  Where is**
9  **15,200 on this document?  We are trying to match it**
10  **up?**
11  Q   It's not.  Ones says 15,120 --
12  **A   So it's not.**
13  Q   Well, look, I read it -- let's do this.
14  **A   Can you say that again to me.  It's not so**
15  **please.**
16  Q   If you look at the top number, it says on --
17  if you look at the bottom number on Exhibit-24 it
18  says, 365,320.  Right.  If you look at the top
19  number on Gary Weiss-6 it says 355,200; correct?
20  **A   Correct.**
21  Q   Those numbers match up; right?
22  **A   No.  They don't match.  355 and 365, no.**
23  Q   I'm sorry.  You are saying this purchase order
24  is for an extra 10,000 kits over and above what

---

Page 67

1  Gary -- what Sam Gross sent to you; correct?
2  **A   This is not an order.**
3  Q   This is a bill.  It says bill to Charlton
4  Holding Group; correct?
5  **A   No.  It does not say bill.  It does not say a**
6  **bill.  I don't see here the word bill, so please**
7  **let's be correct, please.**
8  Q   It says invoice number; correct?  Invoice
9  number?
10  **A   Correct.**
11  Q   Invoice number three; correct?
12  **A   Correct.  So it's not a bill, please.**
13  Q   Right above Charlton Holding Group it says,
14  bill to; correct?
15  **A   Yes.  You are billing to and this is the**
16  **invoice.**
17  Q   So this is an invoice that you sent to Sam
18  when Sam said send me an invoice?
19  **A   Yes.**
20  Q   You sent him an invoice saying I want you to
21  pay me $2,131,200?
22  **A   That's correct.  That's what it says.**
23  Q   For 365,200 test kits?
24  **A   Right.  We read this very correctly.**

---

Page 68

1  **Everything is written here.  My contention is that**
2  **it does not match this paper.  That's all I'm**
3  **trying to say.**
4  Q   I understand.
5  **A   You understand.  It's black and white.**
6  Q   The delivery address list that Sam gave you is
7  for an extra 10,000 test kits over and above your
8  invoice to him; correct?
9  **A   The conclusion would be that it's not the**
10  **same.  Okay.  What is the number above or beyond or**
11  **under, it doesn't matter.  It does not match.**
12  Q   Okay.  But Sam agreed to pay you this invoice?
13  Gary Weiss-6?
14  **A   No.  He did not agree at this point.  This was**
15  **done -- this invoice is done on the date -- invoice**
16  **date is when?  26.**
17  Q   January 26?
18  **A   Let's not get confused here.  Right.  That's**
19  **two days after I met with Levon and Zadik and Sam**
20  **Gross asked me for an invoice and this is the**
21  **invoice I sent him on 26 of January 2022.**
22  Q   Okay.
23  **A   Let's do this correctly.**
24  Q   So Gary Weiss-6 was the invoice you sent him

---

Page 69

1  on January 26?
2  **A   Exactly.**
3  Q   For the test kits you were selling him;
4  correct?
5  **A   Yeah.  This was a proposal invoice.  Right.**
6  Q   And if you look up top, who's the person
7  sending this invoice?
8  **A   It says A. Solar, LLC.**
9  Q   An entity that you admitted a little while ago
10  doesn't exist?
11  **A   Exactly.**
12  Q   Why are you using an A. Solar name to bill
13  Gary Weiss when A. Solar does not exist?
14  **A   Because I wanted to create this entity for**
15  **this transaction.**
16  Q   But you never did create the entity?
17  **A   I didn't have time to do that, no.**
18  Q   When you didn't have time it takes to pick up
19  the phone, call someone and you can form an entity.
20  You are aware of that?
21  **A   No.**
22  Q   So why didn't you have time?
23  **A   Things were rolling.  I was not sure that I'm**
24  **going to get paid yet.  I didn't see any money yet**

---

18 (Pages 66 to 69)

Page 70

1  and he asked me to send him a proposal invoice so
2  he can get for me a deposit.
3      Q    And how much was the initial deposit supposed
4  to be?
5      A    Ten percent from this amount.
6      Q    So that would be -- it was supposed to be a
7  deposit payment made; right?
8      A    Supposed to be a deposit in order for me to
9  proceed with the purchase on my side.
10     Q    Okay.  And who was going to make that deposit
11  to you?
12     A    He told me that funds would be sent through
13  his lawyer into the account that I designated.
14     Q    And you designated for the deposit the Gary
15  Weiss A. Solar Diamond, LLC account at Wells Fargo
16  Bank?
17     A    I designated the A. Solar Diamond, LLC.
18     Q    So, if it was A. Solar Diamond, why didn't you
19  use A. Solar Diamond as the name on this bill?
20     A    I did not want to do business through A. Solar
21  Diamond.  I wanted to do it through a separate
22  entity which I wanted designation as A. Solar, LLC.
23     Q    But that never happened; right?
24     A    That never happened.

Page 71

1      Q    And the money that was sent came to A. Solar
2  Diamond; correct?
3      A    Exactly.
4      Q    So tell me, this invoice, you're sure you sent
5  this to him on January 26th?
6      A    Absolutely sure.
7      Q    Well, look at the bottom.  How could you send
8  him an invoice dated January 26th where it says at
9  the bottom under notes and terms, payment of
10  $2,131,200 total, a deposit payment of 200 --
11     A    I see.
12     Q    Let me read it into the record.  A deposit
13  payment of $219,240 was made on February 1, 2022,
14  by Manfred Sternberg, Junior, attorney at law, SRF,
15  a balance of $1,911,940 payment required to ship.
16  The balance will be made to attorneys escrow
17  account Sokolski and Zekaria.  It lists a Broadway
18  Street address, account number, routing number and
19  everything else.  So how is it you sent Gary Weiss
20  an invoice dated January 26th and in here you put a
21  payment that's made?
22     A    I don't know.
23     Q    You don't know?
24     A    I don't know.  I see it.  I see it.

Page 72

1      Q    So, if you look at the bottom where it says
2  note and payment terms, did you get the deposit
3  wired to you of $219,240?
4      A    Yeah.
5      Q    That was made on February 1st?
6      A    On February 1st.
7      Q    And that was made by a wire from Manfred
8  Sternberg's attorney escrow account to the A. Solar
9  Diamond account at Wells Fargo; correct?
10     A    Correct.
11     Q    And how did that come into being?  Who
12  arranged for that?
13     A    Sam.
14     Q    Sam arranged for that.  Okay.  And let me go
15  back to this.  Before you paid for this -- strike
16  that.
17          Before Sam Gross wired you the
18  219,000, did he come and look at any of the test
19  kits?
20     A    No.
21     Q    Did he ever come and look at any of the test
22  kits?
23     A    No.
24     Q    Before the $219,604 and -- $240 was wired in

Page 73

1  to your A. Solar Diamond account at Wells Fargo,
2  did you look at the test kits you were buying,
3  other than that one time when you went and saw a
4  truck and picked one up?
5      A    I opened one box on that day.
6      Q    On January 24th?
7      A    Yeah.
8      Q    After that at any time did you see the test
9  kits?  Sorry.  Before you went up and actually took
10  possession of them, from the time you opened that
11  one box until the time February 6th when you went
12  and signed this and got the kits, did you look at
13  any of the test kits?
14     A    Yes.
15     Q    When did you do that?
16     A    The Friday before the --
17     Q    The Friday before February 6, 2022?
18     A    What?  Friday I think -- one second.
19  February.  February 6th was probably on a Sunday.
20     Q    Yes.
21     A    Was it?
22     Q    February 6, 2020, was a Sunday?
23     A    The Friday -- the Friday -- so what date it
24  is?

19 (Pages 70 to 73)

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.                    Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                          February 16, 2024

Page 74

1  Q   February 4th?
2  A   **February 4th.**
3  Q   Is a Friday.
4  A   **I saw it.**
5  Q   So you went to 2 West 42nd --
6  A   **No. They came to Elizabeth with the truck.**
7  Q   They came -- so Zadik and Levon came to
8  Elizabeth, New Jersey with a truck containing
9  365,790 COVID-19 test kits?
10 A   **Yes.**
11 Q   And when they came, they came on when?
12 February 6?
13 A   **On February 6, yes.**
14 Q   So, they came on February 6th with a truck.
15 They drove it to your house at -- on 1st Street?
16 A   **I met them on -- it's 5th -- 5th Street.**
17 Q   In Elizabeth?
18 A   **5th Street on the corner of 4th or 5th Avenue.**
19 **I'm trying to remember. There is a little park**
20 **there on the corner.**
21 Q   In Elizabeth?
22 A   **In Elizabeth.**
23 Q   So did you come alone?
24 A   **Yes.**

Page 75

1  Q   And it was just Zadik and Levon?
2  A   **Zadik and Levon in one car and the truck**
3  **separately.**
4  Q   Who drove the truck?
5  A   **I don't know. Somebody drove it.**
6  Q   So tell me what happened. You met them on
7  February 6th.
8  A   **I met them. I looked. They opened the truck.**
9  **I looked at the five or six boxes and they all**
10 **looked like full of this orange and white boxes**
11 **written --**
12 Q   Were they packaged in I-Health boxes?
13 A   **No.**
14 Q   How were they packaged?
15 A   **I don't remember the type of boxes they were**
16 **packaged.**
17 Q   Were they Home Depot boxes?
18 A   **Home Depot and others.**
19 Q   So Home Depot.
20 A   **I don't remember. This size boxes.**
21 Q   Okay. How big was the truck?
22 A   **I would say -- well, at least this room, the**
23 **length.**
24 Q   So a long truck, like a tractor-trailer truck;

Page 76

1  right?
2  A   **A long truck.**
3  Q   And you don't know who was driving?
4  A   **No.**
5  Q   So you met them. Right. And then tell me
6  what happened at the meeting. You look at five
7  boxes or so; right?
8  A   **I went through a few boxes and I think I**
9  **counted like how many boxes it was like about five**
10 **or six high. I don't remember and how many --**
11 **estimated how much it is, you know. And I believed**
12 **their numbers to be correct.**
13 Q   How were you able to go -- was the truck
14 filled with the boxes?
15 A   **No. The truck had like in the middle like a**
16 **little island, so you could pass just about one**
17 **person and the boxes on both sides.**
18 Q   Did you go into the truck?
19 A   **Oh, I climbed up, and I went in the truck. I**
20 **opened some boxes.**
21 Q   And you went in and counted the number and the
22 rows and the length and estimated?
23 A   **Yes. It looked like it's correct. Okay.**
24 Q   And then what happened?

Page 77

1  A   **And then we finished the deal.**
2  Q   You signed this document at the time?
3  A   **No.**
4  Q   When was this document signed?
5  A   **This diamond -- this document was signed on**
6  **Sunday.**
7  Q   The 6th?
8  A   **On the 6th. Yeah. We are talking about**
9  **Friday.**
10 Q   The 4th?
11 A   **Friday, the 4th.**
12 Q   So Friday, the 4th, they delivered this truck
13 to you?
14 A   **Exactly. They came again to show me the**
15 **truck.**
16 Q   And at that time, is that when you paid them
17 the cash and merchandise for the stuff?
18 A   **At that time I gave them a deposit.**
19 Q   How much did you give them?
20 A   **50,000.**
21 Q   And what did they do with the merchandise?
22 A   **They kept it.**
23 Q   So you looked at it. You estimated it was
24 right?

Page 78

1   A   Right.
2   Q   You gave them 50,000 and then they drove away;
3   right?
4   A   Yes.
5   Q   And that was Friday, the 4th; right?
6   A   Friday, the 4th.
7   Q   And this document, this Gary Weiss-6, sale
8   document from Mask and Eldiven signed by you and
9   Zadik and Levon was signed on that Sunday, the 6th;
10  right?
11  A   Yes.  I asked them to give me a receipt for
12  what I'm paying.
13  Q   So they brought the truck and the merchandise
14  back down to you on the 6th?
15  A   They -- I met them on the 6th and I looked
16  again at the truck and we finished the transaction.
17  Q   So you signed this document; right?
18  A   Yes.
19  Q   Was it signed -- when they brought the truck
20  back on the 6th, was it the same park that they met
21  you at the first time?
22  A   Same.  Same.  Everything the same.
23  Q   So you gave them a $50,000 deposit.  Why not
24  just give them the cash and merchandise on the 4th

Page 79

1   when they brought the truck down?
2   A   Because I did not need it yet.
3   Q   You did not need it yet or you didn't have the
4   rest of the funds yet?
5   A   I didn't have the rest of the money from Sam.
6   Q   So Sam had made a $219,000 deposit to you on
7   February 1st through the wire transfer from Manfred
8   Sternberg to A. Solar Diamond?
9   A   Yes.
10  Q   Did you take 50,000 of that money out of your
11  A. Solar Diamond account to pay to these guys?
12  A   No.  I had 50,000 cash.
13  Q   Really.  Where did you get that 50,000 from?
14  A   I don't know what kind of questions you are
15  asking.  I said, I have $50,000.
16  Q   Where did you get the 50,000 from?
17  A   That's none of your business.  It's not.
18  Q   I'm asking the questions.  So you're claiming
19  that you appeared on Friday, the 4th.  Was it a
20  suitcase with 50,000 in cash?
21  A   Not suitcase.
22  Q   What was it?
23  A   Just an envelope.
24  Q   You had one envelope containing $50,000 cash.

Page 80

1   Hundred dollar bills?
2   A   Yeah.
3   Q   And did you withdraw that money from the A.
4   Solar Diamond account?
5   A   No.
6   Q   Did you have it in your -- at home under your
7   mattress?
8   A   No.
9   Q   Did you have it in a safe deposit box?
10  A   No.
11  Q   Where did you accumulate $50,000 to pay them?
12  A   I have it.
13  Q   Where?
14  A   In my drawer.
15  Q   In your home at -- on Elizabeth Avenue at 437
16  1st Avenue you had a drawer containing 50,000 in
17  cash?
18  A   Yes.
19  Q   Any more money in cash there?
20  A   Yeah.
21  Q   How much money was in the drawer when you took
22  50,000 out?
23  A   None of your business.
24  Q   More than 50,000?

Page 81

1   A   If it was money more, I took 50 and there is
2   money, so there is money more.
3   Q   More than half a million?
4   A   No.
5   Q   More than a hundred thousand?
6   A   I think it's none of your business at this
7   point.
8   Q   Where did you get the 50 -- the 50,000 that
9   you took, where did that money come in from?  Was
10  it from a bank?  Was it from jewelry transactions?
11  What was the 50,000 you gave them?
12  A   It's from sales of jewelry over the years.
13  Q   Did you pay taxes on those jewelry sales?
14  A   Did I tell you that it was earned income or
15  something?
16      MR. LAVER:  Before we go forward,
17  can I just clarify one point, Gary, before we
18  go forward?
19      THE WITNESS:  Yeah.
20      MR. LAVER:  You met on February 4th.
21  You met again on February 6; is that right?
22      THE WITNESS:  Correct.
23      MR. LAVER:  When did you hand over
24  the $50,000?  Was that the 4th or the 6th?

21 (Pages 78 to 81)

## Page 82

1      THE WITNESS:  On the Friday.  On the
2  Friday.
3      **MR. LAVER:**  So that's the 4th.
4      THE WITNESS:  The 4th.
5  BY MR. LIGHTMAN:
6  Q   On the 6th you paid him the balance of the
7  million eight; right?
8  **A   Yes.**
9  Q   How much in cash did you give them?
10 **A   I gave them altogether $400,000 in cash.**
11     **MR. HEALEY:**  You paid the balance of
12     the -- what did you say?  The balance of a
13     million eight.
14 BY MR. LIGHTMAN:
15 Q   It says, the total paid cash and merchandise
16 $1,810,660.  So you gave them a total of 400,000
17 cash; right?  And you gave them merchandise of
18 $1,410,660; right?
19 **A   Correct.**
20 Q   What kind of merchandise?
21 **A   Gold necklaces with diamonds.**
22 Q   How many?
23 **A   There were ten sets.**
24 Q   What else was the merchandise?

## Page 83

1  **A   That's -- that's what it was.**
2  Q   And when you gave them -- you signed this
3  document then.  They gave you or you gave them a
4  total of 400.  You gave them another 350,000 in
5  cash; correct?
6  **A   Correct.**
7  Q   You didn't take the 350,000 in cash out of the
8  money that Sam or Manfred wired you.  You went in
9  to your drawer again and took 350,000 cash?
10 **A   Correct.**
11 Q   And you also gave them merchandise of a
12 million four; right?
13 **A   Correct.**
14 Q   How did they know the million and four
15 merchandise was real diamonds and jewels?
16 **A   That's -- they're in business of jewelry for**
17 **over 30 years.**
18 Q   How long have you known Zadik and Levon?
19 **A   Probably over 25 years.**
20 Q   Really.  Have you done business with them
21 before?
22 **A   I have done business with them.**
23 Q   And before January 24th you never had a cell
24 phone number with them?

## Page 84

1  **A   No.**
2  Q   How did you do business?  In a coffee shop?
3  **A   Levon and Zadik, I did business with them**
4  **prior to the year 2015.**
5  Q   And that would be through Mask and Eldiven?
6  **A   No.**
7  Q   What is Mask and Eldiven?
8  **A   I don't know.  That's the name that they gave**
9  **me as their company.**
10 Q   Okay.  And after you gave them this 400,000 in
11 cash and this merchandise, what happened next?
12 **A   They left.**
13 Q   They got in a car and left?
14 **A   Yes.**
15 Q   They left you the truck?
16 **A   I stayed with the truck.**
17 Q   So they brought a truck, tractor-trailer, and
18 they parked it this park in Elizabeth, New
19 Jersey.  Was this document, this Gary Weiss-5
20 signed then?
21 **A   No.**
22 Q   When -- that document was signed on Sunday;
23 right?
24 **A   On Sunday.**

## Page 85

1  Q   Where was it signed?
2  **A   Right there.**
3  Q   At the truck; right?
4  **A   In their car.**
5  Q   In their car.  And then you got out of their
6  car and left and they just left you their
7  tractor-trailer?
8  **A   Yes.**
9  Q   And what happened after that?  You drove away
10 in their tractor-trailer?
11 **A   No.**
12 Q   What did you do?
13 **A   I stayed there.**
14 Q   And what happened?
15 **A   I made an appointment with Available Movers**
16 **for Monday morning.**
17 Q   That would be the 7th?
18 **A   Correct.**
19 Q   And what was the appointment for Available
20 Movers?
21 **A   Take and deliver.**
22 Q   Take the money from --
23 **A   No.  Take the merchandise.**
24 Q   Take the merchandise off of that truck?

22 (Pages 82 to 85)

USDC, ED of PA   American Environmental Ent. v. Manfred Sternberg, Esq., et al.   Friday
No. 2:22-CV-0688 (JMY)   Deposition of Gary Weiss   February 16, 2024

Page 86

1   A   They came with their own truck.
2   Q   On Monday, February 7th?
3   A   Right.
4   Q   And they took all the test kits and put it in
5   to their own truck and you gave them this list here
6   is where I want you to make these deliveries, the
7   one marked as Manfred-24?
8   A   I don't know about this particular list.
9   Q   This list, or lists similar to this?
10   A   I really have to look what I gave them, you
11   know.
12   Q   But you gave them a list?
13   A   I don't think it looked like that.
14   Q   Did it look something like this?
15   A   Let me see.
16       MR. LAVER:   What is the witness
17   looking at?
18       MR. LIGHTMAN:   It's a different --
19       THE WITNESS:   It's a different list;
20   right?
21   BY MR. LIGHTMAN:
22   Q   Let me see something.
23   A   Looks the same.
24   Q   So you gave them a list similar to what you

Page 87

1   are holding in your hand; right?
2   A   I don't think this is the list.
3       MR. LAVER:   This being what?   This
4   being the exhibit that's been marked today?
5       THE WITNESS:   This is not the final
6   list.
7   BY MR. LIGHTMAN:
8   Q   So there is another list?
9   A   In my opinion, I have to look.  I sent them
10   another invoice later on which was a correct
11   invoice with like a final invoice list because I
12   got from Sam several lists like that.
13   Q   Okay.
14   A   So this is a list, but it's not -- probably
15   not the list that I gave to the drivers.  Okay.
16   I'm not sure.  I have to check.
17   Q   Did you get --
18   A   I have documents for Available Mover.  Can I
19   look at them to give an idea?
20   Q   We will do it at the break.  We will do it at
21   the break?
22   A   I just want to reference to this one.
23   Q   When we take the next break, you can find the
24   list that they --

Page 88

1   A   Okay.  And it's not this list for sure.
2   Q   Wait, though.  When you say "it's not this,"
3   meaning the Gary Weiss-6, this is not the final
4   invoice?
5   A   This is not the invoice, no.  It is an
6   invoice.  I sent Sam probably ten invoices.
7   Q   Okay.  But, if this invoice was one that
8   Manfred Sternberg gave to the Texas Bar and said
9   this is the invoice that we paid and used, this is
10   the --
11   A   I don't know what he gave to the Texas Bar.
12   Q   If he gave this one, this Gary Weiss-6
13   invoice, the one for the $2,131,200 --
14   A   Mr. Lightman, I don't know what he gave to the
15   Texas Bar as far as invoices.  I didn't see that
16   invoice that he gave.
17   Q   This invoice that I'm holding that's marked
18   Gary Weiss-6, this was not the final invoice from
19   you to Sam for the test kits; correct?
20   A   I don't think so.
21   Q   After they left, was there a way to lock the
22   truck up overnight or did you sleep on --
23   A   No.  I was behind the truck.  That's it.
24   Q   So you slept in the truck overnight?

Page 89

1   A   Yeah.
2   Q   In actual in the truck or in a car behind the
3   truck?
4   A   In my car.  In my truck.  I had the SUV.
5   Q   So you took your SUV.  You parked it in back
6   of the truck and you slept there?
7   A   Yeah.  I didn't really sleep.
8   Q   Well, you were looking at all the test kits?
9   A   No.  No.  On my phone, you know, YouTube and
10   things like that.
11   Q   When in the morning of the 7th did the
12   Available Movers people show up?
13   A   I don't remember exactly.  I estimate between
14   9:00 and 10:00.  I estimate.
15   Q   And then what happened?
16   A   They backed into the back of the truck to
17   transfer from one truck to another.  They had like
18   three people, I believe, or four with the driver.
19   I'm not sure exactly.  I think three.  They
20   unloaded all the boxes into the truck.
21   Q   And then what happened?
22   A   I gave them the list that I gave them where to
23   go.  I got back into my truck.
24   Q   Your SUV?

23 (Pages 86 to 89)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                 Deposition of Gary Weiss                    February 16, 2024

Page 90

1   A   They left.
2   Q   Your SUV?
3   A   My SUV.
4   Q   They left. Okay. And then what happened?
5   A   And they started to go except that they
6   stopped at the end of the street. I waited few
7   more minutes. I thought it's a stop sign or
8   whatever, but they are stopping there and they
9   don't move. I drove there to the back of the
10  truck. I came to the driver and asked him, que
11  pasa. He says, I need a bill of lading. I said, I
12  don't know what it is.
13  Q   You had not gotten any bill of lading from
14  Sam?
15  A   I never had a bill of lading.
16  Q   From anybody?
17  A   From anybody.
18  Q   At any time?
19  A   At any time. I don't know what it is. I
20  said, I gave you the list where you go. He says,
21  no. It has to be a form that says bill of lading.
22  Q   And then what did you do?
23  A   I said okay. Let me call Sam.
24  Q   And then what happened?

Page 91

1   A   Sam said, okay. I'll send it to you soon. We
2   wait there like an hour and I called Sam and Sam
3   said, soon, very soon. And the drivers told me,
4   listen, I spoke to my office, I cannot wait here.
5        MR. HEALEY: That was Advanced
6   Movers?
7   BY MR. LIGHTMAN:
8   Q   Available Movers?
9   A   Available Movers, yes. And we have to take it
10  to the hub and when we get the bill of lading, we
11  continue with the delivery.
12  Q   The hub meaning Available Moving and Storage
13  warehouse?
14  A   That's what they said, the hub. The driver
15  said, I'm going to the hub and once I get the bill
16  of lading and everything else, we will continue
17  with the delivery. I said okay.
18  Q   Now, when the -- go back for a second. After
19  you -- these guys -- who was the driver? Do you
20  know? Was it Girard?
21  A   I don't think so.
22  Q   So, when they transferred everything in to
23  their own truck, did you talk to Levon and Zadik
24  and say, your truck is empty. Come get it. Or did

Page 92

1   you just leave it there?
2   A   No. The driver left.
3   Q   No. The driver on the Sunday after you paid
4   the cash and merchandise and they left you with the
5   merchandise, the driver -- you said you parked your
6   SUV and stayed overnight with the goods; right?
7   A   But the driver, also, in the cabby.
8   Q   Oh, the driver stayed, too?
9   A   Yeah.
10  Q   Do you know who that driver was?
11  A   No.
12  Q   So, when they transferred it, he then drove
13  the truck, the empty truck away?
14  A   Yeah.
15  Q   And when the goods were transferred to
16  Available Moving and taken away by them, was there
17  any documentation created? Did Available Movers
18  give you anything?
19  A   I don't remember.
20  Q   You are loading a million eight worth of goods
21  into Available Movers and they just drove away
22  without leaving you with any documents or receipts
23  that you got it?
24  A   Maybe. I just don't have it if they did.

Page 93

1   Q   You don't remember?
2   A   I don't remember.
3   Q   And to evidence that you owned these million
4   eight worth of test kits all you had to show for it
5   was this piece of paper, Gary Weiss-5? There was
6   no bill of sale that they gave you?
7   A   This what they gave me.
8   Q   The only thing they gave you was Gary Weiss-5;
9   right?
10  A   Yeah.
11  Q   And did you ever hear the name Mask and
12  Eldiven before?
13  A   No.
14  Q   2 West 47 Street?
15  A   Never.
16  Q   The New York, New York address?
17  A   I just checked it. The building does not
18  exist anymore.
19  Q   Right. The phone number (201) 575-0193?
20  A   There is a phone number, too.
21  Q   That's the phone number; right?
22  A   Yeah.
23  Q   Does that match the one in your phone?
24  A   Yeah. I tried to call several times. Nobody

24 (Pages 90 to 93)

Page 94

1  is answering and I don't know if this is really the
2  phone number.  I noted is their phone number, but
3  nobody answers me, so I'm not sure if this is the
4  one, you know.  That's what I have noted.  Okay.
5  That's the phone number here.
6  Q   The phone number I just typed in my phone, the
7  201 575 1 --
8  A   Yes.
9  Q   -- that's the number in your phone; right?
10  A   That's the number in my phone.
11  Q   That's the one in the purchase order; right?
12  A   Yes.
13  Q   Let's hit send and see what happens.
14  A   I don't even know if that's correct.
15          MR. LIGHTMAN:  Let the record
16      reflect, we called the number and got an
17      answering machine.  I left my name and phone
18      number.
19  BY MR. LIGHTMAN:
20  Q   So they went about a block away.  You don't
21  remember if they gave you any documents after you
22  gave them a million eight of your merchandise;
23  right?  They said we needed bills of lading and you
24  called Sam and said, I need a bill of lading;

Page 95

1  right?
2  A   Yes.
3  Q   Did you ever give a bill of lading to Sam?
4  A   Me?
5  Q   Yes.
6  A   I don't -- I don't have forms that said bill
7  of lading, nor did I know what bill of lading is.
8  Today I know.
9  Q   But at the time you didn't know?
10  A   No.
11  Q   Did Available Moving and Storage ever issue a
12  bill of lading to you for any of the goods of the
13  delivery addresses?
14  A   Why should they?
15  Q   So the answer is no; right?
16  A   No.
17  Q   So your understanding was that Sam was
18  supposed to give you a bill of lading for this
19  stuff; right?
20  A   Yeah.  They said that they need a bill of
21  lading.  I told Sam this, that these people need a
22  bill of lading.  And the way he answered he
23  understood what I'm telling him.  And he says,
24  yeah, I'll send it.

Page 96

1  Q   And the guy, the mover, after an hour they
2  never sent --
3  A   I'm not waiting here.
4  Q   And you said, take it back to your hub, the
5  warehouse?
6  A   No.  He said that he spoke to his boss and his
7  boss told him that he cannot wait here.  He has
8  to -- will be waiting in their hub.  I said, okay.
9  Q   So he took the truck load of these hundreds of
10  thousands of test kits to the Available Moving and
11  Storage warehouse; right?
12  A   I guess.
13  Q   Did you know where it was?
14  A   No.
15  Q   No?
16  A   I mean, the address of Available Movers was --
17  it is what it is, you know.
18  Q   So then --
19  A   And I was -- I don't know the place, you know.
20  Q   What happened then?  So the goods are at
21  Available Moving Storage.  Did Sam ever get you a
22  bill of lading?
23  A   Sam said he's going to send it directly to the
24  movers because they need it, not me.

Page 97

1  Q   Did he ever send the bill of lading to
2  Available Movers?
3  A   I don't think so.
4  Q   And how about Manfred?  Did Manfred ever send
5  the bill of lading?
6  A   I don't know what they did.
7  Q   And then how long -- there came a point in
8  time like a week or two later when Available Moving
9  and Storage said we haven't gotten a bill of
10  lading.  You have to take your goods back; right?
11  A   I don't remember that.  No.  They told me that
12  they will have to charge me storage.
13  Q   And you said, I'll pick up my goods?
14  A   No.  At this point I said okay.  I'll pay for
15  storage.  I asked him how much it is.  I don't
16  remember exactly the number that he said, you know,
17  but he said maybe $350 a week or something.  I
18  don't know the number.  He didn't give me a number
19  that I remember right now, but I said okay.
20  Whatever it is, I'll pay.
21  Q   And then what happened?
22  A   I asked Sam the next day when this bill of
23  lading is and what is the problem.  He said that he
24  mentioned that somebody canceled and he's trying to

25 (Pages 94 to 97)

Page 98

1  sell that portion of the goods to somebody else, so
2  it's going to take him another few days to get it
3  right. I said, okay. I did what you wanted. I
4  put it on the truck for you. Originally, he
5  supposed to do that, but he didn't have a credit
6  card to book the movers and I did it for him. And
7  I guess he never gave them a bill of lading, so
8  they will not continue with the deliveries without
9  a bill of lading. That's how I understand it
10 today.
11     Q   And at some point you went and picked up the
12 goods?
13     A   Yeah. At some point --
14     Q   Do you remember having this telephone
15 conversation with myself and Dan Scully on
16 July 27th?
17     A   I don't remember. I believe what you say, but
18 I don't remember it. Just tell me. Don't -- tell
19 me and I'm going to --
20     Q   I'm going to refresh your recollection.
21     A   Okay. You are showing me now an actual call?
22     Q   I'm showing you an e-mail from my computer
23 that's from Gary Weiss to Kim in the office dated
24 July 27 at 10:04 p.m. Do you see that? From Gary

Page 99

1  Weiss to Kim DiTomaso and me --
2     A   I don't see it because my lenses really -- it
3  doesn't go. Hi, Mr. Weiss. This is July 27?
4     Q   Yes.
5     A   We are now in --
6     Q   July --
7     A   -- February.
8     Q   July 27, 2003. You wrote me. Can you read
9  the first paragraph?
10    A   Hi, Mr. Weiss. Thank you for opportunity to
11 talk to you yesterday, July 27th. But you are
12 asking now about February.
13    Q   Please read this.
14    A   I read the first line.
15    Q   Hi, Mr. Lightman, thank you for the
16 opportunity to talk to you yesterday July 27, 2023.
17 I recognize your phone number so I answered you.
18 You also connected Daniel D. Scully of The Safety
19 House. We had a very good conversation which
20 lasted 28 minutes and 24 seconds from telephone
21 number 215-760-3000.
22        Does that refresh your recollection
23 that we had this phone conversation?
24    A   Hold on a second, Mr. Lightman. We are in

Page 100

1  2023. I am talking about 2022. And the month of
2  February. What are you talking about? What are
3  you mixing the times?
4     Q   Please. I'm asking whether you remember
5  having a telephone conversation with me and Daniel
6  Scully on July 27, 2023.
7     A   If I remember this phone call?
8     Q   No. You wrote to me that we had a telephone
9  conversation. You, me and Dan Scully on July 27,
10 2023?
11    A   Yeah. I wrote this letter.
12    Q   Which lasted 28 minutes and 24 seconds?
13    A   Okay.
14    Q   Do you remember telling Dan and I during that
15 telephone conversation that there came a point in
16 time when about two weeks after the AMS took the
17 goods to their hub on February 7th that AMS said,
18 you have to get your goods out of our warehouse?
19    A   I don't remember what I spoke to you about.
20    Q   You don't remember that?
21    A   No.
22    Q   Did there come a time later in February when
23 you went to take your goods out of the warehouse?
24    A   Okay. Just to answer the first question, I

Page 101

1  don't remember what I spoke to you in those
2  conversations that you called me and at that time a
3  lawyer. Do you mean still in July? Don't say that
4  my lawyer got dismissed on November --
5     Q   9th?
6     A   -- 9th of 2023. This conversation is while I
7  have a lawyer and you called me during the time
8  that I still had a lawyer and I ask you why you are
9  calling me and not my lawyer. But I don't remember
10 what I spoke to you about.
11    Q   Do you remember telling me you were acting pro
12 se at the time?
13    A   I don't remember.
14    Q   I have an e-mail from you saying that and also
15 clear up the record?
16    A   I didn't say the word no. Listen, I'm just
17 telling you what I remember. Don't worry about
18 what I say. I remember, I tell you. What I don't
19 remember, I don't tell you. You told me that in
20 the beginning.
21    Q   Do you remember telling us that about two
22 weeks later later in February --
23    A   I don't remember. I just said before I don't
24 remember that.

26 (Pages 98 to 101)

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.      Friday
No. 2:22-CV-0688 (JMY)                Deposition of Gary Weiss              February 16, 2024

---

Page 102

1   Q   Okay.  Did you go to AMS's facility to pick up
2   your goods?
3   A   Yes.
4   Q   That was later in February; correct?
5   A   No.
6   Q   When was that?
7   A   That was in March.
8   Q   And what happened when you went to your
9   facility?
10  A   I picked it up.
11  Q   And then what did you do?
12  A   And I took it away from them.
13  Q   So, when you got there, how did you get the
14  goods out of their warehouse?  Did they give you
15  their truck?
16  A   No.
17  Q   So you went there --
18  A   I brought my own truck.
19  Q   Okay.
20  A   And I was about to make the delivery myself.
21  Q   So you went there to pick up the goods from
22  AMS?
23  A   Exactly.
24  Q   You took all the boxes and loaded them on to

---

Page 103

1   your truck?
2   A   Right.
3   Q   Was there someone else there helping you?
4   A   Were three people.
5   Q   You -- you brought three people?
6   A   I brought three people with me.
7   Q   Who were the people that you brought?
8   A   I don't remember their names.
9   Q   You don't remember their names.  Did you pay
10  them?
11  A   Of course.
12  Q   How did you pay them?
13  A   In cash.
14  Q   How did you find these three people?
15  A   On Elizabeth Avenue there are people that mill
16  around every morning between 6:00 a.m. to
17  twelve o'clock and they are looking for a day job.
18  Q   Okay.  So what did you do?
19  A   I just went and I got somebody.  Some people.
20  Three.
21  Q   Three people?
22  A   Three people and a truck.
23  Q   How did you get the truck?
24  A   I told them I need a truck.  They called.

---

Page 104

1   Everyone has a cousin or somebody else, you know,
2   and the truck came.
3   Q   What kind of truck was it?
4   A   A big truck.
5   Q   So you went with these three people.  Did you
6   use your car or just the truck?
7   A   No.  I was in my truck, in my SUV truck.
8   Q   You were in your SUV.  These three people that
9   you hired off the street somehow located a truck;
10  right?
11  A   (Nods heads up and down.)
12  Q   And you and your SUV and the three people in
13  the truck went to AMS's hub.  Where was that?  In
14  New York or in New Jersey?
15  A   It's in New York.
16  Q   In New York.  And you pulled the truck in to
17  the yard and then what happened?
18  A   I remember was raining day that I remember and
19  they backed -- they backed into the back of their
20  truck.
21  Q   And then what happened?
22  A   And load it.
23  Q   The took the stuff from the truck that AMS had
24  and put it on the truck that one of the three

---

Page 105

1   people had located you for the day; right?
2   A   Right.
3   Q   And then what did you then do?  You drove away
4   with it?
5   A   Sure.
6   Q   Where did you go?
7   A   I went to Elizabeth.
8   Q   And what was your intent?  To deliver the
9   stuff yourself?
10  A   Yeah.
11  Q   Did you have --
12       MR. LAVER:  Wait a second.  Who
13  drove the truck?
14       THE WITNESS:  Driver.
15       MR. LAVER:  You did not drive the
16  truck?
17       THE WITNESS:  No.  I don't --
18  BY MR. LIGHTMAN:
19  Q   You were following or leading in the SUV?
20  A   I thought that they were driving behind me.  I
21  told them where he were going.
22  Q   Where did you tell them you were going?
23  A   That we were going in to the -- the name is
24  Warinanco Park.

---

27 (Pages 102 to 105)

Page 106

1  Q   How do you spell it?
2  A   W-a-r-r-i-n-i-c-o.
3  Q   Is that the park where you met --
4  A   **I guess that's the name of the park. I'm not**
5  **sure. But, yes, I think Warinanco.**
6  Q   But that's where you met --
7  A   **Say. Same -- same place.**
8  Q   Levon and Zadik?
9  A   **Yeah.**
10 Q   And why were you going to this park again?
11 A   **Check.**
12 Q   Pardon me?
13 A   **To check the boxes and make sure everything is**
14 **okay.**
15 Q   And you got to this park. And is that when
16 you discovered that they had all been -- all the
17 test kits had been taken out and rice had been put
18 in there?
19 A   **Yeah.**
20 Q   Tell me what happened. You get in your SUV.
21 You go to this park. You park the truck; right?
22 Tell me what happened.
23 A   **And I open a box and another box and another**
24 **box and it's all with rice.**

Page 107

1  Q   The test kits are gone?
2  A   **No test kits.**
3  Q   And instead these are boxes of rice?
4  A   **Yeah.**
5  Q   And do you remember telling Dan Scully and I
6  in your phone call in July that you checked every
7  one of the boxes?
8  A   **Every one?**
9  Q   Yes.
10 A   **I check the boxes.**
11 Q   Every one of the boxes?
12 A   **I emptied the boxes.**
13 Q   You emptied all the boxes?
14 A   **I emptied all of the boxes.**
15 Q   You ended up with this big pile of rice.
16 Where -- did you do this in the park?
17 A   **Big pile of rice and big piles of empty boxes.**
18 Q   And no test kits?
19 A   **Not even one.**
20 Q   So it's your sworn testimony you emptied all
21 of the boxes into this big pile of rice; right?
22 A   **Right. I made a big pile of rice, yes.**
23 Q   I would like to show you Deposition Exhibit-16
24 which is Manfred Sternberg Exhibit-16. Is this the

Page 108

1  truck that you're talking about?
2  A   **No.**
3  Q   This is a different truck?
4  A   **Yeah.**
5  Q   What is this truck?
6  A   **This is -- this is the truck that Available**
7  **Movers came and emptied into their truck.**
8  Q   So this is the truck that Levon and Zadik gave
9  to you with all these test kits; right?
10 A   **Yes.**
11 Q   And why did you take a picture of that?
12      **MR. LAVER:** Objection to form.
13      You can answer it.
14 BY MR. LIGHTMAN:
15 Q   Did you take a picture of this?
16 A   **Yeah. I think I did.**
17 Q   Why did you take a picture of this truck?
18 A   **The lawyer Daphna Zekaria wanted me to take**
19 **pictures of the merchandise.**
20 Q   Did you take any other pictures other than
21 this?
22 A   **Yeah. I took several.**
23 Q   You took several pictures of it. Where are
24 those pictures?

Page 109

1  A   **I don't know. You don't have them?**
2  Q   No. Could you please produce these pictures?
3  A   **Yeah. Yeah. Yeah.**
4  Q   So let's go back to this day you told Dan and
5  I this was the last week of February. Why do you
6  say March now?
7  A   **Because I went to Available Movers in the**
8  **beginning of March like 4th of March.**
9  Q   Why did you tell Dan and I when we talked in
10 July that you went in the last week of February?
11 A   **I don't remember what I told you. That's one.**
12 **Okay.**
13 Q   So you are saying it's March 4th?
14 A   **Repeat again the question. I want to**
15 **understand.**
16 Q   When we spoke in July, you were telling us the
17 story about the boxes being switched to rice. You
18 said it was the last week of February and now you
19 are saying --
20 A   **No. No. No. First of all, I did not tell**
21 **you that. Okay. So I disagree with what you are**
22 **saying. Okay. To say it gently. I did not say**
23 **that.**
24 Q   You did not say what?

Page 110

1  **A   About anything picking up in February.**
2  Q   Okay.  Well, the date you're saying -- you
3  dispute that you told us it was in February.  Your
4  testimony here today was March 4th?
5  **A   Right.**
6  Q   So you get to this park.  You open up the
7  truck.  You start looking at the test kits and
8  they're all rice?
9  **A   Yes, sir.**
10  Q   And you took all of the test kits off of the
11  truck and emptied them into a pile of rice in the
12  park?
13  **A   Not in the park.**
14  Q   Where?
15  **A   In the truck.  We emptied the box.  We folded**
16  **it flat.  We put it.  We already realized after**
17  **two, three boxes that this is not going to be --**
18  **they really did not know what is happening.**
19  Q   The driver and the guys you hired?
20  **A   They did not know what is really happening.**
21  Q   So after you emptied all these boxes in to
22  this big pile of rice, what did you do?  Did you
23  take any pictures of it?
24  **A   Of the --**

Page 111

1  Q   Of the rice?
2  **A   Of the rice.**
3  Q   You got a million eight in test kits and you
4  pick them up from Available Movers and Storage,
5  according to your testimony.  You bring them to
6  this park.  You open them up and you say, oh, my
7  God, these aren't test kits.  This is rice.  You
8  open up all the boxes.  You make a big pile of
9  rice.  You didn't take any pictures of that?
10  **A   I don't think so.**
11  Q   So you called Available Movers?
12  **A   I have a check really, but I don't think I**
13  **took pictures.**
14  Q   Did you call Daphna Zekaria and say, Daphna, I
15  picked up a million eight worth of merchandise.  I
16  thought they were test kits.  I drove it to the
17  park and it's all rice.  Did you tell Daphna that?
18  **A   Wait.  Wait.  Wait.  Wait.  You are so**
19  **confused.  What does this stuff now have to do with**
20  **her getting involved in this transaction on**
21  **February 4, 5, 6, 7 and one month after that?**
22  Q   She's your attorney in this deal; right?
23  **A   No.**
24  Q   What does she -- what's her role in this deal?

Page 112

1  **A   I don't know.**
2  Q   Manfred wired million -- over $2 million to
3  her; right?
4  **A   Okay.  Okay.**
5  Q   So what does she have -- why is Manfred
6  Sternberg taking the money from his attorney escrow
7  account.  The first deposit $219,240 he wired right
8  to you; right?
9  **A   Right.**
10  Q   The next one of a million nine and change he
11  didn't wire to you.  He wired it to Daphna Zekaria;
12  right?
13  **A   Exactly.**
14  Q   Why did he do that?
15  **A   First of all, when me and Sam are making the**
16  **deal, there is no Daphna Zekaria.  I never heard**
17  **the name before.  I don't know a Ms. Zekaria.**
18  Q   So you never did business with her?
19  **A   Never.**
20  Q   She never was your attorney?
21  **A   No.**
22  Q   You never met her before this deal?
23  **A   No.**
24  Q   So tell me how she got -- how did Daphna get

Page 113

1  interjected into this deal?
2  **A   I don't know yet.**
3  Q   Well, tell --
4  **A   I'll tell you what I know.**
5  Q   Tell me what you know.  That's all I want to
6  know.
7  **A   So the $219,000 deposit I got directly in to**
8  **A. Solar Diamond.**
9  Q   Right.
10  **A   And after few days, Sam is telling me that it**
11  **is required by Manfred -- by Attorney Manfred that**
12  **the money will go to an escrow account of Zekaria**
13  **which I did not know at that time.**
14  Q   So Manfred's the one who told you it's going
15  to go to Zekaria?
16  **A   No.  Sam told me it's going to go to Zekaria.**
17  Q   Sam told you it was going to go to Zekaria?
18  **A   Yes.  And he put me in touch with Zekaria and**
19  **she made like an agreement, but I never met her**
20  **before.  So the agreement is that she's going to**
21  **get the money, the balance, and she's going to**
22  **verify the -- that it is on the truck and then I'm**
23  **going to get the balance.**
24  Q   And this agreement with you and Zekaria, where

29 (Pages 110 to 113)

Page 114

1  is it?
2  A   I have to look.  I have it someplace.
3       MR. LIGHTMAN:  Both you, Mr. Weiss,
4  and you, Mr. Healey, I requested a copy of
5  this agreement.  Other than the one document
6  you gave us, I would like to see that.  Okay?
7       THE WITNESS:  Okay.
8       MR. HEALEY:  If it exists.
9       MR. LIGHTMAN:  By the way, any time
10  I make a request for documents, mark that
11  spot.
12       MR. LAVER:  Note that I join in that
13  request, please.
14  BY MR. LIGHTMAN:
15  Q   So it's a written agreement?
16  A   Yeah.
17  Q   Is it a retainer agreement?  Did you actually
18  retain her?
19  A   I have to look and find it.
20  Q   Do you have it in that bag of documents you
21  produced?
22  A   You know, I don't know.
23  Q   At the lunch break we will look through that
24  together.  So after the Zekaria.  So the agreement

Page 115

1  is --
2  A   You want the Zekaria agreement?
3  Q   Yes.
4       MR. LAVER:  We will make it easy.
5  We want all documents that pertain to this
6  transaction.
7       THE WITNESS:  That pertain to --
8  BY MR. LIGHTMAN:
9  Q   This transaction.  We want all documents
10  involving you, Sam Gross, Zekaria.  You produced
11  some of them and not all of them and Manfred.  So
12  wait.  The agreement, is it just between you and
13  Zekaria or --
14  A   You said I produced?
15  Q   You produced some, but not all of it?
16  A   I produced.  I want to be open between me and
17  you.  I produced.
18  Q   You did not produce this agreement?
19  A   Not this agreement, but I produced --
20  Q   You did not produce anything other than this
21  one picture, so you said there is a bunch of
22  pictures?
23  A   Yes.  And I said -- okay.  So pictures.
24  Q   I want all the pictures.  This is the written

Page 116

1  agreement just between --
2  A   Zekaria agreement.
3  Q   Zekaria and you.  Is Sam a party to this
4  agreement?
5  A   I don't think so.
6  Q   Is Manfred Sternberg a party to this
7  agreement?
8  A   I don't think so.
9  Q   There is only one agreement signed between you
10  and Zekaria; right?
11  A   Yeah.
12       MR. HEALEY:  I'd like to put on the
13  record, Mr. Scully, you keep nodding your
14  head at questions and things.  I think that's
15  inappropriate.  Don't direct the witness to
16  make a comment.  I'm not being an asshole
17  but --
18       MR. LIGHTMAN:  I would be a little
19  bit nodding my head, too, if someone took
20  two million from me and didn't give it back,
21  but let's go on.  Ready?
22  BY MR. LIGHTMAN:
23  Q   Did you retain Daphna Zekaria or her law firm
24  to act as your attorney?

Page 117

1  A   She insisted that we do the agreement.  I did
2  not want it, but the only way that I can get now
3  the balance of the money is through her.
4  Q   So you retained her as your attorney?
5  A   Yes.
6  Q   Is she still your attorney today?
7  A   No.  I told her she does not represent me any
8  more in April or May.
9  Q   Of 2023 or 2022?
10  A   2022.
11  Q   Do you authorize Daphna Zekaria to disclose
12  information relating to this transaction?
13  A   I have to think about it.
14  Q   I would like an answer?
15  A   We have discussed it once.  Right.  And I said
16  at the moment no, but I also said I want to think
17  about it and I didn't say definitely no.
18  Q   So you have been thinking about it for months
19  now.  Daphna says, I have information to provide to
20  you, but unless you get a court order or Gary Weiss
21  says I can disclose it, I can't disclose it.  Do
22  you authorize her to disclose that information?
23  A   Not at the moment.
24  Q   Why not?

30 (Pages 114 to 117)

Page 118

1    A    Because I'm still looking for $2 million.
2    Q    Ready.  What do you mean you are still looking
3    for $2 million?  That she has?
4    A    That somebody has.
5    Q    So it's --
6    A    I gave collateral of over four million.
7    Q    That's the diamonds and gems?
8    A    Yes.
9    Q    Who did you give the collateral and gems to?
10   A    To Sam and to Zekaria.
11   Q    You gave some of it to Zekaria in a coffee
12   shop to give to Sam.  Did he get those diamonds
13   that you gave to Daphna in that coffee shop?
14   A    Excuse me?
15   Q    Did Sam end up getting those documents that
16   you gave the diamonds to in the Starbucks coffee
17   shop?
18   A    I don't know.
19   Q    You never asked Sam, hey, did you get the
20   diamonds I gave to Zekaria?
21   A    I don't know yet.
22   Q    So it's possible Zekaria should be holding on
23   to those diamonds?
24   A    I don't know.  Okay.

Page 119

1        MR. HEALEY:  Objection.
2        THE WITNESS:  You will ask Zekaria.
3    You have time to ask her.
4    BY MR. LIGHTMAN:
5    Q    Do you have pictures of Zekaria wearing the
6    collateral you gave?  I'm told that there are
7    compromising pictures of Daphna either naked or
8    without clothes or in compromising situations
9    wearing the collateral that eventually ended up
10   with Sam.  Do you have those pictures?
11   A    Well, we have to be correct about the
12   collateral.  But one of them depicts something that
13   looks like square stone between her tits.
14   Q    Do you have a picture of that?
15   A    Yeah, I do.
16   Q    In fact, that's one of the pictures I want you
17   to produce.
18   A    It's going to be juicy here.
19   Q    Well, did she retain that square diamond?
20   That's one of the ones you gave her?
21   A    I'm telling you, I don't know.
22   Q    Where was that picture taken?
23   A    I don't know.
24   Q    Did you take it?

Page 120

1    A    No.
2    Q    Was it in a hotel room?
3    A    I don't know where it was taken.
4    Q    Were you ever in a hotel room with Daphna
5    Zekaria?
6    A    No.
7    Q    No romantic or sexual encounter with Daphna
8    Zekaria?
9    A    No.
10   Q    You are positive about that?
11   A    Absolutely.
12   Q    And how about Sam?  Did Sam have a romantic or
13   a sexual relationship or encounter with Daphna?
14   A    You have to ask him all those questions.
15   Q    To your knowledge, did they ever have?
16   A    I believe, yes, but I don't have definite
17   proof.
18   Q    And you believe yes, because Daphna told you?
19   A    No, because Sam told me.
20   Q    Did you ever ask Daphna, hey, Sam just told me
21   you guys had sex in a hotel room?
22   A    I never asked.
23   Q    Why didn't you ask?  She's your attorney
24   having sex with your seller?

Page 121

1    A    Mr. Lightman, I didn't ask.  Don't ask why.  I
2    didn't ask.  Let put it this way.  I would never
3    ask.
4        MR. LAVER:  Pardon me, Gary.  How
5    did you receive the photograph that you
6    referenced?
7        THE WITNESS:  Sam sent it to me by
8    text.
9        MR. LAVER:  Sam sent you a text of
10   your attorney topless?
11       THE WITNESS:  More than that.
12   BY MR. LIGHTMAN:
13   Q    What other pictures did he send you?
14   A    Everything.
15   Q    How many pictures?
16   A    Must be more than five.
17   Q    Of her naked?
18   A    Yeah.
19   Q    Her having sex?
20   A    No.
21   Q    Her wearing anything other than the one
22   diamond between her tits?
23       MR. LAVER:  This is unreal.
24       THE WITNESS:  Very explicit

31 (Pages 118 to 121)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:2-CV-0688 (JMY)                Deposition of Gary Weiss                February 16, 2024

Page 122

1  pictures.
2          **MR. HEALEY:** Was her face in any of
3  them?
4          THE WITNESS: What?
5          **MR. HEALEY:** Was her face in any of
6  them?
7          THE WITNESS: I have to look and
8  I'll tell you.
9  BY MR. LIGHTMAN:
10  Q  So they're definitely --
11          **MR. HEALEY:** You don't remember?
12          THE WITNESS: No. No.
13  BY MR. LIGHTMAN:
14  Q  Wait. Wait. He said he texted them to you;
15  right? Can you pull them up on your phone?
16  **A  Yeah.**
17  Q  Can I see one of them?
18  **A  If it's here.**
19  Q  Did you delete any texts or messages?
20  **A  No. But I have to open my phone. Hang on a**
21  **second. Each time I open my phone, I don't know**
22  **what my phone will tell me.**
23          **MR. LAVER:** Why don't we go off the
24  record while you are doing that.

Page 123

1  BY MR. LIGHTMAN:
2  Q  Let me ask you one other question. Did
3  Manfred, to your knowledge, ever have sex with
4  Daphna?
5  **A  No.**
6          **MR. LAVER:** We are off the record.
7              - - -
8          (Discussion off the record.)
9              - - -
10  BY MR. LIGHTMAN:
11  Q  Do you have another cell phone, other than
12  this one?
13  **A  Yeah.**
14  Q  What's that cell phone number?
15  **A  Same.**
16  Q  What?
17  **A  Same phone.**
18  Q  You can't have two cell phones with the same
19  cell phone number.
20  **A  It's not working. Just the pictures are on**
21  **that.**
22  Q  Ready. Listen. You can't delete any texts.
23  **A  I don't delete any.**
24  Q  You can't delete any e-mails. You can't

Page 124

1  delete any pictures. Ready. This all evidence and
2  you can't delete any of this. Okay?
3  **A  Correct. Correct.**
4  Q  So, if it's on your -- you don't have to --
5  stop looking. Stop looking. If it's on your other
6  phone, let us know. If that phone is not working,
7  we will arrange for an IT person to go in to the
8  phone and get those pictures, but I request the
9  pictures. So wait. Ready.
10          Let's go back to the park where it's
11  now February -- it's now the end of February, as
12  you told Dan, or me March 4 as you stated it is
13  now, you discover that 355,760 boxes of I-COVID
14  test kits have all turned to rice; correct?
15  **A  Yeah.**
16  Q  What do you do? What did you do?
17  **A  I told Shlomo.**
18  Q  I told Shlomo. And what did you say to
19  Shlomo?
20  **A  I don't remember. I told him. I don't know**
21  **if I told him that moment.**
22  Q  Well, go back to that moment. You take a
23  million eight worth of test kits away from
24  Available Movers. You go to this park in

Page 125

1  Elizabeth, New Jersey. You open a box. It's rice.
2  You open all the boxes and you end up with 355,000
3  boxes of rice? What do you do when you discover
4  that you have no test kits instead you have 355,000
5  boxes of rice. What did you do?
6  **A  I tell you what I did with the rice.**
7  Q  What did you do with the rice? What did you
8  do with the rice?
9  **A  Across from me there was a school and they**
10  **used to give out food once or twice a week.**
11  **Remember, this is COVID time.**
12  Q  You gave ten years supply worth of rice?
13  **A  No. No.**
14  Q  What did you do?
15  **A  So the whole neighborhood used to come there**
16  **and take food. You know, they used to have like on**
17  **the side of the school trucks coming loading**
18  **their -- the big refrigerator in the school, you**
19  **know, like few rooms refrigerator like probably for**
20  **lunches or whatever. So now they bring food and**
21  **they open the doors on some days of the week and**
22  **people come and fill up bags of food.**
23  Q  On Sundays?
24  **A  What is Sundays?**

32 (Pages 122 to 125)

Page 126

1  Q   You said on Sundays?
2  **A   Some days.**
3  Q   Some days.  I apologize.  Go ahead.
4  **A   And I took the rice there.**
5  Q   You took 355 -- 365,790 boxes worth of rice to
6  the school across the street?
7  **A   No.  First I loaded it in my SUV.**
8  Q   Okay.  And you took all the rice.  How did you
9  load it?  Just stuck it in the back?
10  **A   Yeah.**
11         MR. LAVER:  In your SUV?
12         THE WITNESS:  I have a Trailblazer
13     where the back seats come down.  Okay.  And I
14     loaded everything food there and --
15  BY MR. LIGHTMAN:
16  Q   Go ahead, continue.
17  **A   And some I unloaded in front of the school**
18  **where they -- where they distribute the food right**
19  **there so people come and take.**
20  Q   What color is your SUV?  White?
21  **A   Black.  It's Trailblazer.**
22  Q   Okay.  So let's go back.  Before you loaded
23  the rice and gave it away --
24  **A   This is my truck right here.**

Page 127

1  Q    You're pointing to Manfred Deposition
2  Exhibit-16 right in front of the white car is a
3  black SUV.  That's your SUV.  Do you own that
4  today?
5  **A   Yes.**
6  Q   Did you drive that here?
7  **A   No.**
8  Q   What did you drive here?
9  **A   Another car.**
10  Q   What kind of car?
11  **A   A different car.**
12  Q   What car?
13  **A   Four-wheel drive.**
14  Q   A Ford?  A Chevy?  Catty?
15  **A   Why is it important right now?**
16  Q   I'd like to know what kind of car you drove
17  here?
18  **A   A black car.**
19  Q   What make and model car did you drive here
20  today?
21  **A   A Toyota Camry 2019.**
22  Q   Let's go back.
23  **A   The plate number, I don't remember.**
24  Q   Let's go back to this discovery that all of

Page 128

1  your -- the 365,790 boxes of I-COVID test kits have
2  been turned into rice.  Did you call Available
3  Moving and Storage and say, hey, guys the test kits
4  I just picked up from you are not the test kits I
5  gave you.  They are now all rice?
6  **A   I don't remember whom I called really.**
7  Q   Do you remember calling AMS?
8  **A   I don't remember.**
9  Q   Sitting here today, your testimony is I
10  delivered 365,790 boxes of I-COVID test kits to
11  Available Moving and Storage on February 7th that
12  they took to their hub; right?  Right?  You can't
13  nod.
14  **A   (Nods heads up and down.)**
15  Q   The witness nodded yes.  Yes.  That's correct?
16  **A   What is the question exactly?**
17  Q   You testified on February 7 you delivered
18  365,790 I-COVID test kits to Available Moving and
19  Storage; correct?
20  **A   They picked it up.**
21  Q   They picked it up.  You checked the boxes
22  before you delivered it to them and they weren't
23  rice at the time; right?
24  **A   Right.**

Page 129

1  Q   They were test kits; right?
2  **A   Right.**
3  Q   Available Movers and Storage took them to
4  their hub.  When you went to get them from
5  Available Movers and checked them when you got back
6  to New Jersey, they no longer were 365,790 boxes of
7  test kits.  They were 365,790 boxes of rice?
8  **A   Correct.**
9  Q   And you never -- you don't remember calling
10  AMS and saying, what happened to my test kits?
11  **A   No, I don't.**
12  Q   Well, certainly you made a police report.
13  Hey, police, I just had a million eight dollars
14  worth of test kits turned to rice.  You called the
15  police; right?
16  **A   Did I?**
17  Q   Did you?
18  **A   No.**
19  Q   Why didn't you call the police?
20  **A   I did not.**
21  Q   Why?  Someone just stole a million eight worth
22  of merchandise from you.  They took a million eight
23  worth of I-COVID test kits out of these boxes and
24  instead put rice in these boxes; right?

Page 130

1   A   Right.
2   Q   You didn't call the police and say, I'm out a
3   million eight of test kits?
4   A   No.  I didn't call the police.
5   Q   Why?
6   A   I just knew that I got screwed.
7   Q   You knew you got screwed?
8   A   Right.
9   Q   And you didn't do anything about it?
10  A   I don't remember what I did exactly.
11  Q   Really?
12  A   Yeah.
13  Q   So someone stole a million eight worth of
14   merchandise from me I would remember that day very
15   clearly?
16  A   I remember that day very clearly, but I don't
17   remember if I spoke to Available Movers about it,
18   you know.
19  Q   Is the reason why you didn't call the
20   police --
21  A   The police I didn't call.  There is no reason.
22   That whenever -- Available Movers, I don't remember
23   I called them.  It is possible that I did.
24  Q   Is the reason that you didn't call Available

Page 131

1   Movers and the reason you didn't call the police
2   because you just made up the story about the test
3   kits turning to rice?
4   A   This is -- this is your fantasy or --
5   Q   So you are saying what you testified here
6   today about the test kits turning into rice is the
7   truth, the whole truth and nothing but the truth so
8   help you God?
9   A   It is.
10  Q   Who do you think took the test kits?
11  A   Until today, I don't know.
12  Q   When you opened the test kits to check, were
13   they sealed?
14        MR. LAVER:  Objection to form.
15     When?
16        THE WITNESS:  Yeah.  When?
17   BY MR. LIGHTMAN:
18  Q   You picked the test kits up.  When you went to
19   check them out on January 24th when --
20        MR. LAVER:  There we go.
21        MR. HEALEY:  You mean February 4?
22        MR. LIGHTMAN:  No.
23   BY MR. LIGHTMAN:
24  Q   Back on January 24th, when Levon and Zadik

Page 132

1   took you to the truck and you opened up test kits,
2   they were sealed test kits.  You had to cut a
3   plastic thing to open the boxes; right?
4   A   Which boxes are you talking about?
5   Q   Every time I took an I-COVID test I had to
6   un -- the boxes were sealed.  They weren't opened
7   unless you broke a plastic seal on each end.
8        MR. LAVER:  Gary, they are boxes
9    inside boxes.
10        THE WITNESS:  I never said that I
11    opened those orange and white boxes.
12   BY MR. LIGHTMAN:
13  Q   Oh, okay.  So you just saw the orange and
14   white boxes?
15  A   I open the box and there are boxes.
16  Q   So you never opened the boxes; right?
17  A   Each box itself.
18  Q   Yeah.
19  A   No.
20  Q   Did you open one box of -- one orange and
21   white box to see what was in it?
22  A   No.
23  Q   So the first time you did that was on either
24   late February, as you told Dan and I, or March 4th

Page 133

1   as you testified to today, that's the first time
2   you actually opened up one of these orange and
3   white boxes and discovered rice instead of a test
4   kit; right?
5   A   In March.
6   Q   March 4th?
7   A   4 or 5, I don't remember the date.
8   Q   But that's when you opened up one of these
9   orange and white boxes and found rice instead of
10   the test kits?
11  A   Not orange and white boxes.  The big cartons
12   of boxes now did not contain any more boxes of
13   COVID tests.  It contained one bag of rice in each.
14  Q   So there weren't individual boxes?
15  A   Yeah.  There were like 365 boxes.  Each one
16   had one bag of rice of 20 pounds.
17        MR. HEALEY:  You mean a big box like
18    shown in the truck was full of rice?
19        THE WITNESS:  Exactly.  Not full of
20    rice.  There was a plastic bag in each --
21    each box -- each those boxes that you see in
22    the picture here is about this big about this
23    tall about this wide.  When you open it up,
24    there is one bag of rice in each one.

34 (Pages 130 to 133)

Page 134

1    BY MR. LIGHTMAN:
2    Q    And did you ever get your hands on any test
3    kits after that time?
4    A    After which time?
5    Q    March 4 or 5th, when you said you discovered
6    that they had turned to rice?
7    A    I never -- I never put my hand on --
8    Q    Any boxes of test kits; right?
9    A    No.
10          MR. LIGHTMAN:  Do you have anything
11   to ask on this subject before I end?
12          MR. LAVER:  I do.
13          MR. LIGHTMAN:  Do you want to ask
14   some questions then?
15          MR. LAVER:  Please.  Thank you.
16   Before the test kit transaction that
17   we are talking about today, how many deals did
18   you complete with Sam Gross?
19          MR. LIGHTMAN:  Regarding test kits?
20          MR. LAVER:  Anything?
21          THE WITNESS:  Okay.  So I remember
22   the first deal.  Can I tell you?
23          MR. LAVER:  Sure.
24          THE WITNESS:  The first deal was in

Page 135

1    the diamond exchange at 578 5th Avenue where
2    I used to have a store.  That was the first
3    deal when I met Sam Gross, that was the year
4    between 2000 and 2001, 2002.  I don't
5    remember the year.  But the first time I
6    bought from him was a package of diamonds of
7    about $20,000.  And thereafter, he would come
8    like every day, every other day and show me
9    merchandise.  I would buy from him once a
10   week at least.
11          MR. LAVER:  So dozens and dozens of
12   deals over the years?
13          THE WITNESS:  Many.
14          MR. LAVER:  Okay.  Okay.  Were all
15   of those deals exclusively in the jewelry
16   industry?
17          THE WITNESS:  Correct.
18          MR. LAVER:  Can you describe Zadik
19   for us?  What's he look like?
20          THE WITNESS:  Zadik is like skinny
21   guy.  I would say 55 to 60.
22          MR. LAVER:  Does he have an accent?
23          THE WITNESS:  No, not really.  I
24   know that he's Turkish, but there is no

Page 136

1    accent because I know him like close to 30
2    years, so there is no accent really.
3          MR. LAVER:  How about the other guy?
4          THE WITNESS:  Levon.
5          MR. LAVER:  Levon.  Thank you.
6          THE WITNESS:  Levon is a little bit
7    shorter.  I wouldn't say skinny.  Also, about
8    60 something and I don't know what else to
9    tell about him.
10          MR. LAVER:  That's fine.
11          THE WITNESS:  I don't have a
12   picture, so I don't know.
13          MR. LAVER:  But it's your testimony
14   that they provided to you valid COVID test
15   kits?
16          THE WITNESS:  Correct.
17          MR. LAVER:  Sometime during the time
18   when those test kits were being stored in the
19   storage warehouse those test kits went
20   missing?
21          THE WITNESS:  Yes.
22          MR. LAVER:  Okay.  Zadik and Levon
23   are in the jewelry business as well?
24          THE WITNESS:  They used to be both

Page 137

1    together.  They shared -- they shared an
2    office, a place of work, like they were like
3    three, four guys there.  One was a jeweler,
4    one was a sitter, one was a polisher and they
5    used to work there also making jewelry.  And
6    they used to be -- sometimes that I do
7    business with give them some jewelry to make
8    up.  I would buy the components of making a
9    ring, for example, the casting, then the
10   diamonds and then I have to give the metal to
11   be polished, cleaned before putting the gems
12   in and then polishing, so it takes several
13   people to make it up, and they were doing
14   that.  They were some of the people that I
15   use at the time when I had the store in the
16   diamond exchange.
17          MR. LAVER:  Did Levon and Zadik know
18   that you had stored the COVID test kits at
19   the warehouse?
20          THE WITNESS:  I don't believe so.
21          MR. LAVER:  Who knew that the test
22   kits were being stored there?
23          THE WITNESS:  Well, obviously, me.
24          MR. LAVER:  Yep.

35 (Pages 134 to 137)

Page 138

1      THE WITNESS: And I think that Sam,
2   Mr. Mumfred. I don't know who else would be.
3      MR. LAVER: Okay.
4      THE WITNESS: Maybe the people
5   working the deliveries part, you know, but I
6   don't remember any other people. This is the
7   only people -- I thought about this question
8   many times.
9      So it's basically the people that
10  picked it up, me, Sam, Manfred. I had a crazy
11  thought that Mr. Scully also knew about it,
12  that he knew that it's stored someplace. At
13  least maybe not in the beginning, but maybe
14  on. So this is the people that I think that.
15  BY MR. LIGHTMAN:
16  Q   Why do you think Scully knew? Why do you have
17  this crazy thought?
18  **A   You know, I was trying to figure out really**
19  **what happened. Until today, I do not -- I do not**
20  **at this moment yet. And I was trying to figure out**
21  **who knew and who might have been able to do that**
22  **and there is a little group of people.**
23  Q   Why did you say you have a crazy thought about
24  Dan Scully now?

Page 139

1   **A   So you want the particular theory?**
2   Q   Tell me why.
3   **A   Because he knew that it's in a warehouse.**
4   Q   Did he know it was at Available Moving and
5   Storage?
6   **A   Yeah. Yeah. Yeah.**
7   Q   Did he know that before March 4th?
8   **A   Because Scully got the info that it's going to**
9   **the warehouse and he knew that it's going on a**
10  **carrier and he knew the name.**
11      MR. LAVER: Let me just finish real
12  quick.
13      THE WITNESS: So I'm sorry.
14      MR. LAVER: You are doing fine.
15  Thank you. And thanks for allowing me just
16  to --
17      THE WITNESS: I do not suspect
18  Mr. Scully. Don't misunderstand me. I'm
19  just saying who is --
20      MR. LIGHTMAN: The universe of
21  people.
22      THE WITNESS: Who are the people.
23  So okay. I'm sorry.
24      MR. LAVER: You are doing fine. Who

Page 140

1   loaded the box, the boxes from the warehouse
2   into the truck that you had.
3      THE WITNESS: Three people that I
4   brought in the same manner. The truck picked
5   up. It was raining so they just about
6   touched each other. And Available Movers had
7   like two, three people also and I had three
8   people.
9      MR. LAVER: Did you lift any boxes?
10     THE WITNESS: No. I was standing on
11  the side.
12     MR. LAVER: You supervised.
13     THE WITNESS: Under a little awning.
14  It was raining like cats and dogs. I
15  remember that day very well. And they
16  absolutely touched trucks back-to-back and
17  they transferred everything to my truck.
18     MR. LAVER: Box by box by hand.
19     THE WITNESS: Yeah. Yeah.
20     MR. LAVER: Box by box by hand you
21  said? Yes.
22     THE WITNESS: Yes.
23     MR. LAVER: But you were able to
24  visually inspect these boxes; correct?

Page 141

1      THE WITNESS: At what point?
2      MR. LAVER: On March 4th, when you
3   were --
4      THE WITNESS: March 4th. They came
5   with the truck. I came. They came. Right.
6   It was in their warehouse in the big hub.
7      MR. LAVER: You laid eyes on the
8   boxes when they were in --
9      THE WITNESS: Right. When they came
10  --
11     MR. LAVER: Just hear me out. Prior
12  to swapping the boxes on to the truck that
13  you brought that day, did you visually
14  inspect the boxes?
15     THE WITNESS: No.
16     MR. LAVER: You didn't see them at
17  all?
18     THE WITNESS: I saw the boxes. I
19  did not open the boxes.
20     MR. LAVER: That's what I'm saying.
21  You saw the outside of the boxes.
22     THE WITNESS: Exactly.
23     MR. LAVER: To the best of your
24  understanding, those were the same boxes that

36 (Pages 138 to 141)

Page 142

1  you brought.
2        THE WITNESS: Looked to be the same.
3        MR. LAVER: They did?
4        THE WITNESS: Yeah.
5        MR. LAVER: Did they look
6  undisturbed? Unopened?
7        THE WITNESS: I didn't observe
8  anything special really.
9        MR. LAVER: Okay. Okay. That's all
10  I have for you.
11        MR. LIGHTMAN: Let me just finish
12  this one.
13  BY MR. LIGHTMAN:
14  Q   You said you called Sam. Did you tell Sam, my
15  boxes that I had to deliver to your customers are
16  now rice?
17  A   Yes.
18  Q   What did he say?
19  A   I don't remember what he said.
20  Q   Did he tell you, go make a police report?
21  A   I don't remember what I spoke to him on that
22  regard.
23  Q   Did you make my --
24  A   Sam -- Sam, for me at that moment was a person

Page 143

1  with a question mark.
2  Q   Why?
3  A   So I knew somebody did it. I knew I didn't do
4  it, so everybody now becomes a mystery and a
5  suspect. What should I do now? So that -- the
6  same thing -- the same thing past my mind with Sam.
7        MR. HEALEY: I have one question.
8        THE WITNESS: Yes, sir.
9        MR. HEALEY: When you had the boxes
10  delivered to the warehouse, did you get like
11  any kind of document showing like a receipt
12  like -- I don't know. I just brought my dry
13  cleaning this morning and they gave me a tag.
14  I'm not trying to be facetious. Something to
15  indicate that you brought them in and they
16  were being stored there?
17        THE WITNESS: So, if you remember
18  what I said, Available Movers came, backed up
19  to my truck on the pickup day on
20  February 7th about 9:00, 10:00. They backed
21  up. They picked it up. My truck was empty.
22  My driver's going away. He finished. He was
23  waiting all night.
24        MR. HEALEY: Okay.

Page 144

1        THE WITNESS: And the people are
2  closing the truck, Available Movers, I'm
3  still with my -- waiting there and I see them
4  driving away. I'm going into my truck. I
5  put on the radio. I'm looking. I'm waiting.
6  The truck is there not moving from the end of
7  the street. I thought in the beginning it is
8  a stop sign, but that stop sign is going on
9  for five minutes. I came to the guy and ask
10  que pasa. That's exactly what I ask him
11  because they were speaking Spanish. And he
12  said, I need a bill of lading. I cannot
13  continue without a bill of lading.
14        MR. HEALEY: I understand that. I
15  know what you said. What I'm saying is you
16  eventually testified that they brought the
17  boxes to their hub or to their storage --
18        THE WITNESS: One second. At this
19  point we are waiting for Sam to produce a
20  bill of lading. Right. After an hour the
21  driving is telling me, I spoke to my office.
22  I cannot wait here any longer. When you have
23  the bill of lading, you send it to my boss.
24  He use the word my boss. I told Sam, you

Page 145

1  have to send it to Available Movers because
2  if not, they cannot continue. They need this
3  document that is called. He said, okay.
4  I'll give it to them.
5        MR. HEALEY: They can't continue to
6  deliver. They can't deliver the products
7  without --
8  BY MR. LIGHTMAN:
9  Q   But his question was -- first of all, you said
10  it was your truck. It wasn't your truck. It was
11  Levon and Zadik's truck; right?
12  A   No. Now it's my truck. It's my truck. They
13  left. It's a sort of speech. The truck that I
14  came with.
15  Q   So the truck that Levon and Zadik brought you
16  the stuff --
17  A   Exactly.
18  Q   -- the driver is still there and he left?
19  A   Exactly. My truck. Not Available Movers'
20  truck.
21  Q   When Available Movers got all the stuff on the
22  truck his question was, why didn't you get any
23  documents from them that says, I now have your
24  365,000 boxes of I-kits? Why didn't you get a

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)              Deposition of Gary Weiss                    February 16, 2024

Page 146

1  document?
2  A   I don't know if that guy didn't give me a
3  piece of paper or whatever.  I don't have it.
4  Q   I request that you produce that?
5  A   No.  I can tell you right now, I don't have
6  that.
7  Q   So you don't have it.  You don't have in your
8  possession a document from Available Movers that
9  says, we have taken 365,790 boxes of I-test kits
10  from Gary Weiss A. Solar Diamond; correct?  You
11  don't have the document?
12  A   I don't have the document, but we have
13  e-mails, correspondence with Available Movers
14  acknowledging that they picked up and he has it and
15  bla bla bla.  So I have a lot of e-mails.
16  Q   You got in your bag here?
17  A   I got it.
18  Q   Why don't we take a break, order lunch and
19  let's look -- you asked to produce documents
20  today.  You brought a bag of documents.
21  A   Maybe it's here.
22  Q   We will look through the documents.
23        MR. LAVER:  Before we break, I just
24  want to clarify, and put a request on the

Page 147

1  record, too, please, that you provide us with
2  the last name of Levon and Zadik.
3        THE WITNESS:  It won't happen.
4  BY MR. LIGHTMAN:
5  Q   Why?
6  A   Because I don't know.
7  Q   How would you get in touch with them?
8  A   What do you mean how do I get?
9  Q   Today, if we wanted to get in touch with
10  them --
11  A   I can't.  I tried to.  Did you see on my phone
12  trying to call them?
13  Q   You call this phone number and they don't
14  answer?
15  A   I don't even know if it's the phone number.
16  Q   Other than the phone number that you have for
17  them in your phone is a number that matches this
18  number on the --
19  A   Exactly.
20  Q   Other than calling that and hoping they call
21  you back, is your testimony today you have no way
22  of getting in touch with them?
23  A   No way.
24        MR. LIGHTMAN:  Let's take a little

Page 148

1  lunch break here.
2        THE WITNESS:  We tried to get in
3  touch with them.  I try the same that you
4  tried.  I tried.
5        MR. LAVER:  We are off the record.
6                - - -
7        (Off the record from 12:27 until 12:37 p.m.)
8                - - -
9  BY MR. LIGHTMAN:
10  Q   I want to go back to this picture.
11  A   I found those pictures.
12  Q   Let me see them?
13        MR. LIGHTMAN:  We have asked him to
14  find the pictures of the compromising
15  pictures of Daphna and you are showing me --
16  BY MR. LIGHTMAN:
17  Q   What's the date of the picture?
18  A   Okay.  You'll have my phone.  Don't worry.
19  Okay.  This is Daphna.  I never met, but this is
20  her picture.  This is not one of the gems that I
21  gave but --
22        MR. LAVER:  How do you know?
23        THE WITNESS:  Because I don't know
24  this gem.

Page 149

1        MR. LIGHTMAN:  Hold on.  Let me take
2  a picture of that.
3  BY MR. LIGHTMAN:
4  Q   So the next picture.  That was the picture
5  that Sam Gross texted to you?
6  A   This is all from Sam.  Okay.  You can --
7        MR. HEALEY:  Is that pictures or is
8  that a screen shot?
9        THE WITNESS:  I don't know.  This is
10  my phone here.
11        MR. HEALEY:  What I'm saying is, did
12  he send you pictures or --
13        THE WITNESS:  He send me this
14  pictures.
15        MR. HEALEY:  But when it says, plus
16  11, is it 11 pictures or he just sent you --
17  there is more pictures.
18  BY MR. LIGHTMAN:
19  Q   Click on that 11.  Just click and hold it.
20  Now hold it.  You will have to print them out.
21  There is at least --
22        MR. HEALEY:  Wait one second.
23  BY MR. LIGHTMAN:
24  Q   You will print all this out and send it to us?

38 (Pages 146 to 149)

Page 150

1  **A  I open them already before so I know.**
2  Q  You will print all of them out and send them
3  to us.  So let's go back to this --
4        **MR. HEALEY:**  One more thing, was
5  that September 22, 2023 date, is that the
6  date they were sent to you?
7        THE WITNESS:  They were sent to me.
8        **MR. HEALEY:**  So you don't know when
9  they were taken?
10       THE WITNESS:  No.
11 BY MR. LIGHTMAN:
12 Q  Go back to this picture.  What does this
13 picture show?  This Manfred Exhibit-16?  It shows
14 your black SUV on the right.
15 **A  This is what exhibit you say?**
16 Q  Manfred Exhibit-16, this is marked as
17 Deposition-16 in Sternberg's deposition.
18 **A  Oh, okay.  Who gave it to you, if I may ask?**
19 Q  That's a good question.
20       **MR. HEALEY:**  It wasn't me.
21 BY MR. LIGHTMAN:
22 Q  You produced it?
23 **A  I have three, four more pictures.**
24 Q  What is this a picture of?

Page 151

1  **A  That's I'm waiting for Available Movers.**
2  Q  So this is what you bought from Levon and
3  Zadik; right?
4  **A  Yes.**
5  Q  Is this all the merchandise you bought from
6  them?
7  **A  Yeah.**
8  Q  Why is the -- why did you put a jacket over
9  the license plate?
10 **A  I don't know.  I just put it there.  I don't**
11 **know if it was a license plate there.**
12 Q  Well, if there is no license plate anywhere
13 else.
14 **A  Nowhere.  I don't think there was a license**
15 **plate.**
16 Q  So this is the truck that Levon and Zadik
17 delivered to you and you are saying this is a
18 picture of 365,790 boxes of test kits?
19 **A  Correct.**
20 Q  When you picked them up from -- well, how were
21 these packaged?  They are in Home Depot boxes.
22 They are not in I-Health Kit boxes.  Why are they
23 in Home Depot boxes?
24 **A  I don't know.  Don't ask me.**

Page 152

1  Q  I thought off the record you told us they put
2  them in a thousand box lots?
3  **A  Yes.**
4  Q  Explain to me what you meant by that.
5  **A  A thousand kits.**
6  Q  Right.
7  **A  Per box?**
8  Q  Per box.  And how many boxes?  So you would
9  have had 355 boxes of kits; right?
10 **A  Yes.**
11 Q  And when you opened each box, you said there
12 was an 18 pound -- a bag when you got them out from
13 Available Movers and Storage and opened the box,
14 instead of being a thousand test kits in there,
15 there was a bag of rice?
16 **A  Correct.**
17 Q  And the bag of rice weighed about 18 pounds,
18 you said?
19 **A  No.  It was marked 20.**
20 Q  So it was --
21 **A  I think.**
22 Q  -- a 20-pound bag of rice in each of these 365
23 boxes?
24 **A  Yeah.**

Page 153

1  Q  And your testimony is you took all of these
2  bags of rice and fit them in the back of this black
3  SUV shown in this picture?
4  **A  No.  I put over 200 or 250 and I ask them to**
5  **drop it in front of the school where they**
6  **distribute the food to put it right there.**
7  Q  So how many --
8  **A  Two blocks away from there.**
9  Q  I would like to show you what's been marked as
10 Sternberg Deposition-15.  This was marked as
11 Manfred Sternberg Deposition-15.  Do you recognize
12 this as an e-mail exchange between you and Manfred?
13 **A  I'm not sure I have WiFi.  That's why it**
14 **doesn't offer.**
15 Q  We'll come back to that.  Let's look at
16 Manfred Sternberg-15.  This is an e-mail exchange
17 between you and Manfred regarding a declaration he
18 wanted you to sign.  Do you recognize that?
19 **A  Yes.**
20 Q  At the very bottom on April 4 you write to
21 him, okay.  I did pay for the merchandise with
22 diamonds and jewelry.  Do you see that?
23 **A  Let me get -- this is small field for**
24 **anything.  Let me get a bigger feel.  No.  No.  I**

39 (Pages 150 to 153)

Page 154

1 have another glass, you know. This has a small
2 field. This is bigger field.
3 Q   Look at the very bottom e-mail from you to
4 Manfred dated April 4th?
5 A   Okay. I did pay for the merchandise with
6 diamonds and jewelry.
7 Q   They did switch the merchandise in that
8 morning of the pickup of the boxes; right?
9 A   Yes. That's what I wrote.
10 Q   So you told Manfred and -- you told Manfred in
11 your e-mail April 4th that they did switch the
12 merchandise in the morning of the pickup of the
13 boxes; correct?
14 A   That's probably what I told, but -- I was not
15 sure.
16 Q   The "they" was American -- Available Moving
17 and Storage; right? The "they," when you say they
18 did switch the merchandise, you are referring to
19 Available Moving and Storage?
20 A   That's what I think.
21 Q   But you never went back to Available Moving
22 and Storage and confronted them?
23 A   No.
24 Q   Why?

Page 155

1 A   I didn't think they could answer me anything.
2 Q   Well, what you wrote --
3 A   Nor did I want to give them a clue at this
4 point.
5 Q   You never went back and questioned them, did
6 you?
7 A   Questioned who?
8 Q   You never went back to them and said, hey, you
9 switched my merchandise?
10 A   I don't know if they switch.
11 Q   But why did you write to Manfred, they did
12 switch the merchandise?
13 A   Yeah.
14 Q   So, if you told Manfred --
15 A   Who is they? Who is they? Who is they?
16 Q   They did switch the merchandise when I went?
17 A   Who is "they"?
18 Q   They did switch the merchandise in that
19 morning of the pickup of the box?
20 A   They.
21 Q   Who is "they"?
22 A   Somebody there in the warehouse.
23 Q   So you thought somebody from Available Moving
24 and Storage switched the merchandise?

Page 156

1 A   No. Somebody in the warehouse, not they. I
2 never -- until today I don't have any judgment
3 about Available Movers. Okay.
4 Q   You didn't tell the Court that's what happened
5 to the merchandise; right? In the case -- in this
6 case you didn't tell the Court, I picked up the
7 merchandise from Available Movers. I got to New
8 Jersey and someone switched it to rice, did you?
9 A   When was I in the court?
10 Q   Did you tell the Court the same story that you
11 are telling --
12 A   When was I in the court? Please? What date
13 are you talking about?
14 Q   Let me rephrase the question.
15 A   Okay. Good. Thank you.
16 Q   Did you at any time represent to the Court,
17 did you or your attorney represent to the Court
18 that when I -- after I picked up the merchandise
19 from Available Moving and Storage and got back to
20 New Jersey, I discovered that my kits had been
21 switched to rice?
22 A   I would have to check all the --
23 Q   What's your recollection?
24 A   I don't remember. I have to go back in to the

Page 157

1 papers with all the filings --
2 Q   I'm going to short circuit this.
3 A   Yeah. Yeah. That's okay.
4        MR. LIGHTMAN:  Mark this as
5 Deposition Exhibit-7 is what we're up to?
6        THE WITNESS:  We are not in the
7 trial yet. Just to remind you, Mr. Lightman,
8 the story will come out of the court. Don't
9 push it. Slowly we will get there. We will
10 get there. I understand you. You are okay.
11 As though I have to be telling the Court
12 anything there comes the trial, we will
13 discuss it. Okay.
14 BY MR. LIGHTMAN:
15 Q   No. We will discuss it now.
16 A   We will discuss it also now. We have
17 discussed it already.
18        MR. HEALEY:  Mr. Weiss, I know I'm
19 not your attorney, but this is the
20 equivalent -- you took an oath. This is the
21 equivalent of a court proceeding, so you do
22 have to tell him the truth.
23        THE WITNESS:  And I am doing that.
24        MR. HEALEY:  I understand, but you

40 (Pages 154 to 157)

Page 158

1    seem to think that -- I know you don't have
2    to tell us now.  You do.
3         THE WITNESS:  No.  No.  I am telling
4    you now.
5         **MR. HEALEY:**  No.  I understand, but
6    it's not like --
7         THE WITNESS:  With all my respect to
8    you, I am doing the opposite.  I am telling
9    everything now.  Okay.
10        **MR. HEALEY:**  I understand.  I'm just
11   letting you know that's the rules, the way
12   you are saying it is that it will come out at
13   trial.  He's asking you now.
14        THE WITNESS:  He means in court.  I
15   was not in trial yet.  There is nothing --
16        **MR. LIGHTMAN:**  Both of you stop.
17   Stop.  Please let's proceed.
18        (Twenty-one-page photocopy, front and
19        back, of answer to first amended complaint
20        marked GW-7, for identification.)
21   BY MR. LIGHTMAN:
22   Q    Let me show you a document labeled GW-7.  I
23   will represent to you that this is the answer to
24   the first amended complaint and the first line

Page 159

1    says, Gary Weiss, and A. Solar, LLC, answering
2    defendants or Weiss defendants through their
3    attorneys hereby filed this answer to plaintiff's
4    first amended complaint.
5         Do you see that?
6    **A    I'm reading it.  Sure.**
7    Q    You already testified that when your attorney
8    was filing pleadings she would send you the
9    document.  You'd look it over.  If there was any
10   corrections to be made, you'd correct it and,
11   otherwise, you would tell her, go ahead and file
12   it; right?
13   **A    Yeah.**
14   Q    Now, if you look at the first page of this --
15   I'm sorry.  If you go to page 25 of 42 of this
16   pleading --
17   **A    You want me to go where?**
18   Q    Page 25 at the top see where it says 25 of 42?
19   It starts, at, facts supporting affirmative defenses
20   and counterclaims paragraph 168.  Go to 168.  I'm
21   sorry.  Before we do that, go to page 32 of 42.
22   Here.  Give me this.  I'll make it easy for you.
23   On page 32 of 42 of this proceeding of this
24   document which bears ECF document 105 filed

Page 160

1    September 12, there is a verification here; right,
2    Mr. Weiss?
3    **A    Okay.**
4    Q    And that's your signature; right?
5    **A    It says, I true to the best of my personal
6    knowledge.**
7    Q    And it says -- that's your signature; right?
8    **A    And that's my signature.**
9    Q    To the right of the date where it says,
10   9/12/2023; right?
11   **A    I think it's correct.**
12   Q    And it says, you're verifying on behalf of
13   yourself and A. Solar, LLC.  How can you verify
14   something on behalf of A. Solar, LLC when that does
15   not exist?
16   **A    Because that's how it's addressed.**
17   Q    But you didn't --
18   **A    No.  No.  No.  No.  No.  This is how it's
19   addressed.  Then I answer on the address.  I'm not
20   verifying that it exists.  The opposite.  Through
21   my lawyer, we denied that this entity is in
22   business about the COVID tests.**
23   Q    You didn't say, but it's not in business in
24   the COVID test.  You never formed A. Solar, LLC;

Page 161

1    correct?
2    **A    I never did.**
3    Q    But you verify here, Gary Weiss on behalf of
4    myself at A. Solar, LLC; right?
5    **A    It's addressed to A. Solar, so here I'm
6    addressing this complaint and to reference to what
7    I am doing.  Not confirming this particular
8    company.**
9    Q    Okay.  But you say Gary Weiss verified that
10   the statements made in the foregoing answer to
11   plaintiff's amended complaint affirmative defenses
12   and cross-claims are true; right?
13   **A    To the best of my personal knowledge.**
14   Q    Right.  And you say I understand that this
15   verification is made subject to the penalties of 18
16   PACS Section 4904, relating to unsworn
17   falsification to authorities.  Do you see that?
18   **A    I see.**
19   Q    Let's now turn to page 25 of this verified
20   pleading where you say everything in here is true.
21   And there is a heading that says, facts supporting
22   affirmative defenses and cross-claims.  Do you see
23   that?
24   **A    Okay.**

41 (Pages 158 to 161)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

---

Page 162

1  Q   Paragraph 171 or -- excuse me.  On 169, you
2  write, in or around January 2022 the Weiss
3  defendants agreed to provide COVID-19 test kits to
4  the Gross/Sternberg defendants.  Do you see that?
5  169?
6  A   I'm reading.
7  Q   Is that correct?  Did I read it correctly,
8  sir?  In paragraph 169 you write --
9  A   I'm try to understand the paragraph.
10 Q   Quote, in or around January 2022 the Weiss
11 defendants agreed to provide COVID-19 test kits to
12 the Gross/Sternberg defendants, end quote.  Did I
13 read that correctly?
14 A   Yeah.
15 Q   And then you write in paragraph 171, at the
16 direction of the Gross and Sternberg defendants the
17 Weiss defendants were to make arrangements for the
18 test kits to be transported directly to the end
19 user; correct?  That's what you write in paragraph
20 171; correct?
21 A   At the direction of the Gross and Sternberg
22 defendants were to make arrangements for the test
23 kits to be transported directly to the end user.
24 Q   That's what you wrote?

---

Page 163

1  A   Which I did.
2  Q   You claim that's true; right?
3  A   I did, yeah.
4  Q   So the Sternberg defendants were part of the
5  direction that you received.  You received
6  direction from the Gross and Sternberg defendants;
7  correct?  That's what you wrote in here; right?
8  A   I didn't write it.
9  Q   That's what is written in here; correct?
10 A   That's what is written.
11 Q   And you verified as true; correct?
12 A   I may not have understood exactly what it is,
13 but I do not deny that this was how it's written
14 and I do not deny that I signed it.
15 Q   And then on paragraph 172 you write, on
16 February 7, 2022, the Weiss defendants provided
17 photograph evidence of the test kits on the
18 transport vehicle to the Gross and Sternberg
19 defendants.  Do you see that?
20 A   Correct.
21 Q   Would that be a reference to this picture
22 that's marked as Sternberg-16?
23 A   One of them, yes.
24 Q   So this is one of the pictures?

---

Page 164

1  A   Yes.
2  Q   You provided them with other photographic
3  evidence?
4  A   Yes.
5     MR. LIGHTMAN:  Mr. Laver, we haven't
6  received those pictures.  Please produce
7  them.  Mark that request.
8  BY MR. LIGHTMAN:
9  Q   Then you write, thereupon -- in number 173 you
10 wrote, thereafter on information and belief, the
11 Sternberg -- the Gross and Sternberg defendants
12 provided a partial payment for the test kits to the
13 Weiss defendants via electronic wire; correct?
14 A   Correct.
15 Q   That's referring to a wire that occurred on or
16 about February 7th; right?
17 A   That's what it says.
18 Q   What partial payment are you referring to?  Is
19 that the $219,000 deposit?  That was made
20 February 1st; right?
21 A   Okay.  Okay.  I don't want to get confused,
22 sir.  Let me think a little bit and you will get
23 exactly.
24 Q   I will even make it easy.

---

Page 165

1  A   I don't need it.  I don't need it.  Mr.
2  Lightman, I don't need it.
3  Q   We are going to make it easy.
4  A   You can produce it later when you want to
5  catch me.  Okay.  One second.  Let me go to the
6  payments.  I know it by heart.  219 was done on
7  February 1st.  Right.
8  Q   Right.
9  A   Now we are talking about February 7 that means
10 the balance, supposedly the balance.  However,
11 Zekaria did not send me the balance.  She sent only
12 1.2 million, so there is balance.  That's why it
13 says partial.
14 Q   I would like to show you -- stop right there.
15 I would like to show you what's been marked as
16 Sternberg Deposition Exhibit-22.  That's your
17 handwriting; correct?
18 A   Correct.
19 Q   That's a list of the payments that you claim
20 you received from Daphna Zekaria; correct?
21 A   Correct.
22 Q   Are these all the payments that Daphna Zekaria
23 made to you in connection with the test kits?
24 A   Yes, sir.

---

42 (Pages 162 to 165)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                  Deposition of Gary Weiss                    February 16, 2024

---

Page 166

1  Q   These four payments.  February 1, February 7,
2  February 15, February 28; correct?
3  A   Yes, sir.
4  Q   She made no other wire transfers, other
5  payments other than these four payments; correct?
6  A   No.  No.
7  Q   No, that's correct?
8  A   No other payments.  Yes, it is correct.
9  Q   So the partial payment you are referring to in
10 paragraph 173 of your answer Gary Weiss-7, refers
11 to the $1,246,906 payment that Daphna wired to you
12 on February 7th; correct?
13 A   Correct.
14 Q   Then you write in paragraph 174, thereafter,
15 the transport vehicle left its location around
16 eleven o'clock a.m.; right?  174?
17 A   174.
18 Q   Right?  The transport vehicle left its
19 location at 11:00 a.m.  That's the place in the
20 park in Elizabeth, New Jersey where your people --
21 A   No.  No.  No.  Wait.  Wait.  Wait.  Please.
22 On -- on February 7th Available Movers are picking
23 up the merchandise.
24 Q   From the --

Page 167

1  A   No park.  No park here.
2  Q   Where is the street that they parked it?
3  A   Urbinovich Street.
4  Q   Spell that, please.
5  A   Oh, that's a tough one.
6  Q   O-r-b-i-n-o-v-i-c-h?
7  A   Starts with U.  U-R.
8  Q   Urbinovich Street.  We'll figure it out later.
9  The phonetic spelling is U-r-b-i-n-o-v-i-c-h,
10 Urbinovich?
11 A   Something like that, yes.
12 Q   So that's where Levon and Zadik delivered the
13 truck with the test kits to you?
14 A   No.  No.
15 Q   That's where you slept that night?
16 A   No.
17 Q   Where did they deliver the kits to you?
18 A   They delivered it -- they delivered it on
19 another street and we moved from there to this
20 street because of the space that --
21 Q   So they delivered it to you at the park and
22 then you moved it to Urbinovich Street?
23 A   We moved to Urbinovich where we can park and
24 another truck can come.

Page 168

1  Q   So it was on Urbinovich Street?
2  A   Urbinovich, yeah.
3  Q   And that was -- is this picture?
4  A   On Urbinovich Street.
5  Q   So Manfred Exhibit-17 is a picture of the
6  truck on Urbinovich Street?
7  A   On Urbinovich Street.
8  Q   And this is before this was loaded from the
9  truck that Levon and Zadik delivered to you on to
10 the Available Movers truck; right?
11 A   This is -- yes.  The merchandise that came
12 from Levon and Zadik.
13 Q   So this picture, Manfred Sternberg-16, is on
14 Urbanovich Street; right?
15 A   Right.
16 Q   And when you refer to the transport vehicle
17 left its location around 11:00 a.m.  It left this
18 location where the picture was taken; right?
19 A   Yeah.  But not with this truck.
20 Q   Right.  There was another truck that backed up
21 to it.  You loaded all the goods and you left
22 around 11:00 a.m.?
23 A   Right.
24 Q   Then you write, shortly after -- in 175,

Page 169

1  shortly after the transport vehicle left its
2  location the transport company advised that it
3  required a bill of lading in order to complete the
4  transfer?
5  A   Correct.
6  Q   That's Available Movers is the transport
7  company; right?
8  A   Correct.
9  Q   And they are telling you we need bills of
10 lading for each of these deliveries; right?
11 A   Correct.
12 Q   And then turn to the next page, 176, the
13 transport company requested from the Weiss
14 defendants a bill of lading for each destination;
15 correct?
16 A   Yes.
17 Q   So on February 7th you did not have any bill
18 of lading; correct?
19 A   No.
20 Q   And Available Movers didn't have any bill of
21 lading; correct?
22 A   Correct.
23 Q   And neither Sam Gross nor the Sternberg
24 defendants gave you a bill of lading; correct?

43 (Pages 166 to 169)

Page 170

1    A   Correct.
2    Q   You wrote, in 177, quote, the Weiss defendants
3    did not have the requests bill of lading, nor did
4    they have the requisite information to complete a
5    bill of lading, end quote; right?
6    A   Correct.
7    Q   And then you wrote, the Weiss defendants
8    accordingly requested a bill of lading from
9    third-party plaintiffs and the Sternberg
10   defendants; right?
11   A   Correct.
12   Q   And the third-party plaintiffs are Gross and
13   his company CHG; right?
14   A   Right.
15   Q   So number 179, as neither the Gross nor
16   Sternberg defendants provided a bill of lading the
17   transport company, Available Movers, transported
18   the test kits to its own storage facility to hold
19   them there until such time as a bill of lading
20   could be procured.  Do you see that?
21   A   Yes, sir.
22   Q   And then this is February 7th; right?
23   A   7.
24   Q   So then paragraph 180 you write, over the

Page 171

1    course of the next few weeks, the Weiss defendants
2    repeatedly requested bill of -- the bill of lading
3    and requisite details from the Gross and the
4    Sternberg defendants; right?
5    A   Correct.
6    Q   So you are making a request not only to Sam
7    Gross, but to Sternberg.  Give me a bill of lading;
8    correct?
9    A   That's his lawyer.
10   Q   So the answer is yes?
11   A   So both of them through Sam, yes.
12        MR. LAVER:  What was the last part
13   of what you just said?
14        THE WITNESS:  Through Sam.
15   BY MR. LIGHTMAN:
16   Q   You never spoke with Sam Sternberg directly?
17   A   No.
18   Q   Then why did you say Gross and Sternberg
19   defendants?
20   A   Because they are one.
21   Q   They are one.  Okay.
22   A   It's his lawyer.
23   Q   181, after approximately two weeks, so from
24   February 7th now it would be February 21st; right?

Page 172

1    A   I will make a correction.  They are one for me
2    in my eyes.
3    Q   I hear what you are saying.
4    A   Thank you.
5    Q   So after approximately two weeks, that's two
6    weeks from February 7th; right?
7    A   Correct, sir.
8    Q   So it would be approximately February 21st the
9    transport company notified the Weiss defendants
10   that the test kits needed to be treated as it would
11   no longer store them at its facility; correct?
12   A   Correct.
13   Q   I thought you said they agreed to store them
14   for like $350 a day?
15   A   Yeah.
16   Q   But here you are saying, Available Moving is
17   telling you they don't want to store them any
18   longer; right?
19   A   No.  They don't want any longer, no.
20   Q   So they didn't say, we'll keep them there for
21   $350 a day; right?
22   A   They said already before.
23   Q   But now they are telling you around
24   February 21st get them out of there; right?

Page 173

1    A   Yeah.  Get them out.
2    Q   182, you write in this verified answer, the
3    facts to support your defense, quote, still having
4    not received the bill of lading, the Weiss
5    defendants made arrangements to retrieve the test
6    kits from the transport facility, correct, in 182?
7    A   Correct.
8    Q   So that's when you went to the park and hired
9    these three guys and they got this --
10   A   No.  No.
11   Q   What arrangements are you talking about?  I
12   made arrangements to retrieve them?
13   A   The arrangements were made in the beginning of
14   March.
15   Q   When it says, the Weiss defendants made
16   arrangements to retrieve the test kits from the
17   transport facility.  Do you see that?
18   A   Which part?
19   Q   182.
20   A   Okay.
21   Q   It says, you said you made arrangements to
22   retrieve the test kits; right?
23   A   I did.
24   Q   The arrangements you made were to go to the

44 (Pages 170 to 173)

Page 174

1  park, hire three movers, get a truck?
2  **A   No.**
3  Q   What arrangements did you make?
4  **A   No. You are on 182?**
5  Q   182 you said you made arrangements to retrieve
6  the test kits. What arrangements are you talking
7  about?
8  **A   Listen, still not receive the bill of lading,**
9  **the Weiss defendants made arrangements to retrieve.**
10 **They made the arrangements in the beginning of**
11 **March.**
12 Q   What arrangements? I didn't say when. You
13 said, we made arrangements. I want to know what
14 arrangements did you make?
15 **A   I have to go and pick up the boxes with the**
16 **COVID test kits.**
17 Q   Right. So that --
18 **A   From Available Movers.**
19 Q   So the arrangements you are talking about is
20 going to the park, getting three guys in a truck?
21 **A   Not in the park. I said, it's Elizabeth**
22 **Avenue. Please.**
23 Q   I apologize. The arrangements you are talking
24 about are you went to the street in Elizabeth where

Page 175

1  these --
2  **A   That was on March 4th.**
3  Q   Please. I'm not asking you when they made.
4  I'm asking you what arrangements. That's when you
5  went?
6  **A   That's the arrangement.**
7  Q   Hired the three people and one of them got a
8  truck for you; right?
9  **A   Right.**
10 Q   Then you write, 183, quote, upon arrival at
11 the transport facility -- that's when you went to
12 Available Movers; right? Right? Upon arrival at
13 the transport facility, that's when you got to --
14 arrive at Available Movers; right? That's what 183
15 starts out?
16 **A   Uh-hum. Yes.**
17 Q   So upon arrival at the transport facility,
18 meaning AMS, the Weiss defendants learned that the
19 test kits were no longer on the truck and they
20 could not be located; correct?
21 **A   Correct.**
22 Q   So in this pleading that you filed in court on
23 September 12th, verified subject to the penalties
24 for unsworn verification, you told -- represented

Page 176

1  to the Court, to me and my client, to Seth and his
2  client, that the test kits when you got there to
3  get them, were no longer on the truck; correct?
4  That's what this said; correct?
5  **A   It's a mistake.**
6  Q   That's what this says; correct?
7  **A   It is -- can be interpreted like this, but I**
8  **interpreted it wrong and did not correct the**
9  **lawyer's writing, but that's not what I meant.**
10 Q   What you wrote and what you submitted to the
11 Court was that when you got to Available Movers --
12 **A   Correct.**
13 Q   -- the defendants learned that -- please. You
14 didn't write, I took the test kits and they turned
15 to rice; right? Right?
16 **A   Made a mistake. I made a mistake.**
17 Q   You wrote, the Weiss defendants learned the
18 test kits were no longer on the truck. Do you see
19 that?
20 **A   Okay. Yes. Yes. Yes.**
21 Q   And then you wrote, upon learning of the
22 foregoing you -- quote. 184. Upon learning of --
23 upon learning the foregoing the Weiss defendants
24 offered to provide a full refund to the Gross

Page 177

1  defendants. Do you see that?
2  **A   Yes.**
3  Q   And then you write, a true and correct copy of
4  e-mailed correspondence dated March 1, 2022,
5  offering a refund is attached hereto and marked as
6  Exhibit-3. Do you see that?
7  **A   Yeah.**
8  Q   So you didn't go pick up the trucks on
9  March 4th, as you testified to earlier; right? You
10 did it before March 1st?
11 **A   No.**
12 Q   You say in 184 you offered -- you sent him
13 and -- when you learned that the trucks were no
14 longer there, according to this pleading --
15 **A   No. No. No.**
16 Q   Excuse me. I'll start over. According to the
17 pleading you filed in court, when you arrived at
18 the AMS facility and learned that the test kits
19 were no longer on the truck and couldn't be
20 located, that's -- upon learning that, you offered
21 to provide a full refund to the Gross defendants.
22 That's what you wrote in this pleading that you
23 verified and filed in the court; correct? That's
24 what you wrote in this pleading; right?

45 (Pages 174 to 177)

Page 178

1  A  Upon arrival.
2  Q  Upon arrival at the facility?
3  A  I did not check anything at the facility.
4  Q  You claimed earlier you took the test kits
5  away; right?
6  A  I took the boxes away.
7  Q  But here you didn't say that; right?  You
8  didn't say in this pleading --
9  A  It's not -- it's not expanded enough detail to
10  say that I took the boxes and then when I open them
11  up, which happened already in a different place,
12  and not at the hub, that's when I discovered.  So
13  here it has to be corrected to be in more details
14  where and what happened exactly.  So upon arrival
15  that day that I arrived, wherever it was that the
16  4th or the 5th of March, at that day on the
17  arrival, after I took the boxes and put them on the
18  truck that I brought and took them away and drove
19  it away back to Elizabeth, and then when I started
20  to examine the boxes, then I discovered that they
21  have rice in them.
22  Q  None of what you just said is put in this
23  document; right?  Correct?  Isn't it true, Mr.
24  Weiss?

Page 179

1  A  It's not here.
2  Q  It's not here?
3  A  Okay.
4  Q  Let's --
5  A  But that's what happened.
6  Q  Let's go through what you did say.  You claim
7  several times under oath that it was March 4 that
8  you went to pick up --
9  A  No.  I don't remember March 4th or 5th or 6th
10  but --
11  Q  Somewhere after March 1st?
12  A  After -- after March 4th.
13  Q  On or after March 4th is when you say you went
14  to AMS?
15  A  After March 4th, but it can be a few days
16  after that.  I just remember.
17  Q  It is not earlier than March 4th; right?
18  A  No.
19  Q  No, that's correct?  That's correct; right?
20  It's not earlier than March 4th; correct?
21  A  I think so.  I'm not sure.
22  Q  If you went on March 4th or 5th or 6th to get
23  the vehicles, how could you offer a refund to the
24  Gross defendants on March 1st?

Page 180

1  A  Where is March 1st I see offer them.
2  Q  Paragraph 184.  That's what it says, right, on
3  March 1st?
4  A  Maybe there is some mistakes here.  Let's find
5  out.  Where is March 1st?
6  Q  Look at Exhibit-3?
7  A  Where is it?
8  Q  Exhibit-3, turn to the next page.
9  A  Okay.  Okay.
10  Q  On March 1, you write, if you like a refund,
11  you have no questions asked.  Do you see that?
12  A  Okay.
13  Q  And you underlined the word refund in green?
14  A  Yeah.
15  Q  Right?
16  A  Yeah.
17  Q  So on March 1 you were offering a refund?
18  A  Right.
19  Q  So go back to paragraph 184.
20  A  Let me read.  Of course.  As I said many times
21  before, if you like a refund, you have no questions
22  asked.
23  Q  That's what your March 1st e-mail to Manfred
24  and Sam says; right?

Page 181

1  A  Right.
2  Q  But go back to -- go back to --
3  A  Right.  So I read it.
4  Q  184.  Excuse me.  184 says, after you learned
5  that the test kits were no longer on the truck and
6  could not be located, upon learning that, then you
7  offered to provide a full refund to the Gross
8  defendants, a true and correct copy of e-mail
9  correspondence dated March 1, 2022, offering a
10  refund is attached and marked as Exhibit-3; right?
11  A  Okay.
12  Q  Your pleading that you filed in the court --
13  A  No.  That's --
14  Q  Please let me finish my question.  When you
15  filed this pleading on September 12, you
16  represented to the Court and to the plaintiff and
17  to me and to Seth and his client and to Zekaria
18  and --
19      MR. HEALEY:  Maybe not.
20      MR. LIGHTMAN:  What?
21      MR. HEALEY:  Maybe not.  I don't
22  know.
23  BY MR. LIGHTMAN:
24  Q  I don't know if you are in or not.  But the

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.                Friday
No. 2:22-CV-0688 (JMY)                  Deposition of Gary Weiss                          February 16, 2024

Page 182

1  people who are in a case, you represented to them
2  when you got to AMS the product couldn't be located
3  and upon learning that, that's when you offered a
4  refund and you attached your March 1st e-mail as
5  proof of that, right, according to this pleading
6  that you filed; right?
7  A  No. No.
8  Q  What?
9  A  No.
10  Q  Where it says that in this pleading; correct?
11  A  No, it doesn't.
12  Q  It says, you arrived -- 183, you arrived at
13  the transport facility, AMS; right?  It says, you
14  learned that test kits were no longer on the truck.
15  That's what this says; right?  Right, Mr. Weiss?
16  A  This is not what I meant.
17  Q  You can explain it --
18  A  No. No. No. No.  Of course.
19  Q  It says, you arrived at the AMS facility in
20  paragraph 183; right?  Upon arriving at the
21  transport center, it says, you learned the test
22  kits were no longer in the truck; correct?
23  A  It's the wrong --
24  Q  It says that; correct?

Page 183

1  A  Yes, it does.
2  Q  It says, they could not be located; correct?
3  A  Yes.
4  Q  It says, upon learning that, you offered a
5  full refund; correct?
6  A  Yes.
7  Q  It says, a copy of my correspondence dated
8  March 1 offering a refund is attached as Exhibit-3;
9  correct?
10  A  Correct.
11  Q  So how could you notify them on March 1st,
12  when you didn't -- by your own testimony you didn't
13  get there until March 4?
14  A  Okay.
15  Q  That's not possible, is it?
16  A  No.
17  Q  Let's go to the next page?
18  A  Absolutely not.
19  Q  Wait a minute.  Ready?
20  A  This is a mistake.
21  Q  There is mistake after mistake after mistake,
22  according to your testimony.  This version that you
23  filed in court verified is different than the
24  version you testified to; correct?

Page 184

1  A  Absolutely.
2  Q  So the version set forth in this pleading, 105
3  filed, September 12th is false; correct?
4  A  No, it's not.  It's a mistake.
5  Q  It's not true; correct?
6  A  It's a mistake.
7  Q  You could call it a mistake --
8  A  It's mistake.
9  Q  Mr. Weiss, what you wrote in here is not true;
10  right?
11  A  It's a mistake.
12  Q  Mr. Weiss, what you wrote in here is not true;
13  correct?
14  A  I did not read it, interpret it correctly and
15  put it in the right context of timing.
16  Q  So when you verified this --
17  A  It's mistake.
18  Q  -- when you executed -- excuse me.  Excuse me.
19  When you wrote at the end of this pleading, when
20  your verification you signed that says I, Gary
21  Weiss, hereby verify the statements made in the
22  foregoing answer, affirmative defense are true,
23  that is not correct, is it?  These statements that
24  you verified as true are not true?

Page 185

1  A  It's not correct.  This is not correct.
2  Q  It's not correct.  And let's continue.  Let's
3  continue.  Go back to 18 -- go back to the bottom
4  of 185.  After you said I want a refund in 185, you
5  wrote the Weiss defendants were notified by the
6  Gross defendants that they would not accept a
7  refund; right?
8  A  Right.
9  Q  Instead, if you go to 186, the Gross
10  defendants requested collateral from the Weiss
11  defendants; right?  Right?
12  A  186 says the Gross defendants requested
13  collateral from the Weiss defendants.
14  Q  And you say -- go down to 191, on or around
15  March 1 when it appeared that the test kits were
16  irretrievably lost.
17  A  Again, it's wrong date.
18  Q  Excuse me.  It says here, on or about March 1
19  when it appeared the test kits were irretrievably
20  lost; correct?  That's what it says; right?
21  A  That's what it says.
22  Q  And that's what you verified, so it was true
23  to the best of your knowledge subject to penalties;
24  right?

47 (Pages 182 to 185)

Page 186

1    A   Correct.
2    Q   And in here you are claiming now that the
3  March 1 date is a mistake -- it's not correct?
4  It's false?
5    A   It's a mistake.
6    Q   But it also says, it appeared the test kits
7  were irretrievably lost. Is that a mistake as
8  well?
9    A   It's a mistake.
10   Q   That's not true, is it, what you wrote in
11  here; right?
12   A   Well, I did not read it correctly when it
13  represented to me.
14   Q   But you verified it as correct?
15   A   No. I did not verify it.
16   Q   You verified that the statements made in the
17  foregoing are true and correct subject to penalties
18  for unsworn falsification?
19   A   I said, to the best of my knowledge, I guess I
20  did not. I am sure I did not read carefully the
21  wording to correct it.
22   Q   So on version number one, what you wrote to
23  the Court and represented to us on September 12,
24  your story that you put in court was you got to the

Page 187

1  facility and the test kits were gone; right?
2    A   No.
3    Q   That's what you wrote in here; right?
4    A   No. It's not written correctly.
5    Q   Stop. Whether or not the dates correct --
6  whether or not that date is correct -- forget the
7  dates for a second, because it's inconsistent
8  there. But the story that you put in this pleading
9  is I went to pick up the test kits and they were
10  gone. That's what you wrote in here; right?
11   A   Not at that -- I did not find out that it's at
12  the facility that it was lost. I found out when I
13  took it away from there and took it to the park,
14  which I told you, and then I wanted to repack and
15  redivide to where it's going at.
16   Q   That's the version you gave here this morning?
17   A   That's the version I am giving you right now.
18  Yes.
19   Q   But the version you gave in court on
20  September 12th was you did not even pick them up
21  because when you went to pick them up, they were --
22  the test kits were no longer in the truck and they
23  couldn't be located. That's the version you said
24  in September; right?

Page 188

1    A   It's not worded correctly.
2    Q   That's the version you said in September?
3    A   Okay. It is. It is.
4    Q   And then you read it here, the version you
5  wrote in court is that on March 1 it appeared the
6  test kits were irretrievably lost; right? That's
7  what you wrote?
8    A   If that's what it says, I verbally did not
9  read it correctly.
10   Q   And isn't it true nowhere in this pleading do
11  you mention the word rice?
12   A   No.
13          MR. LIGHTMAN: It's a good time for
14  a break. Let's break for lunch.
15                 - - -
16       (Recess taken from 1:19 until 1:51 p.m.)
17                 - - -
18  BY MR. LIGHTMAN:
19   Q   So let's go back to look at this document
20  right here. Sternberg-22. That's a list that you
21  prepared and sent me that shows the four payments
22  you got there; right?
23   A   Correct.
24   Q   I'd like to show you a series of three

Page 189

1  documents. This is Sternberg-17 and 17A. That's
2  17. Here is 17A. You have 17A; right?
3    A   This is 17.
4    Q   Right. Here is 17A. And then a new page I'm
5  going to call this -- label this Gary Weiss -- I
6  want you to label this 17B.
7          (One-page list of wire transfers
8       marked GW-17B, for identification.)
9  BY MR. LIGHTMAN:
10   Q   So on 17, the first line on 17 is The Safety
11  House on January 21, 2022, made a wire $1,965,600
12  to Manfred.
13   A   Seventeen.
14   Q   Seventeen we're looking at. So see the first
15  line on there?
16   A   I see it.
17   Q   The price that you charge on your --
18   A   $6.
19   Q   $6. If you look at that invoice you sent them
20  January 26th?
21   A   $6.
22   Q   So, if you take -- they charged my client
23  $1,965,600 because that was $13 a kit?
24   A   I see it.

Page 190

1  Q   Times 151,000.  If you take the price that you
2  charged Sam and CHG, that was $6 a kit, so it's a
3  total of 907,200; right?
4  A   Okay.
5  Q   So from the 1965 that my client wired in to
6  Manfred he paid you out 900 -- you charged them
7  907, so the balance kept, I know that Mr. Laver
8  disputes that's Manfred's and Sam's product, but
9  they retained 1,058,400?
10  A   I didn't get this 900,000.
11  Q   I know that.  Well, we will talk about that.
12  A   Okay.
13  Q   Let's talk about your wires.  Okay.  See where
14  it says MS total wires out at the bottom of 17.  MS
15  total wires out.  MS total wires out.  Do you see
16  that?
17  A   Yes.
18  Q   On February 1st you were wired 219,240; right?
19  A   Correct.
20  Q   So I'm going to put a check mark next to that.
21  On February 4th there was $1,911,960.  Are you
22  aware of that wire?
23  A   I know how much I got.
24  Q   So, if you go back to this page, this what you

Page 191

1  got on February 4th and February 7th you only got
2  $1,246,960; right?
3  A   Correct.
4  Q   So I'm going to put on -- so that's -- then,
5  if you take -- if you look at your Sternberg-22 you
6  wrote there should be 1,911,960.  Do you see that?
7  And if you turn to --
8  A   Yeah.  Yeah.
9  Q   What's been marked as Sternberg-19, this is a
10  record from Sternberg's escrow account that shows
11  on February 4th he wired $1,911,960 to Sokolski's
12  escrow account.  Do you see that?  These are from
13  Manfred's records?
14  A   Yes.
15  Q   So I'm going to take this 1,911,000 put a
16  check mark next to that because that number has
17  been verified; correct?
18  A   What do you mean been verified?
19  Q   From Sternberg's escrow records it shows he
20  wired $1,911,960, but your records 22 shows she
21  only gave you from that 1,246,960?
22  A   Right.
23  Q   Then the next wire from Sternberg's records
24  show 250,000 that he wired to Sokolski's escrow

Page 192

1  account on February 15.  Do you see that?  Now, on
2  this page on Sternberg-19 it shows on February 15
3  Sternberg wired another 250,000 to Sokolski;
4  correct?  And if you look at your records,
5  Sternberg-22, the paper that you prepared, you show
6  February 15th, of that money she only gave you
7  130,000; correct?
8  A   Correct.
9  Q   And next to that you wrote should be 250,000
10  with a question mark; right?
11  A   Correct.
12  Q   So this 250 has been verified from --
13  A   Sternberg.
14  Q   Sternberg-19.  And then if you look at the
15  last entry from Sternberg's escrow records, it
16  shows February 25, 190,000 went from Sternberg
17  again to Sokolski and Zekaria's escrow account.  Do
18  you see that on Sternberg-19?
19  A   Correct.
20  Q   And if you look at your records, you claim you
21  only got 70,000 of that; right?
22  A   Right.
23  Q   So the 190 has been verified.  Why did you
24  write should be 130, question mark.  If you know it

Page 193

1  was 190 or you thought it was only 130; right?
2  A   No.  I thought 190.
3  Q   So that number you wrote should be 130, that
4  should actually be 190?
5  A   It should be 130.  See I write 130 here.
6  Q   You wrote it should be 130, but actually it
7  was 190,000; right?
8  A   So I made a mistake.
9         MR. HEALEY:  What's actually 190?
10         MR. LIGHTMAN:  The actual wire that
11  went out from Sternberg to Zekaria on
12  February 25 is $190,000.
13         MR. HEALEY:  Okay.
14         MR. LIGHTMAN:  On Gary Weiss' record
15  of payments he only got 70,000 of that.  So
16  he wrote here should be 130.  I think he
17  really -- there really should be -- I don't
18  know why he wrote 130 because the actual
19  number was 190.  All your other numbers on
20  this chart what you got and what you think
21  she got what you got -- what you got on
22  February 7th and what --
23         THE WITNESS:  Do I have another
24  list?

49 (Pages 190 to 193)

Page 194

1 BY MR. LIGHTMAN:
2 Q  No.  This is the only list you sent me?
3 A  **What is here?  Seventy, 130.**
4 Q  That green sticker that you just read from is
5 your numbers there; right?
6 A  **Okay.  Yeah.  Yeah.**
7 Q  So you got --
8 A  **I thought it's 130.  I don't know about 190.**
9 Q  Exactly.  You thought it was 130, but it was
10 actually 190?
11 A  **Shipped and I -- exactly.**
12 Q  So ready.  Go to your green sticker.  You got
13 1,246,960 which is the February 7th wire; right?
14 A  **Yeah.**
15 Q  You got 130,000 February 15th, which is the
16 figure underneath the --
17 A  **It looks like a mistake here.**
18 Q  Right.  In the adding it up, it should be
19 1,241,446,960; right?
20        MR. LAVER:  Say that again.
21 BY MR. LIGHTMAN:
22 Q  If you take the three numbers you put here,
23 the one on the green sticker -- ignore the top 219,
24 240 because you got that directly; right?

Page 195

1 A  **Yes.**
2 Q  You added up the three numbers from the
3 Zekaria wires to you?
4 A  **That's the mistake here.  Yeah.**
5 Q  You wrote $1,447,200.  Do you see that?
6 A  **It's three payments.**
7 Q  But if you add up those three payments, it's
8 $1,246,960, plus another 200,000; right?
9 A  **Correct.**
10 Q  So it's 1,446,960; right, not 1,447,200?
11 A  **There is a mistake again.**
12 Q  So what I did was --
13 A  **You are making right now mistake unless you**
14 **are correcting because it looks like one six**
15 **something.  I'm just adding quickly, but I need a**
16 **calculator.**
17 Q  That's the 219.  What I'm going to do is look
18 at GW-17B, the one that's added there.  All right.
19 On your green sticker you wrote the total
20 payments on your green sticker that you got from
21 that was $1,447,200.  Do you see that?
22 A  **Yeah.  But it's a mistake.**
23 Q  It's actually $1,446,960; right?
24 A  **You think so?**

Page 196

1 Q  Take those three numbers.  It's 200 plus --
2 A  **It's four numbers.  It should be four.**
3 Q  Forget the top right there?
4 A  **Forget the top.  You added it, I take your**
5 **number.**
6 Q  If you take 1,246,960 and add 200 to that, you
7 get 1,446,960; right.  Right?
8 A  **Yeah.**
9 Q  So right here on 17-B I put your number in
10 green in the first column and then I put another
11 column 1,446,960 is the actual number you got.  Do
12 you see that from Daphna?  Total payments to Gary
13 Weiss from Daphna is $1,446,960; right?
14 A  **I see it's a mistake.**
15 Q  So that I'm going to put a check mark next to
16 that because that's the actual.  Then underneath
17 that --
18 A  **Is one four.**
19 Q  46,960.  And that's just due to a math error.
20 The numbers are correct, but you added them wrong;
21 correct?
22 A  **What is your correct number?  I don't see it.**
23 **That's the correct number.**
24 Q  That's the correct one.  So where I wrote

Page 197

1 $1,446,960 is actual, that's where you actually got
2 those three wires; correct?
3 A  **Three paid.**
4 Q  And then the next line was -- this is wrong.
5 The addition -- I should have added that.  So let's
6 go.  I'm going to correct 17.  Do you see 17-B?
7 A  **I don't see any mathematicians here.**
8 Q  Yeah.  Really.  The total payments made to
9 Gary Weiss from Daphna Zekaria is $1,446,960.  Do
10 you see that; right?
11 A  **Which piece of paper?**
12 Q  On 17-B far right side it says, the total
13 payments to Gary Weiss from Daphna 1,446,960.
14 Right there.
15 A  **Okay.**
16 Q  Got that?
17 A  **Yeah.**
18 Q  So go back to 17.  If you add up these wires
19 that are shown in Sternberg's escrow records, the
20 total payments made from Sternberg to Daphna was
21 the 19, the 250, the 190 and equals a total of
22 2,351,960.  Do you see that?  I'm going to circle
23 those numbers.  If you add up these numbers on
24 deposition 17, you take the 19 that he sent her on

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 198

1   February 1st, the 250,000 -- or excuse me -- the 19
2   you sent on February 4th, the 250,000 you sent her
3   on February 15th, and the 190,000 he sent her on
4   February 25th, those three payments add up to
5   2,351,960. Do you see that? The total payments on
6   the next page 17-B, that she sent you the actual
7   payment she sent you is 1,446,960. Do you see
8   that? I'm going to circle that. That's actually
9   what she sent you. That's adding up those three
10  wires there; right?
11          MR. HEALEY: I think your math is
12  off here.
13          MR. LIGHTMAN: You add up the three
14  wires that Daphna sent to Gary Weiss shown on
15  --
16          MR. HEALEY: Yeah. 1,446,960. Why
17  would you take off the 219?
18          MR. LIGHTMAN: Ready. You will see
19  why I'm saying.
20          THE WITNESS: A second. He's saying
21  Daphna sent it.
22          MR. HEALEY: I understand that,
23  but --
24  BY MR. LIGHTMAN:

Page 199

1   Q   So Daphna received the total of $2,571,200.
2   That's from Manfred.
3          MR. HEALEY: 2,351,960.
4   BY MR. LIGHTMAN:
5   Q   2,571,200?
6          MR. HEALEY: And that's from where?
7          MR. LIGHTMAN: That's from total
8   wires from Manfred to Daphna. It's a million
9   nine --$1,911,960.
10          MR. HEALEY: That's just total wires
11  out.
12          MR. LIGHTMAN: Total wires out.
13          MR. HEALEY: But that's not directly
14  to Daphna.
15          MR. LIGHTMAN: Yes, it is.
16          MR. HEALEY: No.
17          MR. LIGHTMAN: On February 1st.
18          MR. HEALEY: He did a GW wire that
19  was directly to him.
20          MR. LIGHTMAN: I'm not counting
21  that.
22          MR. HEALEY: Yeah. I know you are
23  in this -- it's the -- the wires to Daphna,
24  according to your math, are 2,351,960.

Page 200

1          MR. LIGHTMAN: You are right.
2          MR. HEALEY: Not 25.
3          MR. LIGHTMAN: 2,351. Right.
4   Exactly.
5          MR. LAVER: I'm losing track of who
6   is testifying.
7   BY MR. LIGHTMAN:
8   Q   Ready? I'm going to start over again. Total
9   wires from Manfred to Daphna, these three numbers
10  add up to $2,351,960. Are we all in agreement of
11  that?
12  A   Okay.
13  Q   Total wires that Daphna made to you is
14  $1,446,960. Do you see that? So, if you take
15  $2,351,960 and subtract from that $1,446,960, you
16  end up with $905,000 that Daphna got in wires from
17  Manfred that she didn't give to you; correct?
18  Right?
19  A   Yeah. Yeah.
20  Q   What did she do with that money?
21  A   I don't know.
22  Q   Did you ever ask her for it?
23  A   If I ask her for it -- I didn't ask her. It
24  was Sam -- Sam told me that she is going to give me

Page 201

1   less right now because he has some other people
2   that he has to give commissions and settle with and
3   he will pay me in the next few weeks.
4   Q   So Sam told you not to have Zekaria give you
5   the money?
6   A   No. Listen. Essentially, yes. Okay. So 219
7   was wired first; right?
8   Q   Right?
9   A   And then supposed to be 1.9, the balance
10  second.
11  Q   Right. So, if you take -- let's stop right
12  here a second. If you take 219, 240 and you add to
13  it 1,911,960?
14  A   That's what I sold the kits to Sam Gross.
15  Q   Exactly. That number adds up to -- that adds
16  up to $2,131,200 which is the exact amount on your
17  purchase order to him; right?
18  A   Yes.
19  Q   Or your bill to him?
20  A   Yes.
21  Q   So those first two payments adding up to
22  2,131,200 fully paid for the bill that you sent him
23  in January or the test kits; correct?
24  A   But they were not paid to me always.

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)        Deposition of Gary Weiss        February 16, 2024

Page 202

1    Q    But paid to Zekaria?
2    A    Yes. No. Paid one to me.
3    Q    One went to me --
4    A    The 219 and the second one went to Zekaria.
5    Q    Two million nine? And together those two
6    wires --
7    A    Is my invoice.
8    Q    -- equaled your invoice?
9    A    Exactly.
10   Q    So why are they paying an extra -- well, first
11   of all, why didn't you get all that money?
12   A    Okay. So after the wire of the 219, Sam told
13   me that he has to pay some monies some people that
14   he's doing a deal with to give them commissions or
15   whatever. And if I can wait for the balance
16   another week or two, and he told me that I have
17   over $4 million by Sternberg and I suppose to get
18   them and I will give you the balance. I said okay.
19   Q    Sam told you his -- Manfred Sternberg has over
20   $4 million in his escrow?
21   A    That's what he said.
22   Q    And you said okay. I don't have a problem
23   with that?
24   A    Yeah. He give me credit in the past when we

Page 203

1    did business, so I give him the same courtesy. Do
2    you understand?
3    Q    So then -- do you know who he paid that -- how
4    did -- so Zekaria took some of that money and sent
5    it to people that Sam told her to send it to?
6    A    I don't know what Zekaria did, but he asked me
7    to make two payments to one, two --
8    Q    Taylor?
9    A    One to Taylor, his stepdaughter.
10   Q    How much was that payment?
11   A    Twenty, 25,000.
12   Q    So Zekaria took 20 or $25,000 out of her
13   attorney escrow account?
14   A    No. No. No. I. I. I gave to.
15   Q    You. So, out of the 219 you got, you took 20
16   or 25 and paid it to Taylor?
17   A    No. At the end. Later on. After I got the
18   1.2 million. After Available Movers already picked
19   up.
20   Q    So you got --
21   A    Not Zekaria. I did the 25,000 to Taylor.
22   Q    After she wired you a total of 1,227,720, then
23   you took 20 or 25,000 out of that and paid it to
24   Taylor?

Page 204

1    A    He asked me to pay to Taylor 25,000.
2    Q    Why?
3    A    She does for him services.
4    Q    It's money that's supposed to be used to buy
5    test kits. Instead Sam is using it to pay Taylor.
6    Why?
7    A    Don't ask me why.
8    Q    You don't know why?
9    A    I do with Sam 20 years business. He told me
10   he's going to pay me the balance later. Okay. You
11   understand?
12   Q    So you took 20 and paid it to her; right?
13   A    Twenty-five.
14   Q    Twenty-five. That would show in the A Solar
15   Diamond escrow bank account; right?
16   A    Of course.
17   Q    We had asked you to produce those bank
18   records. Will you produce those bank records?
19   A    I gave it to you before.
20   Q    No. No. No. The only thing you gave me is
21   this one page that's been marked as Sternberg-22.
22   A    Where's my bag. I gave you a whole bag.
23   Q    No. There is no bag. I looked through that.
24   That's one of the things I was looking for. There

Page 205

1    are no bank statements from Wells Fargo?
2    A    Are you now saying that you are making a
3    mistake?
4    Q    No. I'm saying I never saw any bank records
5    to support this stuff.
6    A    Are you kidding me? Wait until you get all
7    your records back. I hope so. I gave it to you.
8    Q    They are making copies of stuff.
9    A    One second. One second. One second. There
10   no such thing. I brought it with me. I'm insane,
11   but not that much, you know. So, you know what?
12   When it comes back, we will find out those papers.
13   Q    Okay. When it comes back. I'm telling you
14   they are not there and if you don't have them --
15   A    I can get them.
16   Q    I can go subpoena them from Wells Fargo?
17   A    I have them for --
18   Q    We will see when the documents come back?
19   A    Whom did you give it to?
20   Q    What?
21   A    To whom did you give it?
22   Q    I gave it to Tony, the guy that's been waiting
23   on us, he's going to make a copy of the stuff, take
24   it out and bring it all back.

52 (Pages 202 to 205)

Page 206

1  A   So you don't know what you gave me.  You just
2  gave me bunch of --
3  Q   I'm telling you, I looked through all the
4  documents you gave me and I did not see bank
5  statements from Wells Fargo.  We will put that
6  aside?
7  A   So you are claiming that Mr. Lightman can make
8  a mistake; right?  Mistakes can happen, so remember
9  that.
10 Q   This isn't a standard bank statement.  This
11 is --
12 A   Doesn't matter.  Look at that, the numbers
13 they are not fabricated.
14 Q   Where does it show 20 or 25,000 to Taylor?
15 A   I don't know, but you'll get that, too, if it
16 didn't show here.  Okay.
17        MR. LAVER:  Can I see a copy when
18 you are done with it?
19        MR. LIGHTMAN:  Why don't we mark
20 that as a deposition exhibit and we will make
21 copies of it.  What's the next deposition
22 exhibit?
23        THE WITNESS:  So this one shows the
24 payments.  You understand?

Page 207

1  BY MR. LIGHTMAN:
2  Q   That shows the 1.6 million you totally
3  received; right?
4  A   Whatever.  I didn't sum it up because this is
5  screwed up.  So we have the 70 Zekaria on
6  February 28th I wrote, but I'm not sure what does
7  it say by you?  Let's look again.
8  Q   70,000?
9  A   On what date is it?
10 Q   February 28?
11 A   So I did make a mistake here.  And you have
12 130,000 on February 15?
13 Q   Yes.
14 A   1,246,960 on February 7th?
15 Q   Yes.  And the last one is 219,240 first page.
16 A   219.  So I did pay for that lady.  Okay.
17 Q   It's not on there?
18 A   I find it.
19        MR. LAVER:  Paid for what lady?
20        MR. LIGHTMAN:  Taylor.
21        THE WITNESS:  Taylor.
22 BY MR. LIGHTMAN:
23 Q   Give me this.  I'm going to mark it.  I'm
24 going to make you a copy.

Page 208

1  A   See here I did total payments different than
2  the total is 166.  Maybe it's mistake.
3  Q   No, it isn't because if you take -- ready.  If
4  you take the total wires to you of $1,227,720 --
5  no.  No.  I'm sorry.  Excuse me.  Total wires from
6  Daphna to you is $1,446,960 and you add to that the
7  219,240 that Manfred wired you directly, you end up
8  with $1,666,200 which is the same number you put on
9  the first page of this Wells Fargo statement.
10        Do you see that?
11 A   Uh-hum.
12 Q   So that's the total money you received from
13 Daphna and Sternberg directly for this test kit
14 purchase; correct?
15 A   Correct.
16        MR. LIGHTMAN:  Let's mark this a
17 Gary Weiss-8.
18        (Four-page photocopy of A. Solar
19 Diamond Wells Fargo record excerpts marked
20 GW-8, for identification.)
21 BY MR. LIGHTMAN:
22 Q   We will call that A Solar Diamond Wells Fargo
23 bank records excerpts.  And you are saying
24 somewhere in there in the page that you haven't

Page 209

1  produced today will show a wire --
2  A   I will find it.
3  Q   It's a wire or check?
4  A   I don't remember now.
5  Q   But either a wire or check from you to Taylor?
6  A   I will check.
7  Q   And you don't know why, but because Sam told
8  you to send the money?
9  A   Exactly.
10 Q   And did Sam ever give you back that 30,000 or
11 that 20, 25,000?
12 A   No.
13 Q   That's what you get for trusting people;
14 right?
15        MR. LAVER:  Real quick.  Who's --
16        THE WITNESS:  Not yet.  Not yet.
17        MR. LIGHTMAN:  Okay.
18        MR. LAVER:  Excuse me.  Who is
19 Alberto Herrara?
20        MR. LIGHTMAN:  That's the landlord.
21        THE WITNESS:  Alberto Herrara.
22        MR. LAVER:  Do you know?
23        THE WITNESS:  Yeah.  He's a friend
24 of mine.

53 (Pages 206 to 209)

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.            Friday
No. 2:22-CV-0688 (JMY)                Deposition of Gary Weiss                    February 16, 2024

---

Page 210

1    MR. LIGHTMAN: He testified earlier
2  that was his landlord.
3    Let's go on.
4  BY MR. LIGHTMAN:
5  Q   So what happened to the 905,000 Daphna didn't
6  pay you that she got from Manfred?
7  A   I don't know.
8  Q   Did you ever ask her about that?
9  A   I just told her, in other words, Sam asked me
10  if -- is it okay to pay less now and he will make
11  payments later and he sent some other payments in
12  the future.
13  Q   Right.
14  A   Which they took also out some, so my thought
15  there is bla, bla, whatever you said.  But what
16  they did with the balance you have to ask Sam.  You
17  have to ask Daphna.  I don't know.
18  Q   On page four of their bank records there is
19  white -- a redaction of this $200,000.  Who is that
20  from or to?
21  A   It's not from Daphna.
22  Q   Who is it?
23  A   I have to check.
24  Q   Okay.  You don't know sitting here today;

---

Page 211

1  right?  I'm going to put this right over here, so I
2  remember to make a copy of it.
3  A   Okay.
4  Q   You got a $1,666,200.  Daphna got a total
5  of --
6  A   Twenty-five.
7  Q   2,571,200.  Why didn't you ever get the
8  balance from her?  I mean, irrespective of Sam
9  saying, I'll give you later.
10  A   It's not her.  It's Sam that owes me the
11  money.
12  Q   They sent a total of 2.5 to Daphna.  Daphna --
13    MR. HEALEY: 2.3.
14    MR. LIGHTMAN: Excuse me.  Yes.
15    THE WITNESS: 2.3.
16  BY MR. LIGHTMAN:
17  Q   Sam wired a total to Daphna of $2,351,960.
18  Okay?
19  A   Okay.
20  Q   Daphna only gave you a total of --
21  A   1,446,960.
22  Q   Right.  So where is the $905,000 that she
23  didn't give you that she got from Manfred?
24  A   I don't know who she gave it.

---

Page 212

1  Q   Why didn't you ever ask her for it?  That's
2  not her money, is it?  Was she entitled to keep
3  that money?
4  A   No.
5  Q   That was money that Manfred paid to you
6  through her as an escrow agent; right?
7  A   Yeah.  Yeah.
8  Q   So you never got the money.  Why didn't you
9  ever ask her for the money?
10  A   Because I just told you, Sam asked me if he
11  can keep some money so I guess she gave it to Sam;
12  right?
13  Q   That's 20 or 25,000 that he asked you -- other
14  than the 20 or 25,000 --
15  A   I don't know about the rest.  I don't know
16  what she did.
17  Q   So you don't know what she did; right?
18  A   I don't know what she did.
19  Q   And that money, who controls -- the agreement
20  that you made with Zekaria was just between you and
21  Zekaria; right?
22  A   Right.
23  Q   It wasn't with Sam; right?
24  A   No.

---

Page 213

1  Q   Sam had no -- what authority did Sam have to
2  tell Daphna don't pay Gary the money?
3  A   I don't know what happened between them.
4  Q   All you know is that you got a total of 166
5  of --
6  A   I see -- like I said in the beginning, the
7  first 219 came to me directly from Mr. Manfred.  I
8  thought the balance would come also, but it was in
9  a sudden, an escrow that has to be done through
10  Daphna Zekaria, which I said okay.  What can I say
11  anyhow?  I wasn't -- I wasn't the one to suggest
12  Daphna Zekaria nor did I know her.  Okay.
13  Q   One of the documents that you produced today I
14  had copies made.  Let's mark this as Deposition
15  Exhibit-9.
16    (One-page photocopy of email dated
17  7/19/23 marked GW-9, for identification.)
18  BY MR. LIGHTMAN:
19  Q   This is one of the documents you produced
20  today; correct?
21  A   Yes.
22  Q   It's a text or an e-mail, rather, from you to
23  Rebecca Price dated Wednesday July 19; correct?
24  A   Correct.

---

54 (Pages 210 to 213)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                Deposition of Gary Weiss                February 16, 2024

Page 214

1  Q   You wrote, hi, Rebecca and William, we spoke
2  on July 13, 2023, on the phone.  At the conclusion
3  of that call, I felt that you were not representing
4  me with all the facts I provided to you provide to
5  the Court.  Do you see that?
6  A   You see.  That's what I was talking about.
7  Q   It says, I also was pleading with you to
8  answer the Court to dismiss my case based upon the
9  refund I gave to Sam and Manfred which they have
10 already over one year and never complained about
11 the value of the collateral, refund I gave them and
12 advised me at the end of March that they begin to
13 sell it rather than just argue to dismiss the case
14 on three technicalities and once you did not
15 prevail in the dismissal request, you were
16 surprised with Judge Young's decision.  Do you see
17 that?
18 A   Yeah.  Yeah.
19 Q   I provided you with e-mails that confirmed
20 that Manfred and Sam received the collateral;
21 right?
22 A   Right.
23 Q   You write, Manfred and Sam received the
24 collateral; right?

Page 215

1  A   Correct.
2  Q   And they advise me that they will start
3  selling it?
4  A   Right.
5  Q   Not Sam, but they will start selling it?
6  A   Right.
7  Q   And then you write, I will attach to you the
8  testimony Manfred gave the lawyer of the Texas Bar
9  on March 31, '22, whereby Manfred testified that he
10 executed legally verified that the sale and
11 purchase agreements, SPA in parenthesis, was signed
12 by Daniel J. Scully, the buyer of The Safety House,
13 prior to Scully sending the funds to lawyer Manfred
14 to his escrow IOLTA account to be released once the
15 merchandise is on the truck en route verified which
16 at that point the title of the merchandise is
17 transferred to Safety House.
18     Do you see that?
19 A   Yep.
20 Q   And then you write, please read Manfred's
21 testimony.  Therefore, the agreement is binding
22 according to him and by him and all parties and no
23 agents or other parties can become part of a
24 lawsuit.  In this case, me, Gary Weiss, for any

Page 216

1  reason at all.  See paragraph 11.
2      You are referring to paragraph 11 of
3  the SPA; right?
4  A   Uh-hum.
5  Q   And then you write --
6      MR. LIGHTMAN:  Pay attention
7  Mr. Laver.
8  BY MR. LIGHTMAN:
9  Q   Also in his testimony to the Bar Texas he is
10 hiding the fact that he already received a
11 collateral refund from Gary Weiss; right?
12 A   Correct.
13 Q   The same goes for the proceedings in PA Court
14 in front of Judge Young lying that the agreement
15 which Manfred authored and verified prevents him to
16 initiate a lawsuit against me to hold me
17 responsible for the loss of the merchandise once
18 title of the merchandise was in the hands of Safety
19 House.
20     Do you see that?
21 A   Yeah.
22 Q   Nor does his attorney Lightman disclose that
23 he knows I gave a refund to Manfred and Sam Gross,
24 nor was I present when I was named third-party

Page 217

1  defendant to object and explain.
2      Do you see that?
3  A   Yeah.
4  Q   I'll tell you, by the way, I didn't know that
5  you gave a refund until it was disclosed in
6  discovery or we would have had a different
7  complaint, but that's here nor there.  Ready?
8      You write down two paragraphs below
9  that, do you see where it says based on the lies?
10 Based on the lies of Manfred, Sam and Lightman?  Do
11 you see where you write that?
12 A   Yeah.
13 Q   Based on the lies of Manfred, Sam and Lightman
14 by not disclosing the refund, the case should be
15 dismissed altogether; correct?
16 A   Correct.
17 Q   So neither -- Manfred never disclosed to the
18 Texas Bar that you gave a full refund; correct?
19     MR. LAVER:  Objection to form.  And
20 while I have the floor --
21     MR. LIGHTMAN:  Pardon me?
22     MR. LAVER:  I'm speaking.  I object
23 to the use of this exhibit.  This is not the
24 first time that you've requested testimony

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)              Deposition of Gary Weiss              February 16, 2024

Page 218

1  from a witness without providing a copy ahead
2  of time.
3        MR. LIGHTMAN:  I saw this document
4  for the first time at lunch when he produced
5  his bag of documents and I went through it,
6  so this is --
7        MR. LAVER:  This was produced today?
8        MR. LIGHTMAN:  Yeah.  Today at
9  lunch.
10       MR. LAVER:  Noted.  Still note my
11  objection.
12       MR. LIGHTMAN:  Okay.  Note your
13  objection.
14       MR. LAVER:  Let me speak.  And I
15  object to the use as an exhibit moving
16  forward giving that we only saw it today for
17  the first time.
18       MR. LIGHTMAN:  I understand you
19  would.
20       MR. LAVER:  Moreover, it's clearly
21  privileged, but the witness doesn't know to
22  even assert that.
23       But with that go ahead.
24  BY MR. LIGHTMAN:

Page 219

1  Q  You wrote, based on the lies of Manfred and
2  Sam, right, by not disclosing the refund?
3        MR. LAVER:  Objection.  That's not
4  what it says.
5  BY MR. LIGHTMAN:
6  Q  Of Lightman and Lightman.  Assume for purposes
7  of my questions that I didn't know about the refund
8  so after --
9  A  Okay.  Okay.
10       MR. LAVER:  Objection.  We don't
11  have to make that assumption.
12  BY MR. LIGHTMAN:
13  Q  Manfred knew that you had given him a refund
14  before he wrote to the Texas Bar; correct?
15       MR. LAVER:  Objection.  How does he
16  know what Manfred knows?
17  BY MR. LIGHTMAN:
18  Q  You told Manfred he was getting collateral.
19  Diamonds and gems as collateral; right?
20  A  Yes.
21  Q  And you gave him diamonds and gems in
22  collateral back in March of 2022; right?
23       MR. LAVER:  Objection.  That is not
24  the testimony.  You are testifying now.  He

Page 220

1  didn't give them to my client.
2  BY MR. LIGHTMAN:
3  Q  Did you give collateral consisting of diamonds
4  and gemstones worth, in your opinion, approximately
5  $4 million to the Gross defendants and the
6  Sternberg defendants back in February, March of
7  2022?
8  A  Correct.
9  Q  Did Sternberg know before April '22, when he
10  wrote to the bar, that you had tendered a refund in
11  excess of the money --
12       MR. LAVER:  Objection.
13  BY MR. LIGHTMAN:
14  Q  -- that he had wired?
15       MR. LAVER:  Objection.
16       THE WITNESS:  Yes.
17  BY MR. LIGHTMAN:
18  Q  And did Manfred disclose that, that you had
19  given him a refund of diamonds and gems to the
20  Texas Bar?
21  A  I did not see it any place.
22  Q  The letter that he sent you, he sent you a
23  copy of what he wrote to the Texas bar; right?
24  A  Yes.

Page 221

1  Q  Was that anywhere in there?
2  A  No.
3        MR. HEALEY:  I have to say on the
4  record, Gary, I mean, if this is from his
5  attorney, Mr. Weiss, do you know that you
6  don't have to produce documents between you
7  and your attorney?  Do you know that?
8        MR. LAVER:  It's totally
9  inappropriate.
10       MR. HEALEY:  I can't --
11       MR. LIGHTMAN:  He produced it.
12       MR. LAVER:  It's totally
13  inappropriate.
14       MR. HEALEY:  He produced it, but
15  does he know not to produce it.  I'm not
16  sure -- I just can't sit here as an officer
17  of the court and --
18       THE WITNESS:  I cannot argue about
19  little things, so I cannot -- whatever you
20  say is accepted by me.
21  BY MR. LIGHTMAN:
22  Q  Let me ask you this.
23       MR. HEALEY:  Let me go.  What I'm --
24       MR. LIGHTMAN:  Put your statement on

56 (Pages 218 to 221)

Page 222

1    the record.
2        MR. HEALEY:  What I'm telling you
3    is --
4        MR. LIGHTMAN:  Are you acting as his
5    attorney?
6        MR. HEALEY:  I'm not acting as his
7    attorney --
8        MR. LIGHTMAN:  Then just make a
9    statement on the record so I can go forward.
10        MR. HEALEY:  You get to grandstand a
11    little.  I'm just trying to tell --
12        MR. LIGHTMAN:  I'm not
13    grandstanding.  He knows key information.
14        MR. HEALEY:  But he gave you a bag
15    of documents and you looked through it and
16    this is --
17        MR. LIGHTMAN:  And I asked him, can
18    I look through these documents and he said
19    yes.  If he didn't want me to know anything,
20    he had every right to pull it out.  He has
21    every right to get an attorney.  Judge Young
22    gave him 90 days from when she filed a motion
23    to withdraw and another 30 days and he didn't
24    get an attorney.

Page 223

1        MR. HEALEY:  I understand that.  But
2    I'm just trying to state on the record
3    whether the witness knows communications
4    between you and your attorney are privileged
5    and you don't have to produce them.  I'm just
6    saying that on the record.
7        MR. LIGHTMAN:  Okay.  Thank you.
8    Are you finished?
9        MR. HEALEY:  I'm finished.
10        THE WITNESS:  Is that a question for
11    me?
12        MR. HEALEY:  I'm telling you on the
13    record.
14    BY MR. LIGHTMAN:
15    Q    Here's my question:  Here's my question:
16    Gary Weiss-9, six lines from the bottom where it
17    starts out, fraudulent intentions.  Do you see
18    that?
19    A    One, two, three, four, five, six.
20    Q    You write, on July 19, 2023, fraudulent
21    intentions as there are no five buyers as they told
22    me.  With the detail, they instructed me to make
23    the invoice.  They are trying to lay the blame on
24    me for The Safety House transaction which is

Page 224

1    similar in dollar amount to the whole invoice where
2    they actually sent to lawyer Zekaria but Zekaria
3    and Sam did further to defraud me as part of the
4    invoice amount.  And the collateral they took from
5    me, but I'll leave that for another day.
6        What do you mean by that?
7    A    What?  I didn't get paid.  We went through the
8    numbers.  I'm still short for my $2.1 million.  Is
9    it correct or not by the numbers.
10    Q    Listen, you paid out 2.1 million.  You only
11    got in 1.6 million.  I agree --
12    A    Correct.
13    Q    -- that they never gave you all the money?
14    A    Did they find -- did they file in court that I
15    have something to do with this case and they
16    mention that I gave them already a refund?
17    Q    He filed initially all four defendants -- I'm
18    not supposed to answer questions that was asked,
19    but initially all four defendants Gross and his
20    company, Sternberg and his law firm filed a claim
21    against you saying you are the one responsible?
22    A    Right.  But I already gave them back the money
23    at the time.
24    Q    They didn't put that in their claim against

Page 225

1    you?
2    A    What do you want me to call it?  Not fraud?
3    Q    That's the fraud you are referring to?
4    A    Yeah.
5    Q    And it says, enclosed invoices that are e-mail
6    proof of receiving e-mail and Manfred testimony
7    parenthesis lie, to the Bar of Texas.
8        Do you see that?  Last line right
9    before you wrote thanks, Gary Weiss.  See where it
10    says, enclosed invoice.  Right above where it says,
11    thanks, Gary Weiss, you write, enclose invoice.
12    Their e-mail proof of receiving e-mail.  I think
13    you meant collateral there, didn't you?  And
14    Manfred testimony, lie to the Bar of Texas.
15        Do you see that?
16    A    I see it.
17    Q    So you believe that the letter dated April 22,
18    2022, that Manfred Sternberg submitted to the Bar
19    of Texas contained lies?
20    A    Well, it didn't say anything about already I'm
21    giving collateral at this time and they have
22    already something back.  No.
23    Q    So just for the record, you don't know what
24    Zekaria did with the money over and above what she

Page 226

1   paid you --
2   **A   No.**
3   Q   -- from the money that Sternberg sent her;
4   right?
5   **A   No, I don't.**
6           MR. LAVER:  When do we get a copy of
7   whatever you --
8           MR. LIGHTMAN:  They are making it
9   right now.
10          MR. LAVER:  Where did this come
11  from?
12          MR. LIGHTMAN:  This was so -- jumped
13  out at me, I ran and made five copies of it.
14          Your guy's not getting out on summary
15  judgment.
16          MR. LAVER:  Watch it.  Watch it.
17          MR. LIGHTMAN:  You got a lunch bet.
18          MR. LAVER:  What?
19          MR. LIGHTMAN:  You got a dinner bet.
20  Excuse me.
21  BY MR. LIGHTMAN:
22  Q   I'm going to show you Manfred Sternberg
23  Deposition Exhibit-15.  Do you remember that?
24  That's your exchanges April 4.  This is Manfred

Page 227

1   Sternberg sent you, if you go back, turn to page
2   two of this.  He's asking you to sign a declaration
3   that he wants to submit to the Texas Bar; correct?
4   **A   Correct.**
5   Q   And on page two of Sternberg-15 he writes --
6   you write, hi, Manfred.  As soon as I get from you
7   a declaration that you do not have any grievances
8   regarding the shipment of COVID-19 test kits and
9   will not attempt any lawsuit against me or A. Solar
10  Diamond, LLC nor any claim against me, I will grant
11  you the declaration that you want; right?
12  **A   Right.**
13  Q   You write in here, A. Solar Diamond, LLC?
14  **A   Right.**
15  Q   So they did have some involvement in these
16  test kits transactions because you are asking him
17  to write an e-mail or some statement from you, a
18  declaration that you -- that he doesn't have any
19  grievance against you or A. Solar Diamond, LLC;
20  right?
21  **A   Correct.**
22  Q   And then you write -- then he writes back
23  above that, you wrote that Monday, April 4 at 6:58
24  from you to Manfred at 6:58 a.m. and then he writes

Page 228

1   back to you on April 4th at 1:42 p.m., Dear Gary,
2   you have asked that I make the following statement
3   which is mutually agreed.  As along as no one files
4   a grievance or lawsuit against me, I do not have
5   any grievances against you regarding the shipment
6   of COVID-19 test kits by you and I will not file
7   any lawsuit against Gary Weiss and/or A. Solar
8   Diamond concerning the transaction less I am
9   required by law to join you in any lawsuit against
10  me for claims of contribution or indemnity as a
11  result of this transaction.
12          Do you see that?
13  **A   I'm reading what you read.**
14  Q   That's what he wrote to you, but you weren't
15  satisfied with the qualification he put on that.
16  You wanted an absolute I'm not going to sue you and
17  he didn't give you that; right?
18  **A   No, he did not.**
19  Q   He didn't.  Right.  So then you wrote, on --
20  10:49, okay.  I did pay for the merchandise with
21  diamonds and jewelry.  They did switch the
22  merchandise in that morning of the pickup of the
23  boxes.  I found out when I picked up from the
24  warehouses that the boxes containing these $10

Page 229

1   values, so I paid once.  I did give collateral, so
2   I am paying a second time.  I have nothing left for
3   a third time.  I want to avoid a lawsuit which will
4   cost money more.  Do you see that?
5   **A   What page are you now?**
6   Q   I'm right above that e-mail that you wrote to
7   him; right?  You are telling him they switched the
8   merchandise and you paid for it.  You gave him
9   collateral and you don't want to pay a third time.
10  Do you see that on April 4?
11  **A   You are looking here.  Page two, second page?**
12  Q   I'm sorry.  Bottom of the first page.
13  **A   Okay.**
14  Q   So you write back to him and he writes back to
15  you, hi, Gary, what would you like me to do with
16  this information?  Can you sign the declaration I
17  sent to you; right?  And the next e-mail above
18  that.
19  **A   Okay.  Show me because you are moving ahead of
20  me and I don't know that I'm moving.**
21  Q   Right there.  The response saying, hi, Gary.
22  What would you like me to do with this information?
23  Can you sign the declaration; right?
24  **A   Okay.**

58 (Pages 226 to 229)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.                    Friday
No. 2:22-CV-0688 (JMY)                Deposition of Gary Weiss                           February 16, 2024

Page 230

1  Q  So you said earlier you never spoke with
2  Manfred, but you had numerous e-mail exchanges with
3  him?
4  A  E-mail, yes.
5  Q  How about texts?  You had texts with him, too;
6  right?  We will get to this.
7  A  I don't remember right now.
8  Q  Okay.  I'll show you.
9  A  Talking physically, no.
10  Q  You never talked -- did you ever talk to him
11  on the phone?
12  A  I don't think so.
13  Q  You don't remember?
14  A  I don't think so.  No.
15  Q  Okay.
16  A  I would say no.  I would say no.
17  Q  But you had numerous exchanges with him by
18  e-mail and text?  Maybe text we will get to that.
19  Let's go to that.  Ready.  After you write -- after
20  he writes, what would you like me to do with this
21  information, then you write to him, on April 6 at
22  5:42 a.m., well, the declaration is far from the
23  truth as I know it.  Do you see that?
24  A  Where are you?  I'm sorry.  I'm a little bit

Page 231

1  dizzy, so I'm not as quick as you so...
2  Q  Okay.
3  A  Well, the declaration is far from the truth as
4  I know it.
5  Q  That's the declaration that he drafted to you
6  for you to sign; right?
7  A  Exactly.
8  Q  You reviewed it and you said it's far from the
9  truth; right?
10  A  Yes.
11  Q  I asked you to bring that with you.  Did you
12  bring that with you today?
13  A  I don't know.  I brought some papers.  I don't
14  know what's inside.
15  Q  No matter because when I was preparing for
16  this deposition, I found it.
17       MR. LIGHTMAN:  Let's mark this as
18  Gary Weiss-10.
19       THE WITNESS:  You found it.  It may
20  be also here.  I put everything that I have
21  there inside.
22       (Three-page photocopy of declaration
23  of Gary Weiss marked GW-10, for
24  identification.)

Page 232

1  BY MR. LIGHTMAN:
2  Q  Gary Weiss-10.  Yes.  Here is Gary Weiss-10.
3  Gary Weiss-10, do you recognize that as the
4  declaration that Sam -- that Manfred Sternberg
5  drafted that he wanted you to sign to submit to the
6  State Bar of Texas?  Do you recognize that?
7  A  I have seen this before.
8  Q  And it has Weiss document number 311 and 312
9  and 313; right, at the top of it?
10  A  Oh, okay.  I see it.
11  Q  Here is what I would like you to do.  This is
12  the declaration that he sent you to sign that you
13  said was far from the truth, as I know it; right?
14  A  Of course.
15  Q  I would like you to take a pen and go through
16  the declaration and underline everything in this
17  declaration that he wrote that you don't think is
18  true.  Okay.  And while you are doing that, I will
19  look through this stuff.  In this declaration draft
20  declaration, underline everything that you believe
21  is not true.  Just underline it.
22            - - -
23       (Recess taken from 2:43 until 2:54 p.m.)
24            - - -

Page 233

1  BY MR. LIGHTMAN:
2  Q  You have now -- I hand you back Deposition
3  Exhibit GW-4 with underlines on.  The underlines
4  are what you underlined that is not shown here;
5  right?
6  A  It looks not right.
7  Q  So now Deposition Exhibit GW-10 contains
8  underlines of stuff that is in here that's not
9  true; correct?
10  A  Yes.
11  Q  Let's go on the record for a second.  Are you
12  ready?
13       MR. LIGHTMAN:  During the lunch
14  break, Mr. Weiss let me look through a bag of
15  his documents and I made one copy of the
16  documents sticking out of each of these
17  folders and I will represent to counsel, all
18  of the documents sticking out have been
19  copied and I'm going to put this paperclip,
20  put a little clip on it and I will get these
21  documents copied and I will find the last
22  Weiss document number and add them to that
23  and send you a copy, Mr. Laver, and you a
24  copy, Mr. Healey?  Healey.  Right.  Sorry.

59 (Pages 230 to 233)

Page 234

1    Sorry.  Getting old sucks.  There is one
2    additional set here that I'm going to get
3    copied at the break.  I don't think they were
4    copied.
5    BY MR. LIGHTMAN:
6    Q   But other than that, here are your documents,
7    Mr. Weiss.
8    A   This is all?
9    Q   The ones I did not copy are in your folder.
10   The only other thing that's missing, here is
11   another copy of -- here is your bank records which
12   have been marked as eight.  Here is your bank
13   records?
14   A   Mine was color.
15   Q   Right here.  Let me do this.  Take this right
16   now.  I'm going to make a color copy and I will
17   send you back the color copy.  Do you understand
18   what I'm saying?  Take this so you have it?
19   A   I need the color copy.
20   Q   I'm going to my office, make a color copy and
21   send you back the original color copy.  Okay?
22   A   Yes.
23         MR. LIGHTMAN:  So Deposition Exhibit
24   GW-8, here is a black and white copy for

Page 235

1    counsel, Mr. Healey, and Mr. Laver, I gave it
2    to you.
3    BY MR. LIGHTMAN:
4    Q   And I will take the color copy that you gave
5    me, Mr. Weiss, and send it back to you after I make
6    a color copy of it.
7    A   You think they can make color copies.  They
8    can.  Really?  You know for sure?
9    Q   No.  But I'll make it.  I know I can.
10   A   No problem.
11   Q   Look at Gary Weiss-10, the declaration that
12   Mr. Sternberg drafted and sent to you.  Do you have
13   that in front of you?
14   A   Okay.
15   Q   In paragraph -- you testified earlier that
16   this was the first time that you Zekaria and you
17   met her; right?
18         MR. LAVER:  Wait.  Say that again.
19   So I'm sorry.
20   BY MR. LIGHTMAN:
21   Q   This morning when I asked you, is this the
22   first time you used Daphna Zekaria, you said yes.
23   And you said you didn't know her and that Sam Gross
24   found her for you?

Page 236

1    A   Right.
2    Q   So in paragraph 17 or paragraph seven you
3    underline that, that Zekaria had been a lawyer I
4    used for many years; right?
5    A   Right.
6    Q   So when Manfred Sternberg wrote that in your
7    draft, that wasn't a true statement; correct?
8    A   Correct.
9    Q   And in paragraph ten you wrote, when Manfred
10   wrote, on or about February 8th, a manifest or bill
11   of lading was created by Available Movers and
12   Storage was provided by Charlton A. Solar, you
13   underlined that because that's not true; right?
14   A   No.
15   Q   No, that's correct?
16   A   That's not true.
17   Q   That's not true.  You never got any bill of
18   lading?
19   A   I didn't see -- let me put it this way.
20   Q   You never got any bill of lading from AMS;
21   right?
22   A   No.
23   Q   You never provided any bill of lading or
24   manifest to Sam Gross; correct?

Page 237

1    A   No.
2    Q   You never provided any bill of lading or
3    manifest to Charlton; correct?
4    A   Correct.
5    Q   You never provided any bill of lading or
6    manifest to Sternberg or his law firm; correct?
7    A   Correct.
8    Q   And in 11 --
9    A   I would like to -- you are going too fast.
10   You are saying manifest and bill of lading, is this
11   one form?
12   Q   Do you know what a manifest is?
13   A   It's like a list; right?  But bill of lading
14   is a legal document, isn't it?
15   Q   Let's break it up.  You never got a bill of
16   lading from everybody from --
17   A   Correct.
18   Q   -- from Available Moving and Storage or Sam
19   Gross or Charlton or Sternberg or his law firm;
20   correct?
21   A   Yes.  Why do I ask?  Because you provided me
22   with a manifest before.  Do you remember?
23   Q   They are lists.  Okay?
24   A   That's a manifest.

Page 238

1  Q   But it's not a bill of lading?
2  **A   Exactly.**
3  Q   Paragraph 11, it says in here, paragraph 11,
4  Sternberg writes, I personally assured Sam and his
5  Attorney Manfred by e-mail, text and telephone
6  conversation.  Do you see that?
7  **A   You are on 11 right now?**
8  Q   Yes.  So you didn't underline by telephone.
9  You claim that -- strike that.
10         Does this refresh your recollection
11  as to whether you had telephone conversations with
12  Manfred?
13  **A   I don't remember ever speaking to him.**
14  Q   So you don't know whether Manfred writing that
15  you assured him by telephone is a true statement or
16  not; correct?
17  **A   I don't remember.  I don't know if I ever**
18  **spoke to Mr. Manfred.**
19  Q   Okay.
20  **A   So I didn't underline it, you know.**
21  Q   But you underlined --
22  **A   But I am saying, again, I don't think I ever**
23  **spoke to Mr. Manfred.**
24  Q   But you underlined here the word immediately

Page 239

1  because you said you never personally assured Sam
2  and his attorney that the product would be
3  delivered immediately; correct?
4  **A   I delivered it immediately.**
5  Q   He wrote that you told him the product would
6  be delivered immediately.  That's not true; right?
7  **A   I don't know what they said to their**
8  **customers.**
9  Q   Right.  But he's saying in paragraph 11 -- he
10  prepared a declaration and he wants you to tell the
11  Texas Bar that you told Sam and Manfred that the
12  product was en route and being delivered
13  immediately.  That's what --
14  **A   But it was stopped on the truck.**
15  Q   So it never was being delivered immediately?
16  **A   No.**
17  Q   So that's a lie that Manfred Sternberg put in
18  his --
19  **A   Well, it's not correct.  Right.**
20         MR. LAVER:  Objection.
21  BY MR. LIGHTMAN:
22  Q   And then he says, he writes in here, that is
23  what my team at A Solar told me.  Do you see that?
24  **A   There's no A. Solar.**

Page 240

1  Q   There's no A. Solar.  There's no team at A.
2  Solar; correct?
3  **A   Yes.**
4  Q   And then in number 12 he writes, I honestly
5  believe that trucks with product to deliver
6  product.  That's not true; right?
7  **A   No.**
8  Q   That's not true.  Because the trucks --
9  **A   It's in the warehouse.**
10  Q   It's in the warehouse and they never gave you
11  bills of lading?
12  **A   Exactly.**
13  Q   And then you wrote in 13, through no fault of
14  Charlton due to an unforeseen personnel and
15  logistics problem within A. Solar, we have to date
16  been unable to deliver the product as we
17  represented and agreed.  You underlined through no
18  fault of Charlton; right?
19  **A   Right.**
20  Q   Why is that not true?
21  **A   No bill of lading.**
22  Q   Okay.  And --
23  **A   I asked him from that delivery point where I**
24  **gave it to the Available Movers to move forward the**

Page 241

1  **ball.  You know, otherwise it's not going to be**
2  **moving.  These guys do not deliver without bill of**
3  **lading.**
4  Q   And Mr. Sternberg writes, he wants you to say,
5  due to an unforeseen personnel and logistics
6  problem within A. Solar; is that accurate?
7         MR. LAVER:  Objection to form.
8  BY MR. LIGHTMAN:
9  Q   Is that a true statement that Mr. Sternberg
10  put in his --
11  **A   Of course not.  I delivered the merchandise to**
12  **Sam.  Right?  I put it on the truck.  That's how**
13  **they requested it.  To put it on the truck and**
14  **Zekaria was verified that it's on the truck and**
15  **then I get the money which happened.  Then I got**
16  **the money.**
17  Q   What's the -- is there an unforeseen personnel
18  and logistics problem within A. Solar that
19  prevented the delivery?
20  **A   There's no A. Solar.**
21  Q   So when Sternberg wrote that he wanted you to
22  say to the Texas Bar due to an unforeseen personnel
23  and logistics problem within A. Solar, that's not
24  true?

61 (Pages 238 to 241)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 242

1  A   That's not true.  I put it on the truck.
2  Q   And then it says in 14, it's A. Solar's
3  responsibility to Charlton to fill their order and
4  you wrote A. Solar, that's not true; right?
5  A   Correct.
6  Q   And then he wants you to write in April A.
7  Solar is still as of this date attempting to fill
8  the order and stands behind it.  That's not true?
9  A   Which number are you on?
10  Q   Fourteen.
11  A   Fourteen.
12  Q   A. Solar is still and as of this date
13  attempting to fill the order and stands behind this
14  transaction.  That's not true; correct?
15  A   What date was this written?
16  Q   He wants you to sign this in April which is
17  after either the stuff disappeared from the
18  warehouse or turned to rice?
19  A   I already gave refund by then.
20  Q   So that 14 is not true?
21  A   Yes.
22  Q   By the way, is there anywhere in this
23  declaration that Manfred Sternberg drafted for you
24  to sign, is there anything in here about you giving

Page 243

1  them control?
2  A   Here?
3  Q   Yes.
4  A   I didn't see.
5  Q   Is anything about Sam agreeing to release from
6  you any further responsibility once you gave them
7  the collateral that they accepted?
8  A   Can you rephrase?
9  Q   Is there anything in the draft declaration?
10  A   I don't see anything.  I must stop you.  I
11  must stop you.  I need my coffee.  No.  I'm a
12  little bit cold.  I don't know why.  Maybe this
13  will warm me up.  I'm sorry.  We were at 14?
14  Q   Yes.  You weren't in April attempting to fill
15  the order and standing behind the transaction?
16  A   Oh, no.  Of course not.
17  Q   That's not a true statement that Sternberg put
18  in this draft declaration; correct?
19  A   You're on 14?
20  Q   Yes.
21  A   Yeah.
22  Q   And 15?
23  A   Are you sure this was written 14?
24  Q   Fourteen says, it is A. Solar's responsibility

Page 244

1  to Charlton to fill their order.  A. Solar is still
2  as of this date attempting to fill the order.  You
3  weren't in April attempting to fill the order;
4  right?
5  A   No.  My question is, was this sent to me in
6  April?
7  Q   Yes.
8  A   For sure?
9  Q   Uh-hum.
10  A   Okay.
11  Q   It was sent to you to sign after you gave them
12  collateral and they accepted that?
13  A   That I know, but I just don't know the date of
14  this thing.
15  Q   It's in the -- I'll get to it.  Then in 16, he
16  wants you to state to the Texas Bar, I have read
17  Manfred Sternberg's response to the Office of the
18  Texas Disciplinary Counsel and confirm that all the
19  facts stated therein about me are consistent with
20  this declaration and true and correct.  Do you see
21  that?
22  A   Yes.
23       MR. LAVER:  Objection to form.  You
24  are misstating.

Page 245

1       You may proceed.
2  BY MR. LIGHTMAN:
3  Q   Well, I'll start again.  Because I apologize
4  if I did.  Sixteen says, I have read Manfred
5  Sternberg's response to the Office of the Texas
6  Disciplinary Counsel and confirm that all of the
7  facts stated therein about me are consistent with
8  this declaration and are true and correct.  Is that
9  what it says?
10  A   Yeah.
11  Q   But that's a false?
12  A   Well, I marked all this down so...
13  Q   You underlined, so that's false.  You believe
14  that to be false?
15  A   It's not true.
16  Q   And then number 17 where he writes all of
17  these delays are commercially reasonable in light
18  of the global supply chain disruption due to COVID.
19  You underlined that; right?
20  A   Yeah.
21  Q   You don't think that's true; right?
22  A   I put 365,000 COVID-19 test kits on a truck,
23  so I don't know what is the global supply, but I
24  know what I did.

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)        Deposition of Gary Weiss        February 16, 2024

Page 246

1    MR. LIGHTMAN: Can we mark this as
2  11; right?
3    (Two-page photocopy of declaration of
4  Sam Gross marked GW-11, for identification.)
5  BY MR. LIGHTMAN:
6  Q   I will represent to you, Mr. Weiss, that Gary
7  Weiss-11, is a true and correct copy of the
8  declaration signed -- actually signed by Sam Gross
9  that Manfred Sternberg drafted from that was
10 submitted to the Texas Bar and is part of Mr.
11 Sternberg's response.
12    Did you see this before?
13 A  No.  This is the first time I see it.
14 Q  Okay.
15 A  When was this drafted?
16 Q  By the way, for the record, it bears Sternberg
17 document number 1278 through 1279.  I don't know
18 when it was drafted, but it says that it was signed
19 in April -- on April 24, 2022.  And based upon what
20 I know, after you refused to sign the declaration
21 or at the same time he was drafting the declaration
22 for you, Mr. Sternberg was drafting this for Mr.
23 Weiss, so I --
24 A  I get the picture.  I know what it is.

Page 247

1  Q  Take your pen and go through, Mr. Weiss's,
2  declaration -- Mr. Gross's declaration and same
3  thing.  Underline everything in there that you do
4  not believe is true.
5  A  Mr. Lightman, on paragraph -- on second
6  paragraph, I confirm and agree with all facts
7  stated.  Where are those facts?  Can I see them?
8  Q  That's in -- I can show you the declaration?
9  A  Am I asking too much?  Do you want me to
10 underline what I think is not correct?
11 Q  Yes.  Did you go through that?
12 A  I gave it to you.
13    MR. LIGHTMAN: I'll make a copy of
14 this when we take a break.
15    MR. LAVER: Can I just see it?
16    MR. LIGHTMAN: Sure.
17    MR. LAVER: Okay.  I'm with you.
18 BY MR. LIGHTMAN:
19 Q  All right.  Let's do -- I'd like to show you
20 now what's been previously marked as Manfred
21 Sternberg Deposition Exhibit-31.  Look through
22 those, please.
23 A  Oh, okay.  Looks like I introduced these
24 things.

Page 248

1  Q  You did.  When I marked that Manfred Sternberg
2  Deposition on February 7.  I showed it to him.  He
3  claimed that those documents are fabricated, not
4  accurate documents?
5    MR. LAVER: Objection to form.
6  BY MR. LIGHTMAN:
7  Q  Do you agree that -- did you make up those
8  documents, or did you just produce them in the form
9  that they were in?
10 A  Okay.  This is screenshots?
11 Q  Yes.
12 A  Of messages from Sam Gross to me.
13 Q  Okay.  So you didn't fabricate those
14 documents?
15 A  No.
16 Q  Did you fabricate any of those documents?
17 A  None.
18 Q  Did you falsify any of the information in
19 those documents?
20 A  None.  And they do exist on my phone by the
21 way, still.
22 Q  Excellent.
23 A  So this is not just a piece of copy paper.
24 The original is right here on the phone.

Page 249

1  Q  Each of these documents bears a Weiss document
2  number at the top of each page; right?
3  A  Weiss, yeah.
4  Q  You produced these during discovery in this
5  case; correct?
6  A  I don't remember when I did produce these.
7  Q  Did you fabricate any documents you produced
8  in discovery?
9  A  None.
10 Q  And one of the reasons he claims that you
11 fabricated these documents is if you look at the
12 first where it says Sam Gross, it's spelled with
13 three S's instead of two.  Do you see that?
14 A  Yes.
15 Q  Why is that?  Do you know?
16 A  That's how I have his name in my phone.
17 Q  You have G-r-o-s-s-s in your phone?
18 A  Yeah.
19 Q  Let's look at the first page.  Okay.  This is
20 Weiss document six.  Sam Gross wrote this text to
21 you; right?
22 A  Yeah.
23 Q  In the white part?
24 A  In white part, yes.

63 (Pages 246 to 249)

Page 250

1   Q   He writes, this text is to confirm I never
2   wanted your collateral.  Manfred Sternberg had
3   requested it and he had confirmed through our
4   lawyer as well.  Per his request, I obtained it
5   from you.  Do you see that?
6   A   I see.
7   Q   Now, Manfred Sternberg testified on February 7
8   that it wasn't his idea to give collateral.  Did
9   you agree with that?
10  A   I don't know what went between the two of
11  them.
12  Q   The idea came -- of collateral came up after
13  you said I'll give you guys a refund; right?
14  A   I don't think so.
15  Q   Why not?
16  A   On February 20 or 21 Sam told me that he will
17  need the refund because of the delays he will need
18  the collateral in form of the diamonds, which I did
19  not want to give.  But he said, listen, this is not
20  being delivered and I have to do what my lawyer's
21  advising me or telling me to do.  So I agreed.
22  Q   Okay.  Let's look at the second page of this
23  Manfred Exhibit-30.  It's labeled Weiss-8.  Do you
24  see that?

Page 251

1   A   Uh-hum.
2   Q   And this is an e-mail exchange between Sam
3   Gross and Manfred that Sam Gross sent to you?
4   A   You are on second page?
5   Q   Second page.  Yes.  It is saying, what do you
6   -- on the blue it says, Sam Gross is at the top of
7   this page; right?
8   A   Right.
9   Q   And in the blue it says, what do you think as
10  I'm on hold again.  Sucks for me, too.  And then on
11  the black and white writes back, don't want refund
12  as we will lose.  Do you see that?
13  A   Yeah.
14  Q   And that's from Manfred to Sam?
15  A   He is sending me screenshot.
16  Q   Of what -- of the text between him and
17  Manfred?
18  A   I assumed.
19  Q   And then Sam Gross writes, okay.  So what time
20  line do I give him to perform in a way that
21  protects you, me and the business.  Do you see
22  that?
23  A   Yeah.
24  Q   And then Manfred writes back, next lie from

Page 252

1   him we are done.  Do you see that?
2   A   Yeah.
3   Q   And then if you go to the next page Weiss-10
4   at the top it says, Manfred Sternberg, Esquire.  Do
5   you see that?
6   A   I see.
7   Q   And, again, how did you get this document?
8   A   This was a screenshot that Sam sent me of
9   communication between the two of them.
10  Q   Between Manfred and Sam?
11  A   Yeah.
12  Q   So Sam's writing, what do you think, as I'm on
13  hold again.  Sucks for me, too.  And then Manfred
14  writes back, don't want refund as we will lose.  Do
15  you see that?
16  A   Yeah.
17  Q   What is -- do you know what Manfred means by
18  that.
19  A   (Shakes head from side to side.)
20  Q   No.  Okay.  So then go to the next page again,
21  Weiss-11, is this another screenshot of text
22  between Sam Gross and Manfred that have --
23  A   That's what it looks to me, yeah.
24  Q   And Manfred is writing, next lie from him, we

Page 253

1   are done.  I don't think they can deliver that is
2   the problem.  See that, Manfred writing that?
3   A   Yes.
4   Q   And then Sam is writing you back because Sam
5   writes back, because my feeling is no matter what
6   issues he has, he will deliver and I don't want to
7   lose.  And then Manfred replies yes to that.  Do
8   you see that?
9   A   Yes.
10  Q   Next page of this Exhibit Weiss-12 again it
11  shows Manfred Sternberg's cell phone at the top.
12  How did you get this page?  Another screenshot that
13  Sam Gross sent you?
14  A   He shows me their conversations.
15  Q   You should have these screenshots in your cell
16  phone; right?
17  A   I do.
18  Q   And Manfred should also have them in his
19  phone; right?
20      MR. LAVER:  Objection.
21  BY MR. LIGHTMAN:
22  Q   They're from Manfred's cell phone; right?
23  A   Yes.
24  Q   And they are from Sam Gross's cell phone?

64 (Pages 250 to 253)

Page 254

1    A  Yeah.
2        MR. LIGHTMAN:  So why haven't I
3    gotten any of these documents produced,
4    Mr. --
5        MR. LAVER:  You are asking me?
6        MR. LIGHTMAN:  Yes.
7        MR. LAVER:  Well, my objection is
8    because he's not a tech wizard.  He has no
9    idea what's on Manfred's phone.  As I have
10   already stated to you and I'll state on the
11   record, my client retained a forensic guy
12   that is going to go through everything and we
13   will have a supplement.
14   BY MR. LIGHTMAN:
15   Q  And the next page, Weiss-14, again, says
16   photo.  The next page says, photo at the top.  Is
17   that because that's a photo of a screenshot that
18   was sent to you?
19   A  Yes.
20   Q  And this is Manfred writing, wrong text.
21   Here's the right one.  Dear Manfred, I am the one
22   to blame.  You and Sam did not know about the
23   problems with the shipping, nor did I.  I am sure
24   you guys want it delivered to your customers, but

Page 255

1    the delays were on my side.  Again, I apologize.
2    Until I find out the truth, I'm upping the
3    collateral, four million with Sam.  In the
4    meantime, sorry for creating this delivery problem.
5    Gary.
6        Is that something you wrote to
7    Manfred?
8    A  This is something that Manfred wrote to Sam,
9    so I write and they have a record that that's what
10   I said.
11   Q  So did you actually say this or this is what
12   Manfred wanted you to write to him?
13       MR. LAVER:  Objection.
14       THE WITNESS:  That's what I think is
15   the whole idea that they want to have certain
16   text from me to show that I'm the bad guy.
17   BY MR. LIGHTMAN:
18   Q  So Manfred wants you to send him this text?
19   A  This is coming from Sam, not from Manfred.
20   Okay.
21   Q  Okay.
22   A  Sam is sending me this screenshot.
23   Q  Right.
24   A  And you can tell that this is between Manfred

Page 256

1    and Sam.
2    Q  And Sam is sending this to you because he
3    wants you to write this to them; right?
4    A  He send this to me because he made a mistake.
5    He should have never sent it.
6    Q  Sam shouldn't have sent it to you?
7    A  Exactly.
8    Q  You never wrote this text to Manfred; right?
9    A  No.
10   Q  Look at the next page.  This is another
11   screenshot of a text exchange between Manfred and
12   Sam that Sam e-mailed to you or sent to you; right?
13   A  Correct.
14   Q  And Manfred is saying to Sam, he is buying
15   himself and his lawyer a bunch of bad PR and claims
16   of fraud and wire fraud.  Do you see that?
17   A  Yes.
18   Q  Do you know why he said that to you?
19   A  Same reason like the page before.
20   Q  It says, especially last Friday when he said
21   less than 45 minutes away and I scrambled to send
22   him another 190,000.  Do you see that?
23   A  Yeah.
24   Q  So the $190,000 was wired to you?

Page 257

1    A  Not to me.  February 15 maybe.
2    Q  February 15.  Thank you.  2022.  And according
3    to my calendar here, February -- no.  Hold on.  You
4    got a wire -- Manfred wired to Zekaria 190,000 on
5    February 25, 2022.
6        Do you agree with that?
7    A  I don't know when -- when Manfred wired that
8    money.  I'm not sure.  I know about the monies that
9    I got, you know.
10   Q  But you have -- we look at -- if you look at
11   Manfred Sternberg Deposition-26 which is his IOLTA
12   records for February, on February 25 it shows
13   $190,000 wire from Manfred's escrow account to
14   Zekaria.  Do you see that?
15   A  Okay.
16   Q  So if Manfred wired 190,000 to Zekaria on
17   February 25th that's a Friday, according to my
18   calendar on my phone?
19   A  And there on the 28th which is probably Monday
20   Zekaria sends me 70,000.
21   Q  Right.  But she got 190 and Manfred is telling
22   Sam in this text, especially last Friday -- that's
23   February 25 -- when he said less than 45 minutes
24   away -- that's you telling these guys the delivery

Page 258

1  is less than 45 minutes away.  And I scrambled to
2  send him another 190,000?
3  **A   So there is many parts to your question.  What**
4  **Manfred sent to Zekaria and when exactly, I don't**
5  **know.**
6  Q   February 25, 190,000?
7  **A   No, but I don't know.  You are telling me and**
8  **you are showing me.**
9  Q   I showed you the record.
10  **A   But that's not in my records.**
11  Q   I understand that.
12  **A   But Manfred is saying you told him that the**
13  **delivery is 45 minutes away.  I need you to send me**
14  **another $190,000 which he on Friday scrambled and**
15  **sent to Zekaria; right?**
16            MR. LAVER:  Objection to form.
17       That's not at all what he's saying.
18  BY MR. LIGHTMAN:
19  Q   Tell me.
20  **A   I guess, yes.**
21  Q   Correct?  Right?
22  **A   Correct.  He probably sent her 190,000.**
23  Q   Because you said, he said less than 45 minutes
24  away.  That's Manfred saying you were telling him

Page 259

1  the delivery is less than 45 minutes away, but I
2  need another 190,000; right?
3  **A   Correct.**
4  Q   And then he writes, that is classic fraud in
5  the inducement and can only be cured by delivery or
6  return of all money.  Do you see that?
7  **A   I see.  I see.**
8  Q   So Manfred is telling Sam that you said
9  delivery is imminent.  Send me 190,000, but you
10  never delivered and Sam and Manfred is saying
11  that's classic fraud in the inducement and can only
12  be cured by delivery or return of all money;
13  correct?
14  **A   Correct.**
15  Q   And then Sam says, should we request refund in
16  your mind or should I try to close it.  Do you see
17  that?
18  **A   I see.**
19  Q   And then on the next page it says, don't want
20  refund, as we will lose.  Do you see that and it's
21  circled in red?
22  **A   Right.**
23  Q   Who circled that in red?
24  **A   Sam.**

Page 260

1  Q   You didn't circle that?
2  **A   No, sir.**
3  Q   So Sam did that?
4  **A   This is a screenshot that I'm getting from Sam**
5  **Gross.  I'm getting it with this red circle.  Okay.**
6  Q   You got it with the red circle on it; right?
7  **A   I got it the way you see it.**
8  Q   Got it.  Okay.  And then turn to this page,
9  page Weiss -- it's Weiss document 22 in Manfred
10  Sternberg's Deposition Exhibit-31 here this is Sam
11  writing to you; right?
12  **A   Right.**
13  Q   And Sam writes, Gary, I would had been haiku,
14  h-a-i-k-u, to return the collateral?
15  **A   I would be probably happy he meant and it came**
16  **out --**
17  Q   Haiku?
18  **A   Haiku is what?  Happy, in my opinion.**
19  Q   Okay.  Hold on.
20            MR. LAVER:  Off the record.
21            - - -
22       (Discussion off the record.)
23            - - -
24  BY MR. LIGHTMAN:

Page 261

1  Q   So he said, I would had been happy to -- it
2  says haiku, but you think he meant happy; right?
3  **A   For me, yes.**
4  Q   But then they write, but Manfred won't let me?
5  **A   Yeah.**
6  Q   So Gary -- excuse me -- Sam Gross is telling
7  you Manfred won't let Sam return the collateral to
8  you; right?
9  **A   Looks like.**
10  Q   And then also Sam writes to you, I would have
11  never takes the collateral unless Manfred asked for
12  it.  So Manfred, since he asked for it, is the one
13  you should talk with about it; right?
14  **A   Yeah.**
15  Q   So you are trying to say, well, what about
16  giving me my collateral back?
17  **A   Exactly.**
18  Q   And he's saying, I can't help you.  You have
19  to talk to Manfred?
20  **A   Yeah.  Talk to him.**
21  Q   So Sam is telling you go to Manfred?
22  **A   Yeah.**
23  Q   So Sam didn't have the ability to return the
24  collateral to you; right?

66 (Pages 258 to 261)

USDC, ED of PA         American Environmental Ent. v. Manfred Sternberg, Esq., et al.         Friday
No. 2:22-CV-0688 (JMY)                     Deposition of Gary Weiss                    February 16, 2024

Page 262

1    **A   Excuse me?  What is the question?**
2    Q   Sam did not have the ability to control the
3    collateral; correct?
4            **MR. LAVER:** Objection to form.
5    BY MR. LIGHTMAN:
6    Q   I will rephrase it.  Manfred is controlling
7    the return of the collateral to you; correct?
8            **MR. LAVER:** Objection.
9            THE WITNESS: No.  What he -- no.
10   That's not true, Mr. Lightman.  What he's
11   telling me now that is not going to give it
12   back to me and I should go to Manfred.  Do
13   you understand?
14   BY MR. LIGHTMAN:
15   Q   Right.
16   **A   That's what he's saying.  He's not saying**
17   **anything else.  Do you know what I mean?  He may**
18   **have it and he's saying go to Manfred.**
19   Q   He's also saying, Manfred won't let him, Sam,
20   return the collateral?
21   **A   Right.  Not sure or not.**
22   Q   Go to the next page.  Skip two pages.  That's
23   then.  At the bottom of the next page it says, so
24   you confirm that I gave you the collateral that

Page 263

1    Manfred asked for.  Do you see that at the bottom
2    of the page Weiss-23, at the top of page Weiss-24?
3    **A   Yeah.  So that's probably me.  No?**
4    Q   So you are saying.  Yes.  And then you are
5    writing to Sam, so you confirm that I gave you the
6    collateral Manford asked for; right?
7    **A   I think so.  I don't see the continuation.**
8    **Yeah.  Yeah.**
9    Q   It says that; right?
10   **A   Yeah.**
11   Q   So Manfred is the one that asked for this
12   collateral; right?
13   **A   That's what Sam told me.**
14   Q   And then you write -- Sam writes back, of
15   course, why not.  You gave me collateral.  I didn't
16   wish for it, but I took it because Manfred pushed
17   it.  Do you see that?
18   **A   It looks like a nice poem.**
19   Q   And then he writes, and here we are.  I would
20   like to add, Manfred asked for collateral on
21   President's Day Weekend.  Turn to next page.  Next
22   page.  It says, Manfred asked for collateral on
23   President's Day Weekend.  He had his son with him
24   and they both came up with this idea; correct?

Page 264

1    **A   Yes.**
2    Q   Did you know that Manfred's son was involved
3    in the decision to take collateral?
4    **A   I never know Manfred has a son.  This was**
5    **first time see that Manfred has a son, you know, in**
6    **this -- in this text here.  Are you done with this?**
7    Q   Yeah.  You can put that away.
8            **MR. LIGHTMAN:** Can we mark this as
9    --
10           (One-page photocopy, front and back,
11           of emails marked GW-12, for identification.)
12   BY MR. LIGHTMAN:
13   Q   Do you remember e-mailing this to me on
14   August 16, 2023?
15   **A   From monipair?**
16   Q   From Gary Weiss to Mr. Gary Lightman on
17   August 16; right?
18   **A   Correct.  2023.**
19   Q   And it is an e-mail dated March 14, 2022?
20   **A   Okay.**
21   Q   Sam Gross sent to you.  Do you see that?
22   **A   Yeah.**
23   Q   And it says, good morning.  Read this.  Then
24   call me back.  Thanks?

Page 265

1    **A   Right.**
2    Q   And he forwarded you an e-mail that on
3    March 13 Manfred writes -- and then below that is
4    March 13 e-mail from Randolph Adler to Manfred.
5    Copy William Berman, subject to follow up.
6            Do you see that?
7    **A   Uh-hum.**
8    Q   In this e-mail it says, hi, Manfred.  It was a
9    pleasure speaking with you last week.  As a follow
10   up to our conversation, I wanted you to know that I
11   spoke with the civil litigation counsel, Bill
12   Berman, who is CC'd, and the client.  Based upon
13   what I conveyed from our conversation, everyone is
14   cautiously optimistic.  Did I read that right?
15   **A   Yes.**
16   Q   If you turn to the last page it says, so we
17   don't have to bother you, Bill is sending an
18   agreement that would memorialize our discussion
19   that if delivery of the product doesn't occur to
20   your client by say Thursday --
21   **A   Tuesday.**
22   Q   -- by say Tuesday, that Sam will agree to
23   liquidate the diamonds in his possession and repay
24   the full balance by Thursday or Friday of this

67 (Pages 262 to 265)

Page 266

1    upcoming week.
2          Do you see that?
3    A   Yes, sir.
4    Q   Thank you again for taking the time to speak
5    with me and Bill will be in touch with a simple
6    one-page agreement.  I appreciate your constant
7    professionalism.  Please let me know if you want to
8    discuss any further -- anything further.  Kindest
9    regards, Randy; right?
10   A   Right.
11   Q   So Manfred told Randy Adler shortly before
12   this March 13 e-mail was sent by Randolph to
13   Manfred following up their conversation that if his
14   client does not get the product, Sam is going to
15   liquidate the collateral and give him a full
16   refund; right?
17   A   Black and white says.
18   Q   That's what this says.  What are these yellow
19   stickums on here?
20   A   That's me making just notes just studying
21   correspondence and things like that.
22   Q   I'm sorry.  Are you finished?
23   A   Yeah.
24   Q   The top yellow stickum says, Ran -- Ralph

Page 267

1    Adler, attorney for VRC paid 2.2 million to Manfred
2    and Sam.  Do you see that?
3    A   Correct.
4    Q   How did you figure that out?
5    A   There is some other e-mails referencing to
6    that.  This is more correspondence between Rick
7    Adler and Manfred where he's -- he mentions that
8    VRC gave $2.2 million to Manfred.
9    Q   And your second yellow stickum that says
10   March 13, 2022, you write, Randolph Adler to
11   Manfred telling Manfred to sell diamonds he
12   received as collateral; right?
13   A   Correct.
14   Q   What do you mean by that?
15   A   At this point on March 13 Mr. Manfred,
16   Attorney Manfred, knows that I gave diamonds as
17   collateral which turned into a refund, and now
18   they can sell them and recover money and buy new
19   kits to deliver to their customers.  This is why
20   they took the money -- the escrow money so they
21   have some form of monetary value in their hands.
22   Q   This doesn't say -- look at the back of this.
23   This does not say liquidate the diamonds and buy
24   new kits.  It says, liquidate the diamonds and

Page 268

1    repay the full balance.  Do you see that?
2    A   Okay.  What is between them is correct, you
3    know, if they want to get a refund or, you know, I
4    don't know the terms of the deal.
5    Q   So Manfred is telling him you are going to get
6    your product or we are going to liquidate the
7    diamonds that we have and give you a refund?
8          MR. LAVER:  Objection to form.
9          THE WITNESS:  That is correct.  That
10   Gary Weiss gave to Sam.
11   BY MR. LIGHTMAN:
12   Q   There was the diamonds that they are talking
13   about?
14   A   He doesn't say they have.  That Sam later on
15   here refers to that Sam has in his possession and
16   will start to sell.  Not that Manfred will sell.
17   Do you understand?
18   Q   So you are saying, Manfred is telling Randy if
19   you don't get your product Sam will --
20   A   I will tell Sam to sell.  Am I correct in
21   this?
22   Q   You don't have to ask questions.  You answer
23   questions.  And then you write in your third
24   stickum, Manfred told Randolph Adler about the

Page 269

1    collateral days before 3/13/2022.
2          What do you mean by that?
3    A   Okay.  I don't remember what was my state of
4    mind at the time, but if we put on a big wall all
5    the e-mails with dates and we stick that in between
6    them, we will see inconsistency of things happening
7    and being done which you can only do vet.  Do you
8    understand what I mean?
9    Q   Yes, I do.  That's exactly what I saw.  That
10   this date with the declarations with the bar with
11   not knowing he's doing that I'm doing and they
12   already have a refund in their hand, you know, it
13   is just -- which was a lie in this letter here.
14   Whatever.  I have to put this in front of me and
15   find out.  All those papers, but that's the notes
16   that I'm making there.
17          MR. LIGHTMAN:  Can we mark these as
18   Gary Weiss-12 and Gary Weiss-13 -- 12 is the
19   e-mail exchange.  Gary Weiss-13 and 14.
20          (One-page color photocopy of text
21   message marked GW-13, for identification.)
22          (One-page color photocopy of text
23   message marked GW-14, for identification.)
24   BY MR. LIGHTMAN:

---

Page 270

1  Q   So Gary Weiss-13 and Gary Weiss-14 are
2  screenshots of text messages between you and Daphna
3  Zekaria; correct?
4  A   No.  This is a screenshot from Sam to me
5  showing what he is texting with her.
6  Q   So this 13 and 14 are screenshots of text
7  exchanges between Daphna Zekaria and Sam Gross?
8  A   Correct.
9  Q   And Daphna's writing shows at the top here and
10  Sam is writing, you took my escrow and are blaming
11  me now or who is writing that?  I'm sorry.  Let me
12  strike that.
13         Daphna is writing to Sam, you took my
14  escrow and are blaming me now.  Excuse my language.
15  Fuck this and remember I will always love you, but
16  not being treated this way.  I deserve more than
17  this.  You are wrong and I expect an apology, a
18  really big one.
19         Do you see that?
20  A   Yeah.
21  Q   So Daphna is writing to Sam remember I will
22  always love you?
23         MR. HEALEY:  Objection.  We don't
24  know who that is.

---

Page 271

1  BY MR. LIGHTMAN:
2  Q   Is that what this text is?  Appears to be?
3  A   I read what you read.  I cannot interpret it
4  any other way.  Just look at it.
5  Q   Do you know why Daphna is telling Sam Gross I
6  love you -- I will always love you?
7  A   I don't want to speculate, Mr. Lightman.
8  Q   And then Sam writes back, before you say house
9  of cards, think about the street money Vig your
10  clients and even you have been collecting and
11  benefiting from me for almost six months now.
12         Do you see that?
13  A   Okay.
14  Q   What does Sam mean when he's writing that to
15  Daphna?
16  A   Your guess is as good as mine.
17  Q   Do you have a guess?  I know I asked you not
18  to guess, but do you know what they're talking
19  about when they say Vig -- about street money and
20  Vig?
21  A   Mr. Lightman, please talk to Sam about this.
22  What I think about it --
23  Q   What do you think about it?
24  A   At this point living like this.  I want you to

---

Page 272

1  work on the two parties here which is --
2  Q   Zekaria and Gross?
3  A   You can call me again later on.  I come any
4  time.
5  Q   And next page, she writes, after she writes,
6  think about the street money, Vig your clients and
7  even you have been collecting and benefiting --
8  when he writes for almost six months, he then
9  continues and still collecting as of yesterday.
10  The house of cards cannot make these payments and
11  this is one nasty allegation.  I'm really angry and
12  insulted now.  The fact that you will benefit from
13  our mutual work, yet you say this to me is highly
14  offensive to me and you cannot use our meeting
15  me -- and you cannot use meeting me at the hotel as
16  a tool, too.
17         Do you understand why -- what he
18  means when he writes this to Daphna?
19  A   Mr. Lightman, your guess as good as mine.
20  Q   Okay.
21  A   Okay.
22  Q   Do you want to guess?  What do you think about
23  it?
24  A   I don't want to guess at this point.  I think

---

Page 273

1  that you know and I know, but I will not guess.
2  It's not necessary.
3  Q   Is there a romantic and/or sexual relationship
4  between Sam Gross and Daphna Zekaria?
5         MR. HEALEY:  Objection.
6  BY MR. LIGHTMAN:
7  Q   Correct?  Is there any other explanation for
8  this kind of stuff?
9  A   Well, we have some pictures and things like
10  this later on that you already have.
11  Q   And you are going to produce them?
12  A   So, if you want to connect the two, don't ask
13  me those questions.  I just brought this and you do
14  the rest.
15  A   Can I say something on the record?
16  Q   Sure.
17  A   You are the professional to ask the question
18  and not me.  Okay.  So, if you ask and you do
19  whatever you want, I'm just here.  I'm going to
20  answer.
21  Q   I'm going to take it up with Zekaria and
22  Gross, if I ever see Gross.
23         How many COVID or PPE deals did you
24  ever engage in?

---

Page 274

1  A  Me?
2  Q  Yes.
3  A  One.
4  Q  The one involving Sam Gross and these masks;
5  right?
6  A  Yes.
7  Q  And your suppliers were Levon and Zadik and no
8  one else; right?
9  A  Zadik.
10 Q  Did you ever owe Gross money?
11     MR. LAVER:  Objection to form.
12     THE WITNESS:  No.
13 BY MR. LIGHTMAN:
14 Q  You never did.  Do you know Gross's criminal
15 defense attorneys?
16 A  I know that it is Daphna Zekaria and I know
17 that she called Ron Kuby in, attorney Ron Kuby in
18 to help.  That's all I know.  Yeah.
19 Q  That would be K-u-b-y, Ron Kuby?
20 A  How you spell, I'm not sure.
21 Q  K-u-b-i.  That's Ron Kubi.  How about Stacey
22 Richmond?
23 A  I heard her name, but I don't know in what
24 capacity she does work she does for Sam, you know.

Page 275

1  Q  And Zekaria?  Do you know who attorney Zekaria
2  is, Z-a-k-a-r-i-a?
3  A  Yeah.  We are talking about Daphna Zekaria.
4  Q  I got you.  And the only reason you sent money
5  to Taylor Panagakos is because Sam asked you to?
6  A  Sam asked me to.
7  Q  Did you ever send her anything other than that
8  one 20 or $25,000?
9  A  No.
10 Q  What's your -- do you have any relationship
11 with Taylor?
12 A  No.  She's 22 years old and she has a
13 boyfriend.
14 Q  You were never romantically involved with
15 Daphna?
16 A  Never.
17 Q  Why did you give her the four diamonds as
18 collateral?
19 A  That's what he asked.
20 Q  So the diamonds you gave to Daphna were
21 intended to go to Sam Gross; right?
22 A  Yes.
23 Q  Did you ever give Daphna diamonds as
24 collateral for her to keep?

Page 276

1  A  No.
2  Q  Do you know what Daphna's relationship is with
3  Sam?
4  A  She's his lawyer, we know, representing.
5  Q  Daphna is Sam's lawyer?
6  A  Daphna is Sam's lawyer, yes.
7  Q  Daphna is your escrow -- there is one escrow
8  between you and Daphna; correct?
9  A  Correct.
10 Q  But you didn't retain her as your lawyer;
11 correct?
12 A  Well, she made some agreement, which I agreed
13 to, so we can get the money, and gets it in escrow
14 and she gives it to me.
15 Q  Why were their Home Depot boxes used?  Why
16 didn't you just leave them in the I-COVID boxes?
17 A  I don't know the answer to your question.
18 That's how I got them.
19 Q  And you gave all the rice to the school across
20 the street?
21 A  No.
22 Q  What did you do?
23 A  I drop parts of the rice to the school.  Okay.
24 The rest I kept in my truck and I gave away.

Page 277

1      MR. LIGHTMAN:  It's four o'clock.
2  Here is what we have agreed to do and I will
3  put it on the record.
4      We have agreed to conclude this
5  deposition at 4:00.  I'm going to make copies
6  of the documents that you produced today and
7  distribute them to Mr. Healey and Mr. Laver.
8  You are going to go through your phone and
9  print out all those pictures and any other
10 pictures you have and any other e-mails you
11 have and go through your bank records and
12 produce the additional bank records and
13 documents and then you are getting operated on
14 on January -- or February 29, the end of this
15 year.  It's knee surgery.
16 BY MR. LIGHTMAN:
17 Q  After about a month recuperation you will
18 agree to come back sometime in April?
19 A  Yeah.  I will ask you for the documents that
20 you want from me, please send to me in an e-mail.
21 Q  Would --
22     MR. LIGHTMAN:  Can you send me a
23 list?
24     MR. LAVER:  I will.

70 (Pages 274 to 277)

Page 278

1      **MR. HEALEY:** And I will let you know
2  --
3          **MR. LIGHTMAN:** Why don't you do
4  this?  If you guys can get to me within a
5  week your list of the documents, I will put
6  together a global list circulated and once
7  all three of us reach agreement, I'll send it
8  to Mr. Weiss.
9          **MR. LAVER:** And I just want to add
10  and make clear the deposition is paused.
11  It's not concluded.
12          **MR. LIGHTMAN:** No.  The deposition
13  is concluded because I want to be able to use
14  this if he doesn't show up.  But we are going
15  to have it -- agree to on a second day.  I'm
16  not going to keep it open so I can't use it
17  at trial.  He's concluded and he's agreed to
18  come back for a second deposition.
19          **MR. LAVER:** So long as we have the
20  opportunity to ask questions, that's fine.
21  Okay.
22          THE WITNESS:  Right.  I will be back
23  tomorrow.
24          **MR. LIGHTMAN:** Lastly, I wish you

Page 279

1  well in your knee operation.
2          **COURT REPORTER:** Mr. Laver, do you
3  want a copy of the transcript?
4          **MR. LAVER:** Yes.  Please.
5          **COURT REPORTER:** Pat, you want a copy
6  of the transcript?
7          **MR. HEALEY:** Can I let you know?
8          **MR. LAVER:** With exhibits.
9          (At four o'clock proceedings were
10  concluded.)
11                    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 280

1      C E R T I F I C A T E
2
3
4          I, KIMBERLY A. BURSNER, Registered
5  Professional Reporter, do hereby certify that
6  the foregoing is an accurate transcript of the
7  proceedings, as reported by me, in the
8  case herein stated, and that I am neither
9  counsel nor kin to any party or participant in
10  said action, nor interested in the outcome
11  thereof.
12
13
14                    _____
                       /s/ Kimberly A. Bursner
15                    Registered Professional
                       Reporter
16
17
18
19
20
21
22
23
24

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 74 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 281

**A**

**a.m** 1:15 103:16 166:16,19 168:17 168:22 227:24 230:22
**A.SOLAR** 41:4,5,8
**ability** 8:11,16 261:23 262:2
**able** 76:13 138:21 140:23 278:13
**absolute** 7:17 228:16
**absolutely** 71:6 120:11 140:16 183:18 184:1
**accent** 135:22 136:1 136:2
**accept** 185:6
**acceptable** 7:8
**accepted** 221:20 243:7 244:12
**account** 32:9,11,20 33:5,11,14,17 70:13,15 71:17,18 72:8,9 73:1 79:11 80:4 112:7 113:12 191:10,12 192:1 192:17 203:13 204:15 215:14 257:13
**accountant** 34:14 34:16,18
**accumulate** 80:11
**accurate** 241:6 248:4 280:6
**accusing** 44:20
**acknowledging** 146:14
**act** 116:24
**acting** 101:11 222:4 222:6
**action** 280:10
**actual** 56:3 89:2 98:21 193:10,18 196:11,16 197:1 198:6
**add** 35:8 195:7 196:6 197:18,23 198:4,13 200:10 201:12 208:6 233:22 263:20 278:9
**added** 37:13 195:2 195:18 196:4,20 197:5

**adding** 194:18 195:15 198:9 201:21
**addition** 197:5
**additional** 234:2 277:12
**address** 12:11 17:21 17:24 18:18 21:7 21:15,16 22:18 23:23 24:12 27:20 34:9 58:4 68:6 71:18 93:16 96:16 160:19
**addressed** 160:16 160:19 161:5
**addresses** 18:3,7 29:10 65:16 95:13
**addressing** 161:6
**adds** 201:15,15
**Adler** 265:4 266:11 267:1,7,10 268:24
**admitted** 69:9
**Advanced** 91:5
**adverse** 7:24
**advise** 215:2
**advised** 169:2 214:12
**advising** 250:21
**affect** 8:11,16
**affirmative** 159:19 161:11,22 184:22
**agent** 28:3 29:23 212:6
**agents** 215:23
**ago** 10:7 69:9
**agree** 13:3 14:3,20 53:16 68:14 224:11 247:6 248:7 250:9 257:6 265:22 277:18 278:15
**agreed** 51:15,16 52:9 53:5,6 54:15 55:4 56:22 58:10 68:12 162:3,11 172:13 228:3 240:17 250:21 276:12 277:2,4 278:17
**agreeing** 243:5
**agreement** 113:19 113:20,24 114:5 114:15,17,24 115:2,12,18,19 116:1,2,4,7,9

117:1 200:10 212:19 215:21 216:14 265:18 266:6 276:12 278:7
**agreements** 215:11
**ahead** 126:3,16 159:11 218:1,23 229:19
**al** 1:7
**Alberto** 24:6 209:19 209:21
**allegation** 272:11
**allowing** 3:16 39:3 139:15
**altogether** 60:19 82:10 217:15
**amend** 3:17 39:3
**amended** 3:22 158:19,24 159:4 161:11
**amendment** 7:18,23 27:17 34:22 35:3 35:4 37:22
**American** 1:4 6:15 154:16
**amount** 70:5 201:16 224:1,4
**AMS** 100:16,17 102:22 104:23 128:7 129:10 175:18 177:18 179:14 182:2,13 182:19 236:20
**AMS's** 102:1 104:13
**and/or** 14:13 60:1 228:7 273:3
**angry** 272:11
**answer** 3:21 7:1,5,7 7:19,24 9:21 19:10 38:7,21 63:12,23 95:15 100:24 108:13 117:14 147:14 155:1 158:19,23 159:3 160:19 161:10 166:10 171:10 173:2 184:22 214:8 224:18 268:22 273:20 276:17
**answered** 9:22 95:22 99:17
**answering** 94:1,17

159:1
**answers** 7:1 94:3
**anybody** 13:18 37:10 42:20 90:16 90:17
**anymore** 93:18
**AOL** 18:11
**apart** 38:3,16
**apologies** 39:6
**apologize** 126:3 174:23 245:3 255:1
**apology** 270:17
**appeared** 2:1 79:19 185:15,19 186:6 188:5
**appearing** 39:7
**Appears** 271:2
**appointment** 85:15 85:19
**appreciate** 11:1 266:6
**approximately** 171:23 172:5,8 220:4
**April** 117:8 153:20 154:4,11 220:9 225:17 226:24 227:23 228:1 229:10 230:21 242:6,16 243:14 244:3,6 246:19,19 277:18
**argue** 214:13 221:18
**arrange** 124:7
**arranged** 72:12,14
**arrangement** 175:6
**arrangements** 61:2 61:5,18,19,21 63:9 162:17,22 173:5,11,12,13,16 173:21,24 174:3,5 174:6,9,10,12,13 174:14,19,23 175:4
**arranging** 63:3
**arrival** 175:10,12 175:17 178:1,2,14 178:17
**arrive** 175:14
**arrived** 177:17 178:15 182:12,12 182:19
**arriving** 182:20

**aside** 206:6
**asked** 10:18 12:7,9 50:10 51:19 59:7 59:20 68:20 70:1 78:11 90:10 97:15 97:22 118:19 120:22 146:19 148:13 180:11,22 203:6 204:1,17 210:9 212:10,13 222:17 224:18 228:2 231:11 235:21 240:23 261:11,12 263:1,6 263:11,20,22 271:17 275:5,6,19
**asking** 6:19 11:20 79:15,18 99:12 100:4 158:13 175:3,4 227:2,16 247:9 254:5
**aspect** 33:19
**assert** 218:22
**asshole** 116:16
**Associates** 2:9
**assume** 9:21 219:6
**assumed** 251:18
**assumption** 219:11
**assured** 238:4,15 239:1
**attach** 215:7
**attached** 12:4 177:5 181:10 182:4 183:8
**attempt** 227:9
**attempting** 242:7 242:13 243:14 244:2,3
**attention** 216:6
**attorney** 6:14 14:5 39:12,13,15 40:5 71:14 72:8 111:22 112:6,20 113:11 116:24 117:4,6 120:23 121:10 156:17 157:19 159:7 203:13 216:22 221:5,7 222:5,7,21,24 223:4 238:5 239:2 267:1,16 274:17 275:1
**attorneys** 15:9 36:16,20 71:16 159:3 274:15

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 75 of 749

USDC, ED of PA    American Environmental Ent. v. Manfred Sternberg, Esq., et al.    Friday
No. 2:22-CV-0688 (JMY)    Deposition of Gary Weiss    February 16, 2024

Page 282

**August** 34:24 35:5
37:14 49:11
264:14,17
**authored** 216:15
**authorities** 161:17
**authority** 213:1
**authorize** 117:11,22
**authorized** 30:4
32:24 33:1 37:23
**available** 10:23
85:15,19 87:18
89:12 91:8,9,12
92:16,17,21 95:11
96:10,16,21 97:2
97:8 108:6 109:7
111:4,11 124:24
128:2,11,18 129:3
129:5 130:17,22
130:24 139:4
140:6 143:18
144:2 145:1,19,21
146:8,13 151:1
152:13 154:16,19
154:21 155:23
156:3,7,19 166:22
168:10 169:6,20
170:17 172:16
174:18 175:12,14
176:11 203:18
236:11 237:18
240:24
**Avenue** 16:24 23:24
24:19 35:13 46:1
52:12,12 74:18
80:15,16 103:15
135:1 174:22
**avoid** 229:3
**aware** 6:13 7:12,15
17:4,7 19:13,22
20:3,10 69:20
190:22
**awning** 140:13

——————
**B**
——————

**B** 3:7
**back** 3:10,12,15,21
4:6 10:15 12:21
14:22 15:6 24:13
27:10 39:1 52:11
54:17 72:15 78:14
78:20 89:5,16,23
90:9 91:18 96:4
97:10 104:19
109:4 116:20
124:10,22 126:9

126:13,22 127:22
127:24 129:5
131:24 147:21
148:10 150:3,12
153:2,15 154:21
155:5,8 156:19,24
158:19 178:19
180:19 181:2,2
185:3,3 188:19
190:24 197:18
205:7,12,13,18,24
209:10 219:22
220:6 224:22
225:22 227:1,22
228:1 229:14,14
233:2 234:17,21
235:5 251:11,24
252:14 253:4,5
261:16 262:12
263:14 264:10,24
267:22 271:8
277:18 278:18,22
**back-to-back**
140:16
**backed** 89:16
104:19,19 143:18
143:20 168:20
**bad** 37:3 255:16
256:15
**bag** 114:20 133:13
133:16,20,24
146:16,20 152:12
152:15,17,22
204:22,22,23
218:5 222:14
233:14
**bags** 125:22 153:2
**balance** 71:15,16
82:6,11,12 113:21
113:23 117:3
165:10,10,11,12
190:7 201:9
202:15,18 204:10
210:16 211:8
213:8 265:24
268:1
**ball** 241:1
**ballpark** 50:19
**bank** 32:6,9,11,17
32:19 33:5,11
70:16 81:10
204:15,17,18
205:1,4 206:4,10
208:23 210:18
234:11,12 277:11

277:12
**bar** 88:8,11,15
215:8 216:9
217:18 219:14
220:10,20,23
225:7,14,18 227:3
232:6 239:11
241:22 244:16
246:10 269:10
**based** 29:11 63:17
214:8 217:9,10,13
219:1 246:19
265:12
**basically** 18:12
138:9
**basis** 58:9
**bears** 159:24
246:16 249:1
**beginning** 101:20
109:8 138:13
144:7 173:13
174:10 213:6
**behalf** 12:19 13:4
14:9,11,15,16,21
160:12,14 161:3
**belief** 164:10
**believe** 25:6 41:20
42:18 43:15 46:3
53:15 89:18 98:17
120:16,18 137:20
225:17 232:20
240:5 245:13
247:4
**believed** 76:11
**Bell** 1:14 2:12
**benefit** 272:12
**benefiting** 271:11
272:7
**Berman** 265:5,12
**best** 141:23 160:5
161:13 185:23
186:19
**bet** 226:17,19
**beyond** 68:10
**big** 52:15,16 75:21
104:4 107:15,17
107:17,21,22
110:22 111:8
125:18 133:11,17
133:22 141:6
269:4 270:18
**bigger** 153:24 154:2
**bill** 66:1 67:3,3,5,6
67:6,12,14 69:12
70:19 90:11,13,15

90:21 91:10,15
93:6 94:24 95:3,6
95:7,12,18,20,22
96:22 97:1,5,9,22
98:7,9 144:12,13
144:20,23 169:3
169:14,17,20,24
170:3,5,8,16,19
171:2,2,7 173:4
174:8 201:19,22
236:10,17,20,23
237:2,5,10,13,15
238:1 240:21
241:2 265:11,17
266:5
**billing** 67:15
**bills** 80:1 94:23
169:9 240:11
**binding** 215:21
**birth** 16:12,14,15
**birthday** 59:4,6
**bit** 24:10 53:8
116:19 136:6
164:22 230:24
243:12
**bla** 146:15,15,15
210:15,15
**black** 68:5 126:21
127:3,18 150:14
153:2 234:24
251:11 266:17
**blame** 223:23
254:22
**blaming** 270:10,14
**block** 35:1 94:20
**blocks** 153:8
**blood** 8:13,14,19,20
**blue** 1:14 2:12
251:6,9
**Bluestone** 1:13
**Boehms** 1:13
**bones** 8:24
**book** 98:6
**boss** 96:6,7 144:23
144:24
**bother** 36:21
265:17
**bottle** 7:22 8:2
**bottom** 37:21 62:12
66:17 71:7,9 72:1
153:20 154:3
185:3 190:14
223:16 229:12
262:23 263:1
**bought** 62:19 135:6

151:2,5
**box** 52:5,8,21 54:18
55:4 56:22 73:5
73:11 80:9 106:23
106:23,24 110:15
125:1 132:15,17
132:20,21 133:17
133:21 140:1,18
140:18,20,20
152:2,7,8,11,13
155:19
**boxes** 52:1,2,4 56:2
56:23 75:9,10,12
75:15,17,20 76:7
76:8,9,14,17,20
89:20 102:24
106:13 107:3,7,10
107:11,12,13,14
107:17,21 109:17
110:17,21 111:8
124:13 125:2,3,5
126:5 128:1,10,21
129:6,7,23,24
132:3,4,6,8,9,11
132:14,15,16
133:3,9,11,12,12
133:14,15,21
134:8 140:1,9,24
141:8,12,14,18,19
141:21,24 142:15
143:9 144:17
145:24 146:9
151:18,21,22,23
152:8,9,23 154:8
154:13 174:15
178:6,10,17,20
228:23,24 276:15
276:16
**boyfriend** 275:13
**break** 87:20,21,23
114:23 146:18,23
148:1 188:14,14
233:14 234:3
237:15 247:14
**bring** 12:21 14:22
59:22 111:5
125:20 205:24
231:11,12
**Broadway** 71:17
**broke** 132:7
**brought** 13:12
78:13,19 79:1
84:17 102:18
103:5,6,7 140:4
141:13 142:1

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.                    Friday
No. 2:22-CV-0688 (JMY)                          Deposition of Gary Weiss                          February 16, 2024

Page 283

143:12,15 144:16
145:15 146:20
178:18 205:10
231:13 273:13
**building** 93:17
**bunch** 115:21 206:2
  256:15
**Bursner** 1:16 280:4
  280:14
**business** 6:16 20:8
  20:14,18 30:20
  43:5 45:10 49:16
  70:20 79:17 80:23
  81:6 83:16,20,22
  84:2,3 112:18
  136:23 137:7
  160:22,23 203:1
  204:9 251:21
**buy** 53:20 55:3
  58:11 61:22 62:20
  62:21 63:1 135:9
  137:8 204:4
  267:18,23
**buyer** 215:12
**buyers** 223:21
**buying** 43:19 49:17
  50:2 54:19 59:23
  61:4 73:2 256:14

—————— C ——————

**C** 280:1,1
**cabby** 92:7
**calculate** 28:21
**calculator** 195:16
**calendar** 257:3,18
**call** 6:17 9:4 43:14
  43:15 44:5,8,24
  45:15,19 46:5,8
  46:20 49:8,14,19
  51:6,11 69:19
  90:23 93:24 98:21
  100:7 107:6
  111:14 128:2
  129:19 130:2,4,19
  130:21,24 131:1
  147:12,13,20
  184:7 189:5
  208:22 214:3
  225:2 264:24
  272:3
**called** 17:6 44:4,6
  45:8,23 46:7,19
  47:24 48:6,7,11
  51:2 54:17 56:5
  91:2 94:16,24

101:2,7 103:24
  111:11 128:6
  129:14 130:23
  142:14 145:3
  274:17
**calling** 101:9 128:7
  129:9 147:20
**Camry** 127:21
**canceled** 97:24
**capacity** 19:4 31:2
  43:17 274:24
**caption** 3:17 39:3
**car** 75:2 84:13 85:4
  85:5,6 89:2,4
  104:6 127:2,9,10
  127:11,12,16,18
  127:19
**card** 98:6
**cards** 271:9 272:10
**care** 14:24 16:4
**carefully** 186:20
**carrier** 139:10
**cart** 61:12
**cartons** 133:11
**case** 6:15 7:14 8:4,5
  10:6,8 11:5 13:6
  44:18,22 156:5,6
  182:1 214:8,13
  215:24 217:14
  224:15 249:5
  280:8
**cases** 19:24 20:1
  44:16,19
**cash** 58:16 61:7
  77:17 78:24 79:12
  79:20,24 80:17,19
  82:9,10,15,17
  83:5,7,9 84:11
  92:4 103:13
**casting** 137:9
**catch** 165:5
**cats** 140:14
**Catty** 127:14
**cautiously** 265:14
**CC'd** 265:12
**cell** 17:2 48:17
  83:23 123:11,14
  123:18,19 253:11
  253:15,22,24
**center** 182:21
**certain** 255:15
**certainly** 129:12
**certificate** 3:12
  27:11,16,17 34:21
  35:3 37:21

**certification** 6:3
**Certified** 1:22
**certify** 280:5
**chain** 245:18
**change** 39:24,24
  112:10
**changed** 23:23
**changing** 64:1,2,6
**charge** 97:12
  189:17
**charged** 20:10
  189:22 190:2,6
**Charlton** 67:3,13
  236:12 237:3,19
  240:14,18 242:3
  244:1
**chart** 193:20
**check** 87:16 106:11
  106:13 107:10
  111:12 131:12,19
  156:22 178:3
  190:20 191:16
  196:15 209:3,5,6
  210:23
**checked** 93:17
  107:6 128:21
  129:5
**Chevy** 127:14
**CHG** 170:13 190:2
**children** 25:20,22
**choose** 14:10
**church** 1:13 37:18
**circle** 197:22 198:8
  260:1,5,6
**circled** 259:21,23
**circuit** 157:2
**circulated** 278:6
**civil** 7:24 8:2,5
  265:11
**claim** 163:2 165:19
  179:6 192:20
  224:20,24 227:10
  238:9
**claimed** 178:4 248:3
**claiming** 79:18
  186:2 206:7
**claims** 228:10
  249:10 256:15
**clarify** 81:17 146:24
**clashing** 9:1
**classic** 259:4,11
**cleaned** 137:11
**cleaning** 143:13
**clear** 6:23 14:8
  40:17 101:15

278:10
**clearly** 8:11,17
  130:15,16 218:20
**click** 149:19,19
**client** 176:1,2
  181:17 189:22
  190:5 220:1
  254:11 265:12,20
  266:14
**clients** 271:10 272:6
**climbed** 76:19
**clip** 233:20
**close** 65:22,23
  136:1 259:16
**closed** 13:22 56:9
**closing** 144:2
**clothes** 119:8
**Club** 1:13
**clue** 155:3
**coffee** 45:23 46:4,6
  46:8,9,15,22 47:2
  47:10,11,15 48:6
  48:7,9,12 49:13
  58:10 84:2 118:11
  118:13,16 243:11
**cold** 243:12
**collateral** 118:6,9
  119:6,9,12 185:10
  185:13 214:11,20
  214:24 216:11
  219:18,19,22
  220:3 224:4
  225:13,21 229:1,9
  243:7 244:12
  250:2,8,12,18
  255:3 260:14
  261:7,11,16,24
  262:3,7,20,24
  263:6,12,15,20,22
  264:3 266:15
  267:12,17 269:1
  275:18,24
**collecting** 271:10
  272:7,9
**color** 3:14 4:7,9
  35:22 52:5 126:20
  234:14,16,17,19
  234:20,21 235:4,6
  235:7 269:20,22
**column** 196:10,11
**come** 44:12 55:18
  72:11,18,21 74:23
  81:9 91:24 100:22
  125:15,22 126:13
  126:19 135:7

153:15 157:8
  158:12 167:24
  205:18 213:8
  226:10 272:3
  277:18 278:18
**comes** 157:12
  205:12,13
**coming** 125:17
  255:19
**commencing** 1:15
**comment** 116:16
**commercially**
  245:17
**commissions** 201:2
  202:14
**communication**
  252:9
**communications**
  223:3
**company** 41:7 42:8
  84:9 161:8 169:2
  169:7,13 170:13
  170:17 172:9
  224:20
**complained** 214:10
**complaint** 3:17,22
  33:21 39:4 158:19
  158:24 159:4
  161:6,11 217:7
**complete** 63:11
  134:18 169:3
  170:4
**completely** 7:6
**complies** 49:1
**components** 137:8
**compromising**
  119:7,8 148:14
**computer** 12:2
  98:22
**concept** 15:10
**concerning** 228:8
**conclude** 277:4
**concluded** 278:11
  278:13,17 279:10
**conclusion** 68:9
  214:2
**confirm** 244:18
  245:6 247:6 250:1
  262:24 263:5
**confirmed** 214:19
  250:3
**confirming** 161:7
**confronted** 154:22
**confuse** 66:8
**confused** 68:18

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                         Deposition of Gary Weiss                    February 16, 2024

Page 284

111:19 164:21
**connect** 273:12
**connected** 99:18
**connection** 20:10
   165:23
**consistent** 244:19
   245:7
**consisting** 220:3
**constant** 266:6
**contact** 42:17 43:23
   47:8
**contacted** 41:18,21
   42:9,10 53:21
**contain** 133:12
**contained** 133:13
   225:19
**containing** 74:8
   79:24 80:16
   228:24
**contains** 233:7
**contention** 38:2
   68:1
**context** 7:20 184:15
**continuation** 263:7
**continue** 13:16
   91:11,16 98:8
   126:16 144:13
   145:2,5 185:2,3
**continues** 272:9
**contribution** 228:10
**control** 243:1 262:2
**controlling** 262:6
**controls** 212:19
**conversation** 44:13
   51:1 59:24 98:15
   99:19,23 100:5,9
   100:15 101:6
   238:6 265:10,13
   266:13
**conversations** 56:1
   60:1,10,11 101:2
   238:11 253:14
**conveyed** 265:13
**convicted** 19:6,13
   19:22
**copied** 11:4 233:19
   233:21 234:3,4
**copies** 39:19 205:8
   206:21 213:14
   226:13 235:7
   277:5
**copy** 10:19 11:2
   19:17 36:4 114:4
   177:3 181:8 183:7
   205:23 206:17

207:24 211:2
218:1 220:23
226:6 233:15,23
233:24 234:9,11
234:16,17,19,20
234:21,24 235:4,6
246:7 247:13
248:23 265:5
279:3,5
**corner** 74:18,20
**corporation** 13:10
**correct** 11:7 15:13
   17:17 18:2 22:11
   28:4,7,8 33:6,8,13
   34:1,2 35:1,5,13
   35:14,15 39:16,17
   39:21 40:1,6,7,11
   40:12,19,22 48:13
   54:20 58:7,23
   65:18 66:19,20
   67:1,4,7,8,10,11
   67:12,14,22 68:8
   69:4 71:2 72:9,10
   76:12,23 81:22
   82:19 83:5,6,10
   83:13 85:18 87:10
   88:19 94:14 102:4
   119:11 124:3,3,14
   128:15,19 129:8
   135:17 136:16
   140:24 146:10
   151:19 152:16
   154:13 159:10
   160:11 161:1
   162:7,19,20 163:7
   163:9,11,20
   164:13,14 165:17
   165:18,20,21
   166:2,5,7,8,12,13
   169:5,8,11,15,18
   169:21,22,24
   170:1,6,11 171:5
   171:8 172:7,11,12
   173:6,7 175:20,21
   176:3,4,6,8,12
   177:3,23 178:23
   179:19,19,20
   181:8 182:10,22
   182:24 183:2,5,9
   183:10,24 184:3,5
   184:13,23 185:1,1
   185:2,20 186:1,3
   186:14,17,21
   187:5,6 188:23
   190:19 191:3,17

192:4,7,8,11,19
195:9 196:20,21
196:22,23,24
197:2,6 200:17
201:23 208:14,15
213:20,23,24
215:1 216:12
217:15,16,18
219:14 220:8
224:9,12 227:3,4
227:21 233:9
236:7,8,15,24
237:3,4,6,7,17,20
238:16 239:3,19
240:2 242:5,14
243:18 244:20
245:8 246:7
247:10 249:5
256:13 258:21,22
259:3,13,14 262:3
262:7 263:24
264:18 267:3,13
268:2,9,20 270:3
270:8 273:7 276:8
276:9,11
**corrected** 178:13
**correcting** 195:14
**correction** 172:1
**corrections** 159:10
**correctly** 67:24
   68:23 162:7,13
   184:14 186:12
   187:4 188:1,9
**correspondence**
   146:13 177:4
   181:9 183:7
   266:21 267:6
**cost** 229:4
**counsel** 2:1 6:2 39:7
   233:17 235:1
   244:18 245:6
   265:11 280:9
**counted** 76:9,21
**counterclaims**
   159:20
**counting** 199:20
**Country** 1:13
**course** 7:10 25:11
   49:17 103:11
   171:1 180:20
   182:18 204:16
   232:14 241:11
   243:16 263:15
**court** 1:1,22 7:2,24
   10:23 14:5 38:10

44:16 117:20
156:4,6,9,10,12
156:16,17 157:8
157:11,21 158:14
175:22 176:1,11
177:17,23 181:12
181:16 183:23
186:23,24 187:19
188:5 214:5,8
216:13 221:17
224:14 279:2,5
**Court's** 3:16 39:2
**courtesy** 203:1
**cousin** 104:1
**COVID** 42:18
   43:10,12 125:11
   133:13 136:14
   137:18 160:22,24
   174:16 245:18
   273:23
**COVID-19** 41:15
   56:3 58:11 74:9
   162:3,11 227:8
   228:6 245:22
**crazy** 138:10,17,23
**create** 69:14,16
**created** 92:17
   236:11
**creating** 255:4
**credit** 98:5 202:24
**crime** 19:6
**criminal** 7:20 8:3,4
   19:11 44:22
   274:14
**cross-claims** 161:12
   161:22
**cured** 259:5,12
**customer** 20:8
**customers** 49:21
   142:15 239:8
   254:24 267:19
**cut** 9:9 132:2

─────────────
         **D**
─────────────
**D** 3:1 21:22 99:18
**d/b/a** 1:4
**daily** 8:22
**Dan** 17:6 98:15
   100:9,14 107:5
   109:4,9 124:12
   132:24 138:24
**Daniel** 99:18 100:5
   215:12
**Daphna** 2:13 33:9
   108:18 111:14,14

111:17 112:11,16
112:24 116:23
117:11,19 118:13
119:7 120:4,7,13
120:18,20 123:4
148:15,19 165:20
165:22 166:11
196:12,13 197:9
197:13,20 198:14
198:21 199:1,8,14
199:23 200:9,13
200:16 208:6,13
210:5,17,21 211:4
211:12,12,17,20
213:2,10,12
235:22 270:2,7,13
270:21 271:5,15
272:18 273:4
274:16 275:3,15
275:20,23 276:5,6
276:7,8
**Daphna's** 270:9
   276:2
**date** 16:12,14,15
   55:16 68:15,16
   73:23 110:2 133:7
   148:17 150:5,6
   156:12 160:9
   185:17 186:3
   187:6 207:9
   240:15 242:7,12
   242:15 244:2,13
   269:10
**dated** 3:19 4:1 12:3
   57:14 71:8,20
   98:23 154:4 177:4
   181:9 183:7
   213:16,23 225:17
   264:19
**dates** 187:5,7 269:5
**day** 8:13 9:2 53:6
   53:23,24 54:1
   55:23 56:10 61:24
   73:5 97:22 103:17
   104:18 105:1
   109:4 130:14,16
   135:8,8 140:15
   141:13 143:19
   172:14,21 178:15
   178:16 224:5
   263:21,23 278:15
**days** 55:17 61:18
   68:19 98:2 113:10
   125:21 126:2,3
   179:15 222:22,23

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 78 of 749

USDC, ED of PA       American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 285

269:1
**deal** 50:14 62:21
   77:1 111:22,24
   112:16,22 113:1
   134:22,24 135:3
   202:14 268:4
**dealing** 42:18,22,23
**deals** 42:20 134:17
   135:12,15 273:23
**Dear** 228:1 254:21
**December** 44:1,3,8
   44:13,24 49:8
**decision** 214:16
   264:3
**declaration** 4:3,5
   153:17 227:2,7,11
   227:18 229:16,23
   230:22 231:3,5,22
   232:4,12,16,17,19
   232:20 235:11
   239:10 242:23
   243:9,18 244:20
   245:8 246:3,8,20
   246:21 247:2,2,8
**declarations** 269:10
**defend** 13:18
**defendant** 10:10
   217:1
**defendants** 2:8,13
   159:2,2 162:3,4
   162:11,12,16,17
   162:22 163:4,6,16
   163:19 164:11,13
   169:14,24 170:2,7
   170:10,16 171:1,4
   171:19 172:9
   173:5,15 174:9
   175:18 176:13,17
   176:23 177:1,21
   179:24 181:8
   185:5,6,10,11,12
   185:13 220:5,6
   224:17,19
**defense** 173:3
   184:22 274:15
**defenses** 159:19
   161:11,22
**definite** 120:16
**definitely** 117:17
   122:10
**defraud** 224:3
**delays** 245:17
   250:17 255:1
**delete** 122:19
   123:22,23,24

124:1,2
**deliver** 85:21 105:8
   142:15 145:6,6
   167:17 240:5,16
   241:2 253:1,6
   267:19
**delivered** 77:12
   128:10,17,22
   143:10 151:17
   167:12,18,18,21
   168:9 239:3,4,6
   239:12,15 241:11
   250:20 254:24
   259:10
**deliveries** 86:6 98:8
   138:5 169:10
**delivery** 61:17
   65:16 68:6 91:11
   91:17 95:13
   102:20 240:23
   241:19 255:4
   257:24 258:13
   259:1,5,9,12
   265:19
**denied** 160:21
**deny** 163:13,14
**depicts** 119:12
**deposed** 10:2
**deposit** 70:2,3,7,8
   70:10,14 71:10,12
   72:2 77:18 78:23
   79:6 80:9 112:7
   113:7 164:19
**deposition** 1:12 3:9
   10:15,19 11:2,3,4
   11:11,17 12:5
   13:6 14:7,9,12,23
   15:22 16:2,4
   41:11 62:5 65:14
   107:23 127:1
   150:17 157:5
   165:16 197:24
   206:20,21 213:14
   226:23 231:16
   233:2,7 234:23
   247:21 248:2
   260:10 277:5
   278:10,12,18
**Deposition-15**
   153:10,11
**Deposition-16**
   150:17
**Deposition-26**
   257:11
**Depot** 75:17,18,19

151:21,23 276:15
**describe** 135:18
**deserve** 270:16
**designated** 11:13
   70:13,14,17
**designation** 70:22
**destination** 169:14
**detail** 178:9 223:22
**details** 171:3 178:13
**diamond** 3:23 12:6
   12:19,23 13:14,15
   13:17,17,23 14:4
   14:6,13 18:24
   27:6,7,16,18,21
   27:23 29:10,11,15
   29:18,21 30:7,9
   30:15,19,22 31:7
   31:18 32:6,16,23
   33:5,11,19 34:3,7
   34:14,22 36:11
   37:14 38:4,14,17
   40:10,15,20,21
   41:11,12 44:21
   70:15,17,18,19,21
   71:2 72:9 73:1
   77:5 79:8,11 80:4
   113:8 119:19
   121:22 135:1
   137:16 146:10
   204:15 208:19,22
   227:10,13,19
   228:8
**diamonds** 20:7,11
   82:21 83:15 118:7
   118:12,16,20,23
   135:6 137:10
   153:22 154:6
   219:19,21 220:3
   220:19 228:21
   250:18 265:23
   267:11,16,23,24
   268:7,12 275:17
   275:20,23
**difference** 8:2 15:10
**different** 18:6 63:22
   63:24 86:18,19
   108:3 127:11
   178:11 183:23
   208:1 217:6
**dinner** 226:19
**direct** 116:15
**direction** 162:16,21
   163:5,6
**directly** 96:23 113:7
   162:18,23 171:16

194:24 199:13,19
   208:7,13 213:7
**director** 27:3
**disability** 8:10
**disagree** 13:24 14:2
   109:21
**disappeared** 242:17
**Disciplinary** 244:18
   245:6
**disclose** 117:11,21
   117:21,22 216:22
   220:18
**disclosed** 217:5,17
**disclosing** 217:14
   219:2
**discover** 124:13
   125:3
**discovered** 106:16
   133:3 134:5
   156:20 178:12,20
**discovery** 127:24
   217:6 249:4,8
**discuss** 157:13,15
   157:16 266:8
**discussed** 47:1
   56:20 117:15
   157:17
**discussion** 15:4
   65:11 123:8
   260:22 265:18
**dismiss** 214:8,13
**dismissal** 214:15
**dismissed** 101:4
   217:15
**dispute** 110:3
**disputes** 190:8
**disruption** 245:18
**distribute** 126:18
   153:6 277:7
**DISTRICT** 1:1,2
**DiTomaso** 99:1
**dizzy** 231:1
**document** 11:21
   27:15,22 39:11
   40:9 57:17 59:14
   65:2 66:2,3,9 77:2
   77:4,5 78:7,8,17
   83:3 84:19,22
   114:5 143:11
   145:3 146:1,8,11
   146:12 158:22
   159:9,24,24
   178:23 188:19
   218:3 232:8
   233:22 237:14

246:17 249:1,20
   252:7 260:9
**documentation**
   92:17
**documents** 3:11
   10:16 11:6 38:12
   38:13 41:6 87:18
   92:22 94:21
   114:10,20 115:5,9
   118:15 145:23
   146:19,20,22
   189:1 205:18
   206:4 213:13,19
   218:5 221:6
   222:15,18 233:15
   233:16,18,21
   234:6 248:3,4,8
   248:14,16,19
   249:1,7,11 254:3
   277:6,13,19 278:5
**dogs** 140:14
**doing** 6:16 20:8
   43:5 122:24
   137:13 139:14,24
   157:23 158:8
   161:7 202:14
   232:18 269:11,11
**dollar** 80:1 224:1
**dollars** 58:17
   129:13
**door** 35:15
**doors** 125:21
**downtown** 19:24
**dozens** 135:11,11
**draft** 232:19 236:7
   243:9,18
**drafted** 231:5 232:5
   235:12 242:23
   246:9,15,18
**drafting** 246:21,22
**drafts** 39:19 40:4
**drawer** 80:14,16,21
   83:9
**drive** 21:9 22:2
   23:22 24:1,11
   105:15 127:6,8,13
   127:19
**driver** 89:18 90:10
   91:14,19 92:2,3,5
   92:7,8,10 105:14
   110:19 145:18
**driver's** 16:18,19,22
   16:23 17:8,12,20
   19:17 143:22
**drivers** 87:15 91:3

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 79 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss              February 16, 2024

Page 286

**driving** 76:3 105:20
  144:4,21
**drop** 153:5 276:23
**drove** 74:15 75:4,5
  78:2 85:9 90:9
  92:12,21 105:3,13
  111:16 127:16
  178:18
**drug** 8:22
**drugs** 8:8
**dry** 143:12
**due** 8:23 196:19
  240:14 241:5,22
  245:18
**duly** 6:8 27:23

———————
        **E**
**E** 3:1,7 280:1,1
**E-d-m-o-n-d** 26:2
**E-f-r-a-t** 26:6
**e-mail** 11:10,24
  12:3,11 17:21,24
  18:3,6 48:3 58:2
  62:1 98:22 101:14
  153:12,16 154:3
  154:11 180:23
  181:8 182:4
  213:22 225:5,6,12
  225:12 227:17
  229:6,17 230:2,4
  230:18 238:5
  251:2 264:19
  265:2,4,8 266:12
  269:19 277:20
**e-mailed** 177:4
  256:12
**e-mailing** 264:13
**e-mails** 123:24
  146:13,15 214:19
  267:5 269:5
  277:10
**earlier** 177:9 178:4
  179:17,20 210:1
  230:1 235:15
**earned** 81:14
**easier** 57:10
**EASTERN** 1:2
**easy** 19:8 115:4
  159:22 164:24
  165:3
**ECF** 39:13 159:24
**Edmond** 26:1,13
**Efrat** 26:5,7,9,10
**eight** 20:16 61:7
  82:7,13 92:20

93:4 94:22 111:3
  111:15 124:23
  129:13,21,22
  130:3,13 234:12
**either** 13:3 27:2
  37:6 40:5 119:7
  132:23 209:5
  242:17
**Eldiven** 62:15 78:8
  84:5,7 93:12
**electronic** 164:13
**eleven** 166:16
**Elizabeth** 16:24
  23:24 28:7 59:15
  74:6,8,17,21,22
  80:15 84:18
  103:15 105:7
  125:1 166:20
  174:21,24 178:19
**email** 4:1 213:16
**emails** 4:6 264:11
**embezzlement**
  20:11
**embroiled** 19:24
**employee** 27:3 31:3
  34:11
**employees** 31:19
  32:1
**emptied** 107:12,13
  107:14,20 108:7
  110:11,15,21
**empty** 91:24 92:13
  107:17 143:21
**en** 215:15 239:12
**enclose** 225:11
**enclosed** 225:5,10
**enclosing** 11:11
**encounter** 120:7,13
**ended** 48:1 61:15
  107:15 119:9
**engage** 273:24
**Enterprises** 1:4
  6:16
**entitled** 16:11 212:2
**entity** 13:10 14:10
  29:23 38:3,13,14
  38:16 40:11,19,21
  41:3 42:8 69:9,14
  69:16,19 70:22
  160:21
**entry** 192:15
**envelope** 79:23,24
**Environmental** 1:4
  6:15
**equaled** 202:8

**equals** 197:21
**equipment** 43:11
**equivalent** 157:20
  157:21
**error** 196:19
**escrow** 71:16 72:8
  112:6 113:12
  191:10,12,19,24
  192:15,17 197:19
  202:20 203:13
  204:15 212:6
  213:9 215:14
  257:13 267:20
  270:10,14 276:7,7
  276:13
**especially** 256:20
  257:22
**Esquire** 1:7 2:2,6,8
  2:11 252:4
**Essentially** 201:6
**estimate** 89:13,14
**estimated** 76:11,22
  77:23
**et** 1:7
**events** 8:12,17
**eventually** 51:16
  119:9 144:16
**everybody** 143:4
  237:16
**evidence** 93:3 124:1
  163:17 164:3
**Ex-wife** 10:11
**exact** 201:16
**exactly** 13:20 15:14
  23:10 28:20 36:23
  47:6,18 62:6 69:2
  69:11 71:3 77:14
  89:13,19 97:16
  102:23 112:13
  128:16 130:10
  133:19 141:22
  144:10 145:17,19
  147:19 163:12
  164:23 178:14
  194:9,11 200:4
  201:15 202:9
  209:9 231:7 238:2
  240:12 256:7
  258:4 261:17
  269:9
**examine** 178:20
**examined** 6:9
**example** 137:9
**Excellent** 248:22
**excerpts** 3:24

208:19,23
**excess** 220:11
**exchange** 135:1
  137:16 153:12,16
  251:2 256:11
  269:19
**exchanges** 226:24
  230:2,17 270:7
**exclusively** 135:15
**excuse** 26:8 54:5
  65:1 118:14 162:1
  177:16 181:4
  184:18,18 185:18
  198:1 208:5
  209:18 211:14
  226:20 261:6
  262:1 270:14
**executed** 184:18
  215:10
**exercise** 9:8
**exhibit** 11:2 36:5
  65:14 87:4 150:15
  206:20,22 217:23
  218:15 233:3,7
  234:23 253:10
**Exhibit-15** 226:23
**Exhibit-16** 107:23
  107:24 127:2
  150:13,16
**Exhibit-17** 168:5
**Exhibit-22** 165:16
**Exhibit-24** 62:5
  65:21 66:6,17
**Exhibit-3** 177:6
  180:6,8 181:10
  183:8
**Exhibit-30** 250:23
**Exhibit-31** 247:21
  260:10
**Exhibit-7** 157:5
**Exhibit-9** 213:15
**exhibits** 279:8
**exist** 40:24 41:1,7,9
  69:10,13 93:18
  160:15 248:20
**exists** 114:8 160:20
**expanded** 178:9
**expect** 270:17
**explain** 38:5 152:4
  182:17 217:1
**explained** 15:10
**explanation** 273:7
**explicit** 121:24
**extra** 62:18,20
  66:24 68:7 202:10

**eyes** 141:7 172:2

———————
        **F**
**F** 280:1
**fabricate** 248:13,16
  249:7
**fabricated** 206:13
  248:3 249:11
**face** 122:2,5
**Facebook** 36:3
**facetious** 143:14
**facility** 102:1,9
  170:18 172:11
  173:6,17 175:11
  175:13,17 177:18
  178:2,3 182:13,19
  187:1,12
**fact** 8:1 119:16
  216:10 272:12
**facts** 159:19 161:21
  173:3 214:4
  244:19 245:7
  247:6,7
**Fairway** 21:9 23:22
  23:24 24:11
**false** 184:3 186:4
  245:11,13,14
**falsification** 161:17
  186:18
**falsify** 248:18
**fantasy** 131:4
**far** 13:14 63:3
  88:15 197:12
  230:22 231:3,8
  232:13
**Fargo** 3:23 32:8,9
  32:11 33:5,12,14
  70:15 72:9 73:1
  205:1,16 206:5
  208:9,19,22
**fast** 237:9
**fault** 240:13,18
**February** 1:15 33:4
  59:16,17 60:5,21
  61:16,17 71:13
  72:5,6 73:11,17
  73:19,19,22 74:1
  74:2,12,13,14
  75:7 79:7 81:20
  81:21 86:2 99:7
  99:12 100:2,17,22
  101:22 102:4
  109:5,10,18 110:1
  110:3 111:21
  124:11,11 128:11

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 80 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 287

128:17 131:21
132:24 143:20
163:16 164:16,20
165:7,9 166:1,1,2
166:2,12,22
169:17 170:22
171:24,24 172:6,8
172:24 190:18,21
191:1,1,11 192:1
192:2,6,16 193:12
193:22 194:13,15
198:1,2,3,4
199:17 207:6,10
207:12,14 220:6
236:10 248:2
250:7,16 257:1,2
257:3,5,12,12,17
257:23 258:6
277:14
**feel** 153:24
**feeling** 253:5
**felon** 19:14,22
**felt** 214:3
**field** 153:23 154:2,2
**fifth** 7:18,22
**figure** 50:19 138:18
138:20 167:8
194:16 267:4
**figuring** 61:8
**file** 29:8,15 35:1
159:11 224:14
228:6
**filed** 29:18,20 34:23
35:4 39:13,14,21
40:1,4 159:3,24
175:22 177:17,23
181:12,15 182:6
183:23 184:3
222:22 224:17,20
**files** 228:3
**filing** 39:12 159:8
**filings** 39:18 157:1
**fill** 29:7 125:22
242:3,7,13 243:14
244:1,2,3
**filled** 56:2 76:14
**final** 58:19,21 63:20
63:21 64:6,8,10
87:5,11 88:3,18
**finally** 53:5
**find** 19:8 20:14
38:12 87:23
103:14 114:19
148:14 180:4
187:11 205:12

207:18 209:2
224:14 233:21
255:2 269:15
**fine** 16:5 40:6
136:10 139:14,24
278:20
**finish** 139:11
142:11 181:14
**finished** 41:17 77:1
78:16 143:22
223:8,9 266:22
**firm** 116:23 224:20
237:6,19
**first** 3:22 9:21
11:12 12:9,17
20:7 23:11,13
28:1 41:14,18
45:4 51:17 53:17
55:13,24 60:13
63:18,22 65:21
78:21 99:9,14
100:24 109:20
112:7,15 126:7
132:23 133:1
134:22,24 135:2,5
145:9 158:19,24
158:24 159:4,14
189:10,14 196:10
201:7,21 202:10
207:15 208:9
213:7 217:24
218:4,17 229:12
235:16,22 246:13
249:12,19 264:5
**fit** 153:2
**five** 30:16 34:23
35:6,7,7 57:13
64:3,4 75:9 76:6,9
121:16 144:9
223:19,21 226:13
**flat** 110:16
**floor** 217:20
**fog** 9:18
**folded** 110:15
**folder** 234:9
**folders** 233:17
**follow** 265:5,9
**following** 105:19
228:2 266:13
**follows** 2:1 6:10
**food** 125:10,16,20
125:22 126:14,18
153:6
**force** 10:1
**Ford** 127:14

**foregoing** 161:10
176:22,23 184:22
186:17 280:6
**forensic** 254:11
**forget** 187:6 196:3
196:4
**form** 6:4 36:13
56:12 60:4 69:19
90:21 108:12
131:14 217:19
237:11 241:7
244:23 248:5,8
250:18 258:16
262:4 267:21
268:8 274:11
**formation** 3:13
27:11,16 29:5
35:2 37:24 41:6
**formed** 27:5,23
30:15 160:24
**forms** 95:6
**forth** 65:17 184:2
**forward** 81:16,18
218:16 222:9
240:24
**forwarded** 265:2
**found** 20:13,16
38:13 133:9
148:11 187:12
228:23 231:16,19
235:24
**four** 25:23 64:3,4
83:12,14 89:18
118:6 137:3
150:23 166:1,5
188:21 196:2,2,18
210:18 223:19
224:17,19 255:3
275:17 277:1
279:9
**Four-page** 3:23
208:18
**Four-wheel** 127:13
**Fourteen** 11:15
242:10,11 243:24
**Frank** 25:2
**fraud** 20:2,3,11
225:2,3 256:16,16
259:4,11
**fraudulent** 223:17
223:20
**Friday** 1:14 73:16
73:17,18,23,23
74:3 77:9,11,12
78:5,6 79:19 82:1

82:2 256:20
257:17,22 258:14
265:24
**friend** 35:10,11
36:23 209:23
**friends** 37:18
**front** 3:10,12,15,21
4:6 10:15 13:12
15:17 27:10 38:10
39:1 126:17 127:2
153:5 158:18
216:14 235:13
264:10 269:14
**Fuck** 270:15
**full** 24:17 45:24
52:1 75:10 133:18
133:19 176:24
177:21 181:7
183:5 217:18
265:24 266:15
268:1
**fully** 7:6 201:22
**funds** 70:12 79:4
215:13
**further** 224:3 243:6
266:8,8
**future** 210:12

_____

**G**

**G** 1:22 27:15
**G-a-l-a-t** 26:4
**G-a-l-i-t** 26:5
**g-mail** 18:11
**G-r-o-s-s-s** 249:17
**Galit** 26:3,16,18
**Gary** 1:12 2:2 3:4
4:3 6:8,14 10:13
11:12 12:3,3,5,12
17:11 27:9,15
34:21 35:20 37:21
38:24 39:11,12
57:17 64:19,23
65:2,8,15 66:19
67:1 68:13,24
69:13 70:14 71:19
78:7 81:17 84:19
88:3,12,18 93:5,8
98:23,24 117:20
121:4 132:8
146:10 159:1
161:3,9 166:10
184:20 189:5
193:14 196:12
197:9,13 198:14
208:17 213:2

215:24 216:11
221:4 223:16
225:9,11 228:1,7
229:15,21 231:18
231:23 232:2,2,3
235:11 246:6
255:5 260:13
261:6 264:16,16
268:10 269:18,18
269:19 270:1,1
**gem** 148:24
**gems** 118:7,9
137:11 148:20
219:19,21 220:19
**gemstones** 220:4
**general** 40:3
**gentlemen** 57:5
**gently** 109:22
**Germantown** 2:3
**getting** 111:20
118:15 147:22
174:20 219:18
226:14 234:1
260:4,5 277:13
**Girard** 91:20
**give** 9:20 14:7,9,11
14:17,20 15:11
17:12 48:2,18
50:19 64:11 77:19
78:11,24 82:9
87:19 92:18 95:3
95:18 97:18
102:14 116:20
118:9,12 125:10
137:7,10 145:4
146:2 155:3
159:22 171:7
200:17,24 201:2,4
202:14,18,24
203:1 205:19,21
207:23 209:10
211:9,23 220:1,3
228:17 229:1
250:8,13,19
251:20 262:11
266:15 268:7
275:17,23
**given** 219:13 220:19
**gives** 276:14
**giving** 13:4 14:15
187:17 218:16
225:21 242:24
261:16
**glass** 154:1
**global** 245:18,23

USDC, ED of PA       American Environmental Ent. v. Manfred Sternberg, Esq., et al.       Friday
No. 2:22-CV-0688 (JMY)                  Deposition of Gary Weiss                 February 16, 2024

Page 288

278:6
**gloves** 43:19
**go** 15:1,6 21:1 23:3
23:14 33:4 34:20
44:16 52:11 65:7
72:14 76:13,18
81:16,18 89:23
90:5,20 91:18
99:3 102:1 105:6
106:21 109:4
113:12,15,16,17
116:21 122:23
124:7,10,22,24
126:3,16,22
127:22,24 131:20
142:20 148:10
150:3,12 156:24
159:11,15,17,20
159:21 165:5
173:24 174:15
177:8 179:6
180:19 181:2,2
183:17 185:3,3,9
185:14 188:19
190:24 194:12
197:6,18 205:16
210:3 218:23
221:23 222:9
227:1 230:19
232:15 233:11
247:1,11 252:3,20
254:12 261:21
262:12,18,22
275:21 277:8,11
**God** 111:7 131:8
**goes** 8:20 216:13
**going** 6:19 9:21
12:21 15:15 16:12
19:18 21:19 24:13
24:16 60:2 61:8
61:22 63:6,7,8,14
63:16,23 69:24
70:10 91:15 96:23
98:2,19,20 105:21
105:22,23 106:10
110:17 113:14,16
113:17,20,21,23
119:18 139:8,9
143:22 144:4,8
157:2 165:3
174:20 187:15
189:5 190:20
191:4,15 195:17
196:15 197:6,22
198:8 200:8,24

204:10 205:23
207:23,24 211:1
226:22 228:16
233:19 234:2,16
234:20 237:9
241:1 254:12
262:11 266:14
268:5,6 273:11,19
273:21 277:5,8
278:14,16
**Gold** 82:21
**Goldberg** 2:5
**good** 6:13 53:19
59:3 99:19 150:19
156:15 188:13
264:23 271:16
272:19
**goods** 92:6,15,20
95:12 96:20 97:10
97:13 98:1,12
100:17,18,23
102:2,14,21
168:21
**Google** 19:23
**gotten** 90:13 97:9
254:3
**grandstand** 222:10
**grandstanding**
222:13
**grant** 227:10
**green** 180:13 194:4
194:12,23 195:19
195:20 196:10
**grievance** 227:19
228:4
**grievances** 227:7
228:5
**Gross** 4:5 19:13,22
20:6 42:22,23
43:2,23 45:4
46:17 48:12 49:14
49:24 60:1 67:1
68:20 72:17
115:10 134:18
135:3 149:5
162:16,21 163:6
163:18 164:11
169:23 170:12,15
171:3,7,18 176:24
177:21 179:24
181:7 185:6,9,12
201:14 216:23
220:5 224:19
235:23 236:24
237:19 246:4,8

248:12 249:12,20
251:3,3,6,19
252:22 253:13
260:5 261:6
264:21 270:7
271:5 272:2 273:4
273:22,22 274:4
274:10 275:21
**Gross's** 247:2
253:24 274:14
**Gross/Sternberg**
162:4,12
**group** 67:4,13
138:22
**guess** 7:16:13 59:3
59:10 96:12 98:7
106:4 186:19
212:11 258:20
271:16,17,18
272:19,22,24
273:1
**guy** 50:2 96:1
135:21 136:3
144:9 146:2
205:22 254:11
255:16
**guy's** 226:14
**guys** 56:9 79:11
91:19 110:19
120:21 128:3
137:3 173:9
174:20 241:2
250:13 254:24
257:24 278:4
**GW** 199:18
**GW-1** 3:9 10:13,16
11:2
**GW-10** 4:2 231:23
233:7
**GW-11** 4:4 246:4
**GW-12** 4:6 264:11
**GW-13** 4:7 269:21
**GW-14** 4:9 269:23
**GW-17B** 4:10 189:8
195:18
**GW-2** 3:12 27:11
**GW-3** 3:14 35:23
**GW-4** 3:15 39:4
233:3
**GW-5** 3:18 57:15
**GW-6** 3:20 64:21
**GW-7** 3:21 158:20
158:22
**GW-8** 3:23 208:20
234:24

**GW-9** 4:1 213:17

_____

**H**

**H** 3:7
**h-a-i-k-u** 260:14
**haiku** 260:13,17,18
261:2
**half** 22:23,24 23:11
23:12,13,24 81:9
**hand** 15:15 81:23
87:1 134:7 140:18
140:20 233:2
269:12
**hands** 134:2 216:18
267:21
**handwriting** 165:17
**hang** 47:14 122:20
**happen** 147:3 206:8
**happened** 44:7
47:22 49:18 50:8
51:5 52:22 70:23
70:24 75:6 76:6
76:24 84:11 85:9
85:14 89:15,21
90:4,24 96:20
97:21 102:8
104:17,21 106:20
106:22 129:10
138:19 156:4
178:11,14 179:5
210:5 213:3
241:15
**happening** 110:18
110:20 269:6
**happens** 51:13
94:13
**happy** 260:15,18
261:1,2
**head** 54:23,24
116:14,19 252:19
**header** 39:7
**heading** 161:21
**heads** 11:8 104:11
128:14
**Healey** 2:11 82:11
91:5 114:4,8
116:12 119:1
122:2,5,11 131:21
133:17 143:7,9,24
144:14 145:5
149:7,11,15,22
150:4,8,20 157:18
157:24 158:5,10
181:19,21 193:9
193:13 198:11,16

198:22 199:3,6,10
199:13,16,18,22
200:2 211:13
221:3,10,14,23
222:2,6,10,14
223:1,9,12 233:24
233:24 235:1
270:23 273:5
277:7 278:1 279:7
**hear** 13:24 14:2
43:24 93:11
141:11 172:3
**heard** 56:11 112:16
274:23
**heart** 165:6
**help** 19:18 30:20
31:3,9 131:8
261:18 274:18
**helped** 29:3 31:2
**helping** 103:3
**helps** 8:19
**hereto** 177:5
**Herrara** 209:19,21
**Herrera** 24:6
**hey** 118:19 120:20
128:3 129:13
155:8
**hi** 99:3,10,15 214:1
227:6 229:15,21
265:8
**hiding** 216:10
**high** 8:20 76:10
**highly** 272:13
**hire** 174:1
**hired** 104:9 110:19
173:8 175:7
**hit** 94:13
**hold** 8:4,5 11:23
36:19 64:18 99:24
149:1,19,20
170:18 216:16
251:10 252:13
257:3 260:19
**holding** 67:4,13
87:1 88:17 118:22
**home** 75:17,18,19
80:6,15 151:21,23
276:15
**honestly** 240:4
**hope** 205:7
**hoping** 147:20
**horse** 61:12
**hotel** 120:2,4,21
272:15
**hour** 51:23,24 91:2

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 82 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)              Deposition of Gary Weiss                  February 16, 2024

Page 289

96:1 144:20
**house** 6:17,17 33:21
  74:15 99:19
  189:11 215:12,17
  216:19 223:24
  271:8 272:10
**hu** 33:7 59:4
**hub** 91:10,12,14,15
  96:4,8 100:17
  104:13 128:12
  129:4 141:6
  144:17 178:12
**hundred** 49:23,24
  50:3,4 80:1 81:5
**hundreds** 96:9

**I**

**I-COVID** 43:7 47:4
  47:4 124:13 128:1
  128:10,18 129:23
  132:5 276:16
**I-Health** 41:15 47:4
  56:3 58:11 75:12
  151:22
**I-kits** 145:24
**I-m-e-l-d-a** 37:22
**I-r-a-t-e** 25:17
**I-test** 146:9
**idea** 30:5,6 87:19
  250:8,12 254:9
  255:15 263:24
**identification** 10:17
  27:12 34:11 35:23
  39:5 57:15 64:21
  158:20 189:8
  208:20 213:17
  231:24 246:4
  264:11 269:21,23
**identified** 17:5
**ignore** 194:23
**Imelda** 37:20
**immediately** 238:24
  239:3,4,6,13,15
**imminent** 259:9
**important** 127:15
**inappropriate**
  116:15 221:9,13
**income** 81:14
**inconsistency** 269:6
**inconsistent** 187:7
**incorrect** 39:23
  40:2
**incrimination** 7:23
**indemnity** 228:10
**indicate** 143:15

**individual** 133:14
**individually** 11:12
  12:18 14:11,16,21
  42:9,11,12 57:6,7
  57:9
**individuals** 37:6
**Indocin** 8:21
**Indomethacin** 8:21
  8:22
**inducement** 259:5
  259:11
**industry** 135:16
**inference** 8:1
**inflammation** 8:23
**influence** 8:8
**info** 139:8
**information** 14:17
  16:11 40:1 117:12
  117:19,22 164:10
  170:4 222:13
  229:16,22 230:21
  248:18
**initial** 70:3
**initially** 53:10
  224:17,19
**initiate** 216:16
**insane** 205:10
**inside** 132:9 231:14
  231:21
**insisted** 117:1
**inspect** 140:24
  141:14
**instructed** 223:22
**instructions** 9:23
**insulted** 272:12
**intended** 275:21
**intent** 105:8
**intentions** 223:17
  223:21
**interest** 27:1
**interested** 11:5
  48:10,11 50:2
  280:10
**interjected** 113:1
**interpose** 36:20
**interpret** 184:14
  271:3
**interpretation** 14:3
**interpreted** 176:7,8
**intoxicants** 8:9
**introduced** 247:23
**inventing** 38:21
**invest** 43:18
**invoice** 3:20 63:10
  64:11,15,17,20,23

65:3,4,17 67:8,8
  67:11,16,17,18,20
  68:8,12,15,15,20
  68:21,24 69:5,7
  70:1 71:4,8,20
  87:10,11,11 88:4
  88:5,6,7,9,13,16
  88:17,18 189:19
  202:7,8 223:23
  224:1,4 225:10,11
**invoices** 88:6,15
  225:5
**invoke** 7:18,22
**involved** 20:4 33:19
  34:3 41:19 43:2
  43:17 111:20
  264:2 275:14
**involvement** 41:14
  227:15
**involving** 20:5,11
  20:15 41:16 45:4
  115:10 274:4
**IOLTA** 215:14
  257:11
**Irate** 25:17
**irrespective** 211:8
**irretrievably**
  185:16,19 186:7
  188:6
**island** 76:16
**issue** 95:11
**issues** 44:9 253:6
**item** 65:20,21,24
  66:6

**J**

**J** 215:12
**jacket** 151:8
**jail** 20:12
**January** 11:9 12:3
  23:19 41:20 45:7
  46:11,12,18 54:6
  56:6 60:9,16
  68:17,21 69:1
  71:5,8,20 73:6
  83:23 131:19,24
  162:2,10 189:11
  189:20 201:23
  277:14
**Jersey** 1:23 17:19
  17:20 21:9 27:24
  28:7 29:8 59:15
  74:8 84:19 104:14
  125:1 129:6 156:8
  156:20 166:20

**Jew** 20:23
**jeweler** 137:3
**Jewelformeblue.c...**
  18:19,20
**jewelry** 31:6,7,9,12
  31:14,16 37:16
  81:10,12,13 83:16
  135:15 136:23
  137:5,7 153:22
  154:6 228:21
**jewels** 83:15
**Jewish** 20:22
**JMY** 1:4
**job** 103:17
**join** 114:12 228:9
**judge** 13:13,21 14:4
  38:11,11,15 40:14
  40:18,20 214:16
  216:14 222:21
**judgment** 156:2
  226:15
**juicy** 119:18
**July** 98:16,24 99:3
  99:6,8,11,16
  100:6,9 101:3
  107:6 109:10,16
  213:23 214:2
  223:20
**jumped** 226:12
**June** 27:24
**Junior** 71:14

**K**

**K-u-b-i** 274:21
**K-u-b-y** 274:19
**keep** 21:3 63:14,16
  63:23 116:13
  172:20 212:2,11
  275:24 278:16
**Kelly** 2:10
**kept** 64:1,2,6 77:22
  190:7 276:24
**key** 222:13
**kidding** 205:6
**Kim** 98:23 99:1
**Kimberly** 1:16
  280:4,14
**kin** 280:9
**kind** 8:14 44:18,19
  79:14 82:20 104:3
  127:10,16 143:11
  273:8
**Kindest** 266:8
**kit** 33:20 34:5 41:15
  51:4 52:8 56:3

65:16 133:4
  134:16 151:22
  189:23 190:2
  208:13
**kits** 20:5,15,19 43:7
  43:20 44:11 45:1
  45:5,11 47:3,4,5,7
  47:20 48:10 51:20
  52:4,20 54:18
  55:6 56:23 57:4,8
  58:11 60:3 61:3,8
  61:23 62:2,12
  63:19 64:13 66:7
  66:24 67:23 68:7
  69:3 72:19,22
  73:2,9,12,13 74:9
  86:4 88:19 89:8
  93:4 96:10 106:17
  107:1,2,18 108:9
  110:7,10 111:3,7
  111:16 124:14,23
  125:4 128:1,3,4
  128:10,18 129:1,7
  129:10,14,23
  130:3 131:3,6,10
  131:12,18 132:1,2
  133:10 134:3,8,19
  136:15,18,19
  137:18,22 146:9
  151:18 152:5,9,14
  156:20 162:3,11
  162:18,23 163:17
  164:12 165:23
  167:13,17 170:18
  172:10 173:6,16
  173:22 174:6,16
  175:19 176:2,14
  176:18 177:18
  178:4 181:5
  182:14,22 185:15
  185:19 186:6
  187:1,9,22 188:6
  201:14,23 204:5
  227:8,16 228:6
  245:22 267:19,24
**knee** 8:24 9:3,7
  23:20 277:15
  279:1
**knew** 42:21 130:6,7
  137:21 138:11,12
  138:16,21 139:3,9
  139:10 143:3,3
  219:13
**know** 6:21 7:8,9
  8:18,18 9:4 11:18

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 83 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                        February 16, 2024

Page 290

14:1 15:12 18:9
29:22 30:2 36:23
37:5,10,24 38:1
39:8 40:23 41:5
42:14,16,20 47:21
48:10 52:3,18
53:18 55:2,3,20
56:8 57:22,24
61:5 62:10 63:8
64:1 71:22,23,24
75:5 76:3,11
79:14 83:14 84:8
86:8,11 88:11,14
89:9 90:12,19
91:20 92:10 94:1
94:4,14 95:7,8,9
96:13,17,19,19
97:6,16,18 104:1
109:1 110:18,20
112:1,17 113:2,4
113:5,6,13 114:22
114:22 118:18,21
118:24 119:21,23
120:3 122:21
124:6,20 125:16
125:19 127:16
130:18 131:11
135:24 136:1,8,12
137:17 138:2,5,18
139:4,7 143:12
144:15 146:2
147:6,15 148:22
148:23 149:9
150:1,8 151:10,11
151:24 154:1
155:10 157:18
158:1,11 165:6
174:13 181:22,24
190:7,11,23
192:24 193:18
194:8 199:22
200:21 203:3,6
204:8 205:11,11
206:1,15 209:7,22
210:7,17,24
211:24 212:15,15
212:17,18 213:3,4
213:12 217:4
218:21 219:7,16
220:9 221:5,7,15
222:19 225:23
229:20 230:23
231:4,13,14
232:13 235:8,9,23
237:12 238:14,17

238:20 239:7
241:1 243:12
244:13,13 245:23
245:24 246:17,20
246:24 249:15
250:10 252:17
254:22 256:18
257:7,8,9 258:5,7
262:17 264:2,4,5
265:10 266:7
268:3,3,4 269:12
270:24 271:5,17
271:18 273:1,1
274:14,16,16,18
274:23,24 275:1
276:2,4,17 278:1
279:7
**knowing** 269:11
**knowledge** 41:2,9
120:15 123:3
160:6 161:13
185:23 186:19
**known** 41:3 83:18
**knows** 216:23
219:16 222:13
223:3 267:16
**Kosher** 21:3
**Kubi** 274:21
**Kuby** 274:17,17,19

_____

**L**

**L** 59:11
**L-e-v-o-n** 42:5
**label** 189:5,6
**labeled** 158:22
250:23
**ladies** 36:22
**lading** 90:11,13,15
90:21 91:10,16
94:23,24 95:3,7,7
95:12,18,21,22
96:22 97:1,5,10
97:23 98:7,9
144:12,13,20,23
169:3,10,14,18,21
169:24 170:3,5,8
170:16,19 171:2,7
173:4 174:8
236:11,18,20,23
237:2,5,10,13,16
238:1 240:11,21
241:3
**lady** 207:16,19
**laid** 141:7
**landlord** 209:20

210:2
**language** 47:7
270:14
**lasted** 99:20 100:12
**Lastly** 278:24
**late** 132:24
**Laver** 2:6 9:11,14
15:1 21:23 36:13
37:5,8 45:12 54:5
54:8 56:12 60:4
63:11 65:7 81:16
81:20,23 82:3
86:16 87:3 105:12
105:15 108:12
114:12 115:4
121:4,9,23 122:23
123:6 126:11
131:14,20 132:8
134:12,15,20,23
135:11,14,18,22
136:3,5,10,13,17
136:22 137:17,21
137:24 138:3
139:11,14,24
140:9,12,18,20,23
141:2,7,11,16,20
141:23 142:3,5,9
146:23 148:5,22
164:5 171:12
190:7 194:20
200:5 206:17
207:19 209:15,18
209:22 216:7
217:19,22 218:7
218:10,14,20
219:3,10,15,23
220:12,15 221:8
221:12 226:6,10
226:16,18 233:23
235:1,18 239:20
241:7 244:23
247:15,17 248:5
253:20 254:5,7
255:13 258:16
260:20 262:4,8
268:8 274:11
277:7,24 278:9,19
279:2,4,8
**law** 27:24 71:14
116:23 224:20
228:9 237:6,19
**lawsuit** 215:24
216:16 227:9
228:4,7,9 229:3
**lawyer** 13:11,12,19

14:6 56:19 70:13
101:3,4,7,8,9
108:18 160:21
171:9,22 215:8,13
224:2 236:3 250:4
256:15 276:4,5,6
276:10
**lawyer's** 176:9
250:20
**lay** 223:23
**leading** 105:19
**learned** 175:18
176:13,17 177:13
177:18 181:4
182:14,21
**learning** 176:21,22
176:23 177:20
181:6 182:3 183:4
**leave** 92:1 224:5
276:16
**leaving** 92:22
**left** 84:12,13,15
85:6,6 88:21 90:1
90:4 92:2,4 94:17
145:13,18 166:15
166:18 168:17,17
168:21 169:1
229:2
**legal** 237:14
**legally** 215:10
**length** 75:23 76:22
**lenses** 99:2
**let's** 15:1,6 27:19
34:20,20 38:1
41:14 63:5 64:18
64:18 65:7 66:13
67:7 68:18,23
94:13 109:4
116:21 124:10
126:22 127:22,24
146:19 147:24
150:3 153:15
158:17 161:19
179:4,6 180:4
183:17 185:2,2
188:14,19 190:13
197:5 201:11
207:7 208:16
210:3 213:14
230:19 231:17
233:11 237:15
247:19 249:19
250:22
**letter** 3:19 57:14
100:11 220:22

225:17 269:13
**letting** 158:11
**Levon** 42:1,5 43:2
45:16,19,21 46:10
46:22 47:8 48:2,8
48:12 49:2,2 50:1
50:11 55:6 56:1,4
57:21 58:6 59:12
68:19 74:7 75:1,2
78:9 83:18 84:3
91:23 106:8 108:8
131:24 136:4,5,6
136:22 137:17
145:11,15 147:2
151:2,16 167:12
168:9,12 274:7
**Levon's** 42:15
48:15 57:24
**license** 16:18,20,22
16:23 17:8,12,20
19:18 23:23 151:9
151:11,12,14
**lie** 225:7,14 239:17
251:24 252:24
269:13
**lies** 217:9,10,13
219:1 225:19
**lift** 140:9
**light** 245:17
**Lightman** 2:2,2 3:5
6:12,14 9:16
10:12,18,21 12:7
15:6,8 19:10 22:1
27:8,13 35:20,24
36:15 37:12 38:23
39:6,10 45:14
54:9 56:15 57:12
57:16 60:6 63:13
64:22 65:13 66:8
82:5,14 86:18,21
87:7 88:14 91:7
94:15,19 99:15,24
105:18 108:14
114:3,9,14 115:8
116:18,22 119:4
121:1,12 122:9,13
123:1,10 126:15
131:17,22,23
132:12 134:1,10
134:13,19 138:15
139:20 142:11,13
145:8 147:4,24
148:9,13,16 149:1
149:3,18,23
150:11,21 157:4,7

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                   February 16, 2024

Page 291

157:14 158:16,21
164:5,8 165:2
171:15 181:20,23
188:13,18 189:9
193:10,14 194:1
194:21 198:13,18
198:24 199:4,7,12
199:15,17,20
200:1,3,7 206:7
206:19 207:1,20
207:22 208:16,21
209:17,20 210:1,4
211:14,16 213:18
216:6,8,22 217:10
217:13,21 218:3,8
218:12,18,24
219:5,6,6,12,17
220:2,13,17
221:11,21,24
222:4,8,12,17
223:7,14 226:8,12
226:17,19,21
231:17 232:1
233:1,13 234:5,23
235:3,20 239:21
241:8 245:2 246:1
246:5 247:5,13,16
247:18 248:6
253:21 254:2,6,14
255:17 258:18
260:24 262:5,10
262:14 264:8,12
264:16 268:11
269:17,24 271:1,7
271:21 272:19
273:6 274:13
277:1,16,22 278:3
278:12,24
**Lima** 22:5,13
**line** 65:20,24 99:14
158:24 189:10,15
197:4 225:8
251:20
**lines** 5:2 223:16
**liquidate** 265:23
266:15 267:23,24
268:6
**list** 4:10 61:24 62:1
62:7 64:6,8,10,11
64:13 68:6 86:5,8
86:9,12,19,24
87:2,6,8,11,14,15
87:24 88:1 89:22
90:20 165:19
188:20 189:7

193:24 194:2
237:13 277:23
278:5,6
**listen** 91:4 101:16
123:22 174:8
201:6 224:10
250:19
**lists** 71:17 86:9
87:12 237:23
**litigation** 265:11
**little** 24:9 51:7,12
53:8,11 69:9
74:19 76:16
116:18 136:6
138:22 140:13
147:24 164:22
221:19 222:11
230:24 233:20
243:12
**live** 16:23 21:8,9
22:20,23 24:2,7,9
24:11,17,20,21
28:10,11,13,14,15
**lived** 21:11,12 25:9
28:16,17
**lives** 24:19 35:13
**living** 271:24
**LLC** 13:4 14:4,6,13
14:13,16,21 15:12
18:24 27:2,4,5,6,6
27:7,16,18,21,23
29:5 30:7,10,19
30:22 32:23 38:2
38:3,4,12,14,15
38:17 40:10,10,16
40:16,19,20,21,23
41:2,3,4,5,8,12
69:8 70:15,17,22
159:1 160:13,14
160:24 161:4
227:10,13,19
**load** 96:9 104:22
126:9
**loaded** 102:24
126:7,14,22 140:1
168:8,21
**loading** 92:20
125:17
**located** 104:9 105:1
175:20 177:20
181:6 182:2 183:2
187:23
**location** 166:15,19
168:17,18 169:2
**lock** 88:21

**logically** 8:11,17
**logistics** 240:15
241:5,18,23
**long** 11:21 21:11,11
22:6,12 24:2,8
25:5 75:24 76:2
83:18 97:7 278:19
**longer** 129:6 144:22
172:11,18,19
175:19 176:3,18
177:14,19 181:5
182:14,22 187:22
**look** 11:11,21 13:20
17:9 23:10 34:22
34:23 37:20 40:8
57:1 62:11,12,15
64:10 65:18 66:6
66:13,16,17,18
69:6 71:7 72:1,18
72:21 73:2,12
76:6 86:10,14
87:9,19 114:2,19
114:23 122:7
135:19 142:5
146:19,22 153:15
154:3 159:9,14
180:6 188:19
189:19 191:5
192:4,14,20
195:17 206:12
207:7 222:18
232:19 233:14
235:11 247:21
249:11,19 250:22
256:10 257:10,10
267:22 271:4
**looked** 36:3 75:8,9
75:10 76:23 77:23
78:15 86:13 142:2
204:23 206:3
222:15
**looking** 48:23 86:17
89:8 103:17 110:7
118:1,2 124:5,5
144:5 189:14
204:24 229:11
**looks** 36:24 86:23
119:13 194:17
195:14 233:6
247:23 252:23
261:9 263:18
**lose** 251:12 252:14
253:7 259:20
**losing** 200:5
**loss** 216:17

**lost** 185:16,20 186:7
187:12 188:6
**lot** 49:21 60:10
62:23,24 63:1
146:15
**lots** 152:2
**love** 270:15,22
271:6,6
**lunch** 114:23
146:18 148:1
188:14 218:4,9
226:17 233:13
**lunches** 125:20
**lying** 216:14

_____

**M**
**M-a-n-g-e-r** 46:3
**M-i-r-t-h-a** 22:10
25:15
**machine** 94:17
**maiden** 25:18,19
**mail** 11:10
**maintain** 19:3
**making** 112:15
137:5,8 171:6
195:13 205:2,8
226:8 266:20
269:16
**manager** 30:15
**managers** 30:18
**Manford** 263:6
**Manfred** 1:7 2:8,9
10:19 16:2 33:3
55:13 56:11,14,14
56:18,19 60:2,14
60:19,23 62:5
71:14 72:7 79:7
83:8 88:8 97:4,4
107:24 112:2,5
113:11,11 115:11
116:6 123:3 127:1
138:10 150:13,16
153:11,12,16,17
154:4,10,10
155:11,14 168:5
168:13 180:23
189:12 190:6
199:2,8 200:9,17
202:19 208:7
210:6 211:23
212:5 213:7 214:9
214:20,23 215:8,9
215:13 216:15,23
217:10,13,17
219:1,13,16,18

220:18 225:6,14
225:18 226:22,24
227:6,24 230:2
232:4 236:6,9
238:5,12,14,18,23
239:11,17 242:23
244:17 245:4
246:9 247:20
248:1 250:2,7,23
251:3,14,17,24
252:4,10,13,17,22
252:24 253:2,7,11
253:18 254:20,21
255:7,8,12,18,19
255:24 256:8,11
256:14 257:4,7,11
257:16,21 258:4
258:12,24 259:8
259:10 260:9
261:4,7,11,12,19
261:21 262:6,12
262:18,19 263:1
263:11,16,20,22
264:4,5 265:3,4,8
266:11,13 267:1,7
267:8,11,11,15,16
268:5,16,18,24
**Manfred's** 113:14
190:8 191:13
215:20 253:22
254:9 257:13
264:2
**Manfred-24** 65:15
86:7
**Manger** 46:2,3
**Manhattan** 46:1
**manifest** 236:10,24
237:3,6,10,12,22
237:24
**manner** 140:4
**Manochi** 2:2
**March** 102:7 109:6
109:8,8,13 110:4
124:12 132:24
133:5,6 134:5
139:7 141:2,4
173:14 174:11
175:2 177:4,9,10
178:16 179:7,9,11
179:12,13,15,17
179:20,22,24
180:1,3,5,10,17
180:23 181:9
182:4 183:8,11,13
185:15,18 186:3

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.                Friday
No. 2:22-CV-0688 (JMY)                        Deposition of Gary Weiss                    February 16, 2024

Page 292

188:5 214:12
215:9 219:22
220:6 264:19
265:3,4 266:12
267:10,15
**mark** 10:12 35:20
  64:18 114:10
  143:1 157:4 164:7
  190:20 191:16
  192:10,24 196:15
  206:19 207:23
  208:16 213:14
  231:17 246:1
  264:8 269:17
**marked** 5:1 10:16
  27:9,11,15 35:22
  38:24 39:4,11
  57:13,15,17 62:5
  64:20 65:2 86:7
  87:4 88:17 150:16
  152:19 153:9,10
  158:20 163:22
  165:15 177:5
  181:10 189:8
  191:9 204:21
  208:19 213:17
  231:23 234:12
  245:12 246:4
  247:20 248:1
  264:11 269:21,23
**Market** 2:6
**Marlton** 1:23
**married** 22:14,15
**Mask** 62:15 78:8
  84:5,7 93:11
**masks** 41:16 43:9
  274:4
**match** 65:16 66:9
  66:21,22 68:2,11
  93:23
**matches** 147:17
**material** 11:20
  43:19
**math** 196:19 198:11
  199:24
**mathematicians**
  197:7
**matter** 33:20 68:11
  206:12 231:15
  253:5
**mattress** 80:7
**mean** 14:1 16:7
  30:23 57:7 96:16
  101:3 118:2
  131:21 133:17

147:8 191:18
211:8 221:4 224:6
262:17 267:14
269:2,8 271:14
**meaning** 43:7 62:9
  88:3 91:12 175:18
**means** 158:14 165:9
  252:17 272:18
**meant** 152:4 176:9
  182:16 225:13
  260:15 261:2
**medical** 65:19
**medication** 8:13,14
**medications** 8:9
  9:17,18
**meeting** 2:3 43:14
  45:21,22 46:4,9
  46:12,14,20,21
  47:1,12,16,23
  48:1,8 58:9 76:6
  272:14,15
**member** 27:2 30:14
  30:22,23 31:1
  35:8 36:10 37:13
**members** 30:18
  31:18 37:18
**memorialize** 265:18
**memory** 57:1
**Menjibar** 35:8,9,10
  36:3,6,22,23 37:1
  37:13,15
**mental** 8:10
**mention** 45:1
  188:11 224:16
**mentioned** 51:4
  97:24
**mentions** 267:7
**merchandise** 43:6
  58:17 61:7 77:17
  77:21 78:13,24
  82:15,17,20,24
  83:11,15 84:11
  85:23,24 92:4,5
  94:22 108:19
  111:15 129:22
  130:14 135:9
  151:5 153:21
  154:5,7,12,18
  155:9,12,16,18,24
  156:5,7,18 166:23
  168:11 215:15,16
  216:17,18 228:20
  228:22 229:8
  241:11
**message** 4:8,9

269:21,23
**messages** 122:19
  248:12 270:2
**met** 20:6 42:19 46:8
  46:22 47:10,17
  68:19 74:16 75:6
  75:8 76:5 78:15
  78:20 81:20,21
  106:3,6 112:22
  113:19 135:3
  148:19 235:17
**metal** 137:10
**mid-2020** 43:3,4
**middle** 9:6 42:24
  43:1 76:15
**Miguel** 29:1,1
**Mike** 30:1,3
**mill** 103:15
**million** 61:7 81:3
  82:7,13 83:12,14
  92:20 93:3 94:22
  111:3,15 112:2,2
  112:10 116:20
  118:1,3,6 124:23
  129:13,21,22
  130:3,13 165:12
  199:8 202:5,17,20
  203:18 207:2
  220:5 224:8,10,11
  255:3 267:1,8
**mind** 9:18 143:6
  259:16 269:4
**mine** 209:24 234:14
  271:16 272:19
**minute** 65:9 183:19
**minutes** 90:7 99:20
  100:12 144:9
  256:21 257:23
  258:1,13,23 259:1
**Miquel** 22:5,13
**Mirtha** 22:9 25:14
  28:3 29:22 30:14
  31:12 37:15
**Mirtha's** 30:8,9
**missing** 136:20
  234:10
**misstating** 244:24
**mistake** 176:5,16,16
  183:20,21,21,21
  184:4,6,7,8,11,17
  186:3,5,7,9 193:8
  194:17 195:4,11
  195:13,22 196:14
  205:3 206:8
  207:11 208:2

256:4
**mistakes** 180:4
  206:8
**misunderstand**
  139:18
**mixing** 100:3
**model** 127:19
**moment** 117:16,23
  124:21,22 138:20
  142:24
**Monday** 85:16 86:2
  227:23 257:19
**monetary** 267:21
**money** 33:9,16
  43:18 69:24 71:1
  79:5,10 80:3,19
  80:21 81:1,2,2,9
  83:8 85:22 112:6
  113:12,21 117:3
  192:6 200:20
  201:5 202:11
  203:4 204:4
  208:12 209:8
  211:11 212:2,3,5
  212:8,9,11,19
  213:2 220:11
  224:13,22 225:24
  226:3 229:4
  241:15,16 257:8
  259:6,12 267:18
  267:20,20 271:9
  271:19 272:6
  274:10 275:4
  276:13
**monies** 202:13
  257:8
**monipair** 18:14
  264:15
**monipair@aol.com**
  12:12 18:1
**month** 9:14 23:9
  100:1 111:21
  277:17
**months** 9:10,10
  20:16,16 44:1
  117:18 271:11
  272:8
**Morena** 35:8,8,10
  36:3,6,22,23 37:1
  37:13,15,17
**morning** 6:13 85:16
  89:11 103:16
  143:13 154:8,12
  155:19 187:16
  228:22 235:21

264:23
**motion** 3:15 39:2
  222:22
**move** 28:19 90:9
  240:24
**moved** 23:22
  167:19,22,23
**mover** 87:18 96:1
**movers** 85:15,20
  89:12 91:6,8,9
  92:17,21 96:16,24
  97:2 98:6 108:7
  109:7 111:4,11
  124:24 129:3,5
  130:17,22 131:1
  140:6 143:18
  144:2 145:1,21
  146:8,13 151:1
  152:13 156:3,7
  166:22 168:10
  169:6,20 170:17
  174:1,18 175:12
  175:14 176:11
  203:18 236:11
  240:24
**Movers'** 145:19
**moving** 91:12 92:16
  95:11 96:10,21
  97:8 128:3,11,18
  139:4 144:6
  154:16,19,21
  155:23 156:19
  172:16 218:15
  229:19,20 237:18
  241:2
**Mumfred** 138:2
**Munger** 46:2
**mutual** 272:13
**mutually** 228:3
**mystery** 143:4

---

**N**

**N** 3:1
**naked** 119:7 121:17
**name** 6:14 17:8,11
  19:4,23 22:8 25:2
  25:3,14,18,18,19
  26:20 27:5 29:2
  30:8 32:21 37:22
  41:24,24 42:4,13
  42:15 45:24 55:18
  56:14 57:22,24
  69:12 70:19 84:8
  93:11 94:17
  105:23 106:4

Case 2:22-cv-00688-JMY    Document 201-1    Filed 10/01/24    Page 86 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                     Deposition of Gary Weiss                    February 16, 2024

Page 293

112:17 139:10
147:2 249:16
274:23
**named** 216:24
**names** 25:24 64:2
103:8,9
**nasty** 272:11
**nationwide** 65:19
**necessary** 6:22
14:22 16:7 273:2
**necklaces** 82:21
**need** 16:21 49:23
62:3 65:8 79:2,3
90:11 94:24 95:20
95:21 96:24
103:24 144:12
145:2 165:1,1,2
169:9 195:15
234:19 243:11
250:17,17 258:13
259:2
**needed** 39:24 94:23
172:10
**needs** 49:24 64:13
**negotiate** 51:18
52:23 53:18
**negotiated** 56:4,5,8
**negotiator** 53:19
**neighborhood**
125:15
**neither** 169:23
170:15 217:17
280:8
**never** 32:1 69:16
70:23,24 83:23
90:15 93:15 96:2
98:7 112:16,18,19
112:20,22 113:19
118:19 120:22
121:2 129:9
132:10,16 134:7,7
148:19 154:21
155:5,8 156:2
160:24 161:2
171:16 205:4
212:8 214:10
217:17 224:13
230:1,10 236:17
236:20,23 237:2,5
237:15 239:1,15
240:10 250:1
256:5,8 259:10
261:11 264:4
274:14 275:14,16
**new** 1:23 17:19,20

19:24 21:9 27:24
28:7 29:8 44:22
59:15 74:8 84:18
93:16,16 104:14
104:14,15,16
125:1 129:6 156:7
156:20 166:20
189:4 267:18,24
**nice** 263:18
**night** 143:23 167:15
**nine** 112:10 199:9
202:5
**Nine-page** 3:15
39:1
**nod** 128:13
**nodded** 128:15
**nodding** 116:13,19
**Nods** 11:8 104:11
128:14
**Nope** 11:24
**Norristown** 2:11
**North** 1:22
**Notary** 1:17
**note** 72:2 114:12
218:10,12
**noted** 53:3 94:2,4
218:10
**notes** 71:9 266:20
269:15
**notice** 3:9 10:14
11:3,11,17 12:5
**notified** 172:9 185:5
**notify** 183:11
**November** 38:10
40:18 44:3,8,13
44:24 101:4
**number** 3:8 15:18
15:20,23 16:6,13
16:16 17:2,4,12
30:16 34:7,12,23
35:6,7,7 48:3,21
52:24 53:1,4 58:7
58:10 62:22 63:18
63:19,20,21,22
65:20,23,24 66:16
66:17,19 67:8,9
67:11 68:10 71:18
71:18 76:21 83:24
93:19,20,21 94:2
94:2,5,6,9,10,16
94:18 97:16,18,18
99:17,21 123:14
123:19 127:23
147:13,15,16,17
147:18 164:9

170:15 186:22
191:16 193:3,19
196:5,9,11,22,23
201:15 208:8
232:8 233:22
240:4 242:9
245:16 246:17
249:2
**numbers** 47:9 48:15
58:24 62:2 63:17
63:24 65:17 66:21
76:12 193:19
194:5,22 195:2
196:1,2,20 197:23
197:23 200:9
206:12 224:8,9
**numerous** 230:2,17

_____

**O**

**o'clock** 103:17
166:16 277:1
279:9
**O-r-b-i-n-o-v-i-c-h**
167:6
**oath** 7:12,15 19:8
38:15,19 157:20
179:7
**object** 36:17 217:1
217:22 218:15
**objection** 36:13,20
56:12 60:4 108:12
119:1 131:14
217:19 218:11,13
219:3,10,15,23
220:12,15 239:20
241:7 244:23
248:5 253:20
254:7 255:13
258:16 262:4,8
268:8 270:23
273:5 274:11
**objections** 6:4
**observe** 21:5 142:7
**obtained** 250:4
**obviously** 137:23
**occur** 265:19
**occurred** 164:15
**offended** 20:21
**offensive** 272:14
**offer** 153:14 179:23
180:1
**offered** 176:24
177:12,20 181:7
182:3 183:4
**offering** 177:5

180:17 181:9
183:8
**office** 28:6 91:4
98:23 137:2
144:21 234:20
244:17 245:5
**officer** 27:3 221:16
**official** 32:15
**oh** 31:17 35:6 45:22
76:19 92:8 111:6
132:13 150:18
167:5 232:10
243:16 247:23
**okay** 6:18,24 7:11
12:24 13:2,9,24
15:15 17:10 20:3
20:6 21:20 24:5
32:23 36:14,21
37:3,4,10 38:22
41:10,12 42:21
48:22 51:21 52:8
54:8 55:18,24
57:3,11 61:22
62:6 63:6,7,22
64:9,14 65:6
68:10,12,22 70:10
72:14 75:21 76:23
84:10 87:13,15
88:1,7 90:4,23
91:1,17 94:4 96:8
97:14,19 98:3,21
100:13,24 102:1
102:19 103:18
106:14 109:12,21
109:22 110:2
112:4,4 114:6,7
115:23 118:24
124:2 126:8,13,22
132:13 134:21
135:14,14 136:22
138:3 139:23
142:9,9 143:24
145:3 148:18,19
149:6 150:18
153:21 154:5
156:3,15 157:3,10
157:13 158:9
160:3 161:9,24
164:21,21 165:5
171:21 173:20
176:20 179:3
180:9,9,12 181:11
183:14 188:3
190:4,12,13
193:13 194:6

197:15 200:12
201:6 202:12,18
202:22 204:10
205:13 206:16
207:16 209:17
210:10,24 211:3
211:18,19 213:10
213:12 218:12
219:9,9 223:7
228:20 229:13,19
229:24 230:8,15
231:2 232:10,18
234:21 235:14
237:23 238:19
240:22 244:10
246:14 247:17,23
248:10,13 249:19
250:22 251:19
252:20 255:20,21
257:15 260:5,8,19
264:20 268:2
269:3 271:13
272:20,21 273:18
276:23 278:21
**old** 26:11,15,18
35:17 234:1
275:12
**oldest** 26:13,16,17
**Olmesartan** 8:15
**once** 10:5 91:15
117:15 125:10
135:9 214:14
215:14 216:17
229:1 243:6 278:6
**one-page** 3:14,18
3:20 4:1,6,7,9,10
35:22 57:14 64:20
189:7 213:16
264:10 266:6
269:20,22
**ones** 119:20 234:9
**open** 52:8 106:23
110:6 111:6,8
115:16 122:20,21
125:1,2,21 132:3
132:15,20 133:23
141:19 150:1
178:10 278:16
**opened** 32:21,23
52:3,19,20,21
73:5,10 75:8
76:20 131:12
132:1,6,11,16
133:2,8 152:11,13
**operate** 29:12

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 87 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                   Deposition of Gary Weiss                    February 16, 2024

Page 294

**operated** 277:13
**operating** 29:13
  32:7
**operation** 23:15,19
  279:1
**opinion** 87:9 220:4
  260:18
**opportunity** 99:10
  99:16 278:20
**opposing** 11:4
**opposite** 158:8
  160:20
**optimistic** 265:14
**oral** 12:5
**orange** 52:6 75:10
  132:11,13,20
  133:2,9,11
**order** 3:16 13:15,17
  13:21 14:7 39:2
  47:24 62:3 66:23
  67:2 70:8 94:11
  117:20 146:18
  169:3 201:17
  242:3,8,13 243:15
  244:1,2,3
**original** 234:21
  248:24
**Originally** 98:4
**outcome** 280:10
**outside** 7:13 141:21
**overnight** 88:22,24
  92:6
**owe** 274:10
**owes** 211:10
**owned** 22:12,15,17
  25:5 28:24 93:3
**owner** 27:2 30:9
**owners** 30:6,12
**owns** 22:7,12 25:1

――――――――――
              **P**
――――――――――
**P** 2:2
**P-a-n-t-o-j-a** 22:10
  25:15
**P-r-e-t** 46:2
**P.C** 2:9,13
**p.m** 98:24 148:7
  188:16 228:1
  232:23
**PA** 2:3,7,12 216:13
**package** 135:6
**packaged** 75:12,14
  75:16 151:21
**PACS** 161:16
**page** 3:3,8 5:2 11:12

12:17 34:21 35:2
  36:3 159:14,15,18
  159:21,23 161:19
  169:12 180:8
  183:17 189:4
  190:24 192:2
  198:6 204:21
  207:15 208:9,24
  210:18 227:1,5
  229:5,11,11,12
  249:2,19 250:22
  251:4,5,7 252:3
  252:20 253:10,12
  254:15,16 256:10
  256:19 259:19
  260:8,9 262:22,23
  263:2,2,21,22
  265:16 272:5
**pages** 11:14,15,16
  262:22
**paid** 29:3 58:16
  61:6,9,20 69:24
  72:15 77:16 82:6
  82:11,15 88:9
  92:3 190:6 197:3
  201:22,24 202:1,2
  203:3,16,23
  204:12 207:19
  212:5 224:7,10
  226:1 229:1,8
  267:1
**pain** 8:23
**Panagakos** 275:5
**Pantoja** 22:9 25:15
  28:4 37:15
**paper** 15:15,19 68:2
  93:5 146:3 192:5
  197:11 248:23
**paperclip** 233:19
**papers** 31:1 157:1
  205:12 231:13
  269:15
**paperwork** 29:7
**paragraph** 28:1
  40:8 99:9 159:20
  162:1,8,9,15,19
  163:15 166:10,14
  170:24 180:2,19
  182:20 216:1,2
  235:15 236:2,2,9
  238:3,3 239:9
  247:5,6
**paragraphs** 217:8
**Pardon** 9:11 37:5
  106:12 121:4

217:21
**parenthesis** 215:11
  225:7
**park** 74:19 78:20
  84:18 105:24
  106:3,4,10,15,21
  106:21 107:16
  110:6,12,13 111:6
  111:17 124:10,24
  166:20 167:1,1,21
  167:23 173:8
  174:1,20,21
  187:13
**parked** 84:18 89:5
  92:5 167:2
**part** 15:16,22 16:1
  16:4 22:21 138:5
  163:4 171:12
  173:18 215:23
  224:3 246:10
  249:23,24
**partial** 9:3 164:12
  164:18 165:13
  166:9
**participant** 280:9
**particular** 86:8
  139:1 161:7
**parties** 11:5,5
  215:22,23 272:1
**partner** 27:3
**parts** 258:3 276:23
**party** 10:8 116:3,6
  280:9
**pasa** 90:11 144:10
**pass** 76:16
**Pat** 279:5
**PATRICK** 2:11
**paused** 278:10
**pay** 25:9 51:3 60:3
  61:3 63:6 67:21
  68:12 79:11 80:11
  81:13 97:14,20
  103:9,12 153:21
  154:5 201:3
  202:13 204:1,5,10
  207:16 210:6,10
  213:2 216:6
  228:20 229:9
**paying** 44:21 78:12
  202:10 229:2
**payment** 61:15 70:7
  71:9,10,13,15,21
  72:2 164:12,18
  166:9,11 198:7
  203:10

**payments** 63:3
  165:6,19,22 166:1
  166:5,5,8 188:21
  193:15 195:6,7,20
  196:12 197:8,13
  197:20 198:4,5
  201:21 203:7
  206:24 208:1
  210:11,11 272:10
**pen** 15:17 232:15
  247:1
**penalties** 161:15
  175:23 185:23
  186:17
**pending** 44:22
**Pennsylvania** 1:2
  1:14
**people** 36:8 46:14
  89:12,18 95:21
  103:4,5,6,7,14,15
  103:19,21,22
  104:5,8,12 105:1
  125:22 126:19
  137:13,14 138:4,6
  138:7,9,14,22
  139:21,22 140:3,7
  140:8 144:1
  166:20 175:7
  182:1 201:1
  202:13 203:5
  209:13
**percent** 70:5
**perfectly** 7:8
**perform** 251:20
**person** 20:22 35:17
  35:17 49:5 69:6
  76:17 124:7
  142:24
**person's** 42:4
**personal** 33:14,17
  43:11 44:4 45:21
  45:22 160:5
  161:13
**personally** 13:5
  238:4 239:1
**personnel** 31:19
  32:3 240:14 241:5
  241:17,22
**persons** 41:22
**pertain** 115:5,7
**Peru** 22:5,13,23
  23:2,3,5,14 24:16
**Philadelphia** 2:7
**phone** 17:2 34:7
  43:14,15 44:5,8

44:24 45:15,19
  46:5 47:9 48:2,15
  48:17,21 49:8,18
  50:24 51:5 52:24
  53:1,4 58:7,10
  60:19 69:19 83:24
  89:9 93:19,20,21
  93:23 94:2,2,5,6,6
  94:9,10,17 99:17
  99:23 100:7 107:6
  122:15,20,21,22
  123:11,14,17,19
  124:6,6,8 147:11
  147:13,15,16,17
  148:18 149:10
  214:2 230:11
  248:20,24 249:16
  249:17 253:11,16
  253:19,22,24
  254:9 257:18
  277:8
**phones** 123:18
**phonetic** 167:9
**photo** 37:6 254:16
  254:16,17
**photocopy** 3:9,12
  3:15,18,20,21,23
  4:1,2,4,6,7,9
  10:14 27:10 39:1
  57:14 64:20
  158:18 208:18
  213:16 231:22
  246:3 264:10
  269:20,22
**photograph** 3:14
  35:22 121:5
  163:17
**photographic** 164:2
**physical** 8:10
**physically** 230:9
**pick** 69:18 97:13
  102:1,21 111:4
  174:15 177:8
  179:8 187:9,20,21
**picked** 73:4 98:11
  102:10 111:15
  128:4,20,21
  131:18 138:10
  140:4 143:21
  146:14 151:20
  156:6,18 203:18
  228:23
**picking** 110:1
  166:22
**pickup** 143:19

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 88 of 749

USDC, ED of PA       American Environmental Ent. v. Manfred Sternberg, Esq., et al.       Friday
No. 2:22-CV-0688 (JMY)                   Deposition of Gary Weiss                   February 16, 2024

Page 295

154:8,12 155:19
228:22
**picture** 36:2,12
  108:11,15,17
  115:21 119:14,22
  133:22 136:12
  148:10,17,20
  149:2,4,4 150:12
  150:13,24 151:18
  153:3 163:21
  168:3,5,13,18
  246:24
**pictures** 37:1
  108:19,20,23,24
  109:2 110:23
  111:9,13 115:22
  115:23,24 119:5,7
  119:10,16 121:13
  121:15 122:1
  123:20 124:1,8,9
  148:11,14,15
  149:7,12,14,16,17
  150:23 163:24
  164:6 273:9 277:9
  277:10
**piece** 15:15,19 93:5
  146:3 197:11
  248:23
**Pike** 2:3
**pile** 107:15,17,21,22
  110:11,22 111:8
**piles** 107:17
**place** 47:14 96:19
  106:7 137:2
  166:19 178:11
  220:21
**plaintiff** 2:4 3:16
  6:15 10:10 39:3
  181:16
**plaintiff's** 159:3
  161:11
**plaintiffs** 170:9,12
**plan** 24:9
**planning** 23:14
**plans** 23:16
**plastic** 132:3,7
  133:20
**plate** 127:23 151:9
  151:11,12,15
**pleading** 40:13
  159:16 161:20
  175:22 177:14,17
  177:22,24 178:8
  181:12,15 182:5
  182:10 184:2,19

187:8 188:10
  214:7
**pleadings** 40:4
  159:8
**please** 6:20 7:1,5,5
  10:13 21:18 35:21
  38:5,24 48:24
  66:15 67:6,7,12
  99:13 100:4 109:2
  114:13 134:15
  147:1 156:12
  158:17 164:6
  166:21 167:4
  174:22 175:3
  176:13 181:14
  215:20 247:22
  266:7 271:21
  277:20 279:4
**pleasure** 265:9
**plus** 149:15 195:8
  196:1
**Plymouth** 2:3
**poem** 263:18
**point** 16:21 68:14
  81:7,17 97:7,14
  98:11,13 100:15
  141:1 144:19
  155:4 215:16
  240:23 267:15
  271:24 272:24
**pointing** 127:1
**police** 129:12,13,15
  129:19 130:2,4,20
  130:21 131:1
  142:20
**polished** 137:11
**polisher** 137:4
**polishing** 137:12
**portion** 98:1
**position** 32:16
**positive** 120:10
**possession** 73:10
  146:8 265:23
  268:15
**possible** 7:6 118:22
  130:23 183:15
**posting** 36:2
**pound** 152:12
**pounds** 133:16
  152:17
**PPE** 43:11 273:23
**PR** 256:15
**practice** 40:3
**practicing** 20:22
**prearranged** 47:12

47:16
**prepared** 188:21
  192:5 239:10
**preparing** 231:15
**present** 216:24
**presented** 40:14
  59:18 64:14
**President's** 263:21
  263:23
**pressure** 8:13,14,19
**Pret** 45:23
**pretty** 59:3
**prevail** 214:15
**prevented** 241:19
**prevents** 216:15
**previously** 62:4
  247:20
**price** 39:15 50:17
  50:18 51:15 52:9
  52:23 53:5,7,12
  53:14,16 55:2
  56:4,5,8 58:14
  189:17 190:1
  213:23
**print** 149:20,24
  150:2 277:9
**prior** 84:4 141:11
  215:13
**privileged** 218:21
  223:4
**pro** 101:11
**probably** 23:13
  24:18 29:9 37:24
  73:19 83:19 87:14
  88:6 125:19
  154:14 257:19
  258:22 260:15
  263:3
**problem** 97:23
  202:22 235:10
  240:15 241:6,18
  241:23 253:2
  255:4
**problems** 254:23
**procedure** 9:12
**proceed** 13:1 70:9
  158:17 245:1
**proceeding** 157:21
  159:23
**proceedings** 8:3
  13:22 16:8 216:13
  279:9 280:7
**procured** 170:20
**produce** 109:2
  115:18,20 119:17

144:19 146:4,19
  164:6 165:4
  204:17,18 221:6
  221:15 223:5
  248:8 249:6
  273:11 277:12
**produced** 114:21
  115:10,14,15,16
  115:17,19 150:22
  209:1 213:13,19
  218:4,7 221:11,14
  249:4,7 254:3
  277:6
**product** 182:2
  190:8 239:2,5,12
  240:5,6,16 265:19
  266:14 268:6,19
**production** 3:10
  10:16 11:6
**products** 145:6
**professional** 1:17
  273:17 280:5,15
**professionalism**
  266:7
**proof** 120:17 182:5
  225:6,12
**property** 22:13 25:1
  25:5 28:12
**proposal** 69:5 70:1
**protection** 43:11
**protects** 251:21
**provide** 117:19
  147:1 162:3,11
  176:24 177:21
  181:7 214:4
**provided** 62:7
  136:14 163:16
  164:2,12 170:16
  214:4,19 236:12
  236:23 237:2,5,21
**providing** 218:1
**public** 1:17 15:16
  16:1
**pull** 122:15 222:20
**pulled** 104:16
**purchase** 66:23
  70:9 94:11 201:17
  208:14 215:11
**purchasing** 57:3
**purpose** 18:13
**purposes** 219:6
**push** 157:9
**pushed** 263:16
**put** 9:5 19:20,21
  37:4,11 40:9 59:6

59:7 65:15 71:20
  86:4 98:4 104:24
  106:17 110:16
  113:18 116:12
  121:2 129:24
  134:7 144:5
  146:24 151:8,10
  152:1 153:4,6
  178:17,22 184:15
  186:24 187:8
  190:20 191:4,15
  194:22 196:9,10
  196:15 206:5
  208:8 211:1
  221:24 224:24
  228:15 231:20
  233:19,20 236:19
  239:17 241:10,12
  241:13 242:1
  243:17 245:22
  264:7 269:4,14
  277:3 278:5
**putting** 61:11,12
  137:11

────────────────

**Q**

**qualification**
  228:15
**quantity** 50:17
**que** 90:10 144:10
**question** 6:5,21,23
  7:6,8,18 9:20 34:4
  38:5,7 63:3
  100:24 109:14
  123:2 128:16
  138:7 143:1,7
  145:9,22 150:19
  156:14 181:14
  192:10,24 223:10
  223:15,15 244:5
  258:3 262:1
  273:17 276:17
**questioned** 155:5,7
**questions** 6:20
  20:21 79:14,18
  116:14 120:14
  134:14 180:11,21
  219:7 224:18
  268:22,23 273:13
  278:20
**quick** 139:12
  209:15 231:1
**quickly** 195:15
**quote** 40:9 162:10
  162:12 170:2,5

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 89 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 296

173:3 175:10
176:22

_____

**R**

**R** 280:1
**radio** 144:5
**raining** 104:18
140:5,14
**Ralph** 266:24
**ran** 47:11,13 226:13
266:24
**Randolph** 265:4
266:12 267:10
268:24
**Randy** 266:9,11
268:18
**range** 50:20 51:16
**reach** 278:7
**read** 11:16,19,20,20
12:7,17 66:13
67:24 71:12 99:8
99:13,14 162:7,13
180:20 181:3
184:14 186:12,20
188:4,9 194:4
215:20 228:13
244:16 245:4
264:23 265:14
271:3,3
**reading** 12:14 159:6
162:6 228:13
**ready** 116:21 118:2
123:22 124:1,9
183:19 194:12
198:18 200:8
208:3 217:7
230:19 233:12
**real** 83:15 139:11
209:15
**realized** 110:16
**really** 8:18 11:19
14:23 54:21 60:24
61:1 79:13 83:20
86:10 89:7 94:1
99:2 110:18,20
111:12 128:6
130:11 135:23
136:2 138:18
142:8 193:17,17
197:8 235:8
270:18 272:11
**reason** 39:8 130:19
130:21,24 131:1
216:1 256:19
275:4

**reasonable** 245:17
**reasons** 249:10
**Rebar** 2:10
**Rebecca** 39:8
213:23 214:1
**recall** 8:12,17
**receipt** 57:19 59:21
59:22,22 62:16
78:11 143:11
**receipts** 92:22
**receive** 121:5 174:8
**received** 11:6,10
12:9 163:5,5
164:6 165:20
173:4 199:1 207:3
208:12 214:20,23
216:10 267:12
**receiving** 225:6,12
**Recess** 188:16
232:23
**recognize** 36:6,11
99:17 153:11,18
232:3,6
**recollection** 98:20
99:22 156:23
238:10
**reconsider** 3:16
39:2
**record** 3:24 15:1,4
15:7,9,17,22
19:11 65:7,11
71:12 94:15
101:15 116:13
122:24 123:6,8
147:1 148:5,7
152:1 191:10
193:14 208:19
221:4 222:1,9
223:2,6,13 225:23
233:11 246:16
254:11 255:9
258:9 260:20,22
273:15 277:3
**records** 191:13,19
191:20,23 192:4
192:15,20 197:19
204:18,18 205:4,7
208:23 210:18
234:11,13 257:12
258:10 277:11,12
**recover** 267:18
**recovery** 9:9
**recuperation**
277:17
**red** 259:21,23 260:5

260:6
**redaction** 210:19
**redivide** 187:15
**reduces** 8:23
**refer** 41:10 168:16
**reference** 87:22
161:6 163:21
**referenced** 121:6
**referencing** 267:5
**referring** 41:12
50:16 154:18
164:15,18 166:9
216:2 225:3
**refers** 166:10
268:15
**reflect** 94:16
**refresh** 98:20 99:22
238:10
**refrigerator** 125:18
125:19
**refund** 176:24
177:5,21 179:23
180:10,13,17,21
181:7,10 182:4
183:5,8 185:4,7
214:9,11 216:11
216:23 217:5,14
217:18 219:2,7,13
220:10,19 224:16
242:19 250:13,17
251:11 252:14
259:15,20 266:16
267:17 268:3,7
269:12
**refuse** 7:19,23
**refused** 246:20
**regard** 142:22
**regarding** 13:23
60:2 134:19
153:17 227:8
228:5
**regards** 266:9
**registered** 1:16 28:3
28:6 29:23 30:8
31:1 280:4,15
**rehab** 9:8
**relating** 117:12
161:16
**relation** 60:16
**relationship** 120:13
273:3 275:10
276:2
**release** 243:5
**released** 215:14
**remember** 7:7,9

11:19 12:1,10,14
25:2,3,4 28:20
29:17,18,20 38:18
45:24 47:6 52:10
53:2,2,3 54:4
55:10,12,15 56:7
57:1 60:22 74:19
75:15,20 76:10
89:13 92:19 93:1
93:2 94:21 97:11
97:16,19 98:14,17
98:18 100:4,7,14
100:19,20 101:1,9
101:11,13,17,18
101:19,21,23,24
103:8,9 104:18,18
107:5 109:11
122:11 124:20
125:11 127:23
128:6,7,8 129:9
130:10,14,16,17
130:22 133:7
134:21 135:5
138:6 140:15
142:19,21 143:17
156:24 179:9,16
206:8 209:4 211:2
226:23 230:7,13
237:22 238:13,17
249:6 264:13
269:3 270:15,21
**remind** 157:7
**rent** 24:3,4,5,5,22
25:10,12 29:3
**repack** 187:14
**repay** 265:23 268:1
**Repeat** 109:14
**repeatedly** 171:2
**repeating** 41:8
**repercussions** 7:13
**rephrase** 156:14
243:8 262:6
**replacement** 8:24
9:3,7
**replacements** 23:20
**replies** 253:7
**report** 129:12
142:20
**reported** 280:7
**reporter** 1:17 7:2
10:24 279:2,5
280:5,15
**Reporters** 1:22
**represent** 13:18
27:14 36:1 117:7

156:16,17 158:23
233:17 246:6
**representative**
11:13 30:4 37:23
**represented** 13:11
175:24 181:16
182:1 186:13,23
240:17
**representing** 14:7
214:3 276:4
**request** 3:10 10:15
49:1 114:10,13
124:8 146:4,24
164:7 171:6
214:15 250:4
259:15
**requested** 64:24
114:4 169:13
170:8 171:2
185:10,12 217:24
241:13 250:3
**requests** 5:1 170:3
**required** 71:15
113:11 169:3
228:9
**requisite** 170:4
171:3
**reschedule** 13:6
**reserved** 6:5
**residence** 21:7
**respect** 158:7
**response** 7:17
229:21 244:17
245:5 246:11
**responsibility** 242:3
243:6,24
**responsible** 216:17
224:21
**rest** 79:4,5 212:15
273:14 276:24
**result** 228:11
**retain** 114:18
116:23 119:19
276:10
**retained** 117:4
190:9 254:11
**retainer** 114:17
**retrieve** 173:5,12
173:16,22 174:5,9
**return** 259:6,12
260:14 261:7,23
262:7,20
**returns** 29:16,19
**review** 39:20 40:4
**reviewed** 231:8

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                        Deposition of Gary Weiss                    February 16, 2024

Page 297

**rice** 106:17,24
  107:3,15,17,21,22
  109:17 110:8,11
  110:22 111:1,2,7
  111:9,17 124:14
  125:1,3,5,6,7,8,12
  126:4,5,8,23
  128:2,5,23 129:7
  129:14,24 131:3,6
  133:3,9,13,16,18
  133:20,24 134:6
  142:16 152:15,17
  152:22 153:2
  156:8,21 176:15
  178:21 188:11
  242:18 276:19,23
**Richmond** 274:22
**Rick** 267:6
**right** 7:17,18,23
  11:17 12:11 13:22
  14:9,12 23:2,20
  23:21 24:21,22
  25:3 29:12 32:5
  35:1,2 40:1,6,15
  41:7 46:23 47:17
  48:6,20 49:3,4,10
  49:12 50:3,22,23
  51:9 52:13 54:22
  55:4 58:17,19,22
  59:8,9 60:7,21
  61:14 63:4 64:12
  64:16 65:24 66:2
  66:18,21 67:13,24
  68:18 69:5 70:7
  70:23 76:1,5,7
  77:24 78:1,3,5,10
  78:17 81:21 82:7
  82:17,18 83:12
  84:23 85:2,3 86:3
  86:20 87:1 92:6
  93:9,19,21 94:9
  94:11,23 95:1,15
  95:19 96:11 97:10
  97:19 98:3 103:2
  104:10 105:1,2
  106:21 107:21,22
  108:9 110:5
  111:22 112:3,7,8
  112:9,12 113:9
  116:10 117:15
  122:15 126:18,24
  127:2,15 128:12
  128:12,23,24
  129:1,2,15,24
  130:1,8 132:3,16

133:4 134:8 141:5
141:9 144:20
145:11 146:5
150:14 151:3
152:6,9 153:6
154:8,17 156:5
159:12 160:1,4,7
160:9,10 161:4,12
161:14 163:2,7
164:16,20 165:7,8
165:14 166:16,18
168:10,14,15,18
168:20,23 169:7
169:10 170:5,10
170:13,14,22
171:4,24 172:6,18
172:21,24 173:22
174:17 175:8,9,12
175:12,14 176:15
176:15 177:9,24
178:5,7,23 179:17
179:19 180:2,15
180:18,24 181:1,3
181:10 182:5,6,13
182:15,15,20
184:10,15 185:7,8
185:11,11,20,24
186:11 187:1,3,10
187:17,24 188:6
188:20,22 189:2,4
190:3,18 191:2,22
192:10,21,22
193:1,7 194:5,13
194:18,19,24
195:8,10,13,18,23
196:3,7,7,9,13
197:10,12,14
198:10 200:1,3,18
201:1,7,8,11,11
201:17 204:12,15
206:8 207:3
209:14 210:13
211:1,1,22 212:6
212:12,17,21,22
212:23 214:21,22
214:24 215:4,6
216:3,11 219:2,19
219:22 220:23
222:20,21 224:22
225:8,10 226:4,9
227:11,12,14,20
228:17,19 229:6,7
229:17,21,23
230:6,7 231:6,9
232:9,13 233:5,6

233:24 234:15,15
235:17 236:1,4,5
236:13,21 237:13
238:7 239:6,9,19
240:6,18,19
241:12 242:4
244:4 245:19,21
246:2 247:19
248:24 249:2,21
250:13 251:7,8
253:16,19,22
254:21 255:23
256:3,8,12 257:21
258:15,21 259:2
259:22 260:6,11
260:12 261:2,8,13
261:24 262:15,21
263:6,9,12 264:17
265:1,14 266:9,10
266:16 267:12
274:5,8 275:21
278:22
**ring** 137:9
**Road** 1:14 2:11
**role** 111:24
**rolling** 69:23
**romantic** 120:7,12
  273:3
**romantically**
  275:14
**Ron** 274:17,17,19
  274:21
**room** 75:22 120:2,4
  120:21
**rooms** 125:19
**route** 1:22 215:15
  239:12
**routing** 71:18
**rows** 76:22
**ruled** 13:13
**rules** 158:11

————————————
            S
————————————

**S** 3:7
**S's** 249:13
**s/** 280:14
**Sabbath** 21:5
**safe** 80:9
**safety** 6:16,17 33:21
  41:16 99:18
  189:10 215:12,17
  216:18 223:24
**sale** 58:19,21 78:7
  93:6 215:10
**sales** 31:10 45:4

81:12,13
**Sam** 4:5 19:13,22
  20:6 42:21,23
  43:2,13,23 45:4
  46:5,10,17 47:24
  48:6,7,11 49:14
  49:15,16,24 50:24
  51:3,9,11,12,17
  53:10,21 54:2,10
  54:12,14,17 55:4
  55:9,11 56:1,5,5,8
  56:16,17,18,22,24
  60:1,8 61:2,9,18
  62:9 63:6 64:7,11
  64:24 65:3,16
  67:1,17,18 68:6
  68:12,19 72:13,14
  72:17 79:5,6 83:8
  87:12 88:6,19
  90:14,23 91:1,2,2
  94:24 95:3,17,21
  96:21,23 97:22
  112:15 113:10,16
  113:17 115:10
  116:3 118:10,12
  118:15,19 119:10
  120:12,12,19,20
  121:7,9 134:18
  135:3 138:1,10
  142:14,14,24,24
  143:6 144:19,24
  149:5,6 169:23
  171:6,11,14,16
  180:24 190:2
  200:24,24 201:4
  201:14 202:12,19
  203:5 204:5,9
  209:7,10 210:9,16
  211:8,10,17
  212:10,11,23
  213:1,1 214:9,20
  214:23 215:5
  216:23 217:10,13
  219:2 224:3 232:4
  235:23 236:24
  237:18 238:4
  239:1,11 241:12
  243:5 246:4,8
  248:12 249:12,20
  250:16 251:2,3,6
  251:14,19 252:8
  252:10,22 253:4,4
  253:13,24 254:22
  255:3,8,19,22
  256:1,2,6,12,12

256:14 257:22
  259:8,10,15,24
  260:3,4,10,13
  261:6,7,10,21,23
  262:2,19 263:5,13
  263:14 264:21
  265:22 266:14
  267:2 268:10,14
  268:15,19,20
  270:4,7,10,13,21
  271:5,8,14,21
  273:4 274:4,24
  275:5,6,21 276:3
**Sam's** 190:8 252:12
  276:5,6
**San** 22:5,13
**satisfied** 228:15
**saw** 48:7 52:8 56:2
  56:2 73:3 74:4
  132:13 141:18,21
  205:4 218:3,16
  269:9
**saying** 14:2 38:18
  66:23 67:20
  101:14 109:13,19
  109:22 110:2
  129:10 131:5
  139:19 141:20
  144:15 149:11
  151:17 158:12
  172:3,16 198:19
  198:20 205:2,4
  208:23 211:9
  223:6 224:21
  229:21 234:18
  237:10 238:22
  239:9 251:5
  256:14 258:12,17
  258:24 259:10
  261:18 262:16,16
  262:18,19 263:4
  268:18
**says** 11:12 17:11
  30:3 34:23 35:7
  37:22 40:9 49:20
  49:21 51:12 58:16
  58:19 59:10 62:12
  65:18 66:11,16,18
  66:19 67:3,8,13
  67:22 69:8 71:8
  72:1 82:15 90:11
  90:20,21 95:23
  117:19,21 145:23
  146:9 149:15
  159:1,18 160:5,7

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                         Deposition of Gary Weiss                    February 16, 2024

Page 298

160:9,12 161:21
164:17 165:13
173:15,21 176:6
180:2,24 181:4
182:10,12,13,15
182:19,21,24
183:2,4,7 184:20
185:12,18,20,21
186:6 188:8
190:14 197:12
214:7 217:9 219:4
225:5,10,10 238:3
239:22 242:2
243:24 245:4,9
246:18 249:12
251:6,9 252:4
254:15,16 256:20
259:15,19 261:2
262:23 263:9,22
264:23 265:8,16
266:17,18,24
267:9,24
**schedule** 14:12
**scheduling** 11:3
**school** 125:9,17,18
126:6,17 153:5
276:19,23
**scrambled** 256:21
258:1,14
**screen** 48:23 149:8
**screenshot** 251:15
252:8,21 253:12
254:17 255:22
256:11 260:4
270:4
**screenshots** 248:10
253:15 270:2,6
**screwed** 130:6,7
207:5
**Scully** 17:6 98:15
99:18 100:6,9
107:5 116:13
138:11,16,24
139:8,18 215:12
215:13
**se** 101:12
**seal** 132:7
**sealed** 131:13 132:2
132:6
**sealing** 6:2
**seats** 126:13
**second** 9:22 11:23
12:22 14:22 15:2
17:24 22:18 34:20
35:2 36:19 42:4

65:8,24 66:6
73:18 91:18 99:24
105:12 122:21
144:18 149:22
165:5 187:7
198:20 201:10,12
202:4 205:9,9,9
229:2,11 233:11
247:5 250:22
251:4,5 267:9
278:15,18
**seconds** 99:20
100:12
**Section** 161:16
**Security** 15:18,20
15:23 16:6,13,16
**see** 12:6 16:18,19
28:1 30:16 35:6
48:17,23 49:9
51:19,22,22 59:1
62:16 65:20 66:3
67:6 69:24 71:11
71:24,24 73:8
86:15,22 88:15
94:13 98:24 99:2
114:6 122:17
132:21 133:21
141:16 144:3
147:11 148:12
153:22 159:5,18
161:17,18,22
162:4 163:19
170:20 173:17
176:18 177:1,6
180:1,11 189:14
189:16,24 190:13
190:15 191:6,12
192:1,18 193:5
195:5,21 196:12
196:14,22 197:6,7
197:10,22 198:5,7
198:18 200:14
205:18 206:4,17
208:1,10 213:6
214:5,6,16 215:18
216:1,20 217:2,9
217:11 220:21
223:17 225:8,9,15
225:16 228:12
229:4,10 230:23
232:10 236:19
238:6 239:23
243:4,10 244:20
246:12,13 247:7
247:15 249:13

250:5,6,24 251:12
251:21 252:1,5,6
252:15 253:2,8
256:16,22 257:14
259:6,7,7,16,18
259:20 260:7
263:1,7,17 264:5
264:21 265:6
266:2 267:2 268:1
269:6 270:19
271:12 273:22
**seen** 47:13 232:7
**Segalla** 2:5
**self-incrimination**
7:19
**sell** 31:6,7,12,14
37:16 53:20 57:8
63:2 98:1 214:13
267:11,18 268:16
268:16,20
**seller** 120:24
**selling** 20:7 60:3
62:22 69:3 215:3
215:5
**send** 11:14 12:14
39:19 63:9 64:15
64:17 65:3 67:18
70:1 71:7 91:1
94:13 95:24 96:23
97:1,4 121:13
144:23 145:1
149:12,13,24
150:2 159:8
165:11 203:5
209:8 233:23
234:17,21 235:5
255:18 256:4,21
258:2,13 259:9
275:7 277:20,22
278:7
**sending** 69:7 215:13
251:15 255:22
256:2 265:17
**sends** 257:20
**sent** 11:7,9,24 62:1
62:8 64:23 65:3
65:18 67:1,17,20
68:21,24 70:12
71:1,4,19 87:9
88:6 96:2 121:7,9
149:16 150:6,7
165:11 177:12
188:21 189:19
194:2 197:24
198:2,2,3,6,7,9,14

198:21 201:22
203:4 210:11
211:12 220:22,22
224:2 226:3 227:1
229:17 232:12
235:12 244:5,11
251:3 252:8
253:13 254:18
256:5,6,12 258:4
258:15,22 264:21
266:12 275:4
**separate** 38:3,16,16
40:19,21 70:21
**separately** 29:20
75:3
**September** 39:14
150:5 160:1
175:23 181:15
184:3 186:23
187:20,24 188:2
**series** 6:19 188:24
**served** 11:3 12:4
**services** 21:1 65:19
204:3
**set** 65:17 184:2
234:2
**Seth** 2:6 176:1
181:17
**sets** 82:23
**settle** 201:2
**seven** 54:14 236:2
**Seven-page** 3:9
10:14
**Seventeen** 189:13
189:14
**Seventy** 194:3
**sex** 120:21,24
121:19 123:3
**sexual** 120:7,13
273:3
**shake** 54:24
**Shakes** 54:23
252:19
**shared** 137:1,1
**shareholder** 27:3
**shave** 9:5
**ship** 71:15
**shipment** 227:8
228:5
**Shipped** 194:11
**shipping** 254:23
**Shlomo** 124:17,18
124:19
**shop** 45:23 46:4,6,8
46:9,15,23 47:2

47:10,11 48:6,7,9
48:12 49:13 58:10
84:2 118:12,13,17
**short** 157:2 224:8
**shorter** 136:7
**shortly** 168:24
169:1 266:11
**shot** 149:8
**shoulder** 18:10
**show** 16:23 51:20
62:4 77:14 89:12
93:4 107:23 135:8
150:13 153:9
158:22 165:14,15
188:24 191:24
192:5 204:14
206:14,16 209:1
226:22 229:19
230:8 247:8,19
255:16 278:14
**showed** 52:19 248:2
258:9
**showing** 12:2 38:12
38:13 98:21,22
143:11 148:15
258:8 270:5
**shown** 133:18 153:3
197:19 198:14
233:4
**shows** 27:20,22
49:7,7 150:13
188:21 191:10,19
191:20 192:2,16
206:23 207:2
253:11,14 257:12
270:9
**Shraga** 17:5
**shrug** 18:9,10
**Shrugs** 18:8
**side** 52:13,13 54:23
54:23 70:9 125:17
140:11 197:12
252:19,19 255:1
**sides** 76:17
**sign** 90:7 144:8,8
153:18 227:2
229:16,23 231:6
232:5,12 242:16
242:24 244:11
246:20
**signatory** 32:10,10
32:16,19,24 33:1
**signature** 37:22
58:22 160:4,7,8
**signatures** 30:3

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 299

signed 59:14,15
73:12 77:2,4,5
78:8,9,17,19 83:2
84:20,22 85:1
116:9 163:14
184:20 215:11
246:8,8,18
signing 6:2
similar 86:9,24
224:1
simple 266:5
simply 40:9
sir 110:9 143:8
162:8 164:22
165:24 166:3
170:21 172:7
260:2 266:3
sit 221:16
sitter 137:4
sitting 7:2 48:5
128:9 210:24
situations 119:8
six 9:10 20:16 54:15
54:15 64:3,4 66:2
66:3 75:9 76:10
195:14 223:16,19
249:20 271:11
272:8
Sixteen 245:4
size 75:20
skinny 135:20
136:7
Skip 262:22
sleep 88:22 89:7
slept 88:24 89:6
167:15
Slowly 157:9
small 153:23 154:1
Social 15:18,20,23
16:6,13,16
Sokolski 2:13 71:17
192:3,17
Sokolski's 191:11
191:24
Solar 3:23 12:6,19
12:22,22 13:14,15
13:17,17,23 14:4
14:5,13,13 18:24
18:24 27:2,4,6,6,7
27:16,17,20,23
29:10,11,15,18,21
30:7,9,15,19,22
31:7,18 32:6,16
32:23 33:5,11,19
34:3,7,14,22

36:11 37:14 38:2
38:3,4,12,14,15
38:17 39:15 40:9
40:10,15,16,19,20
40:21,23 41:2,3
41:11,11,12 69:8
69:12,13 70:15,17
70:18,19,20,22
71:1 72:8 73:1
79:8,11 80:4
113:8 146:10
159:1 160:13,14
160:24 161:4,5
204:14 208:18,22
227:9,13,19 228:7
236:12 239:23,24
240:1,2,15 241:6
241:18,20,23
242:4,7,12 244:1
Solar's 242:2
243:24
sold 31:16 201:14
somebody 44:20
47:21 75:5 97:24
98:1 103:19 104:1
118:4 143:3
155:22,23 156:1
someplace 114:2
138:12
son 263:23 264:2,4
264:5
soon 10:22 23:14
51:22 60:16 91:1
91:3,3 227:6
sorry 36:14 66:23
73:9 139:13,23
159:15,21 208:5
229:12 230:24
233:24 234:1
235:19 243:13
255:4 266:22
270:11
sort 145:13
south 52:13
SPA 215:11 216:3
space 167:20
Spanish 144:11
speak 56:13 60:17
218:14 266:4
speaking 60:23
144:11 217:22
238:13 265:9
special 18:13 142:8
speculate 271:7
speech 145:13

spell 21:18 106:1
167:4 274:20
spelled 249:12
spelling 167:9
spoke 45:4 46:10,17
55:24 56:10 60:14
60:18 91:4 96:6
100:19 101:1,10
109:16 130:17
142:21 144:21
171:16 214:1
230:1 238:18,23
265:11
spot 114:11
square 119:13,19
SRF 71:14
Stacey 274:21
stamp 34:24
standard 206:10
standing 140:10
243:15
stands 242:8,13
Starbucks 118:16
start 21:22 61:13
110:7 177:16
200:8 215:2,5
245:3 268:16
started 51:18 54:14
60:8 90:5 178:19
starts 159:19 167:7
175:15 223:17
state 27:24 29:8
34:24 35:4 223:2
232:6 244:16
254:10 269:3
stated 124:12
244:19 245:7
247:7 254:10
280:8
statement 38:18
206:10 208:9
221:24 222:9
227:17 228:2
236:7 238:15
241:9 243:17
statements 161:10
184:21,23 186:16
205:1 206:5
states 1:1 27:23
30:14
stayed 84:16 85:13
92:6,8
steal 7:21 8:1
stepdaughter 203:9
Sternberg 1:7 2:8,9

16:3 33:3 55:14
60:2,14 62:5
71:14 79:8 88:8
107:24 112:6
116:6 153:10,11
162:16,21 163:4,6
163:18 164:11,11
165:16 169:23
170:9,16 171:4,7
171:16,18 192:3
192:13,16 193:11
197:20 202:17,19
208:13 220:6,9
224:20 225:18
226:3,22 227:1
232:4 235:12
236:6 237:6,19
238:4 239:17
241:4,9,21 242:23
243:17 246:9,16
246:22 247:21
248:1 250:2,7
252:4 257:11
Sternberg's 72:8
150:17 191:10,19
191:23 192:15
197:19 244:17
245:5 246:11
253:11 260:10
Sternberg-15
153:16 227:5
Sternberg-16
163:22 168:13
Sternberg-17 189:1
Sternberg-19 191:9
192:2,14,18
Sternberg-22
188:20 191:5
192:5 204:21
stick 269:5
sticker 194:4,12,23
195:19,20
sticking 233:16,18
stickum 266:24
267:9 268:24
stickums 266:19
stipulated 6:1
stole 129:21 130:13
stone 119:13
stood 38:14
stop 29:13 48:1
64:18 90:7 124:5
124:5 144:8,8
158:16,17 165:14
187:5 201:11

243:10,11
stopped 90:6
239:14
stopping 90:8
storage 91:12 95:11
96:11,21 97:9,12
97:15 111:4 128:3
128:11,19 129:3
136:19 139:5
144:17 152:13
154:17,19,22
155:24 156:19
170:18 236:12
237:18
store 46:1 135:2
137:15 172:11,13
172:17
stored 136:18
137:18,22 138:12
143:16
stores 46:1
stories 44:9
story 37:11 109:17
131:2 156:10
157:8 186:24
187:8
street 2:6 28:6,9,19
28:22 52:12,13,14
71:18 74:15,16,18
90:6 93:14 104:9
126:6 144:7 167:2
167:3,8,19,20,22
168:1,4,6,7,14
174:24 271:9,19
272:6 276:20
strike 27:21 72:15
238:9 270:12
stuck 126:9
studying 266:20
stuff 42:19,20 77:17
95:19 104:23
105:9 111:19
145:16,21 205:5,8
205:23 232:19
233:8 242:17
273:8
stupid 46:7
subject 33:20 44:11
134:11 161:15
175:23 185:23
186:17 265:5
submit 227:3 232:5
submitted 176:10
225:18 246:10
subpoena 205:16

Case 2:22-cv-00688-JMY    Document 201-1    Filed 10/01/24    Page 93 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Friday
No. 2:22-CV-0688 (JMY)        Deposition of Gary Weiss        February 16, 2024

Page 300

subtract 200:15
sucks 234:1 251:10
 252:13
sudden 213:9
sue 228:16
sued 10:11
suffering 8:9
suggest 213:11
suitcase 79:20,21
Suite 1:22 2:3,6,11
sum 207:4
summary 226:14
Sunday 73:19,22
 77:6 78:9 84:22
 84:24 92:13
Sundays 125:23,24
 126:1
supervised 140:12
supplement 254:13
suppliers 274:7
supply 125:12
 245:18,23
support 10:11
 173:3 205:5
supporting 159:19
 161:21
suppose 202:17
supposed 70:3,6,8
 95:18 98:5 201:9
 204:4 224:18
supposedly 165:10
sure 6:20 11:18
 38:9,20 48:21
 64:1,8 69:23 71:4
 71:6 87:16 88:1
 89:19 94:3 105:5
 106:5,13 134:23
 153:13 154:15
 159:6 179:21
 186:20 207:6
 221:16 235:8
 243:23 244:8
 247:16 254:23
 257:8 262:21
 273:16 274:20
surfaced 55:14
surgery 8:24 277:15
surprised 214:16
suspect 139:17
 143:5
SUV 89:4,5,24 90:2
 90:3 92:6 104:7,8
 104:12 105:19
 106:20 126:7,11
 126:20 127:3,3

150:14 153:3
swapping 141:12
switch 154:7,11,18
 155:10,12,16,18
 228:21
switched 109:17
 155:9,24 156:8,21
 229:7
swore 38:15
sworn 6:9 107:20

_____

**T**

T 3:7 21:22,23,24
 21:24 280:1,1
T-a-q-u-i-t-a-h-u-...
 21:21 22:2
T-i-x-i 29:2
tag 143:13
take 8:13,21,22
 15:17 16:18 17:9
 19:17 48:17 55:11
 65:14 79:10 83:7
 85:21,22,23,24
 87:23 91:9 96:4
 97:10 98:2 100:23
 108:11,15,17,18
 108:20 110:23
 111:9 119:24
 124:22 125:16
 126:19 146:18
 147:24 149:1
 189:22 190:1
 191:5,15 194:22
 196:1,4,6 197:24
 198:17 200:14
 201:11,12 205:23
 208:3,4 232:15
 234:15,18 235:4
 247:1,14 264:3
 273:21
taken 1:12 92:16
 106:17 119:22
 120:3 146:9 150:9
 168:18 188:16
 232:23
takes 69:18 137:12
 261:11
talk 13:19 34:20
 38:1 41:14 51:17
 54:10 63:5 65:8
 91:23 99:11,16
 190:11,13 230:10
 261:13,19,20
 271:21
talked 54:2 56:3

109:9 230:10
talking 51:8 77:8
 100:1,2 108:1
 132:4 134:17
 156:13 165:9
 173:11 174:6,19
 174:23 214:6
 230:9 268:12
 271:18 275:3
tall 133:23
Taquitahuana
 21:17
TATE 1:21,21
tax 29:15,19
taxes 81:13
Taylor 203:8,9,16
 203:21,24 204:1,5
 206:14 207:20,21
 209:5 275:5,11
team 239:23 240:1
tech 254:8
technicalities
 214:14
telephone 98:14
 99:20 100:5,8,15
 238:5,8,11,15
tell 7:5 9:8 13:7,21
 15:20 16:10 20:1
 25:4 40:2,5 43:3
 49:18,22 54:12,12
 54:19,22 55:1,9
 56:18 57:17 60:11
 60:12 61:9 71:4
 75:6 76:5 81:14
 98:18,18 101:18
 101:19 105:22
 106:20,22 109:9
 109:20 111:17
 112:24 113:3,4,5
 122:8,22 125:6
 134:22 136:9
 139:2 142:14,20
 146:5 156:4,6,10
 157:22 158:2
 159:11 213:2
 217:4 222:11
 239:10 255:24
 258:19 268:20
telling 7:14 12:13
 44:9 49:13 95:23
 100:14 101:11,17
 101:21 107:5
 109:16 113:10
 119:21 144:21
 156:11 157:11

158:3,8 169:9
 172:17,23 205:13
 206:3 222:2
 223:12 229:7
 250:21 257:21,24
 258:7,24 259:8
 261:6,21 262:11
 267:11 268:5,18
 271:5
tells 49:24
ten 70:5 82:23 88:6
 125:12 236:9
tendered 220:10
terms 36:4 71:9
 72:2 268:4
test 20:5,15,19
 33:20 34:5 41:15
 43:7,19 44:11
 45:1,5,10 47:4,4,7
 47:19 48:10 51:4
 51:19 52:4,8,20
 54:18 55:6 56:3
 56:23 57:3,8
 58:11 61:8,23
 62:2 65:16 66:7
 67:23 68:7 69:3
 72:18,21 73:2,8
 73:13 74:9 86:4
 88:19 89:8 93:4
 96:10 106:17
 107:1,2,18 108:9
 110:7,10 111:3,7
 111:16 124:14,23
 125:4 128:1,3,4
 128:10,18 129:1,7
 129:10,14,23
 130:3 131:2,6,10
 131:12,18 132:1,2
 132:5 133:3,10
 134:2,8,16,19
 136:14,18,19
 137:18,21 151:18
 152:14 160:24
 162:3,11,18,22
 163:17 164:12
 165:23 167:13
 170:18 172:10
 173:5,16,22 174:6
 174:16 175:19
 176:2,14,18
 177:18 178:4
 181:5 182:14,21
 185:15,19 186:6
 187:1,9,22 188:6
 201:23 204:5

208:13 227:8,16
 228:6 245:22
testified 6:9 128:17
 131:5 133:1
 144:16 159:7
 177:9 183:24
 210:1 215:9
 235:15 250:7
testify 12:22 13:5
testifying 200:6
 219:24
testimony 13:3,13
 13:16 14:7,9,15
 14:20 15:11 19:9
 61:6 107:20 110:4
 111:5 128:9
 136:13 147:21
 153:1 183:12,22
 215:8,21 216:9
 217:24 219:24
 225:6,14
tests 133:13 160:22
Texas 88:8,11,15
 215:8 216:9
 217:18 219:14
 220:20,23 225:7
 225:14,19 227:3
 232:6 239:11
 241:22 244:16,18
 245:5 246:10
text 4:8,9 62:1
 121:8,9 213:22
 230:18,18 238:5
 249:20 250:1
 251:16 252:21
 254:20 255:16,18
 256:8,11 257:22
 264:6 269:20,22
 270:2,6 271:2
texted 122:14 149:5
texting 270:5
texts 122:19 123:22
 230:5,5
thank 54:8 99:10,15
 134:15 136:5
 139:15 156:15
 172:4 223:7 257:2
 266:4
thanks 19:19 43:22
 139:15 225:9,11
 264:24
theory 139:1
thereof 280:11
THESAFETYHO...
 1:5

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 301

**thing** 12:8 16:7
40:15 93:8 132:3
143:6,6 150:4
204:20 205:10
234:10 244:14
247:3
**things** 14:5 44:10
44:17 69:23 89:10
116:14 204:24
221:19 247:24
266:21 269:6
273:9
**think** 8:11,16 9:19
9:19 10:1 16:21
20:6 25:19 29:24
31:15 44:1,3
48:16 51:2 52:6,6
53:6,8,9 54:15
55:16,22 59:5,7
60:18 63:17,24
73:18 76:8 81:6
86:13 87:2 88:20
89:19 91:21 97:3
106:5 108:16
111:10,12 116:5,8
116:14 117:13,16
131:10 138:1,14
138:16 151:14
152:21 154:20
155:1 158:1
160:11 164:22
179:21 193:16,20
195:24 198:11
225:12 230:12,14
232:17 234:3
235:7 238:22
245:21 247:10
250:14 251:9
252:12 253:1
255:14 261:2
263:7 271:9,22,23
272:6,22,24
**thinking** 117:18
**third** 229:3,9
268:23
**third-party** 170:9
170:12 216:24
**Thirty** 25:7 26:16
**Thirty-five** 26:19
**Thomas** 21:24
**thought** 90:7
105:20 111:16
138:7,11,17,23
144:7 152:1
155:23 172:13

193:1,2 194:8,9
210:14 213:8
**thousand** 49:23
50:1,3,5 81:5
152:2,5,14
**thousands** 96:10
**three** 9:9,10 15:9
33:10 64:3,4
67:11 89:18,19
103:4,5,6,14,20
103:21,22 104:5,8
104:12,24 110:17
137:3 140:3,7,7
150:23 173:9
174:1,20 175:7
188:24 194:22
195:2,6,7 196:1
197:2,3 198:4,9
198:13 200:9
214:14 223:19
249:13 278:7
**Three-page** 4:2
231:22
**Thursday** 265:20
265:24
**tickets** 23:16
**time** 6:5 9:9 12:22
22:21 23:5 24:17
31:16,22 36:16,16
36:19,19 43:16
45:3,4 53:21
55:13 56:7 60:13
60:22 69:17,18,22
73:3,8,10,11 77:2
77:16,18 78:21
90:18,19 95:9
97:8 100:16,22
101:2,7,12 113:13
114:9 119:3
122:21 125:11
128:23 132:5,23
133:1 134:3,4
135:5 136:17
137:15 156:16
170:19 188:13
217:24 218:2,4,17
224:23 225:21
229:2,3,9 235:16
235:22 246:13,21
251:19 264:5
266:4 269:4 272:4
**times** 10:4 64:1
93:24 100:3 138:8
179:7 180:20
190:1

**timing** 184:15
**title** 215:16 216:18
**tits** 119:13 121:22
**Tixi** 29:1,1
**today** 6:17,20 7:12
11:4 14:15 15:11
87:4 95:8 98:10
110:4 117:6 127:4
127:20 128:9
131:6,11 133:1
134:17 138:19
146:20 147:9,21
156:2 209:1
210:24 213:13,20
218:7,8,16 231:12
277:6
**told** 13:10 19:23
38:11 40:18,19
42:23 43:3,5,13
44:15,20 50:4
51:7,17 52:23
53:17 55:2,10
56:24 61:22 63:6
63:8 70:12 91:3
95:21 96:7 97:11
101:19 103:24
105:21 109:4,11
110:3 113:14,16
113:17 117:7
119:6 120:18,19
120:20 124:12,17
124:18,20,21
132:24 144:24
152:1 154:10,10
154:14 155:14
175:24 187:14
200:24 201:4
202:12,16,19
203:5 204:9 209:7
210:9 212:10
219:18 223:21
239:5,11,23
250:16 258:12
263:13 266:11
268:24
**tomorrow** 278:23
**Tony** 205:22
**tool** 272:16
**top** 35:1 39:8 66:16
66:18 69:6 159:18
194:23 196:3,4
232:9 249:2 251:6
252:4 253:11
254:16 263:2
266:24 270:9

**topless** 121:10
**total** 9:3,7 58:16
62:12 71:10 82:15
82:16 83:4 190:3
190:14,15,15
195:19 196:12
197:8,12,20,21
198:5 199:1,7,10
199:12 200:8,13
203:22 208:1,2,4
208:5,12 211:4,12
211:17,20 213:4
**totally** 207:2 221:8
221:12
**touch** 10:23 48:3
113:18 147:7,9,22
148:3 266:5
**touched** 140:6,16
**tough** 167:5
**Toyota** 127:21
**track** 200:5
**tractor-trailer**
75:24 84:17 85:7
85:10
**Trailblazer** 126:12
126:21
**transaction** 61:10
69:15 78:16
111:20 115:6,9
117:12 134:16
223:24 228:8,11
242:14 243:15
**transactions** 20:5
33:20 34:5 41:15
41:19 81:10
227:16
**transcribe** 7:3
**transcribed** 10:22
**transcript** 16:2,5
279:3,6 280:6
**transfer** 79:7 89:17
169:4
**transferred** 33:3
91:22 92:12,15
140:17 215:17
**transfers** 4:11
166:4 189:7
**transport** 163:18
166:15,18 168:16
169:1,2,6,13
170:17 172:9
173:6,17 175:11
175:13,17 182:13
182:21
**transported** 162:18

162:23 170:17
**travel** 23:16
**treasurer** 34:24
35:4
**treated** 172:10
270:16
**trial** 6:6 13:23
157:7,12 158:13
158:15 278:17
**tried** 93:24 147:11
148:2,4,4
**truck** 51:23,24
52:11,15,17,19
56:2 73:4 74:6,8
74:14 75:2,4,8,21
75:24,24 76:2,13
76:15,18,19 77:12
77:15 78:13,16,19
79:1 84:15,16,17
85:3,24 86:1,5
88:22,23,24 89:2
89:3,4,6,16,17,20
89:23 90:10 91:23
91:24 92:13,13
96:9 98:4 102:15
102:18 103:1,22
103:23,24 104:2,3
104:4,6,7,7,9,13
104:16,20,23,24
105:13,16 106:21
108:1,3,5,6,7,8,17
110:7,11,15
113:22 126:24
132:1 133:18
140:2,4,17 141:5
141:12 143:19,21
144:2,4,6 145:10
145:10,11,12,12
145:13,15,19,20
145:22 151:16
167:13,24 168:6,9
168:10,19,20
174:1,20 175:8,19
176:3,18 177:19
178:18 181:5
182:14,22 187:22
215:15 239:14
241:12,13,14
242:1 245:22
276:24
**trucks** 125:17
140:16 177:8,13
240:5,8
**true** 55:1 160:5
161:12,20 163:2

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 95 of 749

USDC, ED of PA       American Environmental Ent. v. Manfred Sternberg, Esq., et al.       Friday
No. 2:22-CV-0688 (JMY)                Deposition of Gary Weiss                February 16, 2024

Page 302

163:11 177:3
178:23 181:8
184:5,9,12,22,24
184:24 185:22
186:10,17 188:10
232:18,21 233:9
236:7,13,16,17
238:15 239:6
240:6,8,20 241:9
241:24 242:1,4,8
242:14,20 243:17
244:20 245:8,15
245:21 246:7
247:4 262:10
**trusting** 209:13
**truth** 7:5,14 11:22
15:11 131:7,7,7
157:22 230:23
231:3,9 232:13
255:2
**try** 148:3 162:9
259:16
**trying** 25:2 28:20
52:10 55:16,22
60:18 66:9 68:3
74:19 97:24
138:18,20 143:14
147:12 222:11
223:2,23 261:15
**TSH** 6:17
**Tuesday** 265:21,22
**Turkish** 135:24
**turn** 161:19 169:12
180:8 191:7 227:1
260:8 263:21
265:16
**turned** 53:11
124:14 128:2
129:14 134:6
176:14 242:18
267:17
**turning** 131:3,6
**twelve** 103:17
**Twenty** 26:12
203:11
**Twenty-five** 204:13
204:14 211:6
**Twenty-one-page**
3:21 158:18
**twice** 125:10
**two** 8:24 9:5 13:1
18:6 19:24 36:8
37:6 41:22 55:23
56:9,10 57:5 64:3
64:4 65:20 68:19

97:8 100:16
101:21 110:17
116:20 123:18
140:7 153:8
171:23 172:5,5
201:21 202:5,5,16
203:7,7 217:8
223:19 227:2,5
229:11 249:13
250:10 252:9
262:22 272:1
273:12
**Two-page** 3:12 4:4
27:10 246:3
**type** 43:6 75:15
**typed** 94:6

_____
**U**

**U** 167:7
**U-R** 167:7
**U-r-b-i-n-o-v-i-c-h**
167:9
**U.S** 58:17
**Uh-hum** 175:16
208:11 216:4
244:9 251:1 265:7
**un** 132:6
**unable** 240:16
**underline** 232:16
232:20,21 236:3
238:8,20 247:3,10
**underlined** 180:13
233:4 236:13
238:21,24 240:17
245:13,19
**underlines** 233:3,3
233:8
**underneath** 194:16
196:16
**understand** 6:21
7:4,16 8:6 9:24
12:15 13:8 14:18
14:19 41:13 68:4
68:5 98:9 109:15
144:14 157:10,24
158:5,10 161:14
162:9 198:22
203:2 204:11
206:24 218:18
223:1 234:17
258:11 262:13
268:17 269:8
272:17
**understanding**
14:14 95:17

141:24
**understood** 9:22
95:23 163:12
**undisturbed** 142:6
**unforeseen** 240:14
241:5,17,22
**Union** 21:9
**UNITED** 1:1
**universe** 139:20
**unloaded** 89:20
126:17
**Unopened** 142:6
**unreal** 121:23
**unsworn** 161:16
175:24 186:18
**upcoming** 266:1
**upping** 255:2
**Urbanovich** 168:14
**Urbinovich** 167:3,8
167:10,22,23
168:1,2,4,6,7
**use** 7:20 18:4,13
47:21 49:20 50:4
70:19 104:6
137:15 144:24
217:23 218:15
272:14,15 278:13
278:16
**user** 162:19,23

_____
**V**

**V-a-s-q-u-e-z** 37:23
**vacation** 22:18
**valid** 136:14
**value** 214:11 267:21
**values** 229:1
**Vasquez** 37:20,23
**vehicle** 163:18
166:15,18 168:16
169:1
**vehicles** 179:23
**verbalize** 7:1
**verbally** 60:15,19
188:8
**verification** 160:1
161:15 175:24
184:20
**verified** 161:9,19
163:11 173:2
175:23 177:23
183:23 184:16,24
185:22 186:14,16
191:17,18 192:12
192:23 215:10,15
216:15 241:14

**verify** 113:22
160:13 161:3
184:21 186:15
**verifying** 160:12,20
**version** 183:22,24
184:2 186:22
187:16,17,19,23
188:2,4
**vet** 269:7
**Vig** 271:9,19,20
272:6
**Vine** 28:6,9,19,22
**visit** 44:4
**visually** 140:24
141:13
**VRC** 267:1,8
**vs** 1:6

_____
**W**

**W-2** 27:15
**W-a-r-r-i-n-i-c-o**
106:2
**W231127400** 17:14
**W23112740002514**
17:17
**wait** 48:1 88:2 91:2
91:4 96:7 105:12
111:18,18,18,18
115:12 122:14,14
124:9 144:22
149:22 166:21,21
166:21 183:19
202:15 205:6
235:18
**waited** 90:6
**waiting** 96:3,8
143:23 144:3,5,19
151:1 205:22
**waived** 6:3
**wall** 269:4
**wallet** 16:19
**want** 13:5 15:16,21
15:21,24 16:4
19:17 43:18 51:3
51:22 56:24 63:2
67:20 70:20 86:6
87:22 109:14
113:5 115:2,5,9
115:16,24 117:2
117:16 119:16
134:13 139:1
146:24 148:10
155:3 159:17
164:21 165:4
172:17,19 174:13

185:4 189:6
222:19 225:2
227:11 229:3,9
247:9 250:19
251:11 252:14
253:6 254:24
255:15 259:19
266:7 268:3 271:7
271:24 272:22,24
273:12,19 277:20
278:9,13 279:3,5
**wanted** 51:14 53:20
53:20 56:23 63:1
64:7 69:14 70:21
70:22 98:3 108:18
147:9 153:18
187:14 228:16
232:5 241:21
250:2 255:12
265:10
**wants** 63:19 227:3
239:10 241:4
242:6,16 244:16
255:18 256:3
**warehouse** 91:13
96:5,11 100:18,23
102:14 136:19
137:19 139:3,9
140:1 141:6
143:10 155:22
156:1 240:9,10
242:18
**warehouses** 228:24
**Warinanco** 105:24
106:5
**warm** 243:13
**warmer** 24:9
**wasn't** 47:16 145:10
150:20 212:23
213:11,11 236:7
250:8
**Watch** 226:16,16
**water** 7:22 8:1
**way** 22:14 88:21
95:22 114:9 117:2
121:2 147:21,23
158:11 217:4
236:19 242:22
246:16 248:21
251:20 260:7
270:16 271:4
**ways** 13:1
**we'll** 153:15 167:8
172:20
**we're** 157:5 189:14

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 303

| | | | |
|---|---|---|---|
| **wearing** 119:5,9<br>121:21<br>**weather** 24:9<br>**website** 18:16,17,18<br>18:20 19:1 34:9<br>**websites** 18:22 19:3<br>**Wednesday** 213:23<br>**week** 97:8,17 109:5<br>109:10,18 125:10<br>125:21 135:10<br>202:16 265:9<br>266:1 278:5<br>**Weekend** 263:21,23<br>**weeks** 21:13 100:16<br>101:22 171:1,23<br>172:5,6 201:3<br>**weighed** 152:17<br>**Weiss** 1:12 3:4 4:3<br>6:8,13 11:12 12:3<br>12:4,5,12 17:11<br>26:21 27:14 36:1<br>39:11,11 69:13<br>70:15 71:19 98:23<br>99:1,3,10 114:3<br>117:20 146:10<br>157:18 159:1,2<br>160:2 161:3,9<br>162:2,10,17<br>163:16 164:13<br>169:13 170:2,7<br>171:1 172:9 173:4<br>173:15 174:9<br>175:18 176:17,23<br>178:24 182:15<br>184:9,12,21 185:5<br>185:10,13 189:5<br>196:13 197:9,13<br>198:14 215:24<br>216:11 221:5<br>225:9,11 228:7<br>231:23 232:8<br>233:14,22 234:7<br>235:5 246:6,23<br>249:1,3,20 260:9<br>260:9 264:16<br>268:10 278:8<br>**Weiss'** 193:14<br>**Weiss's** 247:1<br>**Weiss-1** 10:13<br>**Weiss-10** 231:18<br>232:2,2,3 235:11<br>252:3<br>**Weiss-11** 246:7<br>252:21<br>**Weiss-12** 253:10 | 269:18<br>**Weiss-13** 269:18,19<br>270:1<br>**Weiss-14** 254:15<br>270:1<br>**Weiss-2** 27:9,15<br>34:21 37:21<br>**Weiss-23** 263:2<br>**Weiss-24** 263:2<br>**Weiss-3** 35:21<br>**Weiss-4** 38:24<br>39:12<br>**Weiss-5** 57:18<br>84:19 93:5,8<br>**Weiss-6** 64:19,23<br>65:2,15 66:19<br>68:13,24 78:7<br>88:3,12,18<br>**Weiss-7** 166:10<br>**Weiss-8** 208:17<br>250:23<br>**Weiss-9** 223:16<br>**Wells** 3:23 32:8,9<br>32:11 33:5,11,14<br>70:15 72:9 73:1<br>205:1,16 206:5<br>208:9,19,22<br>**went** 20:11 23:2<br>33:10 54:14 61:6<br>73:3,9,11 74:5<br>76:8,19,21 83:8<br>94:20 98:11<br>100:23 102:8,17<br>102:21 103:19<br>104:5,13 105:7<br>109:7,10 129:4<br>131:18 136:19<br>154:21 155:5,8,16<br>173:8 174:24<br>175:5,11 179:8,13<br>179:22 187:9,21<br>192:16 193:11<br>202:3,4 218:5<br>224:7 250:10<br>**weren't** 128:22<br>132:6 133:14<br>228:14 243:14<br>244:3<br>**West** 74:5 93:14<br>**Wgary4109@gm...**<br>17:22<br>**When's** 23:5<br>**white** 68:5 75:10<br>126:20 127:2<br>132:11,14,21 | 133:3,9,11 210:19<br>234:24 249:23,24<br>251:11 266:17<br>**wide** 133:23<br>**wife** 10:11 22:7,8<br>24:11 27:1 28:3<br>29:6,22 31:20,23<br>32:4,19 34:18<br>35:10 37:17 44:10<br>44:14,15<br>**wife's** 25:14<br>**WiFi** 153:13<br>**William** 214:1<br>265:5<br>**willing** 15:11<br>**Wilson** 30:1,3<br>**wire** 4:10 72:7 79:7<br>112:11 164:13,15<br>166:4 189:7,11<br>190:22 191:23<br>193:10 194:13<br>199:18 202:12<br>209:1,3,5 256:16<br>257:4,13<br>**wired** 33:4,9,16<br>72:3,17,24 83:8<br>112:2,7,11 166:11<br>190:5,18 191:11<br>191:20,24 192:3<br>201:7 203:22<br>208:7 211:17<br>220:14 256:24<br>257:4,7,16<br>**wires** 33:10 190:13<br>190:14,15,15<br>195:3 197:2,18<br>198:10,14 199:8<br>199:10,12,23<br>200:9,13,16 202:6<br>208:4,5<br>**wish** 263:16 278:24<br>**withdraw** 80:3<br>222:23<br>**witness** 3:3 9:13,15<br>10:18 21:24 36:14<br>37:7,9 45:13 49:1<br>54:7 56:13 60:5<br>81:19,22 82:1,4<br>86:16,19 87:5<br>105:14,17 114:7<br>115:7 116:15<br>119:2 121:7,11,24<br>122:4,7,12 126:12<br>128:15 131:16<br>132:10 133:19 | 134:21,24 135:13<br>135:17,20,23<br>136:4,6,11,16,21<br>136:24 137:20,23<br>138:1,4 139:13,17<br>139:22 140:3,10<br>140:13,19,22<br>141:1,4,9,15,18<br>141:22 142:2,4,7<br>143:8,17 144:1,18<br>147:3 148:2,23<br>149:9,13 150:7,10<br>157:6,23 158:3,7<br>158:14 171:14<br>193:23 198:20<br>206:23 207:21<br>209:16,21,23<br>211:15 218:1,21<br>220:16 221:18<br>223:3,10 231:19<br>255:14 262:9<br>268:9 274:12<br>278:22<br>**wizard** 254:8<br>**word** 58:21 67:6<br>101:16 144:24<br>180:13 188:11<br>238:24<br>**worded** 188:1<br>**wording** 186:21<br>**words** 210:9<br>**work** 50:14,22,23<br>51:11,18 63:7<br>137:2,5 272:1,13<br>274:24<br>**working** 123:20<br>124:6 138:5<br>**worry** 101:17<br>148:18<br>**worth** 92:20 93:4<br>111:15 124:23<br>125:12 126:5<br>129:14,21,23<br>130:13 220:4<br>**wouldn't** 136:7<br>**write** 15:18,24<br>40:13 153:20<br>155:11 162:2,8,15<br>162:19 163:8,15<br>164:9 166:14<br>168:24 170:24<br>173:2 175:10<br>176:14 177:3<br>180:10 192:24<br>193:5 214:23 | 215:7,20 216:5<br>217:8,11 223:20<br>225:11 227:6,13<br>227:17,22 229:14<br>230:19,21 242:6<br>255:9,12 256:3<br>261:4 263:14<br>267:10 268:23<br>**writes** 217:5,22,24<br>229:14 230:20<br>238:4 239:22<br>240:4 241:4<br>245:16 250:1<br>251:11,19,24<br>252:14 253:5<br>259:4 260:13<br>261:10 263:14,19<br>265:3 271:8 272:5<br>272:5,8,18<br>**writing** 59:8 176:9<br>238:14 252:12,24<br>253:2,4 254:20<br>260:11 263:5<br>270:9,10,11,13,21<br>271:14<br>**written** 68:1 75:11<br>114:15 115:24<br>163:9,10,13 187:4<br>242:15 243:23<br>**wrong** 176:8 182:23<br>185:17 196:20<br>197:4 254:20<br>270:17<br>**wrote** 16:3 40:15<br>99:8 100:8,11<br>154:9 155:2<br>162:24 163:7<br>164:10 170:2,7<br>176:10,17,21<br>177:22,24 184:9<br>184:12,19 185:5<br>186:10,22 187:3<br>187:10 188:5,7<br>191:6 192:9 193:3<br>193:6,16,18 195:5<br>195:19 196:24<br>207:6 214:1 219:1<br>219:14 220:10,23<br>225:9 227:23<br>228:14,19 229:6<br>232:17 236:6,9,10<br>239:5 240:13<br>241:21 242:4<br>249:20 255:6,8<br>256:8 |

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 304

**www.tate-tate.com**
1:24

_____
**X**

**X** 3:1,7

_____
**Y**

**Y-a-e-l** 26:5
**Yael** 26:5
**yard** 104:17
**yeah** 9:15 10:9
   17:14 18:21 19:21
   21:15 22:16,22
   23:1,8,15 24:4,18
   25:8,21 26:3 27:5
   28:2,18 29:4,24
   30:11,17,21 31:8
   31:11 35:12,14,16
   35:18 43:12 44:15
   44:23 45:8 48:19
   49:17 50:7,12
   51:10,20,23 54:7
   54:11 57:11 58:13
   60:10 61:24 62:24
   64:17 69:5 72:4
   73:7 77:8 80:2,20
   81:19 89:1,7 92:9
   92:14 93:10,22,24
   95:20,24 98:13
   100:11 105:10
   106:9,19 107:4
   108:4,16,22 109:3
   109:3,3 114:16
   116:11 119:15
   121:18 122:16
   123:13 124:15
   126:10 130:12
   131:16 132:18
   133:15 139:6,6,6
   140:19,19 142:4
   151:7 152:24
   155:13 157:3,3
   159:13 162:14
   163:3 168:2,19
   172:15 173:1
   177:7 180:14,16
   191:8,8 194:6,6
   194:14 195:4,22
   196:8 197:8,17
   198:16 199:22
   200:19,19 202:24
   209:23 212:7,7
   214:18,18 216:21
   217:3,12 218:8
   225:4 243:21

245:10,20 249:3
249:18,22 251:13
251:23 252:2,11
252:16,23 254:1
256:23 261:5,14
261:20,22 263:3,8
263:8,10 264:7,22
266:23 270:20
274:18 275:3
277:19
**year** 20:17 22:23,24
   23:6,11,12,13
   43:24 45:12 84:4
   135:3,5 214:10
   277:15
**years** 10:7 22:14,16
   22:17 25:6,7
   31:17 81:12 83:17
   83:19 125:12
   135:12 136:2
   204:9 236:4
   275:12
**yellow** 266:18,24
   267:9
**Yep** 137:24 215:19
**yesterday** 36:4
   99:11,16 272:9
**York** 19:24 44:22
   93:16,16 104:14
   104:15,16
**young** 13:22 35:17
   38:11,15 40:20
   216:14 222:21
**Young's** 214:16
**youngest** 26:7,9,10
**YouTube** 89:9

_____
**Z**

**Z** 59:10,11
**Z-a** 42:2
**Z-a-d-i-k** 42:3
**Z-a-k-a-r-i-a** 275:2
**Zadik** 41:24 43:2
   45:16,19,21 46:9
   46:22 47:8 48:2,8
   48:12,15 49:2,3
   50:1,11 55:6 56:2
   56:4 57:20,21
   58:6 59:10,12
   68:19 74:7 75:1,2
   78:9 83:18 84:3
   91:23 106:8 108:8
   131:24 135:18,20
   136:22 137:17
   145:15 147:2

151:3,16 167:12
168:9,12 274:7,9
**Zadik's** 42:13 57:22
   145:11
**Zekaria** 2:13,14
   33:9 71:17 108:18
   111:14 112:11,16
   112:17 113:12,15
   113:16,17,18,24
   114:24 115:2,10
   115:13 116:2,3,10
   116:23 117:11
   118:10,11,20,22
   119:2,5 120:5,8
   165:11,20,22
   181:17 193:11
   195:3 197:9 201:4
   202:1,4 203:4,6
   203:12,21 207:5
   212:20,21 213:10
   213:12 224:2,2
   225:24 235:16,22
   236:3 241:14
   257:4,14,16,20
   258:4,15 270:3,7
   272:2 273:4,21
   274:16 275:1,1,3
**Zekaria's** 192:17

_____
**0**

**02281951** 58:24
**02514** 17:16
**07083** 21:10
**08053** 1:23

_____
**1**

**1** 71:13 94:7 166:1
   177:4 180:10,17
   181:9 183:8
   185:15,18 186:3
   188:5
**1,058,400** 190:9
**1,227,720** 203:22
   208:4
**1,241,446,960**
   194:19
**1,246,906** 166:11
**1,246,960** 191:2,21
   194:13 195:8
   196:6 207:14
**1,400** 25:13
**1,410,660** 82:18
**1,446,960** 195:10,23
   196:7,11,13 197:1
   197:9,13 198:7,16

200:14,15 208:6
211:21
**1,447,200** 195:5,10
   195:21
**1,666,200** 208:8
   211:4
**1,810,660** 58:17
   82:16
**1,911,000** 191:15
**1,911,940** 71:15
**1,911,960** 190:21
   191:6,11,20 199:9
   201:13
**1,965,600** 189:11,23
**1.2** 165:12 203:18
**1.6** 207:2 224:11
**1.9** 201:9
**1:19** 188:16
**1:42** 228:1
**1:51** 188:16
**10** 3:9 228:24
**10,000** 66:24 68:7
**10:00** 89:14 143:20
**10:04** 98:24
**10:49** 228:20
**104** 39:13
**105** 159:24 184:2
**11** 34:24 149:16,16
   149:19 216:1,2
   237:8 238:3,3,7
   239:9 246:2
**11:00** 166:19
   168:17,22
**114** 5:3
**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** 16:17
**12** 39:14 160:1
   181:15 186:23
   240:4 269:18
**12:27** 148:7
**12:37** 148:7
**1278** 246:17
**1279** 246:17
**12th** 11:9 175:23
   184:3 187:20
**13** 12:3 22:14
   189:23 214:2
   240:13 265:3,4
   266:12 267:10,15
   270:6
**130** 192:24 193:1,3
   193:5,5,6,16,18
   194:3,8,9
**130,000** 192:7
   194:15 207:12
**14** 11:16 242:2,20

243:13,19,23
264:19 269:19
270:6
**1418** 2:6
**15** 10:7 35:5 166:2
   192:1,2 207:12
   243:22 257:1,2
**15,120** 65:19,21
   66:11
**15,200** 65:23 66:3,5
   66:9
**151,000** 190:1
**158** 3:21
**15th** 192:6 194:15
   198:3
**16** 1:15 244:15
   264:14,17
**164** 5:4
**166** 208:2 213:4
**168** 159:20,20
**169** 162:1,5,8
**17** 189:2,3,10,10
   190:14 197:6,18
   197:24 236:2
   245:16
**17-B** 196:9 197:6,12
   198:6
**1700** 2:6
**171** 162:1,15,20
**172** 163:15
**173** 164:9 166:10
**174** 166:14,16,17
**175** 168:24
**176** 169:12
**177** 170:2
**179** 170:15
**17A** 189:1,2,2,4
**17B** 189:6
**18** 152:12,17 161:15
   185:3
**180** 170:24
**181** 171:23
**181,440** 66:7
**182** 173:2,6,19
   174:4,5
**183** 175:10,14
   182:12,20
**184** 176:22 177:12
   180:2,19 181:4,4
**185** 185:4,4
**186** 185:9,12
**189** 4:10
**19** 197:21,24 198:1
   213:23 223:20
**190** 192:23 193:1,2

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 305

193:4,9,19 194:8
194:10 197:21
257:21
**190,000** 192:16
193:7,12 198:3
256:22,24 257:4
257:13,16 258:2,6
258:14,22 259:2,9
**191** 185:14
**19103-3907** 2:7
**19422** 2:3,12
**1965** 190:5
**1st** 16:24 23:24
24:19 33:4 35:13
72:5,6 74:15 79:7
80:16 164:20
165:7 177:10
179:11,24 180:1,3
180:5,23 182:4
183:11 190:18
198:1 199:17

_____ 2 _____

**2** 74:5 93:14 112:2
118:1,3
**2,131,200** 67:21
71:10 88:13
201:16,22
**2,351** 200:3
**2,351,960** 197:22
198:5 199:3,24
200:10,15 211:17
**2,571,200** 199:1,5
211:7
**2.1** 224:8,10
**2.2** 267:1,8
**2.3** 211:13,15
**2.5** 211:12
**2/28/1951** 16:14,15
**2/6/22** 3:19 57:15
**2:22-CV-0688** 1:4
**2:43** 232:23
**2:54** 232:23
**20** 28:16 43:1
133:16 152:19
203:12,15,23
204:9,12 206:14
209:11 212:13,14
250:16 275:8
**20-pound** 152:22
**20,000** 135:7
**200** 71:10 153:4
196:1,6
**200,000** 195:8
210:19

**2000** 43:24 135:4
**2001** 135:4
**2002** 20:6 135:4
**2003** 99:8
**201** 2:11 52:24 58:7
93:19 94:7
**201-575-0193** 48:22
**2015** 28:1,15,17
29:15 35:1,5
37:14 84:4
**2017** 29:14
**2018** 28:21
**2019** 127:21
**2020** 42:24 44:2,3,8
73:22
**2022** 41:20 45:13
46:13,14,18 54:6
68:21 71:13 73:17
100:1 117:9,10
162:2,10 163:16
177:4 181:9
189:11 219:22
220:7 225:18
246:19 257:2,5
264:19 267:10
**2023** 23:7 39:14
49:8,11 99:16
100:1,6,10 101:6
117:9 150:5 214:2
223:20 264:14,18
**2024** 1:15
**208** 3:23
**21** 189:11 250:16
**213** 4:1
**215** 2:4
**215-760-3000** 99:21
**219** 165:6 194:23
195:17 198:17
201:6,12 202:4,12
203:15 207:16
213:7
**219,000** 33:3 72:18
79:6 113:7 164:19
**219,240** 71:13 72:3
112:7 190:18
207:15 208:7
**219,604** 72:24
**21st** 171:24 172:8
172:24
**22** 150:5 191:20
215:9 220:9
225:17 260:9
275:12
**231** 4:2
**24** 12:3 27:24 46:11

46:12,18 54:6
99:20 100:12
246:19
**240** 72:24 194:24
201:12
**246** 4:4
**24th** 41:20 45:6,7
56:6 60:8,16
61:13 73:6 83:23
131:19,24
**25** 40:8 83:19
159:15,18,18
161:19 192:16
193:12 200:2
203:16 257:5,12
257:23 258:6
**25,000** 203:11,12,21
203:23 204:1
206:14 209:11
212:13,14 275:8
**250** 153:4 192:12
197:21
**250,000** 191:24
192:3,9 198:1,2
**25th** 198:4 257:17
**26** 68:16,17,21 69:1
**264** 4:6
**267** 2:7
**269** 4:7,9
**26th** 71:5,8,20
189:20
**27** 3:12 49:11 98:24
99:3,8,16 100:6,9
**277** 21:17
**27th** 98:16 99:11
**28** 99:20 100:12
166:2 207:10
**28th** 207:6 257:19
**29** 277:14
**29th** 9:13 23:19

_____ 3 _____

**3-6** 5:3
**3/13/2022** 269:1
**30** 25:6 83:17 136:1
222:23
**30,000** 209:10
**31** 215:9
**311** 232:8
**312** 232:8
**313** 232:9
**32** 159:21,23
**344-5340** 2:12
**35** 3:14 22:16,17
**350** 97:17 172:14,21

**350,000** 83:4,7,9
**355** 66:22 126:5
152:9
**355,000** 125:2,4
**355,200** 66:19
**355,760** 124:13
**365** 66:22 133:15
152:22
**365,000** 145:24
245:22
**365,200** 67:23
**365,320** 62:13 66:18
**365,790** 58:11 62:16
74:9 126:5 128:1
128:10,18 129:6,7
146:9 151:18
**39** 3:15

_____ 4 _____

**4** 111:21 124:12
131:21 133:7
134:5 153:20
179:7 183:13
202:17,20 220:5
226:24 227:23
229:10
**4.75** 53:15 54:12,19
56:4,9
**4.95** 58:11,13
**4:00** 277:5
**400** 2:3 62:18 83:4
**400,000** 55:8 57:1,2
82:10,16 84:10
**42** 159:15,18,21,23
**42nd** 74:5
**437** 16:24 23:24
24:19 35:15 80:15
**441** 35:13
**45** 256:21 257:23
258:1,13,23 259:1
**46,960** 196:19
**460** 62:20
**47** 46:2 93:14
**470** 2:11
**48** 46:2
**484** 2:12
**48th** 52:12
**4904** 161:16
**4th** 74:1,2,18 77:10
77:11,12 78:5,6
78:24 79:19 81:20
81:24 82:3,4
109:8,13 110:4
132:24 133:6
139:7 141:2,4

154:4,11 175:2
177:9 178:16
179:9,12,13,15,17
179:20,22 190:21
191:1,11 198:2
228:1

_____ 5 _____

**5** 51:4,12 53:8,10,12
53:16 111:21
133:7
**5-7** 5:4
**5,200** 65:20
**5:42** 230:22
**50** 35:18,18 81:1,8
**50,000** 77:20 78:2
78:23 79:10,12,13
79:15,16,20,24
80:11,16,22,24
81:8,11,24
**50s** 35:19
**519-6800** 2:7
**546-2649** 17:2
**55** 135:21
**57** 3:18
**575** 94:7
**575-0193** 93:19
**578** 135:1
**5th** 52:12 74:16,16
74:18,18 134:5
135:1 178:16
179:9,22

_____ 6 _____

**6** 3:5 53:7 54:13,18
55:4 56:5,22 60:3
73:17,22 74:12,13
81:21 111:21
189:18,19,21
190:2 230:21
**6:00** 103:16
**6:58** 227:23,24
**60** 135:21 136:8
**600** 2:3
**636-8283** 1:23
**64** 3:20
**650** 21:9
**6th** 46:1 52:12
59:16,17 60:5,21
73:11,19 74:14
75:7 77:7,8 78:9
78:14,15,20 81:24
82:6 179:9,22

_____ 7 _____

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Friday
No. 2:22-CV-0688 (JMY)                    Deposition of Gary Weiss                    February 16, 2024

Page 306

**7** 111:21 128:17
  163:16 165:9
  166:1 170:23
  248:2 250:7
**7/19/23** 4:1 213:17
**70** 207:5
**70,000** 192:21
  193:15 207:8
  257:20
**711** 1:13
**73** 1:22
**739** 28:6,9,19,22
**760-3000** 2:4
**7th** 85:17 86:2
  89:11 100:17
  128:11 143:20
  164:16 166:12,22
  169:17 170:22
  171:24 172:6
  191:1 193:22
  194:13 207:14

---
**8**

**8** 49:8
**800** 1:23
**825** 1:22
**856** 1:23
**8th** 236:10

---
**9**

**9/12/2023** 160:10
**9:00** 89:14 143:20
**9:34** 1:15
**90** 222:22
**900** 190:6
**900,000** 190:10
**905,000** 200:16
  210:5 211:22
**907** 190:7
**907,200** 190:3
**908** 17:2
**983-8484** 1:23
**9th** 38:10 40:18
  101:5,6

# EXHIBIT K

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                  * * * * * * * * *

4    AMERICAN ENVIRONMENTAL      *

5    ENTERPRISES, INC., D/B/A    *

6    THESAFETYHOUSE.COM,         *

7       Plaintiff           *   Case No.

8          vs.              *   2022-CV-00688(JMY)

9    MANFRED STERNBERG, ESQUIRE; *

10   MANFRED STERNBERG &         *

11   ASSOCIATES, PC; CHARLTON    *

12   HOLDINGS GROUP, LLC; SAMUEL *

13   GROSS; GARY WEISS; A. SOLAR,*

14   LLC; DAPHNA ZEKARIA, ESQ.;  *

15   AND SOKOLSKI & ZEKARIA, PC, *

16      Defendants           *

17                           *

18                  * * * * * * * * *

19                  DEPOSITION

20                     OF

21                  GARY WEISS

22              July 16, 2024

23       Any reproduction of this transcript

24       is prohibited without authorization

25           by the certifying agency.

**Page 2**

1                  DEPOSITION

2                     OF

3    GARY WEISS, taken on behalf of the Defendant herein,

4    pursuant to the Rules of Civil Procedure, taken

5    before me, the undersigned, Emma Edwards, a Court

6    Reporter and Notary Public in and for the

7    Commonwealth of Pennsylvania, at the offices of

8    Goldberg Segalla, 1700 Market Street, Suite 1418,

9    Philadelphia, Pennsylvania, on Tuesday, July 16, 2024

10   beginning at 10:13 a.m.

**Page 3**

1                  A P P E A R A N C E S

2

3    GARY P. LIGHTMAN, ESQUIRE

4    Lightman & Manochi

5    600 West Germantown Pike

6    Suite 400

7    Plymouth Meeting, PA  19462

8       COUNSEL FOR PLAINTIFF

9

10   JOSEPH ROSS, ESQUIRE

11   Goldberg Segalla

12   1700 Market Street

13   Suite 1418

14   Philadelphia, PA  19103

15      COUNSEL FOR DEFENDANT

16

17   ALSO PRESENT: DAN SCULLY

**Page 4**

1                  I N D E X

2

3    DISCUSSION AMONG PARTIES                7 - 8

4    WITNESS: GARY WEISS

5    DIRECT EXAMINATION

6       By Attorney Ross                     8 - 102

7    DISCUSSION AMONG PARTIES                102 - 105

8    CROSS EXAMINATION

9       By Attorney Lightman                 106 - 168

10   REDIRECT EXAMINATION

11      By Attorney Ross                     168 - 232

12   RECROSS EXAMINATION

13      By Attorney Lightman                 232 - 283

14   RE-REDIRECT EXAMINATION

15      By Attorney Ross                     284 - 306

16   DISCUSSION AMONG PARTIES                307 - 310

17   CERTIFICATE                             311



Page 5

```
 1              E X H I B I T S
 2                                        PAGE
 3   NUMBER    DESCRIPTION          IDENTIFIED
 4   DZ-9      Messages with Gary Weiss and
 5             Associates                   161
 6   5         Invoice of COVID Test Kits    85
 7   8         Bank Statements               71
 8   20        Business Transactions         32
 9   21        Envelope of Mask and Eldiven
10             Letter                       113
11   22        Letter from Attorney Lightman 113
12   23        Texts                        169
13   24        Email Thread                 232
14   25        Email Thread                 235
15   26        Email with Estimates
16             Attached                     239
17   27        Email 2 with Estimates
18             Attached                     243
19   28        Email 3 with Estimates
20             Attached                     250
21   29        Email 4 with Estimates
22             Attached                     251
23   30        Email and Picture of Invoice 259
24
25
```

Page 6

```
 1              O B J E C T I O N S
 2
 3   ATTORNEY                            PAGE
 4   Lightman              54, 73, 192, 232
 5
 6   Ross     152, 163, 164, 166, 192, 235, 237, 238, 264
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              S T I P U L A T I O N
 2   -------------------------------------------------------
 3   (It is hereby stipulated and agreed by and between
 4   counsel for the respective parties that reading,
 5   signing, sealing, certification and filing are
 6   waived.)
 7   -------------------------------------------------------
 8              P R O C E E D I N G S
 9   -------------------------------------------------------
10   COURT REPORTER:
11   Will you raise your right hand, please?
12                      ---
13                  GARY WEISS,
14   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
15   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
16   FOLLOWS:
17                      ---
18   COURT REPORTER:
19   Thank you.  And would all of the
20   attorneys like a copy of the transcript today?
21   ATTORNEY LIGHTMAN:
22   We would, yes.
23   ATTORNEY ROSS:
24   Yes.
25   ATTORNEY LIGHTMAN:
```

Page 8

```
 1   Yes.
 2   COURT REPORTER:
 3   Email is okay?
 4   ATTORNEY LIGHTMAN:
 5   Usual stips?
 6   ATTORNEY ROSS:
 7   Yeah.
 8   COURT REPORTER:
 9   You may proceed.
10                      ---
11              DIRECT EXAMINATION
12                      ---
13   BY ATTORNEY ROSS:
14   Q.Good morning, Mr. Weiss.
15   A.Morning, Mr. Jones.
16   Q.We've met before, but I'll reintroduce myself.
17   My name is Joseph Ross.  I'm an attorney with the law
18   firm Goldberg Segalla.  We represent Manfred
19   Sternberg and his firm in this matter where you, he's
20   a Defendant, as is his firm, as is yourself.  You're
21   here for the second day of your deposition testimony.
22   Is that right?  You testified once before in this
23   case?
24   A.Yes, sir.
25   Q.Do you remember what that date was?
```



Page 9

1  A. No.
2  ATTORNEY LIGHTMAN:
3  February 16th.
4  ATTORNEY ROSS:
5  Yeah.  I'll represent to you that's
6  correct.
7  BY ATTORNEY ROSS:
8  Q. We're going to go back and forth.  I'm going to
9  ask questions and you're going to answer to the best
10  of your ability.  In a regular conversation, we might
11  interrupt each other and it would be a normal flow of
12  conversation.  But today I want to make sure that I
13  get my question out before you start to respond.  And
14  once you're answering, I want to let you finish
15  before I try and ask another question.  Does that
16  make sense?
17  A. Yes, sir.
18  Q. And just as normally, again, if we're having an
19  informal conversation, we might nod.  We might say
20  uh-huh, uh-uh sounds that we would understand in the
21  conversation.  But for today, we have to use words
22  for all of our responses.
23  A. I understand.
24  Q. Okay.
25  Do you take any medications that might disrupt

Page 10

1  your ability to give truthful answers?
2  A. I doubt it.  However, I took an aspirin today, as
3  I take every day, and one blood pressure medicine.
4  So nothing would impair me.
5  Q. You feel prepared to give truthful answers ---
6  A. I do.
7  Q. --- to the best of your ability?
8  A. I do.
9  Q. Okay.
10  If Mr. Lightman interrupts and objects to one of
11  my questions, says objection, just stop answering and
12  let us talk about that objection before you continue.
13  A. Okay.
14  Q. That's probably not as likely in this situation
15  as it usually is, but it's Mr. Lightman.
16  A. I understand.
17  Q. He likes to keep me on my toes.
18  ATTORNEY LIGHTMAN:
19  And from time to time, I made just
20  assert an objection for the record to preserve my
21  client's rights.  You can just ignore that.
22  THE WITNESS:
23  I understand.
24  ATTORNEY ROSS:
25  That's true, too.

Page 11

1  BY ATTORNEY ROSS:
2  Q. All right.
3  Let's get started.  Why don't you just introduce
4  yourself and explain your role in the transaction
5  that gave rise to the lawsuit.
6  A. Okay.
7  I made many mistakes.  I may make mistakes as far
8  as the dates.  I'm going to try to do it without the
9  calendar in front of me and just from memory.
10  Otherwise, if I don't remember something, I'll take a
11  look at my notes maybe.  I do have here the notes.
12  And I will start by on the 25th of January 2022, I
13  was approached by two people regarding a purchase or
14  interest in purchase COVID-19 test kits.  I told them
15  that I may be interested.  I called Sam Gross and Sam
16  Gross told me that if the price is right, he would be
17  interested.  He asked me how many are available.  I
18  asked those people how many are available.  They told
19  me they have over 400,000 test kits.  And that's how
20  this transaction started.
21  And Sam Gross told me he would be interested in
22  something like 370,000 test kits.  I asked those two
23  people that approached me in New York City as to
24  where can I see those test kits.  They told me that
25  they can show it to me in about an hour or two.  And

Page 12

1  we were at the time in a coffee shop by the name Pret
2  on 6th Avenue, which is on the 47th Street between
3  47th Street and 48th Street on 6th Avenue.  If the
4  name is correct, it's Pret.
5  Q. Spell it, please.
6  A. I'm not sure, but maybe P-R-E-T-T (sic).  Pret
7  Manger or something like this.  Pret, that's what I
8  remember.  It's a place that I bought coffee before.
9  The time of the day was sometime before noon.  In
10  about an hour, they asked me to come to around the
11  corner, which is 48th Street between 5th and 6th
12  Avenue.  They had their truck parked and they told me
13  that the test kits are inside.  I asked them to show
14  me.  They opened the truck and they had their boxes.
15  I went through a box or two or three.  I don't
16  remember how many boxes.  They looked like COVID test
17  kits.  It was written COVID-19 test kits or something
18  like this with the color of, I believe, orange and
19  white type boxes, were packed in big cartons.
20  And I told them that I would be interested.  And
21  we started to negotiate.  They agreed finally to a
22  price just under $5 or something like this per test
23  kit.  And I told them, yes, I would be interested in
24  buying it.  And they asked me how would we know that
25  you going to go through with the transaction.  I



1  said, listen, I don't have the commitment yet from my
2  customer, but it sounds like a go. I will give you a
3  deposit now. I had the diamond ring on me and I told
4  them, you guys hold it. It's two gentlemen that I
5  know that we're working on 47th Street in the past.
6  So I did not have with them contact on a yearly
7  basis, but I knew who they were.
8  Later, I spoke to Sam Gross and we settled, I
9  think, on $6 test. Yeah, about $6. I think we
10  started with around 365,000 test kits. And Sam Gross
11  asked me to send him an invoice. I told him I will
12  and I sent him several invoices, which he asked me to
13  correct, whether the name or the amount. I think
14  this was already the next day. I made few invoices
15  to his company, which is Charlton Holding Group. And
16  he told me that after we decided more or less on the
17  number and the total price, which was something like
18  1.8 million and change, something like that. I'm
19  sorry. Which was like 2.1 million and change. I
20  don't remember now the exact number, 2.1 plus
21  million. He told me that he's going to work on the
22  deposit, that it's definitely a go. That was the
23  26th already of January.
24  I told him, okay, listen. I told you that I gave
25  them a little deposit and they will hold it for me

1  till I give them a deposit. I waited several days.
2  Every day, I gave him an account number where to send
3  the money. And finally on February 1st, which is
4  like five days after, he sent me $219,000 deposit,
5  which was equal to ten percent of the total price
6  that Sam Gross supposed to pay me. So Sam Gross
7  promised me that the balance will come in several
8  days. He didn't know at the moment exactly when. He
9  explained me that he doesn't have the money. The
10  money is by his lawyer. At that time, I found out
11  that his lawyer is Manfred Sternberg.
12  So we are now on February 1st and Sam Gross told
13  me that he would like me to make arrangements for the
14  shipping to his customers. I asked him why, why
15  wouldn't you ship it directly? He said I don't know
16  if I can book it. They're probably going to ask me
17  money with a credit card or something like this and I
18  don't have. I asked him but you got money for the
19  deal? He said, no, the money is by his lawyer. And
20  he doesn't think that his lawyer will release any
21  money right now to him.
22  I said okay. Listen, I'm going to make for you
23  the arrangements and I will look for somebody to have
24  it shipped to your customers. I looked, I think, on
25  Google for somebody that will ship it and I found few

1  shippers. And I think I contacted one or two
2  shippers. Finally, I decided about a company by the
3  name Available Movers. That was, I think, probably
4  already the next day that I got the money or
5  something like that. And they told me that they're
6  going to send me an estimate.
7  They asked me how many --- I told them that I
8  have that many boxes, whatever I told them, like 365
9  or so boxes and it's going to have to go to four or
10  five destinations. They told me they're going to
11  give me an estimate and I think they sent me an
12  estimate via email. And the office told me that if I
13  want to book it, I will have to give them a deposit.
14  I told them but I don't really know exactly if it's
15  four or five destinations and exactly, exactly the
16  number of boxes to a destination. They said no
17  problem. We're going to reserve for you the truck,
18  so with the deposit and we will work out the detail
19  later, whatever.
20  Okay. So I think I paid them, the first deposit
21  was $500.
22  Q. Are you finished?
23  A. No. We scheduled the pickup for February 7th. I
24  told Sam that that's what I scheduled with the
25  company and I will have it sent to them on his

1  behalf. And he said thank you. I needed this favor
2  from you. I said okay.
3  Q. Let me interrupt, ask you scheduled to pick up
4  from whom? Who was picking it up?
5  A. The company's name is Available Movers.
6  Q. And they picked it up from who?
7  A. I'll get to that. And I told him that he should
8  arrange for the balance of the payment so I can make
9  the deal. He told me I already gave you a deposit,
10  so you know it's real and I have over four and a half
11  million dollars by my attorney and you're sure to be
12  to get paid. I said okay. But I won't be able to
13  pay you only once it's on the truck. I said okay.
14  I tried to figure out how to arrange all this to
15  happen. And on about February 3 or 4, Sam told me
16  that he only can send the money, the balance if it's
17  going to be held in escrow by a lawyer. I told Sam
18  that really wasn't our deal to begin with, but I
19  understand you and tell me what should I do now? He
20  says listen. I have an attorney and she going to get
21  the money. And once it's verified that the
22  merchandise is on the truck, the money will be
23  released to you. I said okay. Who is the attorney?
24  And he gave me the name of Daphna Zekaria. And he
25  said soon she's going to call you. I worked with her



1  before.  She did for me several representations
2  before.  And otherwise, I don't think that the money
3  will be released from my lawyer.  So we really have
4  to go through that.  I said okay.
5  I made the arrangements with the movers for
6  February 7th and I told them that I want to verify
7  the merchandise the day before.  I told them it's
8  going to have to come to New Jersey and the movers
9  will take from them the merchandise and it's going to
10  happen in New Jersey.  So on the 6th of February, I
11  think, which was probably a Sunday, they arrived in
12  New Jersey and I examined again the merchandise.
13  Everything was looking, it looked like everything is
14  on the truck.  And those two guys got paid from me
15  through cash and jewelry.
16  They left me the truck with the driver.  It was
17  already in the evening.  I think it was winter, so
18  evening comes early.  But something around 6:00, 7:00
19  or something like this.  I don't remember what time
20  at, already night time at this time.  I stayed with
21  the truck till the next morning and ---.
22  Q.I'm sorry.  What day did the truck come?
23  A.The truck came on the 6th ---
24  Q.Okay.
25  A.--- in the evening.

1  Q.You stayed overnight until 7:00?
2  A.Yeah.
3  Q.Okay.
4  Continue.
5  A.Okay.  Okay.
6  So that was Sunday and the movers supposed to
7  come the next day in the morning.  And I told the
8  driver that we will need more space to put a truck
9  back to back and we will have to move to a different
10  space because this space is full of cars and
11  everything else.  We move to another street by the
12  name Urbanovich.
13  Q.I'm sorry.  Let me interrupt you.  Your suppliers
14  left their truck ---
15  A.Right.
16  Q.--- with you?
17  A.Yeah.
18  Q.And then that truck and the Available Mover's
19  truck had to be moved so they could be positioned
20  properly ---
21  A.Yeah.
22  Q.--- to move ---
23  A.Yeah, yeah, yeah.
24  Q.--- the product from your supplier's truck to
25  Available Movers.

1  Right?
2  A.The truck was a big truck.  It's like a 40 foot
3  truck.  To have another truck next to it, you need
4  space.
5  Q.But did I, does that --- is my understanding
6  correct?  That's the two trucks we're talking about?
7  Your supplier leaves a truck with you.  You wait
8  overnight for Available Movers with their truck and
9  then the two trucks are repositioned to transfer?
10  A.Correct.  I have done with paying those people.
11  The merchandise is on the truck.  The mover is
12  supposed to come only in the morning of the 7th,
13  which is Monday.
14  Okay.  Okay.  Early in the morning, I think early
15  in the morning, I don't know what time, around 4:00
16  or 5:00, I told the truck driver that we're going to
17  move to a different spot to a street by the name of
18  Urbanovich, which is a commercial area of Linden.
19  It's a city adjacent to Elizabeth.  We moved there
20  and was plenty of space there for trucks.  There are
21  some warehouses and commercial places, so trucks are
22  coming and going.  And there's a lot of space to park
23  for two trucks if it's necessary, one next to each
24  other.
25  They arrived in the morning of Monday.  I told

1  them exactly where to go.  I don't remember the
2  number of that building on Urbanovich Street, but I
3  gave it to them, and that's where I met them.  They
4  backed the trucks back to back.  Before that, I
5  remember Zekaria spoke to me.  I think she called me
6  like early in the morning sometime around 6:00 or
7  7:00 in the morning.  I don't really know exactly
8  when.
9  Q.On February 7th?
10  A.Yeah.  And she wanted to coordinate with me and
11  verify that the merchandise will be transferred into
12  the, into the carrier.  She asked me to take some
13  pictures.  I said okay.  I don't remember the time.
14  It was maybe between somewhere 7:00 to 8:00, 9:00.  I
15  think it was a foggy day a little bit, so everything
16  looked like early in the morning.  There was no
17  sunshine, I remember.  And I took some pictures and I
18  asked her when the money is going to come.  She says
19  once everything is loaded, I will send you the money.
20  I said okay.
21  The loading on the truck took about maybe half an
22  hour.  The carrier came with, I think, with three
23  people and a driver or three people total, something
24  like this.  Three people were, they backed up to the
25  truck.  They loaded all the boxes.  And once



1  everything was loaded up, I gave the driver, I think,
2  a copy of the, of one of the invoices or something
3  that I gave to Sam where the boxes have to go with
4  the number of boxes on each for next to each address
5  and they left.
6  I was parked not far from the truck.  I went back
7  into my truck and I don't know what I did in the
8  truck.  Maybe I made a phone call or looked or
9  whatever.  I saw the truck leaving the place where
10  it's parked.  In about ten minutes, I was ready to
11  leave with my little truck at the place.  And once I
12  start to drive, I see that the truck of the carrier
13  is still there.  He drove down maybe 100 yards or
14  something like this, and in the corner waiting there.
15   I stopped next to it and I got out and the driver
16  rolled down the window.  I asked him why are you
17  here?  Why don't you continue?  He says because I
18  just spoke to my office and they have a problem.
19  They need something that is called bill of lading.  I
20  told the truck driver, listen, I don't have anything
21  like this, but let me make a few phone calls and see
22  what it is.
23  I called Sam.  I don't know if he called me at
24  this time anyhow or I just called him.  And I told
25  Sam listen, these people want a document that says

1  bill of lading and I don't know what they really want
2  exactly, but you'll have to provide it for them so
3  it's not going to be a mistake in the deliveries.
4  Sam told me no problem.  I'll have it for them very
5  soon and I'll send it to you.  I said okay.
6  I stayed there with the truck and after about
7  half an hour or something like that, half an hour, an
8  hour, the driver told me listen, I spoke to the
9  office and I cannot wait here any longer.  You know,
10  if you don't have the bill of lading right now, just
11  send it to the office.  In the meantime, I have to
12  continue to drive to their hub.  I cannot stay here
13  on the street.  I said okay and they left.  They left
14  without that document that is called bill of lading.
15   I spoke to Shlomo.  He said soon.  I said okay.
16  Listen, they left ---.
17  Q. Wait.  I'm sorry.  Let me interrupt you.  Just
18  clarify for the record who Shlomo is.
19  A. Sure.
20  ATTORNEY LIGHTMAN:
21  Shlomo, S-H-L-O-M-O is a nickname for
22  Sam Gross.
23  THE WITNESS:
24  I'm sorry, Shlomo.  Yeah, Shlomo Gross.
25  BY ATTORNEY ROSS:

1  Q. Okay.
2  A. Okay.
3  Shlomo said soon you'll have it.  Don't worry.
4  They will have it.  I'll send it over.
5  Okay.  The truck left and the driver said it's
6  going to go to our hub and we'll wait there for the
7  bill of lading.  I spoke, I think, one more time to
8  Shlomo, Shlomi and I asked him when this is going to
9  be.  He said I had a cancellation of one party, so
10  I'm trying to make the other party take it.  So it
11  will take maybe a few more hours or tomorrow morning.
12  I said okay, Sam.  Just have it done.  I've done what
13  you wanted for me and it's on the truck.  So please,
14  they're waiting there.
15  Okay.  The next day, I spoke to the Available
16  Movers and they don't have that bill of lading and
17  they cannot move without that.  They need explicit
18  names in those places to whom to give it to.  And
19  they prefer also to have a phone number so the driver
20  can contact that person before they arrive to the
21  warehouse where they have to upload it.  So they need
22  all this information.  I told them okay,.  I'm
23  waiting for it.  It should come very soon.
24  I spoke again to Available Movers.  They told me,
25  listen.  This is something that we will have to start

1  to charge you now for storage on top of what we are
2  charging.  I said okay, whatever it is.  You'll have
3  to do what you have to do.  That's how it went.
4  Q. Okay.
5  You mentioned --- let me ask you this.  Do you
6  have any papers with you today that you haven't
7  already provided to myself or to Mr. Lightman?
8  A. If the paper's here.
9  Q. Aside from your responses to his request for
10  admissions, when you referred to notes earlier, ---
11  A. Okay.
12  Q. --- are you referring to anything that he and I
13  haven't seen yet?
14  A. I don't know.  So this, I know that now both of
15  you have seen it because it's a document that went to
16  on the website of Pacer (phonetic).
17  ATTORNEY LIGHTMAN:
18  Sorry to interrupt, but when you say
19  this, you're pointing to your responses to the
20  request ---?
21  THE WITNESS:
22  Exactly.  Exactly.
23  ATTORNEY LIGHTMAN:
24  Just so the record's clear.
25  THE WITNESS:



1  Okay.
2  ATTORNEY LIGHTMAN:
3  I apologize, Mr. Ross.
4  THE WITNESS:
5  Okay.
6  ATTORNEY ROSS:
7  Perfectly fine.
8  THE WITNESS:
9  I know that everybody got this paper
10  because everybody's logging in there.  So this is
11  here.  Right?  So I know what you did have, what you
12  got just recently, yesterday.  I provided many
13  documents till this point to the Plaintiff.  Just
14  about almost everything that he asked for and has to
15  do with this case.  So I provided many documents.  I
16  don't know.  I have here, I have here a folder which
17  is marked refunds.
18  Okay?  I made notes of the collateral
19  and the refunds and I decided that I'm going to put
20  it in a separate folder.  So I don't know if you have
21  all these papers.  You understand?  So it's here if
22  you want to take a look, if you want to copy
23  anything.  I did not have a chance to take a look.
24  And what's in here?  I just see my notes, refunds.
25  So I grabbed it in the morning and it's here.  I

1  believe that I gave it to Mr. Lightman, but I don't
2  know if you have all the papers.
3  BY ATTORNEY ROSS:
4  Q.  Okay.
5  A.  So if you want to make copies ---.
6  Q.  Just for a minute to figure out copies.
7  A.  Yeah, if you want to make copies.  I don't know
8  what you have or you don't have.
9  Q.  Mr. Lightman did share something with me he got
10  from you.  I don't know if this ---.
11  A.  Mr. Lightman has all this.  I have no doubt.
12  Q.  Well, he may have it all, but you're saying it
13  might not have been in this pile before this.
14  ATTORNEY LIGHTMAN:
15  For the record's clear, I don't know
16  what this pile is.  He just handed me from his
17  folder.
18  ATTORNEY ROSS:
19  From his folder.
20  ATTORNEY LIGHTMAN:
21  But at his deposition on February 16th,
22  he gave us a stack of documents, which we copied, we
23  gave back to Mr. Wyson, and I emailed ---
24  ATTORNEY ROSS:
25  Yes.

1  ATTORNEY LIGHTMAN:
2  --- Seth copies of those documents.  I
3  don't know ---.
4  ATTORNEY ROSS:
5  So our question is just whether or not
6  we need to copy these because they are ---.
7  ATTORNEY LIGHTMAN:
8  Out of an abundance of caution, I would
9  recommend that you have someone from your office make
10  copies of these new documents and do the same thing
11  for us that we did for you.  Copy them and then email
12  us.
13  THE WITNESS:
14  Okay.
15  So that is why I brought it.  I wasn't
16  sure if you guys have it, but it's here, you know.
17  ATTORNEY ROSS:
18  All right.  I sent somebody a message.
19  THE WITNESS:
20  Maybe some are copies.  Let me take a
21  look.
22  ATTORNEY ROSS:
23  Yeah, you could, yeah.
24  THE WITNESS:
25  I don't know if everything is ---.

1  COURT REPORTER:
2  Are we on the record?
3  ATTORNEY LIGHTMAN:
4  Yes.
5  ATTORNEY ROSS:
6  No, I don't think so.
7  ---
8  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
9  ---
10  ATTORNEY LIGHTMAN:
11  Back on record.  Do me a favor.  If
12  we're going to go off the record, let me know and
13  we'll go off the record.
14  Okay?  So for the record's clear, at
15  Mr. Weiss's deposition on February 16, he produced a
16  bag of documents.  Both Seth Laver and I went through
17  those documents.  We gathered up documents to be
18  copied, which were then copied.  We returned the
19  documents to Mr. Weiss and I subsequently emailed the
20  copied documents to Mr. Laver.  I do not know whether
21  or not the documents Mr. Weiss is producing today are
22  those documents or new documents.  But I would
23  request Mr. Ross make a copy of the new documents,
24  whether or not they were previously produced or not,
25  and send them to me.



1  THE WITNESS:
2  Okay.
3  So ---.
4  ATTORNEY LIGHTMAN:
5  Mr. Ross, is there someone in this
6  office that can do that?
7  ATTORNEY ROSS:
8  Sending a message right now.
9  ATTORNEY LIGHTMAN:
10  Thank you.
11  THE WITNESS:
12  Okay.
13  ATTORNEY LIGHTMAN:
14  I have Joan's phone number if you need
15  to call her.
16  THE WITNESS:
17  Okay.
18  Some are the duplicates here, but
19  whatever.  You'll make it out.  This is already ---
20  okay.  This is a new document.  This is a new
21  document.
22  BY ATTORNEY ROSS:
23  Q.I don't want to make Joan go back and forth, so.
24  A.Okay.
25  This, I know, this I just got about two or three

1  or four weeks ago from Shlomo Gross.  This document
2  is a statement that Mr. Manfred, Attorney Sternberg
3  sent to Sam Gross.  His statement, one of several
4  that he sent to Sam Gross to show monies that he got
5  into his escrow account and payments that he made.
6  So I looked at them.  It doesn't mean much to me, but
7  if you are asking me, it's in my files here.  I know
8  that this is one of the documents that I did not
9  present yet.
10  ATTORNEY LIGHTMAN:
11  May I see that?
12  ATTORNEY ROSS:
13  We will copy that, too.
14  THE WITNESS:
15  First, I will give it to Mr. Joseph.
16  ATTORNEY LIGHTMAN:
17  Yeah.  We'll make a copy.
18  THE WITNESS:
19  Okay.
20  Otherwise, I think this is a copy of
21  the last filing.  So there is no any other ones that
22  I did not present.  Let me just make sure.  No, this
23  is all the document 180, you know, just before I
24  filed it.  This one.
25  Okay.  Everything is here, the same.

1  It's a copy.
2  ATTORNEY ROSS:
3  Okay.
4  THE WITNESS:
5  Okay.
6  Nothing new except that document.
7  Okay.  So everything here I'm showing
8  you, that's what it is.
9  ATTORNEY ROSS:
10  All right.
11  We'll send this.  We'll send that.
12  Make copies.
13  THE WITNESS:
14  Mr. Scully, I would like to have these
15  documents back to Mr. Joe here and mark them as an
16  exhibit.
17  Okay?
18  ATTORNEY ROSS:
19  Well, I'm going to decide what we mark
20  as exhibits.
21  ATTORNEY LIGHTMAN:
22  If you're not going to ---.
23  ATTORNEY ROSS:
24  He'll be happy to mark it.
25  ATTORNEY LIGHTMAN:

1  If you're not going to mark this
2  document as exhibit, I'm going to mark it.
3  ATTORNEY ROSS:
4  And we are going to make everybody a
5  copy.
6  THE WITNESS:
7  Yeah.
8  ATTORNEY ROSS:
9  Yeah.
10  THE WITNESS:
11  I mean, I brought it here for you guys
12  to look.  I cannot --- I don't know what it means.
13  ATTORNEY LIGHTMAN:
14  Why don't we do this?
15  THE WITNESS:
16  Yeah.
17  ATTORNEY LIGHTMAN:
18  The last deposition exhibit in Mr.
19  Weiss's deposition on February 16 was Deposition
20  Exhibit 17B.  But just to be sure, let's start with
21  Weiss 20.  And cab we have this one document marked
22  as Weiss 20, Mr. Ross?
23  ATTORNEY ROSS:
24  That's fine with me.
25  ATTORNEY LIGHTMAN:



Page 33

1 We'll mark this as Weiss 20.
2 ---
3 (Whereupon, Weiss Deposition Exhibit
4 20, Business Transactions, was marked
5 for identification.)
6 ---
7 ATTORNEY LIGHTMAN:
8 You going to mark it?
9 COURT REPORTER:
10 I can mark it afterwards.
11 ATTORNEY LIGHTMAN:
12 Huh?
13 COURT REPORTER:
14 I can mark it afterwards.
15 ATTORNEY LIGHTMAN:
16 Can I put Weiss 20 on the top?
17 COURT REPORTER:
18 Yeah.
19 ATTORNEY LIGHTMAN:
20 Thank you.  And I'll put the date is
21 seven.  And just so the record's clear, the document
22 that's just been marked as Weiss 20 is a spreadsheet
23 that Mr. Manfred Sternberg sent to Sam Gross and that
24 Sam Gross then sent to you.
25 THE WITNESS:

Page 34

1 Correct.
2 ATTORNEY ROSS:
3 All right.
4 Here, give me that.  Thank you, sir.
5 THE WITNESS:
6 Do I have paper clips in my pocket
7 also?
8 ATTORNEY LIGHTMAN:
9 I'm a Boy scout.  You want --- you're a
10 Boy Scout.
11 THE WITNESS:
12 One, two.
13 COURT REPORTER:
14 How many copies?
15 ATTORNEY LIGHTMAN:
16 One, two, three, four copies of the top
17 one and two copies of the bottom one.
18 COURT REPORTER:
19 Okay.
20 ATTORNEY ROSS:
21 Let's do four of both.
22 COURT REPORTER:
23 Okay.
24 ATTORNEY LIGHTMAN:
25 Thank you.

Page 35

1 BY ATTORNEY ROSS:
2 Q.Okay.
3 An instruction I left out is if you have to
4 guess, let us know you're going to guess whether it's
5 a date, or an amount of money, whatever it is.
6 Okay?
7 A.Yeah.
8 Q.And then for the record, for people who aren't
9 familiar, you mentioned earlier that you knew the
10 Daphna Zekaria, right?  That's their names, the
11 suppliers?
12 A.Yeah, yeah.
13 Q.You knew them from 47th Street?
14 A.Yeah.
15 Q.Explain for the record for people who don't know
16 what that means.  What you mean when you say I knew
17 them from 47th Street?
18 A.47th Street is a Diamond District.  And I had a
19 store in the Diamond District from 1975 till 2002.
20 Q.In Manhattan?
21 A.In Manhattan.
22 Q.All right.
23 Aside from the documents we've already discussed
24 that you brought with you today, did you review
25 anything else in preparation for today's deposition?

Page 36

1 A.I reviewed, again, document 180, ECF 180 on the
2 electronic court filing.
3 Q.Those are your responses to Mr. Lightman's
4 request for admission?
5 A.I do not understand your question.
6 Q.When you say document ---.
7 A.Yes.  The document is titled Plaintiff's Request
8 for Admission and Supplemental Interrogatory.
9 Q.Did you speak to anybody yesterday or in the days
10 before yesterday about this deposition that isn't in
11 this room right now?
12 A.Okay.
13 I spoke to Mr. Lightman yesterday.  I do not
14 think that we spoke about this document.  He called
15 me to ask me if I know how to get to your office here
16 and I said that I think I will be able to find it.
17 Q.Did you speak to anybody beside Mr. Lightman
18 about the case, your testimony today?
19 A.I spoke to Shlomo Gross yesterday.
20 Q.What time is that?
21 A.He called me about ten times.
22 ATTORNEY LIGHTMAN:
23 Ten times?
24 THE WITNESS:
25 Yeah, at least.  He called me ten



1   times.  And I think one time, once we spoke about me
2   coming here.  I asked him if he wants to come, I will
3   take him with me in my car.  He just did nothing
4   answer about that, so I took it as a no and ---.
5   BY ATTORNEY ROSS:
6   Q.Let me ask for clarification.
7   A.That's about what we spoke about the case.  That
8   was the extent about what we spoke about the case.
9   Q.He called you ten times, but you only spoke to
10  him once?
11  A.I believe only once about the case.  That was ---
12  I mentioned to him that yes, I will be going and if
13  he wants to come with me, he should come.
14  Q.And he didn't answer?
15  A.He didn't answer yes.  He didn't answer yes.
16  Q.He didn't say no?
17  A.I didn't hear the word no, but he changed the
18  subject.
19  Q.And you didn't, the two of you didn't discuss any
20  other aspect of the case itself?
21  A.No.
22  Q.Did you talk to anybody aside from Mr. Gross and
23  Mr. Lightman in the past two days ---?
24  A.Yesterday?
25  Q.Yesterday or the few days before that about ---

1   A.No.
2   Q.--- today, this deposition?
3   A.No.
4   ATTORNEY LIGHTMAN:
5   Did you speak to the Daphna Zekaria?
6   THE WITNESS:
7   I never speak to Daphna Zekaria.
8   ATTORNEY LIGHTMAN:
9   Sorry, Mr. Ross.
10  THE WITNESS:
11  Not never.  I should not say never.
12  The last time I spoke to Daphna Zekaria was in 2022.
13  Don't remember the date.
14  ATTORNEY LIGHTMAN:
15  Oh, that's not true.
16  ATTORNEY ROSS:
17  That's not true.
18  ATTORNEY LIGHTMAN:
19  You spoke to her at a deposition.
20  THE WITNESS:
21  I'm not --- I mean personally.
22  ATTORNEY LIGHTMAN:
23  You spoke to her ---.
24  BY ATTORNEY ROSS:
25  Q.In the absence of people from this case in a

1   deposition setting?
2   A.The case, yeah.  I'm talking about personally.
3   No.
4   Q.And just to confirm, you don't have your own
5   attorney for this case?
6   A.No, I don't.
7   Q.At one point you did.
8   Correct?
9   A.At one point, I did.
10  Q.And why did you, why do you no longer have an
11  opinion for this case?
12  A.A few reasons.  Reason number one, when I found
13  out that Shlomo Gross and Attorney Manfred Sternberg
14  named me as a Third Party Defendant, which was on
15  November 29th, which was already November, December,
16  seven months after the incident, I was surprised
17  because I gave Shlomo Gross a full refund.  I did not
18  understand why they would come and start a lawsuit
19  against me.  So I asked the lawyer for Mr. Gross to
20  wait till the end of January because I will not be in
21  the United States for the next several weeks.  He
22  said it's fine with me, but you should also call Mr.
23  Gary Lightman and let him know.
24  So I think I contacted Mr. Lightman and Mr.
25  Lightman agreed to wait till the end of January of

1   2023.  They told me that they can make my lawyers,
2   which I hired --- I forgot the name of the firm, but
3   the name of the lawyer was Attorney Price.  She told
4   me she's going to move to change the venue and try to
5   dismiss me as a Defendant.  She asked me for some
6   information about the case and some papers, which I
7   gave her.  And I told her ---.
8   Q.Mr. Weiss, I don't want to hear anything you told
9   your attorney.
10  A.Okay.
11  So I asked her to file the papers that say
12  refund.  She did not.  And that was one reason that I
13  decided after several months to not continue with
14  being represented by them, by this lawyer.  Also ---.
15  Q.I'm sorry.  Can you say that again?
16  A.I asked them that not to --- I cannot afford them
17  anymore to represent me and I don't want to have
18  their services any longer.  So that's the answer why
19  I'm not represented now by a lawyer.
20  Q.And you don't plan to get a new lawyer for this
21  case?
22  A.Well, unless I run into some money that I think
23  that I will be able to afford a lawyer.  As you well
24  know, you need to start with a certain amount of
25  money and at the moment, I don't have that.  So I



1  don't see it in the near future.
2  Q.Did you ever receive a copy of the transcript
3  from your prior deposition in this case?
4  A.No, I asked Mr. Lightman for that.  And I also
5  asked for the deposition of Mr. Sternberg, but I
6  don't think that I received anything yet.
7  ATTORNEY LIGHTMAN:
8  Just so the record's clear.  Did I not
9  give you the contact information of the Court
10  Reporter for you to contact directly to get a
11  transcript?
12  THE WITNESS:
13  I am aware of the company by the name
14  Tate and Tate.  I don't know who gave me the contact
15  information because the Court Reporter presented
16  itself and I think it was a lady.  She gave me a card
17  there.  What Mr. Lightman is telling me now, I'm not
18  sure if he told me or did not tell me, but I knew
19  where to contact to get a copy.  I did call them and
20  they asked for an amount of money that I could not
21  afford at the moment.  So I did not order on myself.
22  I asked Mr. Lightman to, on a couple of
23  occasions, to have a copy of Mr. Sternberg's
24  deposition.  I told him that I'm willing to pay him
25  money, about $200 for it.  And I don't think that it

1  happened.  Also, before coming here, I asked Mr.
2  Lightman to bring it with him if he can.  And I don't
3  remember if he answered me or he didn't, but, you
4  know, this morning he did not present it to me.
5  So the answer is I did not see Mr.
6  Sternberg's deposition that was done by Mr. Lightman,
7  nor do I have my own deposition was not given to me,
8  the certified copy that usually, I understand lawyers
9  give it.  Maybe you go over it.  You have something
10  to correct or whatever.  No, I did not get that yet.
11  I asked for it, but I did not get it.
12  ATTORNEY ROSS:
13  All right.
14  We're going to take a break.  Just for
15  a couple minutes unless anybody objects.  Off the
16  record.
17                    ---
18  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19                    ---
20  ATTORNEY ROSS:
21  We can go back on.
22  BY ATTORNEY ROSS:
23  Q.Mr. Weiss, what's your highest level of
24  education?
25  A.High school.

1  Q.When did you graduate?
2  A.I don't remember.  Has to be --- let's add 17
3  years to my age.  So 1968.
4  Q.And you did graduate?
5  A.Yeah.
6  Q.Any partial college education after that?
7  A.No.
8  Q.Any professional certification of any kind?
9  A.Yes.
10  Q.What kind?
11  A.Certification of hand to hand combat through the
12  Army.
13  Q.Which army?
14  A.In Israel.
15  ATTORNEY LIGHTMAN:
16  IDF?
17  THE WITNESS:
18  Yeah.
19  BY ATTORNEY ROSS:
20  Q.That was after high school?
21  A.Yeah.
22  Q.That's part of the compulsory service?
23  A.Yeah.
24  Q.And any other certifications or ---?
25  A.Special warfare, parachuting and some other

1  things.
2  Q.Anything outside of your IDF service?
3  A.I don't remember right now at the moment.
4  Q.Just for the record, what's your --- state your
5  full, first, middle, last name.
6  A.My name is Gary Weiss.
7  Q.And how old are you today?
8  A.I was born in February 28, 1951.
9  Q.And what's your current home address?
10  A.I currently live in 650 Fairway Drive, Union, New
11  Jersey, 07083.
12  Q.And how long have you lived there?
13  A.Several months.
14  Q.Several months, you said?
15  A.Yeah.
16  Q.Since January 2024?
17  A.Since end of February.
18  Q.And where did you live before that?
19  A.I lived in 680 Evergreen, Union, New Jersey.
20  Q.And how long did you live there?
21  A.I would say about seven, eight months.
22  Q.What about before that?
23  A.277 Taqitahuana Street.
24  Q.Spell it please.
25  ATTORNEY LIGHTMAN:



Page 45

1 Got to spell that.
2 THE WITNESS:
3 T-A-Q-I-T-H, I'm sorry, T-A-H-U-A-N-A,
4 San Miguel, Lima, Peru.
5 BY ATTORNEY ROSS:
6 Q. How long did you live at that address?
7 A. About ten years.
8 Q. Do you currently own any property in Peru?
9 A. No.
10 Q. Do you rent there?
11 A. No.
12 Q. Are you sure?
13 A. I'm sure.
14 Q. What about anywhere else outside the United
15 States?  Any property outside the U.S.?
16 A. No.
17 Q. Any time shares?
18 A. No.
19 Q. Do you have any property in New York?
20 A. No.
21 Q. I know you used to have a store in the Diamond
22 District.  Do you have any store?
23 A. No.
24 Q. What's your mobile phone number?
25 A. 908-546-2649.

Page 46

1 Q. Do you use any other phone numbers?
2 A. No.
3 Q. Have you ever used 718-869-6385?
4 A. Yes.
5 ATTORNEY LIGHTMAN:
6 What's that number again?
7 ATTORNEY ROSS:
8 718-869-6385.
9 ATTORNEY LIGHTMAN:
10 Thank you.
11 BY ATTORNEY ROSS:
12 Q. When did you use that number?
13 A. Maybe ten years ago.
14 Q. And you haven't used it for about that long?
15 A. I don't remember the last time I used it.
16 Q. What about 516-984-8530?
17 A. Also an old number.
18 Q. How old?
19 A. I would say maybe 15 years.
20 Q. What about 516-510-1833?
21 A. Over ten years ago.
22 Q. So the only mobile number you have is 908-546-
23 2649 ---
24 A. Right.
25 Q. --- today?  And do you still use the email

Page 47

1 address W-G-A-R-Y4109@gmail.com?
2 A. Correct.
3 Q. What do those numbers stand for?
4 A. I don't know.
5 Q. You didn't choose them?
6 A. You mean the 4109?
7 Q. Yeah.
8 A. That's a good one.  I don't know.
9 Q. If that's the answer, that's the answer.  That's
10 okay.
11 And you also use M-O-N-I-P-A-I-R@aol.com?
12 A. Correct.
13 Q. Do you have any other email addresses that you
14 use?
15 A. I do have ---
16 Q. Which ones are those?
17 A. --- that I don't use.
18 Q. You don't have any others that you use?
19 A. Those are the two emails that I use.
20 Q. Okay.
21 A. I do have other emails.  You ask me if I do.  I
22 do.  But, you know, many years not in use.
23 Q. What about A-W-E-I-S-SGY@gmail.com, G-U-Y, I'm
24 sorry, @gmail.com.  Weissguy.
25 ATTORNEY LIGHTMAN:

Page 48

1 At?
2 BY ATTORNEY ROSS:
3 Q. @gmail.com.
4 A. It's not me.
5 Q. Okay.
6 A. But let me write it down.  Just please.  You said
7 again?
8 Q. It's A-W-E-I-S-S-G-U-Y@gmail.com
9 A. At Gmail.  Okay.
10 Q. What about gary.weiss@bnymellon.com?
11 A. I'm not going to write them down.
12 Okay.  I don't know.  I don't know these emails.
13 Q. Okay.
14 That's a perfectly fine answer.  What about
15 garyweissinc@aol.com?
16 A. An old email.
17 Q. What about GG0106@aol.com?
18 A. An email that is current, which I don't use.
19 Q. What does that 0106 stand for?
20 ATTORNEY LIGHTMAN:
21 I'm sorry.  What was that?  I missed
22 it.
23 BY ATTORNEY ROSS:
24 Q. What does the 0106 ---
25 ATTORNEY LIGHTMAN:



1  Oh.
2  BY ATTORNEY ROSS:
3  Q.--- in last email address stand for?
4  A.I don't remember why I chose that number.  It's a
5  20 year old number, so I don't remember why it is.
6  Q.Okay.
7  Do you own the house you live in now?
8  A.No.
9  Q.Do you rent it?
10 A.Yes.
11 Q.Have you ever owned property in the United
12 States?
13 A.Yes.
14 Q.What's the last property you owned or the last
15 property you bought and do you still own that
16 property?
17 A.I don't own right now.
18 Q.What was the address for that property?
19 A.521 Woodmere Court, Woodmere, New York.
20 Q.Did you ever own 532 Woodmere Boulevard?
21 A.Okay.
22 That's the number, 532.  I'm sorry.  532 Woodmere
23 Boulevard.
24 ATTORNEY LIGHTMAN:
25 It's not Woodmere Court?

1  THE WITNESS:
2  No, Woodmere Boulevard.
3  ATTORNEY LIGHTMAN:
4  And it's not 521?
5  THE WITNESS:
6  No.  It's 532 Woodmere Boulevard.  But
7  I lived on Woodmere Court, which I don't remember the
8  number.  Maybe it's 521, so I'm mixing up the
9  numbers.  But it's many years ago.
10 BY ATTORNEY ROSS:
11 Q.But one of the --- you're thinking you lived at
12 521, but didn't own it?
13 A.532 --- No.  532 I bought, yeah.
14 Q.But did you had you also at some point lived at
15 521?
16 A.521 or maybe 821 Woodmere Court.  I don't
17 remember right now the number.
18 Q.But you never own 521?
19 A.No.
20 Q.Okay.
21 How long did you own 532 Woodmere Boulevard?
22 A.I don't remember.  Maybe three years, four years,
23 something like that.
24 Q.Did you live there with anyone?
25 A.Yeah.

1  Q.Who did you live there with?
2  A.My wife.
3  Q.What's her name?
4  A.Gael, G-A-E-L, Deborah Shern, S-H-E-R-N.
5  Q.That middle name is D-E-B-O-R-A-H?
6  A.Correct.
7  Q.How long have you been at your current address
8  again?
9  A.Since the end of February.
10 Q.Okay.
11 Do you live there with your wife as well?
12 A.Yes.
13 Q.Any kids?
14 A.No kids.
15 Q.Why did you sell the Woodmere Boulevard house?
16 A.That house I bought in 1980 and I think I got
17 divorced in 1984 and I left it for my first wife and
18 two kids.  I didn't sell it, but I left it for them.
19 Q.Okay.
20 So that, she would have kept that after the
21 divorce.
22 A.Yes.
23 Q.You have a company called A. Solar Diamond.
24 Correct?
25 A.Yes.

1  Q.Did that company sell any property in 2023?
2  A.No.
3  Q.Has it ever owned any property, that company?
4  A.Can you start again the question?
5  Q.Sure.  Has A. Solar Diamond ever owned any
6  property?  Let's start there.  Real estate?
7  A.A. Solar Diamond owned property, yeah.
8  Q.Do you recall from when to when it owned?
9  A.No, not exactly, exactly the date.  I think till
10 November of 2023.
11 Q.What was that address?
12 A.680 Evergreen Parkway.
13 Q.What town?
14 A.Union.
15 ATTORNEY LIGHTMAN:
16 Until what date?  I'm sorry.
17 THE WITNESS:
18 End of November.
19 BY ATTORNEY ROSS:
20 Q.Until the end of November 2023.  What about 215
21 Pershing Avenue in Roselle Park?
22 A.What is the question?
23 Q.Has A. Solar Diamond ever owned that property?
24 A.No.
25 Q.Have you?



Page 53

1  A.No.
2  Q.Do you know anybody that has?
3  A.What city is that?
4  Q.Roselle Park, New Jersey.
5  A.No.  I never owned this property, nor did I live
6  there.
7  ATTORNEY LIGHTMAN:
8    He asked if you knew anyone that owned
9  it.
10 THE WITNESS:
11   Did you ask me if I knew anybody?
12 BY ATTORNEY ROSS:
13 Q.Also --- yeah, that was my last question to you.
14   Do you know anybody that has ever owned that
15   property?
16 A.I know somebody that lives in this property.  I'm
17   not sure he owns it.
18 Q.Who's that?
19 A.His name is Paul.
20 Q.Can you spell that?
21 A.P-A-U-L.
22 Q.Last name.
23 A.I think Larose.
24 Q.Spell that one, too.
25 A.L-A-R-O-S-E, something like that.

Page 54

1  Q.How do you know him?
2  A.I know him through my wife.
3  Q.When's the last time you were in Peru?
4  A.Two months ago.
5  Q.Do you currently have any plans to go back?
6  A.At this moment, no.
7  Q.How many --- what businesses do you own right now
8  aside from A. Solar Diamond?
9  A.I do not ---
10 ATTORNEY LIGHTMAN:
11   Objection.
12 THE WITNESS:
13   --- own A. Solar Diamond.
14 ATTORNEY LIGHTMAN:
15   What was your answer?
16 THE WITNESS:
17   I do not own A. Solar Diamond.
18 BY ATTORNEY ROSS:
19 Q.Let me ask you this.  Tell me all the businesses
20   you own right now.
21 A.Can you define business?
22 Q.Sure.  A corporation, an LLC.
23 A.Okay.
24 Q.A business entity that is not yourself.
25 A.Okay.

Page 55

1  Operating, non-operating?  Does it matter?
2  Q.No.
3  A.No.  Corporation by the name A Solarr.  Let me
4  spell it for you.  A-S-O-L-A-R-R, LLC.
5  Q.Any others?
6  A.No.
7  Q.And is that operating right now?
8  A.No.
9  Q.Did you ever own Blue Gem Diamond, LLC?
10 A.I think so.
11 Q.Do you remember when?
12 A.Must be ten years or more.
13 Q.What about Party for Charity, Inc., the number
14   four.
15 A.Again?
16 Q.Party for Charity?
17 A.No.
18 Q.What about Jaeger Watch Company?
19 A.No.
20 Q.What about W and W Gems Inc.?
21 A.No.
22 Q.What about Gary Weiss, Inc.?
23 A.Yes, I own.
24 Q.Does that still exist?
25 A.I don't know.  I didn't use that for over 15

Page 56

1  years.  So I don't know if it was dissolved
2  officially or no.  I have no idea.
3  Q.What about Med Ready Healthcare Staffing
4  Consulting?  Med Ready?
5  A.No.
6  Q.What about Infinite Personnel Services, Inc.?
7  A.No.
8  Q.Are you familiar with any of those names?
9  A.No.
10 Q.Company names?  You said a few minutes ago, A
11   Solarr is no longer in operation.  When, what was the
12   period of years it was in operation?
13 A.I don't think it was ever in operation.
14 Q.What do you mean by that?
15 A.It did not operate.
16 Q.When did the --- when did you create the LLC?
17   Let's start there.
18 A.Probably in September, November of 2023.  I'm not
19   sure.  I have to look it up, but 2022 or 2023.
20 Q.And did that LLC ever engage in any business
21   transactions?
22 A.No.
23 Q.What was its purpose?
24 A.To transact business.
25 ATTORNEY LIGHTMAN:



1  Which LLC are we talking about now?
2  ATTORNEY ROSS:
3  A Solarr LLC.
4  BY ATTORNEY ROSS:
5  Q. Why didn't it participate in any business
6  transactions?
7  A. I am basically retired, so I don't really pursue
8  any business right now.
9  Q. Then why did you create it?
10 A. I was about to make a deal and I thought that I
11 will form the corporation just in case and the deal
12 fell through.
13 Q. That wasn't this deal.
14 Right?
15 A. No.
16 Q. That was a later deal?
17 A. Exactly.
18 Q. Do you remember who that deal was with that fell
19 through?
20 A. Yeah.  The deal was with an entity from Romania.
21 Q. What was it for?
22 A. For purchase of drones.
23 Q. And why did it fall through?
24 A. We could not agree about prices.
25 Q. Between the deal at issue in this litigation and

1  this drone deal, did you get involved in any other
2  business transactions, whether with A Solarr, LLC or
3  not?
4  A. I made few sales to customers where I sold in the
5  past.
6  Q. Did those deals involve anybody involved in this
7  litigation?
8  A. No.
9  Q. Let me go back a little bit.  Tell me what you do
10 for a living.
11 A. Right now, I am retired.
12 Q. Before you retired, how did you make a living?
13 A. Buying and selling diamonds and jewelry.
14 Q. And when did you get started in that field?
15 A. 1975.
16 Q. How did you get into that field?
17 A. My brother was a jeweler and we decided to open a
18 store together in the Diamond District.  That was in
19 19, no, it was in the summer of 1974, I think.
20 Q. And how often did you sell things other than
21 diamonds and jewelry?
22 A. No.  All my life, that's what I did, sell
23 diamonds and jewelry and things related to diamonds.
24 Q. At some point, you ended up selling PPE, personal
25 protective equipment, leading to this lawsuit.

1  Right?
2  A. This was the only time.
3  Q. This was the first, the first time that you sold
4  any personal protective equipment?
5  A. Correct.
6  Q. What about drones?  Was that deal you mentioned
7  with the Romanian supplier for drones the first time
8  you ever contemplated selling drones?
9  A. Yes.
10 Q. What first led you to the idea of selling
11 personal protective equipment?
12 A. In the summer of 2020, Shlomo Gross asked me if
13 I'm interested in selling PPE.  I told him that I'm
14 not interested.  At the time, I was in Peru.  And
15 when I was approached in February of 2022 about this
16 deal, I contacted Sam Gross and he told me that he's
17 still doing this business.  And that's about the
18 history of the PPE.
19 Q. Why were you in Peru?
20 A. My wife lives there with her family and I stay
21 there a big portion of the year, every year.
22 Q. And you mentioned the last time you were there
23 was I think you said a couple of months ago?
24 A. Yes.
25 Q. How long was that trip to Peru for total?

1  A. It was for one month.
2  Q. Are you ever contacted about selling anything
3  other than diamonds and jewelry outside of the PPE
4  and the drone situations we've already talked about?
5  A. Well, I'm in this business since 1975.  So can
6  you please elaborate more your question?
7  Q. Sure.  You mentioned talking to, being contacted
8  by Mr. Gross in 2020 about whether you were
9  interested in selling PPE.
10 Right?
11 A. Correct.
12 Q. And then at some point, you talked about a
13 potential deal for drones regarding, it was a
14 Romanian entity?
15 A. Correct.
16 Q. Other than those two, are there any non-jewelry,
17 non-diamond business deals that have ever been
18 proposed to you by ---
19 A. No.
20 Q. --- anybody else?  How did you, how do you know
21 Sam Gross?
22 A. I know Sam Gross since the year 2001, I think.
23 He came to me with diamonds that he had and offered
24 it to me that I should buy it.
25 Q. How did he come to contact you, if you know?



Page 61

1 A.He just came to my store and approached me.
2 Q.Do you know if he was referred to you by anybody?
3 A.Most likely he was really a salesman for a
4 company. And I'm not sure if they gave him the name
5 Gary Weiss so go and visit to offer merchandise or he
6 just came to me on his own.
7 Q.He approached you in your shop?
8 A.Yes.
9 Q.How frequently did you do jewelry or diamond
10 business with Mr. Gross before this transaction
11 regarding Mr. Scully's company?
12 A.Mr. Gross would come to me almost every day since
13 2001. I would see him just about every day ---
14 Q.Now, is he ---.
15 A.--- except weekends.
16 Q.Sorry.
17 A.Except weekends. Usually from Monday to Friday,
18 he would come and say hello to me every day and
19 almost always offer for me something to buy, to see
20 if I'm interested in buying. His office was next to
21 mine just across the street.
22 Q.When Mr. Gross contacted you in the summer of
23 2020 to ask you were interested in a PPE deal, did
24 that surprise you?
25 A.No.

Page 62

1 Q.Why not?
2 A.He told me that there is an opportunity in buying
3 and selling PPE's and he wanted me to be the buyer
4 because he didn't have the funds to buy. And he
5 thought that maybe I have the money to buy and he
6 would be able to sell it, but I said no, thanks.
7 Q.So he called you essentially to, as an investor?
8  You pay for this, I'll sell it, and we'll both make
9 money?
10 A.Exactly. Exactly.
11 Q.And he'd never done that before about anything
12 outside the jewelry or the diamond world? With you,
13 I mean. He's never contacted you before summer of
14 2020 about anything buying and selling outside of
15 diamonds and jewelry?
16 A.I don't remember if he did. I don't think so.
17 Q.I know you said you saw him every day. I feel
18 like I see Mr. Lightman every day. We might not
19 necessarily be friends.
20 ATTORNEY LIGHTMAN:
21 We're friends.
22 BY ATTORNEY ROSS:
23 Q.We're polite business acquaintances. Do you
24 consider Mr. Gross to be a friend?
25 A.Yes, I do.

Page 63

1 Q.And is that to this very day?
2 A.To this very day.
3 Q.So is it fair to say you trust him?
4 A.I never said that.
5 Q.Then it's not fair for me to say. Can you
6 explain?
7 A.I cannot explain, but I cannot make any comments
8 on this particular question of yours.
9 Q.What do you mean by that?
10 A.Just exactly what I said. I cannot comment about
11 that as far as trust. What do you define as trust?
12 Q.You have to tell me what you define trust as,
13 since I'm asking you if you trust Mr. Gross or not.
14 If he called you today and said I have $1,000,000 of
15 product X, but I don't have the money, and let's just
16 say that you had $1,000,000. I'm not saying you do.
17 Let's just say you did. Would you say, okay, here's
18 the money, let's try and make some money?
19 A.The premise of your question is not really
20 correct because anybody that will offer me any
21 diamonds or jewelry, I would go myself and examine
22 it. And it's not just a matter of trust. I have to
23 verify when I go to buy something. So it has to do,
24 nothing has to do with being Mr. Gross or anybody
25 else. So, you know, it's not really about trust

Page 64

1 here. But what I meant by trust is if he would ask
2 me to borrow my car, I would not give it to him.
3 Q.You would not give it to him?
4 A.No, I would not give it to him.
5 Q.Why not?
6 A.I don't think he's a good driver and I would
7 trust my car with somebody else. I would not trust
8 with Mr. Gross. So, you know, if this answer your
9 question about trust, no, I would not trust Mr. Gross
10 if he would ask me to borrow my car. As far as
11 business, I have a very simple premise where in every
12 business transaction, I would go and verify
13 regardless who it is. It has nothing to do with
14 trust.
15 Q.If you were going to Peru for a month and needed
16 somebody to water your plants, would you give Mr.
17 Gross the key to your house?
18 A.Well, in the hypothetical, I will have to think
19 about it. So because it's hypothetical, I cannot
20 really answer this type of questions.
21 Q.As you sit here right now, you don't know whether
22 or not you would give him a key to your house while
23 you were away?
24 A.First of all, I do not answer any hypothetical
25 questions. So it's not really a relevant thing for



1  me to think about.  So there is no sense for me to
2  give you an answer of yes or no.  So my answer is no
3  answer except what I just gave you.
4  Q.Does Mr. Gross have a key to your house today?
5  A.No.
6  Q.When he contacted you in 2020 about the PPE deal,
7  why did you decline?
8  A.I did not think that that business is for me.
9  Q.What changed between then and when you spoke to
10 Levin and Zadok in 2022?
11 A.Well, the initiation of this deal wasn't by Sam
12 Gross.  It was my encounter with Levin and Zadok in
13 the Pret coffee shop.  And I initiated the contact to
14 Sam Gross, if he still does business and he would be
15 interested.  So it's not that he came to me with this
16 deal.
17 Okay?
18 Q.That's what I mean to ask.  You said PPE business
19 wasn't for you in 2020, but it was in 2022, which is
20 why you discussed it with Levin and Zadok and then
21 contacted Mr. Gross.  So I'm trying to figure out why
22 it was for you in 2022 when it wasn't in 2020.  What
23 changed there in your approach?
24 A.I don't know if I can answer it.  Well, first of
25 all, it's two different approaches to making a deal.

1  One was where Mr. Gross approached me in getting
2  involved with this business and potentially investing
3  money into a project where I didn't think that I have
4  control of.  I think I was also in Peru at the time
5  anyhow.  And the second time, which was almost two
6  years later, was an approach by two gentlemen that
7  just said that they have the merchandise.  And if I
8  would be interested or know somebody that would be
9  interested.  And I called Sam Gross and he said that
10 he's interested.  So the nature of the proposition
11 was completely different.  Does it answer your
12 question?
13 Q.It does.  Tell me if I'm mischaracterizing,
14 but ---
15 A.Okay.
16 Q.--- you were in control of the 2022 transaction,
17 which made you comfortable with it, whereas you were
18 not necessarily in control of the 2020 ---
19 A.Exactly.
20 Q.--- transaction that Mr. Gross proposed, and not
21 to mention you were outside of the country, so you
22 passed?
23 A.Exactly.  I would say that's probably correct to
24 what happened.
25 Q.And you understand he's in default in this

1  litigation?
2  A.You know, the term default is not understood by
3  me.  And I really looked it up in Google, really what
4  the word default means and what default means into
5  this case.  So in legal terms, I am, you know, I do
6  not understand much.  I understand that he cannot
7  continue to participate, I assume, because he just is
8  not present and does not want to participate or is
9  not participating, and the court ordered him in
10 default.
11 Is that correct what you mean by default?  Is my
12 understanding correct?
13 Q.That's right that the court ordered him in
14 default.
15 A.Okay.
16 So I don't understand beyond that.  That's what I
17 think you mean by default.
18 Right?
19 Q.That's what the court ordered.
20 A.Okay.  .
21 Q.Yeah.  The allegations taken against him are
22 considered true ---
23 A.Okay.
24 Q.--- in default.  Have you discussed the default
25 with Mr. Gross?

1  A.Yes.
2  Q.When was the last time you discussed it with him?
3  A.Well, I just told you.  I asked yesterday if he
4  wants to come with me.
5  Q.But did you --- yeah, you did testify you offered
6  him a ride, ---
7  A.Right.
8  Q.--- but did you talk about the fact that he's in
9  default?
10 A.A ride means to come here to these proceedings.
11 That's what it means.  It's not just a ride.  I
12 wanted him to sit here with me.
13 Q.I wouldn't ---.
14 A.He didn't want, you know.  That is not the first
15 time I tried to take him to court.  I had to bring
16 him to the proceedings, you know.
17 Q.Did you offer him a ride to the July 10th hearing
18 before Judge Young?
19 A.I did.
20 Q.And he declined?
21 A.He didn't take the bait.  He didn't answer.
22 Q.Why do you put it that way, he didn't take the
23 bait.
24 A.I don't know.  I told him I'm going to go to pick
25 you up and bring you and whatever.  And he just, I



1  think, left it off.  I mean, it wasn't really in
2  person, but it was over the phone.
3  Q.What was the total payment you received for the
4  Safety House transaction ---
5  A.Okay.
6  Q.--- we're discussing in this lawsuit?
7  A.The total payment from The Safety House was
8  $907,000 and change.  It was 151,200 test kits times
9  $6.  That's what I received from Sam Gross on the
10  account of The Safety House.
11  Q.You said $907,000?
12  A.If you have a calculator, you can find out right
13  away, 151,200 times 6.
14  Q.$907,200.
15  A.Correct.
16  Q.During the course of that transaction, did you
17  pay anything else to Sam Gross for test kits that
18  were being delivered to buyers other than The Safety
19  House?  Did he pay you for any other customers of
20  his?
21  A.Okay.
22  Please, you're asking a few questions.  Ask me
23  again the first part.
24  Q.The second part corrects the first part.  During
25  the course of this transaction involving the 151,200

1  test kits destined for The Safety House, did Sam
2  Gross pay you for other test kits meant for other
3  customers of his?
4  A.The total payment that Sam Gross paid me was, I
5  believe, $1,600,000 and change.  I don't have the
6  exact number.
7  Q.And did he pay you any of that other money on the
8  same dates that he paid you for The Safety House?
9  A.No.
10  Q.Were any of the test kits destined for The Safety
11  House also on the trucks we talked about, the truck
12  we talked about earlier that you transferred from
13  Levin and Zadok to Available Movers truck?
14  A.Correct.  Sam gave me four names where the test
15  kits will be delivered to.  I think it was four.  And
16  he told me that to give those instructions to the
17  carrier.  So the total payments that he supposed to
18  give me would be for these four people, which
19  totaling to 365,000 test kits, which 151,200 destined
20  to The Safety House.
21  Q.Okay.
22  So one of those four buyers of Mr. Gross's was
23  The Safety House?
24  A.Correct.
25  Q.And does that 1.6 million you mentioned, you said

1  it was an estimate, I think.  Does that include the
2  $907,200 for The Safety House test kits?
3  A.Correct.
4  Q.And how did you receive all those payments?
5  A.Okay.
6  The first payment was $219,000, which equaled to
7  ten percent of the total price for the 365,000 test
8  kits.
9  Q.So the total ---.
10  A.Yeah.
11  Q.Go ahead.  Were you finished?
12  A.I will tell you the numbers from my memory, but
13  it's already on the record anyhow.  But I will try to
14  repeat what I remember.  And I think that Mr.
15  Lightman has it and will give us the exact numbers.
16  Q.I don't doubt him for a second.
17  A.Yeah.
18  ATTORNEY LIGHTMAN:
19  Well, I just want for now ---.
20  THE WITNESS:
21  I will give the numbers.  Yeah, give it
22  to me.
23  ATTORNEY LIGHTMAN:
24  Is it on Gary Weiss 8?
25  THE WITNESS:

1  Yes, yes.
2  ATTORNEY LIGHTMAN:
3  I'm handing a witness what's been
4  previously marked as Gary Weiss 8 ---
5  ---
6  (Whereupon, Weiss Deposition Exhibit 8,
7  Bank Statements, was marked for
8  identification.)
9  ---
10  THE WITNESS:
11  Okay.
12  ATTORNEY LIGHTMAN:
13  --- to his prior deposition.
14  ATTORNEY ROSS:
15  Absolutely.
16  THE WITNESS:
17  Okay.
18  This is good.  It's exactly what I was
19  looking for.
20  BY ATTORNEY ROSS:
21  Q.All right.
22  Take a minute to look at that and then when
23  you're ready.
24  A.Okay.
25  So I said $219,000, but it's exactly $219,240,



Page 73

1  which was made on February 1st.  That was not, that
2  was not to the escrow account of Attorney Zekaria.
3  Second payment that I got was on February 7,
4  $1,246,960.
5  Q.Mr. Weiss, just let me interrupt you for a
6  moment.  Tell me what GW-8, this exhibit, tell me
7  what this exhibit is.
8  A.GW-8 is a list of the payments that were made.
9  Q.Where is this list from?
10  A.I provided this list.  I provided it to Mr.
11  Lightman.
12  Q.Is this a bank record?
13  A.Yes.  This is a bank record.
14  Q.Of your personal bank account.
15  A.This is a record from A. Solar Diamond, LLC.
16  Q.And that's the one that we all keep ---?
17  A.Receive the money.
18  Q.And that's the one that's A-S-O-L-A-R-R?
19  A.No.
20  Q.That's what I want you to correct for us.
21  A.Correct.  That's a bank account that I use to
22  receive the money.  And the payments that I'm
23  referring to went to this account.
24  Q.At this time, A. Solar Diamond, LLC existed and
25  operated for the purposes of this transaction.

Page 74

1  A.For the purposes of this transaction.
2  Q.Today, it doesn't.  But A. Solarr, with two R's,
3  LLC does exist?
4  ATTORNEY LIGHTMAN:
5  Objection.
6  BY ATTORNEY ROSS:
7  Q.Is that right?
8  ATTORNEY LIGHTMAN:
9  No.  A. Solar Diamond, LLC exists
10  today.
11  BY ATTORNEY ROSS:
12  Q.Okay.
13  Well, tell me which of these two entities exist
14  today and which one of them operates.
15  A.The only one that exists today, the one that I
16  have, is A. Solarr, LLC, which I ---.
17  Q.Is that the one with two R's?
18  A.Yes, that's what I said in my testimony before.
19  Right.  And that's the only one that exists.
20  Q.Today?
21  A.Today.
22  Q.Did that A. Solarr with two R's exist during this
23  transaction we're talking about that is reflected, at
24  least partially, in Exhibit GW-8?
25  A.No.

Page 75

1  Q.Okay.
2  When did A. Solar Diamond, LLC cease to exist?
3  It's your testimony that it no longer exists.
4  Right?
5  A.This bank account no longer exists.
6  Q.What about the LLC?
7  A.The LLC does not operate in any way.
8  Q.Was it dissolved?
9  A.Yes.
10  Q.When was it dissolved?
11  A.I believe last year sometime.
12  Q.Do you have any records of that dissolution?
13  A.No.
14  Q.Why not?
15  A.You mean here today?
16  Q.Or at home, anywhere.  Do you possess any records
17  of the dissolution ---?
18  A.If I have, I'll take a look and I'll provide it
19  for you.
20  Q.How did you dissolve it?
21  A.I dissolved it online.
22  Q.You did that yourself?
23  A.Yes.
24  Q.Okay.
25  I interrupted your testimony about the payments

Page 76

1  you received as reflected in GW-8 for the
2  transactions we've been discussing this morning.  So
3  you got the $219,240.  Was that wired to you?
4  A.Yes.
5  Q.And that was wired to you from whom?
6  A.That was wired, I believe, from an Attorney
7  Manfred Sternberg.
8  Q.And this account it was wired into belonged to
9  who or to what entity?
10  A.It was account under A. Solar Diamond, LLC.
11  Q.And who had access to that account?
12  A.Only me.
13  ATTORNEY LIGHTMAN:
14  I'm sorry.  Only you, Gary Weiss?
15  THE WITNESS:
16  Only Gary Weiss.
17  BY ATTORNEY ROSS:
18  Q.You testified after the $219,240 wire from Mr.
19  Sternberg's account, you received another
20  transaction, another wire of money related to this
21  transaction.
22  A.Correct.
23  Q.And what date was that?
24  A.That was on February 7th, I believe.
25  Q.And who, what was the source of that?



1 A. That was sent from Attorney Zekaria.
2 Q. And how much money?
3 A. $1,246,960.
4 Q. Okay.
5 In Exhibit GW-8, are there any other money
6 transfers related to the test kits that you procured
7 for Mr. Gross?
8 A. Yeah.  There is another one on February 15 for
9 $130,000.
10 Q. After that?
11 A. And after that, there is another one on February
12 28 for $70,000.  Can we break for five minutes?
13 ATTORNEY ROSS:
14 I have no objection.
15 ---
16 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
17 ---
18 BY ATTORNEY ROSS:
19 Q. A quick follow-up about the bill of lading, Mr.
20 Weiss.
21 THE WITNESS:
22 Are we back on the record?
23 ATTORNEY LIGHTMAN:
24 Yes.  Back on the record.
25 ATTORNEY ROSS:

1 We are.
2 THE WITNESS:
3 Did you ask me, Mr. Lightman, something
4 while were on lunch?
5 ATTORNEY LIGHTMAN:
6 I'll cover that when I get a chance to
7 ask, to talk.
8 THE WITNESS:
9 Okay.
10 BY ATTORNEY ROSS:
11 Q. Did he ask you something?
12 A. Yeah.
13 Q. What did he ask?
14 A. He asked me if when was the last time I was with
15 Sam Gross and Mr. Manfred on a conversation together.
16 Q. Okay.
17 A. I said that I never spoke to Mr. Manfred.  It
18 usually was messages to my email or through Sam
19 Gross.  That was my answer to my memory, based on my
20 memory.
21 Q. Okay.
22 ATTORNEY LIGHTMAN:
23 He said he emailed and messaged, but
24 never spoke directly on the telephone.
25 THE WITNESS:

1 I said I don't remember ever speaking
2 to Mr. Sternberg.
3 BY ATTORNEY ROSS:
4 Q. Okay.
5 But you emailed and ---
6 A. Yes, yes.
7 Q. --- text message?
8 A. Yes.
9 Q. All right.
10 ATTORNEY LIGHTMAN:
11 None of which were produced by your
12 client, by the way, Mr. Ross.
13 ATTORNEY ROSS:
14 All right.
15 We will address that.
16 BY ATTORNEY ROSS:
17 Q. But regarding the bill of lading, when the driver
18 for Available Movers said he needed one to make the
19 delivery, he said you called Mr. Gross?
20 A. That's what I think, yeah.
21 Q. And what did he tell you again?
22 A. He told me soon.  Soon he'll have it.
23 Q. Did he tell you why he didn't already have it
24 like immediately available to send to you?
25 A. Okay.

1 So I told you before, he told me that he had a
2 cancellation of one of the parties and he's trying to
3 transfer it to somebody else.  I don't know what was
4 the conclusion of that, but that was probably what I
5 remember that he told me about, that it's going to be
6 soon.  I said okay, whatever.  You know what to do.
7 I have done my part and as soon as you have it, the
8 better.
9 Q. Did he tell you he had to get the bill of lading
10 from somebody else?
11 A. I don't remember really exact conversation.  I
12 just know that I relayed to him the message, what the
13 driver told me.  At the time, I did not know what
14 really bill of lading is or what kind of document it
15 is.  Today I do know.  And that's what I asked Sam
16 Gross to provide for Available Mover.  After all,
17 it's his delivery.  I just made the arrangements for
18 him.
19 Q. All right.
20 What did you do with the funds we talked about in
21 Exhibit GW-8, funds that were wire transferred from
22 Mr. Sternberg's account and Ms. Zekaria's account?
23 A. You are referring to any particular transaction?
24 Q. Well, that total, I think you said that total is
25 1.6, 1.666 million.



1  Is that right?
2  A. Right.
3  Q. On receiving that money, what did you do with it
4  next?
5  A. I cashed most of it.
6  Q. And when you say you cashed most of it, what do
7  you mean by that?
8  A. I take out, took out cash transactions.
9  Q. So you took cash home from the bank?
10  A. Yeah.
11  Q. Did you pay any portion of that cash you took to
12  Levin and Zadok?
13  A. Well, as I told you before, on February 6th, I
14  finished to pay to Levin and Zadok.  So the answer is
15  no.
16  Q. On February 6th, how did you pay them?
17  A. Well, let me make a correction.  The payment of
18  $219,000 was on February 1st, right.  So I had that
19  money available.  And so this money, the first part
20  probably was going into the payment that I made to
21  Levin and Zadok for the total that I agreed to pay
22  them, which was about $1.8 million.
23  Q. So it's your testimony that you would have paid
24  the $219,240 that you got on the 1st of February 2022
25  to Levin and Zadok?

1  A. Well, I made a comment and I said that probably
2  this money went part payment towards the total
3  payment, yes.
4  Q. What day did you pay them?
5  A. I paid them in two parts.  One part was on,
6  probably on February 4th and one part on February
7  6th.
8  Q. Do you remember how much you paid on each of
9  those days?
10  A. I believe on February 4th, which was a Friday, I
11  think, I paid them $400,000.  And the balance I paid
12  them on January 6th ---.
13  ATTORNEY LIGHTMAN:
14  February 6th.
15  THE WITNESS:
16  I'm sorry, February 6 --- yeah, I'm not
17  sure, but that's what I remember.
18  BY ATTORNEY ROSS:
19  Q. Would you have paid them out of this account
20  reflected in GW-8?
21  A. No.
22  Q. How would you have paid them?
23  A. I paid them mostly with cash and jewelry.  They
24  did not agree to take any other form of payments.
25  Q. You say that your initial deposit to them was a

1  diamond ring?
2  A. A diamond ring, which I had, yeah.
3  Q. Did you get that back after you paid them ---
4  A. Yes.
5  Q. --- cash?  When did you get that back?
6  A. I got it back on Friday of February 4th.
7  Q. Do you remember how much that ring was worth?
8  A. It had an excess of $5,000.
9  Q. When you made the deal with --- when you
10  finalized the deal with Levin and Zadok for how much
11  you were going to pay them and had then finalized the
12  deal with Gross of how much he was going to pay you,
13  how much did you expect to make in profit?
14  A. Well, it's a very simple math.  From the total
15  price, which was 2.1 million, or whatever the invoice
16  was, minus what I paid them, which is 1.8 million.
17  So the exact numbers are on an invoice that --- I
18  would say in excess of about $300,000.  Yeah, that's
19  what I think it is.
20  Q. And what did you actually end up making off of
21  the transaction at the end of the day?
22  A. Well, right now I didn't get yet paid for the
23  balance, which is another almost $200,000.
24  Q. So are you saying Mr. Gross owes you $200,000?
25  A. Yes.

1  Q. As we sit here today, you made about $100,000 off
2  the deal because there's this 200 that's outstanding
3  in a balance owed by Mr. Gross.
4  A. No.  What I said that my purchase of the test
5  kits was a little bit in excess of 1.8 million.  I
6  got paid from Gross, 1.66, 200, $1,066,200.  So the
7  balance is almost $200,000 that Mr. Gross has to pay
8  me.
9  Q. Yeah.  Until he pays you that, you've made about
10  $100,000 where you expected to make $300,000.
11  Is that right?
12  A. Let's make a correction.  Mr. Gross owes me
13  almost $500,000.  I told you I have to get the
14  invoice.  I'll give you an exact number, 2.19,
15  $200,000.  If we have a calculator, I can tell you.
16  I'll get a calculator.  Let me just do it properly
17  with numbers because I don't have the invoices in
18  front of me.  I'll get you the numbers in a minute.
19  Q. You're using the calculator on your smartphone?
20  A. You have a different calculator here?
21  Q. No, I'm just asking, just for the record.
22  A. Yes.
23  Q. I can see that you're using your phone, but I'm
24  just saying ---.
25  A. Yes, calculator.  Right now, it's going to be a



1 calculator.  So okay.
2 We're going to have 365,000 times --- I have to
3 check really how much I had to pay Levin and Zadok.
4 The number is on a receipt that they gave me, and
5 maybe Mr. Lightman will find it before so we get the
6 correct number.  So I don't want to give you just all
7 kind of guesses, you know, without numbers.  I'm sure
8 you guys have it.  So we're going to be exactly for
9 the record.
10 ATTORNEY LIGHTMAN:
11 Let the record reflect, I'm handling
12 handing the witness ---
13 THE WITNESS:
14 Okay.  What is the number there?
15 ATTORNEY LIGHTMAN:
16 --- Gary Weiss 5.
17                    ---
18 (Whereupon, Weiss Deposition Exhibit 5,
19 Invoice of COVID Test Kits, was marked
20 for identification.)
21                    ---
22 THE WITNESS:
23 Okay.
24 So $1,810,660.  Okay.  Okay.
25 Now, I hope I didn't make a mistake

1 here.
2 BY ATTORNEY ROSS:
3 Q. Well, walk us through the math you did.
4 Q. Okay.
5 What I billed Charlton Holding Group, Shlomo
6 Gross was $2,190,000 minus what he paid me is
7 $1,666,200 will leave a balance of $523,800.
8 Q. And that's --- go ahead.
9 A. Yes.  Okay.
10 So that's the balance from Charlton Holding
11 Group.  Okay.  My sale to Charlton Holding Group was
12 billed at $2,190,000 minus what I paid to this
13 gentleman for their merchandise to Levin and Zadok,
14 which totaled $1,810,660.  Will leave a supposedly
15 profit of $379,340.  Is this answering the questions
16 that you asked me?
17 Q. Yes.
18 A. Okay.
19 Q. So as of today, Mr. Gross still owes you
20 $523,800?
21 A. 800, correct.
22 Q. And in this --- strike that.
23 Let's check that when Levin and Zadok brought the
24 truck of COVID tests to the meeting place with
25 Available Movers on that day that you transferred

1 them over from one truck to the other.  Remember that
2 testimony earlier?
3 ATTORNEY LIGHTMAN:
4 February 6th.
5 THE WITNESS:
6 Okay.
7 Yes and no.  They brought the truck not
8 at the final place where Available Movers move picked
9 up the merchandise.  The delivery to me was made on
10 Sunday in the evening, which was February 6th.  The
11 pickup from Available Movers was on February 7th in
12 the morning.
13 BY ATTORNEY ROSS:
14 Q. So you stayed with the truck that night?
15 A. Exactly.
16 Q. And then Available Movers came that morning?
17 A. Yes.
18 Q. They weren't there at the same time as Levin and
19 Zadok?
20 A. Exactly.  They ---.
21 Q. But they came to the same place that Levin and
22 Zadok had dropped the truck off?
23 A. No.  I said I've moved from that place to the
24 Urbanovich straight where ---.
25 Q. You moved the truck Levin and Zadok dropped off?

1 A. I told the truck driver let's move to a place
2 where he can park and another truck can park.
3 Q. Okay.
4 Before Levin and Zadok, how did they --- they
5 sent a truck driver.  They were not there on the 6th?
6 A. On the 6th, they came.  They were in one car.
7 The truck was in another car.  I made the final
8 payment to them.  They left me with the truck and the
9 driver.
10 Q. Before they left, did you take a look at the test
11 kits?
12 A. Yes.
13 Q. How many?
14 A. I don't remember.  Several boxes.  Not kits.
15 Several boxes.
16 Q. So when you say boxes, you mean a box with many
17 kits in each box?
18 A. Yes.
19 Q. Did you open any of the kits?
20 A. The kits themselves?  No.
21 Q. Did you shake them up or did you get --- did you
22 try and get a sense of whether there was a test kit
23 in there, in any of the test kit packages inside the
24 boxes?
25 A. I don't remember what I did.  I just remember



1  that I opened several boxes and it was clear to me
2  that the packaging is, I had COVID-19 test kits.
3  Q. But you didn't know with a certainty that there
4  were test kits in those boxes, in those I-Health test
5  kit boxes because you didn't open any?
6  A. I had certainty, but I didn't open it.
7  Q. How could you have certainty if you didn't open
8  it?
9  A. I just had certainty is ---
10  Q. You trusted ---?
11  A. --- what I believe, yes.
12  Q. Is it fair to say you trusted Levin and Zadok
13  that they were in there?
14  A. Exactly.
15  Q. What was, what's your understanding of what your
16  responsibility was in this transaction?  What were
17  you required to do in exchange for the money?
18  A. Well, I had to deliver to Sam Gross.  That was my
19  agreement, to sell him the test kits.
20  Q. And do you think that you fulfilled that
21  responsibility?
22  A. Absolutely.
23  Q. But you never saw a single test kit outside of
24  its package before you move them on to Mr. Gross or
25  his customers?

1  A. No.
2  Q. What --- I know I keep talking about opening the
3  packages inside the boxes.
4  A. I just have to interrupt you because I didn't
5  finish.
6  Q. Sure.  Sure.
7  A. I'm sorry.  I just told you that all my test was
8  a visual, seeing all those orange and white boxes, I
9  believe.  But I did not open every box.  365,000 test
10  kits, I did not open.  Nor did I open and check if
11  they are really authentic or anything further.  But I
12  tested --- I mean, I looked at several boxes.
13  Q. Do you know how many were supposed to be in each
14  box?  How many test kits were in each box?
15  A. I think that each box contained like two test
16  kits.
17  Q. I mean ---.
18  A. And there were 365,000 of them in all these
19  boxes.
20  Okay?  I had 365 boxes with approximately 1,000
21  test kits in each one.
22  Q. Do you know how many other transactions Levin and
23  Zadok did in COVID-19 tests?
24  A. No, not at all.
25  Q. Did you do any kind of due diligence on them to

1  make sure they could get what they said they could
2  get?
3  A. What I told you unambiguously that I went to the
4  truck to see the merchandise on the next block on
5  that day that I met them at Pret.  So I went to see
6  the, not the truck.  I went to see the merchandise.
7  And I opened there a few boxes and it looked what it
8  should have been and looked like COVID-19 test kits.
9  Q. Did you know when the product was expected to be
10  delivered to The Safety House?
11  A. No.
12  Q. Mr. Gross never told you I've got ---?
13  A. I don't know if we discussed anything.
14  Q. Let me just --- I'm sorry.  Just for the record,
15  let me finish the question.
16  A. Sure.  I'm sorry.
17  Q. And I know where you're going.  Mr. Gross never
18  told you I need this many test kits.  I need you to
19  help me arrange the delivery to The Safety House,
20  because they're expecting to get them on this
21  particular date?
22  A. No, absolutely nothing.
23  Q. Did he give you a date for any of the customers
24  where they were expecting delivery ---
25  A. No.

1  Q. --- of those kits?  What was, what is your
2  understanding of Mr. Sternberg's responsibility here?
3  A. Shlomo Gross told me that that's his lawyer and
4  his lawyer has the money in escrow and the money
5  would become coming from Mr. Sternberg, which it did.
6  Q. So did Mr. Gross pay you any money that didn't
7  come through Mr. Sternberg?
8  A. No.
9  Q. Mr. Sternberg wasn't your lawyer.
10  Right?
11  A. No.
12  Q. And as far as you know, he wasn't Mr. Scully's
13  lawyer?
14  A. No, not as far as I know.  Mr. Scully told me
15  that it's not his lawyer.  And you can see in his
16  grievance to the Texas Bar, he marked that Mr.
17  Sternberg is not his lawyer.  So that's how I know
18  that for sure it's not his lawyer.
19  Q. Did Levin and Zadok originally rejected $5 per
20  test kit as too low?
21  A. I don't remember really the back and forth
22  negotiations.  I know that --- I think my first offer
23  was $4.  I was trying to make a little bit more
24  profit and we agreed on $4.95, but I don't remember
25  the back and forth really words.  So I cannot really



1  answer you exactly about this question.
2  Q.What was the original date that you intended to
3  have the product expected by The Safety House to get
4  delivered to them?
5  A.Okay.
6  So your question is a little bit not relevant to
7  the happenings.  I was ready at that date because the
8  merchandise was on the truck.  If somebody would come
9  there with the money to 48th Street, that's where I
10  saw the test kits there.  I would have made the deal
11  there.  So I was waiting for a deposit which arrived
12  on February 1st for $219,000.  And I asked Shlomo
13  Gross when will the balance be.  He said in several
14  days.  You have to make the arrangements for me to,
15  with the carriers because I cannot do it.  And then
16  when you are ready, will be made balance payment.
17  And I looked for a carrier and I think I scheduled
18  it.  The first available date with Available Movers
19  was February 7.  So I understood that he would make
20  the arrangements to have the money by then.
21  Consequently, I know that Mr. Sternberg wired the
22  money on Friday to Zekaria.  From the transcript
23  still, now we are two years after that.  So I know
24  many of the facts.  And Ms. Attorney Zekaria had the
25  money to pay me on February 4th.  It was in her

1  escrow account.  But we have made the arrangements
2  already for the pickup of the merchandise by
3  Available Movers for Monday, February 7.  And that's
4  when the next payment came.
5  Q.And so would you, did you anticipate before this
6  bill of lading problem arose, did you anticipate that
7  the product would be delivered to The Safety House on
8  February 7th?
9  A.Cannot be.  I'll explain you why.  I did not
10  anticipate delivery because under agreement, when
11  Available Movers send me the receipt each time that I
12  made a deposit, they also send me their conditions
13  and all the details about their policies, which in
14  some place says it might take 14 days for delivery.
15  So I did not think about delivery of February 7.  I
16  was thinking about giving it to the carrier and they
17  will take it and however days.  My impression was
18  that it will take three to five days for delivery.
19  That was my impression.
20  Q.But their agreement --- go ahead.
21  A.But if you look in their agreement, and they have
22  a lot of details at the end.  You know, you have to
23  read the little print.
24  Q.Did you ever tell Mr. Gross a date when he should
25  expect it would be delivered ---

1  A.Never.
2  Q.--- to The Safety House?
3  A.No.
4  Q.He never asked you for a date ---
5  A.No.
6  Q.--- when should I tell Mr. Scully this will
7  arrive?
8  A.No.  He never told me when delivery has to be
9  made by, you know.
10  Q.Did anybody ever tell you?  Did Ms. ---?
11  A.No.
12  Q.Did Mr. Zekaria ever tell you?
13  A.No.  We never discussed the date of delivery.  We
14  discussed the date where I'm going to place it on the
15  carrier.  From there, I go to my way.  That's all I
16  know what the deal should have been done.  Nothing
17  else.  Once I walk away from putting it on a truck,
18  that's what Mr. Gross asked me.  I don't care anymore
19  about this deal.  That was my discussions with Sam
20  Gross and my understanding what was expected of me.
21  Q.Aside from GW-5 that Mr. Lightman passed to you a
22  few minutes ago, do you have any other records of the
23  payment you made to Levin and Zadok for the test
24  kits?
25  A.No.

1  Q.Do you have any withdrawal records from the bank
2  account that aren't reflected in GW-8 or any of the
3  documents you've provided to us so far in the case?
4  A.No.
5  Q.But there would be a record at the bank of you
6  withdrawing a particular amount of cash?
7  A.Which amount are you now referring?
8  Q.Well, you said you paid Levin and Zadok in cash
9  and merchandise.
10  A.But I'm telling you that's not the chronicles of
11  what happened.  I paid them before I got paid except
12  the $219,000, which I got on February 1.  So I did
13  not make any withdrawals towards this sale.
14  Q.How much cash do you have at your home right now,
15  if you can estimate?
16  A.Maybe $18,000.
17  Q.Did you get the cash to pay Levin and Zadok,
18  aside from the $219, is that cash that you got from
19  your home that day on the 6th to pay them before they
20  ---?
21  A.No.
22  Q.All right.
23  Walk me through it.
24  A.Walk you through it?  It's cash that I had.
25  Q.But it wasn't at your home.



1  Is that right or did I misunderstand?
2  A. You have to ask me more specifically because I
3  don't understand your question.
4  Q. Sure.  When you --- you paid Levin and Zadok on
5  February 6th?
6  A. Yes.
7  Q. 219 of that came --- well, strike that.
8  You paid them on February 6th where did you get
9  the cash you paid them on February 6th?
10  A. It's money that I had.
11  Q. It's money you had where?
12  A. In my home.
13  Q. And what was the total cash that you paid them
14  from your home?
15  A. I paid them total cash of $400,000.
16  Q. That is the total that came from your home?
17  A. Yes.
18  Q. And then I know you said you paid them the
19  balance on, I think the 8th.
20  ATTORNEY LIGHTMAN:
21  7th.
22  ATTORNEY ROSS:
23  The 7th.
24  THE WITNESS:
25  No, I said on the 6th.

1  ATTORNEY LIGHTMAN:
2  On the 6th.  Excuse me.
3  BY ATTORNEY ROSS:
4  Q. No, I'm sorry.  You said you paid the $400 on the
5  4th.
6  A. Correct.
7  Q. And then the balance on the 6th.  So if you paid
8  them $400,000 in cash from your home, plus --- well,
9  is that all you gave them on the 4th was the $400,000
10  in cash?
11  A. Correct.
12  Q. And then on the 6th, you would have paid them in
13  more cash?
14  A. No, in jewelry.
15  Q. Just in jewelry?
16  A. Just in jewelry.
17  Q. So they took the balance of that in jewelry.  Do
18  you remember what jewelry you gave them?
19  A. Yes.
20  Q. What was that?
21  A. It was necklaces and bracelets.  It was what we
22  call today Cuban type necklaces and Cuban type
23  bracelets paved with diamonds.
24  Q. Did you give them any appraisal documentation?
25  A. No.

1  Q. Did they have any appraisal performed as far as
2  you know on what you gave them to make sure that it
3  was worth the balance of what they were owed?
4  A. Well, there were jewelers for the last 40 years
5  and they examined the jewelry.
6  Q. Okay.
7  So they were satisfied that ---
8  A. They were satisfied.  Exactly.
9  Q. --- it was worth the balance?
10  A. Yeah.
11  Q. Is it fair to say that you wouldn't have taken
12  Gross's money if you weren't certain that you could
13  deliver?
14  A. I don't understand the question.
15  Q. Is it fair to say that you wouldn't have accepted
16  money from Mr. Gross for the test kits if you weren't
17  certain that you could deliver on what you told him
18  you were going to sell him for that money?
19  A. I don't understand the question.
20  Q. If you --- you accepted this money from Mr.
21  Gross, right, for test kits?
22  A. Correct.
23  Q. Does that mean that you were certain that you
24  could provide the test kits since you accepted the
25  money?

1  A. Of course.
2  Q. Did you know that at least some of that money was
3  The Safety House's money?
4  A. I don't know from where Attorney Zekaria got the
5  money to pay me.  I know that she paid, but I don't
6  know which funds she used.  To my understanding, Ms.
7  Zekaria had a lot more money in her escrow account
8  than what she paid me.  So I don't know what money
9  she used, whose money it was.  That, I don't know.  I
10  cannot tell you.
11  Q. At some point, you accepted money before you had
12  the product in hand.
13  Right?
14  A. Correct.
15  Q. When's the first time you opened one of the test
16  kits to confirm that there was really a test, two
17  tests in the test kit?
18  A. January 25th.
19  Q. January what?  I'm sorry.
20  A. 25th, I think.
21  Q. 2023?
22  A. No, January 25th of 2022.
23  Q. 2022?
24  A. Correct.
25  Q. When's the first time you opened one of the



1  packages, one of the test kits that Available Movers
2  had eventually placed in storage while they waited
3  for the bill of lading?
4  A.The test kits that were on the truck on January
5  25th are the first time I open the boxes to look at
6  the test kits.
7  Q.And you told Mr. Gross multiple times that you'd
8  be able to get the product delivered.
9  Right?
10  A.Absolutely.
11  Q.Did you tell --- who else did you tell you'd be
12  able to get this delivered?  Did you tell Ms. Zekaria
13  at some point you'd be able to get it delivered?
14  A.Ms. Zekaria came on the scene on about February
15  3rd or 4th, which was in a sudden condition to
16  continuation of the deal.  And she was mentioned to
17  me by Gross and Sternberg that the balance of the
18  money that will be paid for me will come from her
19  escrow account after it will be verified that the
20  merchandise is on the track of the carrier en route
21  to the final recipients.
22  Q.Do you ever communicate with Zekaria through text
23  messages?
24  A.Yeah.
25  Q.And did you tell Manfred Sternberg, whether by

1  email or text message, that don't worry, the product
2  will be delivered?  Something to that effect?
3  A.Probably, yes.  I sent messages to both Sam Gross
4  and Sternberg.
5  Q.Do you remember the, remember text messaging, Mr.
6  Sternberg on February 28th?
7  A.No.
8  ATTORNEY ROSS:
9  Text messages.  They might be one of
10  the items.
11  ATTORNEY LIGHTMAN:
12  This is my copy.
13  ATTORNEY ROSS:
14  No.  Tell me if you have a copy.  That
15  might be among the items we need to make a copy of
16  for you.
17  ATTORNEY LIGHTMAN:
18  You're going to use these as depo
19  exhibits?
20  ATTORNEY ROSS:
21  Yeah.
22  ATTORNEY LIGHTMAN:
23  And you didn't make copies of them in
24  advance?  You have to make copies.
25  ATTORNEY ROSS:

1  No, I can make copies now.  I don't
2  know if you have these or not.
3  ATTORNEY LIGHTMAN:
4  I don't.
5  ATTORNEY ROSS:
6  That's what I'm asking.
7  ATTORNEY LIGHTMAN:
8  I don't.  You never produced these.
9  ATTORNEY ROSS:
10  All right.
11  Let me get a copy of these.
12  ATTORNEY LIGHTMAN:
13  You want me to call or are you going to
14  get a protective order?
15  ATTORNEY ROSS:
16  A what?  Oh, you want me to call?  I
17  think I'll call.
18  ATTORNEY LIGHTMAN:
19  I got to tell you --- we're on the
20  record.  I have to tell you, Mr. Ross, I am very
21  disappointed to be seeing a bunch of text messages
22  between Gary Weiss and Manfred Sternberg for the
23  first time today, July 17, 16, 2024, three days
24  before the discovery deadline, despite numerous
25  document requests.

1  While you're getting that, can we put a
2  hold and let me ask a couple minutes' worth of
3  questions to follow up some of your stuff, so you can
4  get copies?
5  ATTORNEY ROSS:
6  I'm just going to go get them now.  If
7  you --- let me go get these and you can do ---
8  ATTORNEY LIGHTMAN:
9  I can ask some questions?
10  ATTORNEY ROSS:
11  --- 30 minutes or something.
12  ATTORNEY LIGHTMAN:
13  Okay, great.
14  ATTORNEY ROSS:
15  You gotta let me come back, though.  I
16  don't want to miss it.  I don't want to miss the
17  show.  I'm just going to run these off a copier.
18  ATTORNEY LIGHTMAN:
19  Well, don't take a break right now.
20  Have her come in and I'll call her to come in.  Hold
21  on.
22  ATTORNEY ROSS:
23  No, no, no.  Just tell her ---.
24  ATTORNEY LIGHTMAN:
25  Are there any other documents you're



1  going to use as deposition exhibits that we need
2  copied?
3  ATTORNEY ROSS:
4  Not that I plan to use.
5  THE WITNESS:
6  Can I see those?
7  ATTORNEY LIGHTMAN:
8  Yeah, as soon as we get copies.
9  ATTORNEY ROSS:
10  Yeah.  We're going to get you your own
11  copy.
12  THE WITNESS:
13  Okay.  Good.
14  ATTORNEY LIGHTMAN:
15  Can I ask some follow up questions,
16  please?
17  ATTORNEY ROSS:
18  You can ask.  Yeah, yeah.
19  ATTORNEY LIGHTMAN:
20  Thank you.
21  ATTORNEY ROSS:
22  But I got stuff ---.
23  ATTORNEY LIGHTMAN:
24  I know you're going to get back.  We're
25  not waiving your rights.

1                ---
2          CROSS EXAMINATION
3                ---
4  BY ATTORNEY LIGHTMAN:
5  Q.Good afternoon, Mr. Weiss.  Let me see if I get
6  this right.  On January 25th, Sam Gross calls you and
7  says, I've got four and a half million dollars in my
8  attorney's escrow account.  I need to buy I-COVID
9  test kits.
10  A.No.
11  Q.When did he first tell you that?
12  A.Your question was if Sam Gross asked me on
13  January 25th something about four and a half million
14  dollars?  No, I said no.  I called Sam Gross on
15  January 25th and I asked him are you still in this
16  business?  I have a business here that I can purchase
17  a lot of COVID test kits.
18  Q.And that's after the people from Mask and Eldiven
19  approached you.
20  Right?
21  A.Correct.
22  Q.Okay.
23  So you're sitting in a bar, a coffee shop rather.
24  A.Coffee shop.
25  Q.And out of the blue, these two guys come up to

1  you and say, are you interested in buying any test
2  kits?
3  A.Out of the blue?  I don't know what does it mean,
4  out of the blue?
5  Q.How did it come up?
6  A.I never said out of the blue.
7  Q.Well, how did it come up?
8  A.We meet.  It's not out of the blue.
9  Q.Okay.
10  You meet and you're talking and they happen to
11  say to you during your conversation on January 25th,
12  by the way, we have a bunch of test kits we can sell
13  you?
14  A.No.
15  Q.Well, how did the subject come up?
16  A.No.  We said hello and we spoke.  How are you?
17  What are you doing?  How are you doing?  Well, we
18  have these test kits for sale.  That's what we are
19  doing right now.  Do you know anybody that can be
20  interested?  I said I think I do.  Let me make a
21  phone call or something like that.  It wasn't out of
22  the blue.
23  Q.Okay.
24  So when they mentioned that at this meeting, you
25  say, excuse me, you made a phone call to Sam Gross?

1  A.I don't remember.  It was at the meeting or --- I
2  don't remember exactly the timeline of that.
3  Q.You told these guys I want to see the test kits
4  and you saw them later that day.
5  Right?
6  A.After I spoke to Sam Gross.
7  Q.Okay.
8  So you had this conversation with the Mask and
9  Eldiven people, they tell you have test kits.  You
10  call Sam Gross.  Sam Gross says I need to buy test
11  kits and they tell you --- you tell them I'm
12  interested.  I want to see the test kits.
13  Right?
14  A.Correct.
15  Q.And then they bring a truck to you with some test
16  kits.
17  Right?
18  A.Yeah.  They told me to wait and an hour or two.
19  The truck will be here.
20  Q.Okay.
21  A.And when the truck was there, they called me over
22  to the next block, which is 48th Street, where the
23  truck was.
24  Q.So you sat in the coffee shop for two hours while
25  the truck came?



1  A. No, no.  I sat in the coffee shop maybe 10, 15
2  minutes.  I did some things.  I came back to the
3  coffee shop.  They were still waiting there.  They
4  told me soon it's going to come.  And eventually it
5  came.  I don't remember how long it took, between an
6  hour or two for the truck to get there.
7  Q. Okay.
8  This Gary Weiss 5 is the only --- you testified
9  earlier and you repeated your testimony today, this
10  is the only document you have to evidence that your
11  purchase of this 365,790 COVID-19 test kits.
12  Correct?
13  A. I didn't say this is an evidence.  I think that
14  you asked me if I have a receipt.  I said I answered
15  when you asked me, I don't remember where last year,
16  I told you I have somewhere a piece of paper like
17  that.  I will look for it because I believe I do have
18  it.  And then I presented you with a copy of that.
19  Q. This GW-5 is the only piece of paper you have
20  that evidences your claim purchase of these test
21  kits.
22  Correct?
23  A. What do you mean by the only?
24  Q. You don't have --- like, for example, you said
25  you gave him a diamond ring as a deposit.

1  Right?
2  A. Correct.
3  Q. Did you get a receipt for the diamond ring ---
4  A. No.
5  Q. of $5,000?
6  A. No.
7  Q. No.  You testified at your first deposition that
8  the only way you could get in touch with the two
9  people that sold you these test kits was to call a
10  cell phone number.
11  Correct?
12  A. No.
13  Q. How would you get in touch with them?
14  A. No.
15  Q. Oh, I'm sorry.  Hope to catch them ---.
16  A. I never said that.
17  Q. Excuse me.
18  A. Never said that.
19  Q. Other than hoping to see them in the coffee shop,
20  how else would you be able to get in touch with the
21  two people that you claim sold you the test kits?
22  A. What?  I did meet them just about every day in
23  the same coffee shop.
24  Q. So other than meeting them at the coffee shop,
25  how could you get in touch with them?

1  A. I told you.  Every day I would meet them in the
2  coffee shop.
3  Q. Do you have an address for them other than the
4  coffee shop?
5  A. What do you mean by an address?
6  Q. Do you have an address where either one of these
7  two people live or work out of?
8  A. What?  You have here an address.
9  Q. You're pointing to Gary Weiss 5.  The address 2 -
10  --.
11  A. But our business ---.
12  Q. 2 West 47th Street, ---
13  A. Yes.
14  Q. --- Room 105?
15  A. Yeah, but our business is conducted in Pret
16  coffee shop every day.
17  Q. Other than Pret coffee shop and other than this 2
18  West 47 Street, Room 105, you have no other address
19  to be able to get in touch with these two
20  individuals.
21  Correct?
22  A. The only address that I have is Pret coffee shop.
23  Q. Other than the coffee shop, other than the
24  address shown on Gary Weiss 5, you have no other
25  address for either of these two people.

1  Correct?
2  A. No.
3  Q. No, that's correct?
4  A. No means no any address.
5  Q. No other address.  Okay.
6  And other than this phone number, this 201-575-
7  0193 number, you have no other phone number for
8  either of these two individuals.
9  Correct?
10  A. This phone number is what they wrote here.
11  Q. When you needed to get in touch with either of
12  these two people, you called this phone number.
13  Correct?
14  A. No.  I just said I would meet them every day at
15  the coffee shop.  We said every day between 12:00 and
16  2:00, we'll be here.
17  Q. So if I went to this coffee shop tomorrow between
18  12:00 and 2:00, these two individuals would be there?
19  A. Tomorrow?
20  Q. Yes.
21  A. No.  Only in 2022.
22  Q. They're not there anymore.
23  Right?
24  A. They're not there.
25  Q. Okay.



1   A. You can go and take a look for them.
2   Q. Okay.
3   Did you ever visit this address shown on GW-5?
4   A. Which one?
5   Q. This 2 West 47th Street, Room 105, New York, New
6   York address?
7   A. No, never.
8   Q. Do you know what it is?
9   A. What?
10  Q. Do you know what it is?
11  A. The address?
12  Q. Yeah.
13  A. What?  It's in 2 West 47th Street.
14  Q. Is it a building?  Is it a vacant building?  Is
15  it an occupied building?  Is it a home?
16  A. It's not a building anymore.
17  ATTORNEY LIGHTMAN:
18  Right.  Exactly.  Let's mark this as
19  Deposition or Gary Weiss 21, please.
20          ---
21  (Whereupon, Weiss Deposition Exhibit
22  21, Envelop of Mask and Eldiven Letter,
23  was marked for identification.)
24          ---
25  ATTORNEY LIGHTMAN:

1   Let's mark this as Gary Weiss 22,
2   please.
3          ---
4   (Whereupon, Weiss Deposition Exhibit
5   22, Letter from Attorney Lightman, was
6   marked for identification.)
7          ---
8   ATTORNEY LIGHTMAN:
9   I will represent to you --- here can
10  you hand this to him.
11  BY ATTORNEY LIGHTMAN:
12  Q. I will represent to you, Mr. Weiss, that Gary
13  Weiss 22, 21 is the actual original letter that I
14  sent to Mask and Eldiven, our current occupant, 2
15  West 47th Street, Room 1005, New York, New York,
16  10036, after you produced this one page sale receipt
17  that you claim evidences your purchase of the test
18  kits.  I'll represent that to you.  Do you see what
19  the yellow sticker that the post office put on here?
20  A. Yeah.
21  Q. It says return to sender, vacant, unable to
22  forward.  Do you see that?
23  A. Of course.
24  Q. And if you look at Gary Weiss 22, the letter I
25  wrote that's in that envelope, if you open it, it

1   says whoever's at Room --- that's dated 9/26/23.
2   Whoever's at Room 1005 and gets this letter, please
3   call me.  It is important that I speak with you.
4   Thanks, Gary Lightman.  And my cell phone number.
5   You see that?
6   A. Okay.
7   Q. I will represent to you that ---.
8   A. Where is the letter, inside?
9   Q. Yeah.  Don't open it.  I'm going to represent you
10  --- I'm going to open it at trial.  I will represent
11  to you that when you open that letter, when we open
12  in front of a jury, Gary Weiss 22, is going to be
13  inside that letter saying whoever gets this letter,
14  call me.  But no one ever called me.
15  A. So.
16  Q. So isn't it true that no one ever called me
17  because that building's been vacant for years?
18  A. What does it mean?
19  Q. When this receipt dated February 6th, 2022 was
20  given to you, that building was vacant.
21  A. I don't know what it was.  I never went to check.
22  Q. You never went to check.
23  Okay.  When was this piece of paper given to you?
24  A. This was given to me on February 6th.
25  Q. Sunday, February 6th?

1   A. Correct.
2   Q. So in the coffee shop, you gave him a diamond
3   ring worth in excess of $5,000 as a deposit.
4   Correct?
5   A. Yes.
6   Q. You never gave that --- they never, you never
7   asked for receipt.
8   Right?
9   A. No.
10  Q. You never gave them a receipt.
11  Right?
12  A. No.
13  Q. Okay.
14  February 4th, Friday before you took delivery,
15  you said you gave them $400,000 in cash.
16  A. Correct.
17  Q. You didn't have the test kits at that time.
18  Correct?
19  A. What do you mean, in my pocket?
20  Q. The test kits came to you two days later.
21  Right?
22  A. Correct.
23  Q. You claim you handed these guys $400,000 in cash.
24   Did you get a receipt for that $400,000?
25  A. If I find it, I'll give it to you.



1   Q.Do --- you only produce this one piece of paper.
2   Correct?  Gary Weiss 5.
3   Right?
4   A.Yeah, yeah.
5   Q.You haven't produced a receipt for the $400,000
6   in cash that today you claimed you handed them on
7   February 4th.
8   Correct?
9   A.Correct.
10  Q.You didn't ask for a receipt.
11  Correct?
12  A.No.
13  Q.When you gave them the diamond ring, you didn't
14  take a picture of the diamond ring that you gave them
15  as collateral.
16  Correct?
17  A.No.
18  Q.You didn't ask for a receipt.
19  Correct?
20  A.Correct.
21  Q.You claim they delivered you 365,790 I-COVID test
22  kits.
23  Correct?
24  A.Correct.
25  Q.And that was on Sunday, February 6th.

1   Right?
2   A.Correct.
3   Q.When they brought the test kits down, was there
4   anything else in the truck besides these test kits?
5   A.They had some folded covers that you use to pad
6   things.
7   Q.So they had some pads to cover this stuff.
8   Right?
9   A.No.
10  Q.They had some pads?
11  A.They had some pads.
12  Q.Anything else?
13  A.I don't think so.
14  Q.Okay.
15  And then you claim that you slept with the test
16  kits --- oh, I'm sorry.  When they delivered these
17  test kits, you gave them the balance of the $1.8
18  million in cash, in jewelry.
19  Right?
20  A.On February 6th.
21  Q.February 6th.  So you gave him a total of
22  $400,000 in cash that Friday, February 4th and you
23  claim you gave $1,400,000 in jewelry.
24  Right?
25  A.Correct.

1   Q.You didn't take any pictures of the jewelry that
2   you delivered to them.
3   Right?
4   A.No.
5   Q.You didn't ask them for a receipt for the
6   jewelry.
7   Correct?
8   A.I didn't give them any jewelry till February
9   6th ---
10  Q.Right.
11  A.--- where they left all the merchandise.
12  Q.When you gave them the jewelry of $1,400,000 ---
13  A.Yes.
14  Q.--- you didn't ask for receipt for that.
15  Correct?
16  A.They gave me a receipt.
17  Q.They gave you the one page GW-5.
18  Correct?
19  A.Correct, yes.
20  Q.Did you make a list of the jewelry that you gave
21  to them?
22  A.Yeah.
23  Q.Where's that list?  You've been served document
24  requests and you haven't produced that list.
25  Correct?

1   A.Correct.
2   Q.Where's that list?
3   A.I don't think I kept it.
4   Q.You don't think you kept it.
5   Okay.  And you didn't give them an appraisal.
6   Right?
7   A.No, I didn't.
8   Q.Okay.
9   So then you just handed, what were they,
10  gemstones?
11  A.I told you there were necklaces and bracelets
12  paved with diamonds.  I want to make for you
13  clarification so you have more details.  On the
14  Friday of February 4th, they came to get further,
15  beside the diamond ring, which they had before, they
16  came to get another deposit.  I told them they're
17  going to get $400,000 in cash.  And they asked me how
18  will the balance be paid?  I said it's going to be
19  paid with jewelry.  And they said okay.  We want to
20  see it.  I said okay, when you come with the
21  merchandise.  They came with the truck.  I met them.
22  I gave them the money.  They examined the jewelry.
23  They chose these pieces of jewelry which amounted to
24  the balance of the 1.8 million and change that I had
25  to pay them, 1.8 million.  And I put it in a bag.



1  They sealed it up, which we call like a cachet.  That
2  means it's closed.  And this is the jewelry that they
3  agreed to get from me as the balance when they came,
4  when they come on February 6th, on Sunday.
5  Q.You claim you showed them the diamonds on Friday?
6  A.Yeah.  They chose the jewelry already and I
7  closed it up for them.  And that's what they got on
8  February 6th when they came to pick, up the balance
9  to pick up the balance of their money and to deliver
10  me the test kits.
11  Q.When you say you they chose the jewelry, where
12  were they?  Where was this jewelry that you displayed
13  for them to choose from?
14  A.I brought them to take a look.
15  Q.You brought $1,400,000 worth of jewelry to the
16  coffee shop?
17  A.No.
18  Q.Where did you bring the jewelry?  Where did you
19  meet ---?
20  A.I met them in Elizabeth.
21  Q.At your house?
22  A.Not in my house.
23  Q.Where at in Elizabeth?
24  A.Next to my house, there is a little park.  It's
25  called Mattano Park.  That's where I met them to show

1  them the jewelry.  And they chose from it to make up
2  the balance between the $400,000 and the total
3  payment that I had to give them, which is $1,800 ---.
4  Q.1.4, right.
5  A.$1,810,000.
6  Q.How much jewelry did you carry to this park in
7  Elizabeth?
8  A.I carried those necklaces and bracelets and some
9  other rings and bracelets, but they were only
10  interested in this particular type of jewelry and
11  that was the deal consummated.
12  Q.How much in jewelry did you bring with you to the
13  park for them to choose the $1,400,000 in jewelry
14  that they agreed to take?
15  A.Close to $2,000,000.
16  Q.Close to two.  So did you have an armed bodyguard
17  there?
18  A.No.
19  Q.How did you --- was it in a suitcase?  Did you
20  carry it your pocket?
21  A.No, a little bag.
22  Q.A little bag of jewelry?
23  A.Yeah.
24  Q.And you laid it out on a park bench?
25  A.No.

1  Q.What did you do?  You got there.  The two guys
2  were there.  What did you do?
3  A.They came to my truck, they sat down and they
4  chose the pieces.
5  Q.Inside your truck?
6  A.Inside my truck.
7  Q.Were they sitting in the front or the back?
8  A.We were sitting --- they were sitting in the
9  front.  I mean, they were sitting in the back.  I was
10  sitting in the front.
11  Q.Okay.
12  So you handed in the jewelry, they looked through
13  it all.
14  A.Exactly.
15  Q.You didn't take any pictures of anything.
16  Right?
17  A.No.
18  Q.And they said, here's the $1.4 million worth of
19  jewelry that we want.
20  Right?
21  A.Yeah.
22  Q.You put it into what you call a cachet?
23  A.In a bag.
24  Q.And you sealed it up?
25  A.They sealed it up and signed on it.

1  Q.Okay.
2  And when you met them, as you claim, on February
3  6th, you produced this bag right there.  Did they
4  open it ---?
5  A.Their signature.
6  Q.Did they --?
7  A.They tore up the seal.
8  Q.They checked it?
9  A.They checked again.
10  Q.And they drove off?
11  A.We shook hands.
12  Q.And they drove off.
13  A.They told me here's the truck.
14  Q.Okay.
15  A.Thank you.  And they drove off.
16  Q.The truck only had the test kits and some pads.
17  Were there anything else in the truck?
18  A.No, I don't think so.
19  Q.Then why did you sleep with the truck?  Why'd you
20  sleep next to the truck?
21  A.What do you mean?  Where would I leave the truck
22  with the driver?  I don't know then?  I don't know
23  the driver.
24  Q.You were concerned about protecting the assets
25  you claim you ---.



1   A.I was not concerned.
2   Q.Well, you didn't go home.
3   Right?
4   A.I did not go home, but I wasn't concerned.
5   Q.But you stayed there.  Why did you stay there
6   overnight with the truck?
7   A.Why not?
8   Q.Why not?  You could go home and sleep in a nice,
9   comfortable bed instead ---.
10  A.My truck is very comfortable.
11  Q.Okay.
12  So you just slept there just because.
13  Right?
14  A.Yeah, just because I wanted to.
15  Q.Okay.
16  So the next day, you moved the truck.  You and
17  the driver went from Elizabeth to Linden, New Jersey.
18  Right?
19  A.Correct.
20  Q.And then an Available Movers truck showed up.
21  Right?
22  A.Correct.
23  Q.It was an empty truck.
24  Right?
25  A.Correct.

1   Q.There were three people there.
2   Right?
3   A.Correct.
4   Q.There was nothing in the truck other than the box
5   truck to put the stuff in.
6   Right?
7   A.Correct.
8   Q.They backed it up.
9   Right?
10  A.Correct.
11  Q.And these three men, you claim, took all this
12  jewel, all this merchandise from the M&E truck into
13  the Available Movers truck?
14  A.365 boxes.
15  Q.Okay.
16  How did they do that?
17  A.They transfer a box from here to there.
18  Q.These boxes are bubble wrapped on pallets.  How
19  did they physically do that without a hand truck or
20  without a ---?
21  A.Hold on.  Don't put words in my mouth.
22  Q.I'm asking a question.  How did they do that?
23  A.I didn't say pallets.  There's no pallets
24  involved.  So please don't say pallets.  I never said
25  the word pallets.

1   Q.So there were never any pallets involved.  They
2   were just loose boxes, not bubble wrapped or
3   anything?
4   A.I don't know what you are referring to.
5   Q.How were these boxes stored on the M&E truck when
6   you took delivery?  Were they loose boxes?
7   A.What do you mean by loose boxes?
8   Q.When you get a delivery of hundreds of thousands
9   of boxes, they're usually bubble wrapped on pallets.
10  This is not how they were when you took delivery?
11  A.No.
12  Q.How were they when you took delivery?
13  A.They were in this size box each, 365 boxes of
14  them.
15  Q.Okay.
16  A.Inside were packed the test kits.  I never
17  mentioned the word bubble.
18  Q.Okay.
19  They weren't bubble wrap.  They weren't on
20  pallets.  They were just loose boxes totaling 365,000
21  test kits.
22  Right?
23  A.Not loose.  365 boxes and about 1,000 in each
24  box.
25  Q.Did you count to make sure that what M&E gave you

1   was 365,000?
2   A.Yes.
3   Q.You counted all of the boxes?
4   A.Yes.
5   Q.How did you do that?
6   A.Well, there were so many boxes across in the
7   truck.
8   Right?  I opened several boxes.  There were about
9   1000 or 990 in each one of those boxes and just to
10  make things ---.
11  Q.How many were in a box?  How many of the test
12  kits were in a box?
13  A.I believe 990 or 1,000.  Some boxes had a
14  different number on them, about a thousand.
15  Q.You're saying that each box contained 990 boxes
16  of test kits?
17  A.990, 1,000, yeah.
18  Q.Okay.
19  And you, how did you verify that you got 365,000
20  boxes?
21  A.Do you have the picture I sent you with the
22  truck?
23  Q.Just how did you verify that there were 365,970
24  boxes of I-COVID test kits?
25  A.I'm telling you how.  Each row, each row had



1   about six or seven across and about six or seven
2   height.  So each row was about 40 or something like
3   this where about like ten rows or nine rows going
4   into the truck, which made 365 boxes.  Each box
5   contained about a 1,000 test kits.  Some a little bit
6   less than 1,000 and some a little bit more.
7   Q.Other than the one picture that you produced,
8   where are all these other pictures you said you took?
9   A.I took.  I sent to Zekaria several pictures.
10  Q.You only produced one picture for us, a picture
11  of a truck with something hanging over the license
12  plate.  So we couldn't even figure it out.
13  A.You want more pictures?  I can give you more
14  pictures.
15  Q.I've asked you.  The time to give them is in
16  response to the document request, not three days ---.
17  A.I gave you several pictures to my knowledge.  If
18  not, I'm sorry.  I'll give you more pictures.
19  Q.Is there any?
20  A.What?
21  Q.You said that you then made arrangements ---.
22  A.I will give you more pictures, Mr. Lightman.  No
23  problem.  I have more pictures than one.
24  Q.Yeah, but you haven't produced any and discovery
25  ends in three days.

1   A.I don't remember what I produced.
2   Q.Let me continue.
3   A.I produced you at least one.
4   Q.Let me continue this.  You claimed, in response
5   to questions by Mr. Ross, that you felt your
6   responsibility was to deliver the test kits to the
7   buyers from Sam Gross.
8   Correct?  My responsibility was to deliver the
9   test kits and I fulfilled my responsibility.
10  Correct?  That's what you testified to this
11  morning.
12  Right?
13  A.Probably.
14  Q.But you never finished your story for Mr. Ross
15  after you made --- you said you made arrangements
16  with Sam Gross to deliver the test kits to his
17  customers.
18  Right?
19  A.Correct.
20  Q.A guy from Available Movers starts up the truck
21  and then realizes he doesn't have the bills of
22  lading.
23  Right?
24  A.No.
25  Q.No, that's right?

1   A.No, not true.
2   Q.All right.
3   So he went down to the end of the block and said
4   I need bills of lading.
5   Right?
6   A.Not true.
7   Q.All right.
8   Tell me what --- how did the bills of lading
9   issue come up?
10  A.Okay.
11  After all the 365 boxes were loaded, I said
12  goodbye to them.
13  Q.To Zack, to the M&E people?
14  A.To the Available Movers.
15  Q.Oh, okay.  Right.
16  A.Okay.
17  The truck ---.
18  Q.Wait.  Hold on a second.  You said here's the
19  deliver --- here's the addresses and here's how many
20  kits to deliver.
21  Right?
22  A.No.  I gave him a list of four places that he has
23  to go with the number of boxes on every one.
24  Q.And this driver who works for Available Movers
25  never said to you what about bills of lading?

1   A.No.
2   Q.Okay.
3   So you gave him the list.  He starts driving away
4   and then stops.
5   Right?
6   A.Apparently that's what he did.
7   Q.And then when you said what's wrong, he said I
8   need bills of lading.
9   Right?
10  A.He said I spoke to my office and I need a bill of
11  lading.
12  Q.Then you called Sam and said the driver can't
13  deliver because I need bills of lading.
14  Right?
15  A.No.
16  Q.What happened?
17  A.I didn't say I cannot deliver.
18  Q.Okay.
19  A.I said they need a bill of lading to have exact
20  and more information about the delivery destinations.
21  Q.And Sam said to you I'll have them for you
22  shortly.
23  A.And Sam said no.  He said you will have them
24  soon.
25  Q.Soon.  Okay.



1 And how were you going to get them soon? Was Sam
2 going to drive them from where he was in New York to
3 where you were?
4 A. No.
5 Q. How was he going to get you ---?
6 A. Sam would send them via text or email or
7 something.
8 Q. To you?
9 A. I don't remember if to me or to Available Movers.
10 I don't know what he said.
11 Q. You don't know that?
12 A. I don't remember right now.
13 Q. So Sam is supposed to text you or email them to
14 you.
15 Right?
16 A. Correct.
17 Q. And when he didn't come, the driver said, I got
18 to take this stuff back to my hub.
19 Right?
20 A. Right.
21 Q. But you never finished the story for Mr. Ross.
22 Version A in your pleadings was you went to pick them
23 up at Available Movers and you couldn't find them.
24 Do you remember that was in the stuff you ---?
25 A. Wait, you're mixing up everything.

1 Q. Mr. Weiss.
2 A. No, no, no, no. Don't even go there.
3 Q. Mr. Weiss.
4 A. You are asking me. I'm here to answer questions.
5 Q. Right.
6 A. You asked. I answered.
7 Q. Mr. Weiss, isn't it true?
8 A. Yeah. Hold on a second.
9 Q. No, no. Let me ask a question.
10 A. You cannot just make statements.
11 Q. I want to ask a question. I withdraw. I'm going
12 to ask a question.
13 A. Ask the questions.
14 Q. Okay.
15 A. Okay.
16 Q. Isn't it true that in the answer that Rebecca
17 Price filed on behalf of you and A. Solarr, LLC, the
18 pleading stated that you went to Available Movers to
19 pick up the stuff and the test kits could no longer
20 be located. Isn't that true? That's what you put in
21 your answer.
22 A. Okay.
23 Q. Yes or no? Yes or no?
24 A. No.
25 Q. That's not in there?

1 A. So that's what's in there.
2 Q. That's what's in there.
3 Okay. But now you claim that's not what
4 happened.
5 Right?
6 A. No. I claim that I overlooked exactly the detail
7 of the order of what happened when I picked it up. I
8 did not open the boxes in Available Movers warehouse.
9 Q. No, no, no.
10 A. I opened ---
11 Q. Excuse me. Excuse me.
12 A. --- the boxes only when I got to ---.
13 Q. Let me finish. That's version B. I understand.
14 Version A.
15 A. This is the version.
16 Q. When you filed an answer, you verified that the
17 facts set forth in the answer you filed were true and
18 correct under penalty of perjury, didn't you?
19 A. Right. So it's ---.
20 Q. And then I answered it. Rebecca Price filed for
21 you.
22 A. It's a mistake.
23 Q. You said when you went to pick up the test kits,
24 they weren't there.
25 Correct?

1 A. It's a mistake.
2 Q. Okay.
3 Let's talk about version B. You said when you
4 went to Available Movers, you picked up the test
5 kits. You brought them back to New Jersey. You
6 opened them up, and lo and behold, all the test kits
7 had been replaced with rice.
8 Right?
9 A. Correct.
10 Q. So you didn't, you stated earlier you didn't make
11 a police report.
12 Right?
13 A. I didn't make a police report.
14 Q. Why? Why didn't you call the police and said I
15 paid $1,800,000 for these test kits. Someone stole
16 them and replaced them with rice. Why didn't you do
17 that?
18 A. I called Sam. I told him, listen. I picked it
19 up. There is rice here. What do you want me to do
20 now? It's your merchandise. I went there hoping to
21 deliver it by myself because there is delays of one
22 month. And he said listen, the FBI is already
23 involved. I'll get back to you. Don't do anything.
24 Wait for my instructions.
25 Q. Why didn't you make a police report that someone



1  had stolen $1,800,000 worth of test kits you
2  purchased?
3  A. Okay.
4  Q. Why didn't you?
5  A. I'll explain you why.  My responsibility to Sam
6  was to book, to book delivery people a carrier that
7  will take it to his customers.  Once I put it on his
8  truck, on their truck, my responsibilities are
9  finished.  That's all I promised to Sam and that's
10  all I did for him.  Anything that happened after that
11  is not my responsibility.
12  Sam told me specifically that's all I want you to
13  do.  Just make the arrangements.  You're going to be
14  the logistics guy.  You make the arrangements for the
15  delivery to the truck.  Nothing else.  I don't know
16  how much each customer paid him.  I don't know their
17  exact details except the address.  I don't have phone
18  numbers for them.  I don't know how much they paid.
19  All this has to be done on a bill of lading.  He
20  would not disclose to me at what prices he sold it to
21  his customers.  And I didn't really care what he sold
22  it to his customers.  All I had to do is to deliver
23  it to a common carrier, which that's what he used,
24  this word, and from there, it's not my
25  responsibility.

1  He also told me that it will be the
2  responsibility of the recipients to secure and buy
3  insurance or whatever.  It's not your responsibility
4  once you put it on the truck.  Now comes after a
5  month where I pick it up and something happened.  I
6  don't want to know any problems or anything.  That's
7  what I told Sam.  Listen, I'm opening here.  There is
8  rice.  I don't want to hear any accusations,
9  anything.  It's not my responsibility.
10  Q. Mr. Weiss.
11  A. And in the meantime, in the meantime, Mr. Gross
12  and Mr. Manfred started to ask me for collateral.  In
13  a sudden on February of 16, 17, came up a new story
14  of collateral.
15  Q. Mr. Weiss, you didn't answer my question.
16  A. Yeah.
17  Q. My question was you claim you bought $1,800,000
18  worth of test kits.  You claim that they were
19  stewarded, available, moving in storage.  First, you
20  claim when you went there to pick them up, they
21  disappeared.  That's in a pleading that you verified.
22  Now you claim when you picked them up and brought
23  them back to Elizabeth, New Jersey, they had all been
24  replaced with rice.  Why?  You said you called Sam
25  Gross.  He said FBI's investigating.  Hold off.  Why

1  didn't you ever make a police report?  Someone stole
2  a $1,800,000 of my product.
3  A. It's not my product.
4  Q. Not your product?
5  A. It was Sam Gross's product.  He had to call the
6  police.  I told him you have any problems, it's your
7  problems.  It's not my problems.  I did what you
8  want.  I'm doing you a favor.  I made the arrangements
9  and the logistics for delivery.  From that point on,
10  it's your problem.
11  Q. Question.
12  A. Not my problem.
13  Q. You got the stuff from --- you picked up stuff
14  from Available Moving in storage which you thought
15  was test kits.  You brought them back and you
16  discovered the rice.  Why didn't you call Available
17  Moving and Storage and say what happened to my test
18  kits?
19  A. They never picked up the boxes.  They don't know
20  what's in the boxes.
21  Q. You brought a truck to Available Moving and
22  Storage and you had these test kits moved from the
23  truck that they were stored in Available Moving and
24  Storage to your own truck.
25  Correct?

1  A. Correct.
2  Q. And you never discovered there was, there was
3  nothing but rice there?
4  A. I told you when I discovered it.
5  Q. When you opened the boxes.  In the space of
6  moving this, you never discovered that they had
7  been ---?
8  A. No.
9  Q. Okay.
10  A. No.
11  Q. Why didn't you make a claim against Available
12  Moving and Storage?
13  A. There is nothing I can make a claim against them.
14  They gave me back the boxes that I gave them.
15  Q. But the boxes you gave them had test kits in them
16  and the boxes they gave you back had rice in them.
17  A. They didn't sign a receipt that they are getting
18  365,000 test kits.  They are --- they gave me back
19  the boxes that I gave them, but the contents, the
20  contents were changed.
21  Q. So last follow up on this area.  Hold on one
22  second.  So you never made a claim against with the
23  police.  You never made a claim with Available Moving
24  and Storage.  This rice, you said you donated the
25  rights to some charity or churches or something.



1  Right?
2  A. I distributed it to ---.
3  Q. Distributed.
4  A. Yeah.
5  Q. Did you take pictures of the rice?
6  A. No.
7  Q. Did you get receipts from any of the people you
8  said you gave the rice to for food?
9  A. No.
10  Q. No, you didn't do anything, right?  The only
11  thing you did after a million eight worth of product
12  was stolen from you or switched, the only thing you
13  claim you did was you gave $3 million worth of
14  gemstones and diamonds to Sam Gross.
15  Right?
16  A. I don't understand your question.
17  Q. Well, instead of trying to recoup your million
18  eight of lost or stolen or replaced product, you turn
19  around and gave another $3 million to Sam Gross worth
20  of gemstones and collateral.
21  Right?
22  A. No, again, you are making a mistake.
23  Q. What mistake.
24  A. You are mixing the chronology of things.  I told
25  you just a minute ago that the first time they asked

1  me for a collateral, first part of the collateral, I
2  gave it to them in few times was after February 16,
3  between February 16 to 20, they asked me for
4  collateral.
5  Q. Why?
6  A. Because they still don't have the merchandise.
7  And Mr. Manfred, that's what Sam is telling me,
8  wants a collateral in the meantime, because his
9  customers did not get the merchandise.
10  Q. When they say that to you.
11  A. Yeah.
12  Q. Why didn't you say I'm ready to deliver, you
13  didn't give me Bill of Lading.  Why did you say that
14  to them?
15  A. I don't know --- why are you presuming all kind
16  of things?
17  Q. But he's saying to you haven't delivered my
18  product yet, right?  To my customers, right?
19  A. No, I have to deliver it to his customers.
20  Q. He's saying he wants ---
21  A. I had to deliver it to the truck.
22  Q. He's saying, I want to saying I want
23  collateral ---
24  A. His lawyer, on the advice of his son, of
25  Manfred's son, to get --- that's what Sam's telling

1  me.  They want collateral insurance that it will get
2  there.
3  Q. Right.  So they're asking for collateral because
4  the product has not been delivered to the end user,
5  the end purchaser.
6  A. Okay.
7  Q. Right.  Right?  Isn't that correct?  That's why
8  they asked you for collateral?
9  A. I think so.
10  Q. And why did you say to them, that's not my fault,
11  I'm waiting for Bills of Lading?
12  A. I did not say --- I did not wait for a Bill of
13  Lading.
14  Q. But why didn't you say to them ---
15  A. I did not wait for any Bill of Lading.  It was
16  not my responsibility.  It was the responsibility of
17  Sam Gross and Manfred Sternberg to give them Bill of
18  Lading.  I don't --- at that time, I did not know
19  what Bill of Lading is ---
20  Q. How many ---
21  A. --- nor would I provide that Bill of Lading to
22  anyone?
23  Q. How many test kits did you in fact deliver to the
24  Safety house?
25  A. I don't do deliveries.

1  Q. How many --- you said my responsibility is to ---
2  I'm almost done this section, I'll turn it back to
3  you.
4  ATTORNEY ROSS:
5  All right.
6  ATTORNEY LIGHTMAN:
7  Give me one second.
8  BY ATTORNEY LIGHTMAN:
9  Q. My responsibility was to deliver the test kits.
10  And I fulfilled my responsibility.  That's what you
11  testified to, to Mr. Ross.
12  Right?
13  A. My delivery was to deliver it to the carrier.
14  Q. Okay.
15  How many test kits did you in fact deliver to the
16  Safety House?
17  A. I told you, I don't have any contract with the
18  Safety House.  I don't have to deliver anything to
19  anybody.  All I have to do is to put the merchandise
20  on the truck that will go to the end recipients of
21  Sam Gross.  I don't have to deliver, he has a
22  contract with them.  Ask Sam Gross how many was
23  delivered to him.
24  Q. Isn't it true that you, Gary Weiss, or A. Solar
25  Diamond, did not deliver one single test kit to the



1 Safety House.
2 Correct?
3 A.Absolutely true.
4 Q.Isn't it true that you, Gary Weiss, or A. Solar
5 Diamond did not deliver any test kits to any of the
6 customers of Sam Gross, Charlton or Manfred
7 Sternberg?
8 A.Absolutely true.
9 Q.Okay.
10 One other point of clarification I want to make
11 in response to Mr. Ross, and I'll turn it back over
12 to him temporarily. You claim that the only emails
13 that you used, wgary4109@gmail.com and monipair.com.
14 Right?
15 A.Correct.
16 Q.They're the only emails used in connection with
17 this dispute and what followed.
18 Right?
19 A.Correct.
20 Q.Okay.
21 Did A. Solar Diamond have any involvement in this
22 dispute?
23 A.No.
24 Q.None whatsoever.
25 Right?

1 A.No.
2 Q.Well, their bank received the money that
3 Sternberg wired.
4 Right?
5 A.Correct.
6 Q.A. Solar Diamond account received the money that
7 Daphna Zekaria --- Zekaria wired.
8 Right?
9 A.Correct.
10 Q.You said you don't own A. Solar Diamond. Who's
11 the sole owner of A. Solar Diamond?
12 A.Mirthi Pantoja.
13 Q.Mirthi, M-I-R-T-H-I Pantoja.
14 Right?
15 A.Yeah.
16 Q.P-A-N-T-O-J-A?
17 A.Yeah.
18 Q.She's your wife?
19 A.Right.
20 Q.She's the sole owner.
21 Right?
22 A.I believe when the corporation was formed, it was
23 formed with one of her friends in 2015.
24 Q.But this bank account, this Wells Fargo bank
25 account, she's your sole signatory on the account.

1 Right?
2 A.No.
3 Q.Who's the signatory on the account?
4 A.I also had --- I also was a signatory on this
5 account.
6 Q.As what? An owner?
7 A.No.
8 Q.An employee?
9 A.No, just a signature.
10 Q.An officer?
11 A.You can characterize it like that, but ---
12 Q.How would you characterize it?
13 A.Okay. The account was used in 2015, probably for
14 a year or two, and was left open. And I asked Mirthi
15 Pantoja to be able to use it, if I need to, as a
16 business account. And she agreed. And she put me as
17 a person that can sign on.
18 Q.In what capacity? You can't just sign up to sign
19 checks on a corporate account without having some
20 relationship with that company.
21 A.No --- no more capacity. She disconnected from
22 the corporation in about 2018. The account was left
23 open, and I used it again in 2022.
24 Q.So from 2018 forward, Mirthi Pantoja had no
25 involvement whatsoever in the A. Solar Diamond bank

1 account?
2 A.No.
3 Q.Correct?
4 A.Correct.
5 Q.From 2018 forward, Mirthi Pantoja had no business
6 dealings with A. Solar Diamond whatsoever.
7 Correct?
8 A.No. Correct.
9 Q.Okay.
10 And what's Blue River 4747, LLC?
11 A.Another corporation that I used as business
12 account.
13 Q.Is it still active?
14 A.No.
15 Q.Is it still open?
16 A.No.
17 Q.Do you use --- when's the last time you used Blue
18 River 4747 email address?
19 A.Sometime in 2023.
20 Q.Twenty-three (23). And what did --- what was the
21 business of Blue River 4747, LLC?
22 A.Sales of jewelry.
23 Q.Sales for jewelry. And who's the owner of Blue
24 River 4747, LLC?
25 A.It was formed again, I think, by me and Mirthi



1   Pantoja or something like that.
2   Q. Does --- is Mirthi has shown as the owner of Blue
3   River?
4   A. I don't know.
5   Q. Are you shown as an owner of Blue River?
6   A. One of us.
7   Q. One of you is the owner?
8   A. Yeah.
9   Q. And does Blue River 4747 have a bank account?
10  A. No, it doesn't have a bank account.
11  Q. Did it have a bank account back in 2022?
12  A. I believe so, yeah.
13  Q. Did Blue River have any dealings in connection
14  with this dispute?
15  A. No.
16  Q. Did Blue River provide any financing to A. Solarr
17  in connection with this dispute?
18  A. I don't think so.
19  Q. Did Blue River --- did Mirthi have any
20  transactions involved in this --- in this dispute
21  back in February and January of 2020?
22  A. Mirthi was not in the knowledge at the time about
23  this deal.
24  Q. Okay.
25  Did Mirthi make any transfers into or out of Blue

1   River, LLC in January and February of 2022?
2   A. No, I did.
3   Q. You did?
4   A. Yeah.
5   Q. Why?
6   A. Because I want it.
7   Q. But why would A. Solar Diamond transfer $200,000
8   to Blue River the same day that you got $219,000 in
9   from Manfred Sternberg?
10  A. I was --- Blue River 4747 was connected to a
11  website that I have and was doing transactions, and I
12  decided to transfer to that account to 200,000.
13  Q. Why?
14  A. Why not?
15  Q. If they had nothing to do with this --- if you
16  take a look at Gary Weiss 5.
17  A. I don't have to look.  I know the transaction.
18  Q. There are hundreds of thousands of dollars of
19  transfers going from A. Solar Diamond to Blue River,
20  and from Blue River back to A. Solar Diamond.
21  Correct?
22  A. Absolutely, yes.
23  Q. Why?
24  A. Why not?
25  Q. For no business reason?

1   A. For no business reasons.
2   Q. Okay.
3   ATTORNEY LIGHTMAN:
4   I think it's a good stopping point for
5   me to let you jump back in and finish your questions.
6   But I have about another hour's worth when you're
7   done.
8   ATTORNEY ROSS:
9   I think I'll keep us roughly on topic.
10  Does anybody want a break or anything before?
11  THE WITNESS:
12  No, we better do whatever we have to do
13  business here.
14  ATTORNEY LIGHTMAN:
15  How much more are you going to be, an
16  hour?
17  ATTORNEY ROSS:
18  Probably.  Maybe a little bit more.
19  ATTORNEY LIGHTMAN:
20  Try and get through.  Sorry if I
21  interrupted.  I'm just shocked to find out he brought
22  his wife and dragged his wife into this mess.
23  ATTORNEY ROSS:
24  Not going to comment on that.  Oh,
25  that's fine.

1   ATTORNEY LIGHTMAN:
2   One other question.  I'm sorry.
3   BY ATTORNEY LIGHTMAN:
4   Q. Are you looking at Gary Weiss 5?
5   ATTORNEY ROSS:
6   For the record, I think you're talking
7   about eight with the backside.
8   ATTORNEY LIGHTMAN:
9   Eight, right.  I'm sorry.
10  BY ATTORNEY LIGHTMAN:
11  Q. Do you have Gary Weiss 8 in front of you?
12  This is an A. Solar Diamond account.
13  Right?
14  A. Correct.
15  Q. Your wife had nothing to do with A. Solar Diamond
16  after 2018, yet all these transactions appear.
17  You're making all these transactions.
18  A. Correct.
19  Q. Aren't you?  And why did it --- this is not even
20  complete, right.  There's transactions in January,
21  February between A. Solar Diamond and Blue River that
22  you've either whited out or omitted from this.
23  Correct?
24  A. Correct.
25  Q. You didn't produce the full bank statement.  This



1 is a Wells Fargo, A. Solar Diamond bank --- portions
2 of it.
3 Correct?
4 A.Correct.
5 Q.You didn't produce the whole bank statement.
6 Right?
7 A.This is what I produced.
8 Q.Right.  You've doctored up the bank statements
9 for A. Solar Diamond for January and February.
10 Right?
11 ATTORNEY ROSS:
12 Objection.
13 THE WITNESS:
14 No, I didn't doctor, I blanked out.
15 ATTORNEY LIGHTMAN:
16 Q.Well, look ---
17 A.I didn't doctor anything.
18 Q.Look at Gary Weiss 8 then.  Look at Gary Weiss 8.
19 On the left the dates of the transactions are cut off
20 here in your Gary Weiss 8.
21 Correct?
22 A.Well, that's how the printer printed them.  I
23 don't --- I don't cut anything off.
24 Q.But the statements you have show the dates in
25 these transactions.

1 Right?
2 A.I think these copies just did not come out
3 correctly.  I didn't doctor anything.
4 Q.You whited out portions of this statement.
5 Right?
6 A.Excuse me?
7 Q.You whited out portions of this?
8 A.Absolutely not.
9 Q.Look at the second page.
10 A.I didn't white it out.
11 Q.Look at --- ready under check 1053.  See the
12 check 1053?
13 A.Yeah.
14 Q.There's two lines and then there's a white line
15 there.  And if you look halfway between the beginning
16 of the thing and it looks like there's a line there,
17 someone put tape over it and it says $200,000.
18 You see that?
19 A.Correct.
20 Q.And you look at the next line, it says xxx 0832.
21 Do you see that?
22 A.One second.
23 Q.Right below the 200,000.  You white it out who
24 did it, but you didn't wait out to 0832.
25 Do you see that?

1 A.Correct.
2 Q.And if you look down a little bit further to the
3 $40,000 line right below, check 1055, it says $40,000
4 came in.
5 Right?
6 A.Correct.
7 Q.And again, but there it says, online transfer
8 from Blue River 4747, business checking 0832.
9 Do you see that?
10 A.Correct.
11 Q.So you whited out the outgoing transfer right
12 below, check 1053, but you accidentally left in the
13 account number ---
14 A.No accidents.  I didn't white out anything.
15 Q.Well, why did you white out the line above the xx
16 0832 that has a 200,000?  You're claiming if I got
17 the statement from Wells Fargo, it wouldn't say
18 online transfer to Blue River?  You whited out where
19 it said online transfer to Blue River, didn't you?
20 A.I didn't.  Why did I?
21 Q.You redacted it.
22 Correct?
23 A.Correct.
24 Q.I'm sorry.  I'm sorry.  You redacted it and
25 didn't work.

1 A.Exactly.
2 Q.Same thing.  Same thing.  Okay.  And if you look
3 at page two of this, Gary Weiss 8.  The bottom of
4 page two, it shows there's two.  There's a
5 transaction on 2/7/22.  You see that million two at
6 the bottom?
7 A.Correct.
8 Q.You wrote on the right hand side, February 7,
9 2022.
10 Right?
11 A.Correct.
12 Q.I got the bank statement, it would show on the
13 left hand side that date.
14 Right?
15 A.Correct.
16 Q.You look at the very next page, the top of the
17 page, it shows 2/9.
18 Right?
19 A.Two-nine, where?
20 Q.At the top.  Purchase authorized on 2/9.
21 You see that?
22 A.Yes.
23 Q.If you go further down, here you actually left it
24 online transfer from Blue River online transfer to
25 Blue River.  Online transfer to Blue River.



Page 157

1  Right?
2  A. Okay.  I know why the dates here didn't come out.
3  You have an option, I think, of a portrait or
4  landscape, and I should have probably chosen the
5  printer to print on ---
6  Q. On landscape rather than portrait.
7  A. Yeah, it's possible.
8  Q. Can you send me then, when you get home?
9  A. Absolutely.
10  Q. Send me the landscape.  Okay.  And whether or not
11  you printed out landscape or portrait, the redaction
12  you made wouldn't be ---
13  A. I can give you the whole thing.
14  Q. Okay.
15  A. You asked me to show you --- excuse me, Mr.
16  Lightman.  You asked me to show you proof of the
17  payments that I got.  And that's why I got you the
18  statement with proof for the payments.  If you want
19  all the transactions, I don't see why they would be
20  relevant here.  This is only showing what the monies
21  that came in.  And this is why I got you the
22  statement.  Not for any other purpose.  You asked me
23  how many payments you got.  I said I got four
24  payments.  The total is that.  And I will bring you
25  the statement to prove to you.  And I brought it for

Page 158

1  you.
2  Q. But this statement also shows hundreds of
3  thousands of dollars to and from A. Solarr and Blue
4  River.
5  Right?
6  A. So what?
7  Q. For no business reason whatsoever.
8  Right?
9  A. But it's none of your business.
10  Q. Okay.
11  Ready?
12  A. Okay.
13  Q. Okay.
14  Let me ask you this.  Go to page two of this.
15  A. What is your business?  I'm giving you ---
16  ATTORNEY ROSS:
17  Stop.  Okay, Gary.
18  THE WITNESS:
19  --- because you asked me and I want to
20  be very open with you.
21  BY ATTORNEY LIGHTMAN:
22  Q. Go to page two.
23  A. Very simple.
24  Q. Go to page two of this.
25  Okay?

Page 159

1  A. I can transfer between the two accounts day and
2  night, whatever I want to do.
3  Q. For no reason whatsoever?
4  A. Just for the fun, to show transactions.
5  Q. For that --- page two this one point.  Page two
6  you show on February 7 ---
7  A. Yeah.
8  Q. Zekaria transferred to you $1,246,960.
9  A. Correct.
10  Q. Correct?
11  A. Correct.
12  Q. On February 7, I will represent to you --- excuse
13  me.  On February 4, I will represent to you that
14  Manfred Sternberg wired to Daphna Zekaria $1,911,960.
15  A. Correct.
16  Q. What happened to the other 700,000?
17  A. She wired me only this amount.
18  Q. Right.  Did she wire you the other 700,000?
19  A. No.
20  Q. What did she do with that money?
21  A. She gave it to Sam.
22  Q. How do you know that?
23  A. I don't know.
24  Q. Was it the deal you cut with Daphna and Sam and
25  you that you would get 65 percent of that 1.9 and Sam

Page 160

1  would get 35 percent of that?
2  A. The way you characterize it is not exactly, but
3  I'll explain it to you and I'll answer your
4  questions.  Okay?
5  Q. Okay.
6  A. Sam asked me if he can keep certain amount of
7  money because he has certain commissions to pay and
8  bills to pay.  I said yes.  He asked me how much ---
9  I mean, I asked him how much.  He said about 600 to
10  700,000.  And when he gave instructions like that to
11  Attorney Zekaria, she came up with the number.  So,
12  Sam, is it, you want me to just tell me exactly how
13  much do you want me to keep like 35 percent for you.
14  I said, or he said, yes, it's about 35 percent.  And
15  he said that he's going to pay --- make the balance
16  of the payments in about a week to two.  And he
17  started to make some payments, right.  But he
18  finished with 1.666 --- 1,666,000 and 200 and still
19  didn't get the balance.
20  Q. Well, my question to you is ---
21  A. Sure.
22  Q. --- from the 1,900,000 that Manfred wired to you
23  on --- to Zekaria on February 4th, you agreed with
24  Sam and Daphna that you would get 65 percent of that
25  and Sam would get the other 35 percent of that.



Page 161

1  Right?
2  A.Correct.  I just said that, yes.
3  Q.And she never gave you that balance.  Do you know
4  whether she paid that 700,000 to Sam or not?
5  A.I don't know what went in her account.
6  Q.Okay.
7  And then the last transaction here or the next
8  transaction on page three, we have February 15.  You
9  got 130,000.
10  Right.  The bottom page three of Gary Weiss 8.
11  Right?
12  A.Yes.
13  Q.You agreed again ---
14  A.Yes.
15  Q.--- with Sam and Daphna ---
16  A.Yes.
17  Q.--- that you would get 130 of the 250,000 that
18  Manfred wired in, that Daphne could keep the 120 as
19  her fee?
20  A.No.
21  Q.You're saying to me there's no writings that
22  document that you agreed with Sam and Daphna, that
23  from the $250,000 wire transfer that Manfred made to
24  Daphna on February 15, that you and Sam and Daphna
25  agreed that she could keep 120,000 of it as her legal

Page 162

1  fee.
2  Yes or no?
3  A.What you are alluding to, she put it in a text.
4  But that's not what I agreed to as fee.  I agreed
5  with Sam, because Manfred would not give him the
6  balance of the money once it was delivered on the
7  truck, that all the monies that will come later on
8  which Sam promised me to pay the balance which he had
9  to pay, the total was 2,190,000.  So each time that
10  we're going to get a payment from Manfred, he's going
11  to be keeping a part from it and part will be going
12  towards the total balance that he owes her.
13  Q.I'm going to show you that Daphna Zekaria 9.
14              ---
15  (Whereupon, Weiss Deposition Exhibit
16  DZ-9, Messages with Gary Weiss and
17  associates, was marked for
18  identification.)
19              ---
20  BY ATTORNEY LIGHTMAN:
21  Q.Here's Daphne's Zekaria 9.  Look at page two of
22  Daphna Zekaria 9 at the bottom where it says.  See
23  where it says at the very bottom under February 15.
24  See where you're writing Daphna or 2/15 --- February
25  15.  I'm sorry.  For the record, Daphna Zekaria 9 has

Page 163

1  been identified as a transcription of the text
2  messages in WhatsApp between you ---
3  A.Correct.
4  Q.--- and Gross and Daphna.
5  A.Correct.
6  Q.February 15, 2022, Daphna writes, it's my
7  understanding that I am about to receive an
8  additional wire of 250,000, which is 130,000 to Gary
9  Weiss, and the rest are my additional fees.
10  You see that?
11  A.Correct.
12  Q.And then almost immediately, Shlomi, S-H-L-O-M-I,
13  writes, that's Sam Gross.
14  Right?
15  A.Yeah.
16  Q.He writes, Gary, please confirm to her 250,000 is
17  coming in.  She is waiting for it, and 130 is yours.
18  And then later on that day, you write, Hi, Daphna,
19  that --- about ten minutes later you write, Hi,
20  Daphna.  That is correct.  You are sending me 130.
21  Thanks.  And then Daphna writes, awesome.
22  Right?
23  A.Correct.
24  Q.She writes, thanks for the confirmation and
25  opportunity to represent you.

Page 164

1  Do you see that?
2  A.Yeah.
3  Q.Finally, the money that you got from Daphna, who
4  had a thought --- who had to approve the release of
5  any funds by Daphna Zekaria?  Isn't it true that
6  Manfred Sternberg had to approve the release of any
7  of those funds?
8  ATTORNEY ROSS:
9  Objection.  You can answer if, you
10  know.
11  THE WITNESS:
12  I want you to be less emotional with me
13  and ask me again.
14  BY ATTORNEY LIGHTMAN:
15  Q.I'm not emotional.
16  A.No, no.
17  Q.Believe me.  I'm just passionate ---
18  A.That's okay.
19  Q.--- because someone took over $2 million from my
20  client.
21  A.Absolutely, I agree with you.
22  Q.He didn't get his money back, he didn't get his
23  goods.  So here's my question.  Isn't it true, sir,
24  that Manfred Sternberg had to approve Daphna's
25  disbursements of any of the funds from our attorney



1  escrow account?
2  ATTORNEY ROSS:
3  Objection.
4  BY ATTORNEY LIGHTMAN:
5  Q.Isn't that your understanding?
6  A.No.
7  Q.Let me --- Daphna testified on April 2.  Right.
8  Numerous times --- you were there in the deposition.
9  Right?
10 A.Okay.
11 Q.You were present when Daphna testified at her
12 deposition on April 2.
13 Right?
14 A.Yeah.
15 Q.You recall numerous times Daphna said Manfred
16 Sternberg had to authorize the release of my escrow
17 funds, weren't you?
18 A.Yes, but.
19 Q.Okay.
20 A.Hold on.  Let me finish the answer ---
21 Q.Okay.
22 A. --- please.  That was pertaining to the balance.
23   The first payment was 219,000 and I supposed to get
24   another 1.9.  But in the meantime, in the meantime,
25   Sam asked me, please leave some money for me and I

1  will pay you the balance in a week or two.  And I
2  said, okay.  So I received one point ---
3  Q.Two.
4  A.--- two million dollars.  That's the only money
5  that Mr. Manfred had to approve on the transaction.
6  Later on --- later on, Sam Gross tried to get more
7  money from Manfred because he didn't get yet ---
8  Q.Okay.
9  A.--- his $4.5 million in the escrow account.  And
10 Gary Weiss also was owed money.  But the only way for
11 me to get money, if Sam gets the money and Sam gives
12 it to me because Manfred was out of the picture, as
13 far as I'm concerned.  I didn't have any deals with
14 him anymore.  But --- but, me and Sam decided to ask
15 for more money, right?
16 Q.If Manfred had said to you ---
17 A.But Manfred didn't give instructions to separate
18 what Daphna has to give me.  He just send the money.
19 I don't think he was aware of the part that will go
20 to me from this money.  And part will stay with Sam.
21 Q.If Manfred had said to Daphna, don't disperse
22 that 1.9 million, she couldn't have dispersed it.
23 Correct?
24 ATTORNEY ROSS:
25 Objection.

1  THE WITNESS:
2  Exactly.  Yeah, absolutely.
3  BY ATTORNEY LIGHTMAN:
4  Q.He had to approve her disbursements from escrow?.
5  A.Not only.  That's what happened.  She called him
6  two, three times.
7  Q.Okay.
8  A.Mr. Manfred, can I release to Gary Weiss the
9  money?  And he asked for pictures.  I don't know what
10 else he asked her.  I don't know what they spoke to
11 each other.  But after everything was on the truck,
12 several hours after that, I got paid.
13 Q.Manfred had no authority to tell how the 1.9 was
14 to be divvied up between you and Sam Gross.
15 Correct?
16 A.I don't know if you knew about it.  We didn't
17 tell him.
18 Q.Manfred was the one who had to approve the 1.9
19 that come out of the escrow.
20 Right?
21 A.Exactly.
22 ATTORNEY LIGHTMAN:
23 I don't know.  You can, it's a good
24 time for you to jump in.
25 THE WITNESS:

1  The same is for all the other payments
2  that came out.
3  BY ATTORNEY LIGHTMAN:
4  Q.Manfred had to approve?
5  A.He had the money.  It has nothing to do with the
6  approval.
7  Q.Well, no, he gave the money to Daphna.
8  A.Yeah.
9  Q.But when Daphna had the money, Manfred still
10 controlled when that could come out from her.
11 Right?
12 A.Not true.  He had the money in his account.  It's
13 coming from there.
14 Q.All right.  Thank you.
15 A.Okay.
16 ATTORNEY ROSS:
17 I need a five minute break.
18 THE WITNESS:
19 Okay.
20              ---
21 (WHEREUPON, A SHORT BREAK IN THE PROCEEDINGS WAS
22 TAKEN.)
23 ATTORNEY ROSS:
24 All right.
25 I'm trying to organize.



Page 169

1  ATTORNEY LIGHTMAN:
2  Yeah, it's tough when you take that
3  position. It's the toughest thing about it.
4  ATTORNEY ROSS:
5  You covered some things, so I don't
6  want to.
7  THE WITNESS:
8  Yeah. Don't be redundant.
9  ATTORNEY LIGHTMAN:
10  No, please go over them again.
11  ATTORNEY ROSS:
12  Some of them I will. One or two of
13  them I will. But I just want to make sure that I'm
14  hashing for the sake of rehashing. So let's start.
15  Let's just go to this.
16  THE WITNESS:
17  Okay, I have.
18  ATTORNEY ROSS:
19  I guess we'll mark this --- is this 24
20  GW?
21  ATTORNEY LIGHTMAN:
22  I have GW 22, right. Is there
23  anything.
24  ATTORNEY ROSS:
25  It's GW 23. Okay.

Page 170

1              ---
2  (Whereupon, Weiss Deposition Exhibit 23
3  23, Texts from Gary Weiss, was marked
4  for identification.)
5              ---
6        REDIRECT EXAMINATION
7              ---
8  BY ATTORNEY ROSS:
9  Q. Mr. Weiss, I've given you a copy of what's been
10  marked as GW 23. I've given a copy to Mr. Lightman
11  and I think one to his client as well, who's present.
12  Take your time to look through it and let me know
13  when you're familiar enough with it to start talking
14  about it.
15  ATTORNEY LIGHTMAN:
16  Just hold on one second so the record's
17  clear. I'm taking the original of GW 21 because I
18  want to open it in front of the jury and I'm putting
19  a copy of it as the exhibit.
20  ATTORNEY ROSS:
21  Understood?
22  ATTORNEY LIGHTMAN:
23  Okay, thank you.
24  BY ATTORNEY ROSS:
25  Q. Yeah. So, Mr. Weiss, look at GW 23, which is,

Page 171

1  I'm going to represent to you a number of text
2  messages. Let me know when you're ready to discuss
3  it.
4  A. You call it GW?
5  Q. Twenty-three (23).
6  ATTORNEY LIGHTMAN:
7  That's this stuff.
8  ATTORNEY ROSS:
9  Yes.
10  ATTORNEY LIGHTMAN:
11  I still want this to go through, by the
12  way. Just this little stuff.
13  THE WITNESS:
14  Okay.
15  BY ATTORNEY ROSS:
16  Q. All right.
17  You've had a chance to look at the exhibit?
18  A. I --- I see a bunch of texts.
19  Q. What --- who are these texts message exchanges
20  between?
21  A. I don't know. I see my name on that.
22  Q. You see the first one on the first page. The
23  first page has 1046 at the top. And there's a date?
24  A. Correct.
25  Q. Above the first message, it says Monday, February

Page 172

1  28, 5:39 p.m.
2  Do you see that?
3  A. Correct.
4  Q. It says, Hi, Manfred. Sorry, issued delivery
5  today. Just confirmed you sent one. 190k, thanks.
6  Will be by your clients tomorrow. Best, Gary. Is
7  that a message you sent to Manfred Sternberg?
8  A. Can you show me on yours so?
9  Q. Sure. So I'm pointing to the first message at
10  the top of the first page of G23.
11  A. Okay. Okay.
12  ATTORNEY LIGHTMAN:
13  Okay, what are we looking at? The
14  first one?
15  ATTORNEY ROSS:
16  The very first one. I'm going to start
17  from the top.
18  ATTORNEY LIGHTMAN:
19  Do you have another copy?
20  ATTORNEY ROSS:
21  Yeah.
22  THE WITNESS:
23  Yes, I see. I see.
24  BY ATTORNEY ROSS:
25  Q. Do you remember sending that message?



1  A.I am just looking at what you are showing me, so.
2  Q.Let me put it this way.  Do you dispute that this
3  exhibit is ---
4  A.No, no.  Absolutely not.
5  Q.For the record --- let me just finish.
6  A.Okay.
7  Q.I know that you're nothing being rude.  I'm just.
8  A.I'm sorry.
9  Q.For the record, do you dispute that GW-23 is a
10  series of text messages exchanged between you, Gary
11  Weiss and my client Manfred Sternberg?
12  A.It appears to be so, yeah.  Yeah.
13  Q.Okay.
14  So on February 28th, would that be 2022?
15  A.Yes, sir.
16  Q.You sent him a message.  You said, Hi, Manfred.
17  Sorry.  They issued delivery today.  Just confirmed
18  you sent a 190k, thanks.  Will be by your client's
19  tomorrow.  Best, Gary.  What do you mean by we'll be
20  by your clients tomorrow?
21  A.This was a suggestion by Sam to text this to
22  Manfred in order to get this 190,000.
23  Q.Okay.
24  Explain that?
25  A.Okay.  Sam was looking for the balance of his

1  money Manfred.  And Gary was looking for the balance
2  of his money from Shlomo Gross.
3  Q.When you say Gary, you're talking about yourself.
4  A.Yeah.  Let me repeat that again slowly.  Maybe I
5  made a mistake.  Gary Weiss was looking for the
6  balance of the money, which was total 2,190,000 from
7  Sam Gross.  Which has not been paid yet by February
8  28.  And Sam Gross was looking for --- he told me
9  close to four and a half million dollars from
10  Sternberg.  In order for Sam Gross to pay me the
11  total that he owed me, the 2,190,000 and still was
12  balance left.  He had to get money from Sternberg.
13  You understand?
14  Q.Yes.
15  A.He suggested me to make this type of messages.
16  He was dictating to me what to tell Manfred.  He
17  believed that this is how we would be able to get
18  more money from Manfred.  So he can get paid and he
19  can pay me.
20  Q.This message, this first message Sam --- Shlomo
21  Gross dictated to you to send to Manfred Sternberg?
22  A.Exactly.
23  Q.Did --- did Sternberg know that?
24  A.I think yes.
25  Q.Why do you say that?

1  A.Sam Gross told me that most of these messages
2  were suggested by Manfred.  He wanted to use this
3  text messages to some of the people that he had to
4  pay commissions.
5  Q.You say he had to pay commissions.  Who do you
6  mean?  You say he wanted to use text messages.
7  A.What I understood that Manfred had to pay some
8  commissions to people that brought the deal.  Okay.
9  To my knowledge, from what I understand, the deal was
10  solicited not by Manfred and not by Sam Gross.  It
11  was solicited by other people and the deal was given
12  to Manfred and Gross.
13  Q.When you say the deal, what are you referring to?
14
15  A.The purchase of this COVID test kits.  In this
16  case, we are talking now about the Safety House.
17  Q.All right.
18  A.I would explain again this sale to the Safety
19  House was solicited by other people than Shlomo Gross
20  and Attorney Manfred Sternberg.
21  Q.Okay.
22  A.And those people were owed commissions.  I don't
23  know how much or what percentage from the sale or
24  what were the arrangements that they made with
25  Manfred or Sam.  And the way to get more money from

1  Mr. Manfred is to give him this type of text where he
2  can show those people you didn't get paid yet,
3  because the delivery was not made yet.
4  Q.Okay.
5  A.That's what I understood.  So this is what you
6  see, all this series of texts.  All of them.
7  Q.Don't worry, we'll go through them.
8  A.Okay.
9  Q.But what you're saying is these were dictated by
10  Mr. Gross.  And you think that they were --- that Mr.
11  Sternberg was somehow aware of them ---
12  A.Right.
13  Q.--- as confirmation that there was no delivery
14  yet.  So how could he pay a commission yet if the
15  deal was not completed?
16  A.Okay.  Furthermore ---
17  Q.Is that correct, or is that?
18  A.Yes, correct.  Furthermore, I know that Manfred
19  dictated some of this also to Sam to dictate to me.
20  And there is some text where there is a message sent
21  by Manfred, and Sam is forwarding to me, and I should
22  now send them a message or an email like that.
23  Q.Okay.
24  A.Okay.
25  Q.When you said in this first message, will be by



1  your clients tomorrow?  What does that mean in that
2  first message, will be by your clients tomorrow?
3  A.I think that Manfred, with the pressure on him,
4  that delivery is not happening, wanted this text to
5  show that the delays are not on his part.
6  Q.Is this true when you sent it, will it be by your
7  client's tomorrow?
8  A.Well.
9  Q.Does that mean that the product will be delivered
10  to Manfred's client tomorrow?
11  A.Well, it should have been through if Sam and
12  Manfred would come with the Bill of Lading, which for
13  some reason never got to Available Mover, and
14  whatever reason, I don't know.
15  Q.Okay.
16  So you had product to deliver on February 28th,
17  but didn't have a Bill of Lading, that's why you
18  couldn't deliver it?
19  A.No.  I did not have any more the product.  The
20  product was by Available Movers.  They asked me to
21  make this type of text.  They both knew that I don't
22  have any more the merchandise, it's by Available
23  Movers, nor do I have control about those trucks
24  anymore.  The trucks would move, yes, if there would
25  be a Bill of Lading.  But for some reason the Bill of

1  Lading was not produced.  I don't know who had to
2  produce it, who had to give to whom to the Bill of
3  Lading, but yes.
4  Q.Okay.
5  A.Okay.  Available Mover would move right away the
6  minute they have the Bill of Lading.
7  Q.All right.
8  So you're explaining to them that the product is
9  ready.  But you don't have a Bill of Lading.  That's
10  not in here, but.
11  A.The movers don't have the Bill of Lading.  They
12  will not move otherwise.  So in order for this to
13  move, it can move right away.  The minute the Bill of
14  Lading will hit, whoever has to be, I think,
15  Available Movers, the product would continue.
16  Q.Why didn't you put that in the message?
17  A.I don't know.
18  Q.What about this ---
19  A.They asked me to do it in this form.  That's what
20  I was dictated to and I did it.
21  Q.Didn't have any questions about it?  Because here
22  it looks like you've got a product to deliver, and
23  it's going to be delivered tomorrow.  And so
24  testimony is they knew that Available Movers has the
25  product.

1  A.It doesn't look that I have the product, no.
2  Q.Thanks, will be by your client's tomorrow.
3  A.Yeah.  The product is by Available Movers, it's
4  not by me anymore.  And I don't say that.  The
5  product will be there.
6  Q.Will be where?
7  A.By the recipients.
8  Q.Tomorrow?
9  A.Yeah.
10  Q.Which would have been March 1st.
11  A.Which --- whatever, yeah.  February 28.
12  ATTORNEY LIGHTMAN:
13  The rice.  I'm sorry.  I'm sorry.
14  BY ATTORNEY ROSS:
15  Q.Did you --- did you know when you sent this text
16  message, regardless of who dictated or whatever, did
17  you know when you sent this message that there were
18  no kits, but there was rice instead?
19  A.No, I didn't know yet.
20  Q.What was the first day you knew that?
21  A.Only when I arrived in New Jersey to a park.  Now
22  I recall the name of the park is called Mattano Park.
23  Mattano.
24  Q.What date did you know that there was rice
25  instead of kits?

1  A.The day that I picked up the merchandise, the
2  boxes from Available Movers.
3  Q.Do you recall that date?
4  A.Somewhere around seven, eight of March, but I'm
5  not sure now the date.
6  Q.So it would be your testimony that on March 1st
7  there couldn't have been a delivery because Available
8  Movers didn't have a Bill of Lading?
9  A.That's my understanding.
10  Q.And then on March 15th, you text, Hi, Manfred.
11  I'm sorry, I could not coordinate the truck and
12  people today.  Looks ready for tomorrow.  Best, Gary.
13  Do you see that?  It's also on the first page.
14  A.I see that.
15  Q.And did somebody dictate that message to you?
16  A.I think so.  But this is on March 15th, right?
17  Q.That's on March 15th.  So you're saying ---
18  A.Yes.
19  Q.Hi, Manfred, I am sorry, could not coordinate the
20  truck and people today.  Looks ready for tomorrow.
21  A.I'm sure here, Sam told me to do that.  And this
22  is already days after I already picked up the
23  merchandise.  I don't know why Sam did that.  You
24  have to ask him.  And I said, okay, but --- I see
25  here another 190.  Okay.  So we --- he wanted to



Page 181

1  squeeze another amount of money from Manfred. So, as
2  I told you, he was owed a few million dollars more
3  from Manfred, from his escrow account. And he would
4  be able to give me money from this amount of money.
5  Part would be for me towards the balance that he owes
6  me.
7  Q. So when Sam dictated this second message on the
8  first page of GW 23 to you, for you to send to
9  Manfred on March 15th, you already knew that there
10  was rice instead of kits.
11  Right?
12  A. I think so.
13  Q. Why would you tell Manfred that it looks ready
14  for tomorrow, which, you can correct me if I'm wrong,
15  but sounds like looks ready for delivery to Mr.
16  Scully's company tomorrow, on March 15th, if you knew
17  that there was only rice in the truck on March 7th or
18  8th?
19  A. Okay, I told you that Sam dictated to me, and it
20  looks to me now that Sam and Manfred wanted this
21  particular text to use for whatever purpose, with
22  their customers. I don't really understand why, for
23  a few reasons. First of all, they knew that to begin
24  with, the merchandise is not anymore with Gary Weiss,
25  it's by Available Movers. Then they knew that the

Page 182

1  merchandise was picked up already by March 7 or 8,
2  and there is no more merchandise. Okay.
3  Q. When did you tell Manfred Sternberg that there
4  was no more merchandise?
5  A. I did not tell him, I told Sam.
6  Q. Okay.
7  So you don't know when or if Sam Gross told
8  Manfred Sternberg ---
9  A. No, I don't know.
10  Q. --- there was no merchandise?
11  A. I don't know.
12  Q. Okay.
13  I just want to make it clear ---
14  A. Nor do I know if he told him. I don't know. I
15  really don't know. Or I don't recall that I know.
16  But it looks from here that --- it looks like maybe
17  Manfred doesn't know, but you never know, because
18  they concocted all this texts that I should be
19  making, and they would be using for whatever purpose.
20  Q. Okay.
21  You said they again. So what makes you think
22  that the second message was concocted --- that
23  Manfred was involved in concocting this second
24  message?
25  A. Okay. Because all the preceding messages that

Page 183

1  the truck will be there tomorrow. This and that is
2  --- is what they dictated to me to send them in text
3  and emails.
4  Q. When you say they, who dictated this second
5  message to you? Did Manfred Sternberg dictate this
6  message to you?
7  A. I think probably, Sam, on the advice of
8  Sternberg.
9  Q. Why do you think it was on the advice of
10  Sternberg?
11  A. Because he told me that most of this language was
12  dictated to him by Manfred.
13  Q. Did Manfred ever tell you that any of this was
14  dictated by Manfred?
15  A. No, Manfred didn't tell me. No.
16  Q. You see this little circle with two little
17  symbols in it on the second message there on the
18  first page?
19  A. Yeah, yeah, sure. I see it.
20  Q. What is that?
21  A. I don't know.
22  Q. Does that look like a punctuation mark?
23  A. I don't see that. I see. Sure, I see.
24  Q. Have you ever seen that on any other message
25  before with any other people? Just in your social

Page 184

1  life?
2  A. No, I don't know what it means.
3  Q. Well let's look at the ---
4  ATTORNEY LIGHTMAN:
5  The exclamation points?
6  THE WITNESS:
7  No.
8  ATTORNEY ROSS:
9  No, I mean on the text messages.
10  THE WITNESS:
11  It looks like a there's a circle to me.
12  To me it looks like bowling balls or something, but
13  you know. No, no, seriously. But if you're telling
14  me it's exclamation mark, I take your word. I don't
15  know what it is.
16  BY ATTORNEY ROSS:
17  Q. Well, let's look at --- Mr. Sternberg replies.
18  Gary, you said this in February above. And then it
19  looks like he copies and pastes your first text
20  message. So on the second page here, if you go to
21  the second page, this is the full response that I'll
22  represent to you is from Manfred Sternberg to your
23  second message on the first page. Right. And it
24  says, Gary, you said this in February above. And it
25  repeats your first message. Hi Manfred, sorry, they

1 issued delivery today. Just confirmed you sent him
2 100k. Thanks. Will be by your client's tomorrow.
3 Best, Gary. Includes the same typos, which makes me
4 think it's just a copy and paste from your message.
5 All right, Mr. Sternberg goes on in the exhibit to
6 say, of course that never happened, even though the
7 goods were less than 45 minutes away, according to
8 you. Not sure what the real problem is, but
9 stringing us along like this only hurts Sam and his
10 business, destroys your credibility from the broken
11 axle story, to the screws, to the holiday, to the
12 winter storm, and now to the cruise that you assured
13 me about that you would personally indict --- I think
14 it means inspect and deliver first thing Manday ---
15 which I think should be Monday.
16 Do you remember reading that message when you
17 first received it?
18 A.I don't know what to tell you. I'm looking at
19 the message like you are looking.
20 Q.Do you remember reading this when you first
21 received it? That's my question right now.
22 A.No, I don't. That's why I'm trying to figure
23 out.
24 Q.So on March 15th ---
25 A.Yeah.

1 Q.--- just like on February 28th. On March 15, you
2 say, looks ready for tomorrow. But you knew that
3 there was nothing ready for tomorrow.
4 Right?
5 A.Yeah.
6 Q.On March 16th, Manfred texts you after no
7 response to his prior reply.
8 A.Okay.
9 Q.He says, is this done as promised? And now I'm
10 on the third page. This full exchange I'm reading is
11 on the third page. It is done as promised on March
12 16 at 11:24, and then again at 2:42 p.m. On the same
13 day. Where are we on this? And then on March 16th,
14 the same day, at 6:00 p.m. Manfred texts, You don't
15 have the test kits, do you? And you respond, I do
16 not know what you are telling me. Spoke to Sam
17 today. Will take care of them. What did you mean by
18 will take care?
19 A.Where are you? Where are you?
20 Q.The third page of GW 23.
21 A.I'm on the third page, okay.
22 Q.So when you respond, I don't know what you're
23 telling me. Spoke to Sam today. We'll take care of
24 him. What did you mean by we'll take care of him?
25 A.I don't know what it means really. I'm trying to

1 figure it out. I really don't know what it means.
2 I'm looking at the text, but what it means, I do not
3 know what you are telling me.
4 Q.Manfred asks point blank on March 16th at 6:00
5 p.m. You don't have the test kits, do you? And he's
6 right. It doesn't sound like he knows that yet. But
7 you didn't have the test kits because you had rice.
8 And you knew that by the 7th or the 8th of March.
9 A.Yeah. Shlomi knew it too.
10 Q.But he's asking you. You don't have the test
11 kits.
12 A.He already know something. You don't have it,
13 right?
14 Q.Tell me what part of that message shows you that
15 he knows something.
16 A.I don't know, tell me what part that he doesn't
17 know. It tells me that he does know. That's exactly
18 what it is. On March 16th, he's asking, you don't
19 have the test kits, do you? He knows already I don't
20 have it.
21 Q.Then he said ---
22 A.Sam probably told him. So this is only just for
23 show. I had a feeling all along that Manfred is
24 trying to frame me. He's trying to get all this text
25 to be able to use it to the people that he had to pay

1 commissions to show that you are not getting paid yet
2 because the deal was not done, or something happened
3 to the merchandise, or this is what was going on in
4 my mind. I was concerned with the balance that I
5 have to get. And each time that I asked Sam, where
6 is the money? Where is the money? He is telling me,
7 okay, I'm going to get you another portion of the
8 money. But I want you to --- I want you to send an
9 email like that, or a text like that. And that's
10 what I did till I got paid one more time. And one
11 more time and one more time. Unfortunately, it
12 stopped at $1.66 million.
13 I don't know what happened between Manfred and
14 Sam. Why Sam did not get paid all his money from the
15 escrow account, which should have happened when the
16 money went on the truck of the common carrier. But
17 here we are today and there is still money that Sam
18 claims that he did not get. And that's one of the
19 reasons that I did not get paid.
20 Q.So on March 15th you send this message that you
21 say Sam dictated to you, two messages. No, that's
22 not true. On March 15th you sent one
23 message. You say Sam dictated that message to you,
24 Mr. Gross. You're trying to get the balance of money
25 that you're owed ---



1  A. Right.
2  Q. --- even though you know that you have no
3  products to sell.
4  A. Again, I sold already the product to Sam Gross.
5  I already delivered it to Sam Gross on March 7. My
6  responsibility to Sam Gross is fulfilled. I
7  finished. This is what I was asked to --- to
8  coordinate the shipping. Number one.
9  Q. Of rice?
10  A. I made --- no, I made an agreement with Sam Gross
11  that I'm going to sell him 365,000 test kits. And I
12  did give it to him. He asked me to put it on a
13  carrier and it will go from there and my job is done.
14   Okay. To move forward, because you are moving
15  forward. Okay, we are moving forward then --- we are
16  moving forward. To move forward, I already gave a
17  refund to Sam Gross. By then he already got
18  collateral.
19  Q. We'll get to the collateral, I promise.
20  A. Yeah, but I'm telling you that there is no more
21  deal between us here. So I don't know why they need
22  Sam Gross or Manfred, why they need this text, except
23  maybe to show blame on Gary Weiss. However, I still
24  hope to get some more money. And it stopped in the
25  last payment from --- from Zekaria. The last payment

1  was on February 28, right? Something like that, for
2  70,000. And I hope to get more money. But I don't
3  think --- I didn't manage to squeeze any more money
4  till today. And the collateral that I gave ---
5  Q. I'll ask you about the collateral in a minute.
6  We're going to go back to the text messages.
7  Okay?
8  A. Already started to sell it. Probably they sold
9  way before the date that you are mentioning. Because
10  I gave the first time for Diamonds on February 22.
11  And Ms. Zekaria testified that she gave it to
12  somebody by the name Timothy or Tim to give to Sam
13  Gross. Till today ---
14  Q. Okay.
15  A. --- I was never offered that collateral back. So
16  it turned to be a refund. And we already have
17  letters. Sam confirmed that I settled with him long
18  time ago. So I don't know why we continue --- why we
19  continue to have these texts. And I hope that Sam
20  will be able to get more money from Sternberg. But
21  apparently he couldn't. Until today he's still
22  looking for a balance of over a million dollars. And
23  in the meantime, I'm still owed 523,000.
24  Q. Do you remember what you meant when you texted
25  Manfred Sternberg? We'll take care of him in

1  reference to Sam?
2  A. No, I'm looking at it.
3  Q. What about when you said ---
4  A. I don't know who is him, or maybe it's a mistake
5  in whatever. You know, we'll take care of him or it,
6  or whatever. But it says him.
7  Q. Well, let's keep going. Manfred said. You said
8  tomorrow for the last week every day. What am I
9  missing? And you said, I'm working it out with Sam.
10  A. Okay.
11  Q. What do you mean by working it out with Sam?
12  A. I don't know. This is what I was told to text.
13  Unfortunately, I did this text, but.
14  Q. Who told you to text, I'm working it out with
15  Sam?
16  A. I don't know.
17  Q. It's your testimony, under oath, that Mr. Gross
18  told you to text Manfred Sternberg, I am working it
19  out with Sam?
20  A. Exactly.
21  Q. And then Mr. Sternberg replied, there is a piece
22  of the puzzle I don't understand. And you are not
23  being forthcoming with the facts.
24  Do you see that?
25  A. Yeah.

1  Q. You had the tests, we paid for them. Then you
2  held them hostage for more money. We paid. Then you
3  did the same for even more money. Which we paid.
4  A. Okay.
5  Q. Now we have to move to the fourth page for the
6  full response. Now, for the last two weeks, you say
7  tomorrow every day and won't explain why you don't
8  have the tests any longer. What would you think if
9  Sam were selling these kits to you?
10  Do you remember reading that message the first
11  time?
12  A. Where are you now?
13  Q. On the fourth page. This one. Take your time to
14  read it. Tell me what time.
15  A. I don't know. As I'm telling you, everything was
16  dictated by Sam and probably dictated by Manfred to
17  Sam. I'm not sure. But because sometimes when he
18  told me to dictate and it was not correct, he told me
19  to correct something. But I cannot recollect ---
20  Q. I hate to say this about my own client, but Mr.
21  Sternberg looks pretty clueless here.
22  A. Yeah, yeah.
23  Q. Doesn't look like he was involved in whatever
24  this conspiracy between you and Mr. Gross was.
25  ATTORNEY LIGHTMAN:



Page 193

1  Objection.  The mastermind is never
2  clueless.
3  ATTORNEY ROSS:
4  Objection.
5  THE WITNESS:
6  He makes believe that he's clueless.
7  But you know, everybody has a different opinion.  I
8  can just show you that's what it is.  Mr. Manfred is
9  a lawyer.  He knows what it means to give merchandise
10 to a common carrier.  And he knows what does it mean
11 not to give a Bill of Lading and the shipment will be
12 delayed.  He knows.
13 BY ATTORNEY ROSS:
14 Q.Did you call Mr. Sternberg for a Bill of Lading?
15 A.No.  My sale is to Sam Gross.
16 Q.Okay.
17 A.I told Sam Gross that this ---
18 Q.Bags of rice.  Boxes of rice.
19 A.Okay.
20 Q.And he --- I think.  Right, he knew that?
21 A.No, I didn't say that.  What he knows, I don't
22 know.  What you are alleging, I don't know.  I can
23 tell you that on February 7 I loaded two movers
24 365,000 test kits.  COVID-19 test kits.  That's what
25 I did.  I did exactly as agreed and was asked by Sam

Page 194

1  Gross, the person that bought for me the merchandise.
2  I made a deal with Sam Gross and I fulfilled my side
3  of the deal with him.
4  Q.When did Mr. Gross first learn that there was
5  only rice in the boxes?
6  A.On the day that I picked it up.
7  Q.Which was what day?
8  A.Seventh or eighth of March, something like that.
9  I don't remember the date exactly.
10 Q.And how --- how do you know that?
11 A.I called Sam right away.  When I opened the
12 boxes, I told Sam, there's no more kits here.
13 There's rice here.  And he said, okay, hold on a
14 minute.  I have now an investigation from the FBI.
15 I'll get back to you.
16 Q.And when did Manfred Sternberg find out that
17 there was rice in those boxes instead of test kits?
18 A.I believe that he found out after I told Sam.
19 When Sam told him exactly, I don't know.
20 Q.What evidence do you have that Sam told him?
21 A.I don't have any evidence that Sam told him.  And
22 maybe Sam did not tell him.  I don't know that.  I
23 don't know what he texted and spoke to Manfred.  I
24 have no idea.
25 Q.So, while we read through these, what we have is

Page 195

1  your testimony today that you told Mr. Gross on the
2  day of the March 7th --- 7th or 8th.  You said, I
3  think that these were filled with rice and not test
4  kits.  But we have no evidence of when Mr. Sternberg
5  knew that.
6  A.No.  True.  You have to ask Sam Gross when he
7  told his lawyer about that.  I don't know.
8  Q.Why didn't you simply message Sternberg?  All I
9  have is rice.  Didn't Sam tell you?  This is a
10 problem.  I still want my money.  What are we going
11 to do?  Anything?  Why didn't --- if you're in direct
12 contact, why don't you just tell Mr. Sternberg
13 there's only rice?
14 A.No.  Sam Gross is my buyer.  He also was my
15 friend.  I called him right away, Sam Gross, there is
16 only rice in there.  And he said, the FBI is already
17 involved.  I'll take care of it.  That's all.  I told
18 Sam Gross at that time.  Listen, I did what you asked
19 me, and I did you a favor.  I'd have no more
20 responsibility once I put it in the truck.  You know,
21 I already gave you collateral.
22 Q.Let's set aside ---
23 A.--- and at that time, I knew that I'm being set
24 up here already.  And also I gave them collateral,
25 which they took from me.  So they compounded whatever

Page 196

1  happened into me not getting paid the balance and
2  giving collateral for a stupid reason.  I don't know
3  why I gave him a collateral.  I didn't have to.
4  Q.So again, Sam Gross is your friend?
5  A.Right.
6  Q.You know that you don't have any product for his
7  --- for his buyer by March 7th.  What --- how do you
8  and he decide to deal with that?
9  A.I didn't decide.  He decided not to deal.  I told
10 him --- I told him, Sam, I did what you wanted for
11 me.  I put it on the truck.  I don't have any more
12 responsibility.  I don't know what happened to this
13 --- to this test kits that I put on the truck.  It's
14 your --- it's an issue that you have to take care of.
15 Q.Legal duty aside.  You didn't feel any obligation
16 or responsibility to a friend who's about to be
17 pretty screwed over by the disappearing test kits?
18 A.No.
19 Q.You just wash your hands of it and say no.
20 A.I didn't wash my hands.  No, absolutely not.  I
21 had the collateral by him.  I didn't ask for the
22 collateral back.  And after several days, I don't
23 know exactly when, Sam advised me, okay, we're going
24 to have to sell the collateral.  It wasn't any more
25 in my hand.  I don't know in whose hands it was.  It



1  was in Manfred hands or in Sam hands, or both hands
2  or.  I don't know what they did with the collateral.
3  Q. All right.
4  We'll get to the collateral.
5  A. I knew full well they're going to have the money
6  to buy new test kits and deliver to their customer.
7  And they told me that they are doing it.  And also
8  they told me that they shipped to VRC.  They told me
9  later on that they shipped to the Safety House
10  something that was rejected.  So, no I didn't feel
11  bad.  I had a lot of money collateral, which I told
12  Sam I'm taking the loss, whatever it is.  You know,
13  that's all I did.
14  Q. On March 17th ---
15  A. Yeah.
16  Q. --- strike that.  At some point ---
17  A. Okay.
18  Q. --- Mr. Sternberg texts you that he just got
19  served with lawsuit.
20  A. Okay.  I remember seeing it someplace.  Yeah,
21  he's sending me here a picture.
22  Q. Go to the next page after that.  And that's the
23  next page after that is where I'm --- just got served
24  with lawsuit, which is why I had to go.  I'm really
25  not happy.  Tomorrow this must be fixed.  Must be

1  delivered.  I'm advising Sam to sell all collateral
2  tomorrow.  Don't lie to me and think I'm stupid.  I'm
3  not.
4  A. Okay.
5  Q. You screwed around with this sale long enough for
6  me to be sued and serve the lawsuit.  All because of
7  you.  I beside myself not what you want.  On March
8  17th he says, what is the story today?  That was
9  March 17, at 6:38 p.m.
10  A. Okay.
11  Q. On March 18th, respond at 9:01 a.m.  Manfred and
12  Sam working on my issues.  Thanks for patience.  What
13  issues were you working on?
14  A. Okay.  So you started with the served, right?
15  The first part of your long question.
16  Q. Yes, that's right.
17  A. This lawsuit against Manfred and Sam started on
18  February 23rd.  The precious gentleman did not tell
19  me that, they kept on framing me with the emails.
20  Q. What emails?
21  A. With emails and texts.  Oh, the shipment will
22  arrive soon.  They're already being sued.  They
23  already --- they already got a request for refund
24  from Mr. Scully.  They didn't tell me.  They didn't
25  tell me that the sale is severed by Mr. Scully.  And

1  they wanted now to show that Gary Weiss screwing up.
2  But on February 15 and 16, they were asked for the
3  money back.  And consequently, Mr. Scully, through
4  his lawyer on the 23rd, already started a lawsuit
5  against --- the Safety House started a lawsuit
6  against Manfred and Sam.  And they continue after
7  that, without telling me that there is a lawsuit
8  against them.  You see, the first time, only in March
9  15 after a month.  They still trying to frame me to
10  show that the fault is with me.  So this is a
11  continuation of all the proceeding frame up that they
12  tried to do.
13  Q. What evidence do you have that they were trying
14  to frame you?
15  ATTORNEY LIGHTMAN:
16  Excuse me ---
17  THE WITNESS:
18  I'm just coming the conclusion
19  ATTORNEY LIGHTMAN:
20  Hold on, please.
21  THE WITNESS:
22  Yes, sir.
23  ATTORNEY LIGHTMAN:
24  When he's giving answer, don't
25  interrupt him.

1  ATTORNEY ROSS:
2  Oh, that rules for me, but not.
3  ATTORNEY LIGHTMAN:
4  It does, let's not get devolve ---
5  ATTORNEY ROSS:
6  Remember that later.
7  ATTORNEY LIGHTMAN:
8  --- let's not devolve --- let's not
9  devolve the carrier situation.
10  ATTORNEY ROSS:
11  All right, I'm pulling Lightman.  I'm
12  sorry.
13  THE WITNESS:
14  I'm sorry.  I'm sorry.  I am sorry.
15  I'm sorry.  Because I'm guilty of that too.
16  ATTORNEY LIGHTMAN:
17  I'm sorry, you're sorry.
18  ATTORNEY ROSS:
19  He's right.  Mr. Lightman's right.  I
20  got to let you finish.
21  ATTORNEY LIGHTMAN:
22  Mark that spot on the record for the
23  opposing counsel said, Mr. Lightman's right.  I'm
24  teasing.
25  THE WITNESS:

1  Mr. Joseph, we are here to hear what I
2  have to say ---
3  BY ATTORNEY ROSS:
4  Q. Yes.
5  A. --- and to answer your questions.  Okay.  Both of
6  them.  And I'm trying to tell you exactly what I
7  recollect today from some two years ago.  I want you
8  --- to remind you that the lawsuit against me
9  started only seven months after the incident.  Nobody
10  told me that there is a lawsuit and whatever.  I
11  already made an agreement with Sam, here is the
12  collateral and they already told me that they're
13  going to go ahead and sell it.  I cleaned my hands.
14  I gave a refund to them.  I swallowed my loss.  It
15  doesn't matter whose fault it is.  I came clean of
16  debt.  I gave them diamonds, already on '22 and now I
17  question why they asked me for collateral already on
18  the '22.  Okay.  Where I gave the first time four
19  diamonds to Zekaria.  I don't know what they planned.
20  Q. I'm sorry, just briefly.
21  A. Okay.
22  Q. You gave collateral to Zekaria.  That was before
23  the 22nd?
24  A. On the 22nd.
25  Q. Okay.

1  A. First time, four diamonds.
2  Q. Did you give other collateral after the four
3  diamonds?
4  A. After, yes.  They asked me for more collateral.
5  I gave them more collateral.  We ended up with over
6  $4 million of collateral.  When they told me that
7  there --- when I told them there is no merchandise, I
8  already knew collateral is not going to come back to
9  me.  But what I'm trying to answer your question
10  here.  You pointed out the lawsuit.  The lawsuit
11  started on the 23rd, right?  They knew that there is
12  a lawsuit against them.  They knew that Scully asked
13  for a refund already on the 15th.  However, they kept
14  on leading me with the texts and with the emails so I
15  look guilty.  This is why I think today that they try
16  to frame me.  That's my answer to you.  You
17  understand?
18  Q. I do.
19  A. Okay.  I also had another issue.  I was trying to
20  get the balance of the money from Sam.  Sam told me
21  if you want to get some more money, I have to get it
22  out from Manfred.  Do me a favor, text this and I'll
23  get you more money.  Okay.  So I got three more
24  payments and then it stopped after February 28.  Now
25  why they continue to ask me for all these texts and

1  emails, to frame me so I look the one to blame.
2  That's all I'm telling you.  But we go forward.
3  There is collateral verified.  This is collateral
4  that was given to a diamond dealer over 20 years.
5  His name is Shlomo Gross.  He knows the diamonds he
6  got.  He knows all the gems that he got.
7  Mr. Manfred confirmed that he knows that there is
8  collateral and he advised me that he's going to be
9  selling it.  There is a text or email on the 29th of
10  March, tomorrow we're going to start to sell it.
11  It's confirmed by text and emails to me, to Mr. ---
12  Attorney Rick Adler for VRC I think, that they're
13  going to --- if they don't get merchandise by
14  tomorrow, they're going to start to sell the
15  collateral.  So all these texts, I agree with you,
16  they were generated.  What I'm trying to tell you, I
17  was dictated to generate.  I agreed to give them this
18  in order to get more money.  Knowingly --- knowingly
19  that I already made my delivery on February 7.  I did
20  not know about the lawsuit and the refund that Mr.
21  Scully asked.  And they continued to lead me on with
22  all these texts after that.
23  So that's what I have to say.  I have to say that
24  yes, I did send these messages, but I did give
25  collateral.  I did agree that this collateral will

1  stay by them and they can sell it.  And this is my
2  refund to them.  I apologized to Sam Gross that I
3  could not complete this task.  Not on my fault, not
4  because I planned anything here wrong, like you guys
5  are suggesting that I put rice there.  That's what
6  you are suggesting.  No, that was done somewhere
7  after.
8  Q. I don't want you to think --- I'm not suggesting
9  you put rice there.
10  A. Okay.  I'm just making a statement.  You are not
11  saying that --- you are suggesting, but that's what I
12  hear a few times from your testimony and from
13  interjections by Mr. Scully a few times here,
14  alluding to that.  So I heard that --- I heard that
15  with my own ears.
16  Q. All I'm saying is that you keep texting Manfred
17  Sternberg in these text messages.
18  A. Right.
19  Q. About what --- it seems to be a conversation
20  about a delayed delivery ---
21  A. Okay.
22  Q. Of something in these messages he seems to think
23  exists, which are test kits, at least initially.  And
24  you know, by at least the 15th, they don't exist.
25  They're not real.  They'll never come.  And you say



Page 205

1  tomorrow, one day, here you say on March 18th,
2  working on my issues.  What do you mean by working on
3  my issues on March 18th?
4  A. I cannot explain you.  I'm telling you exactly
5  that --- it was dictated to me to say, working on my
6  issues.  And I know that by then ---
7  Q. Was dictated to you by whom, I'm sorry, but by
8  whom?
9  A. By --- to me, everything was dictated directly by
10  Sam Gross.  I believe that with the knowledge of
11  Sternberg.  But I state I believe because I don't
12  have proof, except some text that I intercepted where
13  Manfred is suggesting a text to Sam Gross, to give it
14  to me and I should text it.
15  Q. Do you have those to produce?
16  A. I don't know if I have it here, but I have one
17  and I will produce it.
18  Q. How did you intercept that?
19  A. Sam sent me screenshots of his texts, and he
20  showed me what Manfred is texting to him to text me.
21  And that's not my imagination.  I have one of those
22  texts.  It's not with me here.
23  Q. Okay.
24  And everybody here would like to see those.
25  A. I will produce that, okay.  No, it's not here in

Page 206

1  this batch, but I will produce that.  So let me make
2  a note, so.
3  Q. So, can we mark that as a request for production
4  of the text messages?
5  A. Produce texts of Manfred, texting to Sam to make
6  me text and or image.  I thought I produced it at the
7  time to along with some other papers to Mr. Lightman.
8  Maybe not, but I will.  Look, I saw it.  I know, in
9  the last week, so I know it exists.
10  Q. I have an idea of what you might be referring to.
11  Rather than jump to conclusions, I'd like you to
12  just produce what you're thinking of.  And if you've
13  already produced it, that's okay.  It's no problem.
14  A. I will produce it anyhow.
15  Q. Okay.
16  A. Yes, I produced it before.  I am sure.  I have no
17  doubt.  I have no doubt.
18  Q. Okay.
19  We're going to turn back to the text messages.
20  What are you looking through right now?
21  A. I'm looking through plaintiff request for
22  admission.  There are some texts here in the back
23  that Mr. Lightman sent along with that.  Maybe it's
24  here.
25  Q. Okay.

Page 207

1  I want to set that aside for now.
2  A. Okay.
3  Q. If we're here after five, I want it to be Mr.
4  Lightman's fault.  So I'd like to wrap up.
5  ATTORNEY LIGHTMAN:
6  I have to leave a quarter after five
7  and I need a half an hour at least.  But it's a good
8  half an hour.
9  ATTORNEY ROSS:
10  Okay.  My earplugs are.
11  BY ATTORNEY ROSS:
12  Q. All right.
13  I want to turn you back to GW 23, 23 yeah, Mr.
14  Weiss.
15  A. I also want to make some.  I forgot to mention
16  something that's very short.
17  Q. Go ahead.
18  A. When Mr. Scully asked for a refund, Sam Gross on
19  the 16th or the 15th ---
20  ATTORNEY LIGHTMAN:
21  Of February.
22  THE WITNESS:
23  Of February, I'm sorry, February 2022.
24  Sam Gross told Mr. Scully, call my lawyer and you
25  get a full refund back.  At that time, the money was

Page 208

1  still in Mr. Sternberg's escrow account.  I don't
2  know why it did not happen then.  Right.  I saw that
3  request later on, but it's definitely documented by
4  Mr. Lightman and I saw it, that Mr. Scully is asking
5  for a refund and Mr. Sam Gross is offering the refund
6  and giving an instruction to his lawyer, in essence,
7  to give a refund.  But somehow it did not happen.
8  And then they started with the --- and then they
9  started with my framing, like to look --- they wanted
10  to get out from the refund by making Gary Weiss dirty
11  and guilty.  That's what I wanted to say.  That's my
12  opinion.  And this is what the texts and everything
13  will show later on.  Like Mr. Lightman says in front
14  of the jury, or whatever you guys plan.  That's what
15  the story is.
16  ATTORNEY LIGHTMAN:
17  Mr. Ross.  All your client had to do
18  was send the money back, we wouldn't be here.
19  ATTORNEY ROSS:
20  All right.  We're here for testimony
21  from the witness today.
22  ATTORNEY LIGHTMAN:
23  He just gave you great testimony.  That
24  was good.
25  THE WITNESS:



1  And I'm giving you the truth.  That's
2  all it is.  Nothing more.
3  ATTORNEY LIGHTMAN:
4  At least this part of.
5  THE WITNESS:
6  And I'm not ashamed about all these
7  texts.  Me trying to get more money from Sam Gross,
8  which owes me, you know.
9  BY ATTORNEY ROSS:
10  Q.On March 29th ---
11  A.Yeah.
12  Q.The message, working on a good resolution to our
13  problems.  What did you mean by that?
14  A.I don't know, again.
15  Q.You don't know?
16  A.It may be through for them to --- I told Sam
17  that, listen, you have this collateral.  If you want
18  to go ahead and sell it, whatever you want to do.  I
19  knew I'm not going to get it back anyhow.  I have no
20  doubt that Sam will not give it back.  And by then --
21  - what date was it?
22  Q.The last one I just asked about March 29th.
23  A.By March 29, in my opinion, Sam already sold the
24  diamonds and some other things.  That's my opinion
25  from understanding later on.

1  Q.How much were the diamonds worth?  The four
2  diamonds.
3  A.$840,000.
4  Q.Okay.
5  And because those weren't enough collateral to
6  cover, you gave additional gems?
7  A.Correct.
8  Q.And how much were those worth?
9  A.I gave an excess of four million.  I have to sum
10  up all the collaterals.  I have them, but it's a
11  little bit over $4 million.
12  Q.All right.
13  So it's your testimony that you --- when you
14  repeatedly texted Manfred Sternberg throughout March
15  that you were going to deliver, that those messages
16  were dictated by Gross.  Gross knew that there was
17  just rice in those test kits?
18  A.No, I didn't say after March 8, when I told him
19  that.
20  Q.I'm sorry.
21  A.Okay.
22  Q.Correct.  I stand correct.
23  A.After March 8, yes, he knew already that there is
24  no more text kits in those boxes.
25  Q.Do you remember what gems you gave as additional

1  collateral?
2  A.You have --- I provided already a list to Mr.
3  Lightman, so it's already on record.  There is a copy
4  of --- I see here only one page of list, but it's
5  because of my printer, I guess.  It doesn't show the
6  whole page.  I'm looking more.
7  Q.So about 800,000 four diamonds for the initial
8  collateral.  And then how much in additional gems?
9  A.Had to be over $3 million.
10  Q.Why didn't you just sell those and get money?
11  A.I cannot answer why, because that's how it
12  happened.  That's how it went down.  So there was no
13  question of why, I just did it.
14  Q.Did you still owe him $3 million as a refund?
15  A.No, I gave him a collateral to hold.  Then it
16  turned they are selling it.
17  Q.Was that more or less than the value that ---
18  A.Well, it depends on your customers where you sell
19  it.  You can get even more money than that.  It
20  depends who your customers are.
21  Q.Well, you're a lifelong jeweler, so you would
22  know who to sell them to get more than that.
23  Right?
24  A.Well, those are wholesale prices.  In retail it
25  probably would sell 50 percent above those prices and

1  more.  I'm talking about a jeweler on 47th street in
2  the Diamond District, where merchandise is sold in
3  very reasonable prices, not like in a private store
4  outside of a Diamond District.  So.
5  Q.And my question is, why did you decide to give
6  them gems instead of selling the gems you had to get
7  the cash they wanted as collateral or as payment?
8  A.Okay.  They wanted to ask, can you give us a
9  collateral in the meantime to guarantee delivery that
10  it's not going to be not delivered?  That was what
11  Sam told me that Mr. Manfred asked him to do and to
12  ask me, that was my understanding.  So I gave the
13  first part of the collateral on February 22 that was
14  picked up by Attorney Daphna Zekaria.  And after
15  that, several days, they asked me for more
16  collateral.  So I gave them more collateral.  I gave
17  them, I think, in two --- two more shipments of
18  collateral.
19  Q.Sorry, what dates?
20  A.I don't have --- you see, it's cut off in the
21  printing like this, so.
22  Q.Who did you ship them to?
23  A.Sam send me his friend.  His name is Matthew
24  Acorn or Alcorn, something like this.
25  Q.And after you've given that collateral, including



1  the four diamonds and then the two subsequent
2  shipments, did you consider that collateral excused
3  the inability to pay the money back in the event that
4  there was no --- no actual COVID tests?
5  A.They didn't ask me for money back, they just
6  considered the collateral that they had sufficient.
7  As though, as I gave them a refund.  Nobody was
8  talking about give me the money back.  Manfred or Sam
9  did not ask me the money back.  They already had the
10  collateral, they just suggested to me that they're
11  going to start to sell it.
12  Q.So today, you don't believe you owe anything to
13  Sam Gross?
14  A.I know I don't.
15  Q.When you provided the collateral, what ---
16  A.I am trying to tell you that he owes me money.
17  Q.Okay.
18  Let me just finish the question.
19  A.Okay.
20  Q.When you provided the collateral, what
21  documentation of providence or value did you provide
22  with it?
23  A.I don't know what I provided, but Sam at that
24  time was already 22 years in the diamond and jewelry
25  business.  And everything that he got, he confirmed

1  later on.
2  Q.How did he confirm that?
3  A.I have texts from him that you gave me over $4
4  million in gems.  Several times in emails and texts.
5   You are talking about a person that understands
6  jewelry very well.  Jewelry and diamonds.  Till
7  today, two and a half years ago.  Two and a half
8  years already, not Mr. Manfred and not Sam Gross ever
9  complained about the value?  Nobody said you gave us
10  something that is not worth $4.5 million.
11  Q.Did you provide any GIA certificates?
12  A.I don't know what certificate I provided.
13  Q.IGI, any sort of?
14  A.I don't think so.  For the diamond, I think I
15  provided an appraisal certificate or something.  I
16  don't know.  I have to look it up.  I gave it to ---
17  I gave the gems with the paperwork on the first
18  diamonds, the four diamonds, to Zekaria.
19  Q.Where did you --- I'm sorry.  I'm sorry.  Go
20  ahead, finish.  I'm doing it again.
21  A.No, that's what I had.
22  Q.Where did you get the diamonds that you gave to
23  Zekaria?
24  A.There were four diamonds, so I don't know if it
25  was from the same source, but they were in my

1  inventory sometime, and I provided them with
2  description of the diamonds.  They didn't ask me for
3  any receipts or anything like this.  I cannot give
4  you more of answer about it.
5  Q.Where do you keep your inventory?
6  A.Where did I keep my inventory then?  In my house.
7  Q.And what about the other two shipments of gems as
8  collateral?  Where did you source those from?
9  A.I'm trying to think about the name of the person.
10  Q.Maybe the peanut gallery can give you some quiet
11  to think with.
12  ATTORNEY LIGHTMAN:
13  I'm sorry, if we were, whispering
14  among.
15  THE WITNESS:
16  Well, I had them in my possession for
17  over ten years, so I don't remember really the name
18  of the person, I think Mario something, but I don't
19  remember.  I don't remember right now anyhow.
20  BY ATTORNEY ROSS:
21  Q.Okay.
22  So those two ship --- those two shipments of gems
23  that came after the four diamonds were gems that you
24  had owned for more than ten years.
25  Is that what you said?

1  A.Close to ten years, yeah.
2  Q.And those two shipments constituted the --- the
3  bulk of the value, right.  I mean, they were worth
4  more collectively ---
5  A.Yeah.
6  Q.--- than the diamonds?
7  A.Yeah, exactly.
8  Q.And do you know where the collateral is as of
9  today?
10  A.I don't really know.  That's a good question.
11  Q.If the collateral was tested, would it surprise
12  you if it consisted of quartz and glass and synthetic
13  rubies and emeralds?
14  A.Nothing would surprise me.  But your question is
15  if ---
16  Q.Why wouldn't surprise you?
17  A.Are you suggesting that you had the collateral
18  tested?
19  Q.I'm suggesting that if I could find the
20  collateral and test it, what would I find, as far as
21  you know?
22  A.I don't know.
23  Q.Or if Mr. Lightman tested it, what would he find,
24  as far as you know?
25  A.I don't know.  I gave the collateral two and a



1  half years ago.  I don't know in whose custody it was
2  since then --- what was done with it.  I know that
3  for sure, they told me that they are selling it on
4  March 29th, and I have no doubt that they sold it.
5  And what you are telling me right now, I cannot
6  answer you.  I don't know.  What collateral --- is
7  that my collateral.  You have my collateral back
8  here?
9  Q.Why don't you doubt that they sold it?
10  A.I don't doubt anything.
11  Q.You're certain that they sold it?
12  A.They told me.
13  Q.Who told you?
14  A.Mr. Manfred confirmed that he's selling it
15  tomorrow.
16  Q.And did you see any evidence that he sold it?
17  Aside from him telling you that?
18  A.I don't know what he does.  I never met Mr.
19  Manfred.  He lives in Texas.  I don't know what he
20  has, what he's selling.  You know, you're asking me a
21  question that I don't know how I can.
22  Q.You just trusted him that he sold it?
23  A.I don't have to trust him.  He's telling me that
24  he's selling it tomorrow.  What there is to trust?
25  Q.Well, you either believe him or you don't

1  that's ---
2  A.Why should I believe him or not believe him?
3  Q.That's what I'm asking you.  Do you believe him
4  that he sold it?  You said I'm sure they sold it.
5  I'm asking you how you're sure.  Either there's
6  evidence or you just trust that he did what he said.
7  A.Why do I have to believe or trust him?
8  Q.Well, you tell me.  How else do you know that he
9  --- that they sold it?
10  A.I don't know just what they --- just what Mr.
11  Manfred told me through the email and told Mr. Rick
12  Adler that he's selling it.
13  Q.And it's still your testimony today, given your
14  decades of experience as a jeweler, that the
15  collateral you produced was worth more than $4
16  million?
17  A.Absolutely.
18  Q.You'd stake your professional reputation on it?
19  A.I don't know what exactly you are asking me.
20  Q.That's exactly what I'm asking.
21  A.Okay.
22  Q.As a professional, you are absolutely confident
23  that you provided collateral worth more than $4
24  million?
25  A.Absolutely.

1  Q.And again, why did you provide that much
2  collateral?
3  A.Sam told me to provide a little bit more and a
4  little bit more, and I did.
5  Q.Somebody you wouldn't trust with the keys to your
6  house, you ended up giving over $4 million in
7  collateral to?
8  A.Correct.
9  Q.Why?
10  A.Why not?
11  Q.You said the two subsequent shipments of gems
12  were to Matthew Alcorn or Acorn.  You're not sure?
13  A.I'm not sure.  I think it's Alcorn.  I think so.
14  Q.When you didn't get the collateral back, why
15  didn't he just sue Mr. Gross or Mr. Sternberg if you
16  thought that they had sold it?
17  A.Why to sue them?
18  Q.He said you took a big hit on this.
19  A.But why to sue them?  Why do I have to sue them
20  for anything?
21  Q.You don't think that you're owed any of the
22  collateral back?
23  A.I do.
24  Q.He's suing my client and you because he thinks
25  he's owed money.

1  MR. SCULLY:
2  I am owed.
3  BY ATTORNEY ROSS:
4  Q.And he thinks in good faith that he's owed money.
5  You think you're owed money?
6  A.No.
7  Q.Why haven't you sued?
8  A.I owed collateral.  I tried to get back the
9  collateral.  I could not get it.
10  Q.Didn't that upset you?
11  A.I just said I tried to get back the collateral.
12  There's nothing to get upset.  I just tried to do it
13  already.
14  Q.But it's not worth suing to try and get back $4
15  million in collateral?
16  A.This is a hypothetical.  When you sue something
17  you don't know, if you win, I will not go into there.
18  Q.Does Sam Gross at any point express to you any
19  doubt about the authenticity of any of the
20  collateral?
21  A.Never.
22  Q.Did anybody else?
23  A.No.  I just told you till today, not Sam Gross
24  and not Mr. Manfred complained about the value of the
25  collateral that I gave Sam Gross.



1 ATTORNEY LIGHTMAN:
2 How much longer?
3 ATTORNEY ROSS:
4 Twenty (20) minutes.
5 ATTORNEY LIGHTMAN:
6 Twenty (20) minutes.  Perfect.
7 ATTORNEY ROSS:
8 Twenty (20) minutes.  I'm going to try
9 to hold this up.  All right.
10 BY ATTORNEY ROSS:
11 Q. Have often did Sam Gross dictate text messages
12 for you?
13 A. Did?
14 Q. Did.
15 A. At the time?  Almost every day.
16 Q. And you never --- you never mentioned, and I'll
17 --- strike that.  Did you ever speak to Manfred
18 Sternberg on the phone?
19 A. I don't remember speaking to him.
20 Q. Were you aware that he was relaying the
21 information you sent him in text messages to other
22 people?
23 A. No, I don't know what he did with the text
24 messages.
25 Q. So you didn't know whether he was relaying that

1 information to Mr. Gross's clients ---
2 A. I don't know what he did with those messages.
3 Q. --- like Mr. Scully?
4 A. I thought that he's giving it to two or three
5 people, that he owed commissions.  This is what Sam
6 told me.
7 Q. You didn't think that Mr. Scully would be
8 wondering where the product he paid for was?
9 A. I didn't know Mr. Scully.  I never made an
10 agreement with him.
11 Q. That's fair.  You didn't think Mr. Sternberg was
12 going to pass on any of the information that you
13 texted him to any of Mr. Gross's clients, except for
14 the purposes of commissions?
15 A. Correct.
16 Q. That's your testimony?
17 A. Correct.
18 Q. So you didn't think that he was relying on the
19 truth and veracity of what you told him to make
20 representations to other people who paid for the
21 product?
22 A. Mr. Sternberg knew that there is no truth and
23 veracity in those statements.
24 Q. He knew that there was only rice?
25 A. I don't know when he found out, and looking back

1 today, Mr. Sternberg was trying to frame me, that's
2 for sure.
3 Q. Well, that's your belief?
4 A. That's my belief.  Subsequently, he lied to the
5 court when he filed in November 29, naming me as a
6 third party defendant.  After already seven months,
7 six months, receiving collateral and selling it, and
8 not mentioning to the court that Gary Weiss gave
9 already a refund.  So that was malice on his side.
10 And I believe today, looking back, that he tried to
11 frame me.  You understand?  It's very simple.  And I
12 have other instances --- instances --- instances
13 where Mr. Manfred is not telling the truth.
14 Q. Was the product insured, the test kits?
15 A. Well, the product, the way I was explained that
16 it will be insured by the recipients.  Each one made
17 an agreement, which is called sale and purchase
18 agreement.  They would be insuring because they
19 own the merchandise once it's being shipped to them.
20 Q. But you didn't insure it?
21 A. No.
22 Q. Did you ever submit a claim about this or tell
23 anybody else they should submit a claim about this,
24 this switch up with the rice?
25 A. I didn't tell anybody to claim anything.

1 Q. Are you sure that on the day the test kits were
2 delivered by Levin and Zadok's truck, and then the
3 following day, I guess on the 7th of February,
4 transferred to Available Movers truck.  Are you
5 certain that those --- that there were actual test
6 kits in that collection of boxes?
7 A. I'm sure, yeah.
8 Q. But you testified earlier, you never opened any
9 of the test kits.
10 A. I didn't say, I opened several.
11 Q. You said you opened the boxes inside of which
12 there were many test kits.
13 A. I opened those big boxes.  Exactly.
14 Q. Did you open a test kit?
15 A. No.
16 Q. So how did you find out later that there was only
17 rice?
18 A. Okay.  Every box, one of those 365 boxes was
19 filled to the brim with COVID --- with iHealth COVID-
20 19 test kits.  When I picked it up --- when I picked
21 up the box after a month by Available Movers and took
22 them to New Jersey and was preparing in parts to have
23 them delivered myself.  When I personally lifted up a
24 box, it didn't feel the same thing.  Like a full
25 packed box.  You could have the top, you could have



1 pressed a little bit and it would come in not the
2 same feeling for a box from before.  I opened one box
3 and it was with a pack of rice.  Then I opened
4 another one.  All of them had a pack of rice in each
5 one of them.
6 ATTORNEY LIGHTMAN:
7 You checked all 365,790 boxes?
8 THE WITNESS:
9 I unpacked them.
10 ATTORNEY LIGHTMAN:
11 So the answer is yes?
12 THE WITNESS:
13 The answer is yes.
14 BY ATTORNEY ROSS:
15 Q. So there were no iHealth box --- there was no
16 iHealth --- just look at me.  They're testifying and
17 talking and doing all kinds of stuff over there.  Let
18 them do their thing.
19 A. I went back to New Jersey with those boxes, the
20 big boxes.  They supposed to have inside of them
21 about a thousand COVID-19 test kits.  When I went to
22 separate them into groups where I supposed to have
23 them shipped.  Now it's with my own truck, not any
24 more Available Movers, because I picked it up from
25 them.  The boxes didn't feel right.  I opened the

1 first box to look and it wasn't there anymore test
2 kits.  It was a pack of rice.  And each one that I
3 opened, all of them had pack of rice of rices (sic)
4 sacks of rices.
5 Q. Okay.
6 Who moved the boxes from Available Movers
7 facility to your truck?
8 A. I took with me, I think two people.  And the
9 truck that I brought backed to the back of their
10 truck.  They merged together.  So you can really step
11 from one truck to another in the back, you know, just
12 about touching.  And it was a truck day, so they were
13 touching, so they don't get wet.  And those people
14 took out the merchandise from the truck of Available
15 Movers and transferred it to the truck that I
16 brought.
17 Q. Okay.
18 Did you lift any of the boxes yourself to move
19 them to your truck?
20 A. No.
21 Q. So how do you think the rice got into these
22 boxes?
23 A. You want me to speculate?
24 Q. If that's what you're doing?
25 A. No.  What do you think?  If know I would know, I

1 would tell you.
2 Q. Do you think that it was Sam Gross?
3 A. Well, when I --- when I --- when I had the truck
4 that came from Levin and Zadok on Urbanovich, and
5 then came the truck from Available Movers, they did
6 the same thing.  They moved back to back.  And the
7 people from Available Movers, they had three people.
8 They took out all the boxes and put on their truck.
9 After they finished, they left.  Right.  And they
10 went to the warehouse.  When I picked it up, it was
11 the same truck, looked the same truck.  All the boxes
12 went to the truck that I brought.
13 Q. Were the boxes numbered or have some other way
14 that you knew that those were the same boxes?
15 A. No, they were not numbered, but each one had a
16 number on it and it was the same number.  They said
17 --- some of them said 990 and some of them said 1000
18 to the number of test kits inside each box.  Each box
19 was about this size (indicating) by this size
20 (indicating), this big.  Those are the only numbers
21 that were on the boxes.  I think that's the only
22 numbers.  No other numbers.
23 Q. Well, I mean, going back to, I think something
24 that Mr. Lightman asked you earlier, you didn't file
25 a police report.

1 Right?
2 A. No.
3 Q. This was a crime at the end of the day, this was
4 test kits that belonged to you ---
5 A. Absolutely, no.  They belonged to Sam Gross
6 Q. --- and it was a crime.
7 A. Yeah, but Sam Gross ---
8 Q. Let me just finish the question.
9 A. Okay.
10 Q. And it was a crime for these test kits to be
11 again swapped out for rice.
12 Isn't that right?
13 A. I think so.
14 Q. And were you concerned when you realized that
15 there was no test kits, there was just sacks of rice,
16 that you'd be personally liable for the loss?
17 A. Well, I knew that I have collateral and I would
18 settle with Sam Gross eventually.  So that's really
19 what happened.  I had an agreement with Sam Gross and
20 I had a responsibility for him ---
21 Q. And do you know whether --- sorry
22 A. --- the collateral became a refund, unfortunately
23 for me.
24 Q. Do you know Levin's last name?
25 A. I'm not sure if it's Atenum, no, I'm not sure



1  about the last name.  I cannot say.  Not right now.
2  I don't remember.  I'm not sure about his last name.
3  Q.Well, you said you tried to remember it.  You
4  just ---
5  A.Yeah, yeah, I said I don't.
6  Q.What about ---
7  A.I wasn't in contact with him many years since ---
8  probably more than ten years.
9  Q.What about Bichatian?
10  A.Who?  Bichatian?
11  Q.Levin Bichatian.  Is that name familiar to you?
12  A.No.  Not with a B.
13  Q.What about the store Levin Jewelry Repair?
14  A.No.  I don't know what is.
15  Q.Do you know anybody with the last name Rifkin?
16  A.No.
17  Q.Do you know anybody who ever had a store on at
18  578 5th Avenue?
19  A.Excuse me?
20  Q.Do you know anybody who's ever had a store at 578
21  5th Avenue?
22  A.Yeah.
23  Q.Who's that?
24  A.One name, I'm sure was Haberman.
25  Q.Any other names?

1  A.Another one, Harold Green.
2  Q.What about Menekse or Menekse, M-E-N-E-K-S-E?
3  Does that name familiar to you?
4  A.Yeah, Menekse, yeah.
5  Q.Is that Zadok's last name?
6  A.What?
7  Q.Is that Zadok's last name?
8  A.No.
9  Q.This means I only have one or two questions left.
10  How much jewelry inventory do you have at your home
11  that doesn't, you know, isn't the personal property
12  of you or your wife today?
13  A.Your question again?
14  Q.Yes.  How much monetary value of jewelry
15  inventory do you have at your home that isn't the
16  personal property or your wife?
17  A.How much do I have, right?
18  Q.Right.
19  A.I cannot give you a good estimate.
20  Q.You have no idea.  Decades and decades of
21  experience in the industry.  You have no idea?
22  A.It's nothing to do with decades.  I cannot give
23  you a what is going to be the value right now.  I
24  cannot tell you.
25  Q.Have you ever told anybody on the phone that your

1  name was Shraga?
2  A.I don't believe so.  I heard you, Scully.
3  Q.What did he say?
4  A.He lied.
5  Q.What was his lie?
6  A.That I told somebody that my name is Shraga.
7  Q.Do you know ---
8  ATTORNEY LIGHTMAN:
9  He admitted to both me and Mr. Scully
10  on the phone that he went by the name Shraga and that
11  the picture on Shraga on the website was him as a
12  younger person.
13  THE WITNESS:
14  Person, which I did.  Absolutely.  Ask
15  your question again, and you'll see that there's no
16  connection between the two.
17  BY ATTORNEY ROSS:
18  Q.I've got other questions.  You've already asked
19  that one, and these people want to get their
20  questions in.  Have you ever gone by the name of
21  Shraga?
22  A.Yes.
23  Q.Okay.
24  When?
25  A.Before 1973.

1  Q.Never after 1973.
2  A.Never after.
3  Q.He never told anybody associated with this
4  transaction involving Mr. Gross, Mr. Sternberg,
5  Zekaria, Mr. Scully's company.  Never held yourself
6  out to any of those people as Shraga?
7  A.Never.
8  Q.How do you respond to the allegation in the
9  complaint that you never intended to deliver the test
10  kits?
11  A.False.
12  Q.What's that?
13  A.False.  False allegation.  And I have proof to
14  the contrary.
15  Q.What I would like to know is when you and Mr.
16  Gross agree not to tell Mr. Sternberg that the test
17  kits had been replaced with rice?
18  ATTORNEY LIGHTMAN:
19  Objection.  You can answer.
20  THE WITNESS:
21  I never agreed anything like that.
22  BY ATTORNEY ROSS:
23  Q.You never agreed with Mr. Gross to try and work
24  this out without informing Mr. Sternberg that there
25  were no actual test kits to deliver?



Page 233

1   A. No.
2   Q. Okay. That's all I have.
3   ATTORNEY LIGHTMAN:
4   Could we mark this as Gary Weiss 24,
5   please?
6              ---
7   (Whereupon, Weiss Deposition Exhibit
8   24, Email thread with Gary Weiss and
9   Attorney Lightman, was marked for
10  identification.)
11             ---
12              RECROSS EXAMINATION
13             ---
14  BY ATTORNEY LIGHTMAN:
15  Q. The document 20 --- Gary Weiss 24, on May 23,
16  2024, you sent me with a copy to Seth Laver and a
17  copy to Pat Healy of this email.
18  Correct?
19  A. This is from Gary Weiss. Correct.
20  Q. To me, Seth Laver and Pat Healey.
21  Right?
22  A. To Gary Lightman, Laver and Healy. Correct.
23  Q. And in here you write, quote, we know by now that
24  Mr. Manfred Sternberg stole funds from his escrow
25  account, violated escrow rules of many of his

Page 234

1   clients. He also discovered his Ponzi game scam.
2   See that?
3   A. Correct.
4   Q. What did you mean by that?
5   A. Ponzi? Your reference to Ponzi in his testimony.
6   You told me in an email prior, you sent me a copy
7   that you accused Sternberg of Ponzi game scam.
8   Q. Right, but you wrote in here, we know by now that
9   Mr. Manfred Sternberg stole funds from his escrow
10  account, violated escrow rules of many of his
11  clients.
12  What did you mean by that?
13  A. Just exactly what that.
14  Q. But I didn't tell you that. That's what you told
15  me.
16  ATTORNEY ROSS:
17   His answers his answer, Gary.
18  BY ATTORNEY LIGHTMAN:
19  Q. When you wrote that to me what did you mean by
20  that?
21  A. It says very clearly.
22  Q. What.
23  A. In --- I have emails prior to that from you where
24  after his deposition, I got an email from you, I
25  think, where you mentioned the word Ponzi, Ponzi

Page 235

1   game.
2   Q. I'm talking forget the Ponzi games.
3   A. What does Ponzi gang mean? You take from one and
4   you pay to the other.
5   Q. Please. You wrote, we know by now that Mr.
6   Manfred Sternberg stole funds from his escrow
7   account.
8   What did you mean by that?
9   A. Well, I know from Sam that he's owed over a
10  million dollars from the money that he's supposed to
11  get after that I placed the test kits on the truck.
12  Q. That Sam's owed money from Manfred?
13  A. Correct.
14  Q. And Manfred never paid him?
15  A. Correct. That's what Sam is telling.
16  Q. Did he do something else with the funds?
17  ATTORNEY ROSS:
18  Objection.
19  BY ATTORNEY LIGHTMAN:
20  Q. How did Manfred steal--- steal funds from his
21  escrow account?
22  A. Well, should it be gone to Sam after the little
23  delivery that I made on the carrier to give him all
24  his money.
25  Q. So the money should have gone to Sam?

Page 236

1   A. Exactly.
2   Q. Okay.
3   ATTORNEY LIGHTMAN:
4   Can we have this mark as Gary Weiss 25?
5              ---
6   (Whereupon, Weiss Deposition Exhibit
7   25, Email thread Gary Weiss and others,
8   was marked for identification.)
9              ---
10  BY ATTORNEY LIGHTMAN:
11  Q. In Gary Weiss 25, this is an email you wrote to
12  me, Thursday, June 27, 2:02:40.
13  Do you see that?
14  A. We call it Gary Weiss 25.
15  Q. Yes.
16  A. Okay.
17  Q. It says, you write to me in here, you're talking
18  about Daphna Zekaria. And you write, quote, I
19  already heard what I thought about her role in this
20  deal. She was placed as a condition to complete the
21  purchase so Manfred and Sam can verify the
22  merchandise loaded onto the common carrier, Available
23  Movers, which they did. You see that? You wrote
24  that to me.
25  A. Can you tell me which line?



1  Q.You are right on the end of the.  The first
2  paragraph you write.
3  A.Okay, okay.
4  Q.Also, I already heard what I thought about her
5  role in this deal.  She was placed as a condition to
6  complete the purchase so Manfred and Sam can verify
7  the merchandise loaded onto the common carrier,
8  Available Movers, which they did.
9  You see that?
10  A.Yeah.
11  Q.How did they verify that?
12  A.What?
13  Q.You sent them a picture saying here's some goods
14  on our truck.
15  Right?
16  A.I already heard.  That means I heard it in the
17  deposition of Zekaria.  The deposition that you took
18  of her, she said she called Manfred a few times
19  before releasing the money.  Right.  So that's first
20  part of the quote that you were reading here.  She
21  was placed as --- she was placed as a condition to
22  complete the purchase.  They would not give me
23  directly the money.  Like the first part.  That was
24  the deposit, $219,000.  They would send it to Zekaria
25  first.  And after they would verify that it was ---

1  that the merchandise, the COVID-19 test kits, were
2  placed on the truck of the carrier.  Only then they
3  would send me the balance.
4  Q.Did Manfred Sternberg to your knowledge or Sam
5  Gross, to your knowledge, contact Mask and Eldiven or
6  those to get confirmation that you had actually
7  purchased test kits?
8  A.I don't know what they did.
9  Q.Do you know whether they did?
10  A.I have no idea.
11  Q.How would Sternberg and gross even contact Mask
12  and Eldiven?
13  ATTORNEY ROSS:
14  Objection.  You can answer.
15  THE WITNESS:
16  I don't know.
17  BY ATTORNEY LIGHTMAN:
18  Q.Did you provide contact information regarding
19  Mask and Eldiven or the principles to Manfred
20  Sternberg or Sam Gross?
21  A.I don't believe they ever asked me.
22  Q.Okay.
23  So there's no way they could have contacted Mask
24  and Eldiven without you providing information.
25  Correct?

1  A.Your conclusion?  Yeah, your conclusion is
2  correct.
3  Q.And did you supply contact --- did you --- do you
4  know whether Manfred Sternberg or Sam Gross ever
5  contacted Gerard at Available Movers to confirm that
6  he had the test kits?
7  A.I don't know.
8  Q.Did you ever supply Gerard's contact information
9  to Manfred or Sam Gross?
10  A.Absolutely.
11  Q.How did you do that?
12  A.They knew.
13  ATTORNEY ROSS:
14  Objection, form.
15  THE WITNESS:
16  Okay.
17  ATTORNEY ROSS:
18  Go ahead, you can answer.
19  THE WITNESS:
20  Thank you.  I showed them where the
21  merchandise is going to be.  I send them the booking.
22  BY ATTORNEY LIGHTMAN:
23  Q.You sent them a picture of the goods?
24  A.No, no, no, no.
25  Q.You sent him ---

1  ATTORNEY ROSS:
2  Let him finish his response, Gary.
3  ATTORNEY LIGHTMAN:
4  Q.Excuse me.  When you say the booking, you refer
5  to the estimate that AMS sent you, right?
6  A.My contract with them.  It's a contract.
7  Q.It's an estimate.  It sys estimate.
8  A.It's an estimate for the cost.  But it's booked
9  already.  It's written there on the right side of
10  that estimate, booked.  You look at it, please.  I'm
11  surprised that you have to look at it and you don't
12  know by heart, it's booked.  The first one or the
13  second one.
14  ATTORNEY LIGHTMAN:
15  Mark this as Gary Weiss 26.
16  ---
17  (Whereupon, Weiss Deposition Exhibit
18  26, Email plus estimates attached, was
19  marked for identification.)
20  ---
21  BY ATTORNEY LIGHTMAN:
22  Q.Gary Weiss 26 is an email you sent me August 23,
23  2023.
24  Correct?
25  A.Correct.



Page 241

1  Q.And it says it's from Blue River 4747/Gary.   And
2  that's your email, Monipair, M-O-N-I-P-A-I-R@aol.com.
3  You see that?
4  A.I see that.
5  Q.And it says, the subject matters estimate 714195,
6  number 1, February 2, 2022.
7  You see that?
8  A.Okay.
9  Q.Do you see that?
10  A.Yeah.  I'm looking.
11  Q.And you look at the second page of this, it says
12  Gary Weiss, long distance estimate.  You see that in
13  the green on the second page?
14  A.Okay.
15  Q.And it says estimate number 714195 you see that?
16  A.I see, I see everything, yeah.
17  Q.Okay.
18  And it says it's a long distance estimate and you
19  have to pay $2,210 for this estimate to have this
20  estimate, in effect become a booking.
21  Correct?
22  A.Okay.
23  Q.You didn't produce any documentation showing you
24  actually paid $2,210 to Available Movers.
25  Correct?

Page 242

1  A.That's correct.
2  Q.Is it your contention you paid $2,210 to
3  Available Moving (sic)?
4  A.Yes.
5  Q.Where's the receipt?  Where's the evidence of
6  payment?
7  A.I am surprised about you, Mr. Lightman.
8  Q.Pardon me?
9  A.I'm surprised about you.
10  Q.What page of the responses to request or
11  admission you're looking for?  At the top it says
12  page something of 79.
13  A.Mr. Lightman.
14  Q.Yes.  What page?  Read the top of the page.  It
15  says page one
16  A.Page 58 of 79.
17  Q.Where does it say --- it says, please advised,
18  this is your final invoice.
19  A.Okay.  What else do you want?
20  Q.This is an invoice.
21  A.Yeah.
22  Q.Where did you pay it?
23  A.I paid them.  I paid them in parts.
24  Q.Where's the evidence in here that you paid them
25  for this?  This is an estimate.  There's nothing in

Page 243

1  here that says you actually paid this.  Show me where
2  in these 79 pages you have payment of $6,080.09 to
3  Available Moving?
4  A.Okay.  So I'll give it to you.
5  Q.But nowhere in this 79 pages that you did you
6  show that.
7  Right?
8  A.Yeah, yeah, but I have receipts.
9  Q.That's correct.
10  Right?
11  A.Yeah.
12  Q.You showed the final invoice.
13  Correct?
14  A.If this is the final invoice, no.
15  Q.It says final invoice.  This is your final
16  invoice.
17  You see that?
18  A.Yes.
19  Q.But nowhere in this 79 pages of documents do you
20  show payment receipts for this.
21  Correct?
22  A.This is ---
23  Q.Correct, sir?
24  ATTORNEY ROSS:
25  Let him finish his response as you

Page 244

1  admonished me earlier.  Let him finish.
2  ATTORNEY LIGHTMAN:
3  I will withdraw reply.
4  BY ATTORNEY LIGHTMAN:
5  Q.Isn't it true, Mr. Weiss, that nowhere in this 79
6  page exhibit that you filed with the court yesterday,
7  do you show payment receipts for this final invoice.
8  Correct?  Correct?
9  A.Correct.
10  ATTORNEY LIGHTMAN:
11  And let's mark this as deposition
12  exhibit number Gary Weiss 27.
13                      ---
14  (Whereupon, Weiss Deposition Exhibit
15  27, Email with Estimates attached (2),
16  was marked for identification.)
17                      ---
18  THE WITNESS:
19  Can you look at page 59?  Can you look
20  at page 59?
21  BY ATTORNEY LIGHTMAN:
22  Q.Fifty-nine (59) where there's a yellow tab there?
23  A.Not yellow, this is pink.
24  Q.Excuse me.  Where you hand write invoice paid in
25  full?



Page 245

1  A.Correct.
2  Q.Right.  But you don't actually attach the
3  payments.
4  Right?
5  A.No, I didn't.
6  Q.Okay.
7  It's just your handwriting that you paid.
8  A.Exactly.
9  Q.Okay.
10  Let's look at Gary 27.
11  A.Exactly.
12  Q.Oh, and by the way ---
13  A.Are you claiming I ---
14  Q.By the way, excuse me, by the way, if you go back
15  and look at ---
16  A.You have any ---
17  Q.Please.
18  A.--- you have anything to show that I did not pay
19  the bill?
20  Q.Please?  Ready?
21  A.Okay.
22  Q.If you look at invoice number --- if you look at
23  invoice number --- if you look at Gary Weiss 26, it's
24  an estimate 714195.  You see that on Gary Weiss 26?
25  A.Okay.

Page 246

1  Q.You see that?  Do you see that?
2  A.This is ---
3  Q.So if you look at --- wait, if you look at Gary
4  Weiss 26, it says estimate 714195, number one.  Do
5  you see that on the email that you sent me?  See in
6  the very first page ---
7  A.This is Gary Weiss 26?
8  Q.--- it says estimate 714195, number one.
9  Do you see that?
10  A.Okay.
11  Q.And when I asked if you were paid this, you
12  referred me to page 57 of your --- excuse me?  You
13  referred me to page 58 of your 79 pages.  Right.
14  When I said, did you pay this, you said, yes.  And
15  you said, look at page 58 of my 79 page submission.
16  Right?  But if you look at page 58, it's a completely
17  different invoice number, isn't it?
18  Isn't the invoice that you directed me to where
19  you said I paid that a different job number on page
20  58 than the invoice marked as Gary Weiss 26.
21  Isn't it?
22  A.Let me.  Okay, Mr. Lightman.
23  Q.Yes.
24  A.What is your question?
25  Q.My question is the invoice.  The estimate number

Page 247

1  on gallery 26 is 714195.
2  Correct?
3  A.714195.
4  Q.Correct.
5  The invoice that you pointed me to that said it
6  was paid on page 58 of your 79 page submission says
7  job number 714194.
8  Do you see that?
9  A.One second, let me open it again.
10  Q.Page 58.
11  A.Now, let's do it slowly, please, Mr. Lightman.
12  Don't forget that this was all generated by Available
13  Movers, not I Gary Weiss.
14  Q.I'm sorry, you put this 79 page document
15  together.  Not Available --- wait.  Is your testimony
16  Available Movers put this 79 page document together?
17  A.No, I did.
18  Q.You put it together.
19  Right?
20  A.I did.  Wait, wait.
21  Q.I'm waiting.
22  A.Of course I did.
23  Q.Okay.
24  A.Now we are looking.  Which invoice, which page do
25  you want me to look now?

Page 248

1  Q.I asked you whether Gary Weiss 26, that job
2  invoice was paid, you said yes.  Look at page 58 of
3  79.
4  A.One second.  Which document is 26 with the email
5  that is ---
6  Q.The email with the estimate that has 714195 in
7  it.  On your right hand --- your right hand is right
8  there.
9  A.195?
10  Q.Right.  I said, did you pay this and you said
11  yes.
12  A.Yes.
13  Q.I said, show me where, you said look at page 59.
14  What's page 58 of your 79 page submission?
15  Is that the same job number?
16  A.Where is the job number?
17  Q.Here's the job number on 26.
18  A.Got that?
19  Q.Here's the job number on page 58.  That's a
20  different job number, isn't it?  Okay, one.  This
21  one.  Deposition Exhibit 26.  No, no, just answer my
22  question.  Deposition exhibit 714195 ---
23  ATTORNEY ROSS:
24  Gary, let him answer.
25  ATTORNEY LIGHTMAN:



Page 249

1   --- is different than deposition.  Page
2   58, job number 714194
3   Correct?
4   THE WITNESS:
5   Yeah.
6   BY ATTORNEY LIGHTMAN:
7   Q.Okay.
8   Now look at deposition Exhibit 27.
9   A.Okay.  Mr. Lightman.  There were ---
10  Q.Please just answer my questions, please.
11  Deposition 27 ---
12  ATTORNEY ROSS:
13  Gary, do we have to go off the record
14  here?
15  ATTORNEY LIGHTMAN:
16  What?
17  ATTORNEY ROSS:
18  Do we have to go off the record?
19  ATTORNEY LIGHTMAN:
20  No.
21  ATTORNEY ROSS:
22  If he's going to answer he answers.
23  Then when he's done ask.  You did it to me, I'm doing
24  it to you.
25  BY ATTORNEY LIGHTMAN:

Page 250

1   Q.Deposition Exhibit 27 is an email that says
2   estimate number two.
3   Do you see that?
4   A.Estimate number two?
5   Q.Is Deposition Exhibit 27.
6   You see that?
7   A.Where do you see estimate number two?
8   Q.Look at Gary Weiss 27.  It's an email you sent to
9   me August 23, 2023, at 8:46 p.m.
10  A.8:46, one second.  8:46 is the Deposition Exhibit
11  26?
12  Q.No, 8:44 is Deposition Exhibit 26 is an email you
13  sent me on at 08:44 p.m.  It says, estimate number
14  one.
15  You see that?
16  A.Estimate number one.
17  Q.8:44 p.m.
18  A.Exactly.
19  Q.Look at that Deposition Exhibit Gary ---
20  A.That's.
21  Q.Please.
22  A.Okay, I'm sorry.
23  Q.Look at Deposition Exhibit 27.  Don't write on
24  the exhibits, please.  Deposition Exhibit 27.
25  You have that in front of you?

Page 251

1   A.Okay.  That's deposition 27.  Okay.
2   Q.Deposition 27, is estimate number two you sent me
3   two minutes later.
4   Correct?
5   A.Correct.
6   Q.Let's look at Deposition Exhibit 28.
7   ATTORNEY LIGHTMAN:
8   Did I give you 28?
9   ATTORNEY ROSS:
10  Not yet.
11  THE WITNESS:
12  Okay.  Where does it say number 28?  I
13  should put here number 28?
14  ---
15  (Whereupon, Weiss Deposition Exhibit
16  28, Email and estimates attached 3, was
17  marked for identification.)
18  ---
19  BY ATTORNEY LIGHTMAN:
20  Q.Okay.
21  Deposition 28.
22  A.Okay.
23  Q.It's an email you sent me a few minutes later
24  that says estimate number three.
25  Do you see that?

Page 252

1   A.Right.
2   Q.Let's look at Gary Weiss, number 29.
3   ---
4   (Whereupon, Weiss Deposition Exhibit
5   29, Email and estimates attached 4, was
6   marked for identification.)
7   ---
8   BY ATTORNEY LIGHTMAN:
9   Q.See that?  Deposition Exhibit 29?
10  A.Yeah.
11  Q.It's an estimate you sent me a few minutes later,
12  estimate number four.
13  Correct?
14  A.Correct.
15  Q.So my first question is, why are there four
16  different estimates for the same thing?
17  A.Okay.  Tell you why.  You let me answer.  What
18  they did on each job ---
19  Q.What do you mean they?
20  A.Available Movers.  On each job, on each
21  destination, they gave a different estimate.  You see
22  the numbers?  Okay.  One is estimate.  They have
23  estimate of ending with 194.  Right?  That's the
24  estimate of estimate 194, whis is, I think, number
25  --- your number 26 with an email ---



ESQUIRE
DEPOSITION SOLUTIONS

1  Q. No, estimate number 26 is 195. That's estimate
2  number one. For ease of --- ready, for ease of the
3  record. You have four different estimates here.
4  Refer to it as estimate number one, number two,
5  number three, and number four. Tell me why we have
6  four different estimates for the same thing?
7  A. Because there are four different locations. To
8  each location Available Mover send a different
9  estimate. With the storage, it was totaling to
10 $6,080, which is referenced in the one after they
11 picked up the merchandise and they sent here another,
12 what do they call it --- invoice or something like
13 that, which I submitted.
14 Q. It's an estimate.
15 A. Yeah, but I do have more from them, more from the
16 moving --- from Available Movers. Where it shows
17 paid 500, paid this, end of bill or whatever. Here,
18 each location supposedly had a different estimate.
19 This is how they do their business. I do not
20 generate these invoices. They generate these
21 invoices.
22 Q. So there's four different invoices for four
23 different locations?
24 A. Well.
25 Q. Correct.

1  You said each invoice estimate has a different
2  location.
3  A. I see here one Los Angeles, one Farmingdale, one
4  more Farmingdale. Right.
5  Q. If you look at estimate number one.
6  A. Okay.
7  Q. It goes from Staten Island to Los Angeles,
8  California.
9  You see that?
10 A. Yeah, yeah, yeah.
11 Q. And if you look at the third, it shows pickup in
12 Staten Island delivered in Los Angeles.
13 A. Correct.
14 Q. You look at estimate number two, it says same
15 thing from Staten Island to Los Angeles. You see the
16 second page of estimate number two ---
17 A. Which refers to?
18 Q. Estimate number two. You see where it says from
19 Staten Island to Los Angeles on page two?
20 A. I'm getting confused between the papers.
21 Q. Just look at estimate number two.
22 A. Okay.
23 Q. Okay.
24 Estimate number two, from Staten Island to
25 Farmingdale.

1  Right?
2  A. Yeah.
3  Q. So they're picking up in Staten Island.
4  Right?
5  A. Yeah.
6  Q. And they're delivering to Farmingdale.
7  Right?
8  A. Yeah.
9  Q. Farmingdale, New York is where they're located.
10 Right?
11 A. No.
12 Q. Well, who's in Farmingdale?
13 A. You mean the destination?
14 Q. Right.
15 A. The destination of Farmingdale, should be ---
16 Q. If you look at estimate number three has the same
17 thing.
18 A. Mr. Lightman ---
19 Q. Please. Estimate number three also says, from
20 Staten Island to Farmingdale New York.
21 Correct?
22 A. Correct. Listen, Mr. Lightman.
23 Q. Estimate number two ---
24 ATTORNEY ROSS:
25 Let him finish his answer, Gary.

1  BY ATTORNEY LIGHTMAN:
2  Q. Yes.
3  A. You see this? I don't generate them. They were
4  generated by Available Movers. If you have any
5  questions for their practices of all these different
6  documents that they send me, you have to ask them.
7  Q. I'm asking you.
8  A. One second.
9  Q. You produced these. You produced these
10 documents. I asked you why are there four separate
11 estimates. You said, because they each go to a
12 different location.
13 A. Exactly.
14 Q. But estimate number two and estimate number three
15 are the same location.
16 A. Okay.
17 Q. Estimate number two. From Staten Island to
18 Farmingdale.
19 A. Okay.
20 Q. Estimate number three from Staten Island to
21 Farmingdale.
22 A. Okay.
23 Q. The same location.
24 ATTORNEY ROSS:
25 Are they the same quantity Mr. Weiss?



Page 257

1 THE WITNESS:
2 You have to look at their description.
3 There is here estimate size.  You see?  680 CF.  You
4 see estimate size.  Each one has different estimate
5 size.  Because of the number of boxes, the totaling
6 to one the 2000 CF.  You see estimated size.  Then
7 you have estimated size of 680 CF.  Then again on
8 another one that is the same here, 2000 CF.  And then
9 again 200 CF estimated size.
10 BY ATTORNEY LIGHTMAN:
11 Q.So why are there different sizes going ---
12 A.You have to ask them.
13 Q.But you're the one controlling where these go.
14 A.I don't control these invoices.  I don't control
15 this --- whatever you call here, estimated.
16 Q.And these four estimates, is there anywhere in
17 these four shipping estimates where there's a
18 delivery to my client's place of business.
19 A.Okay, okay.  Okay.
20 Q.So in Glen Mills.
21 A.Yeah, here they have one truck, New Jersey to
22 Farmingdale, $1500 on this one.
23 Q.Right.  My client's not located in Farmingdale.
24 And you're looking at --- you're looking at job 704.
25 A.I'm sorry.  Truck to PA, truck to New Jersey and

Page 258

1 PA.
2 Q.Where in these four estimates that you sent does
3 it refer to any delivery?
4 A.I have more.  I have more.  I have a bigger file
5 with Available Movers.  So if you want more, I'll
6 give you more.  If you have more questions, ask
7 Available Movers.
8 Q.I tried.  We tried subpoenaing them.  They won't
9 respond to us.  So my question to you is where
10 estimate one, two, three or four does show a delivery
11 to Glenn Mills, PA.
12 A.I will show you.  But what I will show you is
13 what they confirm with me.  I have that says.  I
14 have one that says Mills.
15 Q.Which one is it, number one?  Is there anywhere
16 in estimate number one.
17 A.Where you shown here?
18 Q.Okay.
19 It's not in estimate number one, number two,
20 number three, or number four?
21 A.None of them.
22 Q.None of that.  Next question.
23 A.One second.
24 Q.Can we mark this as ---
25 A.One second, truck 2 in English, please.  Mr.

Page 259

1 Lightman, I'm showing it.
2 Q.What deposition?
3 A.Page 58, ECF 180.  The big pile.  Please.
4 Slowly, let me answer.  On page 58 out of the 79.  It
5 says truck two in English, truck to Pennsylvania, New
6 Jersey --- Pennsylvania.
7 Q.So this is the --- none of the four estimates
8 that you sent me referred.  You referred again to
9 page 58, the alleged final invoice.  The one you
10 haven't produced any payment receipts for.
11 Correct?
12 A.Don't confuse me.  First of all, you asked me
13 where does it show PA, Pennsylvania.  And I will show
14 you one with more detail Pennsylvania.
15 Q.Not in any of the four that you produced here.
16 A.Not here.  But they exist.
17 Q.They exist, but you haven't produced them.
18 Right?
19 A.I haven't produced it yet.
20 ATTORNEY ROSS:
21 Can we go off the record one second?  I
22 want to talk to you privately, if I can.
23 ATTORNEY LIGHTMAN:
24 Hold on.  Let me finish this and then
25 we can do it.

Page 260

1 ATTORNEY ROSS:
2 Okay.
3 BY ATTORNEY LIGHTMAN:
4 Q.Let's mark this as Deposition Exhibit 30.
5 ---
6 (Whereupon, Weiss Deposition Exhibit
7 30, Email and picture of invoice, was
8 marked for identification.)
9 ---
10 THE WITNESS:
11 And I promise to produce it.
12 ATTORNEY ROSS:
13 You already did.
14 THE WITNESS:
15 We are off the record now.
16 ATTORNEY ROSS:
17 No, we're still on the record.  I want
18 to get done.
19 THE WITNESS:
20 Okay.  This is a new one.
21 BY ATTORNEY LIGHTMAN:
22 Q.Gary Weiss 30 is another email you sent me.
23 August 21, 2023.
24 Correct?
25 So if you look at the first page of Gary Weiss



1 30, it's an email that Monipair, Gary Weiss sent
2 to ---
3 A.I see.
4 Q.Okay.
5 Right?
6 A.Yeah, yeah.
7 Q.And it says subject.  This is from Manfred.  You
8 see that?  In the subject line of the email?  It says
9 this is from Manfred.
10 Correct?
11 A.Correct.
12 Q.And it said and there's an attachment.
13 Correct?
14 A.There is a second page here.
15 Q.And then you write in your email, Manfred blacked
16 out the name Gary Weiss.  Playing stupid with his
17 question about the deposit.  You see that on the very
18 first page of your email that you write to me?
19 A.You're asking me to look at this page?  No.
20 Q.On the very first page you write to me.  Manfred
21 blacked out the name Gary Weiss.  Playing stupid with
22 his question about the deposit.
23 A.Okay, yeah, I see.
24 Q.What do you mean by that?
25 A.Yes, sir.

1 Q.What do you mean by that?
2 A.In one of the texts or email before the final
3 payment, he asked me that will include the $219,000
4 already was given a deposit.  So I don't see the
5 whole text.  Because this is copies and I don't have
6 really in the real format.  And the email that it was
7 sent, you know.
8 Q.So sitting here today.  You don't know what you
9 mean by that?
10 A.No, I do.
11 Q.What do you mean by that?
12 A.I have to look at the texts that made me the
13 conclusion to that.  You understand?
14 Q.That's what you said on August 21st?
15 A.Yeah.
16 Q.What do you mean by that?
17 A.I have to look back at what --- in some of the
18 texts that he sent in 2022 about payments.  And he
19 asked, does that include the $219,000?  So I don't
20 see --- there's supposed to be invoices that I sent
21 to Manfred for the balance that I write down on the
22 bottom --- on the very bottom of the invoice.  I'm
23 giving Manfred instructions that the balance of 1.9
24 --- 1,900,000 will be paid.  And then he's asking
25 me, does that include the 219?  Because he wants to

1 remind me that I already paid 219 or something like
2 that.  I just have to look back at emails that were
3 done prior to invoices and emails prior to February
4 7.  Where my invoices where I sent him several
5 invoices.  Maybe I can find it.  Mr. Lightman, do you
6 have those three last invoices that I sent you a copy
7 of that I sent to Manfred?  Those are the true and
8 the last three?
9 Q.I don't know what you're talking about.
10 A.Okay.
11 Q.Just answer the question as best you can.
12 A.Okay, I'm trying.  I'm trying to reconstruct from
13 two and a half years ago the chain of ---
14 Q.If you can't do without referring to other
15 documents, just say so.
16 A.Okay, one second.  I will give one more look
17 here.  Maybe it's here.  Yeah, in the last.
18 Q.What page are you referring to?
19 A.Okay, we will go to the last page.
20 Q.What page of 79?
21 A.Page 79 of 79.  That's the one I'm looking.  It
22 may not be the answer for sure about your question.
23 Q.Well, don't guess you don't know, say I'm not
24 sure.
25 A.I'm saying I'm not sure.

1 Q.Okay.
2 Then let's move on.  You're not sure.
3 A.Okay.
4 ATTORNEY ROSS:
5 What were you going to say about the
6 document?
7 THE WITNESS:
8 Okay, let's just say if you one off the
9 record again.
10 BY ATTORNEY LIGHTMAN:
11 Q.No.
12 A.Okay.
13 Q.If you're not sure, I'll move on --- let Mr.
14 Ross.
15 A.You see, at the bottom of the invoice I'm giving
16 a total.  And what is the balance?  But he knows what
17 is the balance.  So that's what the reference is.
18 Q.What's blacked out on page 79?
19 A.Blacked out?
20 Q.Yeah.  You wrote in this --- in this deposition
21 exhibit here, you wrote Manfred blacked out the name
22 Gary Weiss.
23 A.Okay, okay.  Now I know for sure.
24 Q.Okay.
25 Well, answer the question.  Stop making stuff up.



Page 265

1
2  A.Okay.  Manfred is sending me ---
3  ATTORNEY ROSS:
4  Objection.
5  THE WITNESS:
6  Sorry, I got this email with this
7  attachment of invoice that is not the final invoice.
8  So why would I get this invoice when he knows that
9  this is not the last and true invoice?  There's
10  preceding final invoices.  That are on page 79 of 79.
11  Page 78 of 79.  And page 77 of 79 in ECF 180.  That
12  are the true and last invoices that were sent to
13  Manfred on February 4.  Right.  With, on the bottom
14  with the receipt already of the payment and the
15  balance in the notes on the bottom of each invoice.
16  Why would he send me this invoice that is not the
17  lasted true invoice as a reference to anything when
18  he has already the last true invoice?
19  Q.That's what you mean by that?
20  A.Exactly.
21  Q.So let's look at DZ-9 again.
22  A.Did I clear at least what I'm thinking?
23  Q.No, but it's irrelevant now.  Move on.  Let's go
24  back to the text exchange in the WhatsApp between
25  you, the DZ-9.  You recognize this as the text

Page 266

1  between you, Sam Gross and Daphne.
2  Correct?
3  A.DZ-29?
4  Q.DZ-9.
5  A.DZ-9.  Page what?
6  Q.First page?
7  A.Yeah.  Okay.
8  Q.Ready?
9  A.Yeah.
10  Q.February 4, 2022.  Sam Gross created the group
11  iHealth.  Do you see that?  Sam Gross writes to Gary.
12  Please confirm to Daphne here, from the 1.9 million
13  that Manfred is going to send to Daphna, 65 percent
14  is yours, meaning Gary Weiss and the rest is mine.
15  Thanks.
16  Do you see that?
17  A.Where are you?
18  Q.I'm on one, two, three, four, five, six lines
19  down.
20  A.Okay?  Yes, I see.  I see.
21  Q.And then three more lines later, you write at
22  5:02 on May --- February 4, you write, Hi, Daphna, I
23  confirm 35 percent of 1.9 going to Sam, 65 percent of
24  1.9 going to me.
25  Correct?

Page 267

1  A.Correct.
2  Q.Why are you giving Sam 35 percent of the money?
3  A.I explained it.
4  Q.Because he needed money to pay other bills?
5  A.Yeah.
6  Q.That money should have been yours.
7  A.Yeah, but Sam asked me for terms to be paid in a
8  week.
9  Q.Okay.
10  A.We made business always on terms.  Pay me next
11  week, the balance, in another month the balance.
12  Q.So you gave me 700,000 and the terms were, when
13  was he supposed to pay you that money?
14  A.He said in a week or so, once he gets ---
15  Q.Did you get your money in a week or two?
16  A.Well, I got another three payments.
17  Q.Of the 700,000 you diverted and paid to Sam.  Did
18  he ever pay that back to you?
19  A.Yes.
20  Q.When did he pay that back to you?  Is that the
21  subsequent payments you got from Daphna?
22  A.Yeah.
23  Q.Okay.
24  Let's go on.  Ready?
25  A.Okay.

Page 268

1  Q.Daphna then writes, on February 6, Daphna writes,
2  good afternoon to you both.  I'm going to my office
3  in an hour to draft some paperwork that I will need
4  signed, if that's okay.
5  Do you see that?  February 6 at 10:54.
6  A.Okay, let me go there, and I am there.
7  Q.Who did she represent?
8  A.Daphna, Good afternoon to you both.  I'm going to
9  my office in about an hour to draft some paperwork
10  that I will need signed, if that's okay.
11  Q.Who did she represent?
12  A.I don't know.
13  Q.Did she represent Sam Gross?
14  A.I think so.
15  Q.She represented Sam.  How about you?
16  A.I told you, as I told you before, Daphna Zekaria
17  was appointed.
18  Q.I understand that.  But at the deposition, she
19  turned to you and said, do I have your permission to
20  disclose this?
21  Q.And you sometimes said yes and sometimes said no.
22  Correct?
23  A.I don't remember what you are.
24  Q.Did that --- who did you --- did Daphna Zekaria
25  represent Gary Weiss?


ESQUIRE
DEPOSITION SOLUTIONS

1  A.She's supposed to ---
2  Q.She's supposed to represent you.
3  Right?
4  A.She's supposed to represent me.
5  Q.Did Daphna Zekaria represent A. Solar Diamond?
6  A.No.  To represent me.
7  Q.Just you.  Okay.  Did Daphna Zekaria represent
8  Sam Gross?
9  A.Well, they appointed her, without that, I would
10  not get paid.  So how do you call that?
11  Q.I didn't asked who appointed her as an attorney.
12  A.Okay.
13  Q.You admitted she represented you?
14  A.Yes.
15  Q.You claimed she didn't represent A. Solar
16  Diamond.  Did she represent Sam Gross to you in your
17  mind?
18  A.She represented Sam Gross and Manfred Sternberg
19  in my mind.
20  Q.In your mind Daphna represents you, Gary Weiss
21  and ---
22  A.No, not Gary Weiss.  She represented Sam Gross
23  and Manfred Sternberg.
24  Q.So now you're saying she didn't represent you at
25  all?

1  A.In my mind, right?
2  ATTORNEY ROSS:
3  Right.
4  BY ATTORNEY LIGHTMAN:
5  Q.In your mind, she did not represent Gary Weiss?
6  A.No.
7  Q.No, that's correct.
8  A.No, she did not represent me.
9  Q.Okay.
10  So Daphna never represented Gary Weiss.
11  Right?
12  A.In my mind, no.
13  Q.Okay.
14  So, ready?  She says after she says, I'm going to
15  my office to draft some paperwork, you write, yes.
16  Okay.
17  You see that at 10:55 on February 6th?
18  A.I see.
19  Q.Then she writes, 10:58 on February 6th.  I will
20  draft a formal agreement on who I represent and an
21  escrow authorization that mirrors the terms of the
22  disbursement that we texted about.
23  Do you see that?
24  A.Yes.
25  Q.And that's referring to this 65/35 split referred

1  to above.
2  Right?
3  A.I believe so.
4  Q.Okay.
5  Then she says, on February 6 at 11:01 a.m.
6  Daphna writes, the documents will be dated on
7  February 4th.
8  Correct?
9  A.Correct.
10  Q.So she's talking about back dating documents?
11  A.Correct.
12  Q.And then she writes, when she says above there,
13  what's your current email address?  You write back
14  for WGary4019@gmail.com.
15  You see that?
16  A.Correct.
17  Q.And then she writes, so I will draft shortly.
18  Correct?
19  A.Correct.
20  Q.And then she writes, and it will be my pleasure
21  to represent you in the future.
22  Do you see that?
23  A.Correct.
24  Q.Did you ever write back to Daphna?  You don't
25  represent me.  You represent Sam and Manfred.

1  A.No, I didn't write that.
2  Q.You did not write that back to her.  Okay, and
3  then Daphna writes, just need the business name that
4  contracted with Manfred.  And Sam writes, Gary will
5  fill in the info in a few minutes.
6  Right?
7  A.I see that.
8  Q.So she's asking you for the information to fill
9  out in the retainer and escrow agreement.
10  Correct?
11  A.We are on a three way ---
12  Q.Right.
13  A.--- on texts, right?
14  Q.Daphna is writing.
15  A.And Shlomi is interjecting.  And she's asking me.
16  But Shlomi is interjecting.  Oh, Gary will fill in
17  the info in a few minutes.
18  Q.So Daphna is asking, just leave the business name
19  and Shlomi says you're going to give it to her.
20  Right?
21  A.Yes.
22  Q.And then Daphna says, my fee, and in quotes, will
23  include all negotiations and litigation as necessary
24  that may arise from this transaction.
25  You see that?



1   A.My fee.
2   Q.What is the fee that she wrote?
3   A.I don't know.
4   Q.What fee did you agree to pay her?
5   A.Me?
6   Q.You or Sam or Manfred?
7   A.Zero.  She said it's gratis on the D.
8   Q.Then why didn't you write back to her?  Hey, you
9   said it's gratis.
10  Right?
11  A.No, I didn't.
12  Q.Okay.
13  And then Daphna writes and send me the docs that
14  show proof that I can release it to you, and it will
15  be done as early as I can.
16  Correct?
17  A.Correct.
18  Q.Then she writes, Sam writes three minutes later
19  here in the documents.
20  Right?
21  A.Yeah.
22  Q.And then you write, Gary, I did not get the
23  documents.  Please send to.  And you give her your
24  two email addresses.
25  Correct?

1   A.Correct.
2   Q.Then she writes later on, at 1:42, on the same
3   day, February 6th, I will text when sent.
4   Right?
5   A.Yeah.
6   Q.Then she writes at the office, still working on
7   it.  And you write okay.
8   Right?
9   A.Yeah.
10  Q.And then she still need the info requested above.
11  And you write, what info?
12  Right?
13  A.Right.
14  Q.And then she --- you write, do not see request.
15  Call me if you can.
16  Right?
17  A.Right.
18  Q.Then later on 1:58, 1:59, Daphna writes, what is
19  the contract with Manfred date?  And Gary, you write
20  back, I do not have the date right now, Sam knows.
21  You see that?
22  A.Right.
23  Q.And then she writes, tell him the answer, please.
24  And you write back, k.  He will.
25  Right?

1   A.Right.
2   Q.Let's go to the next page.  Then you write, Sam
3   writes, the date off the contract is the date Gary
4   issued the original invoice as we go.  Now, the
5   contract you get assigned, January 28.
6   You see that?
7   A.Yeah.  Yeah.
8   Q.Okay.
9   And then Sam writes, we don't have a contract,
10  only an invoice, as I told you that before.  And Sam
11  writes, I'll call you in a minute.  And then Sam
12  writes, he sent me and Manfred the invoice.
13  You see that?
14  A.One second, too fast for me.
15  Q.February 6th.
16  A.One second.  One second.  Okay.
17  Q.Then ---
18  A.Start again from the top, please.
19  Q.No, I don't need to start from the top.  At 2:05
20  Sam writes, Gary, invoice my company, Charlton.
21  You see that?
22  A.At 2:05?
23  Q.On February 6th at 2:05 Sam writes, Gary, invoice
24  my company, Charlton.
25  You see that?

1   A.Gary invoiced my company.  Correct.
2   Q.So he didn't say, Gary already sent a bill to my
3   company.  He's asking you on February 6th to write an
4   invoice to his company, Charlton.  And Daphna writes,
5   exactly.
6   You see that?
7   A.Right.
8   QSo then Daphne says, so 128, Charlton.  And you
9   answer, yes 1/28/22.
10  Do you see that?
11  A.Yes, I see.
12  Q.So on February 6th, Daphna is telling you, send
13  an invoice dated January 28 to Charlton.
14  You see that?
15  A.Yeah.  Yeah.
16  Q.Okay.
17  And then she writes, 2:10.  Almost done.  You
18  write back to her.  Great waiting.  And then at 2:23
19  of February 6th, she says, send confirm receipt,
20  please.
21  Do you see that?
22  A.Where at 2:28.
23  Q.2:23, Daphna writes, I sent it, please confirm
24  receipt, please.
25  Right?



Page 277

1  A. Yeah.
2  Q. And then after she sends you this retainer and
3  escrow agreement.  At 2:35, you write, receive.
4  We'll print once at home in several hours, sign and
5  sends you back.
6  See that?
7  A. Yes.
8  Q. Okay.
9  Q. Did you sign and send it back to her?
10  A. I think I did.
11  Q. Okay.
12  So why didn't you produced it?
13  A. Because she did not sign it.
14  Q. Well, you have a copy of it?  You have a copy of
15  what she said.
16  A. Yes, but it's not an agreement.  She didn't sign
17  it.
18  Q. Well, you have the draft even if it's unsigned.
19  Right?
20  A. It's possible that I have the draft.
21  Q. Well, I've asked you to produce it and you said,
22  I'll give it to you at the right time, haven't you?
23  A. Yeah.
24  Q. Why haven't give me the unsigned one?
25  A. But I gave you an answer.

Page 278

1  Q. You, you said, I'll produce it at the right time.
2  A. No.  And then ---
3  Q. You said she never signed it.
4  A. Wait, I also told you that it was made to Gary
5  Weiss to make to A Solar Diamond, and there is a
6  default against A Solar Diamond.  And I told you that
7  on the phone.
8  Q. You got a copy of this escrow and retainer
9  agreement that Daphna drafted in February.
10  Correct?
11  A. Correct.
12  Q. Whether or not Daphna signed it, you have failed
13  to produce it.
14  Correct?
15  A. Correct.
16  Q. Why?
17  A. Because it was not signed.
18  Q. But you still have a copy of the unsigned
19  agreement.
20  Correct?
21  A. Yeah, but it's not an agreement.
22  Q. Guess what?  You still have an unsigned copy of
23  the draft.
24  Correct?
25  A. Of the draft, yes.

Page 279

1  Q. I'm asking you to send me that draft.  Will you
2  send that to me tomorrow?
3  A. I don't know if I have it.
4  Q. You just said you have it.
5  A. No, I had it.
6  Q. And what did you do, you threw it away?
7  A. It's not a valid agreement.
8  Q. You threw evidence away, is that what you're
9  saying under oath?
10  A. No, I didn't throw --- it's not an evidence.
11  Q. So if you have this draft, you have the --- you
12  admitted you have it.  I would request you ---
13  A. But I told also that it's made out --- I know it
14  was.
15  Q. I don't care who it's made out to.  I don't care
16  whether it's signed or not.  I would like you to
17  email me the draft agreement that Daphna said she
18  sent to you on February 6th at 2:23 p.m.
19  Okay?  No, please note that document request on
20  the record.
21  ATTORNEY ROSS:
22  I would also like the document.
23  ATTORNEY LIGHTMAN:
24  Finally, Plaintiff's Counsel and
25  Sternberg Counsel agree on something.

Page 280

1  THE WITNESS:
2  Okay.
3  BY ATTORNEY LIGHTMAN:
4  Q. Then later on, Daphna writes Shlomi read it.
5  Right?  At 2:36 p.m.  Right?
6  A. Yeah.
7  Q. And then Daphna says he approved the document.
8  Right?
9  A. Shlomi approved it, yeah.
10  Q. Shlomi approved it.  So she sent it to you.  Sam
11  approved it at 3:10.  She says congratulations to you
12  both and speak tomorrow.  I'm going to be driving for
13  a bit.  And then Daphna, at 10:32 a.m. the next day,
14  says sent.  You see it?
15  A. 10:32?
16  Q. 10:32 on the 7th, Daphna says sent.  You see
17  that?
18  A. Wow.  Yeah, I see that.
19  Q. Wow.  So find the draft, whether or not it's
20  signed, whether or not Sam approved it, whether or
21  not it's A. Solarr and email it to me tomorrow.
22  Okay?  Okay, Mr. Weiss?  You can't nod your head
23  yes.  You have to say yes.
24  A. No, no.  I said already if I find it, I will send
25  it to you ---



Page 281

1  Q.Okay.
2  A.--- and to you both.
3  ATTORNEY ROSS:
4  You can reply all to my last.
5  ATTORNEY LIGHTMAN:
6  Nothing further.
7  THE WITNESS:
8  Yeah, yeah, yeah, yeah.
9  BY ATTORNEY LIGHTMAN:
10 Q.Oh, wait.  I'm sorry.  When you close the A.
11 Solar Diamond bank account, what do you do with the
12 money in the account?
13 A.When I closed it, it was zero.  There was nothing
14 to do.
15 Q.So all the funds were dissipated?
16 A.What do you mean by dissipated?
17 Q.There were millions of dollars in --- $2,000,000
18 came into that bank account.
19 A.On?
20 Q.In February.
21 A.By February 7.
22 Q.Okay.
23 And when did you close the account?
24 A.Sometime in August or October of last year.
25 Q.Okay.

Page 282

1  And you said ---.
2  A.I'm not sure, but somewhere in there.
3  Q.You said at the hearing on July 10th that Daphna
4  stopped representing you ---.
5  A.On April 15th.
6  Q.Is this an epiphany?  Now, she represents you.
7  Two minutes, ten minutes ago you said she doesn't
8  represent you.  Now, you said she does.
9  A.She's supposedly representing me.  That's what I
10 mean.
11 Q.Okay.
12 Well ---.
13 A.I don't want her to continue to talk on my
14 behalf.  She thought that she's representing me.
15 Q.Were you lying ten minutes ago when you said ---
16 A.No.
17 Q.--- she was --- let me finish my question.  Were
18 you lying ten minutes ago when you said Daphna did
19 not represent you or were you lying to the Judge when
20 you told him on July 10th that she stopped
21 representing you on April 15th?
22 A.No.  What I meant here regarding this text, you
23 asked me in your mind.  In your mind, did she
24 represent you?  I said no, in my mind.
25 Q.Well, did you tell the Judge on July 10, in my

Page 283

1  mind, Daphna never represented me?
2  A.No.  It was not a question.
3  Q.Well, he asked you when did Daphna Zekaria
4  represent you and you didn't say in my mind, she
5  wasn't representing you.  You said she stopped
6  representing me on ---
7  A.Exactly.
8  Q.--- April 15th.
9  A.Exactly.  And I'm telling you the same thing.
10 She stopped representing me on ---
11 Q.April 15th?
12 A.--- officially, because she took the money escrow
13 for me actually.  But I told her on April 15 of 2022,
14 no more representation.  Nothing.
15 Q.And how do you do that?  In a text?
16 A.In an email.
17 Q.In an email.  Did you produce that email for us?
18 A.No, it's available.
19 Q.Everything's available.
20 A.Well, you want it?
21 Q.I wanted all the documents from you.
22 A.Okay.  Okay.
23 Q.Okay.
24 A.I know I have it.
25 Q.Hold on one second.  Oh.  What is the address of

Page 284

1  your pass in Peru?
2  A.I gave it to you.  It's 277
3  Q.277.
4  A.Taqitahuana.
5  Q.Spell it, please.
6  A.T-A-Q-I-T-A-H-U-A-N-A.
7  Q.And where is that, in Lima, Peru?
8  A.San Miguel.
9  Q.San M-I-G-U-E-L?
10 A.Exactly.
11 Q.Peru?
12 A.Lima, Peru.
13 Q.And who owns that house?
14 A.I don't know.
15 Q.Does your wife own it?
16 A.I think so.
17 Q.So Mirthi owns it?  When did you buy that house?
18 A.The house was bought, I think, when she was like
19 30 years old.  So that was 40 years, 40 years ago.
20 Q.Do you or your wife own any more property in
21 Peru?
22 A.No.
23 Q.And are you an owner of that property?
24 A.Of the Taqitahuana?
25 Q.Yes.



Page 285

1  A.No.
2  ATTORNEY LIGHTMAN:
3  Okay.
4  That's it for me.
5  ---
6  REDIRECT EXAMINATION
7  ---
8  BY ATTORNEY ROSS:
9  Q.All right.
10 Real quick.
11 A.Okay.
12 Q.I'm going to put in front of you Exhibits GW-27,
13 28, 29.
14 A.Okay.
15 Q.I want you to look at the second date from the
16 bottom of each and tell me what that destination is.
17 A.Thank you, Mr. Joseph.
18 Q.Second date from the bottom of each.  So right
19 now, I'll represent for the record that you're
20 looking at GW-29.  That would be estimate, I
21 think ---
22 A.Okay.
23 So we are on the record?
24 Q.--- 4.  You're on the record.
25 A.Did you provide this also to Mr. Lightman just by

Page 286

1  any chance?
2  Q.These are his exhibits, yes.  He gave them ---.
3  A.Yeah.
4  Q.He gave them to us and we marked, he marked.  He
5  marked these.
6  ATTORNEY LIGHTMAN:
7  Do you have a copy of it for me?
8  THE WITNESS:
9  He gave it to you.
10 ATTORNEY ROSS:
11 You gave it to me.  I gave him my
12 copies just now.
13 ATTORNEY LIGHTMAN:
14 What are we talking about here?
15 ATTORNEY ROSS:
16 These are 27, 28 and 29.
17 ATTORNEY LIGHTMAN:
18 Oh.
19 ATTORNEY ROSS:
20 These are the estimates.
21 ATTORNEY LIGHTMAN:
22 These estimates.  I got it.  Okay.
23 I'm with you.
24 ATTORNEY ROSS:
25 It's 27, 28 and 29.

Page 287

1  ATTORNEY LIGHTMAN:
2  I'm with you.
3  THE WITNESS:
4  I'm absolutely upset when I look at.
5  BY ATTORNEY ROSS:
6  Q.Well, I'm not trying to upset anybody, except
7  maybe Mr. Lightman.
8  A.I know.
9  Q.This really doesn't help me.  It'll hurt me,
10 though.  But just, please, the second date from the
11 bottom of each page ---
12 A.Yeah.
13 Q.--- has next to it a town.  Do you see what town
14 that is?
15 A.I'm sorry for saying the word upset and I'll tell
16 you why because people make mistakes.  So I don't ---
17 I thought that I'm upset at Mr. Lightman, but I take
18 it back.  I'm not upset because mistakes can happen.
19 Let's look at the GW-29.  And I am looking here at
20 Glenn Mills, Pennsylvania,
21 Q.Do you see Glenn Mills on GW-28?
22 A.Wow.  I see one more time.
23 Q.Do you see it on GW-27?
24 A.Yes.
25 Q.See, I'm learning to move fast.

Page 288

1  A.Okay.
2  Q.Okay.
3  I just wanted to clarify that.
4  A.Yes.
5  ATTORNEY LIGHTMAN:
6  I'm sorry.  On 28 and 27, where's the
7  destination to on those invoice, on those estimates?
8  THE WITNESS:
9  Can you do me a favor, Mr. Joseph, and
10 show it to Mr. Lightman?
11 ATTORNEY ROSS:
12 I'll show it to him as I'm showing it
13 to you.  So he's going to see how I'm presenting it
14 to you.
15 ATTORNEY LIGHTMAN:
16 Okay.
17 So on GW-29, the estimate number four,
18 it shows a from Staten Island to Farmingdale, New
19 York.  And on estimate number GW-28, estimate number
20 three, on the second page, it shows from Staten
21 Island to Farmingdale, New York.  And on estimate
22 number two, GW-27 ---
23 THE WITNESS:
24 You will continue.
25 ATTORNEY LIGHTMAN:



1  --- it shows from Staten Island to
2  Farmingdale, New York.  Thank you.
3  BY ATTORNEY ROSS:
4  Q. All right.  GW-27 on page three, the third date
5  from the top, February 7th, 2022.  Glen Mills,
6  Pennsylvania, 19342 is a delivery called extra drop
7  off.  It's a ground delivery.
8  On GW-28, on page three, this is February 7th,
9  2022.  Glenn Mills, Pennsylvania, 19342.  It's a
10  delivery of 200 boxes.  That's a ground delivery.  On
11  GW-29 on February 7, 2022, Glen Mills, Pennsylvania,
12  19342.  That's a delivery of 177 boxes.  That's also
13  a ground delivery.
14  A. Excuse me, Counselor.  Who provided you this
15  paper?
16  Q. These are exhibits that were marked today.  They
17  were entered ---.
18  A. And who gave you this exhibit?
19  ATTORNEY LIGHTMAN:
20  You sent them to me.  I marked them as
21  exhibits.
22  THE WITNESS:
23  But today.  Who gave ---?
24  BY ATTORNEY ROSS:
25  Q. I'm not going to answer that.  I think he just

1  did.
2  A. Thank you.
3  ATTORNEY LIGHTMAN:
4  Were any of those deliveries ever made
5  to Glenn Mills?
6  THE WITNESS:
7  Please.
8  ATTORNEY LIGHTMAN:
9  Well, did you?  Did you ever make any
10  delivery of anything, I-COVID test kits, rice,
11  anything to my client?  Just yes or no.
12  THE WITNESS:
13  Let me answer.
14  ATTORNEY LIGHTMAN:
15  Did you ever make a delivery of
16  anything, a test kit, a box of rice, anything to my
17  client?
18  THE WITNESS:
19  I am not the delivery person.
20  ATTORNEY LIGHTMAN:
21  Yes or no.  Did you, Gary Weiss, ever
22  make or cause to be delivered to Glenn Mills, PA ---.
23  THE WITNESS:
24  Yes, and I'll explain you.  Yes,
25  absolutely.

1  ATTORNEY LIGHTMAN:
2  Yes.  So what did you deliver?  What
3  did you deliver?
4  THE WITNESS:
5  I caused delivery ---.
6  ATTORNEY LIGHTMAN:
7  What did you deliver?  That's my
8  question.  What did you deliver?
9  THE WITNESS:
10  What?
11  ATTORNEY LIGHTMAN:
12  I said did you ever make a delivery.
13  You said yes.  What did you deliver?
14  THE WITNESS:
15  No.  I made the delivery to the
16  carrier.
17  ATTORNEY LIGHTMAN:
18  So you delivered to AMS.
19  THE WITNESS:
20  I am not the delivery man.
21  ATTORNEY LIGHTMAN:
22  Did you, or AMS, or anybody, Gary
23  Weiss, Sam Gross, Manfred Sternberg, Daphna Zekaria,
24  AMS, anybody, did you ever make a delivery of test
25  kits to my client?

1  THE WITNESS:
2  The answer, unambiguously no.
3  ATTORNEY LIGHTMAN:
4  That's it.  Thank you.
5  BY ATTORNEY ROSS:
6  Q. Mr. Weiss, did you ever provide contact
7  information for anyone at Available Movers?  You
8  yourself provide Available Movers contact information
9  to Mr. Sternberg at any point?
10  A. I sent copies to both, yes.
11  Q. Okay.
12  Did ---?
13  A. The answer is yes.
14  Q. Did Daphna Zekaria ever represent Blue River
15  4747?
16  A. Yes.
17  Q. And what was that representation?
18  A. I bought ---
19  Q. You bought a gold bar.
20  A. --- a gold bar and when I went to pick it up,
21  there was a difference in between the time that I
22  bought the gold bar.  And subsequently, I told the
23  person that I will buy more gold.  And I wanted to
24  pay him the balance for the more gold.  But he told
25  me the price went up and you have to pay me now a



1　little bit more.  I said, you know what?  Forget
2　about that order.  Just give me for my original
3　order, which I paid you already, and he said no,
4　because you ordered something else and I put it aside
5　for you.  Now, that you come to pay and the price
6　went up, you have to pay me more because the price
7　went up.  I said no.  I told you that when I come,
8　maybe I will buy from you more.  But I already paid
9　for the first gold bar.  And this one, a person that
10　I do with his father business almost 40 years.  So
11　that's the son.  He refused to give me the original
12　gold bar.  I walked away.  And in the month of April
13　or May, I asked Zekaria to do me a favor and send a
14　letter.
15　Q.April or May of what year?
16　A.2022.
17　Q.Do you recall her filing your behalf a lawsuit on
18　March 18th, 2022, against Bulletin Trading, LLC?
19　A.Yeah, yeah.  That's what I'm talking about.
20　Q.Okay.
21　And that was over $60,000 you paid, and you
22　didn't end up getting your gold bar.
23　Right?
24　A.$61,000.
25　Q.So why is it that you were so forgiving about

1　$4,000,000 in collateral that you lost, but you
2　decided to file a lawsuit over $61,000 in a gold bar
3　you never got?
4　A.Okay.
5　One has nothing to do.  The comparison is not
6　really on equal logic and footing.  Let me explain
7　about the gold bar.  The gold bar was paid.  I gave
8　the person a check and he said I know that you made
9　the business in the past with my father, but my
10　father passed away.  I will wait two, three days till
11　the check clears.  I told him okay, no problem.  And
12　when I came to pick up, I told him, listen, I may buy
13　from you one more and when I get back to you to pick
14　up the gold, I'll let you know.  When I came up to
15　pick up the gold bar, which I already paid, and asked
16　him to give me the other gold, and I will pay him for
17　it, he says no.  The balance is up now for the new
18　gold bar ---
19　Q.Okay.
20　A.--- that you want to buy ---
21　Q.Okay.
22　A.--- because you spoke to me last week and it went
23　up a little bit, the gold.  I want the difference.
24　So he wouldn't give me the original.  He was holding
25　hostage the first gold bar and I walked away from him

1　and he didn't want to give it to me for a month or
2　two and then ---.
3　Q.Why sue him over $61,000 and not do anything to
4　pursue the millions in collateral that you gave to
5　Shlomo?
6　A.Okay.
7　The collateral, the collateral is, collateral as
8　it is, which became a refund.  I asked Shlomo, I
9　asked Shlomo Gross in the --- I don't remember
10　exactly which month.  I asked him, listen, I gave you
11　$4,000,000 worth of collateral and the
12　merchandise was worth only $2,000,000.  I want to
13　have back from you with the collateral.  He told me
14　--- the $2,000,000 collateral.  He told me it was
15　stolen from me.
16　Okay.  But I know who is the thief.  Okay.  I
17　listened to him.  He told me the name of the person
18　is Sal Rizzo.  But Sal Rizzo doesn't have the gold
19　and he pawned it to my knowledge.
20　Q.The gold or the collateral?  You're talking
21　about ---?
22　A.No.  I'm talking about the collateral.  So I told
23　him to give me the contact for Sal Rizzo.  Sal Rizzo
24　told me that I can take you to the pawn shop where I
25　sold part of his merchandise.

1　Q.Why didn't you sue Sal Rizzo?
2　A.I'll tell you in a minute.
3　Q.I'd like to know now.  It's 5:30.
4　A.Wow.  Wow.  Sal Rizzo was in, just got out from
5　rehab and became homeless and he lived in a homeless
6　shelter in Brooklyn.  So I told him, Sal, I'm going
7　to come pick you up.  You're going to take me to the
8　pawn shop.  He said okay, but you have to give me
9　$300.  I said Sal Rizzo, it's okay.  I'm going to
10　give you money.  I went up to pick up Sal Rizzo.  Sal
11　Rizzo told me the pawn shop is in Long Island.  I
12　drove to Long Island, somewhere on Sunrise Highway.
13　And there I met, and I, and Sam, Sam met me there
14　with Matthew Alcorn, a bodybuilder.  Probably his,
15　the one that picked up some of the collateral.
16　Probably his bodyguard or whatever he does for Sam.
17　And Sam told me you're going to go with Sal Rizzo
18　into the pawn shop.  It's next block.  And you get
19　the merchandise from the pawn shop.  And if it's
20　okay, okay.  If not, you give it to Matthew Alcorn.
21　Okay.  Whatever Sam said, I did.  I went into the
22　pawn shop and with Sal Rizzo and the gentleman there
23　told me that, yes, I have this person, Sal Rizzo gave
24　merchandise and you can get it back.  I told him,
25　listen, this was stolen merchandise and I came here



1  to retrieve it and whatever you paid this man, I will
2  pay you back.  Sal Rizzo told me I got $2,000 or
3  something like this for it.
4  And the owner of the pawn shop went there to his
5  safe, took out a box about six inch by six inch,
6  something that opens up, and the top is glass.  And
7  there were a row of gems, red gems, about 15, 18, 20
8  gems, all purchased different sizes from big to small
9  that form a necklace, just loose stones.  And he told
10  me I paid him $4,000, $4,100.  I told him but he told
11  me $2,000.  No, I paid, I paid him $4,100.  When I
12  look at the gems, I knew it's not mine.  So I thought
13  I'm going to pay the guy.  He did have with me the
14  money.  I paid the $4,100 and took the gems with me.
15  I left outside.  Matthew Alcorn is there and he
16  asked me so what do you think?  I said, listen,
17  Matthew Alcorn.  I took the gems there just to show
18  you and you show Sam this is not my merchandise.  I
19  paid for him and you ask Sam to pay me later back.
20  Here's the gems.  This is not mine and it's not
21  acceptable.  That's not what I gave to Sam.  He took
22  the gems from me and left.  I told Rizzo, Sal Rizzo
23  do you have more at another place.  He said yes.
24  And after a few days, I made again an appointment
25  with Sal Rizzo to retrieve two more gems.  He told me

1  I have two more diamonds that I stole from Sam.  But
2  when I passed out, when I overdosed, they took me to
3  the hospital.  And when I took off the clothing, in
4  the clothes were two gems, two diamonds more.  And I
5  can take you to the hospital and it's still in the
6  locker there.  I went with him --- and you're going
7  to give me this time $100.  But not like you promised
8  me before $300 and you gave me only $100.  I said
9  yeah, I'll give you 100.
10  I took him to the hospital.  I don't remember the
11  name of the hospital.  I parked there not far from
12  the front door.  He went inside.  And 10, 15 minutes,
13  he came back with a little package.  I looked at the
14  two stones and I see right away, that's not mine.
15  The two stones were looking like diamonds.  I could
16  not say anything.  I told Sam Rizzo here is $50.
17  It's not my diamonds.  Do you have more?  And he says
18  --- I have to remember.  I have more.
19  I spoke to him some other things.  He was
20  bumbling a little bit and I don't think he was --- he
21  was lapsing again.  Probably took drugs.  And I told
22  him, listen, I'm going to meet you again.  I want to
23  talk to you a little bit more about what you stole
24  and what you know.  And I could not make with him any
25  more contact.  And sometime after that, Sam Gross

1  sent me an article where he passed away.  I don't
2  know what the reasons he passed away.
3  Q.What was the name of the pawn shop?
4  A.It's on Sunrise Highway.  I don't know the name
5  right now.
6  Q.You know the name of the pawn shop you paid
7  $4,000 for a bunch of junk gems to?
8  A.First of all, they were not junk.  They had a
9  value of not junk, but they were not mine.  I didn't
10  say anything about the value of junk.  I just said
11  it's not mine.  I did not take them out from the
12  glass case.  So I don't really know really what they
13  were.  I know that they were not mine.
14  Q.Did Matthew ever threaten you?
15  A.No.
16  Q.And what is his role as far as you know?
17  A.He does jobs for Sam Gross.
18  Q.I had a very Italian uncle who did jobs.  What do
19  you mean by doing jobs?
20  A.He would drive him places.  He came to pick up
21  the gems collateral in the past before.  All kind of
22  jobs.  You have to ask Sam what exactly his function
23  is.  They're friends.
24  Q.We would all love to ask Sam.  Do you think you
25  can arrange that?

1  ATTORNEY LIGHTMAN:
2  Did you ever say to Sam whether or not
3  he stole them from you, you give me my collateral
4  background or I'm going to sue you?  Why did he ever
5  say that to Sam?
6  THE WITNESS:
7  No.  I asked Sam to give me back the
8  balance of the collateral above the $2,000,000.  And
9  he said, yeah, I'm going to put you in contact with
10  the thief that stole from me a bag full of gems and
11  your gems were inside.  You go to the pawn shop.  You
12  retrieve it back.  He probably paid him close to
13  nothing and you're going to have a refund.
14  ATTORNEY LIGHTMAN:
15  What about the balance of the
16  collateral though?
17  THE WITNESS:
18  I'm talking.  I'm trying to recuperate.
19  ATTORNEY LIGHTMAN:
20  But you said to Sam give me my
21  collateral.  He claims someone else stole it from
22  him.  You say Sam, that's your problem.  Give me back
23  my collateral or I'm going to sue you.  Why didn't
24  you ever say that to him?
25  THE WITNESS:



1  I didn't say the word sue.
2  ATTORNEY LIGHTMAN:
3  But why didn't you ever threaten Sam,
4  give me my stuff?
5  THE WITNESS:
6  I don't threaten Sam.
7  ATTORNEY LIGHTMAN:
8  Okay.  So you ---.
9  BY ATTORNEY ROSS:
10  Q.Why don't you threaten Sam?
11  A.I don't threaten Sam.  I don't threaten anybody
12  in general.  That's number one.  And I have my way of
13  getting what I need.  I don't need to threaten
14  anybody.  I don't need to threaten Sam.  I don't need
15  to threaten anything.
16  Q.But you sued Isaac Kahn, Kane.
17  A.Yeah.  I didn't threaten Isaac Khan.  I sued him
18  to get back what I already paid for.
19  ATTORNEY LIGHTMAN:
20  Why didn't you sue Sam?
21  THE WITNESS:
22  I didn't sue him.
23  ATTORNEY LIGHTMAN:
24  Why?
25  BY ATTORNEY ROSS:

1  Q.Why not?  Yes.  We all want to know why not.
2  A.Because I tried to get back the gems that I gave
3  him.
4  ATTORNEY LIGHTMAN:
5  And you didn't.
6  THE WITNESS:
7  And I didn't.
8  ATTORNEY LIGHTMAN:
9  So why didn't you sue?
10  THE WITNESS:
11  I didn't.  I'm still waiting for me to
12  get paid more money and maybe some of the gems, which
13  I will never get back because it's already over two
14  years.
15  BY ATTORNEY ROSS:
16  Q.Do you still maintain that the gems are authentic
17  gems?  That you didn't provide any quartz or glass as
18  collateral.
19  Is that right?  Yes or no?
20  A.Your question is not correct.  I'll tell you why.
21  I gave the collateral in February of 2022.  Where
22  are they?  I'm asking you now.
23  Q.When you gave the collateral ---.
24  A.Are you representing Manfred?
25  Q.We're going to go back in time.  When you gave

1  the collateral, when you gave it, your hands to
2  somebody else.
3  A.When I gave the collateral.  Okay.
4  Q.You're saying there was no glass in there.  There
5  was no quartz in there.  There were no synthetic
6  rubies, no synthetic sapphires, no synthetic ---
7  A.Correct.
8  Q.--- anything in there?
9  A.Correct.
10  Q.Okay.
11  ATTORNEY LIGHTMAN:
12  Who represents you now in the Blue
13  River suit?
14  ATTORNEY ROSS:
15  I'll allow it.
16  THE WITNESS:
17  There is no Blue River suit.
18  ATTORNEY LIGHTMAN:
19  What happened to the suit for the
20  bullion?
21  THE WITNESS:
22  I didn't continue to press with the
23  charges against it.
24  ATTORNEY LIGHTMAN:
25  So you ended the lawsuit?

1  THE WITNESS:
2  Yeah.
3  ATTORNEY LIGHTMAN:
4  When did you end it?
5  ATTORNEY ROSS:
6  Sometime last year, in the middle of
7  last year.
8  BY ATTORNEY ROSS:
9  Q.Okay.
10  And then one follow-up question about --- two
11  more.  Weiss 20.
12  A.Okay.
13  Q.How did you get Weiss 20?
14  A.I said when I presented this document, Shlomi
15  sent me that.  This is a statement that one of the
16  statements that Manfred Sternberg gave him when he
17  asked him for the balance of over $1,000,000 that is
18  still owed to him.
19  Q.When did Manfred send --- when did Sam Gross send
20  you this statement?
21  A.Maybe two months ago.
22  Q.Maybe two months ago?
23  A.Maybe.
24  Q.And he said Manfred sent this to him two months
25  ago?



Page 305

1  A. No, he didn't say that.
2  Q. Okay.
3  But he --- Sam sent you this two months ago, said
4  this is something that Manfred had previously
5  prepared and sent to Sam?
6  A. I got this less than two months ago.  Something
7  like maybe six weeks, seven weeks.  I don't remember
8  really exactly when I got this.
9  Q. Who prepared this?
10  A. I don't know.  Sam presented to me and told me
11  that Manfred sent him this.
12  Q. Okay.
13  So Manfred ---.
14  A. You understand?
15  ATTORNEY LIGHTMAN:
16  So Manfred prepared?
17  THE WITNESS:
18  Yeah, because I don't see a name on it.
19  ATTORNEY LIGHTMAN:
20  Right.  Okay.
21  BY ATTORNEY ROSS:
22  Q. To be clear, Sam told you Manfred prepared this?
23  A. Yes.
24  Q. And that's the only way you have of knowing who
25  prepared it.

Page 306

1  Right?
2  A. No, I don't know.
3  ATTORNEY LIGHTMAN:
4  Why isn't this --- Counsel, why isn't
5  this document been provided to us?
6  ATTORNEY ROSS:
7  I have nothing today to suggest that
8  this is a real document.
9  ATTORNEY LIGHTMAN:
10  Okay.
11  So when you told me out in the hall
12  this is one of the documents that was in your
13  ShareFile that we couldn't access, that wasn't true
14  either?
15  THE WITNESS:
16  Gentlemen, it was a pleasure.
17  BY ATTORNEY ROSS:
18  Q. It's not done yet.
19  A. Oh.
20  Q. I need you to check your records.  I need a copy
21  of every email exchange between you and Mr. Lightman
22  about this case.
23  A. Okay.
24  I will do that.  Wow.
25  Q. So you produced a lot, but if there's any that we

Page 307

1  don't have, we would like them.
2  A. Listen ---.
3  Q. And as Mr. Lightman said earlier, I want to
4  reiterate, we want a copy of the escrow retainer
5  agreement whether it's signed or unsigned.
6  A. Let me write it down and you give me homework.
7  Give me ---.
8  ATTORNEY LIGHTMAN:
9  That's easy.  We've been asking for
10  this escrow agreement for months now and right now
11  you tell me you're not ---.
12  THE WITNESS:
13  It's not in the agreement.  She did not
14  agree ---.
15  ATTORNEY LIGHTMAN:
16  Draft, a draft.
17  ATTORNEY ROSS:
18  I just want to be clear.  Whether it's
19  signed or not, if it's a draft or not, if it's
20  certified, notarized, ---
21  THE WITNESS:
22  You don't care.
23  ATTORNEY ROSS:
24  --- if there's coffee stains on it, ---
25  THE WITNESS:

Page 308

1  Okay.
2  ATTORNEY ROSS:
3  --- I want it.
4  THE WITNESS:
5  Okay.
6  ATTORNEY ROSS:
7  If it says a retainer, a document that
8  says escrow or retainer and has the name of anybody
9  named as a Defendant or a Plaintiff in this case, we
10  want it.
11  THE WITNESS:
12  Okay.
13  Retainer.
14  ATTORNEY LIGHTMAN:
15  February 2022 draft agreement.
16  THE WITNESS:
17  Okay.
18  Draft because it's unsigned.  That's
19  why I'm telling you.
20  ATTORNEY LIGHTMAN:
21  Draft agreement.
22  ATTORNEY ROSS:
23  Doesn't matter.  We want it unsigned.
24  If it's unsigned, we want it.  If it's signed, we
25  want it.



Page 309

1 THE WITNESS:
2 So you don't mind it's unsigned?
3 ATTORNEY ROSS:
4 Do not mind.  I have nothing else.
5 THE WITNESS:
6 No.  You told me, you told me ---
7 ATTORNEY LIGHTMAN:
8 Thank you, Mr. Weiss.
9 THE WITNESS:
10 --- all the emails?
11 ATTORNEY ROSS:
12 Yes.  Any emails between you and Mr.
13 Lightman.
14 THE WITNESS:
15 Between me and who?
16 ATTORNEY ROSS:
17 I keep wanting to ---.
18 THE WITNESS:
19 Email.  Wow, that's a lot.
20 ATTORNEY ROSS:
21 I mean, yeah.
22 THE WITNESS:
23 If there are attachments, I'm going to
24 send you also the attachments.
25 Right?

Page 310

1 ATTORNEY ROSS:
2 Right.
3 ATTORNEY LIGHTMAN:
4 Copy me on that, too.
5 ATTORNEY ROSS:
6 If it's easier, you can forward them to
7 me like you did to him.  You can copy him.
8 That's ---.
9 ATTORNEY LIGHTMAN:
10 Perfect.
11 ATTORNEY ROSS:
12 Whatever's easier.  Have a safe trip
13 back, Mr. Weiss.
14 THE WITNESS:
15 Thank you.
16        * * * * * * * *
17        DEPOSITION CONCLUDED AT 5:30 P.M.
18        * * * * * * * *
19
20
21
22
23
24
25

Page 311

1
2 COMMONWEALTH OF PENNSYLVANIA  )
3 COUNTY OF PHILADELPHIA        )
4                 CERTIFICATE
5 I, Emma Edwards, a Notary Public in and for
6 the Commonwealth of Pennsylvania, do hereby certify:
7 That the witness, Gary Weiss, whose testimony
8 appears in the foregoing deposition, was duly sworn by
9 me on 07/16/2024 and that the transcribed deposition
10 of said witness is a true record of the testimony
11 given by said witness;
12 That the proceeding is herein recorded fully
13 and accurately;
14 That I am neither attorney nor counsel for,
15 nor related to any of the parties to the action in
16 which these depositions were taken, and further that I
17 am not a relative of any attorney or counsel employed
18 by the parties hereto, or financially interested in
19 this action.
20 Dated the 19th day of July, 2024
21                 _Emma Edwards_
22                 Emma Edwards,
23                     Court Reporter
24
25



ESQUIRE
DEPOSITION SOLUTIONS

# EXHIBIT K-1

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**LIGHTMAN & MANOCHI**
BY:    **GARY P. LIGHTMAN, ESQUIRE**
          **GLENN A. MANOCHI, ESQUIRE**
**PA Identification Nos. 28529 and 64223**
**600 Germantown Pike, Suite 400**
**Plymouth Meeting, PA 19422**
**Telephone: 215-760-3000**
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com
kditomaso@lightmanlaw.com
**Attorneys for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AMERICAN ENVIRONMENTAL** : | |
| **ENTERPRISES, INC., d/b/a** : | |
| **THESAFETYHOUSE.COM** : | |
| : | **CIVIL ACTION** |
| **Plaintiff,** : | |
| : | **No. 2022-cv-00688 (JMY)** |
| **v.** : | |
| : | |
| **MANFRED STERNBERG, ESQUIRE,** : | |
| **and MANFRED STERNBERG &** : | |
| **ASSOCIATES, PC, and CHARLTON** : | |
| **HOLDINGS GROUP, LLC, and** : | |
| **SAMUEL GROSS a/k/a SHLOMO** : | |
| **GROSS, and GARY WEISS,** : | |
| **and ASOLARDIAMOND, LLC a/k/a,** : | |
| **ASOLAR. LLC, and DAPHNA** : | |
| **ZEKARIA, ESQUIRE, and SOKOLSKI** : | |
| **& ZEKARIA, P.C.** : | |
| : | |
| **Defendants.** : | |

## NOTICE OF DEPOSITIONS OF GARY WEISS AND ASOLARDIAMOND, LLC
## (WITH REQUEST FOR PRODUCTION OF DOCUMENTS)

TO:    (1)    Gary Weiss, individually and as the
          (2)    Designated  representative of and ASOLARDIAMOND, LLC
          (VIA EMAIL: wgary4109@gmail.com and monipair@aol.com )

**cc: all interested counsel and/or parties:**
          (3) Seth Laver, Esquire (VIA EMAIL: slaver@goldbergsegalla.com)
          (4) Patrick J. Healey, Esquire (VIA EMAIL: phealey@rebarkelly.com)

1



(5) Cathleen Kelly Rebar, Esquire (VIA EMAIL: crebar@rebarkelly.com)
(6) Daphna Zekaria, Esquire (VIA EMAIL: Sokolski.Zekaria@mindspring.com)
(7) Sam Gross (VI EMAIL charltonholdinggroupllc@aol.com and Scg1212@gmail.com and publicdiamonds@gmail.com and Samrosinc@icloud.com

cc: Tate & Tate Court Reporters (VIA EMAIL: tina@tate-tate.com )

        PLEASE TAKE NOTICE that plaintiff American Environmental Enterprises, Inc. d/b/a TheSafetyHouse.Com ("Plaintiff" or "TSH" ("Sternberg"), through its counsel, shall take the oral depositions of the defendants Gary Weiss, both individually and as the designated representative of defendant ASOLARDIAMOND, LLC ("ASOLAR") (Weiss and ASOLAR collectively are referred to as the "Weiss Defendants"), pursuant to Rule 30 *et seq* of the Federal Rules of Civil Procedure.  The depositions shall take place in-person at the law offices of Lightman & Manochi, 600 W. Germantown Pike, Suite 400, Plymouth Meeting, PA 19462, beginning on **Friday, February 16, 2024, commencing at 9:30 a.m.** (as respects Weiss); and **commencing at 12:00 p.m.** (as respects ASOALR).   The depositions above shall continue from day to day thereafter, until all of the depositions noticed hereunder are completed.  Each deposition will be conducted upon oral examination, before a Notary Public, Court Stenographer, or such other officer authorized by law to administer oaths.  The depositions may be videotaped.

        The matters to be inquired into as respects defendant ASOLAR include the following:

    (1)    The designated  representative with knowledge of requests by or communications with defendants Sam Gross and/or Charlton Holding Group, LLC's (collectively, the "Gross Defendants"), directly and/or through Manfred Sternberg or Sternberg, P.C. (collectively the "Sternberg Defendants), to purchase iCovid Test Kits source, in the time period from January 1 2021, through April 2022.

(2)     The designated representative with knowledge of Plaintiff's request in January 2022 to purchase 151,200 iHeath Covid-19 Antigen Rapid two-pack Test Kits (the "Test Kits" or "Covid Test kits") from either the Gross Defendants or the Sternberg Defendants or the Weiss Defendants, or from any other person or entity.

(3)     The designated representative with knowledge of the drafting and preparation and execution and delivery and the contents of the document entitled "Sale and Purchase Agreement" attached as Exhibit "1" to Plaintiff's Complaint (the "Sale Agreement").

(4)     The designated representative with knowledge of the terms and conditions contained in the Sale Agreement, and the practical operation of the Sale Agreement.

(5)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, to Daphna Zekaria, Esquire ("Zekaria"), or her law firm of Sokolski & Zekaria, PC (the "Zekaria PC") (collectively Zekaria and Zekaria PC are referred to herein as the "Zekaria Defendants"), and/or from either of the Zekaria Defendants, to either of the Weiss Defendants, and/or to either of the Gross Defendants, and/or to any other person or entity concerning iCovid test kits or the plaintiff's purchase thereof.

(6)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to Belco Distributors, and/or Nail & Beauty, LLC, and/or VRC Medical Supplies, and/or pertaining to the purchase of iCovid test kits by or for any of said entities.

(7)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to Nationwide Medical Services, and/or pertaining to the purchase of iCovid test kits by or for said entity.

3

(8)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to Yuba County Schools, and/or pertaining to the purchase of iCovid test kits by or for said entity.

(9)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to El Monte Unified School District, and/or pertaining to the purchase of iCovid test kits by or for said entity.

(10)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to relating to Hand Safety LLC, and/or pertaining to the purchase of iCovid test kits by or for said entity.

(11)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to DKW Consulting LLC and/or David Wright, including pertaining to the purchase of iCovid test kits by or for said entity or person.

(12)     The designated representative with knowledge of any and all wire transfers of funds from either of the Sternberg Defendants, and/or from either of the Zekaria Defendants, relating to or pertaining to the purchase of iCovid test kits by or for any person or entity, not identified in nos. (6) to (11) above.

(13)     The designated representative with knowledge of the lawsuit styled Nail & Beauty, LLC v. VRC Medical Services Inc et als, NY Supreme Court, Nassau County, Index no. 60424/2022 (the "NY Fraud Lawsuit"), and the underlying facts of said NY Fraud Lawsuit, and the defenses raised by any of the defendants in the NY Fraud Lawsuit.

(14)    The designated representative with knowledge of any and all communications to or from Randy Adler, Esquire, or William Berman, Esquire, pertaining to their client's purchase of iCovid test kits or their claims relating thereto, and any settlement discussions of the claims of any of their client(s).

(15)    The designated representative with knowledge of your receipt, either directly or through any of the Zekaria Defendants, of any funds from or on behalf of any of the Gross Defendants, to purchase any Covid test kits, whether for plaintiff or another entity or person.

(16)    The designated representative with knowledge of the transfers of any funds form either of the Sternberg Defendants to you, or to the Zekaria Defendants pertaining to the purchase any Covid test kits, whether for plaintiff or any other entity or person.

(17)    The designated representative with knowledge of the transfer or wiring  of any funds to the Zekaria Defendants, between January 20, 2022, and June 30, 2022, including, but not limited to: (a) $1,911,960.00 allegedly sent to Zekaria on or about February 4, 2022; and (b) $250,000.00 sent to Zekaria on or about February 15, 2022; and (c) $190,000.00 sent to Zekaria on or about February 25, 2022.

(18)    The designated representative with knowledge of any and all collateral, including but not limited to, diamonds or gems, delivered by you to any of the Gross Defendants and/or the Sternberg Defendants and/or any of the Zekaria Defendants, for any purpose, including but not limited to, as "collateral" for or securing the repayment of funds provided to you, directly or through any of the Zekaria Defendants, for the purchase or refund of any test kits, whether for plaintiff or any other person or entity.

5

(19)    The designated representative with knowledge of the current status of any and all funds delivered by plaintiff or by any potential purchaser to any of the Sternberg Defendants, for the purchase of Test Kits, whether for plaintiff or any other person or entity.

(20)    The designated representative with knowledge of the time, place and manner of delivery of any Test Kits to plaintiff between January 1, 2022 and June 30, 2022.

(21)    The designated representative with knowledge of the contact information of the person holding himself out as or known by the name "Shraga," and said person's involvement in the purchase or delivery of Covid test kits for or on behalf of plaintiff, or any other person or entity.

(22)    The designated representative with knowledge of the efforts made to locate and/or purchase iCovid test kits to supply to plaintiff pursuant to the Sale Agreement.

(23)    The designated representative with knowledge of the efforts made to locate and/or purchase iCovid test kits to supply to any other person or entity.

(24)    The designated representative with knowledge of any of the Bills of Lading sent by any of the Sternberg Defendants or any of the Gross Defendants, to plaintiff or to counsel for plaintiff.

(25)    The designated representative with knowledge of any and all communications with any common carriers as respects the shipment of the iCovid test kits.

(26)    The designated representative with knowledge of claims made by Nail & Beauty LLC as respects their failure to timely get the iCovid test kits that they ordered.

(27)    The designated representative with knowledge of any claims made by any other entities or persons, involving their failure to timely get the Covid test kits that they ordered.

(28)    The designated representative with knowledge of the current whereabouts of and subsequent disposition of any of the test kits.

6

(29)    The Designated representative with knowledge of the $1,965,600.00 (the "Purchase Price") wired on 1/21/22 by plaintiff to the attorney escrow account of the Sternberg Defendants to purchase the test kits, and the current whereabouts of and subsequent disposition of the Purchase Price.

(30)    The designated representative with knowledge of the time, place and manner of any shipment or delivery of any test kits to plaintiff between January 1, 2022 and June 30, 2022.

(31)    The designated representative with knowledge of the $2,449,440 or other funds that were wired by BELCO and/or Nail & Beauty and/or VRC, to any of the Sternberg Defendants or any of the Zekaria Defendants or any of the Gross Defendants, to purchase their test kits, and the current whereabouts of and subsequent disposition of those funds.

(32)    The designated representative with knowledge of any brokers that may be involved in the sale of any test kits, including without limitation:  Ruth Countinho; and/or John Moran; and/or Dick Gray; and/or Alex Frazier; and/or Chris Cortese.

(33)    The designated representative with knowledge of any communications with Available Movers & Storage, relating to the transportation, storage, or delivery of the iCovid test kits ordered by plaintiff.

(34)    The designated representative with knowledge of any communications with Available Movers & Storage, relating to the transportation, storage, or delivery of the iCovid test kits ordered by any other person or entity.

(35)    The designated representative with knowledge of any payments made to Available Movers & Storage, relating to the transportation, storage, or delivery of the iCovid test kits ordered by plaintiff.

(36)     The designated representative with knowledge of any payments made to Available Movers & Storage, relating to the transportation, storage, or delivery of the iCovid test kits ordered by any other person or entity.

(37)     The designated representative with knowledge of any communications with Mask & Eldiven, relating to the purchase, transportation, or delivery of the iCovid test kits ordered by plaintiff.

(38)     The designated representative with knowledge of any communications with Mask & Eldiven, relating to the purchase, transportation, storage, or delivery of the iCovid test kits ordered by any other person or entity.

(39)     The designated representative with knowledge of any payments made to Mask & Eldiven, relating to the purchase, transportation, or delivery of the iCovid test kits ordered by plaintiff.

(40)     The designated representative with knowledge of any payments made to Mask & Eldiven, relating to the purchase transportation, storage, or delivery of the iCovid test kits ordered by any other person or entity.

(41)     The designated representative with knowledge of the source of any payments made by any of the Weiss Defendants, to Mask & Eldiven, as respects the purchase, transportation, or delivery of the iCovid test kits ordered by plaintiff.

(42)     The designated representative with knowledge of the source of any payments made by any of the Weiss Defendants, to Mask & Eldiven, as respects the purchase, transportation, or delivery of the iCovid test kits ordered by any other person or entity.

8

(43)    The designated representative with knowledge of the formation of ASOLAR, and its bank accounts and other assets, and its personnel and operations, any and all tax returns filed by or for ASOLAR.

(44)    The designated representative with knowledge of the formation of the entity alleged known as ASOLAR, LLC (if different from ASOLAR), and its bank accounts and other assets, and its personnel and operations, any and all tax returns filed by or for ASOLAR.

(45)    The designated representative with knowledge of any communications any of the Weiss Defendants had with any of the Sternberg Defendants, pertaining to any of the matters relating to this dispute.

(46)    The designated representative with knowledge of any communications any of the Weiss Defendants had with any of the Zekaria Defendants, pertaining to any of the matters relating to this dispute.

(47) The designated representative with knowledge of any communications any of the Weiss Defendants had with any of the Gross Defendants, pertaining to any of the matters relating to this dispute.

(48)    The designated representative with knowledge of Stacey Panagakos, and her involvement with any of the Gross Defendants, and/or any of their bank accounts, and/or any of the matters involved in this dispute, and/or any communications with said person.

(49)    The designated representative with knowledge of Taylor Panagakos, and her involvement with any of the Gross Defendants, and/or any of their bank accounts, and/or any of the matters involved in this dispute, and/or any communications with said person.

9

(50)     The designated representative with knowledge of Mirtha Pantoja or Iriate, and any communications involving her, or her involvement with any of the Weiss Defendants or any of the matters involved in this dispute. and/or any communications with said person(s).

(51)     The designated representative with knowledge of Max Sternberg or Molly Sternberg, and any communications involving either of them, or any of their involvement with the Sternberg Defendants or any of the matters involved in this dispute, and/or any communications with said person(s).

(52)     The designated representative with knowledge of any and all Bills of Sale issued or created as respects any test kits purchased by plaintiff, or any other customer.

(53)     The designated representative with knowledge of any and all Bills of Lading issued or created as respects any test kits purchased by plaintiff, or any other customer.

(54)     The designated representative with knowledge of any of the matters in the Interrogatories served upon the Weiss Defendants, or their responses thereto.

(55)     The designated representative with knowledge or possession of any of the responsive documents or other matters in the Document Requests served upon the Weiss Defendants, or their responses thereto, and the responsive documents produced.

(56)     The designated representative with knowledge of any and all facts and/or defenses that you or any of the other Defendants intend to rely upon in this proceeding.

(57)     The Designated representative with knowledge of all documents that the Sternberg Defendants or any other defendant intend to rely upon in this proceeding.

(58)     Any and all documents relating to any of the aforesaid items

In addition to the aforesaid, the matters to be inquired into include: (A) the claims and allegations in plaintiff's Complaint, as amended; and (B) the claims and allegations in any Third-

Party Complaints filed in this lawsuit; and (C) any and all defenses or counterclaims which any defendants have or may have to any of plaintiff's claims or allegations; (D) any and all facts that support any of the Third-Party Complaints; (E) any and all defenses or counterclaims the any of the Defendants may have to the Third-Party Complaints or Cross-Claims; (F) the documents to support any of plaintiff's claims and allegations; (G) the documents to support any of the defenses or crossclaims of the Sternberg Defendants or any other defendant to plaintiff's claims; (H) the documents which support any of the Third-Party Complaints; (I) all areas set forth in any of plaintiff's Document Requests or Interrogatories directed to the Weiss Defendants or any other of the defendants; (J) all facts any of the Weiss Defendants or any other Defendant intends to rely upon in this case; (K) all documents the Weiss Defendants or any other Defendant intends to use as evidence or an exhibit in this case; and (L) all damages any Defendant claims or may claim in this case, and the calculation of such damages, and any and all documents in support of such damages claim or calculation.

TAKE FURTHER NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, ASOLAR is required to designate one or more officers, directors, managers, members, managing agents or other persons who agree to testify on its behalf, and to set forth, for each person so designated , the matters on which each such person will testify, pursuant to Nos. (1) through (58) above, and (A) through (L) above, which designation is to be served upon undersigned counsel reasonably in advance of (and no later than one week prior to) the scheduled deposition(s).

TAKE FURTHER NOTICE that, pursuant to Rules 30(b)(2) and 34 of the Federal Rules of Civil Procedure, each of the Weiss Defendant deponent(s) are instructed to bring with them to their deposition: (i) the actual bank records for any account(s) into which the Purchase Price paid by plaintiff or funds of any other person or entity who purchased test kits was made, whether

11

directly or indirectly; and (ii) all of the aforesaid documents referred to above in this Deposition Notice, including, but not limited to, those requested in Plaintiffs' Document Requests or Interrogatories previously directed to and served upon the Weiss Defendants or any of the other Defendants or required or agreed to be produced by Court Order; and (iii) all of the documents listed in the email sent by undersigned counsel to Gary Weiss on January 12, 2024; and (iv) all of the documents the Weiss Defendants or any other Defendant intends to introduce as an exhibit or into evidence in support of any defenses asserted to plaintiffs' claims and allegations set forth in the Complaint (as amended); and (v) all of the documents the Weiss Defendants or any other Defendant intends to introduce as an exhibit or into evidence in support their claims or defenses or the allegations set forth in any of the Third-Party Complaints.

LIGHTMAN & MANOCHI

BY:  /s/ Gary Lightman
　　　GARY P. LIGHTMAN, ESQUIRE
　　　garylightman@lightmanlaw.com

Date:  January 13, 2024　　　　　　　Attorneys for Plaintiff

12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN ENVIRONMENTAL ENTERPRISES, INC., d/b/a THESAFETYHOUSE.COM, | CIVIL ACTION |
| *Plaintiff,* | No. 2:22-CV-0688 (JMY) |
| v. | |
| MANFRED STERNBERG, ESQUIRE and MANFRED STERNBERG & ASSOCIATES, PC, and CHARLTON HOLDINGS GROUP, LLC, and SHLOMO GROSS a/k/a SAMUEL GROSS and GARY WEISS and ASOLARDIAMOND, LLC d/b/a ASOLAR, LLC and DAPHNA ZEKARIA, ESQUIRE and SOKOLSKI & ZEKARIA, P.C. | |
| *Defendants.* | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below he caused to be served a true and correct copy of the foregoing Notice of Oral Deposition of the Weiss Defendants via email, as indicated, upon the following persons at the following addresses:

Samuel Gross
Charlton Holdings Group, LLC
78 Buckminster Rd.
Rockville Center, NY 11570
charltonholdinggroupllc@aol.com
Scg1212@gmail.com
publicdiamonds@gmail.com
Samrosinc@icloud.com

Seth Laver, Esquire
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
slaver@goldbergsegalla.com

Pro Se Defendant

Attorneys for the Sternberg Defendants

13

Patrick J. Healey, Esquire
Cathleen Kelly Rebar, Esquire
Rebar Kelly
470 Norristown Road, Suite 201
Blue Bell, PA 19422
Phealey@rebarkelly.com
crebar@rebarkelly.com

Attorneys for the Zekaria Defendants

Gary Weiss (pro se)
ASOLARDIAMOND, LLC
437 1st Avenue
Elizabeth, NJ 07206
wgary4109@gmail.com and
monipair@aol.com

Defendants Gary Weiss
and ASOLARDIAMOND, LLC

Daphna Zekaria, Esquire
Sokolski & Zekaria, P.C.
267 Main St., 2nd Floor
Huntington, NY 11743
sokolski.zekaria@mindspring.com

Defendant Daphna Zekaria

LIGHTMAN & MANOCHI

BY: /s/ Gary Lightman
GARY P. LIGHTMAN, ESQUIRE

Date: January 12, 2024

Attorneys for Plaintiff

14

### NEW JERSEY DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES

### CERTIFICATE OF FORMATION

### ASOLARDIAMOND, LLC
### 0400759067

*LLC*

The above-named DOMESTIC LIMITED LIABILITY COMPANY was duly filed in
accordance with New Jersey State Law on 06/24/2015 and was assigned
identification number 0400759067.   Following are the articles that
constitute its original certificate.

**1. Name:**
   ASOLARDIAMOND,  LLC

**2. Registered Agent:**
   MIRTHA PANTOJA

**3. Registered Office:**
   739 VINE STREET
   ELIZABETH, NJ 07202

**4. Business Purpose:**
   INTERNET SALES (INCLUDING INDEPENDENT SALES ON AN AUCTION SITE)

**5. Members/Managers:**
   MIRTHA PANTOJA
   739 VINE STREET
   ELIZABETH, NJ 07202

**6. Main Business Address:**
   739 VINE STREET
   ELIZABETH, NJ 07202

**Signatures:**
   MIKE WILSON
   AUTHORIZED REPRESENTATIVE



*IN TESTIMONY WHEREOF, I have
hereunto set my hand and
affixed my Official Seal
at Trenton, this
25th day of June, 2015*

*Andrew P Sidamon-Eristoff
State Treasurer*

Certificate Number:   136775680
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp



EXHIBIT

GW2

KAB  2-16-24

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:      ASOLARDIAMOND,  LLC
Business Id:           0400759067
Certificate Number:    6000212027

I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE
NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN ORIGINAL CERTIFICATE ON June
24, 2015 AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS TAKEN
FROM AND COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON FILE
AND OF RECORD.

IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL AT
TRENTON, THIS
August 28, 2023 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER

VERIFY THIS CERTIFICATE ONLINE AT
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

L-102 NJSA 42 (2/94)

AmC

FILED

AUG 1 1 2015

STATE TREASURER

0400759067

New Jersey Division of Revenue

**Certificate of Amendment**

Limited Liability Company

This form may be used to amend a Certificate of Formation of a Limited Liability Company on file with the Department of the Treasury. Applicants must insure strict compliance with NJSA 42, the New Jersey Limited Liability Act, and insure that all applicable filing requirements are met.

1. Name of Limited Liability Company:

   **ASOLARDIAMOND, LLC**

2. Identification Number:

   **0400759067**

3. New LLC Name (if applicable):

4. Effective Date:

5. The Certificate of Formation is amended as follows (provide attachments if needed):

   Article 5 to add Member Morena Menjibar, 441 1st Ave., Elizabeth, NJ 07206
   Article 6 to change Main Business address to 739 Vine St., Elizabeth, NJ 07202

The undersigned represent(s) that this filing complies with State law as detailed in NJSA 42 and that they are authorized to sign this form behalf of the Limited Liability Company.

Signature:

Name:  **Imelda Vasquez, Authorized Representative**

Date:  **8/11/15**

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:     ASOLARDIAMOND,  LLC
Business Id:          0400759067
Certificate Number:   6000212028

I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE
NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN AMENDMENT ON August 11, 2015
AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS TAKEN FROM AND
COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON FILE AND OF
RECORD.

IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL AT
TRENTON, THIS
August 28, 2023 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER

VERIFY THIS CERTIFICATE ONLINE AT
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Morena Menjibar Facebook post June 27, 2017





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

AMERICAN ENVIRONMENTAL      :
ENTERPRISES INC. doing business as   :
THESAFETYHOUSE.COM          :        NO. 2:22-cv-00688-JMY
       *Plaintiff,*            :
                      :
      v.                     :
                      :
MANFRED STERNBERG, ESQUIRE,  :
MANFRED STERNBERG &          :
ASSOCIATES, PC,              :
CHARLTON HOLDINGS GROUP, LLC,  :
SAMUEL GROSS,                :
          *Defendants.*          :
      v.                     :
                      :
GARY WEISS,                  :
A.SOLAR LLC,                 :
     *Third Party Defendants*   :
And                          :
AMERICAN ENVIRONMENTAL       :
ENTERPRISES INC.             :
     *Counter Defendant*    :

## MOTION TO RECONSIDER THIS COURT'S SEPTEMBER 1, 2023, ORDER ALLOWING PLAINTIFF TO AMEND THE CAPTION OF THEIR COMPLAINT

**AND NOW**, comes third-party Defendants Gary Weiss and A.SOLAR, LLC ("Moving Defendants" or "Weiss Defendants"), to file this Motion to Reconsider this Court's September 1, 2023 Order allowing Plaintiffs to Amend the Caption of their Complaint, and in support thereof, avers as follows:

    1.     This action was initiated by the filing of a Complaint on or about February 23, 2022.

5



2. On or about November 28, 2022, Defendants Charlton Holdings Group, LLC and Samuel Gross, filed Third-Party Complaint against the Weiss Defendants. (*Please see*: Defendant Gross' Third Party Complaint, *ECF 32-2*).

3. The Gross Defendants alleged that Mr. Weiss was a "shareholder", "officer", and/or "owner" of "A.SOLAR, LLC". (*Please see*: Third Party Complaint, §§. 7-9).

4. The name "ASOLARDIAMOND, LLC" never appears in the Third-Party Complaint. (*Pease see*: Third Party Complaint).

5. No party, in the initial round of pleadings, identified "ASOLARDIAMOND, LLC" as an entity associated with this matter.

6. The name "ASOLARDIAMOND, LLC" does not appear in any of the numerous attachments to any of the pleadings.

7. Further, Plaintiff's counsel on July 31, 2023, filed an Amended Complaint which named "A.SOLAR, LLC" as an additional Defendant. (*Please see*: Plaintiff's First Amended Complaint, *ECF 80*).

8. The name "ASOLARDIAMOND, LLC" never appears in Plaintiff's amended Complaint.

9. On or about August 30, 2023, Plaintiff filed a "Motion to Amend Caption and Correct Name of Defendant A Solar". (*Please see*: Plaintiff's Motion to Amend Caption, *ECF 98*).

10. Plaintiff admits that they named "A.SOLAR, LLC" as a defendant "because that name appeared on one or more documents". (Please see: *Plaintiff's Motion to Amend*, § 2).

11.     According to Plaintiff's counsel, on or around August 29, 2023, Plaintiff's counsel had a conversation with Mr. Gary Weiss directly, during which Mr. Weiss allegedly told him that "A.Solar, LLC" was not a "legal entity.

12.     Plaintiff, admittedly, was unaware of the existence of an entity named "ASOLARDIAMOND, LLC".

13.     Undersigned counsel was also unaware of the existence of an entity named "ASOLARDIAMOND, LLC", and was retained by Gary Weiss and A. Solar, LLC.

14.     Plaintiff has presented no documentation to support any relationship between "A.SOLAR, LLC" and "ASOLARDIAMOND, LLC".

15.     There has been nothing presented to show that "A.SOLAR, LLC" is doing business as "ASOLARDIAMOND, LLC".

16.     Defendant Weiss, who has requested to terminate undersigned as his counsel, verified all the pleadings on his own behalf, and on behalf of "A.SOLAR, LLC".

17.     According to the documents provided by Plaintiff's counsel, Gary Weiss does not appear to be a member of "ASOLARDIAMOND, LLC". (A true and correct copy of the Certificate of Formation, and subsequent amendment, is attached hereto as Exhibit A).

18.     Plaintiff alleged, in their First Amended Complaint, that the address for "A.SOLAR, LLC" is "437 1st Avenue, Elizabeth, New Jersey 07206. (*Please see*: Plaintiff's First Amended complaint.)

19.     The registered address for "ASOLARDIAMOND, LLC" is 739 Vine Street, Elizabeth, NJ 07202.

20.     The addresses provided, by Plaintiff, for "A.SOLAR, LLC" and "ASOLARDIAMOND, LLC" are not the same.

7

21. The alleged owners/members/managers of "A.SOLAR, LLC" and "ASOLARDIAMOND, LLC" are not the same.

22. The owners/members/managers of "ASOLARDIAMOND, LLC" are not parties to this lawsuit, nor do their names appear in any pleadings prior to the Motion.

23. On September 1, 2023, this Court issued an Order Granting Plaintiff's Request to Amend the Caption, based solely on the allegations in the Motion. (*Please see*: Order dated September 1, 2023, *ECF 102*).

24. The Weiss Defendants were not given the opportunity to respond to the Motion to Amend, nor request a hearing on the Motion to Amend.

25. Simply put, "ASOLARDIAMOND, LLC" and "A.SOLAR, LLC" are not the same entity.

26. To allow Plaintiff to add "ASOLARDIAMOND, LLC" to this case would allow Plaintiff to add a new entity to this suit, without following the proper Rules of Procedure.

27. ASOLARDIAMOND, LLC has not been served at its corporate address.

28. ASOLARDIAMOND, LLC's member has not been served.

29. Undersigned counsel has no relationship with "ASOLARDDIAMOND, LLC" and have not been retained to represent said entity.

30. Accordingly, "ASOLARDIAMOND, LLC" has no notice of their introduction into this lawsuit.

**WHEREFORE**, Norris McLaughlin, P.A., respectfully requests that this Honorable Court grant their Motion to Reconsider this Court's September 1, 2023, Order.

NORRIS MCLAUGHLIN, P.A.

Date: September 12, 2023                    By: /s/ *Rebecca J. Price*

Rebecca J. Price, Esq.
Attorney I.D. No. 206182
515 Hamilton Street, Suite 502
Allentown, PA 18101
(610) 391-1800/(f) (610) 391-1805
rprice@norris-law.com
*Attorneys for Third Party Defendants*
*Gary Weiss and A. Solar, LLC*

## **VERIFICATION**

I, Gary Weiss, on behalf of myself and A.Solar, LLC, hereby verify that the statements made in the foregoing Motion for Reconsideration and Memorandum of Law in Support thereof, are true to the best of my personal knowledge, information and belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. §4904 relating to un-sworn falsification to authorities.

Date:  9-12-2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

AMERICAN ENVIRONMENTAL          :
ENTERPRISES INC. doing business as :
THESAFETYHOUSE.COM              :       NO. 2:22-cv-00688-JMY
      *Plaintiff,*                 :
                                :
      v.                           :
                                :
MANFRED STERNBERG, ESQUIRE,     :
MANFRED STERNBERG &             :
ASSOCIATES, PC,                 :
CHARLTON HOLDINGS GROUP, LLC,   :
SAMUEL GROSS,                   :                                    :
      *Defendants.*               :
      v.                           :
                                :
GARY WEISS,                     :
A.SOLAR LLC,                    :
      *Third Party Defendants*    :
And                             :
AMERICAN ENVIRONMENTAL          :
ENTERPRISES INC.                :
      *Counter Defendant*         :

## CERTIFICATION OF SERVICE

I hereby certify that I have served upon all persons listed below a true and correct copy of

Motion of Third-Party Defendants Gary Weiss and A. Solar, LLC to Reconsider this Court's

September 1, 2023, Order, in the above-captioned matter this date by regular mail and/or

electronic service.

10

Glenn A. Manochi, Esquire
Gary P. Lightman, Esquire
William Lyle Stamps, Esquire
Lightman & Manochi
600 W. Germanton Pike
Suite 400
Plymouth Meeting, PA 19462
Emails: gmanochi@lightmanlaw.com; garylightman@lightmanlaw.com;
wlstamps@lightmanlaw.com
Attorneys for Plaintiff/Counter Defendant, American Environmental Enterprises Inc. d/b/a
TheSafetyhouse.com

Seth L. Laver, Esquire
Jason S. Kaner, Esquire
GOLDBERG SEGALLA LLP
1700 Market Street, Ste, 1418
Philadelphia, PA 18103
Email: slaver@goldbergsegalla.com; Jkaner@goldbergsegalla.com
Attorneys for Defendants/Third Party Plaintiffs/Counter Claimants Manfred Sternberg, Esq.
and Manfred Sternberg & Associates, PC

Samuel Gross
Charlton Holdings Group, LLC
78 Buckminster Road
Rockville Center, NY 11570
Email: charltonholdinggroupllc@aol.com
Pro se

NORRIS MCLAUGHLIN, P.A.

Date: September 12, 2023               By:  /s/ *Rebecca J. Price*
                                            Rebecca J. Price, Esq.
                                            Attorney I.D. No. 206182
                                            515 Hamilton Street, Suite 502
                                            Allentown, PA 18101
                                            (610) 391-1800/(f) (610) 391-1805
                                            rprice@norris-law.com
                                            *Attorneys for Third Party Defendants*
                                            *Gary Weiss and A. Solar, LLC*

11

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)**

| | | |
|---|---|---|
| AMERICAN ENVIRONMENTAL | : | |
| ENTERPRISES INC. doing business as | : | |
| THESAFETYHOUSE.COM | : | NO. 2:22-cv-00688-JMY |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| MANFRED STERNBERG, ESQUIRE, | : | |
| MANFRED STERNBERG & | : | |
| ASSOCIATES, PC, | : | |
| CHARLTON HOLDINGS GROUP, LLC, | : | |
| SAMUEL GROSS, | : | |
| *Defendants.* | : | |
| v. | : | |
| | : | |
| GARY WEISS, | : | |
| A.SOLAR LLC, | : | ORDER |
| *Third Party Defendants* | : | |
| And | : | |
| AMERICAN ENVIRONMENTAL | : | |
| ENTERPRISES INC. | : | |
| *Counter Defendant* | : | |

## ORDER

**AND NOW**, this              day of                       , 2023, upon consideration of Third-Party

Defendants, Gary Weiss and A.Solar LLC (hereinafter "Moving Defendants" or "Weiss

Defendants"), Motion for Reconsideration of this Courts September 1, 2023 Order allowing

Plaintiff's amendment to bring a new entity into this suit, , and any response thereto, it is hereby

**ORDERED** as follows:

1. Moving Defendant's Motion is **GRANTED**; and

2. The previous Order allowing the Amendment is **OVERULED**.

3. Plaintiff is **DIRECTED** to file an Amended Complaint and properly serve

   "ASOLARDIAMOND, LLC".

BY THE COURT:

_____

Judge John Milton Younge

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | | |
|---|---|---|
| AMERICAN ENVIRONMENTAL | : | NO. 2:22-cv-00688-JMY |
| ENTERPRISES INC. doing business as | : | |
| THESAFETYHOUSE.COM | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| MANFRED STERNBERG, ESQUIRE, | : | |
| MANFRED STERNBERG & | : | |
| ASSOCIATES, PC, | : | |
| CHARLTON HOLDINGS GROUP, LLC, | : | |
| SAMUEL GROSS, | : | |
| *Defendants.* | : | |
| v. | : | |
| | : | |
| GARY WEISS, | : | |
| A.SOLAR LLC, | : | NOTICE OF MOTION FOR |
| *Third Party Defendants* | : | RECONSIDERATION |
| | : | |

**PLEASE TAKE NOTICE** that undersigned, as counsel of record for Third-Party

Defendants Gary Weiss and A.Solar, LLC (hereinafter "Moving Defendants" or "Weiss

Defendants"), will move this Court for an Order to Reconsider and Overule the prior Order

granted in response to Plaintiff's "Motion to Amend Caption and to Correct Name of Defendant

A. Solar".

**PLEASE TAKE FURTHER NOTICE** that a Proposed Order is attached hereto to this

Motion for Reconsideration.

3

**PLEASE TAKE FURTHER NOTICE** that this matter has not been scheduled for trial.

NORRIS MCLAUGHLIN, P.A.

Date: September 12, 2023

By: /s/ *Rebecca J. Price*

Rebecca J. Price, Esq.
Attorney I.D. No. 206182
515 Hamilton Street, Suite 502
Allentown, PA 18101
(610) 391-1800/(f) (610) 391-1805
rprice@norris-law.com
*Attorneys for Third Party Defendants*
*Gary Weiss and A. Solar, LLC*

# EXHIBIT "A"

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:     ASOLARDIAMOND,   LLC
Business Id:          0400759067
Certificate Number:   6000212027


I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN ORIGINAL CERTIFICATE ON June 24, 2015 AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS TAKEN FROM AND COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON FILE AND OF RECORD.


IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL AT
TRENTON, THIS
August 28, 2023 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER


VERIFY THIS CERTIFICATE ONLINE AT

https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

*NEW JERSEY DEPARTMENT OF THE TREASURY*
*DIVISION OF REVENUE AND ENTERPRISE SERVICES*

### CERTIFICATE OF FORMATION

#### ASOLARDIAMOND, LLC
##### 0400759067

The above-named DOMESTIC LIMITED LIABILITY COMPANY was duly filed in accordance with New Jersey State Law on 06/24/2015 and was assigned identification number 0400759067. Following are the articles that constitute its original certificate.

1. **Name:**
   ASOLARDIAMOND, LLC

2. **Registered Agent:**
   MIRTHA PANTOJA

3. **Registered Office:**
   739 VINE STREET
   ELIZABETH, NJ 07202

4. **Business Purpose:**
   INTERNET SALES (INCLUDING INDEPENDENT SALES ON AN AUCTION SITE)

5. **Members/Managers:**
   MIRTHA PANTOJA
   739 VINE STREET
   ELIZABETH, NJ 07202

6. **Main Business Address:**
   739 VINE STREET
   ELIZABETH, NJ 07202

**Signatures:**
MIKE WILSON
AUTHORIZED REPRESENTATIVE



*IN TESTIMONY WHEREOF, I have*
*hereunto set my hand and*
*affixed my Official Seal*
*at Trenton, this*
*25th day of June, 2015*

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certificate Number: 136775680
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:   ASOLARDIAMOND,   LLC
Business Id:   0400759067
Certificate Number:   6000212028


I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE
NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN AMENDMENT ON August 11, 2015
AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS TAKEN FROM AND
COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON FILE AND OF
RECORD.


IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL AT
TRENTON, THIS
August 28, 2023 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER


VERIFY THIS CERTIFICATE ONLINE AT
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

L-102 NJSA 42 (2/94)

Am C

**FILED**

AUG 1 1 2015

**STATE TREASURER**

0400759067

New Jersey Division of Revenue

**Certificate of Amendment**

Limited Liability Company

This form may be used to amend a Certificate of Formation of a Limited Liability Company on file with the Department of the Treasury. Applicants must insure strict compliance with NJSA 42, the New Jersey Limited Liability Act, and insure that all applicable filing requirements are met.

1. Name of Limited Liability Company:
   **ASOLARDIAMOND, LLC**

2. Identification Number:
   **0400759067**

3. New LLC Name (if applicable):

4. Effective Date:

5. The Certificate of Formation is amended as follows (provide attachments if needed):

   Article 5 to add Member Morena Menjibar, 441 1st Ave., Elizabeth, NJ 07206
   Article 6 to change Main Business address to 739 Vine St., Elizabeth, NJ 07202

The undersigned represent(s) that this filing complies with State law as detailed in NJSA 42 and that they are authorized to sign this form behalf of the Limited Liability Company.

Signature:

Name:  **Imelda Vasquez, Authorized Representative**

Date:    8/11/15

NJ Division of Revenue, PO Box 308, Trenton, NJ 08625

004

**MASK & ELDIVEN**
**2 W 47ST,  ROOM 1005**
**NEW YORK NEW YORK, 10036**
**TEL: 201-575-0193**

Sold to,                                    Feb 6,2022
GARY WEISS
437 1/2 FIRST AVE
ELIZABETH, NJ 07206

365,790 Covid-19 test kits, ( I Health ) @4.95 each.
Total paid cash & Merchandise, $1,810,660.00 US dollars

Final sale

02 28 / 1951

EXHIBIT
GWS
KAB   2-16-24
PENGAD 800-631-6989

ASOLAR, LLC
437 1st Avenue
Elizabeth, New Jersey 07205
United States
Phone: 9085462649
Mobile: Email, WGARRE1079@GMAIL.COM
Edit your business address and contact details

Bill to
Charlton Holding Group, LLC, 78 Buckminster Road - Rockville Center New
York 11570 USA
Sam Gross
516-2325933
samrosinc@icloud.com
Edit Charlton Holding Group, LLC, 78 Buckminster Road - Rockville Center
New York 11570 USA
· Choose a different customer

| | Invoice number | 3 |
| P.O./S.O. number | 10054 |
| Invoice date | 2022-01-26 |
| Payment due | 2022-02-04 |
| | Within 9 days |

✏ Edit columns

| Items | | Quantity | Price | Amount |
|---|---|---|---|---|
| Ihealth Covid Test kits | Ihealth Covid-19 Test Kits | 355200 | 6.00 | $2,131,200.00 |
| View Income account | | Tax | Select tax her ▾ | — |
| #1. 13,200 units to, Manf | Ihealth Covid-19 Test Kits | 13200 | 0.00 | $0.00 |
| #2. 7000 units to, VRC I | Ihealth Covid-19 Test Kits | 7000 | 0.00 | $0.00 |
| #3. 151,200 units to, V9 / | Ihealth Covid-19 test Kits | 151200 | 0.00 | $0.00 |
| Edit income account | | Tax | Select tax ▾ | — |
| #4. 189000 units to, Nei | Ihealth cCovid-19 Test Kits | 189000 | 0.00 | $0.00 |
| Edit income account | | Tax | Select tax ▾ | — |

⊕ Add an item

| | | | Subtotal | $2,131,200.00 | — |
| | ⊕ Add discount |
| | Total | USD ($) - U.S. dollar ▾ | $2,131,200.00 |

Notes / Terms
Payment of $2,131,200.00, Total, a deposit payment of $219,240.00 was made on 02-01-2022 by MANFRED STERNBERG JP
ATTORNEY AT LAW SPF, balance of $1,911,960.00 payment required, to ship. The balance will be made to the Attorneys
Escrow account, Sobrato & Zelada PC. 1133 Broadway, Suite 1001, New York, NY 10010, ( 212-571-4000 ) Account #
3508544267, Routing # 021000021, Escrow account at JP CHASE account. Sobrato & Zelada PC, Attention Dalna Zelada
SO, Tel, 917-251-2218.


EXHIBIT
6w6
PENGAD 800-631-6989
1-15    2-16-24

Norris McLaughlin, P.A.
Rebecca J. Price
Attorney I.D. 206182
515 W. Hamilton St, Ste 502
Allentown, PA 18101
P: 610-391-1800; F: 610-391-1805
rprice@norris-law.com
Attorneys for Third Party Defendants
Gary Weiss and A. Solar, LLC

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | | |
|---|---|---|
| AMERICAN ENVIRONMENTAL | : | NO. 2:22-cv-00688-JMY |
| ENTERPRISES INC. doing business as | : | |
| THESAFETYHOUSE.COM | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MANFRED STERNBERG, ESQUIRE, | : | |
| MANFRED STERNBERG & | : | |
| ASSOCIATES, PC, | : | |
| CHARLTON HOLDINGS GROUP, LLC, | : | |
| SAMUEL GROSS, | : | |
| Defendants. | : | |
| | : | |
| v. | : | |
| | : | |
| GARY WEISS, | : | |
| A.SOLAR LLC, | : | ANSWER TO PLAINTIFF'S FIRST |
| Third Party Defendants | : | AMENDED COMPLAINT WITH NEW |
| | : | MATTER AND CROSS-CLAIMS |



## ANSWER TO FIRST AMENDED COMPLAINT

Answering Defendants, Gary Weiss and A. Solar, LLC[1] (hereinafter "Answering

Defendants" or Weiss Defendants"), through their attorneys, Norris McLaughlin, P.A., hereby file

---

[1] Plaintiff has filed a Motion to Amend Caption alleging that A Solar LLC is not a legal entity and requesting to amend the caption to include ADiamondSolar, LLC d/b/a A Solar LLC. The Court granted the aforesaid Motion before Weiss Defendant's responded to the same. Weiss Defendants filed a Motion for Reconsideration alleging that A Solar, LLC is not a fictitious name of ADiamondSolar, LLC, which is pending with this Court. Norris

this Answer to Plaintiff's, American Environmental Enterprises, Inc., d/b/a TheSafetyHouse.com, First Amended Complaint, as follows:

1. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

2. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

3. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

4. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, the allegations in the within Paragraph contain conclusions of law to which no response is required. Strict proof thereof is demanded at the trial. The Weiss Defendants specifically deny any fraudulent activity as alleged.

5. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny

---

McLaughlin has not been retained by and it does not represent ADiamondSolar, LLC and does not file a response on behalf of the same.

the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. To the extent that the Weiss Received funds related to the allegations in the within Paragraph, a full refund, in the form of collateral, was provided by the Weiss Defendants to the Gross Defendants and the Sternberg Defendants, the only parties with whom the Weiss Defendants had a contractual agreement. Strict proof to the contrary is demanded at the time of trial.

6. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, see the Weiss Defendants' response to Paragraph 5.

## PARTIES, JURISDICTION AND VENUE

7. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

8. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

9. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

10. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

11. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

12. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

13. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

14. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

15. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

16. Admitted.

17. Denied.

18. Denied. The averments in this paragraph constitute conclusions of law to which no response is required. Said allegations are denied and strict proof thereof are demanded at the time of trial.

19. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

20. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

21. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

22. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required. Said allegations are denied and strict proof thereof is demanded at the time of trial.

## FACTUAL BACKGROUND

23. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

24. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

25. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny

the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

26. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

27. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

28. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

29. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

30. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

31. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

32. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

33. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

34. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

35. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

36. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny

the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

37. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

38. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

39. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

40. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

41. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, none of the "aforesaid fraudulent conduct" refer or relate to conduct of the Weiss Defendants.

42. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

43. Denied. The Weiss Defendants specifically deny that they have made any "lies or representations" to Plaintiff. As set forth in Paragraph 5, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

44. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

45. Denied. The Weiss Defendants specifically deny that Plaintiff made any requests of them prior to their joinder to this lawsuit. As set forth in Paragraph 5, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

46. Denied. The Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff related to COVID Test Kits. Strict proof to the contrary is demanded at the time of trial.

47. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

48. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial.

49. Denied. The Weiss Defendants deny that Gary Weiss contacted the Plaintiff using the name "Shagra". Strict proof is demanded at the time of trial.

50. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, upon information and belief, Covid Test Kits were delivered to Safety House and Safety House refused delivery of same.

51. Denied. Strict proof thereof is demanded at the time of trial. By way of further response, upon information and belief, Covid Test Kits were delivered to Safety House and Safety House refused delivery of same.

52. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. As set forth in Paragraph 5, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

53. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. As set forth in Paragraph 5, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial. To the extent that the Weiss Defendants received funds from the Gross Defendants or the Sternberg Defendants for delivery of Covid Test Kits, all such funds were fully refunded to the same and receipt of said refund was acknowledged. (A true and correct copy of email

correspondence between the Weiss Defendants and Gross Defendants dated March 7, 2023, is attached hereto as Exhibit 1).

54. Denied. The Weiss Defendants are without information or knowledge to admit or deny what Plaintiff has "learned", whereby said allegations are denied and strict proof thereof are demanded at the time of trial. By way of further response, the allegations in the within Paragraph contains conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. The Weiss Defendants specifically deny that it participated in a fraudulent scheme to deprive Plaintiff of its property.

55. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof are demanded at the time of trial. As set forth in Paragraph 5, the Weiss Defendants never entered into any agreement with Plaintiff, nor did it receive any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

56. Denied. The allegations in the within Paragraph refer to Defendants other than the Weiss Defendants. Moreover, the allegations refer to a document, which speaks for itself, any characterization of the same is denied.

57. Denied. The allegations in the within Paragraph refer to a document which speaks for itself, and any characterization thereof is expressly denied. By way of further response, the document referenced in the within Paragraph appears to be an invoice. There is no "agreement" as alleged by Plaintiff. Strict proof thereof is demanded at the time of trial.

58. Denied. It is expressly denied that the Sternberg Defendants have asserted any claims against the Weiss Defendants. A Third-Party Complaint was filed solely on behalf of the

Gross Defendants. Strict proof to the contrary is demanded at the time of trial. By way of further response, since filing the Third-Party Complaint, the Gross Defendants have advised that they are no longer pursuing said claims as a result of the full refund that the Gross Defendants received from the Weiss Defendants. (A true and correct copy of text message correspondence between the Weiss Defendants and Gross Defendants dated March 7 is attached hereto as Exhibit 2).

59. Denied. The allegations in the within Paragraph refer to a document which speaks for itself, and any characterization thereof is expressly denied. By way of further response, the Weiss Defendants filed an Answer to the Third-Party Complaint in which the Weiss Defendants allege that a full refund, in the form of collateral, was provided to remaining Defendants, and receipt of said refund has been acknowledged by Defendant Gross. (*See* Exhibit 1). Strict proof to the contrary is demanded at the time of trial.

60. Denied. The allegations in the within Paragraph refer to a document which speaks for itself, and any characterization thereof is expressly denied. By way of further response, the Weiss Defendants filed an Answer to the Third-Party Complaint in which the Weiss Defendants allege that a full refund, in the form of collateral, was provided to remaining Defendants, and receipt of said refund has been acknowledged by Defendant Gross. Strict proof to the contrary is demanded at the time of trial. (*See* Exhibit 1).

61. Denied. The allegations in the within Paragraph refer to a document which speaks for itself, and any characterization thereof is expressly denied. By way of further response, the Weiss Defendants filed an Answer to the Third-Party Complaint in which the Weiss Defendants allege that a full refund, in the form of collateral, was provided to remaining

Defendants, and receipt of said refund has been acknowledged by Defendant Gross. Strict proof to the contrary is demanded at the time of trial. (*See* Exhibit 1).

62. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants specifically deny any involvement in a "shell game" to wrongfully retain Plaintiff's funds. The Weiss Defendants have never had any agreement with Plaintiff and did not receive any funds directly from Plaintiff. To the extent that the Weiss Defendants received funds from the remaining Defendants, said funds were refunded in the form of collateral. Strict proof to the contrary is demanded at the time of trial.

63. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the allegations in the within Paragraph contain conclusions of law to which no response is required. Said allegations are denied and strict proof thereof is demanded at the time of trial.

64. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the allegations in the within Paragraph contain conclusions of law to which no response is required. Said allegations are denied and strict proof thereof is demanded at the time of trial. Additionally, the Weiss Defendants specifically deny any "intentional", "knowing", "deliberate", "outrageous", and/or "extreme" conduct which would entitle Plaintiff to "punitive" damages in this matter.

## COUNT I
### Fraud in the Inducement
### Plaintiff v. Gross Defendants & Sternberg Defendants

65. – 76.    Denied. The allegations in the within Paragraph refer to a party other than the

Weiss Defendants. As a result, no response by the Weiss Defendants is required. To the

extent a response is required, the allegations are denied, and strict proof is requested at the

time of hearing.

## COUNT II
### Fraud
### Plaintiff v. Gross Defendants & Sternberg Defendants

77. – 87.    Denied. The allegations in the within Paragraph refer to a party other than the

Weiss Defendants. As a result, no response by the Weiss Defendants is required. To the

extent a response is required, the allegations are denied, and strict proof is requested at the

time of hearing.

## COUNT III
### Fraud
### Plaintiff v. Weiss Defendants and Zakaria Defendants

88. The Weiss Defendants incorporate paragraphs one (1) through eighty-seven (87) from

above as if the same as set forth at length herein.

89. Denied. The allegations in the within Paragraph contain conclusions of law to which no

response is required, whereby said allegations are denied, and strict proof is requested at

the time of hearing.

90. Denied. The Weiss Defendants are without information or knowledge to admit or deny

representations made by the remaining defendants. Said allegations are denied and strict

proof thereof is demanded at the time of trial. By way of further response, to the extent

that the Weiss Defendants received funds from the remaining Defendants for Covid Test

Kits, all such funds were refunded in the form of collateral. Strict proof to the contrary is demanded at the time of trial.

91. Denied. The allegations in the within Paragraph refer to a document which speaks for itself, and any characterization thereof is expressly denied. Strict proof thereof is demanded at the time of trial.

92. Denied. The Weiss Defendants are without information or knowledge to admit or deny what any other defendant may or may not have done. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants never entered into any agreement related to the delivery of Covid Test Kits with Plaintiff, did not receive any funds directly from Plaintiff and did not deliver any "Gemstones" to Plaintiff, nor was it responsible for doing so. Strict proof to the contrary is demanded at the time of trial.

93. Denied. It is specifically denied that any representations were made by the Weiss Defendants to the Plaintiff before the Weiss Defendants' joinder to this lawsuit. Strict proof thereof is demanded at the time of trial.

94. Denied. The Weiss Defendants are without information or knowledge to admit or deny what Plaintiff relied upon and/or any statements allegedly made by other Defendants, whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

95. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants specifically deny any "intentional and willful" conduct as alleged by Plaintiff.

WHEREFORE, Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Three (III) of Plaintiff's First Amended Complaint, with prejudice.

## COUNT IV
### Wrongful Civil Conspiracy
### Plaintiff v. All Defendants

96. The Weiss Defendants incorporate paragraphs one (1) through ninety-five (95) from above as if the same were set forth at length herein.

97. Denied The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants never received any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

98. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants made no promises or representations to Plaintiff, entered into no Agreements and received no funds from Plaintiffs as set forth in the within Paragraph. Strict proof to the contrary is demanded at the time of trial.

99. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants never received any funds directly from Plaintiff. Strict proof to the contrary is demanded at the time of trial.

100. Denied. Strict proof is requested at the time of hearing.

101. Denied. Strict proof is requested at the time of hearing.

102. Denied. Strict proof is requested at the time of hearing.

103. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required whereby said allegations are denied and strict proof is requested at the time of hearing. The Weiss Defendants specifically deny any involvement in an alleged conspiracy.

104. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required whereby said allegations are denied and strict proof is requested at the time of hearing. The Weiss Defendants specifically deny any involvement in an alleged conspiracy.

105. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required whereby said allegations are denied and strict proof is requested at the time of hearing. The Weiss Defendants specifically deny any involvement in an alleged conspiracy.

106. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

107. Denied. The Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

108. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is

demanded at the time of trial. By way of further response, the Weiss Defendants specifically deny any "intentional and willful" conduct as alleged by Plaintiff.

**WHEREFORE,** Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Four (IV) of Plaintiff's First Amended Complaint, with prejudice.

### COUNT V
### Piercing the Corporate Veil
### Plaintiff v. Gross Defendants and CHG Defendants

109. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-eight (108) from above as if the same were set forth at length herein.

110. – 112. Denied. The allegations in the within Paragraph refer to a party other than the Weiss Defendants. As a result, no response by the Weiss Defendants is required. To the extent a response is required, the allegations are denied, and strict proof is requested at the time of hearing.

### COUNT VI
### Piercing the Corporate Veil
### Plaintiff v. Gross Defendants and CHG Defendants

113. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-twelve (112) from above as if the same were set forth at length herein.

114. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, since filing the Amended Complaint, Plaintiff has alleged that A Solar LLC does not exist and has filed documents identifying another individual as the managing member.

115. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, since filing the Amended Complaint, Plaintiff has alleged that A Solar LLC does not exist and has filed documents identifying another individual as the managing member.

116. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, since filing the Amended Complaint, Plaintiff has alleged that A Solar LLC does not exist and has filed documents identifying another individual as the managing member.

**WHEREFORE**, Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Six (VI) of Plaintiff's First Amended Complaint, with prejudice.

### COUNT VII
### Participation Theory
### Plaintiff v. Gross Defendants and CHG Defendants

117. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-sixteen (116) from above as if the same were set forth at length herein.

118. – 134. Denied. The allegations in the within Paragraph refer to a party other than the Weiss Defendants. As a result, no response by the Weiss Defendants is required. To the extent a response is required, the allegations are denied, and strict proof is requested at the time of hearing.

## COUNT VIII
### Unjust Enrichment/Quantum Meruit
### Plaintiff v. Gross Defendants and Sternberg Defendants

135. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-thirty-four

(134) from above as if the same were set forth at length herein.

136. – 145. Denied. The allegations in the within Paragraph refer to a party other than the

Weiss Defendants. As a result, no response by the Weiss Defendants is required. To the

extent a response is required, the allegations are denied, and strict proof is requested at the

time of hearing.

## COUNT IX
### Intentional Interference with Existing Contractual Relations
### Plaintiff v. All Defendants

146. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-forty-five

(145) from above as if the same were set forth at length herein.

147. Denied. The allegations in the within Paragraph contain conclusions of law to which no

response is required, whereby said allegations are denied and strict proof thereof is

demanded at the time of trial. By way of further response, the Weiss Defendants are

without information or knowledge to admit or deny the allegations in the within Paragraph.

Whereby said allegations are denied and strict proof thereof is demanded at the time of

trial.

148. Denied. The allegations in the within Paragraph contain conclusions of law to which no

response is required, whereby said allegations are denied and strict proof thereof is

demanded at the time of trial. By way of further response, the Weiss Defendants are

without information or knowledge to admit or deny the allegations in the within Paragraph.

Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

149. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants specifically deny any "specific intent to harm" Plaintiff.

150. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

151. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

152. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is

demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

**WHEREFORE,** Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Nine (IX) of Plaintiff's First Amended Complaint, with prejudice.

## COUNT X
### Intentional Interference with Prospective Economic Advantage
### Plaintiff v. All Defendants

153. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-fifty-two (152) from above as if the same were set forth at length herein.

154. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

155. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

156. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants specifically deny any "specific intent to harm" Plaintiff.

157. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

158. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph. Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

159. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial. By way of further response, the Weiss Defendants are without information or knowledge to admit or deny the allegations in the within Paragraph.

Whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

**WHEREFORE**, Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Ten (X) of Plaintiff's First Amended Complaint, with prejudice.

## COUNT XI
### Unjust Enrichment/Quantum Meruit
### Plaintiff v. Weiss Defendants

160. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-fifty-nine (159) from above as if the same were set forth at length herein.

161. Denied. The allegations in the within Paragraph contain conclusions of law to which no response is required, whereby said allegations are denied and strict proof thereof is demanded at the time of trial.

162. Denied. Strict proof is requested at the time of hearing. By way of further response, to the extent the Weiss Defendants received any funds from the remaining Defendants, said funds were refunded in the form of collateral. Strict proof to the contrary is demanded at the time of trial.

163. Denied. Strict proof is requested at the time of hearing.

164. Denied. Strict proof is requested at the time of hearing. By way of further response, Plaintiff did not confer anything, have any agreement with, or make any payment to the Weiss Defendants. Strict proof to the contrary is demanded at the time of trial.

165. Denied. Strict proof is requested at the time of hearing.

166. Denied. Strict proof is requested at the time of hearing.

167. Denied. Strict proof is requested at the time of hearing.

**WHEREFORE**, Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss Count Eleven (XI) of Plaintiff's First Amended Complaint, with prejudice.

## FACTS SUPPORTING AFFIRMATIVE DEFENSES AND CROSS-CLAIMS

168. The Weiss Defendants incorporate each of the foregoing paragraphs as if the same were set forth at length herein.

169. In or around January 2022, The Weiss Defendants agreed to provide Covid-19 test kits to the Gross/Sternberg Defendants, which the Weiss Defendants understood would then be sold to a third party.

170. Thereafter, the Weiss Defendants made necessary arrangements to procure the aforesaid test kits.

171. At the direction of the Gross and Sternberg Defendants, the Weiss Defendants were to make arrangements for the test kits to be transported directly to the end-user.

172. On February 7, 2022, the Weiss Defendants provided photographic evidence of the test kits on the transport vehicle to the Sternberg and Gross Defendants.

173. Thereafter, upon information and belief, the Gross and Sternberg Defendants provided a partial payment for the test kits to the Weiss Defendants via electronic wire.

174. Thereafter, the transport vehicle left its location around 11:00 AM, and the Weiss Defendants were under the impression that the test kits would arrive at their designated locations by Monday February 14, 2022.

175. Shortly after the transport vehicle left its location, the transport company advised that it required a Bill of Lading in order to complete the transport.

176. The transport company requested, from The Weiss Defendants, a Bill of Lading for each destination.

177. The Weiss Defendants did not have the requested Bill of Lading, nor did they have the requisite information to complete a Bill of Lading.

178. The Weiss Defendants, accordingly, requested a bill of sale and Bill of Lading from Third-Party Plaintiffs and the Sternberg Defendants.

179. As neither The Gross nor Sternberg Defendants provided a Bill of Lading, the transport company, Available Movers, transported the test kits to its own storage facility to hold them there until such time as the Bill of Lading could be procured.

180. Over the course of the next few weeks, the Weiss Defendants repeatedly requested the Bill of Lading, and requisite details, from the Gross and Sternberg Defendants.

181. After approximately 2 weeks, the transport company notified the Weiss Defendants that the test kits needed to be retrieved as it would no longer store them at its facility.

182. Still having not received the Bill of Lading, the Weiss Defendants made arrangements to retrieve the test kits from the transport facility.

183. Upon arrival at the transport facility, the Weiss Defendants learned that the test kits were no longer on the truck and that they could not be located.

184. Upon learning the foregoing, the Weiss Defendants offered to provide a full refund to the Gross Defendants. (A true and correct copy of email correspondence dated March 1, 2022, offering a refund, is attached hereto and marked as Exhibit "3").

185. The Weiss Defendants were notified by the Gross Defendants Plaintiffs that they would not accept a refund. (*Please see*: Exhibit "3").

186. The Gross Defendants requested collateral from the Weiss Defendants as security for the future delivery of the test kits. (A true and correct copy of the February 2, 2022, Letter from the Gross Defendants to the Weiss Defendants is attached hereto as Exhibit "4").

187. On February 26, 2022, the Weiss Defendants did provide collateral to the Gross Defendants in excess of the payment received from the Gross Defendants.

188. The Gross Defendants provided correspondence to the Weiss Defendants confirming receipt of the aforesaid collateral and confirming that the Weiss Defendants offer to refund the monies paid to them was rejected. (*Please see*: Exhibit "4").

189. Upon information and belief, the Gross Defendants were directed to accept the aforesaid collateral by the Sternberg Defendants. (*Please see*: Exhibit "4").

190. The Gross Defendants acknowledged and accepted the aforesaid collateral. (*Please see*: Exhibits "1" & "4).

191. On or around March 1, 2022, when it appeared that the test kits were irretrievably lost, the Weiss Defendants provided additional collateral to the Gross Defendants.

192. Thereafter, the Gross Defendants advised the Weiss Defendants that, having received a full refund in the form of the collateral, their business was concluded. (*Please see*: Exhibits "1", "2", and "4").

193. To date, the collateral has not been returned to the Weiss Defendants.

194. After instituting this litigation, the Gross Defendants notified the Weiss Defendants of their intention to abandon their claim against the Weiss Defendants (and notably did not oppose the Motion to Dismiss filed by Third-Party Defendants). (*Please See*: Exhibits "1", "2", and "4").

195. The Weiss Defendants satisfied all obligations to the Gross Defendants.

196. The Gross Defendants have retained the collateral.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the applicable statute of limitations and/or the doctrines of estoppel, release and waiver.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff suffered no damages or injuries for which the Weiss Defendants are liable.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff has suffered no legal damages.

## FIFTH AFFIRMATIVE DEFENSE

If Plaintiff suffered any damages or loss, such damages or losses were caused in whole or in part by individuals or entities over which the Weiss Defendants had not control or right of control.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate their damages.

## SEVENTH AFFIRMATIVE DEFENSE

The Weiss Defendants at all times acted lawfully, in good faith and for legitimate purposes.

## EIGHTH AFFIRMATIVE DEFENSE

The Weiss Defendants have no contractual relationship with Plaintiff, received no funds from Plaintiff and made no representations to Plaintiff.

## NINTH AFFIRMATIVE DEFENSE

The Weiss Defendants are not legally or factually liable for damages allegedly suffered by Plaintiff.

## TENTH AFFIRMATIVE DEFENSE

At all times, the Weiss Defendants were ready, willing and able to perform under the terms of the agreement with The Gross Defendants and/or the Sternberg Defendants but were prevented from doing so by the same in this proceeding.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of justification.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of impossibility of performance, impracticability, illegality and frustration of purpose.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Weiss Defendants fully refunded any monies received by the remaining Defendants.

## FOURTEENTH AFFIRMATIVE DEFENSE

This Court lacks subject matter jurisdiction over Plaintiff's claims.

## FIFTEENTH AFFIRMATIVE DEFENSE

Venue is not appropriate in this Court.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of accord and satisfaction.

## SEVENTEENTH AFFIRMATIVE DEFENSE

There is no privity of contract between Plaintiff and the Weiss Defendants

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff did not confer any benefit upon the Weiss Defendants.

**WHEREFORE,** the Third-Party Defendants, Gary Weiss and A Solar, LLC respectfully requests that this Honorable Court enter an Order dismissing it from these proceedings and granting whatever additional relief this Court deems necessary and just.

## AS AND FOR A FIRST COUNTERCLAIM
### Indemnification v. All Defendants

197. The Weiss Defendants incorporate paragraphs one (1) through one-hundred-ninety-six (196) from above as if the same were set forth at length herein.

198. The Weiss Defendants, while denying all liability, aver that they are entitled to be indemnified and held harmless by the other named Defendants.

199. The Weiss Defendants met their contractual obligations and went as far as to offer the Gross Defendant's a full refund.

200. After this point, the Weiss Defendants had no further involvement in this matter after providing the requested collateral.

201. The Weiss Defendants aver that they fulfilled their obligations, and the remaining Defendants are solely liable to Plaintiff.

202. If the Weiss Defendants are found liable to any extent, Defendants Manfred Sternberg, Esquire, Manfred Sternberg & Associates, PC, Charlton Holdings Group, LLC, Shlomo Gross a/k/a Samuel Gross, Daphna Zekaria, Esquire, and Sokolski & Zekaria, P.C, should indemnify the Weiss Defendants.

## AS AND FOR A FIRST CROSSCLAIM

### Contribution v. All Defendants

203. The Weiss Defendants incorporate paragraphs one (1) through two-hundred two (202) from above as if the same were set forth at length herein.

204. If the Weiss Defendants are found liable to any extent, Defendants NAME, are jointly and severally liable as joint tortfeasors.

205. If the Weiss Defendants are found liable to any extent, Defendants Manfred Sternberg, Esquire, Manfred Sternberg & Associates, PC, Charlton Holdings Group, LLC, Shlomo Gross a/k/a Samuel Gross, Daphna Zekaria, Esquire, and Sokolski & Zekaria, P.C, are jointly and severally liable for the breaches alleged by Plaintiff.

206. The Weiss Defendants demand contribution from all named Defendants for any judgment that may be entered against them.

**WHEREFORE**, Answering Defendants, Gary Weiss and A. Solar, LLC, respectfully request that this Court Dismiss all claims against them and Grant their Affirmative Defenses and Cross-Claims, and any further relief that this Court deems just and proper.


Date: 9/12/2023                              Respectfully submitted,

                                             /s/ Rebecca J. Price

                                             Rebecca J. Price, Esq.
                                             Attorney I.D. #206182
                                             515 W. Hamilton St, Ste 502
                                             Allentown, PA 18101
                                             P: 610-391-1800; F: 610-391-1805
                                             Attorneys for Third Party Defendants
                                             Gary Weiss and A. Solar, LLC

## VERIFICATION

I, Gary Weiss, on behalf of myself and A.Solar, LLC, hereby verify that the statements made in the foregoing Answer to Plaintiff's First Amended Complaint, Affirmative Defenses, and Cross-Claims, are true to the best of my personal knowledge, information and belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. §4904 relating to un-sworn falsification to authorities.

Date: 9 - 12-2023

GARY WEISS

**EXHIBIT "1"**

Case 2:22-cv-00688-JMY Document 101 Filed 09/01/23 Page 251 of 749
Case 2:22-cv-00688-JMY Document 101 Filed 09/01/23 Page 2 of 13

(1,895 unread) - monipalr@aol.com - AOL Mail

3/7/23, 11:04 AM

Advanced ∨                                          JBR-1A      1 2

← Back ⬅ ⬅ ➡ 🗀 Move  🗑 Delete  🚫 Spam  ••• More

Today on AOL

| Inbox | 1.9K |
| Unread | |
| Starred | |
| Drafts | |
| Sent | |
| Spam | |
| Trash | |
| ∧ Less | |

☐

BLUERIVER4747/GARY <monipalr@aol.com> ∨

§ sam gross

Re: Release from Liability, order satisfied

AA  B  *I*  U  ⬧  🔗  ☺  ≣  ≡  ⧉  ⸗

| Views | Hide |
| Contacts | |
| Photos | |
| Documents | |
| Subscriptions | |
| Travel | |

On Tuesday, March 7, 2023, 10:35:04 AM EST, sam gross
<charltonholdinggrouplic@aol.com> wrote:

Yes. That is correct. And what we had agreed upon.

Thanks.
Sam Gross.

Sent from the clutter AOL app for iOS

| Folders | Hide |
| + New Folder | |
| Saved Mail | |
| Archive | |
| gary | |
| Notebook | |
| Notes | |
| SavedIMs | |

On Tuesday, March 7, 2023, 6:59 AM,
BLUERIVER4747/GARY <monipalr@aol.com> wrote:

HI Sam, Regarding the Covid-19 kits to be shipped on
Feb-March of 2022,
  You agreed that I gave you Merchandise of Diamonds
and Gems instead of the 151,000 covid-19 kits, as a
full refund which was on the advice of your counsel
Manfred Sternberg, which is over $3,000,000 worth,
and you consider it as full refund on the kits
transaction, and have no further demands from me,
and my obligations in that matter are satisfied in full,
and no further action or legal demand from me will take
place, which started as Collateral on advice of your
lawyer, and then considered as full refund.

# EXHIBIT "2"






# SamGrosss



# EXHIBIT "3"

8/8/23, 8:51 PM

Gmail - (no subject)

## Gmail

Gary Weiss <wgary4109@gmail.com>

**(no subject)**
1 message

Gary Weiss <wgary4109@gmail.com>
To: Manfred Sternberg ESQ <manfred@manfredlaw.com>, sam gross <Charltonholdinggrouplic@aol.com>

Tue, Mar 1, 2022 at 8:19 AM

Good Morning guys. We will deliver and I will address all your questions this morning. Sam, I forgive your antics as I know how hard it is to wait for this to co
conclude, I believe all the things I stated and regardless of whatever issues I have, or had ? it will not effect you and your buyers. Of course as I said many times
before ? If you like a refund you have no questions asked. And please keep your commitment to return my gems once this is concluded.

Thanks
Gary

EXHIBIT "4"



# C HOLDING LLC

78 Buckminster rd , rvc , NY , 11570.

2/28/22

From the desk of : Sam Gross , president , Charlton Holding Group Llc

### Dear Gary weiss ,

This letter is to attest; that due to my Attorny , Mr Manfred Sternberg ESQ , request , I will accept collateral in the form of gems due to the fact you are having issues with supplying the Covid tests my organization had paid for, and you were supposed to send my customers in Philadelphia, New York and New Jersey. Due to my attorneys request I will not request a refund , but will obtain the commentary in the hope you may supply said Covid test. And of course should you not ? The collateral will be suffice.

My attorney and his team has requested said collateral. There for I have to accept it. I do respect your efforts. And I understand you have no goods to supply at the moment due to certain global supply chain issues.  So due to Mr Sternberg request and so forth directive ? We will accept your collateral. Thank you so much.

Should you decide to provide the Covid test ? I will then return the collateral. If not per Me Manfred Sternberg I will have to keep it.

This letter was created and approved by Charlton Holding Group LLC , on February 24th in the year of 2022.

Sam Gross

Charlton holding group llc.





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

AMERICAN ENVIRONMENTAL          :
ENTERPRISES INC. doing business as   :
THESAFETYHOUSE.COM              :          NO.  2:22-cv-00688-JMY
            Plaintiff,          :
        v.                      :
                                :
MANFRED STERNBERG, ESQUIRE,     :
MANFRED STERNBERG &             :
ASSOCIATES, PC,                 :
CHARLTON HOLDINGS GROUP, LLC,   :
SAMUEL GROSS,                   :                                              :
            Defendants.         :
        v.                      :
                                :
GARY WEISS,                     :
A.SOLAR LLC,                    :
        Third Party Defendants  :
And                             :
AMERICAN ENVIRONMENTAL          :
ENTERPRISES INC.                :
            Counter Defendant   :

## CERTIFICATION OF SERVICE

I hereby certify that I have served upon all persons listed below a true and correct copy of

the Weiss Defendant's Answer to Amended Third-Party Complaint in the above-captioned

matter this date by regular mail and/or electronic service.

Glenn A. Manochi, Esquire
Gary P. Lightman, Esquire
William Lyle Stamps, Esquire
Lightman & Manochi
600 W. Germanton Pike, Suite 400
Plymouth Meeting, PA 19462
Emails: gmanochi@lightmanlaw.com; garylightman@lightmanlaw.com;
wlstamps@lightmanlaw.com
Attorneys for Plaintiff/Counter Defendant, American Environmental Enterprises Inc. d/b/a
TheSafetyhouse.com

Seth L. Laver, Esquire
Jason S. Kaner, Esquire
GOLDBERG SEGALLA LLP
1700 Market Street, Ste, 1418
Philadelphia, PA 18103
Email: slaver@goldbergsegalla.com; Jkaner@goldbergsegalla.com
Attorneys for Defendants/Third Party Plaintiffs/Counter Claimants Manfred Sternberg, Esq.
and Manfred Sternberg & Associates, PC

Samuel Gross
Charlton Holdings Group, LLC
78Buckminster Road
Rockville Center, NY 11570
Email: charltonholdinggroupllc@aol.com
Pro se

NORRIS MCLAUGHLIN, P.A.

Dated: 9/12/2023

By: /s/ *Rebecca J. Price*

Rebecca J. Price, Esq.
Attorney I.D. No. 206182
515 Hamilton Street, Suite 502
Allentown, PA 18101
(610) 391-1800/(f) (610) 391-1805
rprice@norris-law.com
Attorney for Third Party Defendants

A SUB MEDIA HOUSE LLC

DEPOSIT 1

2/1  219,240
2/7  1,248,960
2/15  130,000
2/28  70,000
          1,666,200

TOTAL INVOICE 2,192,400
PAID TOTAL 1,666,200     BAL 526,200

FEB 1-22

| Check number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|
| | WT Fed#09820 Bank of America, N /Org=Manfred Sternberg Jr Attorney at LA Srf# 20220201003232941 Trn#220201096818 Rfb# 2202011148000054 | 219,240.00 | | |
| | Wire Trans Svc Charge - Sequence: 220201096818 Srf# 20220201003232941 Trn#220201096818 Rfb# 2202011148000054 | | 15.00 | |
| | Purchase authorized on 01/31 Paypal *Ebayincshi 402-935-7733 CA S302031629205810 Card 7823 | | 10.92 | |
| | Purchase authorized on 01/31 Dunkin #332939 Q35 Elizabeth NJ S302031817131484 Card 0148 | | 12.99 | |
| | Withdrawal Made In A Branch/Store | | 45,000.00 | |
| 1053 | Cashed Check | | 9,450.00 | |
| | Withdrawal authorized on 02/01 470 Rahway Ave Elizabeth NJ 0002156 ATM ID 6564P Card 0148 | | 1,000.00 | |

EXHIBIT
GW8
PENGAD 800-631-6989
LA   2-16-24

*(continued)*

| Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|
| | Purchase authorized on 02/09 Ch-Rockefeller #1 NEW York NY S58204064848199 Card 0148 | | 235.99 | |
| | Purchase authorized on 02/09 Tst* Kosher Deluxe NEW York NY S38204066894127 Card 0148 | | 26.35 | |
| | Withdrawal Made In A Branch/Store | | 70,000.00 | |
| | Withdrawal authorized on 02/11 625 8th Ave NEW York NY 0004986 ATM ID 69277 Card 0148 | | 1,000.00 | |
| 1058 | Check | | 110,000.00 | 584,129.69 |
| | Online Transfer From Blueriver4747 LLC Business Checking xxxxxx0832 Ref #Ib0Dl88Nbg on 02/13/22 | 60,000.00 | | |
| | Purchase authorized on 02/10 Quick Chek Food St Rahway NJ S38204167188700 1 Card 0148 | | 70.48 | |
| | Purchase authorized on 02/11 Dunkin #353813 Q35 Elizabeth NJ S58204249764296 2 Card 0148 | | 5.74 | |
| | Online Transfer to Blueriver4747 LLC Business Checking xxxxx0832 Ref #Ib0Dkxm5M9 on 02/11/22 | | 400,000.00 | |
| | Online Transfer to Blueriver4747 LLC Business Checking xxxxxx0832 Ref #Ib0Dkxm6W6 on 02/11/22 | | 100,000.00 | |
| | Non-WF ATM Withdrawal authorized on 02/14 Eess - Repsol V462045817004279 ATM ID C111718 Card 0148 | | 195.55 | |
| | Non-Wells Fargo ATM Transaction Fee | | 5.00 | 143,852.92 |
| | WT Fed#00310 Jpmorgan Chase Ban /Org=Sokolski & Zekaria Srf# 3512422046Es Trn# 22021519634 2 Rfb# Dcd of 22/02/15 | 130,000.00 | | |

*(handwritten: Deposit 3)*

*(handwritten: FEB-16-22)*

xxxxxx0832 Ref #Ib0Dmlm6Qj on 02/19/22

Purchase Intl authorized on 02/17 E S Faucett Lima Per
S382048714825204 Card 0148                                                                                      41.40

International Purchase Transaction Fee                                                                            1.24

Purchase Intl authorized on 02/18 E S Faucett Lima Per
S382049526732854 Card 0148                                                                                      34.10

International Purchase Transaction Fee                                                                            1.02

Purchase Intl authorized on 02/18 Izi*Malibegi Lima Per
S582049738131014 Card 0148                                                                                       0.63

International Purchase Transaction Fee                                                                            0.01

Purchase Intl authorized on 02/19 Izi*Malibegi Lima Per
S582050615107398 Card 0148                                                                                      18.58

International Purchase Transaction Fee                                                                            0.55

Non-WF ATM Withdrawal authorized on 02/20 Eess - Repsol
Faucett Lima Per 302051837795030 ATM ID C111718 Card
0148                                                                                                           196.38

Non-Wells Fargo ATM Transaction Fee                                                                              5.00

Purchase Intl authorized on 02/21 Tai Loy San Miguel Lima Per
S382052731780569 Card 0148                                                                                      28.58

International Purchase Transaction Fee                                                                            0.85

                                                                          200,000.00                 50,000.00    112,691.04
                                                                                                                  312,691.04

xxxxxx0832 Ref #Ib0Dnlwy8R on 02/24/22

WT Fed#09336 Jpmorgan Chase Ban /Org=Sokolski & Zekaria
Srf# 3566122059Es Trn#22022818 0245 Rfb# Dcd of 22/02/28       70,000.00

Wire Trans Svc Charge - Sequence: 22022818 0245 Srf#
3566122059Es Trn#22022818 0245 Rfb# Dcd of 02/02/28                                                             15.00

Purchase authorized on 02/25 Vtaveh San Mig Ren Lima Per
S302056586754085 Card 0148                                                                                    5,000.00

Purchase authorized on 02/25 Vtaveh San Mig Ren Lima Per
S582056587772326 Card 0148                                                                                    3,090.00

Zelle to Weiss Yael on 02/28 Ref #RpOQ9Jjp68                                                                  1,500.00

     on 02/28 Ref #PpOQ9Jjt5K xxxxxx7092                                                                        500.00       372,586.04

                                                                                                                             372,586.04

402-935-7733 CA S302031629205810 Card 7823
Purchase authorized on 01/31 Dunkin #332939 Q35 Elizabeth — 12.99
NJ S302031817131484 Card 0148
Withdrawal Made In A Branch/Store — 45,000.00

1053   Cashed Check — 9,450.00
Withdrawal authorized on 02/01 470 Rahway Ave — 1,000.00
Elizabeth NJ 0002156 ATM ID 6564P Card 0148
200,000.00   36,395.91

xxxxxx0832 Ref #Ib0Dhhl4Ql on 02/01/22
Withdrawal Made In A Branch/Store — 8,600.00
Withdrawal authorized on 02/02 470 Rahway Ave — 1,000.00
Elizabeth NJ 0002643 ATM ID 6564P Card 0148

1057   Check — 4,000.00
1055   Check — 3,100.00   19,695.91
Online Transfer From Blueriver4747 LLC Business Checking — 40,000.00
xxxxxx0832 Ref #Ib0Dhtkr4N on 02/03/22
Purchase authorized on 02/01 Safeguard 150202 E — 54.18
908-9650200 NJ S58203280215792 4 Card 0148
Purchase authorized on 02/02 Available Movers & — 500.00
718-292-6500 NY S462033776859414 Card 0148
Withdrawal authorized on 02/03 68 Broad St Elizabeth NJ — 1,000.00
0003646 ATM ID 1190A Card 0148
Withdrawal Made In A Branch/Store — 8,500.00   49,641.73
Wire Trans Svc Charge - Sequence: 220204019517 Srf# — 45.00
Ow0000194604 9778 Trn#22020401 9517 Rfb#
Ow000019460 49778
Purchase authorized on 02/03 NEW York Fried Chi Elizabeth NJ — 12.73
S462034740299713 Card 0148
WT 220204-019517 Banco Internacional /Bnf=Alberto Herrera — 10,000.00
Srf# Ow000019460 49778 Trn#22020401 9517 Rfb#
Ow000019460 49778   *deposit 2*

Withdrawal authorized on 02/04 470 Rahway Ave — 1,000.00   38,584.00
Elizabeth NJ 0003865 ATM ID 6564P Card 0148
WT Fed#00124 Jpmorgan Chase Ban /Org=Sokolski & Zekaria — (1,246,960.00)
Srf# 3289592038Es Trn#22020708 7488 Rfb# Dcd of 22/02/07

FBR-7-22

14

Gary

[Quoted text hidden]

**Gary Weiss** <wgary4109@gmail.com>                                                                                                      Wed, Jul 19, 2023 at 6:30 PM
To: "Rebecca J. Price, Esq." <rprice@norris-law.com>

Hi Rebecca & William, we spoke on July 13, 2023 on the phone, at the conclusion of that phone call , I felt that you are not representing me with all the FACTS I
provided you to provide to the court, I also was pleading with you to answer the court to dismiss my case based on the refund I gave to Sam & Manfred, which they
have already over 1 year, and never complained the about the Value of the collateral , refund I gave them, and advise me at the end of March that they begin to sell
it, rather than just argue to dismiss the case on 3 Technicalities, and once you did not prevail in the dismissal request, you were surprised with the judges's
Youmges decision, I provided you with Emails that confirmed that Manfred & Sam received the Collateral and they advised me that they will start selling it, I will
attach to you the testimony that Manfred Gave the Lawyer of the Texas Bar on March 31, 2022, whereby Manfred testified that he Executed legally, verified that the
THE SALE AND PURCHASE AGREEMENT, (SPA), wsa signed by Daniel J. Scully the buyer of the Safety House, prior to Scully sending the funds to Lawyer
Manfred, to his Escrow, IOLTA account, to be released once merchandise is on the truck, EN ROUTE, verified, which at that point the Title of the merchandise is
transferred to the Safety Hose, Please read Manfred 's testimony, therefor the agreement is binding according to him , by him and all parties, and no agents of other
parties can become a part of a lawsuit , in this case me, GARY WEISS, for any reason at all. see PARAGRAPH 11.
Also in his testimony to the BAR of TEXAS, he is HIDING the fact that he already received a Collateral, Refund from Gary Weiss, the same goes for the
proceedings in PA Court, in front Judge Younges, Lying that the agreement which Manfred authored and verified, prevents him to initiate a lawsuit against me, to
hold me responsible for the loss of the merchandise once Title of Merchandise was in the hands of the Safety House, nor did his Attorney Lightman disclose that he
knows I gave a Refund to Manfred & SAM GROSS, nor was I present when I was named 3rd party Defendant to object and explain.
The basis that Judge Younges agreed to let them, the Safety House, Manfred & Sam Amend the initial Complaint to name me Third Party Defendant and Faulty,
because the judge was not made aware of the truth, they lied to him.
The change of venue awarded based on all tose facts, none of the contracts and agreement between me and Sam Gross happened in PA, nor am I a
resident of PA.

Based on the Lies of Manfred, Sam & Lightman, by not disclosing the refund, this case should be dismissed altogether.
I will enclose to you the invoice that I sent to SAM GROSS & Manfred, which will show, that I sent a bill to Manfred & Sam, whereby the portion of the merchandise
that Manfred sent for the THe Safety House Test Kits, 151,200, billed at $6 a kit, which equals only $907,200.00, and the lawsuits which I was named as 3rd Party
defendant is for $1,965,600.00, not disclosing to the court the fact that Manfred sent only $907,200.00 on account of the sale of covid kits to purchase 151,200 kits,
as the invoice that was sent to him several times, showing only $907,200.00 for Safety House Kits, sending you here the copies of invoice sent to Sam & Manfred
several times between Jan26,2022 and Feb 4, 2022.Again deceiving the court. Today I understand they instructed me to make an invoice with
Fraudulent intentions, as there are no 5 buyers as they told me, with the detail they instructed me to make the invoice, They are trying to lay the blame on me for
the Safety House transaction, which is similar in Dollar Amount to the whole invoice, where they actually sent to Lawyer Zekaria, but Zekaria and Sam did further to
defraud me of part of the invoice amount, and the Collateral they took from me, but that I will leave for another day.
Enclose invoices, their Email proof of receiving Email, and Manfred Testimony ( Lie ) to the Bar of Texas attorney.
Thanks
Gary Weiss

[Quoted text hidden]

**6 attachments**


EXHIBIT
Gw 9
3.16.23

PENGAD 800-631-6989

RE:   2022-01819 – Dan Scully - Manfred Sternberg, Jr.; Complaint to the
Office of the Chief Disciplinary Counsel State Bar of Texas

**DECLARATION OF Gary Weiss**

**Regarding Sale And Purchase Agreement**

**Between Charlton Holding Group, LLC As Seller**

**And**

**Safety House As Buyer**

I, Gary Weiss, declare:

1. I am of sound mind, over the age of 21, capable of making this declaration, and I am personally acquainted with and have personal knowledge of all facts herein stated.  I am the President of ASOLAR, LLC ("ASOLAR").

2. Sam Gross and I have a 20 plus year trusted professional working relationship with each other in the diamond industry in New York City.  We have transacted millions of dollars in product over the years.

3. On or about January 26, 2022, ASOLAR sent a Commercial Invoice to Charlton Holding, LLC.  for 365,320 boxes of ihealth Test kits ("Product") that we owned and was sold to Charlton to be delivered to various customers of Charlton.

4. On or about February 1, 2022, I requested Sam Gross with Charlton to wire $219,240.00 to ASOLAR's bank as a deposit to hold and schedule transport of the goods in the possession of ASOLAR to Charlton's customers.  He promptly did do through his attorney, Manfred Sternberg, as agreed.

5. On or about February 4, 2022, I requested Sam Gross with Charlton wire an additional $1,911,960.00 from his attorney's IOLTA account to ASOLAR's bank as payment in full for the product in the possession of ASOLAR.

6. Because the dollar amount of the wire was sizeable,  Sam requested that ASOLAR use a New York licensed attorney to receive the wire and to hold the funds in trust until the Product was confirmed to be loaded onto a common carrier.    I agreed.

1



WEISS 000312

7.  ASOLAR retained Daphna Zekaria, Esq. with the law firm of Sokolski & Zekaria, P.C., 1133 Broadway Ste 1001 New York, NY 10010-7993 to represent us as a seller of this Product. Daphna Zekaria, Esq. has been a lawyer I have used for many years and she agreed to serve in this capacity to receive payments from Charlton for its purchase.

8.  All funds requested by ASOLAR from Charlton have been paid in full.

9.  Thereafter, I contacted Available Movers & Storage to provide ASOLAR with a quote to transport to Charlton's customers the Product purchased.

10. On or about February 8, 2022 a Manifest or Bill of Lading created by Available Movers & Storage was provided to Charlton by ASOLAR.

11. Throughout this entire period of time, I personally assured Sam Gross and his attorney Manfred Sternberg, by email, text and telephone conversation that the product was en route and being delivered immediately.    Many times I said it would be delivered "tomorrow", because that is what my team at ASOLAR told me and I in good faith believed my team.

12. I honestly believed that trucks with product were en route to deliver product as I represented several times to Sam Gross and Manfred Sternberg.  I was surprised and disappointed when delivery was in fact repeatedly not made as represented to me by my ASOLAR team.

13. Through no fault of Charlton, and due to an unforeseen personnel and logistics problem within ASOLAR, we have to date been unable to deliver the Product as we represented and agreed with Charlton.

14. It is ASOLAR's responsibility to Charlton to fill their order.  ASOLAR is still, as of this date, attempting to fill the order and stands behind this transaction.

15. There was no malfeasance by Manfred Sternberg in this transaction.  It was simply a commercial transaction that to date has failed to be completed by ASOLAR, through no fault of Charlton or Manfred Sternberg.

16. I have read Manfred Sternberg's response to the Office of the Texas Disciplinary Counsel and confirm that all of the facts stated therein about me are consistent with this Declaration and are true and correct.

2

17. I believe the threat and the filing of this grievance against Manfred Sternberg is being used by the Buyer as leverage for Charlton to release the Buyer's purchase money so it can get out of its contract, and is certainly not merited as all of these delays are commercially reasonable in light of the global supply chain disruption due to COVID.

DECLARANT

_____

Gary Weiss

## JURAT

My name is Gary Weiss,  my date of birth is _____, and my address is

_____. I declare under penalty of perjury that every statement in the

foregoing Declaration is within my personal knowledge and is true and correct:   Executed in

_____County, State of _____ on the _____ day of March , 2022.

DECLARANT

_____

Gary Weiss

3

DocuSign Envelope ID: 19A1354F-711F-444E-A002-56C888E911EB

RE:   2022-01819 – Dan Scully - Manfred Sternberg, Jr.; Complaint to the
Office of the Chief Disciplinary Counsel State Bar of Texas

## DECLARATION OF SAM GROSS
### Regarding Sale And Purchase Agreement ("SPA")

### Between Charlton Holding Group, LLC As Seller

### And

### Safety House As Buyer

I, SAM GROSS, declare:

I am of sound mind, over the age of 21, capable of making this declaration, and I am personally
acquainted with and have personal knowledge of all facts herein stated.  I am the President of
Charlton Holding Group, LLC ("Charlton").  Charlton retained the law firm of Manfred Sternberg
& Associates, PC to represent us as a seller of Personal Protective Equipment ("PPE").

I confirm and agree with all facts stated in, and the authenticity of the Exhibits A-E attached to
Manfred Sternberg's letter to the Office of the Chief Disciplinary Counsel State Bar of Texas dated
April 24,2022, in reference to the subject Complaint.

It was based on my understanding and good faith belief that my friend and business associate Gary
Weiss, the owner of ASOLAR LLC, owned over 300,000 iHealth Covid Test Kits before Charlton
solicited purchasers of such product.  Gary Weiss and I have a prior 20 plus year trusted
professional working relationship with each other in the diamond industry in New York City.
Gary and I have transacted millions of dollars in product sales with each other over the last  20
years.

After I personally saw and inspected the boxes of product with Mr. Weiss,  Charlton bought such
test kits from ASOLAR for resale.  The product was fully paid for under ASOLAR Invoice 10054,
Exhibit B and the money was wired to Gary Weiss' attorney by my attorney Manfred Sternberg
as I directed.    Through no fault of Charlton, and due to an unforeseen personnel and logistics
problem caused solely by ASOLAR. ASOLAR was unable to deliver the product to Charlton and
its customers as it repeatedly represented to and agreed with Charlton.

I honestly believed  trucks with product were enroute to  deliver product as Gary Weiss specifically
promised several times to me in person, by telephone, text and email, often along  with my lawyer
Manfred Sternberg.  I was surprised when delivery was in fact not made when and where, as
represented to me by Gary Weiss and his team

1

STERNBERG001278

EXHIBIT
GW-11
YAB   2-16-11

Charlton still intends to fulfill the contract with Safety House in a commercially reasonable manner as it does with our other customers. However, now that Safety House has refused to accept the product, Buyer is in default of the SPA and Charlton intends to submit the matter to a civil court in Texas to determine next steps to resolve the issues that remain between Buyer and Seller per the SPA. Importantly, the SPA between the Charlton and Safety House contains no terms or specific deadlines that were not complied with by Charlton.

Our attorney, Manfred Sternberg followed the SPA in all respects and followed our specific instructions at all times I believe the threat and the filing of this grievance against Manfred Sternberg is being done by the Buyer to create leverage against Charlton to refund the purchase price of the Product Charlton sold and that Safety House purchased, but who now declines to accept delivery.

There was no malfeasance by Manfred Sternberg. This transaction with Safety House was a routine commercial transaction, that to date has failed to be completed, through no fault of Charlton or Manfred Sternberg.

Charlton stands behind the validity of this transaction and acknowledges that it bears the responsibility for this SPA, per its terms as Seller.

DECLARANT

SAM GROSS

**JURAT**

My name is SAM GROSS, my date of birth is January 25, 1974, and my address is

78 Buckminster Road - Rockville Center, New York 11570. I declare under penalty of perjury

that every statement in the foregoing Declaration is within my personal knowledge and is true and

correct: Executed in Harris County, State of Texas on the 24th day of April, 2022.

DECLARANT

SAM GROSS

STERNBERG001279

From: **monipair** monipair@aol.com  
Subject: Collateral, Refund  
Date: August 16, 2023 at 9:29 PM  
To: garylightman@lightmanlaw.com

M

Sent from Samsung Galaxy smartphone.



8/8/23, 7:36 PM                                                                     Gmail - FW: FWd: Follow-up

So we don't have to bother you, Bill is sending an agreement that would memorialize our discussion: that if delivery of the product doesn't occur (to your client) by, say, Tuesday, that Sam will agree to liquidate the diamonds in his possession and repay the full balance by Thursday or Friday of this upcoming week.

Thank you again for taking the time to speak with me and Bill will be in touch with a simple "one-page" agreement.

I appreciate your consummate professionalism; please let me know if you want to discuss anything further.

Kind regards,
Randy


Randolph Adler
Managing Partner







MS WIRES TO DZ                          $2,351,960

                                                    $1,446,960  (actual)
TOTAL PYMTS TO GW            $1,447,200             $219,240    (same)
less: wire from MS directly      $219,240
TOTAL WIRES DZ to GW        $1,227,960             $1,227,720  (actual)

**MONEY RETAINED BY DZ**      **$1,124,000**        **1,124,240 (actual)**

                               per MSDE-22         (corrected for GW math err.

EXHIBIT
GW-17b
3-16-34
PENGAD 800-631-6989



EXHIBIT
Gary
Weiss 21
7/16    EP

GW-21

LICHTMAN
152 Township Dr/
Blue Bell, PA 19422

PHILADELPHIA PA 190

26 SEP 2023 22 AM 2

MASK + ELDIVEN or
CURRENT OCCUPANT
2 W 47th ST, RM 1005
NEW YORK,

VAC
10036-425455

BC: 19422

NIXIE    100    4E  1

RETURN TO SENDER
UNABLE TO FORWARD

0110/04/23

*2997-06125-26-42



en

WEISS-20
7/16/24

EXHIBIT
Gary
Weiss 20

7/16          89

| DATE | NAME | Gross IN Transac | OUT to Beneficiary |
|------|------|------------------|--------------------|
| | **2 Pallets of Queen Gloves** | | |
| 8-Jun-21 | George bought 2 pallets Queen | $ 17,500.00 | |
| 8-Jun-21 | To Joseph to purchase | | $ 13,000.00 |
| 8-Jun-21 | To SAM | | $ 2,200.00 |
| 8-Jun-21 | To MSA | | $ 2,300.00 |
| | | | **SUBTOTAL** |
| | **480,000 Masks in Brookshire TX** | | |
| 4-Aug-21 | Daniel MDR - Richard Varguese | $ 200,000.00 | |
| 4-Aug-21 | To Jason to purchase | | $ 78,174.00 |
| 4-Aug-21 | To SAM | | $ 33,500.00 |
| 4-Aug-21 | To SAM to repay MS | | $ 5,099.62 |
| 6-Aug-21 | To Rami | | $ 38,568.04 |
| 6-Aug-21 | To MSA | | $ 38,568.04 |
| 6-Aug-21 | 5% Flat fee MSA | | $6,090.30 |
| 6-Aug-21 | Inspection Fee - Bill Koehler | | |
| | | | **SUBTOTAL** |
| | **480,000 Masks in Brookshire TX** | | |
| | Jason = Seller @ $0.43 | | |
| | Sam = Buyer 1 | | |
| 9-Aug-21 | George - Exit @ $0.83 | $ 25,000.00 | NRD |
| | Purchase Price | $ 16,500.00 | |
| | **SELLER  PAUL** | | |
| 9-Aug-21 | TO Jason to purchase | | $ 21,500.00 |
| 6-Aug-21 | Overage above as pd KOEHLER post closing MSA | | $ 2,000.00 |
| 9-Aug-21 | TO SAM | | $ 5,000.00 |
| 13-Aug-21 | REFUND by Jason | $ 10,000.00 | |
| 27-Aug-21 | TO SAM | | $ 1,800.00 |
| 27-Aug-21 | TO SAM | | $ 13,000.00 |
| 27-Aug-21 | FROM Bob Keech-Randy Angelle | $ 24,990.00 | NRD |
| 28-Aug-21 | TO SAM | | $ 2,100.00 |
| 30-Aug-21 | TO SAM | | $ 11,000.00 |
| 30-Aug-21 | To Bill Koehler | | $ 2,000.00 |
| 30-Aug-21 | TO MSA | | $ 18,090.00 |
| 1-Sep-21 | From Sunni Jones | $ 25,000.00 | NRD |
| 1-Sep-21 | TO SAM | | $ 2,500.00 |
| 1-Sep-21 | TO MSA | | $ 7,500.00 |
| 1-Sep-21 | TO MSA | | $ 10,000.00 |
| 10-Sep-21 | From George Garcia | $ 25,000.00 | NRD |

| Date | Description | | Amount | | Amount |
|---|---|---|---|---|---|
| 10-Sep-21 | TO SAM | | | $ | 5,000.00 |
| 10-Sep-21 | TO SAM | | | $ | 1,000.00 |
| 10-Sep-21 | To Bil Koehler | | | $ | 2,000.00 |
| | | | | | |
| 10-Sep-21 | From Ryan Morrow | $ | 25,000.00 | NRD | |
| 13-Sep-21 | TO MSA | | | $ | 12,000.00 |
| 13-Sep-21 | TO SAM | | | $ | 3,444.00 |
| 13-Sep-21 | TO SAM | | | $ | 7,000.00 |
| 30-Sep-21 | TO SAM | | | $ | 2,502.00 |
| | | | | | |
| 30-Sep-21 | From Steve Rosen | $ | 25,000.00 | NRD | |
| 30-Sep-21 | TO MSA | | | $ | 13,000.00 |
| 30-Sep-21 | TO SAM | | | $ | 4,250.00 |
| 30-Sep-21 | TO SAM | | | $ | 3,800.00 |
| 1-Oct-21 | TO SAM | | | | $1,900.00 |
| 1-Oct-21 | Bill Koehler | | | | $1,000.00 |
| | | | | | |
| 1-Oct-21 | From Globe Componet Product | $ | 25,000.00 | NRD | |
| 30-Sep-21 | TO MSA | | | $ | 5,000.00 |
| 1-Oct-21 | TO MSA | | | $ | 13,000.00 |
| 1-Oct-21 | TO SAM | | | | $4,750.00 |
| | | | | | |
| 2-Oct-21 | From Scottie McDonald - Edgew | $ | 25,000.00 | NRD | |
| 30-Sep-21 | TO MSA | | | $ | 6,895.00 |
| 1-Oct-21 | TO MSA | | | $ | 13,000.00 |
| 4-Oct-21 | TO SAM | | | $ | 4,752.00 |
| | | | | | |
| 4-Oct-21 | | | | | |
| 4-Oct-21 | TO SAM | | | $ | 3,817.00 |
| 4-Oct-21 | TO SAM | | | $ | 5,000.00 |
| 5-Oct-21 | TO SAM | | | $ | 3,803.00 |
| 5-Oct-21 | TO SAM | | | $ | 1,827.00 |
| 6-Oct-21 | TO SAM | | | $ | 12,810.00 |
| 6-Oct-21 | TO SAM | | | $ | 707.00 |
| 7-Oct-21 | TO SAM | | | $ | 2,700.00 |
| 8-Oct-21 | TO SAM | | | $ | 1,300.00 |
| 11-Oct-21 | TO SAM | | | $ | 3,607.00 |

| Date | Description | Amount In | Amount Out |
|------|-------------|-----------|------------|
| 15-Oct-21 | Manhattan Group | $ 25,000.00 | |
| 21-Oct-21 | TO MSA | | $ 13,000.00 |
| 20-Oct-21 | FROM SAM deal with Keech | $ 4,000.00 | |
| 20-Oct-21 | TO MSA | | $ 4,000.00 |
| 15-Oct-21 | TO SAM | | $ 1,818.18 |
| 21-Oct-21 | TO SAM | | $ 1,800.00 |
| 21-Oct-21 | TO MSA | | $ 8,400.00 |
| 21-Oct-21 | TO SAM | | $ 1,118.18 |
| 22-Oct-21 | TO SAM | | $ 1,800.00 |
| 26-Oct-21 | TO SAM | | $ 2,718.18 |
| 27-Oct-21 | TO SAM | | $ 1,336.18 |
| 1-Nov-21 | TO SAM | | $ 2,818.36 |
| 3-Nov-21 | TO SAM | | $ 3,618.18 |
| 8-Nov-21 | TO SAM | | $ 2,218.36 |
| 11-Nov-21 | TO SAM | | $ 3,636.36 |
| 12-Nov-21 | TO SAM | | $ 2,518.18 |
| 15-Nov-21 | TO SAM | | $ 3,188.18 |
| 16-Nov-21 | TO SAM | | $ 2,136.18 |
| 18-Nov-21 | TO SAM | | $ 2,136.18 |
| 18-Nov-21 | TO SAM | | $ 1,218.36 |
| 18-Nov-21 | From Mike Foley | $ 52,000.00 | |
| 19-Nov-21 | TO MSA | | $ 12,500.00 |
| 19-Nov-21 | Vapor Diamond Labs Inc | | $ 20,000.00 |
| 18-Nov-21 | TO SAM | | $ 5,999.18 |
| 19-Nov-21 | TO SAM | | $ 1,100.36 |
| 19-Nov-21 | TO SAM | | $ 4,350.18 |
| 22-Nov-21 | TO SAM | | $ 1,100.36 |
| 20-Nov-21 | TO SAM | | $ 2,870.36 |
| 21-Nov-21 | TO SAM | | $ 2,378.36 |
| 21-Nov-21 | TO SAM | | $ 5,000.18 |
| 22-Nov-21 | TO SAM | | $ 2,100.18 |
| 23-Nov-21 | TO SAM | | $ 2,118.36 |
| 29-Nov-21 | From Danny Hauck | $ 25,000.00 | |
| 29-Nov-21 | TO MSA | | $ 13,000.00 |
| 29-Nov-21 | TO MSA | | $ 2,000.00 |
| 29-Nov-21 | TO SAM | | $ 3,100.18 |
| 29-Nov-21 | TO SAM | | $ 6,900.18 |
| 30-Nov-21 | TO SAM | | $ 3,200.36 |
| 1-Dec-21 | TO SAM | | $ 1,999.18 |
| 2-Dec-21 | TO SAM | | $ 1,200.36 |
| 6-Dec-21 | From Mike Foley | $ 25,000.00 | |
| 3-Dec-21 | TO SAM | | $ 2,000.18 |
| 3-Dec-21 | TO SAM | | $ 7,518.36 |
| 6-Dec-21 | TO SAM | | $ 5,818.36 |
| 5-Dec-21 | TO SAM | | $ 1,818.18 |

| Date | Description | | Amount | | Amount |
|---|---|---|---|---|---|
| 7-Dec-21 | TO SAM | | | $ | 2,000.18 |
| 8-Dec-21 | TO SAM | | | $ | 3,018.16 |
| 9-Dec-21 | From World Pharma- Cortese | $ | 25,000.00 | | |
| 9-Dec-21 | TO SAM | | | $ | 2,900.18 |
| 9-Dec-21 | TO SAM | | | $ | 1,700.18 |
| 9-Dec-21 | TO SAM | | | $ | 6,518.18 |
| 9-Dec-21 | Vapor Diamond Labs Inc | | | $ | 4,500.00 |
| 9-Dec-21 | TO SAM | | | $ | 4,518.18 |
| | Refund Paypal | $ | 4,369.00 | | |
| 10-Dec-21 | TO SAM | | | $ | 2,490.18 |
| 10-Dec-21 | TO SAM | | | $ | 1,818.18 |
| 12-Dec-21 | TO SAM | | | $ | 3,181.36 |
| 12-Dec-21 | TO SAM | | | $ | 2,900.36 |
| 13-Dec-21 | WORLD Pharma Alpha Micro Co | $ | 25,000.00 | | |
| 13-Dec-21 | TO SAM | | | $ | 9,700.18 |
| 13-Dec-21 | TO SAM | | | $ | 2,800.36 |
| 13-Dec-21 | TO SAM | | | $ | 998.36 |
| | | | | | |
| 14-Dec-21 | DEPOSIT Biozola | $ | 25,000.00 | | |
| 14-Dec-21 | TO SAM | | | $ | 1,500.36 |
| 14-Dec-21 | TO SAM | | | $ | 9,500.36 |
| 14-Dec-21 | TO SAM | | | $ | 1,300.18 |
| 15-Dec-21 | DEPOSIT Constellation | $ | 25,000.00 | | |
| | | | | | |
| 15-Dec-21 | To SAM | | | $ | 1,800.00 |
| 15-Dec-21 | To SAM | | | $ | 1,300.18 |
| 15-Dec-21 | To SAM | | | $ | 2,200.00 |
| 15-Dec-21 | To SAM | | | $ | 9,418.18 |
| 16-Dec-21 | To SAM | | | $ | 2,100.18 |
| 17-Dec-21 | To SAM | | | $ | 1,800.00 |
| 17-Dec-21 | To SAM | | | $ | 3,200.54 |
| 20-Dec-21 | To SAM | | | $ | 3,600.36 |
| 20-Dec-21 | DEPOSIT | $ | 25,000.00 | | |
| 20-Dec-21 | TO SAM | | | $ | 11,500.00 |
| 20-Dec-21 | TO SAM | | | $ | 1,318.00 |
| | | | | | |
| 26-Dec-21 | TO SAM | | | $ | 3,300.18 |
| 27-Dec-21 | TO SAM | | | $ | 1,800.18 |
| 28-Dec-21 | TO SAM | | | $ | 1,400.16 |
| 28-Dec-21 | TO SAM | | | $ | 1,500.18 |
| 3-Jan-22 | TO SAM | | | $ | 1,000.18 |
| 5-Jan-22 | TO SAM | | | $ | 2,500.18 |
| 5-Jan-22 | TO SAM | | | $ | 1,500.54 |
| 6-Jan-22 | TO SAM | | | $ | 3,500.00 |
| 10-Jan-22 | TO SAM | | | $ | 1,600.00 |
| 10-Jan-22 | TO SAM | | | $ | 1,700.18 |

| Date | Description | Deposit | Amount |
|---|---|---|---|
| 12-Jan-22 | DEPOSIT Gary Black | $ 79,149.00 | |
| 12-Jan-22 | | | |
| 12-Jan-22 | TO SAM | | $ 9,518.18 |
| 12-Jan-22 | TO SAM | | $ 1,300.36 |
| 12-Jan-22 | | | |
| 13-Jan-22 | DEPOSIT SHANTRELL ABN | $ 90,000.00 | |
| 13-Jan-22 | DEPOSIT AVRIO | $ 98,280.00 | |
| 13-Jan-22 | TO SAM | | $ 1,600.54 |
| 13-Jan-22 | TO SAM | | $ 6,300.18 |
| 13-Jan-22 | TO SAM | | $ 5,900.36 |
| 13-Jan-22 | TO SAM | | $ 3,036.36 |
| 14-Jan-22 | TO SAM | | $ 1,018.00 |
| 14-Jan-22 | TO SAM | | $ 2,700.54 |
| 15-Jan-22 | TO SAM | | $ 2,500.18 |
| 17-Jan-22 | TO SAM | | $ 1,800.36 |
| 18-Jan-22 | To REFUND Gary Black Refund | | $ 60,000.00 |
| 19-Jan-22 | DEPOSIT VRC Medical | $2,268,000.00 | |
| 19-Jan-22 | DEPOSIT Hand Safety | $ 130,000.00 | |
| 19-Jan-22 | TO SAM | | $ 2,500.36 |
| 19-Jan-22 | TO SAM $9500 | | $ 9,500.00 |
| 19-Jan-22 | TO SAM | | $ 4,800.36 |
| 20-Jan-22 | TO SAM | | $ 25,000.00 |
| 20-Jan-22 | TO SAM | | $ 20,000.00 |
| 20-Jan-22 | TO REFUND SHANTRELL ABN | | $ 90,000.00 |
| 20-Jan-22 | TO SAM | | $ 5,500.00 |
| 21-Jan-22 | DEPOSIT Safety House Scully | $1,965,600.00 | |
| 20-Jan-22 | DEPOSIT VRC Medical | $ 181,440.00 | |
| 24-Jan-22 | DEPOSIT Sam | $ 10,000.00 | |
| 24-Jan-22 | TO REFUND AVRIO | | $ 98,280.00 |
| 26-Jan-22 | TO SAM | | $ 6,300.18 |
| 28-Jan-22 | TO REFUND Hand Safety | | $ 130,000.00 |
| 1-Feb-22 | To ASOLAR Gary Weiss | | $ 219,240.00 |
| 4-Feb-22 | To Sam Mediation FEE Daniel | | $ 1,550.00 |
| 4-Feb-22 | To ASOLAR Gary Weiss | | $ 1,911,960.00 |
| 9-Feb-22 | To Refund ID Clean Mike Foley | | $ 77,000.00 |
| 9-Feb-22 | To Refund Sr Life LLC | | |
| 10-Feb-22 | To REFUND Daniel Ross Sears, Esq | | $ 170,000.00 |
| 15-Feb-22 | To ASOLAR Gary Weiss | | $ 250,000.00 |
| 25-Feb-22 | To ASOLAR Gary Weiss | | $ 190,000.00 |
| 11-Mar-22 | TO REFUND George Gianforcaro | | $ 41,500.00 |
| 16-Mar-22 | TO SAM | | $ 204,120.00 |

| Date | Description | | Amount |
|------|-------------|---|--------|
| 17-Mar-22 | To Charles Mansour for Keith | $ | 1,000.00 |
| 17-Mar-22 | To Keith Bauer | | $1,500.00 |
| 21-Mar-22 | TO SAM | $ | 185,000.00 |
| 22-Mar-22 | TO SAM | $ | 140,000.00 |
| 22-Mar-22 | TO SAM | $ | 69,500.00 |
| 22-Mar-22 | To Keith Bauer | $ | 1,500.00 |
| 23-Feb-22 | TO SAM | $ | 69,100.18 |
| 23-Mar-22 | TO SAM | $ | 68,972.36 |
| 24-Mar-22 | TO SAM | $ | 72,500.36 |
| 25-Mar-22 | TO SAM | $ | 10,000.00 |
| 25-Mar-22 | TO SAM | $ | 56,700.36 |
| 28-Mar-22 | TO SAM | $ | 71,018.00 |
| 31-Mar-22 | To Global Picklener REFUND | $ | 25,000.00 |
| 1-Apr-22 | To Global Picklener REFUND | | $450 |
| 1-Apr-22 | TO SAM | $ | 5,818.39 |
| 4-Apr-22 | TO SAM | $ | 78,036.00 |
| 5-Apr-22 | TO SAM | $ | 52,018.18 |
| 5-Apr-22 | TO SAM | $ | 41,518.00 |
| 7-Apr-22 | DEPOSIT | $ 7,000.00 | |
| 7-Apr-22 | TO SAM | $ | 26,000.36 |
| 14-Apr-22 | TO SAM | $ | 5,000.18 |
| 18-Apr-22 | To BLAKE CORLEY Refund | $ | 27,355.00 |
| 19-Apr-22 | TO SAM | $ | 6,718.18 |
| 26-Apr-22 | TO SAM | $ | 5,936.36 |
| 31-May-22 | TO SAM | $ | 65,000.18 |
| 25-Jun-22 | to sam | $ | 10,000.00 |
| 11-Aug-22 | To Peckar Abramson | $ | 11,000.00 |

**SUBTOTAL** $5,533,828.00   $   5,573,174.71

From the desk of:   9/26/23

GARY P. LIGHTMAN

Whoever is at Room 1005
+ gets this letter, please
call me, it is important
that I spoke to you

Thx

Gary Lightman
cell 215-760-3000

↱ Dr
PA 19422



MASK + ELDIVEN or
CURRENT OCCUPANT
2 W 47 ST, RM 1005
NEW YORK, NY 10036



PENGAD 800-631-6989
EXHIBIT
Gary
Weiss - 22
7/16
33

10:46





Gary

**EXHIBIT**
Gary
Weiss - 23
7/16        EE

Text Message
Mon, Feb 28, 5:39 PM

Hi Manfred, sorry they .issued the delivery Today, just confir.ed you sent a 190K. Thanks, will be by your clients tomorrow, best
Gary

I told u i wired on friday when the trucks were less than 45 minutes away. Should have been there today.

Not sure what this game is but u are hurting ur friend sam.

Tue, Mar 15, 1:29 PM

Hi Manfred, I am sorry, could not coordinate the truck and people Today, looks ready for tomorrow.
Best
Gary

Gary U said this in February above

Hi Manfred, sorry they .issued the delivery Today, just confir.ed you sent a 190K. Thanks, will be by your clients tomorrow, best Gary

Text Message

STERNBERG
GARY - DEPOSITION

G W
23

10:46

GW

Gary

Gary U said this in February above

Hi Manfred, sorry they .issued the delivery Today, just confir.ed you sent a 190K. Thanks, will be by your clients tomorrow, best Gary

Of course that never happened even though the goods were less than 45 minutes away acvording to u

Not sure what the real problem is, but stringing us along like this only hurts sam and his business and destroys ur credibility from the broken axel story, to the screws, to the holiday, to the winter storm, and now to the crews that u assured me about that u would personally indoect and deliver 1st thing minday

Wed, Mar 16, 11:24 AM

Is this done as promised?

Text Message



10:46

GW

Gary ›

Wed, Mar 16, 11:24 AM

Is this done as promised?

Wed, Mar 16, 2:42 PM

Where r we on this?

Wed, Mar 16, 6:00 PM

U dont have the test kits do u?

I do not know what you are telling g me, spoke to Sam Today, will take care of him

U said tomorrow for last week everyday what am i missing?

I am working it out with Sam

There is a piece of the puzzle i dont understand and u are not being forthcoming with the facts

U had the tests we paid for them Then u held them hostage for more money, we paid then u did the same for even more money which we paid

Text Message

10:47

GW

Gary >

I am working it out with Sam

There is a piece of the puzzle i dont understand and u are not being forthcoming with the facts

U had the tests we paid for them Then u held them hostage for more money, we paid then u did the same for even more money which we paid

Now for last two weeks u say tomorrow everyday and wont explain why u dont have the tests any longer

What would u think if sam were selling these kits to u??

Manfred, I have never asked you for money 💰

Didnt u get money from ur lawyer?

Yes, I did,

We will work it out

Text Message

10:47

GW

Gary

Yes, I did,

We will work it out



Just got served w lawsuit which is why i had to go i am really not happy

Tomorrow this MUST be Fixed. Must be delivered

I'm advising sam to sell all collateral

Text Message

10:47

**GW**

Gary

Just got served w lawsuit which is why i had to go i am really not happy

Tomorrow this MUST be Fixed. Must be delivered

I m advisng sam to sell all collateral tomorrow

Dont lie to me and think i m stupid

I m not

U have screwed around w this sale long enough for me to be sued and served with a lawsuit all because of u

i am beside myself, not what u want

Thu, Mar 17, 6:38 PM

What is story today?

Fri, Mar 18, 9:01 AM

Manfred & Sam,Working on my issues, thanks for patience

Text Message

Cash

10:47



Gary

What is story today?

Fri, Mar 18, 9:01 AM

Manfred & Sam,Working on my issues, thanks for patience

Fri, Mar 25, 8:45 AM

What is story today?

Just hired lawyer to defend me and san for lawsuit that was filed against me personally because of ur delay that u dont even have enough respect for me or tha balls to tell me the truth about why such delay and u seem to forget u cheated us out of another $440k as the trucks are less than 45 minutes away
Let me guess next week this will be fixed?



Text Message

         

10:48



Gary ›



I went to cardiologist because of u

Did you ship some kits to your customers ?

High blood pressure because of u

Yes that i paid for because u stole our money

Text Message

         



Gary

High blood pressure because of u

Yes that i paid for because u stole our money

Axel brokrn

Need screws

Presidents day

My pressure is also high, took some of this

Now u show me pictures of drugs

All lies





Text Message

10:49

GW

Gary



Less than 45 min away

You asked me for the story of Today, that is my story

Good one

I did steal from you even 1 penny

I did not

Facts to date say otherwise

Those are your interpretation

Of the facts yes

Text Message

10:49

**GW**

Gary

I did not

Facts to date say otherwise

Those are your interpretation

Of the facts yes

If u factor in the lies then u have 30 different reasons why u have not delivered and stolen the money

You & Sam in 1 lawsuit ?

The lies on top of the pure greed are what is so stunning

2 + FBI investigation because of you

This will be fixed tomorrow per u for last 30 dsys  haha

And u just cant tell me the truth regarding why

Tue, Mar 29, 7:41 AM

Thanks for your patience,  working on a good resolution to our problems. Thanks

Text Message

Cash

10:49



Gary

Thanks for your patience,  working on a good resolution to our problems. Thanks
Gary



Wed, Apr 6, 8:01 AM

Sorry i am occupied now, I will call u later. Text if urgent.  Thanks

1. I Gary Weiss declare that I am over the age of 21

Text Message

         

10:49



‹

Gary ›

Wed, Apr 6, 8:01 AM

Sorry i am occupied now, I will call u later. Text if urgent.  Thanks

1. I Gary Weiss declare that I am over the age of 21.
2. Sam Gross and I have been doing business for about 20 years.
3. On or about January 6, 2022, Sam Gross of Charlton Holding Group LLC, asked me to send him an invoice for 365,320 of boxes of Ihealth test kits ( "product") and help him in the logistics of delivering the products to his (Charlton Holding Group ) various customers .
4. Sam Gross told me that a wire of $219,240.00 will be sent to my account ( Asolardiamond_ LLC ) in order of the start of the process of orders that he has, the money would come from his lawyers ( Manfred Law ) account, Manfred Sternberg. The funds were sent.
5.

To be continued



Text Message

**Gary Lightman**

EXHIBIT

Gary
Weiss-24
7/16                EC

| | |
|---|---|
| **From:** | Gary Lightman |
| **Sent:** | Monday, July 15, 2024 2:10 PM |
| **To:** | Gary Lightman |
| **Subject:** | Fwd: what your buddy Manfred is saying about you in the lawsuit |

Begin forwarded message:

**From:** Gary Weiss <wgary4109@gmail.com>
**Subject: Re: what your buddy Manfred is saying about you in the lawsuit**
**Date:** May 23, 2024 at 9:18:12 PM EDT
**To:** Gary Lightman <garylightman@lightmanlaw.com>, "Laver, Seth L."
<slaver@goldbergsegalla.com>, Pat Healey <phealey@rebarkelly.com>

Mr. Lightman, as you are aware by now, that Sam Gross, CHG received full refund on His order of Covid
test kits from Gary Weiss, A.Solar, the collateral-refund was known & acknowledged also by his attorney
Manfred Sternberg, despite the refund given to Sam Gross, CHG, Mr. Manfred Sternberg filed in court a
complaint naming Gary Weiss and A. Solar ,as Third party Defendants on November of 2022, not
disclosing to the court that refund was given already, a perjury, and letters of relief and satisfaction
were given to me by Sam Gross, CHG, copies of those letters which you have already, settling the
transaction between me & and Sam Gross, I never did business with Mr. Manfred Sternberg, never
signed a contract with him, those facts he did not disclose to the court, well, we know by now that Mr.
Manfred Sternberg stole funds from his Escrow account, violated Escrow rules of many of his clients,
You also discovered his Ponzy Game-Scam, you are now asking from me a retainer agreement between
me and Attorney Dafna Zekaria, that agreement was made between ASOLARDIAMOND LLC, and Dafna
Zekaria's law firm, SOKOLSKY & ZEKARIA , P, C, Entry of Default was entered against ASOLARDIAMOND
LLC, ECF document 145, 146, 147 which does not permit ASOLARDIAMOND LLC, to continue with the
discovery proceedings, all documents that I have and facts that are known to me in this case was given
to you already. Please disclose to the judge that I gave a full refund to SAM GROSS, CHG, and do not
continue to Carry The Lie in front of the court.
Gary Weiss, Pro-Se

On Wed, May 22, 2024 at 10:48 PM Gary Lightman <garylightman@lightmanlaw.com> wrote:
Gary Weiss,

In response to your below email:

The retainer/escrow agreement that both you and Zekaria testified under oath existed, was not in the
bag of documents you brought to your deposition. We scanned and emailed you the documents we
copied from that bag of documents we reviewed.

If you can't locate the physical paper February 2022 retainer/escrow agreement that Zekaria sent you,
just print out another copy of it from your phone or computer and email it to us, or even better, just
forward Zekaria's email or text with the attached draft to us directly. If you cannot do that, then please
contact us, so we can make arrangements for an IT technician to examine your phone and computer

1

**EXHIBIT**
Gary
Weiss-25
7/16        EE

## Gary Lightman

| | |
|---|---|
| **From:** | Gary Weiss <wgary4109@gmail.com> |
| **Sent:** | Thursday, June 27, 2024 12:33 PM |
| **To:** | Gary Lightman |
| **Subject:** | Re: Zekaria failure to comply with Judge Younge 6/13/24 Order |

Hi Mr. Lightmam, when I agreed to sell CHG, Sam Gross the Covid-19 test kits at 2.19 million, there was no Dafna Zekaria in the deal nor Sternberg, I did not know them, on or January 26, 2022. Only after I received a deposit of 10%, on February 1, 2022, Sam told me the balance will be paid in several days, however, on the 4th of February he informed me that his Lawyer suggested that the balance will be paid through Escrow, and I was told that it will be through Attorney Dafna Zekaria, otherwise the deal will not continue, I agreed. So, I have no feeling regarding the delays in her Deposition, also; I already heard what I thought about her role in this deal, she was placed as a condition to complete the purchase, so, Manfred & Sam can verify the merchandise Loaded onto the Common Carrier, Available Movers, which they did.

Her delays, cannot change the outcome of this case, The exact relationship of Dafna Zekaria regarding this case with Manfred & Sam or otherwise, is clear, I never heard about her before Feb 4, 2022, nor did I suggested her to be the Escrowee, her future as a lawyer is over, her mental well being is questionable, I will not contact her, I know you will, so, I have to wait and see what and when.

G. W.

On Thu, Jun 27, 2024 at 8:02 AM Gary Lightman <garylightman@lightmanlaw.com> wrote:

Gary Weiss,

Are you going to let Daphna get away with this?

Please email us the February 2022 agreement that she drafted, asap.

thx
Gary Lightman
cell 215-760-3000

Begin forwarded message:

**From:** Patrick Healey <phealey@rebarkelly.com>
**Subject: RE: Zekaria failure to comply with Judge Younge 6/13/24 Order**
**Date:** June 27, 2024 at 7:30:27 AM EDT
**To:** Gary Lightman <garylightman@lightmanlaw.com>
**Cc:** Kimberly Tyler <kimtyler255@gmail.com>, "G. Manochi" <gmanochi@lightmanlaw.com>, GARY LIGHTMAN <ltag8r@me.com>, "Laver, Seth L." <slaver@goldbergsegalla.com>, "Joseph Ross (jross@goldbergsegalla.com)" <jross@goldbergsegalla.com>

Gary:

Attached please find an Affirmation from Ms. Zekaria regarding the Court's Order of June 13, 2024.

Regarding your unilateral scheduling of Ms. Zekaria's deposition, please be advised that I am not available for a deposition on July 5, 2024.

1

**Gary Lightman**

EXHIBIT
Gary - 26
Weiss
716    88

| | |
|---|---|
| **From:** | Gary Lightman |
| **Sent:** | Monday, July 15, 2024 4:54 PM |
| **To:** | Gary Lightman |
| **Subject:** | Fwd: Estimate 714195 #1, 02-02-2022 |

Begin forwarded message:

**From:** BLUERIVER4747/GARY <monipair@aol.com>
**Subject: Fw: Estimate 714195 #1, 02-02-2022**
**Date:** August 23, 2023 at 8:44:14 PM EDT
**To:** "garylightman@lightmanlaw.com" <garylightman@lightmanlaw.com>

https://jewelformeblue.com, Any setting, or any picture you submit, any Jewel.
Diamond Search, https://jewelformeblue.com/pages/diamond-search#/

----- Forwarded Message -----
**From:** Gerard <gerard@availablemovers.com>
**To:** Gary Weiss <monipair@aol.com>
**Sent:** Wednesday, February 2, 2022, 09:47:20 AM EST
**Subject:** Estimate 714195

Estimate 714195

1

Operation Route
Inventory



Enjoy the difference
with Available Movers
& Storage, reliable
moving company in
New York NYC.

**Available Movers & Storage** US DOT #1323278 US MC #510368 NYDOT #T-36716

656 656 E 133rd St,
Manhattan, NY 10020

avamoving@gmail.com

Chat online

02/02/22 9:46AM

| Gary Weiss | Long Distance Estimate | Estimate # 714195 |
|---|---|---|

9085462649
monipair@aol.com

From **Staten Island, NJ 07206**
To **Los Angeles, CA 91405**

Job Date **02/07/22**

| Pickup | 02/07/22 8:00AM-9:00AM | Job: 200.00 cf x $7.50 /cf | $1,500.00 |
|---|---|---|---|
| Delivery | 02/24/22 | Fuel Charge - Long Distance | $360.00 |
| Estimated Size | 200.00 cf | Shuttle Service | $350.00 |
| Liability & Protection | Released Value | | |
| | | Subtotal | $2,210.00 |
| Job Distance | 2798.90 mi | | |

2

| | | Total Estimate | $2,210.00 |
|---|---|---|---|

| Sales Manager | Gerard | | |
|---|---|---|---|
| Phone | 7182926500 | | |
| Fax | 7182927797 | | |
| Email | gerard@availablemovers.com | Remaining Amount | $2,210.00 |

| Item | Qty | Item | Qty | Item | Qty |
|---|---|---|---|---|---|
| Box (4.5 Cu. Ft.) | 20 | Box (4.5 Cu. Ft.) | | | |

| Date | Address | Operation | Note |
|---|---|---|---|
| 02/07/22 8:00AM-9:00AM | Staten Island, NJ 07206 Ground | Pickup Primary Origin | |
| 02/24/22 | Los Angeles, CA 91405 Ground | Delivery Final Destination | |

**Long Distance Estimate**

**Inventory**
Only the items listed are included in the total cost. Any additional items or any additional services added will result in an additional cost. Packing materials are charged separately from the hauling.

**Reservations**
To schedule a date and reserve space on a truck, a deposit of 20% of the total cost of the move is required upon booking. The deposit will be applied to the move and deducted from the total cost. The deposit is refundable up to 7 days prior to your move date. All cancellations must be in writing via e-mail. The deposit can be in the form of Visa or Master Card. By providing us with your credit card information/number you agree to the terms and conditions of this contract.

**Form of payment**
20% deposit due upon booking via Visa or Master Card, 40% due upon pick up via Cash, Postal Money Order, Visa or MasterCard, and remaining 40% due upon delivery via Postal Money Order OR Cash ONLY. A 4% Credit Card Surcharge will apply to credit card charges except for deposits.NO PERSONAL CHECKS Please

**Charges include**
1. Disassembling and assembling of basic furniture (except cribs), loading & unloading.
2. Transportation, gas, tolls, mileage (Parking Tickets are extra)
3.Padding for protection of furniture with moving blankets, padding materials

**Estimate Information:**
This estimate includes labor, loading, unloading, and basic valuation. All furniture must be wrapped in blankets and/or protective materials. Any disassembly and reassembly of basic furniture is also included provided all parts are available excluding cribs. The shipper also understands that boxes & labor for packing boxes are not included and will be charged per items ordered and listed on the packing materials price list. If non-binding, the total charges are based on the actual weight of the property and may exceed the estimate subject to U.S. Federal Law and the 110% rule; you may be charged 110% of the non-binding estimate. Estimate may also be based upon or the actual space or cubic feet occupied by the property on the transport vehicle. If binding, the total amount of the binding estimate must be paid in full prior to unloading. For all estimates there may be additional charges for flights of stairs, elevators, extra drop-offs or pick-ups, re-delivery, long carriers over 150 feet from the entrance to the home and shuttles for residences in restrictive areas such as downtown Manhattan or other restrictive complexes. There will be a fuel surcharge on all shipments in the amount of 18% of the line haul charges. All charges are based upon full tariff rates. The carrier`s tariff is available for inspection upon reasonable request. Please contact carrier to make arrangements.

**Dispute settlement program**
Our neutral arbitration program has been designed to give neither the carrier nor the shipper any special advantage. If a dispute arises between the carrier and the shipper Arbitration may be a mutually beneficial alternative to help resolve the dispute. Section 49 U.S.C. Section 375.211 provides that a mover must have a program in place to provide shippers with an Arbitration alternative. Arbitration is optional and not required under Federal law. 1. Summary of the arbitration process: Arbitration is an alternative to

courtroom litigation. It provides each party to the dispute to present their cases and allows a neutral third party arbitrator to make decision as to the merits of each side's case. 2. Applicable costs: Each party is responsible for their own costs associated with arbitration. A benefit to the arbitration alternative may be that it is less expensive than traditional litigation. Each party is responsible for 50% of the costs associated with securing the arbitrator and 100% of their own expenses, including but not limited to attorney fees. 3. Legal effects: If the arbitration alternative is chosen, then any decision made by the arbitrator may be binding. Additionally, an arbitration decision may not be appealed in a court of law. There are many arbitration programs available at multiple locations throughout the United States. It is mandatory that JAMS Arbitration services be used for. Contact information and other information about JAMS can be found at http://www.jamsadr.com. Please contact the moving company if you wish to participate in or get more information about the arbitration program.

### Cancellation/Rescheduling Policy

All cancelations must be made in writing at least 7 business days prior to the original move date as stated on the original estimate in order for a refund to be honored. Written cancellations may be submitted either via mail, email or fax to the office listed on this estimate. For the quickest cancellation process, it is best to forward your cancellation request via email. Your deposit will not be refundable if your cancellation notice is not received 7 business days or more prior to the first date of your moving pick up window (moving date). For original reservations made less than 7 business days prior to the move and/or postponed moves, cancellation policy does not apply, therefore deposit is non-refundable.

By placing a deposit with Available Movers & Storage, I am agreeing to the Terms & Conditions stated above. By approving this Estimate Cost for Service via my electronic or hand signature, I hereby voluntarily free Available Movers & Storage the liability of an onsite visual, and agree to an online, e-mail / over the phone estimate. I am fully aware that I am entitled to an in home consultation at my request for no additional cost and that it is my responsibility to request it.

### Storage

Monthly rates are charged at 50 per cubic foot, with a minimum of 200 cubic feet. Handling fees may apply.

### Packing/Unpacking

Unless specified in the Additional Services above, your move does not include packing services, unpacking services or packing materials. Packing labor and packing materials can be ordered through your salesperson or at the time of the pick-up with the foreman. All Trucks come fully equipped with a full line of moving supplies such as boxes, tape, shrink wrap, etc. Our company policy states that certain items MUST BE PROTECTED IN BOXES before being moved and loaded. You may pack these items yourself, prior to the moving date, in either the original boxes or other suitable boxes.

Remove me

EXHIBIT

Gary
Weiss - 27
7/16        6

## Gary Lightman

From:       Gary Lightman
Sent:       Monday, July 15, 2024 4:45 PM
To:         Gary Lightman
Subject:    Fwd: Estimate 714194, Estimate #2, 02-02-2022,9:50AM

Begin forwarded message:

**From:** BLUERIVER4747/GARY <monipair@aol.com>
**Subject: Fw: Estimate 714194, Estimate #2, 02-02-2022,9:50AM**
**Date:** August 23, 2023 at 8:46:06 PM EDT
**To:** "garylightman@lightmanlaw.com" <garylightman@lightmanlaw.com>

https://jewelformeblue.com, Any setting, or any picture you submit, any Jewel.
Diamond Search,  https://jewelformeblue.com/pages/diamond-search#/

----- Forwarded Message -----
**From:** Gerard <gerard@availablemovers.com>
**To:** Gary Weiss <monipair@aol.com>
**Sent:** Wednesday, February 2, 2022, 09:50:19 AM EST
**Subject:** Estimate 714194

Estimate 714194

1

Operation Route
Inventory



Enjoy the difference
with Available Movers
& Storage, reliable
moving company in
New York NYC.

**Available Movers & Storage** US DOT #1323278 US MC #510368 NYDOT #T-36716

656 656 E 133rd St,
Manhattan, NY 10020

avamoving@gmail.com

Chat online

02/02/22 9:48AM

| **Gary Weiss** | **Local Move Estimate** | **Estimate # 714194** |
|---|---|---|
| 9085462649 | From **Staten Island, NJ 07206** | Job Date **02/07/22** |
| monipair@aol.com | To **Farmingdale, NY 11735** | |

| | | | | |
|---|---|---|---|---|
| Pickup | 02/07/22 8:00AM-9:00AM | Job: 10.00 hr x $250.00 /hr | | $2,500.00 |
| Delivery | 02/07/22 | Basic Handling Fee | $177.40 | |
| Estimated Size | 680.00 cf | Tolls | $199.00 | |
| Liability & Protection | Released Value | | | |
| | | | Subtotal | $2,876.40 |
| Job Distance | 108.20 mi | | | |

| Total Estimate | $2,876.40 |
| --- | --- |

Deposit $100.00   Make a Payment

| Sales Manager | Gerard |
| Phone | 7182926500 |
| Fax | 7182927797 |
| Email | gerard@availablemovers.com |

Remaining Amount          $2,876.40

| Item | Qty | Item | Qty | Item | Qty |
| --- | --- | --- | --- | --- | --- |
| Box (4.5 Cu. Ft.) | 170 | Box (4.5 Cu. Ft.) | | | |

| Date | Address | Operation | Note |
| --- | --- | --- | --- |
| 02/07/22<br>8:00AM-9:00AM | Staten Island, NJ 07206<br>Ground | Pickup<br>Primary Origin | |
| 02/07/22 | Monroe Township, NJ 08831<br>Ground | Delivery<br>Extra Drop Off | |
| 02/07/22 | Glen Mills, PA 19342<br>Ground | Delivery<br>Extra Drop Off | |
| 02/07/22 | Farmingdale, NY 11735<br>Ground | Delivery<br>Final Destination | |

**Local Move Estimate**

**Inventory**
Only the items listed are included in the total cost. Any additional items or any additional services added will result in an additional cost. Packing materials are charged separately from the hauling.

**Reservations**
To schedule a date and reserve space on a truck, a deposit of $500 of the total cost of the move is required upon booking. The deposit will be applied to the move and deducted from the total cost. The deposit is refundable up to 7 days prior to your move date. All cancellations must be in writing via e-mail. The deposit can be in the form of Visa or Master Card. By providing us with your credit card information/number you agree to the terms and conditions of this contract.

**Gary Lightman**

EXHIBIT

Gary
Weiss - 28
7/18        ee

| | |
|---|---|
| **From:** | Gary Lightman |
| **Sent:** | Monday, July 15, 2024 4:44 PM |
| **To:** | Gary Lightman |
| **Subject:** | Fwd: Estimate 714194, Estimate #3, 02-02-2022, 11:06AM |

Begin forwarded message:

**From:** BLUERIVER4747/GARY <monipair@aol.com>
**Subject: Fw: Estimate 714194, Estimate #3, 02-02-2022, 11:06AM**
**Date:** August 23, 2023 at 8:48:00 PM EDT
**To:** "garylightman@lightmanlaw.com" <garylightman@lightmanlaw.com>

https://jewelformeblue.com, Any setting, or any picture you submit, any Jewel.
Diamond Search,  https://jewelformeblue.com/pages/diamond-search#/

----- Forwarded Message -----
**From:** Gerard <gerard@availablemovers.com>
**To:** Gary Weiss <monipair@aol.com>
**Sent:** Wednesday, February 2, 2022, 11:10:45 AM EST
**Subject:** Estimate 714194

Estimate 714194

1

28

Operation Route
Inventory



Enjoy the difference
with Available Movers
& Storage, reliable
moving company in
New York NYC.

**Available Movers & Storage** US DOT #1323278 US MC #510368 NYDOT #T-36716

656 656 E 133rd St,
Manhattan, NY 10020

avamoving@gmail.com

Chat online

02/02/22 11:06AM

| Gary Weiss | Local Move Estimate | Estimate # 714194 |
|---|---|---|

9085462649

monipair@aol.com

From **Staten Island, NJ 07206**
To  **Farmingdale, NY 11735**

Job Date **02/07/22**

| Pickup | 02/07/22 8:00AM-9:00AM | | | Flat Rate 2 |
|---|---|---|---|---|
| Delivery | 02/07/22 | | | Trucks 3 |
| Estimated Size | 2000.00 cf | | | Guys per |
| Liability &
Protection | Released Value | | | truck |
| | | Truck NJ To Farmingdale | $1500.00 | |
| | | Truck to NJ/Pa | $2500.00 | |
| Job Distance | 108.20 mi | | | |

Subtotal   $4,000.00

2

| Sales Manager | Gerard |
| Phone | 7182926500 |
| Fax | 7182927797 |
| Email | gerard@availablemovers.com |

**Total Estimate** $4,000.00

Deposit $500.00    Make a Payment

Remaining Amount  $4,000.00

| Item | Qty | Item | Qty | Item | Qty |
|------|-----|------|-----|------|-----|
| Box (4.5 Cu. Ft.) | | 410 Box (4.5 Cu. Ft.) | | | |

| Date | Address | Operation | Note |
|------|---------|-----------|------|
| 02/07/22 8:00AM-9:00AM | Staten Island, NJ 07206 Ground | Pickup (Pickup 410 Boxes) Primary Origin | |
| 02/07/22 | Monroe Township, NJ 08831 Ground | Delivery (10 Boxes) | |
| 02/07/22 | Glen Mills, PA 19342 Ground | Delivery (200 Boxes) | |
| 02/07/22 | Farmingdale, NY 11735 Ground | Delivery (200 Boxes) | |

Remove me

3

EXHIBIT
Gary
Weiss  29
7/16      88

## Gary Lightman

**From:**     Gary Lightman
**Sent:**     Monday, July 15, 2024 4:53 PM
**To:**       Gary Lightman
**Subject:**  Fwd: Estimate 714194,Estimate #4, 02-02-2022, 11:14AM

Begin forwarded message:

**From:** BLUERIVER4747/GARY <monipair@aol.com>
**Subject: Fw: Estimate 714194,Estimate #4, 02-02-2022, 11:14AM**
**Date:** August 23, 2023 at 8:49:42 PM EDT
**To:** "garylightman@lightmanlaw.com" <garylightman@lightmanlaw.com>

https://jewelformeblue.com, Any setting, or any picture you submit, any Jewel.
Diamond Search, https://jewelformeblue.com/pages/diamond-search#/

----- Forwarded Message -----
**From:** Gerard <gerard@availablemovers.com>
**To:** Gary Weiss <monipair@aol.com>
**Sent:** Wednesday, February 2, 2022, 11:20:44 AM EST
**Subject:** Estimate 714194

Estimate 714194

1

Operation Route
Inventory



Enjoy the difference
with Available Movers
& Storage, reliable
moving company in
New York NYC.

**Available Movers & Storage** US DOT #1323278 US MC #510368 NYDOT #T-36716

656 656 E 133rd St,
Manhattan, NY 10020

avamoving@gmail.com

Chat online

02/02/22 11:14AM

| Gary Weiss | Local Move Estimate | Estimate # 714194 |
|---|---|---|

9085462649

monipair@aol.com

From **Staten Island, NJ 07206**
To **Farmingdale, NY 11735**

Job Date **02/07/22**

| Pickup | 02/07/22 8:00AM-9:00AM | 2 Trucks 3 Guys Each/Flat Rate | |
|---|---|---|---|
| Delivery | 02/07/22 | Truck NJ To Farmingdale | $1500.00 |
| Estimated Size | 2000.00 cf | Truck to NJ/Pa | $2500.00 |
| Liability & Protection | Released Value | | |
| | | Subtotal | $4,000.00 |
| Job Distance | 108.20 mi | | |

2

| | Total Estimate | $4,000.00 |
|---|---|---|
| | Deposit $500 | Make a Payment |

| | | |
|---|---|---|
| Sales Manager | Gerard | |
| Phone | 7182926500 | |
| Fax | 7182927797 | Remaining Amount | $4,000.00 |
| Email | gerard@availablemovers.com | |

| Item | Qty | Item | Qty | Item | Qty |
|---|---|---|---|---|---|
| Box (4.5 Cu. Ft.) | 410 | Box (4.5 Cu. Ft.) | | | |

| Date | Address | Operation | Note |
|---|---|---|---|
| 02/07/22 8:00AM-9:00AM | Staten Island, NJ 07206 Ground | Pickup Primary Origin | |
| 02/07/22 | Monroe Township, NJ 08831 Ground | Delivery (10 Boxes) | |
| 02/07/22 | Glen Mills, PA 19342 Ground | Delivery (177 Boxes) | |
| 02/07/22 | Farmingdale, NY 11735 Ground | Delivery (197 Boxes) | |

3

## Gary Lightman

EXHIBIT
Gary
Weiss - 30
7/16     EE

**From:**          monipair <monipair@aol.com>
**Sent:**          Monday, August 21, 2023 6:30 PM
**To:**            Gary Lightman
**Subject:**       This is from Manfred
**Attachments:**   20230821_182748.jpg

Manfred blacked out the name Gary Weiss ?
Playing stupid with his question about the deposit

Sent from Samsung Galaxy smartphone.

1

30



[2/4/22, 4:52:51 PM] I health: Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them.
[2/4/22, 4:52:51 PM] Shlomi: Shlomi created group "I health"
[2/4/22, 4:52:51 PM] I health: Shlomi added you
[2/4/22, 4:53:15 PM] Gary Weiss: Gary Weiss started a call
[2/4/22, 4:54:09 PM] Shlomi: Gary please confirm to Dafna here.



From then 1.9 m 65% is yours. The rest is mine.

Thanks.
[2/4/22, 4:54:45 PM] Gary Weiss: Gary Weiss started a call
[2/4/22, 4:58:18 PM] Gary Weiss: Gary Weiss started a video call
[2/4/22, 5:02:45 PM] Gary Weiss: Hi Dafna, I confirm 35% of 1.9 m going to Sam, and 65% of 1.9m to me Gary Weiss
[2/4/22, 5:03:47 PM] Gary Weiss: Gary Weiss started a call
[2/4/22, 5:16:07 PM] Daphna: Ok no problem
[2/6/22, 10:54:31 AM] Daphna: Good afternoon to you both - I am going to my office in about an hour to draft some paperwork that I will need signed if that's ok ?
[2/6/22, 10:55:07 AM] Gary Weiss: Yes
[2/6/22, 10:58:45 AM] Daphna: I will draft a formal agreement on who I represent and an escrow authorization that mirrors the terms of the disbursement that we texted about .....what's your current email address?
[2/6/22, 11:00:32 AM] Daphna: I will speak to Shlomi again before sending everything and will let you know if I have more questions. It's 11 now - I anticipate being ready with some of this by 1 or so
[2/6/22, 11:01:30 AM] Daphna: The documents will be dated on 2/4/22
[2/6/22, 11:26:40 AM] Gary Weiss: Wgary4019@gmail.com
[2/6/22, 1:00:42 PM] Daphna: So I will draft shortly
[2/6/22, 1:01:19 PM] Daphna: And it will be my pleasure to represent you in the future
[2/6/22, 1:01:54 PM] Daphna: Just need the business name that contracted with Manfred  etc
[2/6/22, 1:03:18 PM] Shlomi: Gary will fill in the info in a few minutes.
[2/6/22, 1:03:26 PM] Daphna: My "fee" will include all negotiations and litigation if necessary that may arise from this transaction
[2/6/22, 1:05:53 PM] Daphna: And send me the docs that show proof that I can release to you and it will be done as early as I possibly can
[2/6/22, 1:08:06 PM] Shlomi: Here are the docs.
[2/6/22, 1:11:26 PM] Daphna: Great after I prepare the docs and he signs - send it to me by email with this proof
[2/6/22, 1:41:16 PM] Gary Weiss: I did not  get the documents please send to monipair@aol.com,  or wgary4019@gmail.com
[2/6/22, 1:42:44 PM] Daphna: I will text when sent
[2/6/22, 1:42:58 PM] Daphna: At office working on it
[2/6/22, 1:42:59 PM] Gary Weiss: Ok
[2/6/22, 1:45:10 PM] Daphna: Still need the info requested above though
[2/6/22, 1:45:43 PM] Gary Weiss: What info ?
[2/6/22, 1:45:52 PM] Daphna: Call me
[2/6/22, 1:46:20 PM] Gary Weiss: Do not see request, call me if you cN5
[2/6/22, 1:46:55 PM] Shlomi: This
[2/6/22, 1:50:19 PM] Daphna: Got it
[2/6/22, 1:50:23 PM] Daphna: We spoke
[2/6/22, 1:58:57 PM] Gary Weiss:
[2/6/22, 1:59:44 PM] Daphna: What is the contract with Manfred? Date?
[2/6/22, 2:00:40 PM] Gary Weiss: I do not have the date me right now, Sam knows
[2/6/22, 2:00:53 PM] Daphna: Tell him to answer
[2/6/22, 2:00:58 PM] Daphna: Please
[2/6/22, 2:01:16 PM] Gary Weiss: K
[2/6/22, 2:02:46 PM] Gary Weiss: He will

ZEKARIA000001

2, 2:03:10 PM] Shlomi: He date off the contract is the date Gary issued the original invoice as we don't
e a contract.

ou can assign January 28th.
[2/6/22, 2:03:34 PM] Daphna: Call me
[2/6/22, 2:03:52 PM] Daphna: I want a piece of paper please
[2/6/22, 2:03:59 PM] Daphna: Even an invoice
[2/6/22, 2:04:35 PM] Daphna: And who is the person he sent invoice to ?
[2/6/22, 2:04:36 PM] Shlomi: We don't have a contract. Only a invoice. And I told you that before.
[2/6/22, 2:04:44 PM] Shlomi: I'll call you in A min
[2/6/22, 2:04:50 PM] Shlomi: He sent me abs Manfred the invoice.
[2/6/22, 2:05:01 PM] Daphna: The company name ?
[2/6/22, 2:05:31 PM] Shlomi: Lol.
[2/6/22, 2:05:40 PM] Shlomi: Gary invoice my company.

Charlton
[2/6/22, 2:05:52 PM] Daphna: Exactly
[2/6/22, 2:06:15 PM] Daphna: I feel like a dentist pulling teeth
[2/6/22, 2:06:41 PM] Daphna: So 1/28? Charlton ?
[2/6/22, 2:07:19 PM] Gary Weiss: Yes , 01 28 2022
[2/6/22, 2:10:18 PM] Daphna: Great ty
[2/6/22, 2:10:23 PM] Daphna: Almost done
[2/6/22, 2:10:40 PM] Gary Weiss: Great, waiting
[2/6/22, 2:23:32 PM] Daphna: Sent confirm receipt please
[2/6/22, 2:35:08 PM] Gary Weiss: Qreceived , will print once at home in several hours, sign an send you bCk
[2/6/22, 2:35:22 PM] Daphna: No rush
[2/6/22, 2:35:38 PM] Daphna: Just wanted my end done and approved by both of you
[2/6/22, 2:36:28 PM] Daphna: Send to Sokolski.Zekaria@mindspring.com
[2/6/22, 2:36:39 PM] Daphna: At your convenience
[2/6/22, 2:36:48 PM] Daphna: Shlomi - read it
[2/6/22, 2:37:43 PM] Gary Weiss:
[2/6/22, 3:05:51 PM] Daphna: He approved the document
[2/6/22, 3:10:09 PM] Daphna: Congratulations to you both and speak tomorrow- I am going to be driving for
a bit so anything else call me
[2/6/22, 3:11:47 PM] Gary Weiss:
[2/7/22, 10:32:38 AM] Daphna: Sent
[2/7/22, 10:34:32 AM] Gary Weiss:
[2/7/22, 10:48:04 AM] Daphna: Confirm when you receive
[2/7/22, 10:48:24 AM] Daphna: May take an hour because you are not chase
[2/7/22, 10:48:59 AM] Gary Weiss: K
[2/7/22, 10:49:33 AM] Gary Weiss: It was a bank wire ? Not ACH?
[2/7/22, 10:49:43 AM] Daphna: Bank wire
[2/7/22, 10:49:56 AM] Daphna: Is that ok???
[2/7/22, 10:50:20 AM] Daphna: Call me
[2/7/22, 11:20:55 AM] Gary Weiss: Please send copy of wire order
[2/15/22, 3:36:20 PM] Daphna: Good afternoon
[2/15/22, 3:37:03 PM] Gary Weiss:
[2/15/22, 3:37:28 PM] Daphna: It's my understanding that I am about to receive an additional wire of
250,000 which is 130,000 to Gary Weiss and the rest for my additional fees ?
[2/15/22, 3:37:39 PM] Shlomi: Gary please confirm to her

250k is coming in ( she is waiting for it )

And 130 is yours.
[2/15/22, 3:46:04 PM] Gary Weiss: Hi Dafna, that is correct you are sending me 130K, thanks
[2/15/22, 3:47:21 PM] Daphna: Awesome
[2/15/22, 3:48:29 PM] Daphna: Thanks for the confirmation and opportunity to represent you

ZEKARIA000002

22, 3:50:01 PM] Daphna: I will confirm as soon as the funds hit my account
/22, 3:50:38 PM] Gary Weiss: Great
5/22, 4:08:10 PM] Daphna: Just got it
15/22, 4:08:19 PM] Daphna: Heading to bank
/15/22, 4:52:45 PM] Daphna: Sent
2/15/22, 4:52:54 PM] Daphna: Confirm receipt when you get it
[2/22/22, 10:05:02 AM] Daphna: Gary let me know when I can expect the diamonds Shlomi told me about. I
would need to be prepared in advance in order to feel comfortable to negotiate on your behalf.
[2/22/22, 10:09:55 AM] Gary Weiss: Around 3pm they will be ready to pick up in Manhattan
[2/22/22, 10:17:01 AM] Gary Weiss: I will be sending you the Appraisal Certificates shortly, these will be the
first 4 Diamonds
[2/22/22, 10:43:10 AM] Daphna: I will be in person in the city after 2:00. Let me know where to be and
when. I would like to prepare so I can make this entire transaction smooth for all parties.
[2/22/22, 11:00:10 AM] Gary Weiss: Please give me the Email for the certificates, you can print them, once
you are in the city, the delivery will be made at Starbucks, 55w 46st
[2/22/22, 11:01:13 AM] Daphna: Give me an actual time
[2/22/22, 11:01:20 AM] Daphna: I will be there
[2/22/22, 11:01:46 AM] Shlomi: Pelase give him your email for the certificates.
[2/22/22, 11:02:08 AM] Daphna: Send to sokolski.zekaria@mindspring.com
[2/22/22, 11:03:29 AM] Daphna: Was doing that
[2/22/22, 11:04:36 AM] Gary Weiss: Once you are in Starbucks, text me, somebody will come there in 4
minutes, please show them ID, thanks
[2/22/22, 11:04:37 AM] Shlomi: Ty
[2/22/22, 11:04:53 AM] Gary Weiss: Will send certs in 5 minutes
[2/22/22, 11:06:05 AM] Shlomi: Shlomi started a call
[2/22/22, 11:08:12 AM] Gary Weiss: No ID
[2/22/22, 11:09:34 AM] Daphna: Ok thanks
[2/22/22, 11:09:48 AM] Daphna: When exactly is the earliest time to go
[2/22/22, 11:18:50 AM] Daphna: I can go sooner if it works
[2/22/22, 11:19:54 AM] Gary Weiss: After 2PM
[2/22/22, 11:20:10 AM] Daphna: So be there at 2?
[2/22/22, 11:26:05 AM] Gary Weiss: Certificates were sent to your Email
[2/22/22, 11:27:35 AM] Daphna: Ok thanks
[2/22/22, 11:27:53 AM] Daphna: 2:30 I'm there
[2/22/22, 11:28:20 AM] Gary Weiss: OK
[2/22/22, 2:02:51 PM] Gary Weiss: Gary Weiss started a call
[2/22/22, 2:08:36 PM] Daphna: <attached: 00000131-PHOTO-2022-02-22-14-08-36.jpg>
[2/22/22, 2:09:11 PM] Daphna: <attached: 00000132-PHOTO-2022-02-22-14-09-11.jpg>
[2/22/22, 2:09:36 PM] Daphna: I can go there when told to
[2/22/22, 2:10:31 PM] Daphna: Or whoever it is can come here I'm alone and no one else is here
[2/22/22, 2:12:01 PM] Gary Weiss: Got it. I know the place that is not across, that is down the block towards
5th Ave
[2/22/22, 2:12:33 PM] Daphna: Just tell me what to do I'm here
[2/22/22, 2:32:08 PM] Daphna: @19085462649 should I go to Starbucks or wait here ?
[2/22/22, 2:32:25 PM] Gary Weiss: Please
[2/22/22, 2:36:00 PM] Daphna: Here
[2/22/22, 2:36:19 PM] Daphna: <attached: 00000140-PHOTO-2022-02-22-14-36-19.jpg>
[2/22/22, 2:40:23 PM] Daphna: Ok done
[2/22/22, 2:50:49 PM] Shlomi: I just spoke to Gary.

You may do as you deem with these diamonds.

We trust you. To handle the deal with manfred ( with my assistance of course )

You have free rein and full trust by Gary.
[2/22/22, 2:51:03 PM] Shlomi: Gary kindly approve this. So Dafna can feel comfortable
[2/22/22, 2:51:10 PM] Shlomi: Thanks

ZEKARIA000003

[2/22/22, 2:52:54 PM] Gary Weiss: Of course, you will make the deal the way you understand with Manfred, completely the way you understand and want
[2/22/22, 3:06:51 PM] Daphna: Ok thanks
[2/25/22, 8:06:15 PM] Daphna: Confirmed wire received
[2/25/22, 8:07:00 PM] Daphna: Please also confirm what I'm sending to Gary in the morning
[2/25/22, 8:17:14 PM] Shlomi: Whatever I say goes with this.
[2/25/22, 8:17:18 PM] Shlomi: Other wise
[2/25/22, 8:17:20 PM] Daphna: Ok
[2/25/22, 8:17:23 PM] Shlomi: Every one can go home
[2/25/22, 8:17:27 PM] Shlomi: In peace
[2/25/22, 8:17:38 PM] Daphna: Just tell me what to do
[2/25/22, 8:17:41 PM] Daphna: Period
[2/25/22, 8:17:47 PM] Shlomi: Abs gary will agree to what I say. And he is sorry he he texts.
[2/25/22, 8:17:55 PM] Shlomi: Texted. So you can relax
[2/25/22, 8:18:02 PM] Daphna: I'm fine
[2/25/22, 8:18:09 PM] Daphna: Making a salad at moment
[2/25/22, 8:23:36 PM] Gary Weiss: Hi Dafna, I am happy, we do always Sam instructs, Shabazz Shalom,
[2/25/22, 8:24:10 PM] Daphna: Hi guys my pleasure always Shabbat shalom xo
[2/28/22, 12:35:40 PM] Gary Weiss: Hi Dafna, this is Gary Weiss. My banking in fo is,   Wells Fargo Bank, 201 N Wood Ave. Linden, NJ 07036. Routing # 121000248, Account # 3166375570. To that account of Asolardiamond LLC, 437 1st Avenue, Elizabeth, NJ 07206. Tel, 908-5462649
[2/28/22, 12:46:57 PM] Daphna: Done
[2/28/22, 12:47:17 PM] Gary Weiss:
[2/28/22, 12:47:35 PM] Daphna: Confirm here when you get it please
[2/28/22, 12:53:45 PM] Daphna: Have a great day

ZEKARIA000004

# EXHIBIT L

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

800.211.DEPO (3376)
EsquireSolutions.com

        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

American Environmental      )   NO.
Enterprises, Inc. d/b/a      )   2022-CV-00688(JMY)
THESAFETYHOUSE.COM,          )
                             )
          Plaintiff,         )
                             )
       - vs -                )
                             )
Manfred Steinberg,           )
Esquire; Manfred             )
Steinberg & Associates,      )
PC; Charlton Holdings        )
Group, LLC; Samuel Gross;    )
Gary Weiss; A. Solar,        )
LLC; Daphna Zekaria,         )
Esq.; and Sokolski &         )
Zekaria, PC,                 )
                             )
          Defendants.        )
- - - - - - - - - - - - - -  )


            Oral deposition of DANIEL SCULLY,

taken at the Law Offices of Goldberg Segalla, LLP,

1700 Market Street, Suite 1418, Philadelphia,

Pennsylvania, on Tuesday, July 23, 2024, commencing

at 10:12 a.m., before Lucy M. Berardi, Professional

Reporter and Notary Public in and of the

Commonwealth of Pennsylvania.



```
 1   A P P E A R A N C E S:

 2

 3   LIGHTMAN & MANOCHI
     BY:   GARY P. LIGHTMAN, ESQUIRE
 4     600 West Germantown Pike
       Suite 400
 5     Plymouth Meeting, PA 19462
       garylightman@lightmanlaw.com
 6         Attorneys for Plaintiff

 7

 8   GOLDBERG SEGALLA, LLP
     BY:   JOSEPH ROSS, ESQUIRE
 9     1700 Market Street
       Suite 1418
10     Philadelphia, PA 19103
       jross@goldbergsegalla.com
11         Attorneys for Defendants

12

13

14

15

16

17   A L S O   P R E S E N T:

18   Gary Weiss, Pro Se Defendant
     Manfred Sternberg, Esquire, Defendant (Via Zoom)
19

20

21

22

23

24
```



```
 1                     I N D E X

 2

 3   WITNESS                              PAGE

 4

 5   DANIEL SCULLY

 6

 7      By: Mr. Ross                      14, 240

 8      By: Mr. Weiss                     217

 9      By: Mr. Lightman                  229

10

11                     - - -

12

13

14                 E X H I B I T S

15                                        PAGE

16   NUMBER          DESCRIPTION          MARKED

17   TSH-1           E-mail               4

18   TSH-2           E-mail               6

19   TSH-3           Wire Transfer        203

20

21                     - - -

22

23

24
```



```
 1              (By agreement of counsel, the
 2   signing, sealing, filing, and certification
 3   of the transcript have been waived; and all
 4   objections, except as to the form of the
 5   question, have been reserved until the time
 6   of trial.)
 7                  - - -
 8              DANIEL SCULLY, after having been
 9   duly sworn, was examined and testified as
10   follows:
11                  - - -
12              MR. LIGHTMAN:  Before we begin,
13   some preliminary matters, Mr. Ross.
14              MR. ROSS:  Okay.
15              MR. LIGHTMAN:  First, can you
16   mark this -- I premarked this as Deposition
17   Exhibit TSH, for The Safety House, 1, and
18   also Deposition Exhibit Sternberg-41.
19              (At this time, Exhibit TSH-1 was
20   marked for identification.)
21              MR. LIGHTMAN:  For the record,
22   this is an e-mail that I sent July 21st to
23   Seth Laver and Joseph Ross, subject:  Texts
24   from Manfred and texts from Manfred and
```



1   Sam messages.  And it says:  Second

2   request.  Joseph and Seth, why didn't

3   Manfred produce any of the attached texts

4   to us in discovery?  Please advise ASAP.

5   This was a second request.

6            Mr. Ross, do you know why we

7   didn't get any of these texts?

8            MR. ROSS:  I'll let you say what

9   you want to say.

10            MR. LIGHTMAN:  Okay.

11   Mr. Sternberg, do you know why you didn't

12   produce any of these texts to us in

13   discovery?

14            MR. ROSS:  You'll let him say

15   what he wants to say too, Manfred.

16            MR. LIGHTMAN:  Mr. Sternberg?

17   Let the record reflect --

18            MR. STERNBERG:  Yes, I'm here.

19            MR. LIGHTMAN:  Why didn't you

20   produce any of these texts to us in

21   discovery?

22            MR. STERNBERG:  I don't think I'm

23   here to testify today, but thank you

24   anyway.



```
 1              MR. LIGHTMAN:  Okay.

 2              MR. ROSS:  That's right.

 3              MR. LIGHTMAN:  I would like the

 4   record also to reflect that Mr. Ross is

 5   here in person, Gary Weiss is here in

 6   person, my client Dan Scully's here, and

 7   I'm here.  And Manfred Sternberg is

 8   appearing via -- what do you call this?

 9              THE COURT REPORTER:  Zoom.

10              MR LIGHTMAN:  -- Zoom and

11   listening in.  I would like to hand you a

12   document that I marked as Deposition

13   Exhibit TSH-2, which is also Deposition

14   Exhibit Scully-41.

15              (At this time, Exhibit TSH-2 was

16   marked for identification.)

17              MR. LIGHTMAN:  This is also a

18   second request, and it's to -- July 21st,

19   to Seth Laver and Joseph Ross, saying:  Are

20   the Sternberg defendants going to provide

21   proper responses to plaintiff's request for

22   admission, as outlined in our below July

23   18, 2024, e-mail to you, or are you going

24   to force plaintiff to file an appropriate
```



1  Rule 36(a)(6) motion.

2          I sent an e-mail on July 18th

3  outlining the deficiencies in the request

4  for -- in responses to the request for

5  admission of the Sternberg defendants to

6  plaintiff's request for admission, first

7  request on July 18 asking you to confirm

8  you're going to provide proper responses, a

9  second request dated July 21st, and

10  yesterday, I also called you, Mr. Ross, and

11  asked if you're going to provide responses.

12          Are you going to provide proper

13  responses?

14          MR. ROSS:  I'm not here to

15  testify, but I'm going to let you say --

16          MR. LIGHTMAN:  I will take that

17  as confirmation that you're refusing --

18          MR. ROSS:  You can take it as

19  what was said.  That's all you can take it

20  as.

21          MR. LIGHTMAN:  Okay.  I asked you

22  to confirm it.  You haven't confirmed it so

23  I'm going to proceed on the assumption that

24  you're not.



```
 1                MR. ROSS:  That's fine.
 2                MR. LIGHTMAN:  Mr. Weiss, at your
 3    deposition here a week ago today, you
 4    agreed to send Mr. Ross and I a copy of the
 5    Feb -- draft of the agreement.  You first
 6    claimed it wasn't in agreement because it
 7    wasn't fully signed, but we asked for the
 8    draft of that, and you promised to send it
 9    to us.  You haven't sent it.  I asked you
10    yesterday, left you a voice message, to
11    bring that with you today.  Do you have
12    that?
13                MR. WEISS:  Just for the record,
14    we are outside of the discovery date, which
15    was July 19th.  Judge Younge gave you a
16    special courtesy to have it extended to
17    July 23rd.  As far as that goes, I will
18    reserve my rights to abide by Judge Younge.
19                MR. LIGHTMAN:  The question was,
20    you agreed to send it to us last week,
21    which was within the discovery deadline.
22    On July 16th, you agreed to send it to us
23    that day.  You didn't send it to us,
24    correct?
```



1              MR. WEISS:  Just to correct you,

2    I agreed to send it if I find it, so please

3    do not twist what I said.  If you want to

4    go back to the transcript, you'll see that

5    I told I will look for it and if I find it,

6    I'll bring it with me.

7              MR. LIGHTMAN:  Okay.  And did you

8    bring it here today?

9              THE WITNESS:  No.

10             MR. LIGHTMAN:  So you claim you

11   didn't find it, right?  That's your claim?

12             MR. WEISS:  I just told you in

13   plain English.

14             MR. LIGHTMAN:  Can I have your

15   phone?  I would like to check your phone to

16   see what's on there because I'm pretty sure

17   --

18             MR. WEISS:  You cannot have my

19   phone.  You cannot have my pen.  You cannot

20   have anything.

21             MR. LIGHTMAN:  So the record will

22   reflect that I asked you to produce -- your

23   phone is sitting less than 5 feet away from

24   me.  I'm pretty sure that she texted it to



```
 1    you so it should be on your phone.  You're

 2    refusing to let me look through your phone,

 3    correct?

 4              MR. WEISS:  Who text what?

 5              MR. LIGHTMAN:  Zekaria texted you

 6    the agreement on February 6th, as evidenced

 7    in DZ-9.  You admitted that that's a true

 8    and correct copy of the transcript of the

 9    WhatsApp application.  I'm asking you can

10    you give me your phone so I can look on

11    February 6th to see if the agreement is

12    there.  You're refusing to give me your

13    phone?

14              MR. WEISS:  You can -- you cannot

15    look in my phone.

16              MR. LIGHTMAN:  Okay.  You're

17    refusing.  And then lastly, do you have the

18    file of -- Joseph Ross file that you walked

19    off with last Tuesday at your deposition?

20              MR. WEISS:  Okay.  Just to --

21              MR. LIGHTMAN:  Do you have it

22    with you today, yes or no?

23              MR. WEISS:  Listen to me --

24              MR. LIGHTMAN:  I asked you a
```



```
 1    question and then you can say whatever you
 2    want.  Do you have Mr. Ross's file to
 3    return to him?
 4              MR. WEISS:  Listen, I did send an
 5    e-mail to Mr. Ross, and I asked him if he
 6    would like it back.  He did not answer till
 7    now.  And I took his answer as it's not
 8    necessary to bring it.
 9              MR. LIGHTMAN:  Yesterday --
10              MR. WEISS:  It's none of your
11    business.
12              MR. LIGHTMAN:  Yesterday Mr. Ross
13    and I called you on the telephone.  We left
14    you a message to bring his file with you,
15    and also to bring --
16              MR. WEISS:  Did you speak to me
17    yesterday?
18              MR. LIGHTMAN:  I left a voicemail
19    message for you on your phone.
20              MR. WEISS:  I will check it later
21    on.  Okay?
22              MR. LIGHTMAN:  So you didn't
23    return the documents you took from him,
24    right?
```



```
1              MR. WEISS:  I didn't take, from
2    anybody, a document.
3              MR. LIGHTMAN:  You took his file.
4              MR. WEISS:  No.  It was placed
5    among my papers when I gathered them up.  I
6    left from here and when I came home, I
7    discovered that it was here, papers that do
8    not belong to me.  I sent you an e-mail
9    thanking you for leaving the transcript in
10   -- among my papers, and you answered that
11   you did not leave it for me.  So apparently
12   some kind of mistake happened.  Your tone
13   of accusation is not acceptable, and by
14   that, I will conclude with talking to you
15   today.
16             MR. LIGHTMAN:  Let the record
17   reflect that Mr. Weiss took Mr. Ross's
18   files.  He was -- numerous requests were
19   made to him to bring the file, return it
20   today, including a voicemail that Mr. Ross
21   and I left on his voicemail yesterday, and
22   that he's failed and refused to return to
23   Mr. Ross the documents and files he took
24   from Mr. Ross.
```



```
 1            I'm done my preliminary comments.
 2   Thank you.
 3            MR. WEISS:  Just -- can I ask you
 4   something, Mr. Ross?
 5            MR. ROSS:  Yes.
 6            MR. WEISS:  Did you ask me to
 7   return those?
 8            MR. ROSS:  I don't know, but I
 9   would like --
10            MR. WEISS:  What do you think?  I
11   think you --
12            MR. ROSS:  I believe you, but I
13   didn't see it, and I would like it back at
14   some point.
15            MR. LIGHTMAN:  Were you on the
16   phone call with me when we left a voicemail
17   message for Mr. Weiss?
18            MR. ROSS:  I was.
19            MR. LIGHTMAN:  Yes, you were.
20   And during that phone call, did you not ask
21   him to bring your files back?
22            MR. ROSS:  That is true.
23            MR. LIGHTMAN:  Okay.
24            MR. ROSS:  But I don't need it
```



```
 1              today.  All right.
 2                      Manfred, can you still hear us?
 3                      MR. STERNBERG:  Yes.
 4   BY MR. ROSS:
 5   Q.        All right.  Good morning, Mr. Scully.
 6   A.        Good morning.
 7   Q.        As you know very well, I represent Manfred
 8   Sternberg in the case you had brought on behalf of
 9   your company against he and several other
10   defendants, and we're here today for your
11   deposition.
12              Have you ever been deposed before?
13   A.        I have not.
14   Q.        Okay.  I think you've seen a few, at least
15   a few in this case --
16   A.        I have.
17   Q.        -- but just for the sake of the record and
18   reminders for both of us, I'll give you a couple --
19   I'll go through a few instructions.
20              We want to make sure we let each other, you
21   know, finish what it is that we're saying.  So I'm
22   going to ask a lot of questions you probably know
23   before I even finish them, but just let me finish
24   them for the sake of the record and the court
```



```
 1  reporter.

 2  A.        Gotcha.

 3  Q.        And I'm going to do my best to refrain from

 4  interrupting your answers.  When we -- throughout

 5  the deposition when we're talking to each other, we

 6  might usually nod or say um-hum.  That's stuff

 7  that's difficult to take down for the record, so

 8  let's do what we can to be -- make sure every

 9  response is verbal.

10            If you have to guess, that's okay with me,

11  but just say that you're guessing or estimating or

12  anything like that.  If you don't know, you don't

13  know, that's fine.  If the question is confusing,

14  you can say that or you can ask me to reword it.

15  Whatever I hand you, you know, you can take as much

16  time as you need to look through it so you're

17  familiar with it.

18            Are you -- do you take any medications you

19  think might impede your ability to tell the truth?

20  A.        No.

21  Q.        Okay.  I think that's it.

22            Do you recall we sent you interrogatories

23  in April of 2024?  I forget the date, but April --

24  A.        I don't know the date, but you did send
```



```
 1  interrogatories.
 2  Q.        And you sent responses to those?
 3  A.        Yes.
 4  Q.        Have you brought today any supplemental
 5  responses --
 6  A.        No.
 7  Q.        -- to those same interrogatories?
 8            All right.  In -- what materials have you
 9  reviewed in preparation for your deposition today?
10  I don't want to -- let me -- one more thing.  I
11  don't want to know anything you said to your
12  attorney or he said to you.  Any question that
13  suggests that I'm asking that, you can just leave
14  all that out.  And obviously, if he objects and
15  you're answering, stop answering, or if you're not
16  answering yet, don't answer until he tells you it's
17  okay to answer.
18  A.        I reviewed the amended complaint.
19  Q.        Okay.  Anything else?
20  A.        I reviewed the interrogatories that you
21  sent.
22  Q.        Okay.  The April ones?
23  A.        I don't know the date.
24  Q.        All right.  Anything else?
```



```
1   A.        No.
2   Q.        Did you speak to anybody other than
3   Mr. Lightman in the past few days about this
4   deposition?
5   A.        Just to notify my staff that I would be out
6   of the office.
7   Q.        Okay.  When you said you reviewed our
8   interrogatories, I know you're not sure -- exactly
9   sure which ones.
10            Did you review your responses together with
11  the interrogatories?
12  A.        No, I just looked at your questions --
13  Q.        Just the questions.
14  A.        -- and then -- and I have responses for
15  you.
16  Q.        Okay.  All right.  So is it fair to say
17  that you believe you've complied with all the
18  discovery requests directed to you so far?
19  A.        Yes.
20                    MR. LIGHTMAN:  Objection.  From
21            time to time, I'll assert an objection.
22            Just ignore it, unless I direct you not to
23            answer.  I'm just preserving the record.
24                    THE WITNESS:  Say the question
```



```
 1           again, Joe.
 2   BY MR. ROSS:
 3   Q.      The question was:  Do you believe you've
 4   complied with all discovery requests directed to
 5   you?
 6                   MR. LIGHTMAN:  Objection.
 7                   THE WITNESS:  Yes.
 8   BY MR. ROSS:
 9   Q.      And your responses to the interrogatories
10   we discussed, those were -- you signed a
11   verification page for those; do you recall that?
12   A.      I do not recall, but if it's required, I
13   know we -- we abide by what's required.
14   Q.      And what about the document request; do you
15   recall signing a verification for those?
16   A.      I do not.
17   Q.      Is it -- is it fair to say that you took
18   the position on those April 2024 interrogatories
19   that there were a number of them that you didn't
20   have to respond to because you had already responded
21   to 25 interrogatories from --
22                   MR. LIGHTMAN:  Objection.
23   BY MR. ROSS:
24   Q.      -- the Sternberg defendants?
```



```
 1   A.        Yeah, your -- you had too many questions.
 2   Q.        If you think that was too many, wait until
 3   today.
 4             So there's a number of interrogatories you
 5   didn't respond to.  Your position is you don't have
 6   to.  I'm not impunging your position, but there's
 7   several you didn't respond to --
 8                       MR. LIGHTMAN:  Objection.
 9   BY MR. ROSS:
10   Q.        -- right?
11                       MR. LIGHTMAN:  You can answer.
12                       THE WITNESS:  Yeah, we responded
13        to everything.
14   BY MR. ROSS:
15   Q.        Did you bring any documents with you today?
16   A.        I just brought a copy of the amended
17   complaint.
18   Q.        All right.  Anything else?
19   A.        No.
20   Q.        And let's recap the deposition so far.  You
21   attended two deposition sessions with Mr. Weiss, who
22   -- who is present here today, right?
23   A.        Correct.
24   Q.        You attended my client Manfred Sternberg's
```



```
 1  deposition in February?

 2  A.        Correct.

 3  Q.        And then you attended something like a

 4  deposition with Ms. Zekaria, right?

 5  A.        Correct.

 6  Q.        Okay.  So other than reviewing the

 7  documents you talked about, is there anything else

 8  you did to prepare for the deposition today?

 9                    MR. LIGHTMAN:  Other than

10         attorney-client privilege?

11                    MR. ROSS:  Yes.  Yes.

12  BY MR. ROSS:

13  Q.        Anything that does not involve

14  communication with your attorney.

15  A.        I just read over the amended complaint.

16  Q.        Okay.  Isn't it true that you never spoke

17  to Mr. Sternberg before wiring the money into the

18  account?

19  A.        The only correspondence with Sternberg was

20  through -- through the brokers.  So there was phone

21  calls, e-mails, texts, and communication through the

22  brokers with Mr. Sternberg.

23  Q.        With -- okay.

24                    But never any communication with him at
```



```
 1   least -- eventually I think there was, in the lead
 2   up to the lawsuit, right?
 3   A.        Correct.
 4   Q.        But before the -- before wiring the money,
 5   there was no direct communication with him?
 6   A.        Only indirect, only through the brokers.
 7   Q.        Okay.  All right.  I --
 8                  MR. LIGHTMAN:  Just before you
 9             continue, I would like to just note the
10             significance of why we marked TSH-1,
11             Deposition Exhibit Sternberg-40.  Some of
12             the texts that were never produced by your
13             client include Dick Gray saying:  Hey,
14             trying to get a few orders in.  The Safety
15             House wire is in your account for
16             $1,965,600.  Please process for 151,200
17             iHealth test kits.  More to follow.
18             Thanks, Dick.  And it says:  Please add the
19             invoice number to the previous SPA docs for
20             The Safety House and send it when you get a
21             chance.  Thanks.  Please, please call me.
22             Important.  And the phone number.  Thanks,
23             Dick.  And that's on page 9 of Deposition
24             Exhibit TSH-1, also marked Deposition
```



1  Exhibit Sternberg-40.

2          And if you look at page 10 of

3  these texts that should have been produced

4  by Mr. Sternberg, but never were produced,

5  it says:  There's a third order we

6  discussed, 151,200 going to The Safety

7  House, and his address.  That's on page 10.

8  He's talking about The Safety House has

9  another hundred thousand purchase order in

10  hand that he would wire after the 151,200

11  kits are given to the customer on the first

12  order.  That's on page 10.

13          And on page 11 where Dick says:

14  Please see my e-mail.  The order for the

15  151,200 has the wrong names on the bill of

16  sale.  It should be thesafetyhouse.com, not

17  Hand Safety.  Thanks.

18          Manfred replies:  Waiting on Sam

19  to sign.  And then Dick Gray's writing:

20  Manfred, Dan wants to know where his

21  product is located.  Bill of sale states

22  product title is transferred to buyer.  Dan

23  would like to know where is his product

24  located and when he will receive it,



1   please.  Thank you.

2            And later on he writes:  Hey,

3   Manfred.  Is there any way you think Sam

4   will help me with this?  I sent this to

5   Sam.  The trucks are not there.

6            And then he writes:  Hey, Sam.

7   Is the supplier going to deliver, or do you

8   think he's defrauding everyone?  I'd

9   appreciate your opinion.  Thanks.  That's

10  on page 11 of the text that Manfred failed

11  to produce.

12           And then on page 13, it says:

13  Manfred, please refund the first order from

14  Dick's client.  I do not deal with such

15  people.  People that threaten can never be

16  my clients.  And then -- that's on page 13.

17  On page 14, there's a bunch of screenshots.

18  One where he writes:  My customer is about

19  to file a fraud claim on these guys for

20  iHealth.  And Manfred writes back:  Okay.

21  I'm refunding you now.  Lose my number.

22  Find a new vendor.  Just -- that's on page

23  15.  Examples of texts that were never

24  produced by Manfred Sternberg that should



```
 1              have been produced in discovery.
 2                        THE WITNESS:  So there's a lot
 3              that went on behind the scenes with the
 4              broker and Manfred --
 5  BY MR. ROSS:
 6  Q.      There's no question pending, Mr. Scully.
 7                        MR. LIGHTMAN:  Just wait till he
 8              asks a question.
 9                        MR. WEISS:  Mr. Ross --
10                        MR. ROSS:  Were you reading from
11              here?
12                        MR. LIGHTMAN:  Yes.
13                        MR. ROSS:  Okay.
14                        MR. WEISS:  Mr. Ross --
15                        MR. LIGHTMAN:  If you look at
16              page --
17                        MR. ROSS:  How do we know what
18              the -- did you type these up, Mr. Lightman?
19                        MR. LIGHTMAN:  No.  These are
20              texts that --
21                        MR. ROSS:  How do I know these
22              are texts, Mr. Lightman?
23                        MR. LIGHTMAN:  These are texts we
24              got from --
```



```
 1              MR. ROSS:  How do I know that?

 2              MR. LIGHTMAN:  Sternberg's broker

 3    sent them to us.  Have Sternberg call Dick

 4    Gray and say you know the texts between me

 5    and you --

 6              MR. ROSS:  I don't have to

 7    authenticate these, sir.  You have to you

 8    authenticate these.  This is just writing.

 9    Somebody just wrote this.

10              MR. LIGHTMAN:  Oh.  I have a

11    motion pending for you to produce these

12    documents and other documents, and that's

13    when they'll be authenticated, but call

14    Dick Gray.

15              MR. ROSS:  Did you check if these

16    were in the text messages we produced to

17    you already?

18              MR. LIGHTMAN:  They're not.

19              MR. WEISS:  Mr. Ross --

20              MR. ROSS:  Are you sure about

21    that?

22              MR. LIGHTMAN:  Do you have a

23    document number?

24              MR. ROSS:  Or did you --
```



1          MR. LIGHTMAN:  Do you have a
2   document number because I haven't seen
3   them?
4          MR. ROSS:  It looks like
5   something somebody typed up for you.
6          MR. LIGHTMAN:  These are what
7   Dick Ray sent us, your broker.
8          MR. ROSS:  Did you depose him?
9          MR. LIGHTMAN:  Are you done with
10  the deposition?
11         MR. ROSS:  No, but you're done
12  until -- first of all --
13         MR. LIGHTMAN:  Mr. Weiss, you'll
14  have your chance to ask all the questions
15  you want.
16         MR. WEISS:  You're interrupting
17  the -- the depo -- the person that is being
18  deposed.  You are taking away a lot of time
19  from the time that Mr. Ross has today to
20  ask him questions.  Your interruptions --
21         MR. LIGHTMAN:  Ask any and all
22  questions you want.
23         MR. WEISS:  -- are not in -- not
24  proper.



```
 1                    MR. LIGHTMAN:  The documents --
 2                    MR. WEISS:  To say the least,
 3          they're not proper.  Mr. Scully's here to
 4          answer the questions from Mr. Ross.  If you
 5          like -- if you have objection, you say
 6          objection.  Nobody ask you to write
 7          transcript or read transcripts and anything
 8          like this.  Don't put words into his mouth
 9          during the deposition, please.
10                    MR. LIGHTMAN:  Next question,
11          please.
12                    MR. ROSS:  I will say we're not
13          going to do any more exhibits or questions
14          from Mr. Lightman until it's his turn.
15                    MR. LIGHTMAN:  Okay.  That's
16          fine.
17   BY MR. ROSS:
18   Q.      All right.  We're going to go backwards a
19   little bit.
20          Can you state your full name for the
21   record?
22   A.      Dan Scully.
23   Q.      Do you have a middle name?
24   A.      Joseph.
```



```
1   Q.      Strong name.

2           And how old are you today?

3   A.      61.

4   Q.      What's your birth date?

5   A.      December 19, 1962.

6   Q.      Have you ever gone by any other names?

7   A.      No -- well, Daniel, Daniel Joseph Scully.

8   Q.      Does the name O'Mara(ph)?

9   A.      Yeah.

10  Q.      Daniel -- Dan J. O'Mara?

11  A.      Yeah.

12  Q.      Who's that?

13  A.      He's a good friend of mine.

14  Q.      And where do you know him from?

15  A.      Grade school.

16  Q.      How about Daniel Sealy?

17  A.      Daniel Sealy?

18  Q.      Yeah, S-E-A-L-L-Y.

19  A.      I don't know that name.

20  Q.      You've never gone by the name Dan J.

21  O'Mara, right?

22  A.      No.

23  Q.      That's just a friend?

24  A.      Yeah.
```



```
 1   Q.        Do you still use the e-mail
 2   dans@thesafetyhouse.com?
 3   A.        I do.
 4   Q.        What about dan.scully@verizon.net?
 5   A.        I do not use that.
 6   Q.        Does that belong to you?
 7   A.        Verizon closed it down, so I don't -- I
 8   don't use it anymore.
 9   Q.        What do you mean by that?
10   A.        They -- they were bought out by AOL and
11   they closed down the e-mail so I can't use it.
12   Q.        Oh, the verizon.net --
13   A.        Yeah.
14   Q.        -- is no longer --
15   A.        Yeah.
16   Q.        So it doesn't function?
17   A.        It doesn't fun -- yeah.
18   Q.        It was yours --
19   A.        Yeah.  Yeah, I used to --
20   Q.        -- but you don't use --
21   A.        -- use it all the time.
22   Q.        Sorry.
23             What about djs325@aol?
24   A.        I don't want use that either.
```



```
1   Q.        It used to be yours --

2   A.        Yeah.

3   Q.        -- it doesn't work anymore because of AOL?

4   A.        AOL, yep.

5   Q.        What about djs325@gmail.com?

6   A.        I don't have that.

7   Q.        Was that ever yours?

8   A.        No.

9   Q.        What's the -- what is thescully.com?

10  A.        That's just an e-mail that we used to use.

11  So dan@thescully.com or jill@thescully.com.

12  Q.        Oh, like a family web -- like, an e-mail

13  web --

14  A.        Yeah, all the family used to use that.

15  Q.        All right.  But you don't use that -- any

16  e-mail from there these days?

17  A.        I do not.

18  Q.        What's the plaintiff's business address?  I

19  know -- just for the record, to be clear, your

20  company is the plaintiff, and you're here as a

21  corporate designee.

22  A.        Right.  The plaintiff is

23  thesafetyhouse.com.  The address is 99 Aldan,

24  A-L-D-A-N, Avenue, Suite 5, and that's in Glen
```



```
 1  Mills, Pennsylvania.
 2  Q.        What's the business phone number?
 3  A.        (610) 344-0637.
 4  Q.        And that's like a -- that's a landline
 5  office number?
 6  A.        That's a landline.
 7  Q.        And what's your phone number?
 8  A.        The office, it's the same number.  My
 9  extension is 325.
10  Q.        And what's your mobile number?
11                     MR. LIGHTMAN:  Don't answer the
12             question.
13                     THE WITNESS:  Gotcha.
14                     MR. ROSS:  Is there an objection?
15                     MR. LIGHTMAN:  Yep.  You guys are
16             fraudsters.  We don't trust you having his
17             cell phone.
18                     MR. ROSS:  I'm happy to hear it.
19             What's the objection?  A valid objection
20             under the rules, of course.
21                     MR. LIGHTMAN:  Look to your left.
22                     MR. ROSS:  Just to be clear,
23             you're instructing him not to answer?
24                     MR. LIGHTMAN:  I'm instructing
```



```
 1              him not to give -- divulge his cell phone

 2              number.  I've got a person sitting to your

 3              left that first swore under oath that when

 4              he went to pick up the test kits, they

 5              disappeared at Available Movers.  I then

 6              have the same person who now swore that

 7              they turned to rice, but I'll -- I'll wait.

 8                      MR. ROSS:  Well, you --

 9                      MR. LIGHTHOUSE:  I'll wait.  But

10              I'm not going to divulge his cell phone

11              absent an order from the court.

12                      MR. ROSS:  Will you divulge it to

13              me privately?

14                      MR. LIGHTMAN:  Yes.

15  BY MR. ROSS:

16  Q.      Do you have just one cell phone?

17  A.      Correct.

18  Q.      And do you own a home?

19  A.      I do.

20  Q.      What's that address?

21  A.      I'm not telling you.  Same reason.

22                      MR. ROSS:  Are you instructing

23              him not to answer?

24                      MR. LIGHTMAN:  He's not
```



```
 1              divulging.  If you want to court order it,
 2              let me know, otherwise I'll tell you
 3              privately.
 4    BY MR. ROSS:
 5    Q.        Okay.  Have you ever had a fore --
 6    residential foreclosure?
 7    A.        No.
 8    Q.        Do you own the home you live in now?
 9    A.        I do.
10    Q.        How long have you lived there?
11    A.        Twenty-plus years.
12    Q.        And who do you live with now?
13    A.        My family.
14    Q.        Who's that?  I don't need necessarily any
15    names, but just --
16    A.        My wife and my kids.
17    Q.        How many kids?
18    A.        Two kids.
19    Q.        Adults or children?
20    A.        Adults, 20-plus.
21    Q.        I hate to say it, but 20 seems like
22    children to me now that I'm 40 -- 41.
23    A.        Yeah.
24    Q.        Do you own any other residential or
```



```
 1  commercial property?

 2  A.      Yes.

 3  Q.      All right.  What other residential

 4  properties do you own?

 5                  MR. LIGHTMAN:  Objection.  Why is

 6          that relevant?

 7                  THE WITNESS:  I'm not telling

 8          you.

 9                  MR. LIGHTMAN:  Is that relevant?

10                  MR. ROSS:  That's not a basis for

11          an objection.

12                  MR. LIGHTMAN:  Okay.

13                  MR. ROSS:  You're always

14          e-mailing us about the rules, Mr. Lightman.

15                  THE WITNESS:  I'm uncomfortable

16          telling you.

17                  MR. ROSS:  That's also not among

18          the rules.

19  BY MR. ROSS:

20  Q.      What other commercial properties do you

21  own?

22  A.      None.

23  Q.      All right.  Have you ever sought commercial

24  bankruptcy protection?
```



```
 1  A.        No.

 2  Q.        What about personal bankruptcy protection?

 3  A.        No.

 4  Q.        Did you go to high school?

 5  A.        I did.

 6  Q.        Where?

 7  A.        Springfield, Pennsylvania.

 8  Q.        What was the name of the school?

 9  A.        Cardinal O'Hara.

10  Q.        And when did you graduate?

11  A.        1981.

12  Q.        And then did you go to college?

13  A.        Two years.

14  Q.        Where at?

15  A.        West Chester University.

16  Q.        Did you obtain a degree?

17  A.        I did not.

18  Q.        When did you -- when did you finish West

19  Chester?

20  A.        '84, '83.  I don't remember.

21  Q.        Any college degrees?

22  A.        No.

23  Q.        Do you have any license, like state issued

24  licenses, aside from a driver's --
```



```
 1   A.        I do not.
 2   Q.        -- license?
 3                   MR. LIGHTMAN:  Other than a
 4           driver's license?
 5                   MR. ROSS:  Other than a driver's
 6           license.
 7                   THE WITNESS:  He said that.
 8                   MR. LIGHTMAN:  Okay.
 9                   MR. ROSS:  I always forget to say
10           that so I made it a point.
11   BY MR. ROSS:
12   Q.        All right.  Are you the sole owner of The
13   Safety House?
14   A.        I am.
15   Q.        And what kind of entity is that?
16   A.        The Safety House is an S corporation.
17   Q.        Are there any directors or officers aside
18   from yourself?
19   A.        No.
20   Q.        And do you have an official title in the
21   corporate --
22   A.        President.
23   Q.        -- documents?
24                   Again, you're -- I'm doing it to you too.
```



```
 1   Let's try and just finish each -- it's -- it can be
 2   difficult especially when we're in a rhythm.
 3           What -- what did you do for employment
 4   after high school?
 5   A.      After high school?
 6   Q.      Your first employment after high school.
 7   A.      I worked for a company called Creative
 8   Innovations.
 9   Q.      What did they do?
10   A.      They sold -- they manufactured products in
11   asbestos abatement market for the removal of
12   asbestos.
13   Q.      Okay.  How long were you there?
14   A.      I don't remember.
15   Q.      Okay.
16   A.      Prob --
17   Q.      I'm sorry.  Go ahead.
18   A.      Two, three years maybe.  I'm not sure.
19   Q.      And where did you go after that?
20   A.      I formed the company called Regency
21   International with three gentlemen from England.
22   Q.      How did you come to start a company with
23   several Brits?
24   A.      It's a long story.
```



1  Q.        Is there Cliff notes?  I don't -- you don't

2  have to give me all the details.

3  A.        I met them at a trade show, we hit it off,

4  and they wanted to bring their products into the

5  states.

6  Q.        And what did you -- what did that business

7  entail in terms of the products?

8  A.        In asbestos removal there are certain

9  products needed to do the job.  They manufactured,

10  they're called, Decon Showers.  D-E-C-O-N showers.

11  They man -- manufactured that product and wanted me

12  to import it into the states.

13  Q.        Something that can get asbestos off --

14  A.        When you --

15  Q.        -- of something?

16  A.        When you remove asbestos, in order to go in

17  and out of an asbestos area, you have to go through

18  this chamber and go out of this chamber.  There's no

19  way in or out of an asbestos work site unless you go

20  through this chamber, and you shower off after you

21  -- after you're done removing.

22  Q.        Okay.  And how long did you have that

23  business?

24  A.        I was with them since 1987 to 1993.



1  Q.        And why did -- why did it -- why did you
2  stop?
3  A.        I bought them out in '93.
4  Q.        All right.  How long did you have that
5  business after you bought it out?
6  A.        That's in business today.  Since 1993 till
7  the present.
8  Q.        And that's independent of The Safety House?
9  A.        What, the --
10 Q.        Yeah, I'm asking.
11           Is Regency a separate --
12 A.        Yeah, that was them -- that was the company
13 I had with them.  They -- I bought them out.  We
14 dissolved that and then I -- I started my own
15 company.
16 Q.        Does it still do the sort of Decon shower
17 sales that it did before?
18 A.        No, I don't do anything that I did with the
19 British.  No.  That was just a very specific line.
20 My -- my product is -- I'm a full line distributor
21 now.
22 Q.        What does that mean?
23 A.        So what my -- what my company does is we go
24 to manufacturers or other larger distributors or



1  other brokers and we buy large volume of safety

2  products in -- in bulk.  So we'll buy them in a

3  container, we'll ship them into our warehouse, we'll

4  house them in the warehouse, and then we'll resell

5  them to other customers at a markup.

6  Q.       And that's -- are those different products

7  than what The Safety House sells?

8  A.       No, same -- I'm sorry, I don't understand

9  the question.

10  Q.       I can -- we can get back to that.

11  A.       Okay.

12  Q.       So after Creative Innovations, you -- you

13  work on Regency with these folks then you buy them

14  out.  In '93, you bought them out?

15  A.        '93, '94ish.

16  Q.       And then in addition to continuing Regency

17  on your own, did you do anything else for -- for

18  work?

19  A.       I didn't continue as Regency.  I continued

20  as American Environmental doing business as The

21  Safety House.

22  Q.       Okay.  So Regency -- and that's -- you

23  know, my question was poorly phrased, but that's --

24  Regency sort of just gets bought out, turns into



```
 1  American Environmental?
 2  A.        Yeah, it's dissolved.
 3                    MR. LIGHTMAN:  Objection.  He
 4         said it was dissolved.
 5                    MR. ROSS:  Okay.
 6                    THE WITNESS:  Here in the states.
 7  BY MR. ROSS:
 8  Q.        All right.  You did similar business, but
 9  no -- because Regency was dissolved, you no longer
10  did it as Regency, you did it as American
11  Environmental?
12  A.        Right, but I didn't sell any of the
13  products that I was importing from England.
14  Q.        Okay.
15  A.        Those products were -- I didn't sell those.
16  Q.        And aside from -- for the record, American
17  Environmental Enterprises, it -- The Safety House is
18  doing business as American Environmental, right?
19  A.        Correct.
20  Q.        Now, do you have any other companies active
21  today?
22  A.        Yes, so there's American Environmental
23  Enterprises, Inc., there's American Environmental
24  Supply, LLC, and they're all doing business as The
```



```
 1   SAFETYhouse.com.
 2   Q.      And what's the difference between those two
 3   American Environmental companies?
 4   A.      There's no difference.  We -- we felt that
 5   as the years progressed and as the Internet and the
 6   web became popular, we felt that The SAFETYhouse.com
 7   would be a more acceptable name in the marketplace
 8   for what I do.
 9   Q.      Well, why is there an American
10   Environmental Enterprises, Incorporated and an
11   American Environmental Supply, LLC?
12   A.      We also have what's called a GSA schedule.
13   That is a -- the GSA has created what's called GSA
14   Advantage.  We put products on their website.  All
15   the agencies go there to make purchases.  At the
16   time when I was soliciting the GSA schedule to put
17   products on there, we decided to use a different
18   name called American Environmental Supply, LLC.
19   Q.      And just for the record, what is GSA?
20   A.      So GSA is a Government Service
21   Administration, and it's a website that is created
22   so that all the agencies of the government can go to
23   a website and buy product.  It's a way the
24   government wants to streamline their purchasing, you
```



1  know, make the purchasing more efficient.

2  Q.      Why did you decide to use the LLC instead

3  of the -- the Inc.?

4  A.      It was -- it had to deal with the

5  government agency -- the government listing and

6  stuff in that regard.  It was prior to the Internet

7  really taking off.

8  Q.      What was it about the LLC that made it

9  better?

10  A.      Nothing.  Nothing.  In hindsight, it was a

11  mistake.

12  Q.      Why was it a mistake?

13  A.      Just because now I just want to promote The

14  SAFETYhouse.com, and in order to change it on the

15  GSA contract, it's like an act of congress.  It's so

16  difficult to change and it's just a nuisance.

17  Q.      What about Foxbax, Inc., F-O-X-B-A-X, Inc.?

18  A.      Fox?

19  Q.      Foxbax, B-A-X, Inc.?

20  A.      Never heard of them.

21  Q.      So you don't know whether Joe Scully is the

22  vice president of that company?

23  A.      No.

24  Q.      What about S&S International, Inc.; do you



```
 1  know anything about that?
 2  A.       Yep.
 3  Q.       What's that?
 4  A.       That was a -- I'm not even sure how it was
 5  filed.  One of the British guys that I was partners
 6  with wanted to import certain goods into the states
 7  using that -- using that company entity.  We were
 8  importing -- at the time, way back when, 20 years
 9  ago, we were importing Bart Simpson dolls, believe
10  it or not, and we used that entity.
11  Q.       And I've done this already, but American
12  Environmental Enterprises is an S Corp., The
13  SAFETYhouse.com is a d/b/a?
14  A.       Ii's a fictitious name, d/b/a, correct.
15  Q.       So who did the funds wired to
16  Mr. Sternberg's account belong to before they were
17  wired?  In other words, did they belong to American
18  Environmental Enterprises, Inc.?
19  A.       D/b/a The Safety House, yes.
20  Q.       Those were funds from a company account?
21  A.       Yep.
22  Q.       And what bank -- what bank was that?
23                  MR. LIGHTMAN:  You have the bank
24          and the wire information.
```



```
 1                    MR. ROSS:  That wasn't the

 2        question.

 3                    MR. LIGHTMAN:  Well, I don't like

 4        divulging my client's --

 5                    THE WITNESS:  I'm not comfortable

 6        --

 7                    MR. ROSS:  -- bank while Mr. Gary

 8        Weiss is in the room.

 9                    THE WITNESS:  Yeah.

10                    MR. ROSS:  If you want to

11        testify, I'll send you a deposition notice.

12                    THE WITNESS:  Yeah, please do.

13  BY MR. ROSS:

14  Q.      Okay.  So your attorney represented that

15  the bank name is in the documents.  Does that sound

16  right to you?

17  A.      That sounds right.

18  Q.      Does the plaintiff company have any

19  investors?

20  A.      No.

21  Q.      Has it ever?

22  A.      No.

23  Q.      How would you describe the business of The

24  Safety House today?
```



```
1   A.        How would I describe it?

2   Q.        Yeah.

3             What is it in the business of?

4   A.        What do we do?

5   Q.        Right.

6   A.        The SAFETYhouse.com is a wholesale

7   distribution company that buys and sells products

8   for distribution in the environmental safety

9   industry.  We deal with safety products, hazmat,

10  disaster relief.

11  Q.        And part of that is sales of personal

12  protective equipment, right?

13  A.        It's all personal protective equipment,

14  depending on the -- depending on the disaster.

15  Q.        How did the COVID-19 pandemic that began in

16  2020 affect the business?

17  A.        It increased our sales.

18  Q.        You must have been -- is it fair to say

19  that you were far busier at least at the outset of

20  the pandemic than prior to it?

21  A.        Correct.

22  Q.        Significantly increased demand, is that

23  fair to -- fair to say as well?

24  A.        Wait.  Say the question.
```



1  Q.        Did you see significantly increased demand?

2  A.        We did.

3  Q.        Did your prices change in 2020?

4  A.        Not really, no.  I mean, depending on the

5  item.

6  Q.        So maybe, but no more --

7  A.        I mean --

8  Q.        -- no more than usual, in general?

9  A.        It depends on the item.  So if -- because

10 during the pandemic, we were really struggling to

11 get product.

12 Q.        What was your top selling product during

13 the pandemic -- let's just say in 2020, for the

14 record, for the ease of referring?

15 A.        If I had to guess, I would say, in 2020,

16 coveralls.  We sell coveralls to protect the worker.

17 Q.        What about 2021?

18 A.        I mean, again, I can't guess.  I won't

19 really know.  Maybe plastic sheathing.  We sell a

20 lot of plastic sheathing.

21 Q.        So you were profitable in 2020?

22 A.        2020, yeah, we were profitable.

23 Q.        Between then and now, have you had -- has

24 the company had any -- let me just clarify.  If I



1  say you, I mean the company unless I specify that

2  I'm asking you, as an individual.

3  A.       Okay.

4  Q.       Between 2020 and today, has it been a year

5  that the company wasn't profitable?

6  A.       Between now and?

7  Q.       And, like, January 1, 2020, let's say.

8  A.       We're profitable.

9  Q.       Every year since then?

10 A.       Yeah, slightly.  I mean, we're a small, you

11 know, individually owned company, so.

12 Q.       Did you get any paycheck protection program

13 assistance during the pandemic?

14 A.       Paycheck?  No, no paycheck.

15 Q.       Did you get any kind of assistance from the

16 Small Business Administration during the pandemic?

17 A.       We did -- there was a program that the

18 government offered that we got some money from.

19 Q.       What was the name of that?

20 A.       I don't remember.

21 Q.       Do you remember how much?

22 A.       It was like a hundred thousand-plus.  I

23 don't remember the dollars.

24 Q.       And what was that for?



```
 1  A.        The government was offering money to
 2  companies, so I applied through my accountant and
 3  got it.
 4  Q.        Do you remember what it was used for?
 5  A.        Payroll, I believe.
 6  Q.        And was that -- was that in 2020?
 7  A.        I could look it up.  I don't exactly
 8  remember the date, no.
 9  Q.        And how many employees did you have in
10  2020?
11  A.        I would -- I would guess -- I'm guessing
12  here.  Between -- about seven.
13  Q.        Did the company experience higher than
14  usual attrition in, you know, the 2020 to 2022
15  period because of the pandemic that you would
16  attribute to the pandemic?
17  A.        Attrition?  What do you mean by attrition?
18  Q.        Like, employees quitting or leaving, being
19  fired, anything like that.
20  A.        We were struggling with employees catching
21  COVID.
22  Q.        Did you find yourself -- did the company --
23  was the company short-staffed at certain --
24  A.        Yes.
```



```
1   Q.        -- points?

2   A.        Yes.

3   Q.        Did you need to lay anybody off during that

4   --

5   A.        We did not.

6   Q.        -- two-year period?

7             Do you -- are you short-staffed today?

8   A.        No.

9   Q.        How many people do you have today?

10  A.        Ten, including -- including myself.

11  Q.        Okay.  Was there ever a time in that period

12  -- strike that.

13            Did you have enough employees in the

14  2022 -- 2020 through 2023 time period to meet all

15  the customer needs given the increased demand?

16  A.        Yes.

17  Q.        There's no other ownership stake in The

18  Safety House, but yours, right?

19  A.        Yes.

20  Q.        Before 2020, had the company ever sold any

21  kind of test kits, like disease test kits?

22  A.        No.

23  Q.        What -- I know that you're the president,

24  right, of the company?
```



```
 1   A.        (Nods.)
 2   Q.        What's your day-to-day role when you go to
 3   work, in general?  Like, what's a general week look
 4   like?
 5   A.        A lot of sales.  I handle -- I still handle
 6   customers, a lot of sales.  I handle -- I handle a
 7   lot of -- I have a lot of hats.  I handle employee
 8   problems.  I handle customer problems.  I handle
 9   purchasing, large purchases.  I handle all the cash.
10   Q.        Does anybody else have access to, you know,
11   disburse company money, whether it's --
12   A.        Yes.
13   Q.        -- providing product or payroll, whatever?
14   A.        Yes.
15   Q.        All right.  Explain who that is.
16   A.        I have an outside consultant, CF -- or
17   controller, that handles that with me.
18   Q.        Okay.  What's that name?
19   A.        Kevin Kelly.
20   Q.        Is he -- is he a CPA?
21   A.        I don't think so, no.
22   Q.        All right.  And he -- only he and you have
23   any control over the company funds to --
24                        MR. LIGHTMAN:  Objection.
```



```
 1  BY MR. ROSS:
 2  Q.        When The Safety House purchases equipment,
 3  how many employees are involved in that decision
 4  about what -- what to buy?
 5                      MR. LIGHTMAN:  Objection.
 6                      THE WITNESS:  Depends on the --
 7            depends on the -- who the order's for, the
 8            customer, but usually me and one other
 9            person.
10  BY MR. ROSS:
11  Q.        Who is that?
12  A.        Whether it be one of the sales guys or
13  whether it be my purchasing agent.
14  Q.        That's -- that's two different people
15  though, right?
16  A.        Correct.
17  Q.        And what distinguishes a purchase where it
18  might just be you versus one where they might be
19  involved?
20  A.        What distinguishes it, what do you mean by
21  that?
22  Q.        You said depending on the -- did you say
23  depending on the size --
24  A.        No, it depends --
```



1  Q.      -- of the purchase?

2  A.      -- if it's one of my sales rep's customers

3  --

4  Q.      Okay.

5  A.      -- and there's some specifics about what he

6  needs, then we -- we discuss it.  And then we get --

7  we loop in the buyer and say, all right, here's what

8  you have to do.

9  Q.      And would those same people, depending on

10  the purchase, be also making the decision of how

11  much of that product to buy?

12  A.      Correct.  They would -- depending on the

13  request from the customer, we would make the

14  decision whether we're going to buy just enough for

15  the customer or we're going to buy more and stock

16  it.

17  Q.      So some -- does the company sometimes take

18  -- you know, just take a customer order from a

19  particular customer, we need this many and then get

20  it to them, and other times, I think, as you said,

21  buy extra to have on hand for other customers?

22  A.      Depending on the product.  A lot of times,

23  we will just -- we get a one-off, I mean a lot, we

24  get one-off, he wants this specific product, which



1   is odd for us to stock.  Like, for example, traffic

2   safety.  The other day, a guy wanted safety cones,

3   barriers.  We don't stock that stuff.  We went to

4   our vendor, we bought it, we resold it to our

5   customer.

6   Q.      How many employees are --

7                   MR. LIGHTMAN:  I need to take a

8           one-minute break.

9                   MR. ROSS:  All right.  We can

10          take a one-minute break.

11                  (At this time, a short break was

12          taken.)

13                  MR. LIGHTMAN:  My apologies.  I

14          had to take a short phone call from France,

15          and I rescheduled it for tomorrow.

16                  MR. ROSS:  No problem.

17  BY MR. ROSS:

18  Q.      Mr. Scully, does the company have general

19  counsel?

20  A.      No.

21  Q.      Is there an attorney the company has a

22  retainer with?

23  A.      No.

24  Q.      So how do you address legal decisions that



1  the company might have to make, whether it's, for

2  example --

3                      MR. LIGHTMAN:  Now?  Now?

4  BY MR. ROSS:

5  Q.      -- how do you have -- today, how do you

6  have contracts -- do you have contracts vetted

7  before the company enters them by -- by an attorney?

8  A.      Well, I'm not sure of the question.  I

9  don't have any contracts.  I'm not sure what you

10  mean by contracts.

11  Q.      The company doesn't -- is not a party to

12  any contracts of any kind, today?

13  A.      I mean, the only contracts that come to

14  mind are with my insurance.  That's it.  And I deal

15  with the broker -- the insurance broker on that, but

16  there's no -- I don't have any -- no, I have no

17  contracts.

18  Q.      There's no federal government contracts?

19  A.      I mean, I have what I told you earlier as a

20  GSA schedule, and that, I don't have -- I didn't

21  have an attorney.  I did it myself.

22  Q.      That didn't involve a contract?

23  A.      I mean, there's some -- there's probably

24  some legal document that enabled me to get that



1  scheduled.  I haven't seen it in 15 years.  It's

2  been a long time, so I couldn't even tell you if

3  there's a contract.

4  Q.      Does the company do business with any

5  municipalities?

6  A.      We do.

7  Q.      Do those involve -- those business

8  relationships involve --

9  A.      They involve --

10  Q.      Just let me -- I'm still doing it to you

11  too, so.

12          Do those relationships involve contracts?

13  A.      They involve what's called purchase orders.

14  Q.      Okay.  When's the last time you had an

15  attorney?  Aside from this case, when's the last

16  time you -- or any lawsuit, let's put it that way.

17  When's the last time the company had an attorney

18  review something related to the business?

19  A.      I can't recall.  Maybe in the formation of

20  the entity.

21  Q.      What about the sale and purchase agreement

22  that you entered into for this -- the transaction

23  giving rise to this lawsuit, did an attorney review

24  that before you executed on behalf the company?



```
 1   A.        Well, Manfred Sternberg, he's -- he

 2   reviewed it.  He sent it to us.

 3   Q.        Was he representing you?

 4   A.        He was the escrow agent.

 5   Q.        Did he represent The Safety House?

 6   A.        As the escrow agent.

 7   Q.        Did any attorney on behalf of The Safety

 8   House, other than Manfred Sternberg, review the sale

 9   and purchase agreement?

10   A.        No.

11   Q.        Why not?

12   A.        Because I had Manfred Sternberg.

13   Q.        What do you mean you had him?

14   A.        He was the -- he was the attorney.  He's

15   the one that fraudulently induced me acting as this

16   professional attorney with this agreement to sign

17   the SPA.

18                     MR. LIGHTMAN:  SPA is S-P-A,

19           referring to sale and purchase agreement.

20           Sorry to interrupt.

21                     MR. ROSS:  No, that's -- that's

22           good.

23   BY MR. ROSS:

24   Q.        Did the company have an engagement letter
```



```
 1   with Mr. Sternberg?

 2   A.        The SPA of -- nothing -- other than the

 3   SPA, no.

 4   Q.        Did you pay a retainer to Mr. Sternberg?

 5   A.        No.

 6   Q.        Did he ever send you a bill?

 7   A.        No.

 8   Q.        So there was no attorney hired by the

 9   company to review the SPA before you executed it for

10   the company?

11   A.        Correct.

12   Q.        What -- which employees are involved in

13   vetting The Safety House's suppliers?

14   A.        Vetting?  What do you mean by vetting?

15                    MR. LIGHTMAN:  Objection.

16                    THE WITNESS:  What do you mean by

17           vetting?

18   BY MR. ROSS:

19   Q.        Determining if they're capable of supplying

20   what they're telling you they're supplying you.

21                    MR. LIGHTMAN:  Objection.

22                    THE WITNESS:  So -- and I've been

23           doing this forever.  If we need product

24           that we want to buy, we call up the
```



```
 1              merchant, the vendor -- you good?
 2   BY MR. ROSS:
 3   Q.        Yeah.
 4   A.        And we say, hey, we're looking to buy X
 5   amount of product from you.  We just negotiate back
 6   and forth.  The vendor gives us their terms, whether
 7   it be wire up front, terms, 30-day net, payment
 8   terms, and we issue a purchase order, and they send
 9   us the goods.
10   Q.        And is that you?
11   A.        Me and another gentleman in the office, the
12   buyer.
13   Q.        What's his name?
14   A.        Dan Lomerson.
15   Q.        Can you spell that?
16   A.        L-O-M-E-R-S-O-N.
17   Q.        Was Mr. Sternberg a party to the SPA?
18   A.        He created it.
19   Q.        Was he a party to it?
20   A.        He sent it to us, yeah, of course.
21   Q.        Was there a line for him to execute it?
22                   MR. LIGHTMAN:  You're asking
23              whether he signed it or whether he's a
24              party to it?
```



```
 1                        MR. ROSS:  I'm asking whether he
 2          was a party to it.
 3                        THE WITNESS:  Yeah.
 4  BY MR. ROSS:
 5  Q.      A party.  A signatory.  Let's call it a
 6  signatory.
 7                        MR. LIGHTMAN:  No, no.  There's a
 8          difference between being a party to it and
 9          being a signatory.
10                        MR. ROSS:  Well, I'll ask both.
11                        MR. LIGHTMAN:  Okay.
12                        THE WITNESS:  He definitely -- he
13          was the whole -- he was the main guy.
14  BY MR. ROSS:
15  Q.      All right.  Was he a signatory to it?
16  A.      I don't know if he signed it or not.  I
17  couldn't tell you.  I don't think so.
18  Q.      Was there an escrow agreement for this --
19  for this transaction?
20                        MR. LIGHTMAN:  You mean a
21          separate escrow agreement?
22                        MR. ROSS:  Right.
23                        THE WITNESS:  The SPA was the
24          escrow agreement, under my impression.
```



```
 1   BY MR. ROSS:
 2   Q.        How does The Safety House identify
 3   potential suppliers?
 4   A.        How do we identify them?
 5   Q.        Yeah.
 6                   MR. LIGHTMAN:  In general, not --
 7            again, you're not talking this particular
 8            deal, right?
 9                   MR. ROSS:  No, I'm just -- in
10            general.
11                   MR. LIGHTMAN:  In general.
12                   THE WITNESS:  How do we identify
13            them?  I mean --
14   BY MR. ROSS:
15   Q.        Yeah.
16            How do you -- when The Safety House gets a
17   -- has a new supplier, how does that happen?
18   A.        I mean, usually we -- we know in advance
19   where -- 90 percent of the time, 95 percent of the
20   time of where to get the product.  We've been doing
21   this a long time, so the identification of just
22   certain suppliers is pretty easy to -- to find.
23   Q.        You said a minute ago that Mr. Sternberg
24   was the main guy with regard to the SPA.  What did
```



1    you mean by that?

2    A.        The only reason that I did this purchase

3    order agreement was because of Manfred Sternberg and

4    him being a lawyer.  I thought he was the

5    protection.

6    Q.        But he was not The Safety House's attorney,

7    right?

8    A.        He was the escrow agent.

9    Q.        Was he The Safety House's attorney?

10   A.        He was counsel for Sam Gross.  He was the

11   escrow agent, and he was also profiting on the

12   transaction.

13   Q.        Was he The Safety House's attorney?

14   A.        He was not.  He was the escrow agent.

15   Q.        Do you ever have -- strike that.

16             Does an attorney or law firm ever assist in

17   the vetting of new suppliers?

18   A.        No.

19   Q.        Is that -- was that also true in 2020?

20   A.        Yep.

21   Q.        What about 2022?

22   A.        Yeah, I don't use -- I don't have counsel.

23   There's no need.

24   Q.        And when you -- when there are purchase



```
 1  orders to the -- to the company, who handles those?
 2  A.        Purchase orders to The Safety House?
 3  Q.        Yes.
 4                    MR. LIGHTMAN:  You're talking
 5            about someone issuing a purchase order to
 6            buy stuff from The Safety House or The
 7            Safety House issuing a purchase order to
 8            buy stuff from a manufacturer?
 9  BY MR. ROSS:
10  Q.        When somebody wants to sell something to
11  The Safety House --
12  A.        Right.
13  Q.        -- who reviews those?
14  A.        Either Dan Lomerson, who I spoke about
15  earlier, or myself.
16  Q.        Do you know how much -- how much the
17  company spent purchasing product from its suppliers
18  in 2019?
19  A.        Off the top of my head, no.
20  Q.        And The Safety House maintains a website,
21  right?
22  A.        Thesafetyhouse.com.
23  Q.        How often do you update the website --
24  strike that.
```



1          How often is the website updated?

2    A.      It's funny you ask that.  It's being

3    updated as we speak.

4    Q.      Do any of the employees have control over

5    the website, or is it an outside contractor?

6    A.      We have -- we have several things.  So we

7    have one employee that can get into the back end of

8    the website to retrieve orders, and then we have an

9    outside consultant who handles all the -- all the

10   programming of the website.

11   Q.      Okay.  So orders come in through the

12   website and an employee can retrieve those?

13   A.      Correct.

14   Q.      But if you want to update the copy, like,

15   what it says or --

16   A.      We use the outside consultant.  We -- we --

17   I, myself, can do it as well.  I will -- I will now

18   and then go in and edit a product, edit either the

19   price or the description of the product or if we

20   have it in stock or not.

21   Q.      Has the website ever list -- listed

22   COVID-19 test kits as one of the products you sell?

23   A.      Yeah, it's on there now.

24   Q.      Was it on there in 2020?



```
1   A.        I think it was put on there recently.

2   Q.        Do you know roughly --

3   A.        Within the last six months.  So the answer

4   to your question is no to 2020.

5   Q.        When did you decide to start selling

6   COVID-19 test kits?

7   A.        When one of my customers requested if I

8   could get them for him.

9   Q.        So it was a preexisting customer that asked

10  you --

11  A.        That's right.

12  Q.        -- do you have these or can you get these?

13  A.        Yep.

14  Q.        And when was that?

15  A.        When did I wire the money?  January of '22.

16  Q.        2022?

17  A.        Yeah, the -- January 21, 2022, is when I

18  wired the money, so, you know, three weeks prior to

19  that.

20  Q.        So The Safety House didn't sell any test

21  kits in 2020, for COVID-19?

22  A.        No.

23  Q.        What about 2021?

24  A.        No.
```



1  Q.       And from when you -- well, strike that.

2           Does the company still sell COVID-19 test

3  kits?

4  A.       We do, actually.

5  Q.       What kind -- what kind of test kits does it

6  sell today?

7  A.       iHealth and -- there's another brand.  I

8  can't remember.

9  Q.       Between 2022 and today, how many vendors

10 does the company use for test kits?

11 A.       How many vendors?

12 Q.       Or suppliers.

13 A.       How many people that we buy them from?

14 Q.       Exactly.

15 A.       There's a bunch.

16 Q.       Can you estimate how many?

17 A.       No, I have no idea.

18 Q.       Two?  Ten?

19 A.       Ten.

20 Q.       Have you ever declined to use a test kit

21 vendor for any reason?

22 A.       Decline?  Decline, meaning what?

23 Q.       Yeah.

24          Have you, you know, as a supplier of test



```
 1  kits, ever come to your attention and the company,

 2  for whatever reason, didn't -- you know, decided not

 3  to do business with them?

 4  A.       No.

 5  Q.       And aside from the parties to this case,

 6  what do you do to ensure that those test kit

 7  suppliers are going to be able to meet your

 8  requirements, your -- you know, for product?

 9                   MR. LIGHTMAN:  Objection.

10                   THE WITNESS:  Well, obviously the

11            -- the game has changed now, especially

12            when it deals with test kits.  So we -- we

13            would only probably go to the manufacturer

14            to buy test kits.  So whoever makes the

15            test kits is really where we would probably

16            go.

17  BY MR. ROSS:

18  Q.       So today you try -- you buy directly from

19  manufacturers?

20  A.       Or -- or their broker agents, as they're

21  called, or their distribution network.

22  Q.       In the period between 2020 and 2022, how

23  many customers asked for test kits?

24  A.       I couldn't tell you.
```



```
1    Q.       You don't know?

2    A.       No, I have no idea.

3    Q.       What percentage of the business were those

4    tests kits after you started offering them?

5    A.       It's very limited.  I don't know the -- I

6    don't know the percentage.  I couldn't tell you that

7    either.

8    Q.       Was -- was there a substantial need from

9    your customers for test kits?  Was there, like, a

10   flood of test kit orders for some time period?

11   A.       No.

12   Q.       It was just something that because of the

13   pandemic sort of came on to your radar --

14   A.       Correct.

15   Q.       -- and became sort of just another product

16   among the products --

17   A.       Yeah.

18   Q.       -- of many products the company sells?

19   A.       Correct.

20   Q.       All right.  And what -- what led the

21   company to buy the -- attempt to buy the test kits

22   at the heart of this transaction, this lawsuit?

23   A.       A request --

24                      MR. LIGHTMAN:  Objection.
```



```
 1                    THE WITNESS:  I've already spoke

 2           to that.  A request from a customer.

 3  BY MR. ROSS:

 4  Q.        And why did you purchase -- try to purchase

 5  test kits from Sam Gross?

 6  A.        During the pandemic, the products were very

 7  hard to get a hold of.  Even my current supplier

 8  products that I sell, coveralls, respirators,

 9  everything was just becoming very difficult to get.

10  Manufacturers were shutting down.  I couldn't get

11  stuff.  So having run into somebody who knew

12  somebody who knew somebody who knew Sam, which --

13  which is, you know, a day I'll never forget, we were

14  desperate to get -- my customer needed them.  They

15  needed them right away.  We were desperate to get

16  the product.

17  Q.        As far as somebody, somebody, somebody, can

18  you follow that chain back and, you know, tell me

19  who those people are?

20  A.        I was dealing with a bunch of other sellers

21  and brokers during the pandemic.  One of the brokers

22  I reached out to and said, hey, I'm looking for a

23  bunch of test kits, can you help me.  That broker

24  got me in touch with Dick Gray and John Mann.  John
```



1    Mann and Dick Gray knew Manfred Sternberg.  Manfred

2    Sternberg was in bed with Sam Gross.  As we found

3    out now, Sam Gross is in bed with Gary Weiss.

4    Q.       And who were the test kits -- subject of

5    this lawsuit, which of your customers were they

6    intended for?

7                         MR. ROSS:  We can go off.

8                         (At this time, a discussion was

9            held off the record.)

10                        (At this time, the court reporter

11           read back from the record.)

12                        THE WITNESS:  I'm not giving that

13           information.  It's proprietary.

14   BY MR. ROSS:

15   Q.       I'm going to need you to answer the

16   question unless there's a valid objection.

17                        MR. LIGHTMAN:  Well, there --

18           he's -- he's --

19                        THE WITNESS:  Well, here -- I'll

20           answer.

21                        MR. LIGHTMAN:  Okay.

22                        THE WITNESS:  That is one of my

23           customers.  It's proprietary information.

24           I don't -- I don't want it on record.



```
 1   BY MR. ROSS:
 2   Q.      You're refusing under oath to tell us who
 3   you were trying to supply these test kits to?
 4                   MR. LIGHTMAN:  It's also not part
 5          of his damages claim, so it's irrelevant --
 6                   MR. ROSS:  It doesn't have to be
 7          for him to have to ask -- he has to answer.
 8                   THE WITNESS:  Look, I -- I don't
 9          --
10                   MR. ROSS:  Unless there's a
11          privilege or a valid objection --
12                   THE WITNESS:  There's a valid
13          objection.
14                   MR. ROSS:  That's -- I mean,
15          under the rules of federal -- the federal
16          rules of civil procedure.
17                   THE WITNESS:  What's the rule?
18   BY MR. ROSS:
19   Q.      I would ask you.  What's the rule that
20   makes your refusal to answer the question valid?
21   A.      I'm in fear of -- it is my -- my customers
22   are my secret sauce, and I don't want to give that
23   out.
24   Q.      Okay.
```



1  A.        So it's similar to the Coke formula.

2  Nobody wants to give the Coke -- that's my secret

3  sauce.  Why would I give that to you?  I don't want

4  it on record.  I can tell you the --

5  Q.        Well, the reason you'll give it is because

6  you brought a lawsuit, and you're obligated to

7  answer questions in a deposition --

8                      MR. LIGHTMAN:  Well, not if it's

9            not relevant or material to his claims or

10           his damages.

11                     MR. ROSS:  That's --

12                     MR. LIGHTMAN:  And what's to

13           prevent Manfred and Gross from contacting

14           this guy and pulling another fraud on them?

15                     THE WITNESS:  Yeah.

16                     MR. ROSS:  Is that the objection

17           you're making?

18                     MR. LIGHTMAN:  He's already

19           stated his answer.

20                     MR. ROSS:  Can you tell me the

21           rule the objection's based on?

22                     MR. LIGHTMAN:  Proprietary

23           confidential information.

24                     MR. ROSS:  Okay.  We'll have to



```
1              make the necessary motion to compel, which
2              --
3                     MR. LIGHTMAN:  Do whatever you
4              feel necessary, Mr. Ross.
5    BY MR. ROSS:
6    Q.      What was the price per test kit that The
7    Safety House was going to charge for these, in the
8    event they were delivered?
9    A.      Again, I'm not giving you that information.
10   Q.      Do you also lack a valid objection to this
11   question?
12                    MR. LIGHTMAN:  Objection.  He's
13             uncomfortable divulging that information.
14             It's irrelevant and immaterial to the
15             lawsuit or any claim of damages, and if you
16             disagree, please file the appropriate
17             motion.
18                    MR. ROSS:  Once again, you
19             decided to bring a lawsuit, which brings
20             with it certain burdens, including
21             answering questions at depositions.
22                    MR. LIGHTMAN:  He decided to
23             bring a lawsuit because your clients
24             together with --
```



```
 1              MR. ROSS:  To the extent --
 2              MR. LIGHTMAN:  -- Gross -- with
 3   Gross --
 4              MR. ROSS:  -- that there's no
 5   valid objection --
 6              MR. LIGHTMAN:  -- and Gary Weiss
 7   defrauded him out of 2 million bucks.  They
 8   took his $2 million, he didn't give him his
 9   money back or give him the test kits.
10              MR. ROSS:  To the --
11              MR. LIGHTMAN:  It's not a hard
12   case.
13              MR. ROSS:  There's no --
14              THE WITNESS:  Pretty simple.
15              MR. ROSS:  -- valid objection
16   under the rules of civil procedure.
17              MR. LIGHTMAN:  If you disagree
18   with his refusal to divulge what he
19   believes is confidential and proprietary
20   information, please make a motion.
21              MR. ROSS:  Is there a protective
22   order in place about this information?
23              MR. LIGHTMAN:  I don't even know
24   if -- is there a confidentiality order in
```



```
 1            place?
 2                      MR. ROSS:  About this
 3            information.
 4                      MR. LIGHTMAN:  About anything, I
 5            don't even know if that's the case.
 6   BY MR. ROSS:
 7   Q.        Mr. Scully, do you know if there's a
 8   protective order in place about this -- the identity
 9   of the intended Safety House customers and the price
10   per kit that they were going to be charged?
11   A.        No, I don't.  And if there isn't, maybe
12   we'll put one on.
13   Q.        But there's not one on today, I'll
14   represent to you.  So these are not questions that
15   can properly be refused, but we're going to move on.
16            Tell me who Sam Gross is.
17   A.        Sam Gross is a criminal who has been put in
18   jail for diamond fraud and is the -- Manfred
19   Sternberg's partner in crime in this transaction.
20   Q.        Did you ever meet Mr. Gross?
21   A.        No.
22   Q.        And how did you first learn of Mr. Gross?
23   A.        Through the brokers.
24   Q.        Was -- you said he's convicted?
```



```
1   A.        Yeah.

2   Q.        When was he convicted?

3   A.        I don't know the dates.  You can look it

4   up.  It's all over the Internet.

5   Q.        And one of the brokers got you in touch

6   with Sam Gross?  How did that --

7   A.        No.

8   Q.        Explain it to me.

9   A.        He got us in touch with Manfred Sternberg.

10  Q.        Okay.  Did you ever do business with

11  Mr. Gross prior to 2022?

12  A.        No.

13  Q.        You eventually agreed to wire him almost

14  $2 million?

15  A.        I didn't wire Sam Gross $2 million.

16  Q.        It wasn't intended for him?

17  A.        It was for Manfred Sternberg, escrow agent.

18  Q.        Taking for a moment that as true, which it

19  is not --

20                     MR. LIGHTMAN:  Is there a dispute

21           that the money was wired to Manfred

22           Sternberg's trust account?

23                     MR. ROSS:  I'll finish my

24           question.
```



```
 1                        MR. LIGHTMAN:  Okay.
 2  BY MR. ROSS:
 3  Q.       If you're saying that the money was being
 4  held in escrow by Mr. Sternberg, do you know who it
 5  was being held in escrow for?
 6  A.       Sam Gross and -- and myself.
 7  Q.       How does $1.9 million purchase compare to
 8  other typical purchases of The Safety House in 2022?
 9  A.       It's huge.  It's massive.
10  Q.       Was it the biggest that --
11  A.       Biggest ever.
12  Q.       -- biggest that year?
13  A.       Biggest ever.
14  Q.       Biggest ever.
15                        MR. LIGHTMAN:  Your guy stung him
16          real good.
17  BY MR. ROSS:
18  Q.       You didn't have an attorney look at any of
19  this on the company's behalf?
20  A.       I had an attorney, Manfred Sternberg.  I
21  was so --
22  Q.       You represented that he --
23                        MR. LIGHTMAN:  Excuse me.  Let
24          him finish his answer.
```



```
 1                    THE WITNESS:  Manfred was -- he
 2            was the golden boy.  He -- he was the only
 3            reason I did the deal.  The only --
 4   BY MR. ROSS:
 5   Q.       What do you mean?
 6   A.       -- reason I did the transaction is of
 7   Manfred Sternberg being represented as -- because we
 8   did due diligent on Manfred, and he was an attorney
 9   in Texas.  That's the only reason why I did the
10   deal.
11   Q.       Did you understand Mr. Sternberg to be an
12   attorney representing The Safety House in connection
13   with this deal?
14   A.       I -- I thought Manfred Sternberg was the
15   escrow agent.  And now, as it comes to be, Manfred
16   Sternberg was counsel for Sam Gross, and Manfred
17   Sternberg was also Sam Gross's partner, who was
18   profiting from the transactions.  I didn't find that
19   out till later, but obviously, it's out there.
20   Q.       And how do you know that he profited?
21   A.       Through the bank records.
22   Q.       The bank records?  What would you think if
23   you learned that he didn't make any profit at all
24   from this transaction?
```



```
 1   A.        I mean, if he's saying that, I don't --
 2   he's a criminal, so of course he's going to say
 3   that.
 4   Q.        Well, what would you think if you learned
 5   objectively, not from any representation by him or
 6   even myself --
 7                      MR. LIGHTMAN:  Objection.
 8   BY MR. ROSS:
 9   Q.        -- he made no profit off of this
10   transaction?
11                      MR. LIGHTMAN:  Objection.
12                      THE WITNESS:  He's lying to you.
13         He's lying to his counsel.
14   BY MR. ROSS:
15   Q.        You're not listening.  Putting aside
16   something that I would say or that Mr. Sternberg
17   would say, if there was documentary evidence
18   presented to you that he did not make any profit off
19   of this transaction, what would you think of that?
20                      MR. LIGHTMAN:  Objection.  It's a
21         hypothetical.  Assumes facts not in
22         evidence.
23                      THE WITNESS:  Yeah, I -- I have
24         no answer.
```



```
 1                    MR. LIGHTMAN:  And --
 2  BY MR. ROSS:
 3  Q.     So there's --
 4                    MR. LIGHTMAN:  Hold on one
 5        second.
 6                    MR. ROSS:  No.  We're not going
 7        to take any testimony from you,
 8        Mr. Lightman.
 9                    MR. LIGHTMAN:  In one of the --
10                    MR. ROSS:  Your client is
11        testifying.
12                    MR. LIGHTMAN:  In one of the
13        texts --
14                    MR. ROSS:  Mr. Lightman --
15                    MR. LIGHTMAN:  -- that your
16        client produced, he writes --
17                    MR. ROSS:  Your client is
18        testifying.
19                    MR. LIGHTMAN:  I know that, but
20        --
21                    MR. ROSS:  You can test -- I will
22        send you a deposition notice.
23                    MR. LIGHTMAN:  I'm not --
24                    MR. ROSS:  You can testify
```



1  another day.

2           MR. LIGHTMAN:  I'm not

3  testifying.

4           MR. ROSS:  You can testify

5  another day.

6           MR. LIGHTMAN:  All I'm saying is

7  in one of the texts --

8           MR. ROSS:  The next --

9           MR. LIGHTMAN:  -- that you were

10  supposed to produce --

11           MR. ROSS:  The next question --

12           MR. LIGHTMAN:  -- he says:  I add

13  my profit to the deal.

14           MR. ROSS:  Are you reading again

15  from some unauthenticated, typed up plain

16  piece of --

17           MR. LIGHTMAN:  I'm reading from

18  the text that --

19           MR. ROSS:  -- paper?

20           MR. LIGHTMAN:  -- Dick Gray

21  produced involving texts between him and

22  Manfred Sternberg.

23           MR. ROSS:  Where on that document

24  does it demonstrate that it's a text



```
 1              message, aside from your representation?

 2                      MR. LIGHTMAN:  That's what Dick

 3          Gray said.

 4                      MR. ROSS:  Okay.

 5                      MR. LIGHTMAN:  And you know what,

 6          I'll learn better when you produce -- when

 7          the judge rules on the -- on the motion

 8          that we have pending.  In fact, Man -- on

 9          page 7 of Deposition Exhibit TSH-1, which

10          is also Deposition Exhibit Sternberg-40, on

11          page 7, Manfred writes:  Tell the buyer

12          they disrupted my weekend to look for

13          something that is not there.  This is not

14          typical PPE game, and my time is not free.

15          Another false alarm from these guys, and my

16          -- "my fee will be tacked on top of cost."

17                      Where's that e-mail -- where's

18          that text, Mr. Ross?

19  BY MR. ROSS:

20  Q.       You said, I think, earlier that the company

21  had no attorney review anything on its behalf since

22  formation; is that right?

23  A.       Not that I can recall.

24  Q.       So you agreed to buy something from
```



```
 1  Mr. Gross for $1.9 million based on your vetting of

 2  an attorney with whom the company had no engagement

 3  or other --

 4  A.       Yeah.

 5  Q.       -- a retainer --

 6                  MR. LIGHTMAN:  Objection.

 7  BY MR. ROSS:

 8  Q.       -- representation agreement of any kind,

 9  except for the SPA, we'll get to later --

10                  MR. LIGHTMAN:  Objection.

11  BY MR. ROSS:

12  Q.       -- is that right?

13  A.       So I was under the impression that Manfred

14  Sternberg was a lawyer in Texas, on good standing,

15  sent us the -- the e-mail, SPA, through the brokers,

16  who also confirmed that they knew him, and I based

17  my decision on that.

18  Q.       Do you regret not hiring an attorney to

19  review the SPA, aside from anybody who's a party to

20  this case?

21  A.       Of course.  Are you kidding me?

22  Q.       Do you think it would've been good business

23  sense to have hired somebody prior to signing this

24  SPA?
```



```
 1                    MR. LIGHTMAN:  Objection.
 2                    THE WITNESS:  What do you think,
 3           Joe?  I'm sitting here in a courtroom
 4           trying to get $2 million back from four
 5           criminals.
 6  BY MR. ROSS:
 7  Q.      Is that a yes?
 8  A.      Criminally, yes.
 9  Q.      And --
10                    MR. LIGHTMAN:  And ask him why he
11           didn't feel the need to get independent
12           counsel?
13  BY MR. ROSS:
14  Q.      Did you speak to Mr. Gross on the phone
15  before sending -- before wiring the 1.9 million?
16  A.      No.
17  Q.      Did you communicate with him in any way?
18  A.      The brokers did.
19  Q.      Okay.  But no direct communication with --
20  A.      No direct --
21  Q.      -- Mr. Gross?
22  A.      All through the brokers.  And you see it in
23  the testimony that Gary's pointing out, there's a
24  lot of conversation that went through.
```



1  Q.        No direct communication with Mr. Sternberg
2  or Mr. Gross before wiring the money, right?
3  A.        All through the brokers.
4  Q.        Is -- so that's correct?
5  A.        The communication was all through the
6  brokers.
7  Q.        You didn't speak to any -- any lawyer
8  that's not a party to this case before wiring the
9  funds?
10 A.        No lawyer, except Sternberg.
11 Q.        Did you investigate Gross in any way?  I
12 know that you said you vetted Mr. Sternberg.  What
13 about Gross?
14 A.        No, it was just Sternberg.
15 Q.        You didn't do any due diligence on Gross
16 before the deal?
17 A.        No.
18 Q.        Why not?
19 A.        It was Charlston[sic] Holding Group.  We
20 did a little vetting on his company.
21 Q.        And what did you find about Charlston
22 Holding Group?
23 A.        That Manfred and him set it up in 2020.  So
24 it was really just a shell.



1  Q.       Well, Charslton Holding Group had an

2  attorney help them form their company.  Didn't you

3  do that?

4  A.       Manfred did it with Sam, is what I'm

5  saying.

6  Q.       Did you know he was -- Mr. Gross was a

7  convicted felon before sending his company money?

8  A.       I did not.

9  Q.       Did you check?

10 A.       No.

11                 MR. LIGHTMAN:  Did Manfred

12        disclose that to you?

13                 THE WITNESS:  No.

14                 MR. ROSS:  No more questions.

15        You'll have your turn, I promise.

16 BY MR. ROSS:

17 Q.       You testified earlier it's all over the

18 Internet that Mr. Gross is a convict.  So it

19 would've been pretty easy to find out, right?

20 A.       I mean, look, I'm a small company.  I'm not

21 used to being in this criminal world.  I call up a

22 vendor and try to get product, they're -- they're

23 happily to sell me -- if there's an issue with cost

24 or delivery, you know, we work it out.  These guys



1  are criminals.  I'm not used to dealing with

2  criminal people who take your money and then just

3  disappear.  I'm not -- I'm not -- I'm not privy to

4  -- like Mr. Weiss is, I'm not privy to his world.

5  Q.      So when you vet Charslton Holding Group

6  before -- before the -- wiring the money, is that

7  when you learned that Mr. Sternberg had assisted

8  Mr. Gross in forming it?

9                    MR. LIGHTMAN:  Objection.

10                    THE WITNESS:  I don't -- I don't

11        recall when that -- that happened.

12  BY MR. ROSS:

13  Q.      Did you know Mr. Gross was the owner of

14  Charslton Holding Group before wiring the money?

15  A.      I -- I -- I assumed so.  I think it was on

16  one of the documents.

17  Q.      And what facts can you give me that

18  demonstrate Mr. Sternberg helped Mr. Gross set up

19  CHG?

20  A.      I can't give you any facts.  I don't

21  remember.

22  Q.      You don't remember how you learned that?

23  A.      Yeah, I don't remember.  I don't recall how

24  I learned that.



1  Q.       Do you have any documents that show that

2  being the case?

3  A.       No.  Is it true?

4  Q.       That's what I'm asking you.  Is that true?

5  A.       Yeah.

6  Q.       I just --

7  A.       It's an assumption.

8  Q.       Okay.  And earlier you called Mr. Sternberg

9  a partner of Mr. Gross's, right?

10 A.       Right.

11 Q.       And what evidence do you have for that?

12 A.       He was representing Sam Gross in this

13 transaction.

14 Q.       Is Mr. Lightman a partner of yours?

15 A.       No.

16 Q.       So representation of a client doesn't make

17 an attorney their partner; is that right?

18 A.       Well, it was pretty evident through all the

19 money transfer.

20 Q.       That's a yes or no.  Does an attorney's

21 representation of somebody alone make them a partner

22 of that -- of that person?

23 A.       He may not have been his official partner

24 in officially owning, like, pieces of a company, but



1   in this particular transaction, they were partners.

2   Manfred was profiting from these transactions.

3   Q.      Does an attorney's representation of

4   somebody alone make them a partner of that --

5   A.      No --

6   Q.      -- person?

7   A.      -- of course not.

8                   MR. LIGHTMAN:  Objection.

9                   MR. ROSS:  What was the response?

10                  MR. LIGHTMAN:  He said no after

11          my objection.

12   BY MR. ROSS:

13   Q.      You understood that Gross was represented

14   by counsel in the transaction at -- at the time,

15   right?

16   A.      Wait, is that -- what's the question?

17   Q.      Did you know that Mr. Gross was represented

18   by counsel at the time of the transaction?

19   A.      Yes, he was represented by Manfred

20   Sternberg.

21   Q.      Did you know that then?

22   A.      Yeah.  Yes.

23   Q.      And you were aware that Mr. Sternberg

24   represented Mr. Gross and not yourself or your



```
 1  company?
 2                    MR. LIGHTMAN:  Objection.
 3                    THE WITNESS:  He just represented
 4         me as the escrow agent.
 5  BY MR. ROSS:
 6  Q.      Did you have any kind of an escrow
 7  agreement with Mr. Sternberg?
 8                    MR. LIGHTMAN:  Objection.
 9                    THE WITNESS:  Just the -- the
10         SPA, the special purchase agreement.
11                    MR. LIGHTMAN:  Sales and
12         purchase.
13                    THE WITNESS:  Sales and purchase
14         agreement.
15  BY MR. ROSS:
16  Q.      But outside of the SPA, there was no escrow
17  agreement with Mr. Sternberg and The Safety House?
18  A.      No.
19  Q.      Did -- before wiring money, did you read
20  the standard operating procedures, the SOP?
21  A.      Yes.
22  Q.      How -- did you ever pay Mr. Sternberg
23  anything for legal services?
24  A.      No.
```



```
 1                    MR. LIGHTMAN:  Objection.
 2   BY MR. ROSS:
 3   Q.      Did he ever tell you that he was your
 4   attorney?
 5   A.      No.
 6   Q.      Did he ever tell you he was your company's
 7   attorney?
 8   A.      No.
 9   Q.      So he was never the plaintiff's attorney --
10                    MR. LIGHTMAN:  Never what?
11   BY MR. ROSS:
12   Q.      -- right?
13   A.      No, he was the escrow agent.
14                    MR. LIGHTMAN:  You can ask a
15              hundred different ways to Sunday, his
16              answer's not going to change.  He's already
17              testified that Sternberg was Gross's
18              attorney and the escrow agent for both
19              Gross and -- and his company.  It's not --
20              you can ask it 50 different ways, and his
21              answer's not going to change.
22                    MR. ROSS:  Then why do you feel
23              the need to testify for him?
24                    MR. LIGHTMAN:  Well, you keep
```



```
1              asking the same question over and over

2              again, different versions.

3                     THE WITNESS:  And I keep

4              answering it.

5                     MR. LIGHTMAN:  I'm not

6              testifying.  I'm just reiterating what the

7              witness has said maybe 20 times now.

8    BY MR. ROSS:

9    Q.     How many times had you met Manfred

10   Sternberg in person?

11   A.     Once.

12   Q.     When was that?

13   A.     At his deposition.

14   Q.     Never before wiring the money?

15   A.     Never.

16   Q.     All right.  What -- before you wire --

17   wired the 1.9-something million, for the record, I'm

18   estimating, it's a little bit more --

19                  MR. LIGHTMAN:  $1,965,600.

20   BY MR. ROSS:

21   Q.     -- what representations did Mr. Sternberg

22   make to you before you wired the money?

23                  MR. LIGHTMAN:  Objection.

24                  THE WITNESS:  What
```



1        representations?  What do you mean by that?

2   BY MR. ROSS:

3   Q.      What did he tell you about the transaction

4   before you wired the money?

5                      MR. LIGHTMAN:  Objection.

6                      THE WITNESS:  Indirectly through

7           the brokers, he said this is the SPA, this

8           is the sales and purchase agreement, and as

9           soon as you sign that and wire the money,

10          then you'll get your goods.

11  BY MR. ROSS:

12  Q.      And so how do you know that what the

13  brokers told you Mr. Sternberg said was actually

14  what he said?

15  A.      How do I know --

16                      MR. LIGHTMAN:  Objection.

17                      THE WITNESS:  Repeat the

18          question.

19  BY MR. ROSS:

20  Q.      How do you know that the brokers were relay

21  -- correctly relaying information from

22  Mr. Sternberg?

23                      MR. LIGHTMAN:  Objection.

24                      THE WITNESS:  Well, there's



```
 1          e-mails and texts that confirm it.
 2  BY MR. ROSS:
 3  Q.      And how do you know -- well, strike that.
 4          And he made no representations to you
 5  before you wired the money, directly?  He made no
 6  direct representations to you before you wired the
 7  money?  It's a yes or no.
 8                      MR. LIGHTMAN:  Objection.
 9                      THE WITNESS:  Wait.  Manfred,
10          you're saying?
11  BY MR. ROSS:
12  Q.      Manfred.
13  A.      The only direct representations he made was
14  e-mailing over the SPA, sales and purchase
15  agreement.
16  Q.      Okay.  That was an e-mail when?
17  A.      It was a week before I wired the money.
18  Q.      All right.  He e-mailed you?
19  A.      Through the brokers.
20  Q.      What representations did Manfred Sternberg
21  make directly to you that involved no brokers or
22  other intermediaries prior to you wiring the money?
23                      MR. LIGHTMAN:  Objection.
24                      THE WITNESS:  Directly, you're
```



```
 1              saying?  There was no direct e-mail from
 2              Manfred.  Everything was through the
 3              brokers.
 4   BY MR. ROSS:
 5   Q.      Or a phone call?
 6   A.      Excuse me?
 7   Q.      What about phone calls?
 8   A.      No phone calls.
 9   Q.      What about text messages?
10   A.      No texts.
11   Q.      What about WhatsApp or any other app --
12   phone app?
13   A.      No.  The only correspondence was through
14   e-mail and texts through the brokers, prior to me
15   wiring the money.
16                    MR. LIGHTMAN:  And the SPA that
17              he got.
18   BY MR. ROSS:
19   Q.      Did you -- setting aside protecting the
20   communications with other parties to the transaction
21   and the lawsuit, did -- did you have a particular
22   delivery date that you promised to your --
23   A.      Yeah.
24   Q.      -- customer?
```



1  A.       Yeah.  It's on the purchase order, January

2  25th.

3  Q.       And why was that -- why was that the

4  deadline?

5  A.       That's what I asked that they could deliver

6  it, and they agreed.

7  Q.       Okay.  That wasn't, like, a customer

8  request or imposition of a deadline that they -- I

9  need these by this date?

10 A.       Yeah, that was my -- that was my -- I said,

11 look, I need them by the 25th, I'll put that on the

12 purchase order, can you do that, and they agreed.

13 Q.       And how --

14 A.       He said get in queue is what their words

15 were.  You got to wire the money to get in queue if

16 you want that date.

17 Q.       Okay.  And that -- you said you told them

18 that because that's when your customer wanted them,

19 or you just wanted to get them kind of as fast as

20 you could?

21 A.       No, that's what -- that was what the

22 customer said, hey, can you get them here on this

23 date.

24 Q.       And you still refuse to tell us who the



1  customer was?

2  A.       Yeah, Joe, I don't want to give out my

3  proprietary information.

4  Q.       Was it just one customer or more than one

5  customer?

6  A.       Just one customer.

7  Q.       Do you know who the owner is of -- I think

8  it's Charlton actually, but I'm not sure.

9           Do you know who the owners of Charlton

10 Holding Group are?

11 A.       I'm assuming Sam Gross.

12 Q.       What about Mr. Sternberg, do you know

13 whether or not he has any ownership interest in the

14 company?

15 A.       I'm not sure through my dealings with Gary

16 Lightman if we looked that up or not, who the -- who

17 the actual owners are.

18 Q.       You have not seen any documents filed with,

19 you know, state authorities that would reflect any

20 ownership interest of Manfred Sternberg and CHG?

21 A.       No.

22 Q.       Were you involved in the -- negotiating the

23 SPA?

24 A.       The SPA was presented to me through the



1  brokers, and I was informed that there was no

2  negotiation, this is it, take it or leave it.

3  Q.      So you -- you first expected delivery by

4  January 25th, nobody said that was impossible?

5  A.      They agreed to it.

6  Q.      Okay.  And do you recall what the first

7  sign was that there would be any delay?

8  A.      The 25th came and went, and then week after

9  week, it just kept going on and on, and text and

10  e-mails, and...

11  Q.      Was there any -- anything that gave you

12  concern, prior to January 25th, about whether or not

13  delivery would happen on the 25th?

14  A.      No.  Nope.

15  Q.      Who first alerted you to the fact that

16  there was a delay?

17  A.      I mean, the product never showed up.

18  Q.      And who did you contact?

19  A.      John Mann, one of the brokers.

20  Q.      And what did he tell you?

21  A.      I mean we were in constant communication

22  from -- I wired the money on the 21st.  It was a

23  Friday.  From Monday on, we were in constant phone

24  calls, e-mails, texts.


ESQUIRE
DEPOSITION SOLUTIONS

1    Q.       Is that M-A-N-N?

2    A.       Correct.

3    Q.       J-O-H-N?

4    A.       Correct.

5    Q.       And is he with a company?

6    A.       Yeah.  I forget the name of his company.

7    Lincoln Park and Associates, I believe is the name.

8                      MR. LIGHTMAN:  Manfred should

9           have all the info on these brokers.

10                     THE WITNESS:  Yeah.

11                     MR. LIGHTMAN:  Which he didn't

12          disclose to us as well, by the way.

13   BY MR. ROSS:

14   Q.       I'm sorry, what did he -- what did Mr. Mann

15   tell you?

16   A.       He told me that I'm trying to get answers

17   from Manfred and Sam on why there's a delay in the

18   shipment.

19   Q.       Do you remember reading a printout of text

20   messages at Mr. Weiss's second deposition session?

21   Were you given a copy of those?

22   A.       Can you repeat the question?  I'm not --

23   Q.       Do you remember looking at text messages --

24   a printout of iPhone text messages at Mr. Weiss's

1  second deposition, which I think was last week?

2  A.      Yeah.  I -- I've probably reviewed them.

3  I'm not sure which specific ones you mean, but I

4  probably looked at them.

5                  MR. LIGHTMAN:  Gary Weiss-23.

6                  MR. ROSS:  These copies have my

7           handwriting in the bottom right corner.

8                  MR. LIGHTMAN:  Thank you.

9  BY MR. ROSS:

10  Q.      Is it -- well, first, take -- take time to

11  look through the document.  This is the exhibit

12  marked GW-23 at Mr. Weiss's second and most recent

13  deposition.  Take whatever time you want to look

14  through it.  Look through the whole thing.

15  A.      Okay.  Do you want me to read -- do you

16  have questions pertaining to this?

17  Q.      I do.

18          Do you see the message that begins on the

19  first page, but there -- it appears in its entirety

20  on the second page?

21                  MR. LIGHTMAN:  The one that says:

22           Gary, you said this in February above?

23                  MR. ROSS:  That's right.

24                  THE WITNESS:  Go to the second



```
 1          page?
 2                    MR. ROSS:  Yeah.
 3                    MR. LIGHTMAN:  For the record,
 4          that's starting on page 2 of GW-23.
 5                    THE WITNESS:  Okay.  Yeah.
 6  BY MR. ROSS:
 7  Q.      Do you see the -- sort of the last full
 8  paragraph there?  It actually follows a quote.  I'll
 9  represent it follows a quote from the previous
10  message sent by Mr. Weiss to Mr. Sternberg.  Those
11  are the parties to -- to this text message thread.
12  And Mr. Sternberg said:  Not sure what the real
13  problem is, but stringing us along like this only
14  hurts Sam and his business and destroys your
15  credibility.
16          Do you see that paragraph?
17  A.      Yes.
18  Q.      So I guess my question to you is, does that
19  read like the message of somebody who's sort of in
20  on whatever misconduct is going on here, to you?
21                    MR. LIGHTMAN:  Objection.
22                    THE WITNESS:  It does.
23  BY MR. ROSS:
24  Q.      Okay.  Explain why.
```



1  A.        Because -- and even in Mr. Weiss's

2  testimony, Sam -- Manfred and Sam were dictating to

3  Mr. Weiss of -- he even said it, well, they were

4  telling me what to put in the text and I would text

5  them back.  So obviously they got together and said,

6  hey, to cover ourselves, Gary, send me some texts

7  and create it -- create these texts.

8                      MR. LIGHTMAN:  And just --

9  BY MR. ROSS:

10 Q.        How do you know that?

11 A.        Mr. Weiss testified.

12                     MR. LIGHTMAN:  And just so the

13           record's clear --

14 BY MR. ROSS:

15 Q.        Do you find --

16                     MR. LIGHTMAN:  Just so the

17           record's clear, the text you're reading

18           from is sent on or after March 15, 2022.

19                     MR. ROSS:  Thank you.

20 BY MR. ROSS:

21 Q.        And this is somebody you trust, Mr. Weiss?

22 A.        I didn't -- he testified.  I don't trust

23 the guy.  That's why I didn't want to give any

24 information out.  I'm afraid of the guy.  I don't



```
 1  know what he's going to do.  He's a criminal.
 2  Q.       But you trust just for what he said there
 3  about being dictated to by Manfred Sternberg?
 4  A.       Look, this is -- this is Manfred setting up
 5  the scene knowing he's going to get sued, saying,
 6  Gary, text us this or him texting that to set
 7  himself up.
 8  Q.       And I'm asking you how you know that.
 9  A.       Gary Weiss testified saying they -- Gary
10  Weiss testified and said Sam and Manfred put me up
11  to creating texts and then had me text them to him.
12  Q.       So --
13  A.       That's why I think it's all --
14               MR. LIGHTMAN:  And the March 15th
15          texts were --
16               MR. ROSS:  Okay.
17               MR. LIGHTMAN:  -- after the
18          February 23rd date of the lawsuit.
19               MR. ROSS:  Gary, please stop
20          testifying.
21  BY MR. ROSS:
22  Q.       So I just want to understand this.  You
23  don't trust him to know the name of a customer you
24  had in 2020 --
```



```
 1                      MR. LIGHTMAN:  2022.
 2   BY MR. ROSS:
 3   Q.      -- or the price even, without the customer,
 4   of each kit, but you do trust him for things he says
 5   that are adverse to Mr. Sternberg; is that right?
 6                      MR. LIGHTMAN:  Objection.
 7                      THE WITNESS:  No, no, no.  Let me
 8           answer.  Let me answer.
 9                      MR. LIGHTMAN:  Objection.
10                      THE WITNESS:  No, you're
11           misunderstanding.  This statement, not sure
12           what the real problem is, is Manfred
13           setting himself up with Gary because of
14           this lawsuit --
15   BY MR. ROSS:
16   Q.      Okay.
17   A.      -- he's like oh, I better protect myself
18   here, let me write this.
19   Q.      Okay.  So you don't --
20   A.      He's acting like he's not on -- he's
21   involved in this whole thing.
22   Q.      So you don't think that Mr. Sternberg
23   dictated any of these messages in GW-23 for
24   Mr. Weiss to send to Mr. Sternberg, correct?
```



```
 1  A.      I mean --
 2                  MR. LIGHTMAN:  Objection.
 3                  THE WITNESS:  -- some of -- some
 4       of the responses, I do think that.
 5  BY MR. ROSS:
 6  Q.      And what makes you think that?
 7  A.      He -- because Gary testified that and told
 8  us that.
 9  Q.      Okay.
10  A.      He said, oh, they were telling me what to
11  put in here.
12  Q.      Well, this kind of gets back -- back to the
13  question.  Why is it that you trust him when he says
14  that, but you don't trust him for anything else?
15  A.      Well --
16                  MR. LIGHTMAN:  Objection.
17                  THE WITNESS:  -- he's caught.
18       We're under oath.
19  BY MR. ROSS:
20  Q.      Isn't it because it helps your case?
21                  MR. LIGHTMAN:  Objection.
22                  THE WITNESS:  But he's caught.
23       He's under oath testifying, hey, these guys
24       told me what to put in the text.
```



```
 1   BY MR. ROSS:

 2   Q.      Are you --

 3   A.      So I'm just thinking --

 4   Q.      You assume that he's under oath, he's

 5   telling the truth?

 6                   MR. LIGHTMAN:  Objection.

 7                   THE WITNESS:  I'm assuming that

 8           --

 9                   MR. ROSS:  What's the objection?

10                   THE WITNESS:  I'm assuming that

11           he's trying to cover his own -- his own

12           butt.  So he's starting to let things out

13           of the bag here that -- that -- you know,

14           all four of these people were together.

15           Now they're all watching out for their own

16           -- their own well-being.  And part of that

17           is saying, well, look what -- because they

18           sued -- let's -- let's face it, Manfred and

19           Sam are suing Gary Weiss.  He's trying to

20           protect himself.  So what does he do?

21           Well, if they're going to sue me, I'm going

22           to tell them what happened.

23   BY MR. ROSS:

24   Q.      You don't think there's any chance he would
```



```
 1  lie about what happened to protect himself?
 2                      MR. LIGHTMAN:  Objection.
 3  BY MR. ROSS:
 4  Q.      Right, you don't think there's any chance
 5  he would lie?
 6  A.      About Manfred and --
 7  Q.      Right.
 8  A.      In this particular case he's trying --
 9  Q.      Mr. Sternberg --
10  A.      -- he's trying to cover his own butt,
11  basically.  That's what he's doing.  Come on.  It's
12  obvious.
13  Q.      So you don't think there's any chance that
14  he would lie about what Mr. Sternberg did in this
15  case to protect himself?
16                      MR. LIGHTMAN:  Objection.
17                      THE WITNESS:  I can't answer
18          that.  I don't know.
19  BY MR. ROSS:
20  Q.      You know, Mr. Scully.
21  A.      I don't.  I can't answer it.
22                      MR. LIGHTMAN:  What about the
23          declaration that Manfred asked him to sign
24          that Gary said was false?
```



```
 1                         THE WITNESS:  And Sam.
 2   BY MR. ROSS:
 3   Q.      Can you tell me which of these messages
 4   that you take the position Mr. -- Mr. Sternberg
 5   dictated?
 6                         MR. LIGHTMAN:  Objection.
 7                         THE WITNESS:  You know what, I --
 8           no, I can't.  Looking at -- I mean, I guess
 9           I could go through it and go back through
10           Gary's testimony and try to pick them out
11           that way and --
12   BY MR. ROSS:
13   Q.      Sure.
14   A.      I can go through these and -- and --
15                         MR. LIGHTMAN:  If you don't know,
16           don't guess.
17                         THE WITNESS:  Yeah, it would be a
18           guess because I would have to do some due
19           diligence on my own to look at this in
20           comparison to his testimony.
21   BY MR. ROSS:
22   Q.      As you sit here right now, you don't know?
23   A.      I don't, no.  I would be guessing.
24                         MR. LIGHTMAN:  Where is the text
```



1           Manfred writes that's fraud -- classic

2           fraud in the inducement?  Did you purposely

3           omit that from this, Mr. Ross?

4  BY MR. ROSS:

5  Q.      What do you know about the collateral that

6  Mr. Weiss put up as part of the transaction, if

7  anything?

8  A.      What do I know about it?

9  Q.      Yeah.

10  A.      According to what Mr. Weiss said in his

11  testimony, in the jewelry business, there's a lot of

12  jewels that could show value to some people and no

13  value to another.  So over the years, Gary collected

14  a box -- a drawer full of these jewels that to you

15  and me could be worthless, but they could be worth

16  some value to somebody else.  He took that box and

17  gave it to Sam and said here's your collateral.

18  That's what -- that's what I know about the jewels,

19  but he -- he even said that I didn't -- I didn't --

20  those jewels to me could be worth, who knows.  Those

21  jewels to somebody else could be worth -- could be

22  use -- worthless.

23  Q.      And that understanding you have from

24  Mr. Weiss's testimony, I forget last week, I think?



```
 1                    MR. LIGHTMAN:  And his first --
 2                    THE WITNESS:  Last week.
 3                    MR. LIGHTMAN:  And his first
 4         depo.
 5                    THE WITNESS:  And we also -- we
 6         also sought an expert opinion on that, and
 7         they told us the same thing.
 8  BY MR. ROSS:
 9  Q.       What information did you give the expert?
10  A.       We just said how -- how -- you know, they
11  have a box of jewels.  It could be like an amber
12  jewel, it could be, you know, whatever and to
13  somebody, that could be worth a lot of money.  To
14  most people -- to jewelers, it's been sitting in
15  their drawer for 20 years and it's worthless.
16  Really stuff that's really super hard to sell,
17  basically.
18  Q.       What was the name of that expert?
19  A.       I don't -- I don't recall.
20  Q.       All right.  I ask that you -- Mr. Lightman
21  to send me the name of that expert after the
22  deposition.
23           What do you think happened to that
24  collateral, those gems that were given as collateral
```



```
 1  to Mr. Gross?
 2                      MR. LIGHTMAN:  Objection.
 3                      THE WITNESS:  I can't answer
 4          that.  I have no idea.
 5  BY MR. ROSS:
 6  Q.      But do you know how much they were worth?
 7                      MR. LIGHTMAN:  Let me just lodge
 8          a continuing objection because any
 9          information we have about the collateral is
10          secondhand.  He has no personal knowledge
11          if collateral was, in fact, given.  So I'm
12          just going to lodge a continuing objection
13          so I don't have to keep interrupting.
14  BY MR. ROSS:
15  Q.      So -- okay.  So I just got an objection
16  from your attorney because all the information you
17  have about the gems is secondhand?
18                      MR. LIGHTMAN:  We don't know if
19          the gems were, in fact, given or not.  We
20          have Gary Weiss's story they were given.
21          We have Manfred writing to various other
22          victims, I'll give you collateral, but we
23          have no independent firsthand knowledge.
24          Oh, we have pictures of Daphna Zekaria
```



```
 1              naked wearing some of the diamonds, but.
 2   BY MR. ROSS:
 3   Q.      So testimony that you would give about
 4   something, you know, that you don't have firsthand
 5   knowledge wouldn't -- wouldn't be credible, right?
 6                    MR. LIGHTMAN:  Objection.  It's
 7           not what he's saying.
 8                    THE WITNESS:  That's not what I'm
 9           saying.  That's not what I'm saying.
10                    MR. LIGHTMAN:  It's the same
11           circumstantial evidence catch.  If people
12           say it's raining outside, you don't
13           actually have to be outside to see it to be
14           able to infer from circumstantial evidence
15           that it, in fact, rained.
16   BY MR. ROSS:
17   Q.      Has anybody ever posed as an FBI agent on
18   behalf of The Safety House --
19   A.      No.
20   Q.      -- or yourself?
21   A.      No.
22   Q.      So you were unaware if before somebody
23   posing as an FBI agent contacted anyone in this --
24   in this case, you would have no prior knowledge of
```



```
 1   that?
 2                       MR. LIGHTMAN:  Objection.
 3                       THE WITNESS:  No.
 4   BY MR. ROSS:
 5   Q.      And you would have nothing to do with that?
 6   A.      No.
 7   Q.      I think your testimony is that that didn't
 8   happen or you just would have no -- you're not
 9   involved in any way?
10                       MR. LIGHTMAN:  Objection.
11                       THE WITNESS:  I don't know what
12          you're talking about.
13                       MR. ROSS:  I need -- I need five
14          minutes.
15                       MR. LIGHTMAN:  And for the
16          record, before we go off, I strenuously
17          object to Mr. Sternberg's accusation in his
18          letter to the Texas bar that I posed as an
19          FBI agent.  We can take a break.
20                       (At this time, a short break was
21          taken.)
22                       MR. ROSS:  We're back on after a
23          brief break, in which I bought the witness
24          and his attorney lunch.
```



```
 1                    MR. LIGHTMAN:  Partially.  You
 2          didn't get my full order, but that's okay.
 3          Better than nothing.
 4                    THE WITNESS:  Thank you, Joe.
 5                    MR. LIGHTMAN:  Thank you.
 6                    THE WITNESS:  Thank you.
 7                    MR. ROSS:  My pleasure.  I'm
 8          sorry.  Give me a quick moment here.
 9   BY MR. ROSS:
10   Q.        Some of this we talked about, so I'm not
11   going to go back over anything we touched on.
12   A.        Yeah.
13   Q.        All right.  Do you recall if you repaid
14   the -- the COVID related loan that The Safety House
15   got or whether it was forgiven?
16   A.        Well, there was two -- there were two loans
17   that The Safety House got.  One was a loan that --
18   not a loan, a stipend that I didn't have to pay
19   back, but there was another loan that I got to do
20   this deal.
21   Q.        Which one was the, like -- the roughly
22   hundred thousand dollar --
23   A.        I didn't have to pay that back.  That was
24   actually -- it was actually interesting, it was a
```



1  big debate with my accountant, because they were

2  treating it as income.

3  Q.        Okay.  And then you got a different loan --

4  A.        I got --

5  Q.        -- from the government?

6  A.        I got -- it's called an EDIL[sic] loan.

7  Q.        What does that stand for?

8  A.        I'm not sure.  Emergency something loan.

9  And that is where I borrowed the money to buy these

10 test kits.

11 Q.        And you paid that back?

12 A.        I did not.

13 Q.        So do -- was it like -- was that loan for

14 the exact --

15 A.        It was for $2 million.

16 Q.        Okay.  And so what's the status of that

17 loan?

18 A.        You have two years -- I actually just got

19 notice a couple weeks ago that they're incurring in

20 -- of me paying it back.  So I had two and a half

21 years before the time started back that I have to

22 pay it back.

23 Q.        Okay.  So for that two and a half years,

24 there was --



```
1    A.        As of now --

2    Q.        -- no repayment obligation?

3    A.        Nothing.

4    Q.        But --

5    A.        So now I got to pay it back, starting now.

6    Q.        And is that, like, installments, or do you

7    have --

8    A.        Yep.

9    Q.        -- do you owe them the whole thing right

10   away?

11   A.        No, it's installments.  Like, it's -- it's

12   a lot of money.  It's a lot of money.

13   Q.        Do you recall -- do you know what -- if

14   it's a monthly installment or a quarterly

15   installment?

16   A.        Monthly.

17   Q.        Do you -- do you know how much it is?

18   A.        It's -- I don't because I'm afraid to look

19   at it.  It's probably going to be 15K a month.

20   Again, that's a guess.

21   Q.        Okay.  All right.

22                       MR. ROSS:  And sorry, Mr. Weiss.

23   BY MR. ROSS:

24   Q.        Do you believe Mr. Weiss is a liar?
```



```
 1                        MR. LIGHTMAN:  Objection.
 2                        THE WITNESS:  Yes.
 3    BY MR. ROSS:
 4    Q.        Did you allege dishonest conduct by him in
 5    your complaint?
 6    A.        No.
 7                        MR. LIGHTMAN:  Objection.
 8    BY MR. ROSS:
 9    Q.        You didn't?
10    A.        I didn't know Mr. Weiss existed until they
11    filed a third-party complaint against him.
12                        MR. LIGHTMAN:  In the amend -- in
13             the complaint, I don't think he was named.
14             I think in the amended complaint.
15    BY MR. ROSS:
16    Q.        All right.  That's where I was going.
17             The amended complaint, the --
18    A.        Yeah.
19    Q.        -- he's a direct defendant now?
20    A.        Right.  Right.  We brought him on in the
21    amended complaint.
22    Q.        Is it fair to say that, at least from your
23    perspective -- I'm sure he would disagree -- that
24    you found evidence to support the claim that he lied
```



```
 1  during the transaction?
 2                    MR. LIGHTMAN:  Objection.
 3                    THE WITNESS:  That he lied
 4        during?
 5  BY MR. ROSS:
 6  Q.      Throughout the transaction.
 7  A.      Yeah, against -- yeah.  Yes, he lied.
 8  Q.      Did he lie to Mr. Gross?
 9                    MR. LIGHTMAN:  Objection.
10  BY MR. ROSS:
11  Q.      If you know.  If you don't --
12  A.      I can't answer that.
13  Q.      What about Ms. Zekaria?
14                    MR. LIGHTMAN:  Objection.
15                    THE WITNESS:  I can't -- I can't
16        answer that either.  I don't know what they
17        did.
18  BY MR. ROSS:
19  Q.      What about Mr. Lightman?
20                    MR. LIGHTMAN:  Objection.
21                    THE WITNESS:  He lied in his
22        deposition.
23  BY MR. ROSS:
24  Q.      Did he lie in any e-mails that include --
```



```
 1   A.       Yes.
 2   Q.       My question for the record, my actual
 3   question I typed out, this is true:  Did he lie to
 4   your attorney, the esteemed, distinguished
 5   Mr. Lightman?
 6   A.       Yes.
 7                   MR. LIGHTMAN:  Objection.
 8                   MR. ROSS:  It's not a lie by me.
 9           You object?  All right.
10                   MR. LIGHTMAN:  You didn't answer
11           the -- ask the question properly.  I don't
12           object to the substance of your question or
13           the substance of the answer.
14                   MR. ROSS:  That's fair.
15   BY MR. ROSS:
16   Q.       Is it your opinion that he lied at his
17   first deposition in February?
18   A.       Yes.
19                   MR. LIGHTMAN:  Objection.
20   BY MR. ROSS:
21   Q.       And is it your opinion that he also lied at
22   the second -- his second deposition day?
23   A.       Yes.
24                   MR. LIGHTMAN:  Objection.
```



```
 1  BY MR. ROSS:
 2  Q.      Do you believe that he had test kits at
 3  some point that were swapped, whether by him or
 4  anybody else, for -- for Weiss?
 5  A.      No.
 6  Q.      Do you -- do you believe he ever had test
 7  kits?
 8  A.      No.
 9  Q.      Do you believe he ever intended to get test
10  kits and provide them to Gross?
11  A.      No.
12  Q.      Have you seen examples of him telling
13  people that he was going to deliver the test kits?
14  A.      Yes.
15  Q.      Did you rely on any of his representations
16  that he would deliver?
17                    MR. LIGHTMAN:  Objection.
18                    THE WITNESS:  Did I rely --
19          during the transaction?
20  BY MR. ROSS:
21  Q.      Yeah.
22  A.      No, I didn't -- like I said, I didn't know
23  him.
24  Q.      And similarly, is it your opinion Mr. Gross
```



```
 1   is a liar?
 2                      MR. LIGHTMAN:  Objection.  How
 3           many times are you going to ask it?
 4                      THE WITNESS:  Yes.
 5   BY MR. ROSS:
 6   Q.      Do you believe Mr. Weiss still has money
 7   that belongs to you?
 8                      MR. LIGHTMAN:  Objection.
 9                      THE WITNESS:  I guess if you --
10           if you -- yeah, I do.  I do because in his
11           -- in the testimony, we found texts of, I
12           guess, Manfred and Sam and Daphna and Gary
13           all saying, oh, we're going to split it,
14           you get 65, I get 35.  So they took the
15           money -- they took the money from VRC that
16           was given to them and divvied it up.
17   BY MR. ROSS:
18   Q.      There's a text thread with those four
19   individuals on -- on the same text link?
20   A.      Maybe not all at the same time, but yeah,
21   they're all in there at one time or the other.  So I
22   believe that Gary has some of my money.
23   Q.      Is that a text thread between the four of
24   them or some other means?
```



```
 1  A.        I believe text thread.  I think there's
 2  some e-mails that indicate that.  There's a bunch of
 3  evidence that shows -- I believe the percentage
 4  things were text, Manfred, Sam, Gary, Daphna saying,
 5  ah, you take this, I'll take that.  They were
 6  divvying up the money.
 7  Q.        Well, the 65-35, I'm going to surprise you
 8  -- remind you that was a thread in -- I think it was
 9  in WhatsApp involving Mr. Weiss, Mr. Gross, and
10  Ms. Zekaria that didn't involve Mr. Sternberg at
11  all.
12                    MR. LIGHTMAN:  Objection.
13                    THE WITNESS:  Well, look, if he
14          wasn't involved in that, you know, he got
15          his cut.
16  BY MR. ROSS:
17  Q.        And I mean, again, it seems like everything
18  Mr. Weiss, Mr. Gross has -- correct me if this is
19  wrong.  In your book they're liars except for when
20  they're talking about Manfred --
21                    MR. LIGHTMAN:  Objection.
22  BY MR. ROSS:
23  Q.        -- and then everything they say is true --
24                    MR. LIGHTMAN:  Objection.
```



```
 1  BY MR. ROSS:

 2  Q.         -- in terms of --

 3  A.         Think about it, they're all buddies, they

 4  all collude together in conspiracy, they're all

 5  buddies, and then the lawsuit comes and then they

 6  turn on each other.

 7  Q.         What --

 8  A.         You know what I mean?  It's typical of

 9  criminals.

10  Q.         All of a sudden they're -- they're caught

11  and then they start to tell the truth?

12  A.         Exactly.

13  Q.         What evidence have you seen that at any

14  point Mr. Sternberg didn't believe that Gross would

15  deliver these test kits?

16                      MR. LIGHTMAN:  Objection.

17                      THE WITNESS:  What evidence did I

18          see that Sternberg?

19  BY MR. ROSS:

20  Q.         That Sternberg believed at any point in the

21  transaction that -- that you wouldn't get your test

22  kits.

23                      MR. LIGHTMAN:  Objection.

24                      THE WITNESS:  I don't -- I don't
```



1          know.  I mean, look, the -- the evidence
2          that I have is Sternberg was defrauding
3          people six months prior to me.  So in other
4          words, him and Gross -- I'll give you an
5          example.  David Wright contacts us because
6          he saw our lawsuit.  He was defrauded by
7          Sam and by Manfred six months prior to us.
8          Manfred then defrauds me.  He then defrauds
9          VRC.  A year-plus after the lawsuit is in
10         place, Sternberg and Gross, and maybe
11         Weiss, were still defrauding people.  There
12         are still lawsuits and people that they
13         were ripping off, a year into the lawsuit.
14         So there's how I knew that he -- Manfred
15         knew Sternberg wasn't going to deliver the
16         goods because he's -- they were defrauding
17         people the whole way.
18  BY MR. ROSS:
19  Q.      Manfred knew you weren't going to get your
20  test kits because --
21  A.      Because this is the ruse that they paid.
22  Look, if Manfred was innocent and he met up with Sam
23  Gross to help me get test kits and we got burnt and
24  that was his only and -- and first deal and only



1 deal, okay, I could kind of see how Manfred got
2 sucked into this, but Manfred did it to David Wright
3 six months before me, he did it to VRC, he did it to
4 me, then a year later -- and this is -- I mean, Joe,
5 there's -- we don't -- these are the ones that we
6 discovered.  Who knows how many more there are.  And
7 then George Deinfacar(ph), who's a friend of mine,
8 he defrauds him, and he has to go to the cops to get
9 his money back.  He knew Sam wasn't going to provide
10 him the kits.  That's how -- that's how I knew
11 Manfred -- that's how I knew Manfred knew that Sam
12 wasn't going to provide any kits because they were
13 together defrauding people all along.
14 Q.      It's your position that Mr. Sternberg was
15 the escrow agent in this transaction?
16 A.      Again?  Yes, Joe.
17 Q.      And what is an escrow agent's role in such
18 a transaction?
19                      MR. LIGHTMAN:  Objection.
20                      THE WITNESS:  So his role is he's
21           in between me and the seller.  I'm the
22           buyer.  He's the seller.  He's an attorney.
23           He holds the money until the product is
24           received and then he releases the money.



```
 1   BY MR. ROSS:

 2   Q.        And what -- where does it say that in the

 3   documents?

 4   A.        Do you want to refer to the SPA?

 5   Q.        We can turn to that.  Let's turn to that.

 6   And I've got some copies.

 7   A.        So if you look at the SPA --

 8   Q.        Give me -- give me one minute, please.

 9   A.        Sure.

10   Q.        There's no question.

11                       MR. ROSS:  Mr. Weiss.

12             Mr. Lightman.  I think this is what's been

13             previously marked Sternberg-4.

14   BY MR. ROSS:

15   Q.        Here, this way you can be certain we're

16   looking at the same one.  All right.

17             Can you tell me what this exhibit -- it's a

18   previously marked exhibit, Sternberg-4.  Take any

19   time you need to look through it and let me know if

20   you recognize it.

21   A.        Yeah, it's the sale and purchase agreement.

22                       MR. LIGHTMAN:  Hold on a second.

23             Is there a reason why you have three sets

24             of it in one exhibit?
```



```
 1                    MR. ROSS:  No.

 2                    MR. LIGHTMAN:  The document

 3           marked as 4 -- oh, okay.  You got --

 4                    MR. ROSS:  Unless they're just

 5           stapled and there's more than one copy

 6           accidentally.

 7                    MR. LIGHTMAN:  So just --

 8                    MR. ROSS:  Whatever Adam

 9           Sternberg -- yeah --

10                    MR. LIGHTMAN:  You've got -- the

11           one you handed me as Exhibit 4 has three

12           Sternberg Exhibit 4s stapled together and

13           you --

14                    THE WITNESS:  Same with me, Joe.

15  BY MR. ROSS:

16  Q.        Okay.

17  A.        Okay.

18  Q.        All right.  As long as the -- is the whole

19  thing there --

20  A.        I mean, the SPA's here.

21  Q.        -- as you understand it?

22           Yeah, maybe there's more than one of them,

23  but as long as there's one of them.

24           All right.  Can you read aloud, for me,
```



1  paragraph 6?

2  A.        Yep.   Once the transferred funds have

3  cleared in the seller's account, bill of sale

4  (Exhibit D) shall be provided, and seller will

5  deliver the goods to a common carrier with

6  instructions to deliver the goods to the locations

7  as directed by the buyer.   Title transfer shall

8  happen contemporaneously with funds being released

9  to seller.   Exhibit-E, attached, is incorporated

10  here as seller's agreed upon standard operating

11  procedure.

12  Q.        And before -- before signing, did you

13  review Exhibit D?

14  A.        I mean, I'm assuming I did.   It's been two

15  and a half years, but I would say yes to that.

16  Q.        How about Exhibit E, the SOP, which I -- I

17  think I did ask you about earlier?

18  A.        Yeah, but if you -- if you go to the

19  Exhibit E and you look at 4, 5, 6, and 7, all that

20  needs to happen at the same time.

21  Q.        All right.

22  A.        And it directly contradicts paragraph 6 on

23  the SPA.   So this is where the -- the case starts

24  because this is where Manfred was fraudulently



```
 1  trying to induce us to commit a fraud.  In one
 2  agreement he has two opposite things to do.
 3  Q.        Can you read paragraph 9 aloud?
 4  A.        Risk of loss shall transfer to the buyer at
 5  the point the product is paid for by the buyer and
 6  the seller is released of all loss guarantees.
 7  Q.        When you signed the agreement, what did you
 8  think that paragraph meant?
 9  A.        I'm -- that's -- I'm asking you.  I don't
10  know what risk of loss is, and I'm -- I'm baffled.
11  Risk of loss.  So what he's saying is as soon as I
12  wire him the money, everything -- everything's on
13  me.
14  Q.        And the last sentence in paragraph 10, I'll
15  just read it.  It says:  Seller makes no other
16  warranty of any kind, expressed or implied, any
17  warranty by seller expressly disclaimed.
18            Did you ask anybody about what that meant?
19  A.        No.
20  Q.        And did you consult anybody about what
21  paragraph 9, about risk of loss meant?
22  A.        No.
23  Q.        Sitting here today, do you know what that
24  means?
```



```
 1  A.        Risk of loss?

 2  Q.        Yeah, what the import of paragraph 9 was.

 3  A.        In my view now, what Manfred, again, is

 4  fraudulently trying to induce is saying that once I

 5  wire him the money, it's over no matter what happens

 6  to the goods, no matter what happens in this

 7  transaction, I'm -- I'm off the hook, as an escrow

 8  agent.

 9  Q.        I think paragraph 15 writes:  Buyer agrees

10  to indemnify, defend, and hold harmless the seller,

11  its agents, servants, employees, contractors, and

12  affiliates --

13  A.        Yep.

14  Q.        -- from and against all damages, losses,

15  costs, and expenses -- I am skipping parentheticals.

16  A.        Yep.

17  Q.        -- which -- which they may incur by reason

18  of any breach of the representations and warranties

19  made by buyer in this agreement.

20                      MR. LIGHTMAN:  Made by buyer.

21  BY MR. ROSS:

22  Q.        Did you make any misrepresentations to

23  anybody in the course of this transaction?

24  A.        Misrepresentations?
```



```
 1  Q.       Yeah.

 2  A.       No.  What do you mean by

 3  misrepresentations?  For example?

 4  Q.       Just what I said.

 5  A.       For example?

 6  Q.       I don't have any examples.

 7                   MR. LIGHTMAN:  No, you don't need

 8           that -- no, you don't answer a question

 9           with a question.

10  BY MR. ROSS:

11  Q.       It looks like in paragraph 16:  Seller and

12  the buyer are independent contracting parties and

13  nothing in this agreement shall make either party

14  the agent, employee, or legal representative of the

15  other.

16           Do you see that?

17                   MR. LIGHTMAN:  I'll stipulate you

18           read it correctly.

19                   THE WITNESS:  Yeah, I see it.

20  BY MR. ROSS:

21  Q.       Did that -- did paragraph 16, or any of

22  these paragraphs, make you think I should show this

23  to a lawyer before I sign this --

24                   MR. LIGHTMAN:  Objection.
```



```
 1  BY MR. ROSS:

 2  Q.        -- this is kind of like --

 3  A.        I had a lawyer, Manfred.

 4  Q.        Again, when did you retain Manfred

 5  Sternberg as your attorney?

 6                    MR. LIGHTMAN:  Well, he didn't --

 7                    THE WITNESS:  He provided this

 8          document to me.  He created this document.

 9          It's obviously he created it to induce a

10          fraudulent act.

11  BY MR. ROSS:

12  Q.        How is it obvious?

13  A.        After the fact, and now that I got Gary

14  involved and we've -- he showed me, it's obvious.

15  Q.        How?

16  A.        Both sides are -- it's -- it's -- it's a

17  one-sided contract.

18  Q.        How is it obvious?

19  A.        Read it.  Seller and buyer, independent

20  contracting parties.  What he's saying, risk of

21  loss.  As soon as I wire the money, he's out,

22  there's no responsibility.

23  Q.        And above the signature lines, it says

24  here:  We, the undersigned, with full legal and
```



```
 1  corporate responsibility accept the agreement.
 2                      MR. LIGHTMAN:  Objection.
 3  BY MR. ROSS:
 4  Q.      Did you ask Mr. Sternberg any questions
 5  about contents of this agreement?
 6  A.      The brokers did.
 7  Q.      Did the brokers sign the agreement?
 8  A.      No.
 9                      MR. LIGHTMAN:  Objection.
10  BY MR. ROSS:
11  Q.      Did the brokers give anybody any money in
12  relation to the agreement?
13  A.      I can't tell you that.  I don't know.
14  Q.      But there's at least one concept in here,
15  paragraph 9, risk of loss, that even today you
16  testified you don't -- you're not sure what that
17  means.
18  A.      I mean, if you're --
19                      MR. LIGHTMAN:  Objection.  Go
20          ahead.
21  BY MR. ROSS:
22  Q.      If I mischaracterized --
23  A.      Can we read it again?
24  Q.      -- your testimony, please correct me
```



```
 1   anytime.
 2   A.       Can we read it again?
 3   Q.       Paragraph 9?
 4   A.       Risk of loss shall transfer to buyer, The
 5   Safety House, at the point the product is paid for
 6   by the buyer and the seller is released from all
 7   loss guarantees.
 8            So basically the way I read that now is you
 9   wire the money, whatever happens is not my fault.
10   Is that -- do you agree?
11   Q.       That's what that said before you signed it
12   too though, right?
13   A.       Do you agree that's what that says?
14   Q.       Your testimony is your testimony.
15            So -- strike that.
16            Can you tell me where in the agreement it
17   states what Mr. Sternberg's role is?
18                     MR. LIGHTMAN:  Objection.
19   BY MR. ROSS:
20   Q.       For example, where it says he's the escrow
21   agent.
22   A.       Without reading the whole thing, no.
23   Q.       Take your time.  Please read the whole
24   thing.
```



```
 1                    MR. LIGHTMAN:  Go through it and
 2           point out each provision.
 3                    THE WITNESS:  This agreement is
 4           for sale and purchase of the product
 5           identified on the purchase order here and
 6           marked as Exhibit A.  This sale and
 7           purchase agreement is hereto referred to as
 8           the agreement.
 9                    What do you want to know?
10   BY MR. ROSS:
11   Q.      Which of these paragraphs describes
12   Mr. Sternberg's role as an escrow agent?
13   A.      I mean, the whole agreement does.  He
14   created the agreement that he sent me to say, hey,
15   send me the money and we'll get my -- we'll get the
16   product delivered to you.
17   Q.      Where do you see that in the agreement?
18   A.      Read the agreement.  The whole agreement is
19   established for me to send him money so that I would
20   get product.
21   Q.      You cannot tell me which numbered paragraph
22   says that; isn't that right?
23   A.      It says --
24                    MR. LIGHTMAN:  Go through it and
```



```
 1                point out each of the paragraphs that

 2                support your answer you just gave.

 3                     THE WITNESS:  Paragraph 6:  Once

 4                the transferred funds have cleared in the

 5                seller's account, bill of sale (Exhibit D)

 6                shall be provided and seller will deliver

 7                the goods to a common carrier with

 8                instructions to deliver the goods to the

 9                location as directed by the buyer.  Title

10                transfer shall happen contemporaneously

11                with the funds being released to the

12                seller.  Exhibit-E, attached hereto, is

13                incorporated herein as the seller agrees

14                upon the standard operating procedure.

15                     MR. LIGHTMAN:  Keep going.

16                     THE WITNESS:  Seller agrees to

17                pay commissions --

18   BY MR. ROSS:

19   Q.    Wait a minute.  Where in that paragraph

20   number 6 does it --

21                     MR. LIGHTMAN:  Wait.  He's not

22                done.  You asked him to go through each

23                provision.

24                     THE WITNESS:  Number 7:  Seller
```



```
 1           agrees to --
 2   BY MR. ROSS:
 3   Q.        Please do.
 4   A.        -- pay commissions --
 5   Q.        Please do.
 6   A.        -- if any, included with rolls and
 7   extensions for the duration of this agreement as a
 8   separate written agreement.
 9                   MR. LIGHTMAN:  Keep going.
10                   THE WITNESS:  8:  The seller
11           agrees to coordinate and pay for common
12           carrier transportations to deliver the
13           goods from the seller's warehouse to buyer
14           at seller's cost and is included in the
15           purchase price paid to the seller by buyer
16           hereunder.
17                   This is the agreement that
18           Manfred Sternberg created, or, as his words
19           are, drafted.
20                   MR. LIGHTMAN:  Keep going.
21           Finish your answer.
22                   THE WITNESS:  And then if you
23           look at the wiring instructions.
24   BY MR. ROSS:
```



1    Q.       I asked about the numbered paragraphs.  Are

2    we done with the numbered paragraphs?

3                    MR. LIGHTMAN:  No because this is

4            part of -- you referred to the --

5                    MR. ROSS:  I asked about the

6            numbered paragraphs.

7                    MR. LIGHTMAN:  Well, you said go

8            through the SPA and point out each of the

9            provisions --

10                   MR. ROSS:  I'll ask him where

11           else --

12                   MR. LIGHTMAN:  No.  No.  Let him

13           finish his answer because there's an

14           exhibit that he's referring to.

15                   THE WITNESS:  So Exhibit B,

16           where's the Exhibit B that he -- that he

17           mentions that I wire the money to his

18           escrow account?  It even says on the top of

19           Exhibit B, escrow account, Manfred

20           Sternberg.  Right on the top of the page.

21           So when you see an e-mail from you with

22           Manfred Sternberg, Jr., attorney at law,

23           IOLTA, escrow account, what are you

24           thinking, Joe?  It's an escrow agent.  He's



```
 1              the escrow attorney.  It gives you that
 2              peace of mind that, okay, the funds are
 3              going in escrow, it's safe, I'll get my
 4              goods, if not, I'll get my money back.
 5                   Do I have that?  Do you see this?
 6              Joe, can you look at Exhibit B?
 7   BY MR. ROSS:
 8   Q.      I am on Exhibit B.
 9   A.      What's the first words there?  Escrow --
10   Q.      You're the witness.
11   A.      Escrow account, right?  Manfred Sternberg,
12   Jr., account[sic] at law, IOLTA trust, account wire
13   instructions.  Escrow account.  Fraudulently
14   induced.  Escrow account.  Remember those words.
15   Q.      Is your answer complete?
16   A.      Do you have any other questions?
17   Q.      Is it true that none of the numbered
18   paragraphs name Manfred Sternberg anywhere?
19   A.      The Exhibit B does.
20   Q.      Isn't it true that none of the numbered
21   paragraphs contain the words --
22   A.      Let me see.
23   Q.      -- Manfred or Sternberg?
24   A.      Let me just go back to it.  Hold on.
```

```
 1                      MR. LIGHTMAN:  By name?
 2                      MR. ROSS:  The words Manfred or
 3          Sternberg, yes.
 4                      MR. LIGHTMAN:  Well, other than
 5          there was a seller's attorney escrow
 6          account, does that -- does it have to say
 7          Manfred Sternberg?
 8                      THE WITNESS:  On 4 -- on 4 --
 9  BY MR. ROSS:
10  Q.        The question is Manfred or Sternberg.
11  A.        Okay.  On page[sic] 4, it says:  The
12  product lots may be located in more than one
13  location or warehouse in various locales in the
14  United States.  Immediately after delivering a
15  purchase order, buyer agrees to authorize a wire be
16  made to the seller through the seller's attorney's
17  escrow account identified in Exhibit B.
18        Now, when you go to Exhibit B, like we just
19  did, Manfred Sternberg, Jr. right on the front,
20  escrow account.  Now, I don't know about you, but
21  what does that look like?
22                      THE WITNESS:  Gary, do you want
23          to answer it?  That looks like --
24                      MR. LIGHTMAN:  I'm not being
```



```
 1              deposed.
 2                        THE WITNESS:  Not you.  Gary
 3              Weiss.
 4                        MR. LIGHTMAN:  Oh.
 5                        MR. ROSS:  He's not being deposed
 6              either.
 7                        THE WITNESS:  It looks like it's
 8              an escrow account by an escrow attorney.
 9  BY MR. ROSS:
10  Q.      Whose -- whose attorney does it say in
11  paragraph 4?
12  A.      Seller -- through the seller's attorney
13  escrow account.
14  Q.      Were you the seller?
15  A.      No.
16  Q.      Was The Safety House the seller?
17  A.      No.
18  Q.      Who was the seller?
19  A.      Sam Gross.
20                        MR. LIGHTMAN:  But who was the
21              attorney escrow -- never mind.  Never mind.
22                        THE WITNESS:  It's
23              self-explanatory.
24                        MR. LIGHTMAN:  Yeah, he's trying
```



```
 1            to pick and choose --
 2  BY MR. ROSS:
 3  Q.       I just want to hear what the answer is.  Do
 4  the words Manfred or Sternberg appear in the
 5  numbered paragraphs, 1 through 18, of the SPA?
 6  A.       Indirectly it does when it says to go to
 7  Exhibit B.
 8  Q.       But directly, it doesn't, right?
 9  A.       No, if -- when you -- it says in here go to
10  Exhibit --
11  Q.       Why are you so afraid to answer the
12  question?
13  A.       I am.
14                 MR. LIGHTMAN:  He is.
15                 THE WITNESS:  I am.
16                 MR. LIGHTMAN:  He's saying it's
17            -- he's saying this is a reference to
18            Exhibit B, and Exhibit B says Sternberg
19            escrow account.
20                 THE WITNESS:  This --
21                 MR. LIGHTMAN:  Paragraph 4 says
22            seller's attorney escrow account, and he's
23            the seller's attorney escrow account.  So
24            you're right, the words Manfred Sternberg
```



```
 1              are not --
 2                      THE WITNESS:  But they're on
 3              Exhibit B.
 4                      MR. LIGHTMAN:  Exactly.  Not set
 5              forth in the numbered paragraphs, but
 6              there's references to the -- to him, the
 7              seller's attorney escrow account and to the
 8              Exhibit B, which does name him, so you're
 9              right.
10                      THE WITNESS:  And the thing is,
11              Joe, you're asking me --
12    BY MR. ROSS:
13    Q.       So --
14    A.       -- how did I make a decision here.  I made
15    the decision on Manfred Sternberg, Jr. escrow
16    account.  He's trying to -- he's trying to
17    fraudulently induce me to make a decision acting
18    like, oh, I'm not involved, I'll take your 2
19    million, but I'm not involved.
20    Q.       If you bought a $2 million house, would you
21    use the same lawyer as the seller?
22    A.       No, I would not.
23    Q.       Let's look at Exhibit B.  You're right, at
24    the top it says Exhibit B in quotes, it says dash,
```


ESQUIRE
DEPOSITION SOLUTIONS

```
 1   and it says escrow account.  That's true.  What we

 2   see here is -- under it, Manfred Sternberg, Jr.,

 3   attorney at law, IOLTA trust account wire

 4   instructions.  It looks like the bank information

 5   for this account refers to it as a trust account.

 6   It doesn't say anything about an escrow account.  Is

 7   that right?

 8   A.       It says Exhibit B, escrow account right at

 9   the top.

10   Q.       And what does it say underneath?

11   A.       Manfred Sternberg, Jr., attorney at law.

12   Q.       What else?

13   A.       IOLTA trust.  That's all it needs.  You see

14   that, you're like, oh, okay, I got -- I got an

15   escrow account here for a respectable attorney in --

16   what am I supposed to think?

17   Q.       So, again, if a seller -- if a home

18   seller's attorney gave you a contract of sale for a

19   property worth $1.9 million, you would just sign

20   that because the seller's lawyer is a lawyer and you

21   can trust them?

22                     MR. LIGHTMAN:  Objection.

23   BY MR. ROSS:

24   Q.       Or they're -- they're your lawyer and the
```



```
 1  seller's lawyer.

 2  A.      Well, that's the problem, Manfred was the

 3  escrow agent, he was counsel for Sam Gross, and he

 4  was also profiting from the transaction.

 5              MR. LIGHTMAN:  The better analogy

 6         to your question would be Sternberg acting

 7         not only as the seller's attorney but also

 8         as the title company escrow agent.

 9              THE WITNESS:  Right.

10              MR. LIGHTMAN:  That would be a

11         better example.

12              THE WITNESS:  Yeah.

13              MR. ROSS:  I think my analogy is

14         pretty good.

15              MR. LIGHTMAN:  Well, we'll see --

16              THE WITNESS:  They're both good.

17              MR. ROSS:  I'm still looking for

18         --

19              THE WITNESS:  I'll give you both

20         credit.  They're both good.  But he acted

21         on both sides.

22  BY MR. ROSS:

23  Q.      Well, this agreement is pretty -- pretty

24  clearly discloses he's the seller's attorney, right,
```



1  in paragraph 4?

2  A.       Yeah, and it's pretty clear he was also the

3  escrow agent.  Pretty clear of that too, right?

4  Q.       That's also --

5  A.       It's pretty clear.

6  Q.       -- a contention that you made.

7           My question is:  Where in the agreement

8  does it call him or anybody the escrow agent?

9  A.       Again, referring back to what we said

10 earlier about Exhibit B, when you go to Exhibit B,

11 right on the top, it says escrow account, Manfred

12 Sternberg, Jr.

13                    MR. WEISS:  Exhibit B, you said?

14                    MR. ROSS:  Exhibit B to the

15           escrow --

16                    MR. WEISS:  Who labeled Exhibit

17           B?

18                    THE WITNESS:  I'm not sure who

19           did that.  I guess --

20                    MR. WEISS:  Okay.

21                    THE WITNESS:  I guess it was -- I

22           guess they --

23                    MR. WEISS:  Interruptions --

24                    THE WITNESS:  They sent it to us



```
 1                    --
 2                         MR. LIGHTMAN:  Let him finish.
 3                         THE WITNESS:  Manfred did.
 4                         MR. LIGHTMAN:  Manfred did.
 5            Manfred's his answer.
 6                         THE WITNESS:  He sent that to us,
 7            Manfred.
 8    BY MR. ROSS:
 9    Q.       So -- and the only aspect of this agreement
10    where the person Manfred Sternberg is being
11    characterized as something, he's being called the
12    seller's attorney; is that right?
13                         MR. LIGHTMAN:  Objection.
14                         THE WITNESS:  Wait.  Say -- I'm
15            sorry, repeat --
16    BY MR. ROSS:
17    Q.       He's -- seller's attorney is referring to
18    Manfred Sternberg, right, in paragraph 4?
19    A.       Product loss -- baa, baa, baa.  Authorize a
20    wire to be made to seller through the seller's
21    attorney's escrow account, identified in Exhibit B.
22    Q.       Do you understand the seller's attorney to
23    refer to Mr. Sternberg?
24    A.       Yeah, I see he's the seller's attorney and
```



```
 1  he's the attorney for the escrow account.  That's
 2  what I see in that.
 3  Q.      What was Mr. Sternberg's duty to The Safety
 4  House with regard to this transaction?
 5                      MR. LIGHTMAN:  Objection.
 6                      THE WITNESS:  He was to hold the
 7          escrow money until I got delivery of the
 8          goods, in a nutshell.
 9  BY MR. ROSS:
10  Q.      Was it his duty to deliver the goods?
11                      MR. LIGHTMAN:  Objection.
12                      THE WITNESS:  He was the
13          quintessential leader of the transaction.
14          So nothing that was done in this
15          transaction was not done without the
16          instruction of Manfred Sternberg.  Now, did
17          he physically put the boxes on the truck
18          and try to make delivery, no, but he -- he
19          was -- because he was the -- I'll just put
20          it this way, because he was the escrow
21          holder, he who holds the gold, he's the --
22          it's the golden rule.  Are you familiar
23          with the golden rule, Joe?
24  BY MR. ROSS:
```



1  Q.        I'm all ears.

2  A.        Whoever holds all the gold makes all the

3  rules.  So Manfred made sure that whatever he was in

4  charge, going you do this, you do that, you do this,

5  you do that, he was the quintessential master leader

6  of this whole transaction.

7  Q.        That's an assumption, right?

8  A.        No, no, no, that's a fact.  I mean, look at

9  -- look at all the documentation, look at him trying

10 to get things done, yelling at Gary through texts,

11 things aren't getting done, I want to get it done.

12 Daphna in her testimony is saying that I did nothing

13 without Manfred Sternberg's say so.  So every part

14 of this deal -- again, you have your underlings do

15 stuff.  Gary Weiss was doing stuff.  Sam was doing

16 stuff.  Daphna was doing -- but nothing was done

17 unless Manfred instructed it to do.

18 Q.        And, again, we're -- you consider

19 Ms. Zekaria's testimony credible?

20                    MR. LIGHTMAN:  Objection.

21                    THE WITNESS:  Well, I mean, look

22        --

23 BY MR. ROSS:

24 Q.        Do you believe her when she says that?



```
 1   A.        Yes.
 2                       MR. LIGHTMAN:  Objection.
 3                       THE WITNESS:  Yes.
 4   BY MR. ROSS:
 5   Q.        She's suspended, if not yet disbarred --
 6   A.        Again --
 7   Q.        -- from the practice of law, right?
 8   A.        She's another criminal.  She's part of the
 9   criminal -- and, again, all four criminals are now
10   all against each other, but --
11   Q.        Telling the truth now?
12   A.        Yeah because they're -- they're being
13   indicted.
14   Q.        Now that you need them to tell the truth --
15   A.        They're being indicted.
16   Q.        -- to support your lawsuit?
17                       MR. LIGHTMAN:  They're not always
18             telling the truth, but --
19   BY MR. ROSS:
20   Q.        But when talk about each other, they're
21   telling the truth?  Nobody's lying about --
22                       MR. LIGHTMAN:  When Zekaria --
23                       MR. ROSS:  Let me just -- I will
24             listen to --
```



```
 1                          MR. LIGHTMAN:  Okay.
 2                          MR. ROSS:  -- what you're saying.
 3              I will.
 4                          MR. LIGHTMAN:  Go ahead.
 5                          MR. ROSS:  I will not ask -- to
 6              say that -- to not testify.
 7  BY MR. ROSS:
 8  Q.       The problem I'm having here is these are
 9  all liars until they start to talk about each other
10  and then everything they say is true?
11  A.       Well --
12                          MR. LIGHTMAN:  Stop.  That's your
13              interpretation.  First of all, not
14              everything they say is true, but --
15                          MR. ROSS:  About each other.
16                          MR. LIGHTMAN:  -- when Zekaria
17              says I was told by Manfred to release the
18              funds and I had to check with Manfred, we
19              have nothing to dispute that, but when
20              Zekaria says I retained 130,000 as my --
21              120 as my fee and there's no evidence to
22              show that she sent that out and she said
23              she sent it out, yeah, some things you can
24              believe and some things you can't believe.
```



ESQUIRE
DEPOSITION SOLUTIONS

```
 1              It's not just an all or nothing.  Look at
 2         Gary Weiss, Gary Weiss is telling lie after
 3         lie in his deposition, but sometimes he
 4         tells the truth.  Which story is the
 5         correct one, the one where he went to pick
 6         up the stuff and they vanished or when he
 7         went to pick up the stuff and there was
 8         rice there?  Which story is Gary Weiss
 9         telling the truth, the one where he said he
10         gave them $400,000 in cash on Friday
11         without a receipt and then showed up on
12         Sunday to buy the rest and --
13                   THE WITNESS:  Don't forget about
14         the jewels.
15  BY MR. ROSS:
16  Q.      Mr. Scully, how do you --
17                   MR. LIGHTMAN:  And the jewels.
18  BY MR. ROSS:
19  Q.      -- how do you know when --
20                   MR. LIGHTMAN:  We don't.
21  BY MR. ROSS:
22  Q.      -- Mr. Weiss is telling a lie and when he's
23  telling the truth?  How do you determine that?
24  A.      A lot of the e-mails and texts that were
```



```
 1  provided to us in discovery, which were internal
 2  between Gary, Manfred, Sam, and Daphna, we -- we
 3  figured those -- some of those were truths in there.
 4  Q.        And is it -- so it's just a coincidence
 5  that everything the other defendants say about what
 6  you consider the only collectible defendant is true?
 7                        MR. LIGHTMAN:  Objection.
 8                        THE WITNESS:  Wait.  Repeat that.
 9          I'm sorry.
10  BY MR. ROSS:
11  Q.        It's just a coincidence that you believe
12  everything the other defendants say about
13  Mr. Sternberg, who you understand to be the only
14  collectible defendant, all those things are true,
15  it's just a coincidence that everything about
16  Manfred is true?
17                        MR. LIGHTMAN:  Objection.
18                        THE WITNESS:  Look, Manfred is
19              the leader of the pack, he's the one with
20              the law degree, he's the one that's the
21              professional.  Okay.  So he's caught.  He's
22              with these criminals that he's been with
23              for a while, and now he's caught so he's
24              using his law degree to back himself up.
```



```
 1              He's using his profess -- I'm a lawyer, I'm
 2              -- these guys are the criminals, I'm an
 3              innocent bystander, I'm getting burnt just
 4              like you are, which is not true.
 5  BY MR. ROSS:
 6  Q.      Outside of the SPA, do you have any
 7  documentary evidence that he was representing you or
 8  the company?
 9                      MR. LIGHTMAN:  Objection.
10                      THE WITNESS:  Other than the --
11  BY MR. ROSS:
12  Q.      In this transaction.  I'm sorry.
13  A.      Yeah, the only --
14                      MR. LIGHTMAN:  Objection.
15                      THE WITNESS:  All I have is he
16              was my escrow agent.  That's it.
17  BY MR. ROSS:
18  Q.      But you have nothing that says that?
19  A.      He was the escrow agent for this
20  transaction.
21  Q.      You have nothing that refers to him as an
22  escrow agent?
23  A.      The documents.  Other than the documents,
24  no, I have nothing else.
```



1  Q.      But they don't refer to him as the escrow

2  agent?

3  A.      Yeah, it does.

4                  MR. LIGHTMAN:  Objection.  It

5          does.  Come on.

6  BY MR. ROSS:

7  Q.      Where --

8                  MR. LIGHTMAN:  You can't -- it

9          says --

10                 THE WITNESS:  How many times do

11         you want me to tell you?

12  BY MR. ROSS:

13  Q.      Where in the SPA does it say escrow agent?

14  I am all ears.

15                 MR. LIGHTMAN:  Attorney --

16         seller's attorney escrow account.

17                 MR. ROSS:  Okay.

18                 MR. LIGHTMAN:  In paragraph 4 --

19                 THE WITNESS:  Number 4.  Number

20         4.

21                 MR. LIGHTMAN:  -- and in -- and

22         in Exhibit --

23                 THE WITNESS:  And in Exhibit B.

24                 MR. LIGHTMAN:  -- B.  He said it



```
 1              four or five times.  You can ask it 800

 2              different ways, he's not going to change

 3              his answer.

 4  BY MR. ROSS:

 5  Q.      I'm just seeing if you can give an answer.

 6                   MR. LIGHTMAN:  That is his

 7              answer.

 8                   THE WITNESS:  That's my answer.

 9  BY MR. ROSS:

10  Q.      If that's your answer under oath, that's

11  your answer under oath.

12                   MR. LIGHTMAN:  Right.  Let's move

13              on.

14  BY MR. ROSS:

15  Q.      Is it your contention that Mr. Sternberg

16  was obligated to provide you with test kits?

17                   MR. LIGHTMAN:  Objection.

18                   THE WITNESS:  Yes.

19  BY MR. ROSS:

20  Q.      And why is that your contention?

21  A.      Again, he was the leader.  He -- everything

22  in this transaction went through Manfred Sternberg.

23  He hooked us up with Sam.  He hooked us up with

24  where -- what's going to happen.  He sent out the
```



1  agreements.  He sent out the bill of sales.  He --
2  he later, after I canceled the order, sent out bill
3  of ladings.  He -- he was it.  He was -- look, the
4  money went into his account.
5  Q.      And Charlton Holdings Group, LLC executed a
6  sale and purchase agreement to provide The Safety
7  House with test kits, right?
8  A.      Yeah, that's -- that's the company --
9  that's the LLC shell company they used.
10 Q.      Mr. Gross signed that?
11 A.      Mr. Gross and Mr. Sternberg used that.
12 Q.      Mr. Gross signed it, right?
13                  MR. LIGHTMAN:  Signed what?
14                  THE WITNESS:  Yeah, what are you
15         talking about?
16 BY MR. ROSS:
17 Q.      The SPA.
18                  MR. LIGHTMAN:  Objection.  When?
19                  THE WITNESS:  Yeah, I don't -- I
20         don't see that in this.
21 BY MR. ROSS:
22 Q.      Do you see his signature anywhere in --
23 A.      Did you give me a copy?  Is it in your
24 copy?



```
 1   Q.      There's like a -- there's -- I don't know
 2   what page --
 3   A.      Oh yeah, but we don't know when he signed
 4   it because he won't provide the metadata to -- of
 5   when he signed that.  He could have signed that
 6   after I already canceled it.  Who knows.
 7   Q.      But there's nothing in this agreement that
 8   obligates Manfred Sternberg to provide test kits to
 9   The Safety House --
10                   MR. LIGHTMAN:  Objection.
11   BY MR. ROSS:
12   Q.      -- right?
13   A.      Well, the agreement does.  He -- he's the
14   -- like I told you, he's the leader.  He's the --
15   Q.      You keep saying that, but there's no
16   evidence for that.  I'm trying to get to the
17   evidence.
18                   MR. LIGHTMAN:  Don't argue with
19           him.  Take his facts and make your
20           argument, but he's giving you facts.  Don't
21           argue with him.
22                   THE WITNESS:  It's a fact that he
23           was the man.
24   BY MR. ROSS:
```



```
 1  Q.      All right.  I see two names here on this
 2  agreement, Sam Gross and Daniel J. Scully.
 3                      MR. LIGHTMAN:  That signed it.
 4          There's Stern --
 5                      MR. ROSS:  But it is your --
 6          that's a good point.
 7                      MR. LIGHTMAN:  Sternberg --
 8                      MR. ROSS:  That's a good point.
 9          That's a fair point.
10                      MR. LIGHTMAN:  Sternberg's
11          referred to in here.  There's an escrow
12          agreement as an exhibit.
13                      MR. ROSS:  Let's see.
14                      THE WITNESS:  There's wiring
15          instructions.
16  BY MR. ROSS:
17  Q.      At the top of the first page, it says:
18  This sale and purchase agreement is referred to
19  herein as this agreement.  Seller --
20  A.      Wait.  Where are you?  I'm lost.
21  Q.      The first page.  Not the Exhibit A page,
22  but the first page --
23  A.      Yeah.  This agreement is for the sale and
24  purchase, that?
```



```
 1  Q.      Yes.  Yes.  Yes, that's right.
 2          And under that, it says:  Seller, Charlton
 3  Holdings Group, LLC, and buyer says Safety House.
 4  Neither of those says Manfred Sternberg or Manfred
 5  Sternberg and Associates, right?  Yes or no.  You
 6  can elaborate, but I want a yes or no.
 7  A.      No, those two sentences do not say Manfred
 8  Sternberg.  You're right.
 9  Q.      And actually, again, his name does not
10  appear in the agreement?
11                  MR. LIGHTMAN:  Objection.  How
12          many times are you going to ask him that?
13          Every time you ask that, he says his name
14          doesn't appear in the agreement, but --
15                  THE WITNESS:  Until the exhibit.
16                  MR. LIGHTMAN:  -- it appears in
17          the exhibit and there's a reference in
18          paragraph 4.  How many times are you going
19          to ask him?
20                  MR. ROSS:  Don't get upset.
21                  MR. LIGHTMAN:  I'm not.  It's
22          just you keep asking the same thing over
23          and over and over again.
24  BY MR. ROSS:
```



```
 1   Q.       Do you think that Mr. Sternberg's duties to
 2   the Gross defendants were different than the duties
 3   you contend he had to you?
 4                       MR. LIGHTMAN:  Objection.
 5                       THE WITNESS:  Well, as an escrow
 6            agreement, his duties are the same.  He's
 7            -- he represented Gross and he represented
 8            me.  Now, as counsel, his duties were
 9            different, yes, and as his profiting
10            partner, yeah, they were definitely
11            different.
12   BY MR. ROSS:
13   Q.       But, again, you refer to him as a profiting
14   party.  You don't have any evidence to support that?
15                       MR. LIGHTMAN:  Objection.  Other
16            than what he's testified to, you mean?
17                       THE WITNESS:  I mean, I guess
18            that --
19                       MR. ROSS:  Yeah, that's fair.
20            Yeah.
21   BY MR. ROSS:
22   Q.       Any evidence other than your own
23   self-serving testimony?
24                       MR. LIGHTMAN:  Objection.
```



```
1                        THE WITNESS:  I guess the
2          Venmoing payments out.
3   BY MR. ROSS:
4   Q.      What -- again, I'm only talking about
5   direct.  So any -- what direct statements by
6   Mr. Sternberg did you rely on in completing the
7   transaction?
8                        MR. LIGHTMAN:  Objection.
9                        THE WITNESS:  Everything was
10         through the brokers.
11  BY MR. ROSS:
12  Q.      Is it your position that Mr. Sternberg was
13  obligated to perform any due diligence on your
14  behalf before you wired the funds for the purchase?
15                       MR. LIGHTMAN:  Objection.
16                       THE WITNESS:  Yeah, he was
17         supposed to provide some due diligence.
18  BY MR. ROSS:
19  Q.      Where do you -- where does that obligation
20  come from?
21  A.      Once I wired him the money.
22  Q.      I'm talking about due diligence before you
23  wired the money.  Did he have any obligation to do
24  any kind of due diligence before you wired the
```



```
 1   money?
 2   A.       Mr. Sternberg?
 3   Q.       Yeah.
 4   A.       Before I wired, was there any due
 5   diligence?
 6   Q.       Yeah, any obligation by him to do due
 7   diligence on behalf of The Safety House.
 8   A.       Before the wire?
 9   Q.       Before the wire.
10   A.       I would say -- I would say that doesn't
11   make any sense.
12                     MR. LIGHTMAN:  I would agree.
13                     THE WITNESS:  What kind of due
14        diligence would you do before the wire?
15   BY MR. ROSS:
16   Q.       What about after the wire?
17   A.       After the wire, yeah, he had a lot of due
18   diligence.
19   Q.       What kind of due diligence was he obligated
20   to do, in your opinion?
21   A.       I mean, he had to provide the -- he had to
22   provide the bill of sale, he had to provide the bill
23   of ladings, he had to verify that the bill of
24   ladings were correct.  You can't just hearsay
```



1  saying, yeah, here you go.  He could have called the

2  shipping company to say, hey, do you have this

3  product that Sam Gross and Gary Weiss say are there.

4  He could have done all those -- he could have done

5  the typical escrow agent's duty.  He can't just say,

6  ah, got the money, see you.

7  Q.     How do you know those were his obligations?

8  Where were those obligations set forth?

9  A.     It's the standard practice, escrow agent.

10 He can't just -- as an escrow agent, he has a duty

11 to both parties.

12 Q.     Do you regret not having done any

13 additional due diligence yourself on the Charlton

14 Holdings Group to determine whether or not you

15 thought they would actually provide you with

16 product?

17                 MR. LIGHTMAN:  Objection.

18                 THE WITNESS:  Wait.  Repeat the

19        question.

20 BY MR. ROSS:

21 Q.     Do you regret not doing due diligence on

22 Charlton Holdings Group to determine if they can

23 provide product or not?

24                 MR. LIGHTMAN:  Objection.



```
 1                    THE WITNESS:  Yeah, I mean,
 2          looking back now, I could have -- I could
 3          have -- I could've done things differently.
 4  BY MR. ROSS:
 5  Q.      Having looked at the SPA, do you dispute
 6  that the title of the test kits transferred to you
 7  immediately on wiring the money?
 8                    MR. LIGHTMAN:  Objection.
 9                    THE WITNESS:  Yeah, I dispute it.
10          Come on.  What -- what -- it's ridiculous.
11          It's an inducement of fraud by Sternberg.
12  BY MR. ROSS:
13  Q.      That provision of the SPA that --
14  A.      Risk of loss, is that what you're talking
15  about?
16  Q.      I think so, but let's just double-check.  I
17  think we're talking about, yeah, paragraph 9.
18  A.      Yeah, risk of loss transfers as soon as I
19  give him the money and then --
20  Q.      You don't dispute that's what that means?
21                    MR. LIGHTMAN:  Objection.
22  BY MR. ROSS:
23  Q.      You characterize this as fraud, I
24  understand that.
```



```
 1   A.        Look, I'm -- it is -- it's ambiguous.  I
 2   really don't understand it.  I mean, I would love
 3   for you to explain what risk of loss means.  I mean,
 4   please explain number nine to me.  I would love that
 5   because I really don't understand it.
 6   Q.        I'm trying to figure out how Mr. Sternberg
 7   induced The Safety House into anything without ever
 8   communicating with them.
 9                    MR. LIGHTMAN:  Objection.
10   BY MR. ROSS:
11   Q.        Can you --
12                    MR. LIGHTMAN:  How do you say
13            that they never communicated with him when
14            he's testified there were tons of
15            communications --
16                    THE WITNESS:  Tons of broker --
17                    MR. LIGHTMAN:  -- through the
18            brokers and after -- afterwards he had
19            direct communications?
20   BY MR. ROSS:
21   Q.        Why are not the brokers --
22                    MR. LIGHTMAN:  He had direct
23            communication.
24   BY MR. ROSS:
```



1  Q.       -- the subject of this lawsuit?

2                     MR. LIGHTMAN:  Bring them in.

3                     MR. ROSS:  You had communication

4           --

5                     MR. LIGHTMAN:  They're your

6           agents.  Bring them in.

7  BY MR. ROSS:

8  Q.       You're suing somebody for making fraudulent

9  misrepresentations with whom you never spoke.

10                    MR. LIGHTMAN:  Objection.  He --

11                    THE WITNESS:  Look, this is --

12                    MR. LIGHTMAN:  Don't answer it.

13          Objection.  You mischaracterized his

14          testimony.  The record will speak for

15          itself.  Don't -- this is not a place to

16          make argument.

17                    MR. ROSS:  I'm not arguing.

18                    MR. LIGHTMAN:  It's a place to

19          ask questions.

20                    MR. ROSS:  I just want to know --

21          I want to get a clear understanding of the

22          answers.  That's all.

23                    MR. LIGHTMAN:  Okay.  Then ask

24          questions.



```
 1                    THE WITNESS:  Go ahead.
 2    BY MR. ROSS:
 3    Q.        And it's your contention you never received
 4    any of these test kits, right?
 5    A.        No, I never received any test kits.
 6    Q.        Delivery was attempted, right, of some
 7    amount of test kits?
 8    A.        I already canceled the order on the 16th of
 9    February.  On March 29th or April 1st, we can confer
10    to the notes to look at the exact dates, I received
11    one skid, 7,560 test kits, of which the expiration
12    dates of the test kits were two weeks.  I also had
13    an FBI agent with me, who also verified that the
14    test kits came when they did, because I already
15    canceled the order because they were about to expire
16    and because they were also -- the serial numbers on
17    those test kits were also known in the iHealth world
18    to be fraudulent.  I rejected the shipment.  And
19    beside the fact it was only 7,560 kits, two months
20    after I wired the money, and -- which was only --
21    out of 151,200 kits.  That's the only ones I
22    received.
23    Q.        What was that name of that FBI agent?
24    A.        Elizabeth Becker.  Look her up.
```



```
1   Q.      Was that the only FBI agent that you've
2   discussed this transaction with?
3   A.      No.  No.
4   Q.      All right.  Which other FBI agents?
5   A.      I would have to look them up because it's
6   been -- it's been a while.
7   Q.      All right.  I would ask your attorney to
8   provide that information after the deposition.
9           Do you accept any responsibility for never
10  receiving any test kits related to this transaction?
11                    MR. LIGHTMAN:  Objection.
12                    THE WITNESS:  I accept no
13          responsibility.  Come on.  I was defrauded.
14          I was defrauded.
15  BY MR. ROSS:
16  Q.      Who is Ed Napolitano?
17  A.      Ed is a consultant that was introduced to
18  me by one of my customers.  And Ed was said -- I met
19  with Ed and he said that he could help me negotiate
20  possibly a settlement with this transaction.
21  Q.      Have you already produced all your
22  communications with him about the transaction?
23  A.      With Ed?
24  Q.      Yes, with Mr. -- yes.
```



```
 1  A.       Have I what?
 2  Q.       Have you already produced all your
 3  communications about the transaction with him?
 4                     MR. LIGHTMAN:  Objection.
 5                     THE WITNESS:  Yeah.  Yeah, it was
 6           a small time.  He -- he didn't uncover much
 7           for me that I was happy with.
 8  BY MR. ROSS:
 9  Q.       All right.  So you've given us whatever --
10  A.       You got it all, yeah.  There's not much.
11  There's not much.
12  Q.       Did he speak to anybody else that's a party
13  to the lawsuit except you --
14  A.       Who?
15  Q.       -- in his effort?
16           Mr. Napolitano.
17  A.       Yeah, he spoke to Manfred.
18  Q.       Okay.  Were you a part of that discussion?
19  A.       Ed had told me about it.
20  Q.       Who did?
21  A.       Ed.  Ed told me he spoke to Manfred.
22  Q.       And did he tell you what they talked about?
23  A.       They just talked about the case.
24  Q.       How -- how many deliveries did you refuse?
```



```
1   A.      How many did I refuse?

2   Q.      Yeah.

3   A.      One.

4   Q.      And that was the February 16th?

5   A.      No --

6                   MR. LIGHTMAN:  Objection.

7                   THE WITNESS:  -- it was -- it was

8           March --

9                   MR. LIGHTMAN:  He said March 29th

10          earlier.

11                  THE WITNESS:  Yep.  Yeah.

12          April 1st, March 30th.  I forget the date.

13          I think it was March 29th or 30th.

14  BY MR. ROSS:

15  Q.      Did any -- hold on a second.

16          All right.  I'm going to show you what was

17  marked GW-27 to Mr. Weiss's most recent deposition.

18  On the third and last page, among the destinations,

19  Glen Mills, PA is listed as a delivery "extra drop

20  off" on February 7th.

21          Do you see that?

22                  MR. LIGHTMAN:  Hold on.  You're

23          referring to --

24                  THE WITNESS:  Yeah, I got it.
```



```
 1                      MR. ROSS:  The second to the last
 2          --
 3                      THE WITNESS:  Yeah, Glen Mills,
 4          2/7, delivery, extra drop off.  Got it.
 5  BY MR. ROSS:
 6  Q.      What I'm asking you is do you have any
 7  record of anyone attempting a delivery on that date
 8  at The Safety House?
 9  A.      From Available Movers & Storage?
10  Q.      Yes.
11  A.      No.
12  Q.      From anybody else in terms of test kits,
13  relating to this transaction.
14  A.      No.  We only got one delivery.  We never
15  got another delivery.
16  Q.      All right.  I'm going to do this very
17  quickly, but for the sake of completeness for the
18  record, I'm going to refer to all three of them.
19  This is GW-28.  This is the same exercise.  Did you
20  see -- do you have any record on the 7th of
21  200 boxes --
22                      MR. LIGHTMAN:  What is this?
23  BY MR. ROSS:
24  Q.      -- being delivered to --
```



```
 1                      MR. ROSS:  This is GW-28, which
 2          --
 3                      MR. LIGHTMAN:  Right, but what is
 4          it?
 5                      MR. ROSS:  -- which is a --
 6                      MR. LIGHTMAN:  It's an estimate.
 7                      MR. ROSS:  This is an --
 8                      MR. LIGHTMAN:  It's an estimate.
 9                      MR. ROSS:  -- estimate from
10          Available Movers.
11                      MR. LIGHTMAN:  Right.
12  BY MR. ROSS:
13  Q.      I'm not purporting that anybody had or
14  refused the delivery.  I'm asking the question.
15  That's all.  This is not a trick.
16  A.      Yeah, nobody -- nobody delivered anything
17  to me.
18  Q.      All right.  Same question about the same
19  page of GW-29, which was another Available Movers --
20                      MR. LIGHTMAN:  Estimate.
21  BY MR. ROSS:
22  Q.      -- estimate, you can call it.
23                      MR. LIGHTMAN:  That's what they
24          call it.
```



```
 1                        MR. ROSS:  I believe you.  I'm
 2          not even going to look.
 3                        THE WITNESS:  It's the same
 4          thing, right?
 5   BY MR. ROSS:
 6   Q.      Same thing, except this one says 177 boxes.
 7   A.      Yeah, no -- nothing.
 8   Q.      At any time before the 7th though, had you
 9   refused delivery and said you did not want the
10   product?
11                        MR. LIGHTMAN:  Refused --
12   BY MR. ROSS:
13   Q.      You wanted your money back now and you
14   don't want the product.
15                        MR. LIGHTMAN:  Hold on.
16          Objection.  If your question is asking did
17          you refuse and demand your money back, it's
18          objectionable because it assumes something
19          in evidence that he got a delivery that he
20          refused, and he testified the only delivery
21          ever made was March 29th.  Are you asking
22          just about his request for a refund?
23                        MR. ROSS:  I'll rephrase.
24                        MR. LIGHTMAN:  Okay.  Thank you.
```



1  BY MR. ROSS:

2  Q.        At some point before February 7th, had you

3  told anybody that you don't want this product, give

4  me my money back?

5  A.        Probably -- I probably was -- had said that

6  either to one of the brokers or something, possibly,

7  because it was -- it was -- you know, I wired the

8  money on the 21st.  I'm like, ah, this is a joke,

9  I'm not getting anything.  So I might've said that

10 to somebody, but I -- it's not that something was

11 delivered and I said --

12 Q.        Yeah, I don't mean to imply in the question

13 --

14 A.        Yeah.  Yeah.

15 Q.        -- that you refused a delivery before --

16 I'm just asking, like did you then express to

17 somebody that you're fed up with this wait and don't

18 try to deliver anything?

19                      MR. LIGHTMAN:  Before

20          February 16th?

21                      MR. ROSS:  No, before the 7th.

22                      THE WITNESS:  Before the 7th.

23                      MR. LIGHTMAN:  Before the 7th.

24                      THE WITNESS:  I know there was a



```
 1            text from Manfred saying there's a delivery

 2            coming, and I said if you send a delivery,

 3            I'm going to call the cops and all that.  I

 4            know there was that.

 5   BY MR. ROSS:

 6   Q.       When was that?

 7   A.       I got to look it up.  I don't remember the

 8   date, but I did not -- but by the 7th, I don't think

 9   there was anything official sent out to refuse.

10   Q.       Okay.  Who's Russell Stoner?

11   A.       I don't know who that is.

12   Q.       Do you dispute that Mr. Sternberg wire

13   transferred in excess of the purchase price to an

14   account held by Defendant Zekaria in anticipation of

15   the delivery of the product?

16   A.       I'm not sure what it was in anticipation

17   of, but I think the bank records do show that there

18   was a 2. something million dollar transfer made to

19   her account, yes.  That was discovered in discovery,

20   obviously.

21   Q.       Again, I'm going to take just a moment

22   because some of these we've discussed.

23                    MR. LIGHTMAN:  Take a five-minute

24            break?
```



```
 1                        MR. ROSS:   Yeah.

 2                        (At this time, a short break was

 3          taken.)

 4  BY MR. ROSS:

 5  Q.       Prior to executing the SPA, had you had any

 6  previous business dealings with Charlton House --

 7  A.       No, nothing.

 8  Q.       -- I'm sorry, Charlton Holdings Group?

 9  A.       Nope, nothing with Sam Gross prior.

10  Q.       And did you have the opportunity to suggest

11  edits to the SPA before you signed it?

12  A.       Had I had a chance to do what?

13  Q.       Did you suggest any edits to the SPA before

14  you executed it?

15  A.       I think I -- the only thing I did was made

16  note to the brokers, and they sent it to Manfred, of

17  the ship to date on the 25th.

18  Q.       You didn't send anybody any other changes

19  or questions?

20  A.       No.

21  Q.       Did the parties -- did the people who

22  signed the SPA agree that the ownership would

23  transfer on the signing of the bill of sale?

24                        MR. LIGHTMAN:   Objection.
```



```
 1                    THE WITNESS:  Did the people?

 2          Who are the people?

 3  BY MR. ROSS:

 4  Q.      Did the people who signed the SPA on behalf

 5  of the respective entities?

 6  A.      Which is me and Sam Gross?

 7  Q.      Yeah.

 8  A.      Did we what?

 9  Q.      Did you agree that the ownership of the

10  test kits would be transferred to the buyer upon the

11  signing of the bill of sale?

12                    MR. LIGHTMAN:  Objection.

13                    THE WITNESS:  I never signed a

14          bill of sale.

15  BY MR. ROSS:

16  Q.      I'm not saying that you did, that you

17  signed a bill of sale.

18  A.      No, it said that I --

19                    MR. LIGHTMAN:  Objection.

20                    THE WITNESS:  -- that I would get

21          -- I would get a bill of lading and a bill

22          of sale at the same time.  The transfer

23          would happen at the same time,

24          contemporaneously, with the funds being
```



```
 1                released.  But yeah, there was no bill of
 2                sale signed.  I don't know what you're
 3                talking about, signing the bill of sale.
 4  BY MR. ROSS:
 5  Q.       Did The Safety House and CHG agree that
 6  CHG's counsel, Mr. Sternberg, would draft the sale
 7  and purchase agreement?
 8                     MR. LIGHTMAN:  Objection.
 9                     THE WITNESS:  I couldn't speak to
10                what they talked about the sale and
11                purchase agreement.  All I know is it came
12                from Manfred.
13  BY MR. ROSS:
14  Q.       And did you agree with CHG that that would
15  be the case, that CHG would send you a sale and
16  purchase agreement --
17  A.       No.
18  Q.       -- drafted by counsel?
19                     MR. LIGHTMAN:  Objection.
20                     THE WITNESS:  It was through the
21                brokers, it was agreed with Manfred, not
22                CHG.
23  BY MR. ROSS:
24  Q.       And as far as you knew, before wiring the
```



```
 1  money, CHG was going to provide the test kits,

 2  setting aside Mr. Weiss's role?

 3                      MR. LIGHTMAN:  Objection.

 4                      THE WITNESS:  Well, we were under

 5          the assumption that Manfred Sternberg and

 6          Sam Gross were going to provide the kits.

 7  BY MR. ROSS:

 8  Q.      Where was Manfred Sternberg during this

 9  time?

10  A.      He created the sale and purchase agreement.

11  Q.      Where was Manfred Sternberg at this time --

12                      MR. LIGHTMAN:  Objection.

13  BY MR. ROSS:

14  Q.      -- if you know?

15  A.      I don't know.

16  Q.      Do you know where he is now?

17  A.      He's in Texas, assumption.

18  Q.      And you don't --

19  A.      I'm assuming he was in Texas of the signing

20  -- of the creation of the sale and purchase

21  agreement.  I think it was a pretty standard

22  boilerplate agreement that he sent all the people he

23  defrauded.

24  Q.      Wasn't it true that CHG obligated itself in
```



```
 1  entering this agreement with you to provide test

 2  kits?

 3                  MR. LIGHTMAN:  Objection.

 4                  THE WITNESS:  I'm sorry, repeat

 5       the question.

 6  BY MR. ROSS:

 7  Q.      Doesn't this agreement require CHG to

 8  provide test kits to The Safety House?

 9                  MR. LIGHTMAN:  Objection.

10  BY MR. ROSS:

11  Q.      If it doesn't, there's no lawsuit.

12                  MR. LIGHTMAN:  What?

13  BY MR. ROSS:

14  Q.      Doesn't this agreement require CHG to

15  provide test kits to The Safety House?

16                  MR. LIGHTMAN:  Objection.

17                  THE WITNESS:  It requires that

18       Manfred and Sam provide test kits, yes.

19  BY MR. ROSS:

20  Q.      Where does it say Manfred is required to

21  provide test kits?

22  A.      Well, Manfred -- Manfred orchestrated the

23  transaction, let's put it that way.

24  Q.      Okay.  But it's not in the agreement that
```



1  he's obligated to provide test kits?

2  A.      Well, it is because it says in B, we would

3  wire the money in his escrow account, and it also

4  says in paragraph 4 of the sale and purchase

5  agreement that the attorney's escrow account

6  identified Exhibit B for actual number of boxes of

7  product contained in the purchase order.  So right

8  then and there, Manfred and Sam are both involved in

9  this.

10 Q.      Did Sternberg ever possess any of the test

11 kits himself?

12 A.      Physically?

13 Q.      Physically.

14 A.      Did he ever have the test kits in Texas, in

15 his office?

16 Q.      Yes.

17 A.      I can't speak to that.  I have no idea.

18 Q.      Did he ever present to anyone, as far as

19 you know, that he had physical control of the test

20 kits?

21 A.      Yes.

22 Q.      Who did he tell that he had physical

23 control of the test kits?

24 A.      He -- let's strike that and take that back



```
 1   --
 2   Q.        Yeah, I'm trying to narrow it --
 3   A.        Did he physically have the skids of product
 4   --
 5   Q.        However the -- yes, however the product
 6   was.
 7   A.        -- with him?
 8             That, I don't know.  That, I don't know.
 9   Q.        But he never told you that?
10   A.        He never told me that, no.
11   Q.        He never told you anything before the
12   transfer?
13   A.        Through the -- he never told the brokers
14   that.
15   Q.        How do you know that?
16   A.        They would have told me.
17   Q.        Do you know whether -- whether Mr. Gross
18   inspected the test kits?
19   A.        He did not.  Do you know how I know that?
20   Q.        Yeah, you can tell us.
21   A.        Gary Weiss testified.
22                       MR. LIGHTMAN:  Stop volunteering
23             information.  Only answer his question.
24                       THE WITNESS:  But that was a good
```



```
 1            one.
 2                      MR. LIGHTMAN:  But stop.  Good,
 3        bad, indifferent, just answer his question.
 4  BY MR. ROSS:
 5  Q.      That was conveniently some of his true
 6  testimony, not some of his false testimony, right?
 7                      MR. LIGHTMAN:  Objection.  Come
 8        on.
 9  BY MR. ROSS:
10  Q.      Do you know whether Gross told Sternberg
11  that he confirmed the test kits were real and ready
12  for delivery?
13                      MR. LIGHTMAN:  Objection.
14                      THE WITNESS:  Yeah, I don't -- I
15        don't know what those two said.
16  BY MR. ROSS:
17  Q.      Did the Gross -- if you know -- when I say
18  Gross -- I should have said this a lot earlier, but
19  we both understand when I say the Gross defendants
20  to be Sam Gross and his company, CHG.  Is that fair?
21  A.      I don't -- I --
22  Q.      When I say the Gross defendants, that's who
23  I mean --
24  A.      Yes.  Yeah --
```



1  Q.        -- both him and the company.

2  A.        -- okay.  When you say the Gross

3  defendants, yeah.  Yeah.

4                    MR. LIGHTMAN:  When he uses

5           Gross, he's referring to Gross and/or CHG

6           is what he's trying to say.

7                    MR. ROSS:  That's a fair

8           characterization.

9                    MR. LIGHTMAN:  Thank you.  I'm

10          actually helping you.

11                   THE WITNESS:  See, he's a good

12          guy.

13  BY MR. ROSS:

14  Q.        Do you know if the Gross defendants ever

15  gave instructions to Mr. Sternberg about when to

16  distribute the funds regarding -- you know, the

17  funds in relation to the test kits?

18  A.        How would I know?

19                   MR. LIGHTMAN:  Objection.

20  BY MR. ROSS:

21  Q.        After the wire, did you have -- after the

22  wire but before you decided you wanted a refund and

23  weren't going to accept delivery, in that period,

24  did you communicate with Mr. Sternberg about whether



1  the delivery -- when it's going to happen, if it's

2  going to happen?

3  A.        I believe I was going through the brokers,

4  but I believe I did try to reach out through phone,

5  e-mail, and text to Mr. Sternberg, but was -- he

6  would not respond.  So once -- once it got bad and

7  it got later and later and I realized I wasn't

8  getting them, I circumvented the brokers and tried

9  to reach out to Mr. Sternberg directly, but he would

10 not get on the -- would not respond to the e-mails,

11 he would not respond to the phone calls, he would

12 not respond to texts, nothing.

13 Q.        Did you already produce those e-mails and

14 texts that he didn't -- that you sent but he didn't

15 respond to?

16 A.        I believe we have, yes.

17 Q.        I would just ask that you check and your

18 attorney provide me what you haven't yet provided.

19 A.        Yeah.  I mean, similar to the letter that

20 was given of me cancelling the order on the 16th, he

21 never responded to that.  So that's the document --

22 one of the documents I'll give you, which you

23 already have.

24 Q.        I have that.  You don't have to --



```
 1   A.         Yeah.   Yeah.

 2   Q.         -- that's fine.

 3             But in terms of e-mails and texts, that's

 4   all I would be asking for, unless there are any

 5   other letters.

 6             Are there any other letters that you sent

 7   him that he didn't respond to?

 8   A.         You have them all.

 9   Q.         Okay.  Did Manfred reasonably rely on

10   representations by Mr. Weiss about the delivery of

11   the test kits --

12                     MR. LIGHTMAN:  Objection.

13   BY MR. ROSS:

14   Q.         -- after the wire was transferred?

15                     MR. LIGHTMAN:  Objection.

16                     THE WITNESS:  I have no idea what

17         Manfred and Weiss did.

18   BY MR. ROSS:

19   Q.         Do you know whether he relied on

20   representations by Gross?

21                     MR. LIGHTMAN:  Objection.

22                     THE WITNESS:  No, I don't.  How

23         would I know that, other than discovery

24         docs.
```



```
 1  BY MR. ROSS:

 2  Q.       Is it reasonable for attorneys to rely on

 3  the representations of their clients?

 4                    MR. LIGHTMAN:  Objection.

 5                    THE WITNESS:  Let me answer that

 6           in two part.  As an escrow agent, in which

 7           case Manfred -- that was his duty in this

 8           transaction.  He can't just rely on the

 9           hearsay of his clients.  He has to do due

10           diligence to make sure that what they say

11           is true, as a reputable escrow agent.

12  BY MR. ROSS:

13  Q.       Did you or anyone else on the plaintiff's

14  behalf impersonate any government investigators --

15  A.       No.

16  Q.       -- regarding the test kits?

17                    MR. LIGHTMAN:  Objection.

18                    THE WITNESS:  No.

19  BY MR. ROSS:

20  Q.       Would you agree that there was some

21  failures by the plaintiff in terms of this test kit

22  transaction?

23                    MR. LIGHTMAN:  Objection.

24                    THE WITNESS:  Failed to recognize
```



```
 1              I was dealing with criminals, yeah, there's
 2              my failure.
 3    BY MR. ROSS:
 4    Q.        Well, failure to have an attorney review
 5    the agreement before you signed it?
 6    A.        I mean, in relationship to when you have an
 7    attorney to deal with criminals, yeah, I was -- I
 8    fell down in that regard.  Like I said earlier in my
 9    testimony, I -- I'm not used to dealing with
10    criminals.  I don't know this world.
11    Q.        Do you know whether it's common for
12    businesses to have multimillion dollar contracts
13    reviewed by attorneys before entering them?
14                        MR. LIGHTMAN:  Objection.
15                        THE WITNESS:  I'm sorry, repeat
16              the question.
17    BY MR. ROSS:
18    Q.        Do you know if it's common for --
19    A.        Of course, yeah, it's common.
20    Q.        -- companies in multimillion dollar
21    contracts to have attorneys review those contracts
22    --
23    A.        Yep --
24    Q.        -- before they sign?
```



```
1   A.        -- it's definitely common.

2   Q.        But not something that you did here?

3   A.        Let's put it into perspective.  He

4   fraudulently induced me saying get in the queue,

5   through my brokers, get your money over, get in the

6   queue so that you get your product and you don't

7   lose your place.  There's where -- there's where the

8   fraud began.

9   Q.        You said through your brokers?

10  A.        That's through the brokers, correct.

11  Q.        You didn't engage --

12  A.        And Sam Gross.

13  Q.        I'm sorry, go ahead.

14  A.        And Sam Gross.  Sorry.

15  Q.        You didn't engage anybody by the name of

16  Russell Stoner to help you locate the test kits in

17  the way that you --

18  A.        I did not.  I don't know who that is.

19  Q.        -- that Ed Napolitano tried to help?

20  A.        Ah, Ed.  Okay.

21  Q.        Now, I'm just asking -- yeah, you already

22  answered.  That's fine.

23            Do you know why Mr. Sternberg wired more

24  than the purchase price to the Zekaria account in
```



 1  anticipation of delivery?
 2                    MR. LIGHTMAN:  Objection.
 3                    THE WITNESS:  I can't speak on
 4           why he did that.  I know that he also
 5           defrauded another company called VRC at the
 6           same time as me, and I'm assuming -- and,
 7           again, this is an assumption on my part
 8           that it had something to do with the
 9           defrauding of those people as well.
10  BY MR. ROSS:
11  Q.       Is it your contention that Mr. Sternberg
12  has any money that's rightfully yours still in his
13  possession today?
14  A.       Yeah.
15                    MR. LIGHTMAN:  Objection.
16                    THE WITNESS:  Yes, he's got all
17           $2 million of my money somewhere.
18  BY MR. ROSS:
19  Q.       How is that the case if he transferred it
20  to the Zekaria account?
21                    MR. LIGHTMAN:  Objection.
22                    THE WITNESS:  I -- you know what,
23           I don't -- they then transferred it to
24           another account, to his son and then to his



```
 1              wife and back to him.  Who knows how he got
 2              it back.  He's got my money.
 3   BY MR. ROSS:
 4   Q.         But you don't have any record --
 5   A.         No.
 6   Q.         -- of him getting the money back?
 7   A.         No.  He won't give us the records.
 8   Q.         Is there any evidence that Sternberg has
 9   any liability to plaintiffs here, given that he's
10   already -- all the money is in Zekaria's account --
11                   MR. LIGHTMAN:  Objection.
12   BY MR. ROSS:
13   Q.         -- or elsewhere that isn't in his
14   possession?
15                   MR. LIGHTMAN:  Objection.
16                   THE WITNESS:  Manfred Sternberg,
17              out of all the criminals involved, is the
18              number one criminal.  He's hiding behind
19              his law license.  It's white crime.  He is
20              the leader of this criminal organization.
21              Mr. Weiss has even testified to that.
22   BY MR. ROSS:
23   Q.         Do you think anything that Mr. Sternberg
24   says about this transaction is true?
```



```
 1                      MR. LIGHTMAN:  Objection.
 2                      THE WITNESS:  Do I think anything
 3          that he said is true?
 4  BY MR. ROSS:
 5  Q.       Yeah.  Can you think of anything he said
 6  about this transaction at his -- that you can recall
 7  is true?
 8  A.       It's true that he has an escrow account
 9  with the numbers on.  It's true that he created the
10  sales and purchase order agreement.
11  Q.       But he didn't say that?
12  A.       He didn't say what?
13  Q.       That he has an escrow account.  Did he?
14  A.       Well, it's in the documents.  He provided
15  his escrow account numbers.  It's true that he
16  created the sale and purchase agreement because he
17  said that at his deposition.  It's true that Sam
18  Gross and him were -- he was Sam Gross's counsel and
19  him and Sam were partners together in transactions
20  with test kits, numerous transactions with test
21  kits, face masks, and all PPE that assume they did
22  multiple deals together, that's true.
23  Q.       So when he says that if there was any fraud
24  here, he wasn't involved in it, you don't think
```



```
 1   that's true?
 2                    MR. LIGHTMAN:  Objection.
 3                    THE WITNESS:  It's completely
 4         false.
 5   BY MR. ROSS:
 6   Q.     All the other defendants, when they're
 7   caught, they start to tell the truth about each
 8   other, but Manfred Sternberg, he's the only liar?
 9                    MR. LIGHTMAN:  Objection.
10                    THE WITNESS:  They're all lying.
11         Come on.  Gary Weiss sat there -- how long
12         was that depo?  Seven hours.  He lied
13         continuously.
14   BY MR. ROSS:
15   Q.     What do you think the biggest lie
16   Mr. Sternberg told in this transaction was?
17                    MR. LIGHTMAN:  Objection.
18                    THE WITNESS:  The biggest lie?
19   BY MR. ROSS:
20   Q.     Yeah.
21   A.     Dude, there's just so many.  I don't know.
22   I guess -- I guess you can refer to the agreement
23   because that's one big lie.  Everything in the
24   agreement is a lie.  I mean, he just -- he's setting
```



```
 1   you up.  He's just -- I just don't know how he
 2   lives.
 3                         THE WITNESS:  I don't understand,
 4           Manfred, how you can do this.
 5   BY MR. ROSS:
 6   Q.       Did you ever discuss the purchase price --
 7   at any time, did you ever discuss the purchase price
 8   either with Mr. Sternberg or with the brokers?
 9   A.       Yes.
10   Q.       Was it with him or the brokers?
11   A.       Brokers.
12   Q.       So is it your position that Mr. Sternberg
13   was only to release the money when the goods were in
14   transit to The Safety House?
15                         MR. LIGHTMAN:  Objection.
16                         THE WITNESS:  He was to release
17           the money at the time that I got a bill of
18           sale and a bill of lading.  That was my
19           impression.
20   BY MR. ROSS:
21   Q.       What evidence do you have that
22   Mr. Sternberg lied to these brokers at any point
23   regarding whether the goods were going to be
24   delivered?
```



```
 1                    MR. LIGHTMAN:  Objection.

 2                    THE WITNESS:  He continuously

 3         lied.

 4  BY MR. ROSS:

 5  Q.        Well, there's evidence that he was wrong.

 6  I'm asking whether there's evidence that he knew he

 7  was wrong that you've seen.

 8  A.        I mean, first of all, because he defrauded

 9  so many people prior to me, he knew Sam Gross didn't

10  have any product.  He never bought any product, so

11  he knew going into the deal that there was no

12  product.  He started off lying once he e-mailed the

13  sale and purchase agreement, and besides, this

14  interesting fact that he was supposed to give

15  commissions to the brokers.  Yet, he sends an e-mail

16  to my lawyer the day after he got sued saying

17  there's no money left in the escrow account.  Well,

18  where's the commission for the brokers?  He never

19  paid any brokers any commissions.

20  Q.        How do you know that?

21  A.        They told me they never got paid.  And then

22  you ask Manfred that question, he's saying, well,

23  there was no commissions due.  Yet there's

24  commission sheets going back and forth between the
```



```
 1  brokers and Manfred.

 2  Q.        How are they going back and forth?

 3  A.        E-mail.

 4  Q.        When did he tell you that the kits were in

 5  route?

 6  A.        Jeez.  Manfred?  He said that -- he would

 7  periodically state and throw bills of lading to my

 8  lawyer, like three months, four months down the

 9  road, here's another one coming your way.

10  Q.        And it's your position he knew that wasn't

11  true when he sent it?

12  A.        Every bill of lading that was sent to my

13  lawyer --

14                    THE WITNESS:  How many were

15          there, six or seven, Gar?  Can you verify

16          that?

17                    MR. LIGHTMAN:  After the fact.

18                    THE WITNESS:  Not one of them

19          were legit.  I followed up with all the

20          freight companies and they go this doesn't

21          exist.

22  BY MR. ROSS:

23  Q.        You have nothing to show that Mr. Sternberg

24  knew that they weren't going to be consummated?
```



```
 1                    MR. LIGHTMAN:  Objection.

 2                    THE WITNESS:  He provided us with

 3         the bill of ladings.

 4   BY MR. ROSS:

 5   Q.      I'm saying, you don't have anything to show

 6   that he knew these bill of ladings weren't going to

 7   be consummated when he sent them to you?

 8                    MR. LIGHTMAN:  Objection.  He

 9         just said they were fabricated.

10                    THE WITNESS:  They were

11         fabricated.

12   BY MR. ROSS:

13   Q.      Before this transaction, have you ever had

14   any contact with Mr. Weiss?

15   A.      No.

16   Q.      Did you eventually fill this -- satisfy

17   this customer's order by some other means?

18   A.      Yes.

19   Q.      And how did you do that?

20   A.      I went out into the market and purchased --

21   what I had to do is -- I couldn't afford to buy the

22   product all at once because it was too much money,

23   so I would buy a little at a time, get paid from the

24   customer, take the profits from that money and buy
```



```
 1  more until I satisfied the order.  And then they

 2  gave me another order, but because I couldn't

 3  deliver, they canceled.  So they also cost me a

 4  bunch of money.  I lost a $2.4 million order because

 5  I told them I could deliver and then these guys

 6  screwed me.  It's a shame.

 7  Q.       Is that in the amended complaint, that

 8  second order?

 9  A.       Is that in the amended complaint?

10  Q.       Yeah.

11  A.       I think it's mentioned that I got the order

12  canceled.

13  Q.       Do you know whether you eventually provided

14  to this same customer the exact or more kits that

15  this order referred to, 151,000?

16  A.       I provided all of them, yeah.  They got

17  them all.  Is that your question?

18  Q.       Yes.

19  A.       Yeah, they got all their product.

20  Q.       And for those deliveries, did you charge

21  the same you would have charged per kit had the CHG

22  test kits materialized?

23  A.       Yeah.  Yeah, same amount.

24  Q.       You didn't charge less?  You didn't charge
```



```
 1  more?

 2  A.      They actually cost me a little bit more the

 3  second time around, but it was pretty close to the

 4  same price.

 5  Q.      I'm going to show you what's previously

 6  been marked as Sternberg-12.  It's a letter that you

 7  wrote, I think.  Yes, you wrote this letter.  Take a

 8  look at it.  Let me know when you're ready to talk

 9  about it.

10  A.      Yeah, okay.  What about it?

11  Q.      You address this letter to Mr. Gross,

12  right?

13  A.      Yes.

14  Q.      Did you send a copy at the same time to

15  Mr. Sternberg?

16  A.      Yes.

17  Q.      Why didn't you address it to Mr. Sternberg?

18  A.      I sent a copy to Mr. Sternberg.

19  Q.      Why didn't you address it to him instead of

20  Sam Gross if he was the --

21  A.      I was instructed by my attorney to do this.

22  Q.      So it's fair to say when you sent this

23  letter, you were open to taking delivery, if it was

24  immediate or if it -- that's not -- let me rephrase
```



1  that.

2           MR. LIGHTMAN:  Objection.  What's

3       the letter say?  What does the letter say?

4           MR. ROSS:  He wrote it.  I'm

5       asking him about it.

6           MR. LIGHTMAN:  Okay.  How about

7       the letter that came the next day?

8           THE WITNESS:  What's the

9       question?

10 BY MR. ROSS:

11 Q.     Your letter says, you know, I need all

12 shipping documents today, in bold and all caps,

13 right?

14 A.     Yeah.

15 Q.     Were you ready to take the deliveries, if

16 those shipping documents were provided that day --

17 the documents were provided, you know, setting forth

18 whenever they were supposed to arrive, would you

19 have accepted them?

20 A.     No.  I probably -- if they -- if they

21 provided me with the product that day -- all of the

22 product that day, I probably would have.  I got -- I

23 got to check to see when I actually obtained the

24 other product because I might have went already out



```
 1  and bought the other product and did the deal

 2  anyway, so I would have to check.  But if they gave

 3  me all the product on that day, you know, we're

 4  close, but I probably would have taken it.  Yeah, I

 5  probably would have taken it.

 6  Q.      Okay.  And I know that you copied

 7  Mr. Sternberg and you copied Mr. Lightman.  Did you

 8  speak, yourself, to Mr. Sternberg that day or the

 9  next day?

10  A.      No.  By now I've obtained Mr. Lightman as

11  my attorney and I wasn't allowed to.

12  Q.      Okay.

13  A.      That was a great day, the day I met

14  Mr. Lightman.

15                  MR. LIGHTMAN:  Thank you.

16                  MR. ROSS:  He changed all of our

17          lives.

18                  THE WITNESS:  He sure did.

19                  MR. ROSS:  This, I think, is my

20          first new exhibit.  How do we want to refer

21          to this?  It's not new to anybody in terms

22          of never having seen it, but.

23                  THE WITNESS:  Okay.  We're done

24          with this letter?
```



1  BY MR. ROSS:

2  Q.      We're done with that letter for now, at

3  least.

4  A.      Okay.

5              MR. ROSS:  Gary, did you mark

6       something earlier as an exhibit to this --

7              MR. LIGHTMAN:  Yeah, TSH-1 and

8       TSH-2.  Start with TSH-3.

9              MR. ROSS:  This will be TSH-3.

10              (At this time, Exhibit TSH-3 was

11       marked for identification.)

12  BY MR. ROSS:

13  Q.      Take a look at it and tell me if you

14  recognize it.

15  A.      Yep.

16  Q.      What is it?

17  A.      It's the outgoing wire paperwork.

18  Q.      All right.  And like I said earlier, this

19  reflects the bank was Fulton Bank NA.  Do you see

20  that?

21  A.      You already knew that.  You dog.

22  Q.      I'm just calling back to that because that

23  was not some kind of a gotcha attempt or like a

24  trick question.



1          Who is the name next to wire created by

2    user ID?

3    A.        Maramirez.

4    Q.        Is that --

5    A.        That's the bank agent.

6    Q.        All right.  That would be a bank

7    employee --

8    A.        Correct.

9    Q.        -- not a Safety House employee?

10   A.        Yeah, that's the bank.

11   Q.        Outside of this wire, did you pay any more

12   relating to this transaction?

13   A.        Did I pay any more?

14   Q.        Yeah.  Setting aside -- I think, you know,

15   you -- I understand you have losses that -- that you

16   would contend you have losses that exceed this

17   number possibly, but as far as the purchase money

18   transferred for these test kits, is this the

19   entirety of what you paid to try to get these test

20   kits?

21   A.        Yes.  Yes.  I mean, obviously -- there was

22   a bank fee of 50 bucks, but this is what I paid to

23   try to get the test kits from Manfred and Sam.

24   Q.        Does The Safety House still use Fulton?



```
 1   A.        We do.

 2   Q.        Does anything on here, as far as you know,

 3   look to be in error?

 4                     MR. LIGHTMAN:  Objection.

 5                     MR. ROSS:  I was waiting.  I

 6          thought you weren't paying attention.

 7                     THE WITNESS:  I'm not sure what

 8          you're talking about, but no.

 9   BY MR. ROSS:

10   Q.        The information that -- you don't see

11   anything that's wrong on here, as far as you would

12   know?

13   A.        As far as I would know, no.  Again, the

14   bank created this document, not me.

15   Q.        Do you remember if you e-mailed that -- the

16   letter we looked at a minute ago marked as

17   Sternberg-12, did you e-mail that on the day -- the

18   date that appears on the letter itself,

19   February 16th?

20   A.        Yeah.  Yeah.

21   Q.        Did you ever report any of the defendants

22   to criminal authorities?

23                     MR. LIGHTMAN:  Objection.  Why is

24          that relevant?
```



```
 1   BY MR. ROSS:
 2   Q.      All right.  This is Sternberg-13.  Well,
 3   answer or ask your attorney if --
 4                    MR. LIGHTMAN:  I'm directing him
 5          not to answer that.
 6                    THE WITNESS:  Okay.
 7                    MR. ROSS:  This is Sternberg-13.
 8          Mr. Weiss.
 9   BY MR. ROSS:
10   Q.      Take a look at that and let me know if you
11   recognize it.
12   A.      Here you go.
13   Q.      What is that, Sternberg-13?
14   A.      Read it.  It's telling Manfred to give me
15   my money back.
16   Q.      Do you see in that paragraph under the
17   bolded line demanding your money back?
18                    MR. LIGHTMAN:  Where is it?  Oh.
19   BY MR. ROSS:
20   Q.      You say, sort of in the middle --
21                    MR. LIGHTMAN:  Wait.  Where it
22          says I want my $2 million wired back to me
23          immediately?
24                    THE WITNESS:  Under that?
```



```
 1  BY MR. ROSS:
 2  Q.      It's sort of in the middle of the paragraph
 3  right under that.
 4                  MR. LIGHTMAN:  From Scully to Sam
 5          Gross and Manfred on February 16th?
 6                  MR. ROSS:  That's right.
 7  BY MR. ROSS:
 8  Q.      It says:  I also think your actions are
 9  criminal and I intend to report your fraudulent
10  activity to the US attorneys office and to the
11  district attorneys office both in Houston and
12  Austin, Texas and New York.
13          Do you see that?
14  A.      Yep.
15  Q.      Did you ever do that?
16                  MR. LIGHTMAN:  Objection.  Don't
17          answer the question.
18                  THE WITNESS:  Okay.
19                  MR. ROSS:  What's the valid
20          objection?  That's the invalid objection.
21                  MR. LIGHTMAN:  Listen --
22                  MR. ROSS:  He's threatening here
23          --
24                  MR. LIGHTMAN:  Whether or not
```



```
 1              criminal action has been reported is
 2              completely irrelevant to this civil case.
 3                     MR. ROSS:  Relevance is not -- it
 4              is not an appropriate objection.
 5                     MR. LIGHTMAN:  I'm directing him
 6              not to answer the question.  Jeez.  Come
 7              on.
 8  BY MR. ROSS:
 9  Q.      Are there any other threats you've e-mailed
10  to any of these parties that you refuse to say
11  whether you followed through on or not?
12                     MR. LIGHTMAN:  Objection.
13                     THE WITNESS:  Don't answer?
14                     MR. LIGHTMAN:  Don't answer the
15              question.  Come on.  We're not going to
16              answer anything about criminal.
17  BY MR. ROSS:
18  Q.      Of course it's not irrelevant, right,
19  Mr. Scully?  You've been calling these people
20  criminals since 10:30 this morning.  So --
21                     MR. LIGHTMAN:  So because he
22              calls them -- thinks they're criminals,
23              because he thinks they engaged in criminal
24              activity, that gives you the right to --
```



1   he's not -- it's irrelevant.

2             MR. ROSS:  Got me busy,

3   Mr. Lightman.

4             MR. LIGHTMAN:  Don't need to be,

5   but.

6             MR. ROSS:  I gotta reserve our

7   right to move for a valid response to that

8   question, unless there's a ruling --

9             MR. LIGHTMAN:  Ready.  Assume his

10  answer is yes, assume his answer is no, so

11  what.  How does that affect the civil case

12  for civil liability?

13            MR. ROSS:  That's not the

14  standard for the requirement to answer a

15  deposition question in federal court.

16            MR. LIGHTMAN:  If your client is

17  so worried about criminal activity, give

18  the money back.  Isn't that a way -- the

19  easiest way to avoid criminal prosecution?

20            MR. ROSS:  The only reason to

21  refuse, right, would be that you didn't

22  report anybody.  Isn't that right?

23            THE WITNESS:  That's a good

24  point.



```
 1                    MR. LIGHTMAN:  Will you stop.
 2         Both of you stop it.  Come on.
 3                    THE WITNESS:  Give the money
 4         back.
 5                    MR. LIGHTMAN:  Stop it.  Both of
 6         you stop.
 7  BY MR. ROSS:
 8  Q.      What suppliers did you use to obtain the
 9  test kits that you tried to obtain in this
10  transaction?
11  A.      Oh, you mean when they -- when they
12  defrauded me, who did I go to afterwards, is that
13  what your question is?
14  Q.      You said earlier you were able eventually
15  to supply your customer with all the test kits.
16  A.      I would have to actually look that up, but
17  I think they were called Suncoast Suppliers.
18  Q.      Were they able to provide all of them, if
19  you remember?
20  A.      All of them, yep.
21  Q.      Do you remember who you dealt with there?
22  A.      I dealt with another broker.  I don't
23  recall his name.  And don't quote me on that name.
24  I could look that up and get that to you, if need
```



```
 1  be.
 2  Q.      Yeah.  Well, I'm going to ask for that
 3  information, but for -- what I'm really going to ask
 4  for is, you know, all wire transfers to them or to
 5  any other entity that reflect, you know, these test
 6  kits for fulfilling this order specifically.
 7  A.      Sure.
 8              MR. LIGHTMAN:  No, no, no.  Make
 9      all your requests -- discovery requests --
10              MR. ROSS:  I'm not -- I'm telling
11      him what I'm going to request.  I'm not --
12              MR. LIGHTMAN:  Okay.
13              MR. ROSS:  -- directing -- I'll
14      send it to you.  I'm not --
15              MR. LIGHTMAN:  We're not agreeing
16      to anything.  Discovery is over, as far as
17      we're concerned, except for our motion.
18              MR. ROSS:  I do agree,
19      discovery's over.
20              MR. LIGHTMAN:  Except for the
21      motion that we made.
22  BY MR. ROSS:
23  Q.      Do you remember the date when you -- on
24  which you had fully satisfied this order?
```



1  A.        I do not.

2  Q.        Was it in 2022, or did it take longer than

3  -- than that, if you know?

4  A.        I believe it was in 2022.

5  Q.        And you said there was an order placed by

6  the customer that they eventually canceled because

7  this order didn't come through; is that right?

8  A.        They re -- they canceled the second order

9  because of my delay in getting them the product for

10  the first order.

11  Q.        All right.  I'm going to ask your attorney

12  to provide any documents reflecting that

13  cancellation.  And given our dispute over the

14  identity of the customer, that request will include

15  the agreement that you can redact, at least for now,

16  the name of the customer.

17                    MR. LIGHTMAN:  Like I said, if

18           you believe you're entitled to additional

19           discovery, make the appropriate request.

20           We will respond accordingly.

21                    MR. ROSS:  You want to explain to

22           Judge Younge why you refuse document

23           request at the deposition?

24                    MR. LIGHTMAN:  Yeah because it's



1   taken after the discovery deadline because

2   you had ample time to file a motion to

3   compel discovery and you didn't because we

4   objected to certain discovery because you

5   didn't take any action, unlike what the

6   plaintiff's done.  We served a discovery

7   request on you March 7 -- March 7th, you

8   never responded -- oh, I'm sorry, you did

9   respond to it, here's your file share link.

10  And we tried to access your file share link

11  and we couldn't do it.  We called your IT

12  guy here, he couldn't do it.  And when we

13  called Seth and we talked to you, what's

14  the response we get?  We'll look into it.

15  Well, the time to look into it has passed.

16  The time to give me the documents, either

17  voluntary or by court order, is at hand.

18          MR. ROSS:  You didn't condition

19  this deposition on the prohibition of

20  document requests though, right?

21          MR. LIGHTMAN:  I was attempted,

22  but I decided you were entitled to

23  discovery.

24          MR. ROSS:  I'm also going to



```
 1            request communications with any customers
 2            who didn't receive test kits as a result of
 3            the allegations in the amended complaint.
 4            Also, in that request, though I understand
 5            it will be refused, I'm going to say that
 6            I'll agree for now the redaction of the
 7            customer's identity.
 8   BY MR. ROSS:
 9   Q.       How -- I may have already asked this, and
10   I'm sorry if I did.
11            How many attempted deliveries did The
12   Safety House reject with regard to these test kits?
13   A.       One.
14   Q.       Okay.
15                    MR. LIGHTMAN:  And when was that?
16   BY MR. ROSS:
17   Q.       Did you --
18                    MR. LIGHTMAN:  You're not going
19            to ask him when?
20   BY MR. ROSS:
21   Q.       Did any party -- did any entity or person
22   not a party to this lawsuit sue The Safety House as
23   a result of the events in the amended complaint?
24   A.       Did any party --
```



```
 1  Q.       Yeah.  Did anybody sue The Safety House for

 2  the failure to deliver test kits?

 3  A.       No.

 4  Q.       Did that customer, though they canceled

 5  that order, did they do business with The Safety

 6  House at some other later point in time?

 7  A.       Yes.

 8  Q.       What was the name of the attorney that

 9  assisted in the formation of American Environmental

10  Enterprises?

11                   MR. LIGHTMAN:  Objection.

12                   THE WITNESS:  I have no idea.

13           That's funny.  I don't remember.

14  BY MR. ROSS:

15  Q.       Do you have documents regarding the

16  formation --

17  A.       I do.

18  Q.       -- in your possession?

19  A.       Yeah, I do.

20  Q.       All right.  I'm going to request those too.

21           Do you have any communications between

22  yourself and any of the defendants, as far as you

23  know, that you haven't produced yet?

24  A.       No.
```



```
 1   Q.        Almost there.

 2             How do you know Sternberg profited off of

 3   this?  Hold on.  Don't answer until he gets a chance

 4   to hear and object to this.

 5                     MR. LIGHTMAN:  I heard it.  How

 6        do you know Sternberg profited.

 7   BY MR. ROSS:

 8   Q.        How do you know if Sternberg profited off

 9   of this?

10   A.        I mean, why wouldn't -- isn't he in

11   business to profit?

12   Q.        That's not the question.  The question is

13   how do you know he profited off of this transaction?

14   A.        Through the bank records.

15   Q.        What do you mean by that?

16   A.        The wires in and out between him and Sam.

17   Q.        So the bank records show how even though he

18   transferred more than he received from The Safety

19   House to Mr. Zekaria that he somehow profited?

20   A.        But there's also --

21                     MR. LIGHTMAN:  Objection.

22   BY MR. ROSS:

23   Q.        Is that right?

24                     THE WITNESS:  Don't answer?
```



```
 1                    MR. LIGHTMAN:  Yeah, you can
 2          answer.
 3                    THE WITNESS:  The incoming and
 4          outgoing wires between Sam Gross and
 5          Manfred is how he profited.
 6  BY MR. ROSS:
 7  Q.      Off of this transaction?
 8  A.      Um-hum.  There were lots of transfers.
 9                    MR. ROSS:  I don't have anything
10          else at this time.  Although --
11                    MR. LIGHTMAN:  Mr. Weiss, do you
12          have any questions?
13                    MR. WEISS:  Yeah, I have a few
14          questions.
15  BY MR. WEISS:
16  Q.      When did you get the $2 million loan; do
17  you remember the date?
18  A.      No.
19  Q.      Would you say a week before that you wired
20  the money?
21  A.      I don't remember.
22  Q.      A day before?
23                    MR. LIGHTMAN:  He doesn't
24          remember.
```



```
 1                         THE WITNESS:  I don't remember.
 2          I don't know.
 3   BY MR. WEISS:
 4   Q.      But you have a record of it?
 5   A.      Probably.
 6   Q.      Okay.  Please...
 7                         THE COURT REPORTER:  What did you
 8          say?
 9                         THE WITNESS:  What did you say?
10   BY MR. WEISS:
11   Q.      Please have the record so we know on what
12   date did you get that loan.
13                         MR. LIGHTMAN:  Okay.
14   BY MR. WEISS:
15   Q.      So it wasn't really your money when you
16   wired it?
17                         MR. LIGHTMAN:  Objection.
18                         THE WITNESS:  It was.
19   BY MR. WEISS:
20   Q.      It was the loan's money?
21   A.      It was my money.
22                         MR. LIGHTMAN:  It was his money.
23   BY MR. WEISS:
24   Q.      And till now, you didn't re -- it wasn't
```



```
 1   even required to pay back.  As you said before, two

 2   years after the loan, you still were -- weren't

 3   required to pay back any -- anything of it.

 4                    MR. LIGHTMAN:  Objection.

 5   BY MR. WEISS:

 6   Q.      Did you?

 7                    MR. LIGHTMAN:  You can answer it.

 8                    THE WITNESS:  No, I wasn't

 9         required.

10   BY MR. WEISS:

11   Q.      Okay.

12                    MR. LIGHTMAN:  Are you required

13         to pay the loan back?

14                    THE WITNESS:  Yes.

15                    MR. LIGHTMAN:  Has it been

16         forgiven at all?

17                    THE WITNESS:  No.

18   BY MR. WEISS:

19   Q.      Okay.  You said the defendants re --

20   defrauded you, all the defendants.

21   A.      They did what, excuse me?

22   Q.      You said in your testimony that all the

23   defendants defrauded you --

24   A.      Oh.
```



1  Q.       -- all four, and you mentioned their names,

2  including my name.

3                    MR. LIGHTMAN:  According to

4        Manfred, you were the biggest part of it,

5        Mr. Weiss.

6  BY MR. WEISS:

7  Q.       You wired the money on January 21st?

8  A.       Correct.

9  Q.       You said that you saw the SPA presented to

10 you, the sale and purchase agreement, for about a

11 week before that?

12 A.       Maybe two weeks, maybe three.  I don't

13 remember.

14 Q.       Okay.  When the SPA was presented to you,

15 you read it?

16 A.       Yeah.

17 Q.       Okay.  How many times did you think -- do

18 you think you read it?

19 A.       Ten times.

20 Q.       Okay.

21 A.       Guess.  That's a guesstimate.

22                    MR. LIGHTMAN:  Don't guess.

23                    THE WITNESS:  I don't know.

24 BY MR. WEISS:



```
 1   Q.       So you read all the paragraphs in the SPA.
 2   There are about 18 paragraphs in there.
 3                     MR. LIGHTMAN:  Objection.
 4   BY MR. WEISS:
 5   Q.       Correct?  We see.
 6   A.       Yeah.
 7   Q.       It has been presented here and it has 18
 8   paragraphs?
 9   A.       Um-hum.
10                     MR. LIGHTMAN:  And exhibits.
11   BY MR. WEISS:
12   Q.       And you read it more than once, which you
13   just said now.  You have seen it for at least one
14   week before you wired the money?
15   A.       Excuse me?
16   Q.       You have seen the SPA, it was presented to
17   you at least, you said, one week before --
18   A.       At least.
19   Q.       -- you wired the money?
20   A.       Yeah, at least.
21   Q.       Okay.  You said that now and before in the
22   testimony, too.
23           And that agreement is about -- just about
24   $2 million, 1,965,000 --
```



```
1   A.       600.

2   Q.       -- and $600.

3            In the original filing and document number

4   one, which was made on February 23 of 2022, that was

5   done with your attorney, Mr. Gary Lightman, you

6   stated that you never signed the agreement.

7                      MR. LIGHTMAN:  Objection.

8   BY MR. WEISS:

9   Q.       The SPA.

10                     MR. LIGHTMAN:  He signed it, but

11           Sam didn't sign it.

12                     MR. WEISS:  Please.

13                     MR. LIGHTMAN:  Okay.  I'm sorry.

14                     MR. WEISS:  I'm not asking you --

15                     MR. LIGHTMAN:  Well, you're

16           mischaracterizing his testimony.

17                     THE WITNESS:  Yeah, I didn't say

18           that.  I didn't say that.

19  BY MR. WEISS:

20  Q.       I -- you didn't say that?

21  A.       I said that Sam -- Sam and Manfred didn't

22  sign it.

23  Q.       Okay.  In the -- in your grievance to the

24  Texas bar, you did not say that you did not sign it,
```



```
 1   you just said although I never received it signed by
 2   Sam Gross.
 3                    MR. LIGHTMAN:  Exactly.
 4   BY MR. WEISS:
 5   Q.       You did not say it wasn't signed by me.
 6                    MR. LIGHTMAN:  He said --
 7   BY MR. WEISS:
 8   Q.       It wasn't signed by me.  Can you refer
 9   to --
10   A.       Me, meaning Gary Weiss?
11   Q.       -- somebody defrauded you.  I never saw it.
12   I never signed the agreement.
13                    MR. LIGHTMAN:  Objection.  You're
14           mischaracterizing what he wrote to the bar.
15                    MR. WEISS:  Okay.
16                    MR. LIGHTMAN:  He sent a copy of
17           the SPA signed by him to the bar.
18                    MR. ROSS:  Objection.
19   BY MR. WEISS:
20   Q.       Okay.  I am almost finished.
21           So you read it more than once.  You said
22   almost ten times.  You know that there are 18
23   paragraphs in it.
24   A.       That was a guesstimate, I read it, how many
```



ESQUIRE
DEPOSITION SOLUTIONS

```
 1  times.
 2  Q.      Okay.  You can open it.  It's right in
 3  front of you.  There's 18 paragraphs.
 4  A.      No, I agree with that, but I don't agree
 5  with the amount of times.
 6  Q.      At least one week of it sitting in front of
 7  you, you still sent $1.965 million dollars and 600,
 8  and you didn't do due diligence by showing the
 9  agreement to a lawyer.  That's what you said?
10  A.      I had a lawyer.
11  Q.      Did you show that SPA to a lawyer prior to
12  you sending that wire for $2 million?
13  A.      As I stated before, there was a -- Manfred
14  Sternberg was the lawyer, that's why.
15  Q.      So you claim now that you had a lawyer?
16  You said I had a lawyer.  So the lawyer --
17  A.      Was an escrow agent.
18                      MR. LIGHTMAN:  Objection.
19  BY MR. WEISS:
20  Q.      -- was your lawyer, is that what you are
21  saying?
22  A.      Repeat the question.
23  Q.      Are you saying that Manfred is your lawyer
24  --
```



```
 1                   MR. LIGHTMAN:  Objection.
 2   BY MR. WEISS:
 3   Q.        -- and that's why you didn't have it
 4   reviewed by another lawyer?
 5   A.        Correct.  He was the escrow agent.  There
 6   was a lawyer involved so I didn't feel it was
 7   necessary.
 8   Q.        Okay.  Okay.  Fair enough.
 9             So is it not true that you just sent the
10   money because it wasn't really your money and maybe
11   you don't have to pay it back?
12                   MR. LIGHTMAN:  Objection.
13   BY MR. WEISS:
14   Q.        Because it was a loan, and maybe it will be
15   forgiven in the future?
16                   MR. LIGHTMAN:  Objection.
17   BY MR. WEISS:
18   Q.        You said that all the defendants defrauded
19   before.  Sam Gross has a record.  Manfred defrauded
20   before.  That's what you allege.  You included me.
21             Do you have any proof that I did anything
22   wrong to anybody before, that I ever defrauded
23   anybody of one penny?
24   A.        Yes.  If you -- if you read online, you
```



1  defrauded somebody out of diamonds.  It's all over
2  the Internet.  I can print it out and show you.
3  Q.      Okay.
4  A.      You defrauded.  And then you testified in
5  your case something about Romania and you're in a
6  law -- a fraud case with somebody from Romania, so I
7  read that as well.  You told me that.
8                  MR. LIGHTMAN:  Do you deny that
9          you defrauded someone, Mr. Weiss?
10                 MR. WEISS:  Of course.
11                 MR. LIGHTMAN:  The guy from
12         Romania, the guy that sued you that's on
13         the Internet?
14                 THE WITNESS:  How about the lady
15         with the diamonds?  She's complaining on
16         yelp or one of those sites that you defraud
17         her.  Did you defraud a lady?
18  BY MR. WEISS:
19  Q.      So she claims.  It's only a claim.
20  A.      Did you win?
21  Q.      It was never a lawsuit.  It was nothing
22  there.
23                 MR. LIGHTMAN:  Did you give her
24         money back?  You gave her her money back.



```
 1                      THE WITNESS:  No, he didn't.

 2                      MR. LIGHTMAN:  Yes, he did.  He

 3           won't answer that.  Notice he didn't

 4           answer.

 5                      THE WITNESS:  I know, right.

 6                      MR. LIGHTMAN:  Go ahead.  I'm

 7           sorry, Mr. Weiss.  Finish your questions.

 8                      THE WITNESS:  Yeah, we need to

 9           get out of here.

10   BY MR. WEISS:

11   Q.      You claim today you had 2 million -- over

12   $2 million of damages, right?

13   A.      I'm claiming, yeah.  Oh, yeah.

14   Q.      You had 2 million -- over $2 million of

15   damages.  In your testimony today you said, yeah,

16   you did buy eventually those test kits, just about

17   the same price that was offered to you by Gross --

18                      MR. LIGHTMAN:  Objection.

19   BY MR. WEISS:

20   Q.      -- or very close?

21   A.      Yep.

22   Q.      And you did supply, at that price, the kits

23   to your customer?

24                      MR. LIGHTMAN:  Objection.
```



```
 1                    THE WITNESS:  Yeah.

 2   BY MR. WEISS:

 3   Q.      You mentioned before in one of your letters

 4   that it's a school district --

 5   A.      Okay.

 6   Q.      -- correct?

 7   A.      Yes.

 8   Q.      So how much damage could you have had from

 9   this intended transaction that you supposedly did

10   not get the kits?

11   A.      Gar, I'm out $2 million.

12                    MR. LIGHTMAN:  You kept the

13          money, Gar.

14                    THE WITNESS:  You never gave me

15          product or money.  I'm out 2 million.

16                    MR. WEISS:  Thank you.  That's

17          everything --

18                    THE WITNESS:  He's not free.

19                    MR. WEISS:  -- I have to ask.

20                    MR. LIGHTMAN:  He's not -- so the

21          record's --

22                    MR. WEISS:  Mr. Lightman, I

23          didn't ask you any question.

24                    MR. LIGHTMAN:  I know.  I --
```



```
 1                    MR. WEISS:  You can --

 2                    THE WITNESS:  He's allowed to ask

 3          questions.

 4                    MR. WEISS:  -- argue in court

 5          whatever you have to argue.

 6                    MR. LIGHTMAN:  Mr. Weiss, he's

 7          not claiming the lost profit on the sales

 8          to the school district as part of his

 9          damages.  He's claiming that you took

10          $2 million from him, you didn't give him

11          his money, you didn't give him his test

12          kits.  He's got interest on this loan.

13  BY MR. WEISS:

14  Q.      Did you give me any money ever?  You gave

15  me one penny?

16                    MR. LIGHTMAN:  Yes --

17                    THE WITNESS:  Indirectly.

18                    MR. LIGHTMAN:  -- yes, you got

19          $2 million from the -- from the money.  Let

20          me ask some questions.

21  BY MR. LIGHTMAN:

22  Q.      You had said earlier that -- Mr. Ross asked

23  you that Manfred Sternberg -- did Manfred Sternberg

24  reasonably rely upon representations.  If you were
```



1   the escrow agent in this deal and one of the parties

2   -- the seller said, oh, the goods are on the truck,

3   release the funds to me, if you're the escrow agent,

4   is that enough for you to release the funds?

5   A.        No, of course not.

6   Q.        What else do you have to do?

7   A.        You have to get the bill of sale, the bill

8   of lading, you have to check that the bill of lading

9   is accurate with the shipping company, Available

10  Movers & Storage.  There's so much that goes on that

11  you have to back yourself up as the escrow agent.

12  Q.        So if Gary Weiss or Gross had given Manfred

13  a bill of lading, would that be enough to do it or

14  would you have to --

15  A.        That's not enough.  He then would have to

16  call who the carrier is and say, hey, do you have X

17  amount of skids coming to The Safety House, plus

18  there was other names on that list that they were

19  shipping to.

20  Q.        And what about Gary Weiss saying to

21  everybody, hey, I got the goods, load it on the

22  truck, is that -- can the escrow agent rely upon

23  that statement --

24  A.        No.



```
 1  Q.        -- without more?

 2  A.        No.

 3  Q.        What does the escrow agent have to do?

 4  A.        He's got -- he's got to dig in, he's got to

 5  find out, okay, how many skids, where are they

 6  going, what -- where -- what's the moving company,

 7  give me the bills that match the shipments.

 8  Q.        Doesn't he have to confirm that the Home

 9  Depot boxes in a half a truck that Gary Weiss took a

10  picture of are, in fact, the COVID test kits?

11  A.        Correct, pictures, everything.

12  Q.        Okay.  You said you rejected one offer.  At

13  any time from the time you wired the money to

14  Sternberg on January 21st till you sent this letter

15  --

16  A.        This one?

17  Q.        -- I got it -- Manfred Sternberg-13 till

18  you sent this e-mail on February 16th saying due to

19  your inability to deliver the goods --

20                    MR. WEISS:  What --

21  BY MR. LIGHTMAN:

22  Q.        -- that I ordered and paid for, you leave

23  me no alternative but to cover my contracts with my

24  existing customers, I want my $2 million wired back
```



```
 1   to me immediately, between the time you wired these
 2   guys your 2 million and the time you canceled the
 3   transaction and demanded your money back, did they
 4   ever make a shipment to you?
 5   A.        By the time that I asked that wire --
 6   Q.        February 16th.
 7   A.        No.
 8   Q.        Did they ever give you a bill of lading?
 9   A.        No.
10   Q.        Did Mr. Weiss ever send you a bill of
11   lading?
12   A.        He did not.
13   Q.        And you filed -- I'll represent to you, you
14   filed your lawsuit February 23rd.  At any time
15   before you filed your lawsuit, February 23rd, did
16   they make your shipment to you?
17   A.        No.
18   Q.        And request for admission number 87, in our
19   request that was sent, it says, "on February 16th,
20   plaintiff sent an e-mail to Gross and Sternberg
21   cancelling the purchase -- plaintiff's purchase
22   transaction and demanding the return of the 2
23   million purchase price that plaintiff paid for the
24   test kits that were never delivered.
```



```
 1            Do you see that in request for admission
 2  number 87?
 3  A.        Right.
 4  Q.        Gary Weiss, in his response to request for
 5  number 87, wrote what?
 6  A.        Correct.
 7  Q.        And number 88:  A true and correct copy of
 8  plaintiff's February 16, '22, e-mail that was sent
 9  to or received by Gross saying we're canceling the
10  purchase and demanding a full refund was marked as
11  Sternberg Deposition Exhibit 13 at the Sternberg
12  deposition.
13            Do you see that, number 88?
14  A.        Um-hum.
15  Q.        I read it correctly?
16  A.        Yep.
17  Q.        And the deposition transcript -- the
18  deposition exhibit marked Sternberg -- Manfred
19  Sternberg-13 was this deposition exhibit that
20  Mr. Rose -- Mr. Ross questioned you about, right,
21  where it says I want my $2 million wired back to me
22  immediately.  Do you see that?
23  A.        Yep.
24  Q.        And the response to request for admission
```



1  number 88, how did Gary Weiss respond to that?

2  A.      Correct.

3  Q.      But what did the Manfred Sternberg

4  defendants respond to that?

5  A.      Denied.

6  Q.      Did they say why they denied it?

7  A.      No.

8  Q.      Do they dispute that they got this e-mail

9  from you on -- marked Deposition Exhibit 13 at

10  Manfred's deposition?

11  A.      No.

12  Q.      But they denied it without saying anything

13  more, right?

14  A.      Correct.

15  Q.      And Deposition Exhibit Number 89 says --

16  excuse me, strike that.

17          Request for admission number 89 says:

18  Plaintiff, through its counsel, also notified

19  Sternberg on February 15 not to make any further

20  disbursements from Sternberg attorney escrow account

21  in a phone call.  And then it says an e-mail

22  exchange was memorialized as Sternberg Deposition

23  Exhibit 11 at the Sternberg deposition.

24          Do you see that?



1  A.       Yes.

2  Q.       And in response to number 89, Gary wrote --

3  Gary Weiss answered:  Plaintiff never presented to

4  me those documents, but saw the e-mail, confirmed,

5  right?

6  A.       Correct.

7  Q.       And what did the Sternberg defendants say?

8  A.       The response speaks for itself.  Any

9  character -- characterization thereof is denied by

10  the way of further answer, denied.

11  Q.       And do they dispute that they the got the

12  e-mail on February 15th not to make any further

13  disbursements?

14  A.       They did not.

15  Q.       Did they dispute that they got a phone call

16  from us on February 15th telling them don't make any

17  further disbursements?

18  A.       They did not.

19  Q.       Did they dispute that the February 15th

20  e-mail was marked as Deposition Exhibit Sternberg-11

21  at his deposition?

22  A.       No.

23  Q.       Do they say why they denied that?

24  A.       They did not.



```
 1  Q.       And even Gary Weiss admits that, right?
 2  A.       Yes.
 3  Q.       And then number 90, request for admission
 4  number 90:  Sternberg continued to make
 5  disbursements from the Sternberg trust account on
 6  and after February 15, '22, even after being put on
 7  notice not to make any further disbursements from
 8  his trust account.  Do you see that?
 9  A.       Yes.
10  Q.       And in response to request admission number
11  90, how did Gary Weiss answer that?
12  A.       Correct.
13  Q.       And how did the Sternberg defendants answer
14  that?
15  A.       Denied.
16  Q.       Did they put any -- did they dispute that
17  they --
18  A.       Nothing else.
19  Q.       -- that they received notice on
20  February 15th?
21  A.       They did not.
22  Q.       Did they dispute that they made
23  disbursements after February 15th?
24  A.       They did not.
```



1   Q.        And what did they say?

2   A.        Denied.

3   Q.        And did they put anything more in there?

4   A.        They did not.

5   Q.        So if a title company's holding money on

6   one of the two parties to the transaction and says

7   don't make any further disbursements, is that title

8   company agent acting as the escrow agent for both

9   parties permitted to make further disbursements?

10  A.        No, of course not.

11  Q.        And if you look at number 91, it says in

12  the request for admission:  Section 11 of the SPA

13  states in part as follows:  "If buyer in any way

14  attempts to circumvent seller, seller will be

15  entitled to liquidated damages of 50,000 from buyer.

16            Do you see that?

17  A.        I do.

18  Q.        And it continues:  Or if buyer terminates

19  this contract without cause, seller will be entitled

20  to liquidated damages of 25,000 from buyer.  Do you

21  see that?

22  A.        I do.

23  Q.        And how did Gary Weiss respond to request

24  for admission number 91?



```
1    A.        Correct.

2    Q.        And how did the Sternberg defendants

3    respond to request for admission --

4    A.        This document speaks for itself.  Any

5    characterization thereof is denied.

6    Q.        Do they deny that that's what section 11 of

7    the SPA states?

8    A.        No.

9    Q.        Now, do they claim that you tried to

10   circumvent the seller in any way?  You didn't try to

11   go behind their back directly to the --

12   A.        I did not.

13   Q.        -- to -- to the user, right?

14   A.        I did not.

15   Q.        If -- you terminated the contract, right?

16   A.        That is correct.

17   Q.        You terminated it -- well, section 11 of

18   the SPA states if you terminate it without cause,

19   what's the most they're entitled to keep?

20   A.        25 grand.

21   Q.        Does it say they're entitled to keep the

22   million 9?

23   A.        It does not.

24   Q.        Does it say they can keep your $2 million
```



1  and not give you any product?

2  A.      It does not.

3  Q.      Okay.  But this says they get liquidated of

4  damage of 25,000 if you terminate the contract

5  without cause?

6  A.      Right.

7  Q.      Do you believe you had to cause to

8  terminate --

9  A.      Yes, I had cause.

10 Q.      -- this contract?

11         What was the cause?

12 A.      I didn't get the product.

13 Q.      Okay.  And if you look at request for

14 admission number 93, it says:  "There's no agreement

15 between -- between plaintiff on the one hand and

16 Gross and Sternberg on the other hand that would

17 allow Gross and Sternberg to retain the $1,965,600

18 purchase price paid by plaintiff for the test kits

19 and also not make delivery of the test kits to

20 plaintiff, right?

21 A.      True.

22 Q.      And what did Gary Weiss respond to request

23 for admission number 93?

24 A.      Correct.



```
 1   Q.        And what did the Sternberg defendants
 2   respond to this --
 3   A.        Admitted.
 4   Q.        So everyone admits there's no agreement
 5   that lets them keep the million nine and not give
 6   you the product, right?
 7   A.        Yeah, we all agree.
 8                      MR. LIGHTMAN:  I have nothing
 9           further.
10                      MR. ROSS:  All right.  Just a few
11           follow-ups.
12                      MR. LIGHTMAN:  I would imagine
13           you would.
14   BY MR. ROSS:
15   Q.        Which school district was it?
16                      MR. LIGHTMAN:  Don't answer that.
17                      THE WITNESS:  I can't tell you.
18   BY MR. ROSS:
19   Q.        You already opened the door.  What --
20                      MR. LIGHTMAN:  No, he's not
21           answering that.  Go -- go file a motion if
22           you think you're entitled to that --
23                      THE WITNESS:  I'm not telling
24           you.
```



```
 1                    MR. LIGHTMAN:  -- and then you
 2          can go contact the school district and sell
 3          them test kits that you never had, or
 4          better yet, that are now filled with rice.
 5                    MR. ROSS:  Once again, what rule
 6          are you citing, Mr. Lightman?
 7                    MR. WEISS:  It's in the writing.
 8          It's Olden(ph) School District.  It's in
 9          his writing.  It says --
10                    MR. LIGHTMAN:  Then what do you
11          need it for?
12                    THE WITNESS:  What do you need it
13          for then?
14   BY MR. ROSS:
15   Q.    You're under oath here.
16                    MR. LIGHTMAN:  He doesn't -- he
17          doesn't feel comfortable disclosing it to
18          one of the fraudsters -- two of the
19          fraudsters.
20   BY MR. ROSS:
21   Q.    You talked about what the obligations of an
22   escrow agent are in response to some of
23   Mr. Lightman's questions.  Do you remember that --
24   A.    Yeah.
```



```
1   Q.        -- a few minutes ago?

2             Have you ever been an escrow agent?

3   A.        No.

4   Q.        Do you know any?

5   A.        Mr. Lightman.

6                       MR. LIGHTMAN:  Did you ever buy a

7             house?

8   BY MR. ROSS:

9   Q.        Have you ever --

10                      MR. LIGHTMAN:  Did you ever buy a

11            house?

12                      THE WITNESS:  I bought multiple

13            houses.

14                      MR. LIGHTMAN:  Did you use title

15            companies.

16                      THE WITNESS:  Title company and

17            escrow agents.

18  BY MR. ROSS:

19  Q.        All right.  And what did -- what did those

20  escrow agents tell you about the duties of an escrow

21  agent?

22  A.        They never did.  They never told me.

23  Q.        So you're guessing?

24                      MR. LIGHTMAN:  They acted like
```



```
 1              they're supposed to.
 2                      THE WITNESS:  Yeah, I just -- I
 3          mean, there was no reason for me to ask any
 4          questions because everything went --
 5  BY MR. ROSS:
 6  Q.       I mean when you testified about the
 7  obligations of an escrow agent, you were just
 8  guessing what those obligations are?
 9                      MR. LIGHTMAN:  Objection.
10                      THE WITNESS:  I mean, I looked it
11          up.
12  BY MR. ROSS:
13  Q.       Where?
14  A.       I mean, it's -- Gary has informed me.  It's
15  all over.  I can --
16  Q.       Don't tell me anything Mr. Lightman's told
17  you, but -- but where did you look it up?  On the
18  Internet?
19  A.       Some case law.  I don't -- I don't recall.
20  I'm guessing to know where I found it.
21                      MR. LIGHTMAN:  If you don't
22          remember, don't say --
23                      THE WITNESS:  I don't remember.
24          I don't remember.
```



```
 1  BY MR. ROSS:
 2  Q.      Is it your position that any of the
 3  documents I requested today were outside the
 4  document demands that we already served on you
 5  earlier in this case?
 6                      MR. LIGHTMAN:  Objection.  That's
 7           a legal conclusion.
 8                      THE WITNESS:  Yeah, I mean, we'd
 9           have to, you know, discuss what documents
10           you want just to see if it's relevant --
11           see the relevance.
12  BY MR. ROSS:
13  Q.      All right.  I'll represent to you that
14  nothing I asked for today falls outside the scope of
15  our prior document requests.
16                      MR. LIGHTMAN:  I'll represent to
17           you that that's not the case --
18                      MR. ROSS:  To the extent --
19                      MR. LIGHTMAN:  -- and that your
20           document case was untimely filed, but other
21           than that.
22                      MR. ROSS:  And to the extent you
23           didn't already produce those documents, I
24           requested today, we do reserve the right to
```



 1   seek motion practice together with the

 2   appropriate sanctions.  We also --

 3            MR. LIGHTMAN:  Reserve any rights

 4   you want.

 5            MR. ROSS:  -- reserve the right

 6   to complete and truthful responses to all

 7   the questions you refused to answer today

 8   and any appropriate sanctions for the

 9   failure to answer.

10            I have no more questions today.

11   You're done for now.

12            MR. LIGHTMAN:  I think you're

13   done.

14            THE WITNESS:  Thank you.

15            THE COURT REPORTER:  Gary, do you

16   want a copy of this?

17            MR. LIGHTMAN:  Of course.

18            (Witness excused.)

19            (Deposition concluded at 3:15

20   p.m.)

21

22

23

24



1                        CERTIFICATION

2

3                            - - -

4

5                        I hereby certify that the

6    testimony and the proceedings in the foregoing

7    matter are contained fully and accurately in the

8    stenographic notes taken by me, and that the copy is

9    a true and correct transcript of the same.

10

11

12

13

14    _____

15                    Lucy M. Berardi,

16                     Professional Court Reporter

17

18

19                        The foregoing certification

20    does not apply to any reproduction of the same by

21    any means unless under the direct control and/or

22    supervision of the certifying shorthand reporter.

23

24















































































































































































# EXHIBIT M

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 611 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Tuesday
No. 2:22-CV-0688 (JMY) Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT        April 2, 2024

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2            CIVIL ACTION NO. 2:22-CV-0688 (JMY)

3    _____

4    AMERICAN ENVIRONMENTAL
     ENTERPRISES, INC., D/B/A
5    THESAFETYHOUSE.COM,

6    Plaintiff,

7    vs.                              Oral Deposition of:

8                                     DAPHNA ZEKARIA

9    MANFRED STERNBERG, ESQUIRE, AND
     MANFRED STERNBERG & ASSOCIATES,
10   PC, AND CHARLTON HOLDINGS GROUP,
     LLC, AND SAMUEL GROSS A/K/A SHLOMO
11   GROSS, AND GARY WEISS, AND
     ASOLARDIAMOND, LLC A/K/A ASOLAR,
12   LLC, AND DAPHNA ZEKARIA, ESQUIRE,
     AND SOKOLSKI & ZEKARIA, P.C.,
13
     Defendants.
14   _____

15
            U N C E R T I F I E D   T R A N S C R I P T  of
16   the stenographic notes of the proceedings in the
     above-entitled matter, as taken by and before CAYCE
17   KILEY, a Certified Court Reporter and Notary Public of
     the State of New Jersey, held at Bluestone Country Club,
18   711 Boehms Church Road, Blue Bell, Pennsylvania, on
     Tuesday, April 2nd, 2024, commencing at 12:07 p.m.

19

20

21              TATE & TATE
            Certified Court Reporters
22          825 Route 73 North, Suite G
            Marlton, New Jersey 08053
23          (856) 983-8484 - (800) 636-8283
                www.tate-tate.com

24

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

## Page 2

APPEARANCES:

LIGHTMAN & MANOCHI
BY: GARY P. LIGHTMAN, ESQUIRE
600 Germantown Pike, Suite 400
Plymouth Meeting, PA 19422
(215) 760-3000
garylightman@lightmanlaw.com
Representing the Plaintiff.

GOLDBERG & SEGALLA
BY: SETH LAVER, ESQUIRE
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
(267) 519-6800
slaver@goldbergsegalla.com
Representing the Defendants Manfred Sternberg, Esquire,
and Manfred Sternberg & Associates, P.C.

REBAR KELLY
BY: PATRICK HEALEY, ESQUIRE
470 Norristown Road, Suite 201
Blue Bell, PA 19422
(484) 344-5340
phealey@rebarkelly.com
Representing the Defendants Sokolski & Zekaria, P.C. &
Daphna Zekaria.

ALSO PRESENT:
Daniel Scully
Gary Weiss

## Page 3

INDEX

WITNESS:          DIRECT   CROSS   REDIRECT RECROSS
DAPHNA ZEKARIA
BY ATTORNEY LIGHTMAN  6

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit DZ-1 | Amended notice of deposition | 18 |
| Exhibit DZ-2 | Article | 40 |
| Exhibit DZ-8 | Case summary | 25 |
| Exhibit DZ-9 | WhatsApp messages | 66 |
| Exhibit DZ-10 | Text messages | 66 |
| Exhibit DZ-11 | Copy of Judge Younge's order dated April 1, 2024 | 100 |
| Exhibit DZ-12 | Responses and objections of defendants Daphna Zekaria, Esquire, and Sokolski and Zekaria P.C. to plaintiff's interrogatories | 101 |
| Exhibit DZ-13 | Responses and objections of defendants Daphna Zekaria, Esquire, and Sokolski and Zekaria P.C. to plaintiff's first request for production of documents | 101 |

(Exhibits retained by counsel.)

## Page 4

INFORMATION REQUESTED

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Official resignation of Robert Sokolski | 21 | 16 |
| Picture | 58 | 11 |

QUESTIONS MARKED

| QUESTION TEXT | PAGE | LINE |
|---|---|---|
| And when was the last time you represented Stacey? | 31 | 19 |
| Did you represent Stacey Panagakos in any legal matter after January 1, 2022, when this dispute arose? | 33 | 14 |
| You're not going to state whether you live with your husband? | 37 | 11 |
| What's your residence address? | 37 | 14 |
| What are your other email addresses? | 38 | 17 |
| How long have you lived in your residence address? | 38 | 23 |
| What crime? | 40 | 10 |
| Is the first column and part of the second column where it talks about an attorney being charged with -- a New York state lottery winner hiring you, making promises to withhold a portion of her winnings in the firm's escrow account and an additional portion on her behalf, and saying you collected a total of 230,000 from the client transactions; and instead of holding the money or investing it, you made large transfers to other individuals which she would have not been able to make without her client's funds. Is that a reference to the charges that were brought against you? | 42 | 1 |

## Page 5

DAPHNA ZEKARIA,

Stating the address 267 Main Street, Second Floor, Huntington, NY, 11743, having been first duly sworn by a Notary Public of the State of New Jersey, was examined and testified as follows:

THE WITNESS: I just wanted to apologize for the delay this morning. I -- I'm recently on a medication that has messed with my sleeping schedule. I normally wake up without any prompting between three and four in the morning. My plan was to wake up at five, six o'clock. And I did set my alarm. I woke up an hour late which shifted the balance of train travel by over an hour. I live an hour from Penn Station. So I appreciate delaying it until now. I just wanted on the record for why we started late.

ATTORNEY LIGHTMAN: Okay. I'd like the record to -- thank you for that. I'd like the record to reflect that at approximately 7:30 this morning, Patrick Healey called me, told me you missed your train and wanted to cancel the deposition. I requested that he contact you and tell you to take the next train or an Uber and that we would delay the deposition. He said he would see what he could do and then called me back and

2 (Pages 2 to 5)

Page 6

1  said we can start at noon which is fine today. We may
2  have to take you a second time, probably --
3      THE WITNESS: Well, I don't think we will be.
4  ATTORNEY LIGHTMAN: Well, we'll see. But --
5      THE WITNESS: I know we won't.
6      (Overlapping speakers.)
7  THE COURT REPORTER: One at a time.
8  ATTORNEY LIGHTMAN: I want to thank Mr. Healey.
9      THE WITNESS: And I wanted to thank you for
10  accommodating the noon appointment. I didn't think you
11  would suggest that which is why I wanted to reschedule.
12
13      DIRECT EXAMINATION BY ATTORNEY LIGHTMAN:
14  Q. Okay. Good morning.
15  A. Good morning.
16  Q. Or good afternoon. By the way, the record will
17  reflect the deposition started at 12:07. My name is Gary
18  Lightman. And as you're aware, I represent the plaintiff
19  in this case, American Environmental Enterprises doing
20  business as The Safety House. The person seated to my
21  right is Dan Scully, the principal of the client. At the
22  end of the table, that's Seth Laver. And he represents
23  the Sternberg defendants. To his right is Gary Weiss who
24  you're aware of and so on. I'm going to be asking you a

Page 7

1  series of questions today.
2      First, please make sure you understand my
3  question. If not, let me know and I'll do whatever is
4  necessary to make my question clear.
5      Second, please answer my question verbally so the
6  court reporter sitting between us can transcribe what
7  you're saying. Don't talk over me and I won't talk over
8  you. Let one person talk at a time. Please answer each
9  question as fully and completely and truthfully as
10  possible. It's okay to say "I don't remember" or "I
11  don't recall" if you don't remember an answer to a
12  question or you don't recall. But if you do remember the
13  answer and say "I don't remember," that's perjury.
14  A. I'm sorry?
15  Q. I said --
16  A. I didn't --
17      (Overlapping speakers.)
18  Q. If I ask you a question and you remember an
19  answer to a question but tell me "I don't remember" --
20  A. Got it. Got it. Got it. It just rolled into.
21  Q. Okay. Are you under the influence of any drugs
22  or medications or suffering from any physical or mental
23  disability that would affect your ability to think
24  logically and clearly, recall past events?

Page 8

1  A. Not sure. I mean, I don't think so.
2  Q. Okay.
3  A. I'm going to put it on the record because I'm
4  not embarrassed about it. I've recently been
5  hospitalized, in large part due to a lot of things that
6  other people have done. I am not blaming you, Mr.
7  Lightman. But what I am saying is I was recently
8  hospitalized and I'm on medication. Now, does that
9  medication -- we spoke about this in the car -- impact --
10      ATTORNEY HEALEY: You don't have to tell him
11  what we discussed.
12      THE WITNESS: Well, that's all I'm going to
13  say.
14  BY ATTORNEY LIGHTMAN:
15  Q. Okay. Does the medication --
16      (Overlapping speakers.)
17  THE COURT REPORTER: One at a time.
18      (Overlapping speakers.)
19  THE COURT REPORTER: Guys, you're talking at
20  the same time and I'm not going to be able to take this
21  down --
22  A. I was literally speaking and you did start this
23  out by saying --
24      (Overlapping speakers.)

Page 9

1  A. I don't know. I'm not my own doctor. I don't
2  think it does. But I'm telling you I'm on medication. I
3  was recently hospitalized.
4  Q. Okay.
5  A. Not more than a month ago because my medication
6  is not even a month old.
7  Q. What is the medication you're doing?
8  A. I don't even know the name of it.
9  Q. Do you have it in your pocketbook?
10  A. Yes, I do. Because I don't know the name of it.
11  It's a generic version of something else.
12  Q. May I see it, please?
13  A. No, I'm going to -- I gave it to my attorney.
14      ATTORNEY HEALEY: Quetiapine,
15  q-u-e-t-i-a-p-i-n-e.
16  A. It impacts --
17  Q. It should say the brand name of that -- that
18  generic --
19  A. It doesn't. It doesn't. It tells you --
20      (Overlapping speakers.)
21  THE COURT REPORTER: I'm sorry, guys. If you
22  don't all speak one at a time --
23      (Overlapping speakers.)
24  THE COURT REPORTER: -- I won't be able to do

3 (Pages 6 to 9)

Page 10

1  this. I won't be able to take it down or certify it.
2  So it has to be one at a time.
3      THE WITNESS: Right. But he should honor --
4      ATTORNEY HEALEY: Just --
5      (Overlapping speakers.)
6      THE COURT REPORTER: I'm just making sure
7  everyone is clear on this.
8      ATTORNEY LIGHTMAN: Did you get the spelling of
9  the name?
10     THE COURT REPORTER: I know the medication,
11 yes. Thank you.
12 BY ATTORNEY LIGHTMAN:
13     Q. Okay. Any other medication?
14     A. No.
15     Q. All right. So if I ask you a question and you
16 give me an answer, I'm going to assume, first, that you
17 understood my question and, second, are answering it in
18 accordance with these instructions. Okay?
19     A. That's fine.
20     Q. You're represented by an attorney today. That's
21 Patrick Healey seated to your left?
22     A. Oh, yes.
23     Q. Okay. And you're aware that you're under oath
24 subject to the penalties of perjury?

Page 11

1      A. I am aware.
2      Q. Okay. So, for example, you have the absolute
3  right to plead the Fifth Amendment at any time --
4      A. I'm not speaking about pleading the fifth. I'm
5  speaking about I object because I know that the district
6  attorney in Suffolk County is still investigating me and
7  has spoken to you. So I'm not letting -- and my criminal
8  defense lawyer does not yet know that this is happening
9  here and today.
10     I wanted to comply to answer questions about
11 where the money went pursuant to my client's directive
12 pursuant to Mr. Sternberg's directive. But anything
13 beyond that, it's not about pleading the fifth. I'm not
14 letting discovery happen through you. You're not going
15 to be using this deposition as a little badge to do
16 investigative work for the DA where my case is coming up.
17     If anything, if you don't want just answers to
18 where the money went -- because I have no problem with
19 that. I never did have a problem with that. But I did
20 have a problem with things called attorney-client
21 privilege and having waivers for that, which I understand
22 that Mr. Weiss did not give. You can ask him. We're
23 going to ask him if that's been revised. But where the
24 money went, I'm happy to answer. What the arrangements

Page 12

1  were about that money, it's already been asked and
2  answered by many people about this.
3      What you're not going to do, what I will get up
4  and walk out -- and I'm happy to get sanctioned if that's
5  what you want to try to do. If what you're looking to do
6  is be detective for the Suffolk County District Attorney
7  to aid in investigation that I won't participate in, you
8  know, to add potentially or create more drama for my
9  life. As it is, my life isn't good. You don't need to
10 add to it. She can or cannot add to it. But I won't let
11 you help her add to it.
12     So if you'd like to help your client, I'm willing
13 to do that. Get -- know where the money went. That's
14 not a problem. It's never been a problem. We've given
15 you most of the records I have. I'm in the middle of
16 shutting down a practice so I have things everywhere. I
17 will have access to a more organized version of my files
18 hopefully within the next two weeks.
19     Q. Are you finished?
20     A. Yeah.
21     Q. Okay. I'm here to talk about the two million
22 dollars that's -- my client paid and didn't get his money
23 back for the goods he purchased. If I ask you a
24 question -- any question -- you have the absolute right

Page 13

1  under the law to refuse to answer under the Fifth
2  Amendment.
3      A. It's not because of the Fifth Amendment --
4      Q. Please, please let me finish --
5      ATTORNEY HEALEY: Daphna, let him ask -- let
6  him --
7  BY ATTORNEY LIGHTMAN:
8      Q. If I ask you a question and you assert your
9  Fifth Amendment rights -- for example, if I say to you
10 "Isn't it true it's raining out" and you say "I assert
11 my Fifth Amendment rights" --
12     A. That's ridiculous.
13     (Overlapping speakers.)
14     ATTORNEY HEALEY: Daphna, let him -- this will
15 go much quicker --
16 BY ATTORNEY LIGHTMAN:
17     Q. Can you please let me -- if I ask you a question
18 like "Isn't is it true that it's raining out" --
19     A. Am I boring you?
20     ATTORNEY HEALEY: Daphna, let's focus on the
21 deposition.
22 BY ATTORNEY LIGHTMAN:
23     Q. If I ask you a question like "Isn't it true it's
24 raining out?" and you answer "I assert my Fifth Amendment

4 (Pages 10 to 13)

Page 14

1    rights and refuse to answer the question," you have every
2    right to assert a Fifth Amendment right in response to
3    any question.  But if you do that, then I am entitled to
4    get the jury to adversely infer from your refusal to
5    answer the question that it is in fact raining outside.
6    That's what the assertion --
7        **A. Right.**
8        Q. Please --
9            (Overlapping speakers.)
10       **A. I know the answer.  What I'm saying is --**
11           (Overlapping speakers.)
12       **A. I'm objecting not just on Fifth Amendment.  On**
13   **many grounds.  I'm not letting you become the prosecutor.**
14       Q. I don't intend to be.
15       **A. Right.  So my objection is not on Fifth**
16   **Amendment so that you can or so that she can concoct it**
17   **somehow.  My objection is on attorney-client privilege.**
18   **It's on Fifth Amendment potentially.  We don't even know.**
19   **And it's not letting you be the investigator on things**
20   **that are beyond the scope of where this money went.**
21       **We gave you proof that Mr. Weiss received money.**
22   **We gave you proof that -- that they had a 65-35 split,**
23   **that money went to them, or how it was directed by them.**
24   **And Manfred approved it.  Manfred himself said that I am**

Page 15

1    **not the blameworthy party.**
2        **I never met Manfred actually.  I spoke to him a**
3    **few times on the phone to say, Is this okay?  You know,**
4    **should -- you know, should you get authority?  He said**
5    **we're okay.  I have authority.  And he gave authority to**
6    **release the money.  What more do you want from me?**
7        Q. Are you finished?
8        **A. Yeah.**
9        Q. Okay.  How long have you been a practicing
10   attorney?
11       **A. Since 1997.**
12       Q. And currently are you in good standing?
13       **A. Yes.**
14       Q. Okay.  And you're licensed in New York?
15       **A. I'm sorry?**
16       Q. Are you licensed in --
17       **A. Yes.**
18       Q. -- any other jurisdictions?
19       **A. No.**
20       Q. And have you taken depositions before --
21       **A. Well, actually, I'm sorry.  Federal would be --**
22   **yeah.**
23       Q. All right.  State?  Any other state courts?
24       **A. No, no.**

Page 16

1        Q. Have you taken any depositions over your --
2        **A. Career?**
3        Q. -- 30 years of practice?
4        **A. Well, it's not 30.**
5        Q. How many?  When did you start --
6        **A. No, no.  When I graduated law school is '96 or**
7    **'97.**
8        Q. So almost thirty --
9        **A. Yeah, yeah.**
10       Q. -- it's 17 -- 18 years?
11           **ATTORNEY HEALEY:** Just to clarify the record --
12       Q. 20 years?
13           **ATTORNEY HEALEY:** -- which federal courts?
14           (Overlapping speakers.)
15           THE WITNESS:  I think it's eastern and
16   southern.  And honestly I don't know if I renewed them.
17   If there was a renewal thing.
18   BY ATTORNEY LIGHTMAN:
19       Q. In the 27 years practice, have you taken any
20   depositions?
21       **A. Yeah.**
22       Q. How many?
23       **A. I don't know.**
24       Q. Over 50?

Page 17

1        **A. I don't know.**
2        Q. Okay.  Have you --
3        **A. Again I don't know.**
4        Q. Have you defended depositions --
5            (Overlapping speakers.)
6            THE COURT REPORTER: I'm sorry.  One at a time.
7        **A. Yes.  I've defended and taken.**
8        Q. Okay.  So you're familiar with how this works,
9    right?  I'd like to hand you what's been marked --
10       **A. I mean, in other words, you just said "right"**
11   **and you didn't wait for my answer and that --**
12           **ATTORNEY HEALEY:** Daphna --
13   BY ATTORNEY LIGHTMAN:
14       Q. Are you familiar with how the deposition
15   procedures work in general?
16       **A. Not in federal court.**
17       Q. You've never taken a deposition in federal court
18   --
19       **A. Actually no, no.**
20       Q. Okay.  Never --
21           (Overlapping speakers.)
22           THE COURT REPORTER: I'm sorry.  One at a time.
23   You need to slow down.  I'm not going to be able to take
24   this down.

5 (Pages 14 to 17)

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 616 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 18

1    BY ATTORNEY LIGHTMAN:
2        Q. I'd like to hand you what's been marked as
3    Daphna Zekaria 1.
4            (Exhibit DZ-1 was marked for
5            identification.)
6        A. What is this?  I just realized I never did --
7        Q. I will represent to you that Daphna Zekaria 1 is
8    a true and correct copy of the amended notice of
9    deposition of Daphna Zekaria, Esquire, and Sokolski and
10   Zekaria P.C. with requests for production of documents
11   that we served on you through your attorney on or about
12   March 8th, 2024.  Did you see this before?
13       A. Not really.  I was in the hospital.
14       Q. You've never seen it at any time --
15       A. I've seen it but I have not studied it.
16       Q. But you received it before today --
17       A. You asked and I answered it.
18       Q. Did you receive it before today?
19       A. I received this page before today.
20       Q. Okay.  So you received.  And are you testifying
21   here today both individually and as a designated
22   representative?
23       A. I'm the only person in the corporation.
24       Q. Mr. Sokolski --

Page 19

1        A. He has not been part of that corporation for
2    over ten years, and he withdrew from it a couple months
3    ago I think.
4        Q. So your answers today are both --
5        A. I'm the only one.
6        Q. Could you please let me finish --
7            ATTORNEY HEALEY:  Daphna, just wait until he --
8        Q. -- my question and then I will give you the
9    courtesy of giving an answer without interruption.  Okay?
10   I'll take your silence as assent.
11           So you are testifying here today both
12   individually and as the designated representative for
13   defendant Sokolski and Zekaria P.C.?
14       A. Yes, as the only representative.
15       Q. Okay.  And when your -- the Sokolski -- Sokolski
16   is Gary, was your husband?  Sokolski?  Robert Sokolski?
17       A. I'm sorry?
18       Q. The Sokolski --
19       A. Yes, yes, yes.  I didn't know what your question
20   was.
21       Q. You're married, right?
22       A. Yes.
23       Q. And Robert Sokolski is your husband, right?
24       A. Yes, yes, yes.

Page 20

1            (Overlapping speakers.)
2        Q. And he --
3        A. No, it's just that you're asking it weird, so.
4        Q. And when did he withdraw from Sokolski --
5            (Overlapping speakers.)
6            THE COURT REPORTER:  Again, wait until the end
7    of the question, please.  I'm not going to be able to --
8            THE WITNESS:  I apologize.
9    BY ATTORNEY LIGHTMAN:
10       Q. Can you give me an approximation?
11       A. I don't have the date.  A few months ago.  It
12   was to formalize something that happened over a year ago.
13       Q. What happened over a year ago?
14       A. That he left the firm.  He wasn't working there.
15       Q. So he left the firm over about a year ago --
16       A. Over a year ago and it was to culminate the fact
17   that he had been absent from the firm for over ten years.
18       Q. Why was he absent?
19       A. He had been sick.  He basically consulted from
20   home on occasion.  He was sick.  He had an assortment of
21   medical conditions.  He had his own issues that I can't
22   speak to necessarily.  But outside of that, he did
23   consult on some cases.
24           But when COVID hit we didn't quite shut down but

Page 21

1    we -- well, to back up, we primarily do landlord tenant
2    practice.  And the tenant regulations -- format -- the
3    laws for tenant protection changed in 2019.  So that
4    impacted the nature of our long-term business.  And after
5    that changed, he worked less.  But as that -- even less
6    than he did in the ten years prior.  But he would work
7    from home or here and there do some harder case.
8            But when COVID hit and we were shutting --
9    contemplating shutting down, we had too many cases to
10   just simply shut down.  So we kind of kept it going to
11   see when two weeks became two years would end.  And so he
12   hasn't really practiced in all this time, but.  So he
13   gave official resignation a few months ago I think.
14       Q. There's a document evidencing that?
15       A. I believe so but I don't have it.
16       Q. All right.  I request you produce that document
17   --
18       A. I will --
19           ATTORNEY LIGHTMAN:  Every -- Ms. Court
20   Reporter, every time I request a document, can you mark
21   it so that I can go back --
22       A. Yes, I will get that.  He told it to me.
23       Q. And you'll give me the document from Robert --
24       A. I have --

6 (Pages 18 to 21)

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT        April 2, 2024

Page 22

1    Q. -- from Robert Sokolski terminating his
2   affiliation with Sokolski and Zekaria, right?
3    A. Yes.
4    Q. Is he still practicing law?
5    A. He's unsure of what he's going to do. He is
6   uncertain of whether he wants to take on more clients.
7    Q. Okay. Was he still practicing law in 2022 --
8        (Overlapping speakers.)
9    A. Well, he has no cases at the moment.
10    Q. Would you please --
11    A. You asked. I answered. I said so -- it's not a
12   yes or no.
13    Q. I didn't even finish my question. Please let me
14   ask the question and then you can answer it. Okay?
15    A. Okay.
16    Q. Thank you. Was he still practicing law back in
17   2022, January, February, March, at or about the time the
18   events in this case were transpiring?
19    A. Practicing law? Licensed to. But actually
20   working on the business of Sokolski and Zekaria? Very
21   far and few between.
22    Q. Okay.
23    A. He had nothing to do with this case, with
24   probably 95 percent of our cases.

Page 23

1    Q. Did he ever -- who are you representing in
2   connection with this transaction?
3    A. He's right there. Gary Weiss.
4    Q. Gary Weiss. Okay. Were you representing anyone
5   else in connection with this transaction --
6    A. No, no.
7    Q. Were you representing Sam Gross --
8    A. No, he had Manfred.
9    Q. Were you representing any of Gary Weiss's
10   entities?
11    A. Right. Gary Weiss and whoever his entity would
12   have been which I believe was Asolar.
13    Q. Asolar or Asolar Diamond?
14    A. I call it Asolar. I don't remember the
15   actual -- whether it's Asolar, Inc., or Asolar Diamond.
16   But I represented Gary Weiss.
17    Q. All right. So when we say Asolar, we're going
18   to refer to Asolar Diamond?
19    A. We're going to refer to Gary Weiss.
20    Q. Okay. And you weren't representing Sam Gross in
21   this deal?
22    A. No.
23    Q. You weren't representing any of Sam Gross's
24   entities?

Page 24

1    A. No.
2    Q. You weren't representing Manfred Sternberg?
3    A. Manfred Sternberg represented himself.
4    Q. So the answer to my question is --
5        (Overlapping speakers.)
6    A. My answer is no.
7    Q. -- no, you weren't representing him. So the
8   only person you were representing in connection with this
9   deal was Gary Weiss?
10    A. Correct.
11    Q. Ad when did you first start representing Gary
12   Weiss?
13    A. I don't have that date memorized.
14    Q. Did you represent Gary Weiss at all before this
15   transaction?
16    A. I represented Gary Weiss in connection with this
17   transaction and another transaction. And I'm not sure if
18   they were simultaneous or one came before the other.
19    Q. What was the other transaction?
20    A. There's another transaction, and I'm going to
21   allege and I'm going to -- not -- I'm going to object
22   because --
23        ATTORNEY HEALEY: Attorney-client privilege.
24    A. -- attorney-client privilege --

Page 25

1    Q. Was it a lawsuit?
2    A. -- which he has not I believe waived.
3    Q. Is it a lawsuit?
4    A. He has not -- I -- that's it.
5        ATTORNEY LIGHTMAN: Mark this as DZ-8, please.
6        (Exhibit DZ-8 was marked for
7        identification.)
8        ATTORNEY LIGHTMAN: Before that, Mr. Weiss, can
9   she disclose the other matters for which you retained
10   her?
11        GARY WEISS: This one?
12        ATTORNEY LIGHTMAN: No, she said was there
13   another matter. Before we get to this, can she disclose
14   to me the name of that other matter?
15        GARY WEISS: That other matter which is this --
16        ATTORNEY LIGHTMAN: This is the one? All
17   right.
18        THE WITNESS: I don't know what you're all
19   looking at.
20        ATTORNEY LIGHTMAN: All right. Can she
21   disclose it?
22        GARY WEISS: This one?
23        ATTORNEY LIGHTMAN: Is there another one
24   besides this?

7 (Pages 22 to 25)

Page 26

1    GARY WEISS:  Can you spell the name?
2    ATTORNEY LIGHTMAN:  I will but she said there
3    were --
4    GARY WEISS:  Can you spell the name, please?
5    I'll answer you.
6            (Overlapping speakers.)
7    THE COURT REPORTER:  One at a time.
8    ATTORNEY LIGHTMAN:  Blue River 4747 LLC.
9    GARY WEISS:  Okay.  She can.
10   ATTORNEY LIGHTMAN:  Okay.  Is that the second
11   -- okay.
12   BY ATTORNEY LIGHTMAN:
13   Q.  I'd like you to look at --
14   A.  Well, how many others are we talking about?
15   Q.  Could you look at DZ-8, please.
16   ATTORNEY HEALEY:  Look at this.  This is --
17   A.  I'm sorry.
18   Q.  I will represent to you that DZ-8 is a search I
19   found online from the New York County Court System, a
20   case summary for Blue River 4747 LLC versus Bullion
21   Trading LLC.  And it indicates in the case summary
22   section --
23   A.  Yes, this is the case.
24   Q.  This is the second case --

Page 27

1    A.  Yes.
2    Q.  Let me ask you a question.
3    A.  There's no more questions that I will answer.
4    Q.  Well, no.  No, no.  It's not attorney-client
5    privilege --
6    A.  Well, it's not --
7    ATTORNEY HEALEY:  Let him ask -- let him --
8    A.  It's not relevant.
9            (Overlapping speakers.)
10   ATTORNEY HEALEY:  Stop.  Let him answer the
11   question -- let him ask the question.
12   BY ATTORNEY LIGHTMAN:
13   Q.  Look at page 2.  Who does it identify as the
14   plaintiff's attorney?
15   A.  Robert Sokolski but I used -- he -- it was -- we
16   recently have had trouble changing it.  He set it up over
17   25 years ago.  He is not the attorney of record.  I did
18   the lawsuit.  I drafted it.  The NYSCEF that is linked to
19   my Sokolski and Zekaria email address and it's -- he
20   created it over 30 years ago or 27 years ago.
21   Q.  So Robert -- if I get the actual entry of
22   appearance or the complaint that was filed, it will not
23   be Robert Sokolski's name?  It will be your name --
24   A.  Well, it shouldn't be.  It will be me.

Page 28

1    Q.  Did you sign the complaint that was filed in
2    this case --
3    A.  I don't remember.
4    Q.  Okay.
5    A.  I mean --
6    Q.  Is Robert Sokolski representing the plaintiff in
7    this case?
8    A.  Robert Sokolski didn't even draft this pleading.
9    Q.  Okay.  So your answer is no --
10   A.  My -- my --
11           (Overlapping speakers.)
12   Q.  -- Robert Sokolski is not representing the
13   plaintiff in this case?
14   A.  No, no.  My associate, Mark Davies, at the
15   time -- my associate at the time.  He doesn't represent
16   now.  He doesn't work for me now.  But at the time, I
17   didn't have Robert's help even on the drafting of the
18   complaint.
19   Q.  Does Sokolski and Zekaria have any associates
20   now?
21   A.  No.
22   Q.  Besides Mark Davies, were there any other
23   associates that Sokolski --
24   A.  Over the years plenty of different rotating

Page 29

1    associates.
2    Q.  How about from January 1, 2022, to the present?
3    A.  I can't be -- I don't want to misspeak.  I don't
4    know.
5    Q.  All right.
6    A.  I mean, I know that Mark Davies may have been
7    one.  But, you know, in giving you an answer on actual
8    dates, we've had other not just attorney associates but
9    we have had other legal assistants.
10   Q.  Okay.  Did -- Mark Davies you said drafted the
11   complaint --
12   A.  I believe he did, yeah.
13   Q.  So he was working for Sokolski and Zekaria in
14   2022?
15   A.  I believe he was.
16   Q.  Did he have any involvement in the Gary Weiss,
17   Sam Gross, Manfred Sternberg, SafetyHouse transactions,
18   the subject of my lawsuit?
19   A.  No.
20   Q.  And when did --
21   A.  None of us did.
22   Q.  How do you spell his last name?
23   A.  Davies?
24   Q.  Mm-hmm.

8 (Pages 26 to 29)

Page 30

1  A. D-a-v-i-e-s.
2  Q. And where is he now?
3  A. He's for a long time been at another law firm.
4  I'm not sure where he is now --
5  Q. In New York City?
6  A. I believe so. I don't know. He left not under
7  bad terms but he left to pursue other things.
8  Q. Okay. Did you represent Taylor Panagakos at
9  all?
10  A. I don't believe so.
11  Q. How about Stacey Panagakos?
12  A. At some point, yes.
13  Q. When did you represent Stacey?
14  A. She had a ticket in Rockefeller Center.
15  Q. Speeding ticket?
16  A. No. I forget what kind of ticket.
17  Q. Moving violation?
18  A. No.
19  Q. What kind of ticket?
20  A. I don't remember. You keep asking me --
21  ATTORNEY HEALEY: Daphna, you can just say "I
22  don't remember."
23  THE WITNESS: I did say that and he keeps
24  going --

Page 31

1  (Overlapping speakers.)
2  ATTORNEY HEALEY: No comments. This will take
3  much longer than it needs to.
4  BY ATTORNEY LIGHTMAN:
5  Q. Is that the only matter in which you represented
6  Stacey?
7  A. No.
8  Q. What other matters?
9  A. Are you going to keep cutting me off? Because I
10  was trying to recall. I think it was something about a
11  fence. I don't know. And it was something with the
12  town. And in a foreclosure proceeding. And I think
13  that's it. I could be wrong.
14  Q. Who is Stacey Panagakos?
15  A. She's Sam Gross's wife I believe.
16  Q. And --
17  A. Well, not -- or the mother of his child, his
18  wife. And Taylor --
19  Q. And when was the last time you represented
20  Stacey?
21  A. I don't know.
22  Q. Was it --
23  A. And I'm not -- you know what? At this point, I
24  don't think that I'm going to answer any more questions

Page 32

1  because it goes so far afield of --
2  ATTORNEY HEALEY: Daphna, let's just --
3  A. I'm going to --
4  ATTORNEY HEALEY: -- answer the questions.
5  A. You know what? I object.
6  Q. Okay. Thank you. Let the --
7  A. That's it.
8  ATTORNEY LIGHTMAN: Every time she refuses to
9  answer --
10  (Overlapping speakers.)
11  THE COURT REPORTER: One at a time. I'm not
12  going to be able to certify this transcript soon, guys.
13  You have to speak one at a time or --
14  (Overlapping speakers.)
15  ATTORNEY LIGHTMAN: Please, Madam Court
16  Reporter, every time she refuses to answer, mark that as
17  well.
18  BY ATTORNEY LIGHTMAN:
19  Q. Did you represent Stacey --
20  A. I refuse to answer.
21  Q. Did you represent Stacey Panagakos at any time
22  after January 1, 2022 --
23  A. I refuse to answer.
24  Q. May I please finish my question? Thank you.

Page 33

1  A. No because you asked it and I'm answering you
2  that I refuse to answer --
3  ATTORNEY HEALEY: Daphna, let --
4  A. -- about Stacey or about anything beyond this
5  case with Gary Weiss.
6  ATTORNEY HEALEY: Daphna --
7  A. I mean, it has nothing to do with your case.
8  ATTORNEY HEALEY: Daphna, let him answer the
9  question and give the answer you're going to give.
10  THE WITNESS: My answer is an objection.
11  ATTORNEY HEALEY: I understand that. But let
12  him ask the question.
13  BY ATTORNEY LIGHTMAN:
14  Q. Did you represent Stacey Panagakos in any legal
15  matter after January twenty -- January 1, 2022, when this
16  dispute arose?
17  A. Objection.
18  Q. You're refusing to answer?
19  A. I'm refusing to answer on multiple grounds. Not
20  Fifth Amendment or attorney-client privilege or one or
21  the other. I'm just refusing to answer. Because --
22  Q. You don't have to give me a reason.
23  A. Well, I do because you're going to say that I'm
24  being obstructionist. I'm not. I'm saying I refuse to

9 (Pages 30 to 33)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 34

1    answer because of multiple grounds.
2         Q. Did --
3         A. I know she's been investigated. You know, I've
4    heard that from investigators.
5         Q. Did Stacey Panagakos have anything to do with
6    the transactions which are the subject of this lawsuit?
7         A. This lawsuit I will answer to. Yes.
8         Q. What did she have to do?
9         A. Well, she received checks. I don't know if she
10   had anything to do with the actual negotiation or the --
11   of the transaction between Manfred and your client.
12        Q. Why did she receive checks?
13        A. Because she was part of Charlton Holdings.
14        Q. She's a principal of Charlton Holdings?
15        A. What I understood, yes.
16        Q. How did -- what's your understanding based on?
17        A. Because she -- apparently the corporate
18   formation -- corporate -- excuse me -- formation was to
19   include her as the principal.
20        Q. Did you see the corporate --
21        A. No.
22        Q. -- formation documents?
23        A. No. But I was told to write to her because she
24   -- either to her or to Charlton.

Page 35

1         Q. Who told you to write checks to Stacey --
2         A. Mr. Gross as well as I believe her daughter
3    even.
4         Q. So Stacey -- her daughter's Taylor?
5         A. Yes.
6         Q. So Taylor Panagakos told you to write --
7         A. I was told when to write checks, and it was
8    either to Charlton -- you have the copies of the checks.
9    And that's why it was written to them because they were
10   part of Charlton Holdings.
11        Q. Could you please let me finish my question
12   before you answer? My question is did Taylor Panagakos
13   tell you to write checks to Stacey Panagakos?
14        A. She may have. She may have at least in one
15   instance. But I would have been directed when a check
16   was written to her or to Stacey or to Charlton or to
17   anyone that was the beneficiary of that portion that was
18   to Mr. Gross.
19        Q. Okay. Who gave you authority to write checks to
20   Taylor -- excuse me -- to Stacey?
21        A. She did at least on one occasion say it's okay
22   to send to me. He did.
23        Q. He meaning?
24        A. Meaning Sam Gross as -- and that's it. He said

Page 36

1    she was part of Charlton Holdings.
2         Q. So your client is Gary Weiss, right?
3         A. My client is Gary Weiss who gave authority to
4    cut 65 percent to him and 35 percent to Gross. And Gross
5    then, who had been a former client -- and that's all I'm
6    asking -- answering -- said I don't want the money
7    directly. I owe this one some money and I owe that one
8    some money and the rest can go to my company because they
9    owe more money.
10        Q. So we'll get to the 65-30. But from the 35
11   percent cut --
12        A. He had it divvied up, yes. Yes. And growl at
13   me all you want. Yes, the 35 percent is how they all got
14   paid. But Mr. Weiss got his 65 percent. Yes. Next
15   question.
16        Q. From the 35 percent that you claim was to go to
17   Gross that -- from that distributions from that Sam Gross
18   told you to pay Taylor?
19        A. Yes.
20        Q. Did he ever tell you to pay Stacey?
21        A. Yes.
22        Q. Did he ever tell you to pay anyone other than
23   Taylor or Stacey?
24        A. Yes. And you have a list of the checks that I

Page 37

1    was able to find so far. Ron Kuby for legal fees. There
2    was a couple of other people that he had owed money to
3    that he wanted it paid directly to them. Midtown Watch
4    Company stands out because I thought that was odd but I
5    guess he bought a watch and he owed them money.
6         Q. Okay. How long you been married to Robert
7    Sokolski?
8         A. Since '97. And that's all I'm going to answer.
9         Q. Do you live together?
10        A. Objection.
11        Q. You're not going to state whether you live with
12   your husband?
13        A. I don't need to.
14        Q. Okay. What's your residence address?
15        A. I'm not giving it to you. You know it.
16        Q. If I know it, tell me a resident address.
17        A. Objection.
18        Q. You're refusing to disclose your residence
19   address --
20        A. I'm going to continue to object to every
21   question that has nothing to do with where the money
22   went.
23        Q. Okay.
24        A. I answered those questions.

10 (Pages 34 to 37)

Page 38

1    Q. You're refusing to --
2    **A. Yes.**
3    Q. Okay. And what -- do you have any other cell
4    phones other than your one cell phone?
5    **A. No.**
6    Q. Okay.
7    **A. And you have that number.**
8    Q. And your email address -- do you have any other
9    email addresses other than Sokolski.zekaria --
10   (Overlapping speakers.)
11   **A. Yes.**
12   **THE COURT REPORTER:** I didn't hear the end of
13   the email address.
14   Q. Sokolski.zekaria@mindspring.com. Do you have
15   other email addresses?
16   **A. Yup.**
17   Q. What are your other email addresses?
18   **A. Objection.**
19   Q. Why aren't you answering that?
20   **A. Because it's a defunct email address that I**
21   **haven't used in over seven years. And I'm not giving a**
22   **personal email address to people that just don't have it.**
23   Q. Okay. How long have you lived in your residence
24   address?

Page 39

1    **A. Objection.**
2    Q. Why aren't you telling that?
3    **A. Because I don't have to.**
4    Q. I believe you do but --
5    **A. Okay.**
6    Q. -- I'm not going to fight with you.
7    **A. That's good.**
8    Q. And do you have a website?
9    **A. You would know.**
10   Q. Do you have a --
11   **A. Yes.**
12   Q. -- website? What's the name -- what's the
13   address --
14   **A. You mean -- wait. Objection. Are you talking**
15   **about for the business?**
16   **ATTORNEY HEALEY:** Wait. Daphna, stop. Let me
17   clarify, Gary. Is it a website for her law?
18   BY ATTORNEY LIGHTMAN:
19   Q. When I say "you," I'm referring to you
20   personally and as the designated representative of
21   Sokolski and Zekaria P.C. So if there's --
22   **A. Oh, wait --**
23   Q. -- a difference -- if there's a difference in an
24   answer, then please let me know. Otherwise assume it

Page 40

1    pertains to both --
2    **A. Actually no.**
3    Q. There's no website for you individually or for
4    Sokolski and Zekaria?
5    **A. There shouldn't be.**
6    Q. And have you ever been convicted of a crime?
7    **A. No.**
8    Q. Have you been accused of a crime?
9    **A. Yup.**
10   Q. What crime?
11   **A. No. Objection.**
12   Q. Okay. I'd like to show you a document that's
13   been marked as --
14   (Exhibit DZ-2 was marked for
15   identification.)
16   **A. I'm going to leave soon.**
17   Q. -- Daphna Zekaria 2.
18   **A. I haven't seen this before. Oh, okay. No, it**
19   **says two lawyers. And I didn't know what that's about.**
20   **I haven't read this.**
21   Q. I will represent to you that this is an article
22   I found online that is titled "Two Lawyers Charged with
23   Stealing Money from Former Clients." One attorney
24   accused of taking funds from a state lottery winner and

Page 41

1    then there's a whole left column and part of the right
2    column that --
3    **A. I understood it as soon as I actually read it**
4    **that it was talking about a different attorney.**
5    Q. Well, it says here separate larceny charges and
6    it says in a separate case Douglas Valente, and then it
7    goes onto that person, and that's a second lawyer.
8    **A. Well, that's why I got confused when I saw the**
9    **title.**
10   Q. So the first column and part of the second
11   column -- that's talking about --
12   **A. Objection then if you want me to answer**
13   **questions about it.**
14   Q. Is the first column in this article and part of
15   the --
16   **A. Objection.**
17   Q. Will you please --
18   **ATTORNEY HEALEY:** Let her answer.
19   (Overlapping speakers.)
20   Q. Let me finish my question.
21   **A. Don't growl and grit your teeth at me.**
22   Q. I'm not growling. You just keep continually
23   interrupting me. Show some civil courtesy, please.
24   Thank you.

11 (Pages 38 to 41)

Page 42

1    Is the first column and part of the second column
2    where it talks about an attorney being charged with -- a
3    New York state lottery winner hiring you, making promises
4    to withhold a portion of her winnings in the firm's
5    escrow account and an additional portion on her behalf,
6    and saying you collected a total of 230,000 from the
7    client transactions; and instead of holding the money or
8    investing it, you made large transfers to other
9    individuals which she would have not been able to make
10   without her client's funds. Is that a reference to the
11   charges that were brought against you?
12       A. Objection.
13       Q. You're not answering the question?
14       A. Right.
15       Q. Isn't it true that --
16       A. Objection. How many --
17       ATTORNEY HEALEY: Daphna, stop --
18       THE WITNESS: Well, I'm not going to let him
19   ask it ten different ways --
20           (Overlapping speakers.)
21       THE COURT REPORTER: One at a time. One at a
22   time.
23           (Overlapping speakers.)
24       THE COURT REPORTER: I need to take a minute

Page 43

1    break.
2           (Overlapping speakers.)
3       ATTORNEY LIGHTMAN: We're taking a break.
4           (Off the record.)
5    BY ATTORNEY LIGHTMAN:
6       Q. Is it your contention that all of the money that
7    was wired to you by Manfred Sternberg was distributed by
8    him?
9       A. Yes.
10       Q. Did you retain or make any money from these
11   deals?
12       A. Not that I'm recalling but objection. No. Not
13   objection. Withdrawn. Because it has to do with this
14   deal. With this deal, it's -- I was told to take -- I
15   had a retainer agreement to take money but I didn't wind
16   up taking money because there was nothing really involved
17   in -- I regret that now. But there was nothing really
18   involved.
19       We had a retainer agreement that I've been trying
20   to locate. Because I'm cleaning my office and I didn't
21   print everything all the time, I did look for it. So
22   yes. I don't mean to be difficult. But here is where I
23   want to talk about there's a retainer agreement that I
24   would have received significant compensation. I never

Page 44

1    received that. I --
2       Q. What was the compensation --
3       A. I don't remember exactly and I wish I had the
4    retainer agreement because I didn't get paid under that
5    retainer agreement because I wound up being told, oh,
6    this was -- there was no problem, there was no dispute.
7    So I didn't take money.
8       Mr. Weiss got everything that we gave you in the
9    bank records so I didn't take money back from him.
10   There's nothing that I believe he's saying -- or at least
11   I'm not sure of what he's saying. But what I'm told is
12   he's saying he didn't receive the money. I don't know
13   what I'm being told. But he received wires and I've
14   shown the wires and the conversations about getting the
15   wires. So he received that money, and I never received
16   money from that money.
17       He -- you know, what he did or didn't do with it
18   is beyond that. It would only be speculation on my part.
19   But what I can say is that after I wired him the
20   money, I never received money from him. Not in cash, not
21   in wires, not in checks. Not from any entity.
22       Q. How about gems? Did you ever receive gems or
23   diamonds?
24       A. I received -- not as a compensation. I received

Page 45

1    at one point, after he received money, stones to deliver
2    to Mr. Gross for no particular purpose. I don't know if
3    they were diamonds, gems, or anything because I didn't
4    have them evaluated. I did the favor of meeting in the
5    city whoever he directed. And I've seen some of the
6    pictures of Starbucks or whatever. That happened. I
7    didn't know it was necessarily for your client. But I do
8    know that it could have been anything.
9       They did a lot of other business together which
10   I'm going to stop here. Like I said, I've been
11   objecting. But it was just -- it could have been
12   anything. I don't know what it was. Because if I knew
13   what it was, it would mean that I would have taken them
14   to a gemologist which I did not do.
15       Q. Mr. Weiss testified in his deposition that he
16   met you at a Starbucks --
17       A. He did not. Sorry. I'm sorry. That -- you're
18   right there. I apologize.
19       Q. Mr. Weiss testified that he met you at a
20   Starbucks in Center City and gave you four diamonds.
21       A. He did not.
22       Q. Did you meet someone on his behalf --
23       A. Yes.
24       Q. -- and get four diamonds?

Page 46

1      A. Four stones.

2      Q. Did you sign a receipt for those?

3      A. A receipt for stones.

4      Q. Okay. And what did you do with stones? Did you

5    keep them or --

6      A. I -- no.

7      Q. What did you do with them?

8      A. Immediately was going back to Long Island and

9    met Timothy Mahoney who I gave them to.

10     Q. And who was Timothy Mahoney?

11     A. He's someone that was designated by both parties

12   I believe to deliver them to Mr. Gross.

13     Q. And do you have contact information for Mr.

14   Mahoney?

15     A. Currently no.

16     Q. How did you meet him?

17     A. Through Mr. Gross. He was giving them to Mr.

18   Gross.

19     Q. Right.

20     A. Mr. Mahoney I believe has changed his phone

21   number. I don't know his phone number. I haven't called

22   him in years.

23     Q. Do you have his old phone number?

24     A. I can look. Sorry.

Page 47

1      ATTORNEY LAVER: Off the record.

2      (Off the record.)

3    BY ATTORNEY LIGHTMAN:

4      A. An old number was --

5      Q. What's the number?

6      A. -- was (516) 402-9872.

7      Q. Do you have an email --

8      A. I have it as Timmy.

9      Q. Do you have an email address?

10     A. No.

11     Q. All right.

12     GARY WEISS: Can I ask a question?

13     ATTORNEY LIGHTMAN: What? Tell me and I'll ask

14   her.

15     GARY WEISS: Who is this Timothy Mahoney?

16     ATTORNEY LIGHTMAN: I'm going to get to that --

17     (Overlapping speakers.)

18   BY ATTORNEY LIGHTMAN:

19     Q. Let's go back on the record. The person that

20   you met at the Starbucks on behalf of Mr. Weiss -- do you

21   remember his name?

22     A. It was a woman, and no.

23     Q. You don't know? Okay.

24     A. I remember it being a woman.

Page 48

1      Q. She gave you a package of four stones; you

2    signed the receipt --

3      A. I don't recall if it was four. But I'm sure if

4    you say it was four, it was four.

5      Q. That's what Mr. Weiss told us.

6      A. Maybe but --

7      (Overlapping speakers.)

8      THE COURT REPORTER: I'm sorry. One at a time.

9    Slow it down, guys --

10     (Overlapping speakers.)

11   BY ATTORNEY LIGHTMAN:

12     Q. I apologize. What did you do after this woman

13   gave you stones and left?

14     A. Gave it directly in Queens on my way home or

15   back to Huntington I should say to Timothy Mahoney, who I

16   just spoke about, as the representative of Charlton.

17     Q. And how did you know to deliver the stones to

18   Timothy Mahoney --

19     A. Because I knew that he worked with them.

20     Q. How did you know that?

21     A. Because I was told that in the past. And Mr.

22   Weiss did not direct me not to give it to a

23   representative. He just said that I could pick these up

24   at Starbucks to deliver to Mr. Gross. It was not as an

Page 49

1    escrow agent. It was not in the capacity of anything.

2    It's no good deed goes unpunished. I made the delivery

3    from one spot to the other because I happened to be in

4    the city. I used to be in the city regularly.

5      Q. Did Sam Gross tell you to deliver the stones to

6    Timothy Mahoney?

7      A. He said just give them to Timothy and you'll be

8    in touch with him.

9      Q. Okay. Let's go back to the retainer agreement.

10   You said there were no funds that you transferred to Gary

11   Weiss that he paid you as a retainer. Were there any

12   funds that Manfred Sternberg wired to you that you

13   retained as a fee?

14     A. No.

15     Q. None at all?

16     A. No. Maybe -- when I said I don't know for sure,

17   it could be that there would be a residual $5,000. But

18   if it was more than that, it would be amazing because I

19   was offered money and refused it. Because I said I don't

20   really want to be involved in this. It was too easy, God

21   willing. It was not too easy. It ruined my life here.

22   But at the time I said no. I mean, it just didn't make

23   sense.

24     I said if you guys have a good deal and you, you

13 (Pages 46 to 49)

Page 50

1    know, finished it because that's what Manfred said
2    happened, great.  And then a month later I started
3    getting calls from investigators on behalf of Mr. Scully
4    and I didn't -- Mr. Napolitano I believe in fact.  And I
5    couldn't cooperate at the time because there's
6    attorney-client privilege.  So I didn't.
7        Q.  Did you delete any emails?
8        A.  No.
9        Q.  Pertaining to this?
10       A.  No, no, no.
11       Q.  So you have all the emails, right?
12       A.  I have all the emails.  But what happened with
13    my email which I'm trying to recover -- I have no reason
14    to delete them.  They would only help me.  What happened
15    with my email that -- for a while at least -- is that
16    there was an auto delete in effect that as you -- when
17    you --
18       Q.  I know what auto delete is.
19       A.  No, no, no.  When I go to open something on an
20    iPad, it would just delete it.  Like, if I was not
21    swiping it right.  So we recovered some.  But it was not
22    even for a long period of time because I didn't use an
23    iPad back in that time.
24       Long story short, I have at least many hard

Page 51

1    drives to go through to make sure that I can -- I don't
2    know which computer would -- I was using at the time.
3    But the one that was attached to my desk, I know where I
4    was sitting when Gary sent me an email saying it's okay
5    to cut the check or release the funds.
6        Q.  Which computer were you using?
7        A.  The one in my front office.
8        Q.  And do you still have that computer?
9        A.  Yeah.
10       Q.  And you haven't deleted any emails from that
11    computer?
12       A.  No.
13       Q.  Okay.  Is that --
14       A.  No, no, no.  That's not a true statement.  I
15    have never deleted emails?  Never deleted emails in
16    connection with this.
17       Q.  Okay.  And what was the --
18       A.  I've absolutely deleted emails.
19       Q.  Who was your email provider?
20       A.  Mindspring.
21       Q.  Mindspring.  Okay.  And is that the same
22    computer you used to draft this retainer agreement?
23       A.  Yeah.
24       Q.  And you sent the draft of the retainer agreement

Page 52

1    to Gary --
2        (Overlapping speakers.)
3        THE COURT REPORTER:  One at a time, guys.  This
4    is my last plea here.  You need to slow down.  It has to
5    be one at a time --
6        (Overlapping speakers.)
7        THE COURT REPORTER:  -- or I am not going to be
8    able to stay.
9    BY ATTORNEY LIGHTMAN:
10       Q.  You sent a copy of the retainer agreement to
11    Gary Weiss via email?
12       A.  Can I answer now?
13       Q.  Yes.
14       A.  Yes.
15       Q.  And you sent a copy of the retainer agreement
16    draft to Sam Gross for his review and approval?
17       A.  Not that I'm aware of.  If I sent it to Sam
18    Gross, it would have been to both of them at once or
19    after the fact to say, like, this is done.  We're
20    representing.  I believe I sent to Gary.  Gary signed it.
21    But then we texted each other through WhatsApp.  And he
22    asked -- in other words, when it was time to wire the
23    funds to him, he sent me that information and where to
24    send it to on WhatsApp.  It would not be in the retainer

Page 53

1    agreement.
2        Q.  Okay.  The retainer agreement -- we'll get to
3    the wires in a minute.
4        A.  Well, no, but I'm saying it's not part of the
5    retainer agreement.
6        Q.  The retainer agreement -- you emailed that to
7    Gary Weiss --
8        A.  Definitely.
9        Q.  And when it was signed by Gary Weiss, you also
10    emailed it to Sam Gross; correct?
11       A.  I don't know.  I don't know.
12       Q.  Okay.  And how about --
13       A.  If I emailed it, it would have been to Charlton
14    but I don't believe I did.  And definitely not to
15    Manfred.
16       Q.  Okay.  And --
17       A.  Well, definitely is a very strong statement.  I
18    don't believe to Manfred.
19       Q.  And why haven't you been able to locate that
20    email on your server?
21       A.  Why?  I don't -- because of the deleted email
22    business, and I haven't been able to -- the way I did
23    things when I was in the office is sometimes I'd save a
24    document or I would just email it right from my desktop.

14 (Pages 50 to 53)

Page 54

1  But I can't find it.  And I would love to find
2  it.  I definitely printed it.  It's definitely sitting in
3  this stack of crap that's, like, all over my floor, like,
4  because there was a while where I wasn't printing -- my
5  old practice was every time you send an email or get a
6  response, print it, put it in the filing tray, put it in
7  the file.  I didn't do that for a long time because too
8  much was happening by email versus here and there.
9      Q.  But you remember printing out the retainer --
10     A.  Yes, absolutely.
11     Q.  You remember printing out this retainer?
12     A.  Yes, I do.
13     Q.  So it's in a stack of piles somewhere in your
14  office --
15     A.  I hope so.  Yeah, and I hope to have that by the
16  end of the week because I'm going through every piece of
17  paper in my office not just for your purposes but just to
18  make sure everything is where it needs to be.
19     Q.  What do you recall sitting here today were the
20  terms of payments for your services that were put in the
21  retainer?
22     A.  It was going to originally come out of this but
23  it was just an amount that was ridiculous.  It was over a
24  hundred thousand dollars.  But it would have contemplated

Page 55

1  defense of any litigation.  And there was no litigation,
2  or at least there wasn't.  So I didn't take a fee for the
3  -- for that service.
4      But then when this investigation started to
5  happen, I sort of distanced myself from any of it because
6  it was -- I wouldn't want to use the word aggressive, but
7  I didn't know enough about it to participate in it.  I
8  felt that it was better directed to Manfred because he
9  negotiated the entire agreement and knew more about it
10  than I did.  And it was my understanding that it did
11  direct to him and he did deal with it for a while.
12     But I -- you know, at that point I hadn't even
13  been in touch with him.  I've only spoken to Manfred even
14  maybe two to maybe three to four times.  And more of the
15  times that I spoke to him was and after the fact, like,
16  you know, did you answer Dan's -- like, what's going on
17  here.
18         (Whereupon server of the country club
19          entered the room.)
20     ATTORNEY LIGHTMAN:  Give me fifteen more
21  minutes.
22  BY ATTORNEY LIGHTMAN:
23     Q.  So was it a lump sum payment that was
24  contemplated and set forth in the retainer agreement?

Page 56

1      A.  I don't remember.  I don't -- maybe.
2      Q.  When you said over a hundred thousand, what's
3  the basis for that?
4      A.  I don't -- I think it contemplated litigation
5  potentially between all of -- like, in other words, if --
6  if he didn't get paid but the goods were delivered, you
7  know, there could have been a reality where he delivered
8  and Mr. Scully would have, you know, not authorized
9  release of the money.
10     See, from all I knew is that Mr. Sternberg had to
11  authorize it.  I didn't have to go to Mr. Scully to get
12  that authority.  So but if -- you know, when -- to back
13  up, when I received the money, Mr. Sternberg asked me for
14  proof that the goods were on the truck.  And I said okay,
15  I'll get you that, presuming that he would go get
16  whatever authority he needed pursuant to his own contract
17  to authorize release of the funds.
18     So when I called Mr. -- or contacted Mr. Weiss --
19  I don't know if it was by phone or by text or a
20  combination.  I said they want proof that the goods
21  are -- or Manfred wants proof that the goods are on the
22  truck in order to authorize release to you.
23     Now, I didn't need Mr. Scully to authorize.  I
24  figured that as a licensed attorney in Texas who

Page 57

1  negotiated the agreement with Mr. Scully that it would be
2  a foregone conclusion that he had whatever mechanisms in
3  place to authorize the release of the money.
4      Anyway, so Mr. Weiss did send a picture of what
5  was on the truck as well as a picture of himself to show,
6  hey, I'm here and I put it on the truck.  That was enough
7  for Mr. Sternberg to say almost immediately -- I wouldn't
8  say it was within moments -- yes, I'm satisfied.  You can
9  cut the check to -- or you -- he didn't use those words.
10  You can release -- you can distribute to Mr. Weiss.
11     I didn't immediately distribute to Mr. Weiss,
12  but -- because it was some time at night I remember.  And
13  the bank wouldn't have been open.  So I believe in the
14  next day or two or three, I think I remember it taking a
15  few days till I could get to the bank and do it.  But
16  then I released to Mr. Weiss based on Mr. Sternberg's
17  authorization.
18     Q.  I'm going to show you what's been marked as
19  Manfred Sternberg deposition 16.  Is that a picture that
20  was sent to you by Mr. Sternberg?
21     A.  By Mr. Sternberg?
22     ATTORNEY LAVER:  Objection.
23  BY ATTORNEY LIGHTMAN:
24     Q.  By Mr. Sternberg or Mr. -- who -- was that the

Page 58

1  picture of the goods on the truck that was sent to you
2  that you just referred to?
3      A. I believe mine might have been a little bit
4  different because there was a picture of Mr. Weiss in it.
5      Q. Okay. So it was a different picture?
6      A. This is -- yeah.
7      Q. Do you have that picture?
8      A. I think we -- I gave it to you.
9      Q. Pointing to Mr. Healey.
10     A. Yes.
11     Q. I request that you produce that picture.
12     A. Well, I gave it -- I don't have it other than I
13  gave it to him from a screenshot.
14     Q. You still should have the screenshot, right --
15     A. Well, I didn't -- I don't know.
16         ATTORNEY HEALEY: If you do have it --
17         (Overlapping speakers.)
18         ATTORNEY LIGHTMAN: Mr. Healey, if you have it,
19  could you produce it?
20     A. Either way if I still have it, I'll give it. I
21  just don't know if I --
22         ATTORNEY HEALEY: If I had it, I would have
23  produced it.
24         ATTORNEY LIGHTMAN: I figured that.

Page 59

1  THE WITNESS: Well, let me look.
2      ATTORNEY HEALEY: No, no, don't look --
3      ATTORNEY LIGHTMAN: We can go back and look. I
4  just made a request.
5      THE WITNESS: No, no, but I don't want --
6      ATTORNEY LIGHTMAN: Don't worry about it.
7  We'll deal with documents later.
8  BY ATTORNEY LIGHTMAN:
9      Q. So tell me your best recollection of what --
10     A. How --
11     Q. -- services you were supposed to provide in this
12  retainer agreement?
13     A. Well --
14     Q. What was your role in the transaction?
15     A. The role in the transaction --
16     Q. Your role.
17     A. Yes. My role was Mr. Weiss was to provide goods
18  and deliver goods by putting them on a truck. He was not
19  going to put them on a truck without some security of
20  having the funds available. He didn't I guess know Mr.
21  Sternberg enough to -- just because he was negotiating
22  essentially with Mr. Sternberg and Mr. Gross. And
23  whether he had a good or a bad relationship with Mr.
24  Gross, he didn't know Mr. Sternberg at all. And Mr.

Page 60

1  Sternberg being the attorney and/or somewhat of a
2  recipient in -- you know, an investor in this
3  transaction, he wanted protection from that.
4      Q. Who wanted protection?
5      A. Mr. Weiss.
6      Q. Wanted protection from what?
7      A. From delivering goods and not being paid for
8  them.
9      Q. Okay.
10     A. So he wanted his own counsel because Mr.
11  Sternberg was not just the attorney for Charlton but also
12  a beneficiary of this transaction. So to that extent --
13  is what I'm under the impression of. And again, I
14  wouldn't have actual knowledge of that. But it's my
15  understanding that Mr. Sternberg did not represent Mr.
16  Weiss at all. And Mr. Weiss needed independent counsel
17  to secure that he got paid if the goods were on the
18  truck.
19     So what I was -- what I was told is that I would
20  have the money held. I wouldn't release the money. I
21  wasn't asked to sign anything. But even just -- it's --
22  without Manfred's authorization, it would have been
23  insanity to release anything. But he didn't even ask me
24  to sign anything. He just said all I need to do is have

Page 61

1  proof that the goods are on the truck and then I'll give
2  you the okay. And that's what happened.
3      Q. When --
4      A. Whether he needed authority from the
5  plaintiff --
6         ATTORNEY HEALEY: Daphna, you answered.
7      A. Yeah, that's it. I don't know.
8      Q. Whether Manfred needed authority from Mr.
9  Scully --
10     A. I don't know whether he did or he didn't. I
11  presume he had it.
12     Q. You presume that Mr. Sternberg had authority
13  from Mr. Scully to release --
14     A. To release.
15     Q. -- the goods? Okay. And so your role --
16     A. Actually he told me he did.
17     Q. Okay. Who told you he did?
18     A. Mr. Sternberg told me that he had authority once
19  he had proof that the goods were on the truck.
20     Q. Okay. When you say the goods were on the truck,
21  the goods have to be owned by Gary Weiss or his company?
22     A. I didn't understand the question.
23     Q. Well, anybody can load goods on the truck. Did
24  the goods have to be owned by Gary Weiss before you would

16 (Pages 58 to 61)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 62

1  release the money?
2      A.  No.  It was not a requirement.  And in fact
3  there was no requirement.  The only requirement was that
4  the masks -- those were the goods -- the masks were
5  loaded on the truck to be delivered to the plaintiff.
6  Again not a requirement that was made of me.
7      My only answer -- my only comment is is that I
8  told Manfred don't send me money and then leave me
9  sitting there with it.  Either authorize me to release it
10  or tell me what to do with it.  He said, no, there was no
11  problem.  My contract with Safety House only requires
12  that we deliver, meaning the delivery has to be goods on
13  truck.
14      So I asked Mr. Weiss for proof of that.  When I
15  got a picture of Mr. Weiss in front of a truck, I sent it
16  to Manfred.  To me that was like -- well, that may not be
17  enough in and of itself as proof that you loaded a truck
18  with those masks.  But I sent it to him and figured that
19  he would do his own due diligence as far as his, you
20  know, checking whether the truck was sufficient, whether
21  everything was okay, whether the goods were in fact on
22  the truck.  That was on him.
23      Q.  So you weren't concerned whether or not Gary
24  Weiss had title to the masks that were on the truck?

Page 63

1      A.  I was told that Gary Weiss needed to produce
2  goods on a truck -- not to have title to it, not to own
3  it.  Maybe he owned it.  Maybe he didn't.  Maybe he had a
4  partner in it.  What I was told is that he had to load
5  goods on a truck.  He had to, you know, essentially
6  get -- source them and put them on a truck.  And what I
7  understood is that he completed that task.
8      Q.  Was -- were they N95 masks?
9      A.  I don't know.  I wasn't on the truck.
10      Q.  Okay.  Were they supposed to be N95 masks?
11      A.  I believe so.
12      Q.  You believe so?
13      A.  I believe so based on -- not a contract that I
14  entered but based on everything that, you know, was part
15  of that transaction that they -- it was for the COVID
16  masks.
17      Q.  So your role was once Manfred told you we're
18  satisfied that Gary Weiss has these N95 masks on a truck,
19  whether or not he owned them or not, you were authorized
20  to release funds to Gary Weiss?
21      A.  What I was under the impression was that
22  Manfred, an attorney who negotiated the transaction, once
23  he authorized the release of funds is when I would do it.
24  And he did do that.  If he didn't do that, I wouldn't

Page 64

1  have released the funds and I would have waited for --
2  then I would have had to do one of several things.
3      One would have been to negotiate an outcome
4  between Manfred, the parties involved which includes Mr.
5  Scully, or go to court to, you know, essentially force
6  the issue as this unfortunately has come to be because I
7  wouldn't have wanted to continue to hold it.  I would
8  have wanted a determination absent an agreement.
9      Q.  What your --
10      A.  Because I wouldn't want exactly what's happening
11  here to be happening.
12      Q.  Your understanding of your role in the
13  transaction, who is the person that could authorize you
14  to release the funds from your attorney as per
15  accounting?  Is it Manfred Sternberg?
16      A.  Manfred Sternberg as well as my client, you
17  know, subsequent to that.  But primarily speaking
18  Manfred.  Because without his authority, I wouldn't have
19  done any of it.
20      Q.  So if Gary Weiss had said to you "I want the
21  funds that Manfred wired to you and Manfred" --
22      A.  He did say that.  And I said, no, I'm waiting
23  for authority.
24      Q.  From Manfred?

Page 65

1      A.  Yeah.
2      ATTORNEY LIGHTMAN:  I'm going to take a break
3  and order some lunch.
4      (Off the record.)
5  BY ATTORNEY LIGHTMAN:
6      Q.  Ms. Zekaria, in addition to the retainer
7  agreement was supposed to be a -- was there supposed to
8  be a separate escrow agreement that sets forth your
9  responsibilities and duties when you -- for your receipt
10  and subsequent disbursement of the funds --
11      A.  I don't recall if we were doing it separate or
12  together as part of one document.
13      Q.  So your recollection it's supposed to one --
14      A.  I --
15      Q.  -- document that sets forth both?
16      A.  No, I just said I don't recall.  And you're just
17  putting words in my mouth.  Yeah.
18      Q.  Okay.  Okay.  The -- your duties as an escrow
19  agreement, did you require any documentation from Gary
20  Weiss or Asolar evidencing his purchase of the goods
21  before you released the funds?
22      A.  No.
23      Q.  Were you required to obtain that
24  documentation --

17 (Pages 62 to 65)

## Page 66

1      A. Nope.

2      Q. No. Okay.

3          ATTORNEY LIGHTMAN: Okay. Could we have this

4   marked as DZ-8?

5          THE COURT REPORTER: We're up to 9.

6          ATTORNEY LIGHTMAN: DZ-9. I'm sorry. 8 was

7   the --

8          ATTORNEY LAVER: The other --

9          ATTORNEY LIGHTMAN: The what?

10         ATTORNEY LAVER: Eight was the other case.

11         ATTORNEY LIGHTMAN: Eight was the --

12             (Overlapping speakers.)

13     THE WITNESS: The newspaper article.

14         ATTORNEY LIGHTMAN: Newspaper article, right.

15  No, that was --

16             (Overlapping speakers.)

17         ATTORNEY LAVER: Eight was the Blue River

18  lawsuit.

19         ATTORNEY HEALEY: What's -- did you introduce 3

20  and 4?

21         ATTORNEY LIGHTMAN: Not yet. We'll get to

22  that. Let's have this marked as 9 and 10.

23             (Exhibits DZ-9 and DZ-10 were marked for

24             identification.)

## Page 67

1      Q. I'm going to hand you two documents which have

2   been marked as DZ-9 and DZ-10. For the record --

3      A. I don't know what this is.

4      Q. For the record, DZ-9 has been marked

5   Zekaria000001 through Zekaria 4. And the document --

6      A. This is the transcription. Okay.

7      Q. Yes.

8      A. No, I just didn't understand the format. I was

9   asking him.

10     Q. These are documents you produced, so. And the

11  document marked as DZ-10 has a Bates stamp Zekaria000011.

12     A. Oh, I thought because I sent it to you like

13  this. Okay. Sorry. It just took a minute.

14     Q. So would you agree that DZ-9 is a transcription

15  of the WhatsApp messages between you and Gary Weiss and

16  Sam Gross?

17     A. No. I wouldn't agree. Because I don't know. I

18  would have to read it and compare it. But I would assume

19  that that is what it looks like. I just sat with my

20  attorney asking what this is. And you watched me do

21  that.

22     Q. These are -- I'm sorry?

23     A. Because I didn't recognize the format or the

24  font.

## Page 68

1      Q. Okay. And, for example, if you look at DZ-10 --

2      A. Well --

3      Q. If you look at DZ --

4      A. -- I look at DZ-10 I'm looking at a -- so is --

5   are you saying that this and this is the same?

6      Q. No. I'm trying to finish my question before you

7   answer it. But you interrupted me. So if you look at

8   DZ-10 which is Zekaria document 11 where it says "Shlomo,

9   please confirm to her 250K is coming in. She is waiting

10  for it and 130 is yours" and you look at the bottom of

11  the second page of DZ-9, you see where it says -- if you

12  find the entry for 3:37.

13     A. Wait. What are we talking about?

14         ATTORNEY HEALEY: Compare this --

15     A. This to?

16     Q. To what's on page 2 of DZ-9, it says --

17     A. What is all this now?

18     Q. Well, go to the bottom --

19     A. Where it says -- no, I mean, you asked me to --

20         ATTORNEY HEALEY: Stop.

21     Q. I'm asking a specific question. If you go to

22  the bottom one, two, three, four, five, six, seven lines

23  or six lines up where it says 2/15 3:37:39 p.m. and it

24  says "Shlomi"?

## Page 69

1      A. Please confirm to her --

2      Q. Right.

3      A. Gary, please confirm to her --

4      Q. Right.

5      A. So is that --

6      Q. What's printed on DZ-10 --

7      A. Oh, oh, is this.

8      Q. -- is the same as what's listed on --

9      A. They are the same words.

10     Q. Right. So this screenshot of a text message

11  shown on DZ-10 is transcribed and is --

12     A. I don't know.

13     Q. -- the same -- please let me finish.

14     A. You just keep asking me the same thing.

15         ATTORNEY HEALEY: Daphna, let him finish the

16  question.

17     Q. If you read DZ-10 where Shlomo at 3:37 p.m. is

18  writing "Gary, please confirm to her 250K is coming in.

19  She is waiting for it" in parentheses "and 130 is yours,"

20  that's what this screenshot on DZ-10 indicates; correct?

21     A. When you're done talking, I'm going to take a

22  moment. I don't know. I know that these are the same

23  words with the same time. I didn't prepare what you have

24  labeled as 9. I gave what you have labeled as 10. So if

Page 70

1  you're asking me are these the same words, yes, they are.
2      Q. Okay.
3      A. But here's the problem. This all seems like a
4  lot more words than this is.
5      Q. I agree. DZ --
6      A. So that's why -- that's why I'm having trouble
7  with it.
8      Q. DZ-10 is a screenshot of a portion of what's
9  reflected in DZ-9?
10     A. Oh, okay. I thought that --
11     Q. Got it?
12     A. -- this was supposedly --
13     Q. No.
14     A. -- a transcript of this.
15     Q. No.
16     A. Well, because I didn't prepare this.
17     Q. Okay. If you look at --
18         ATTORNEY HEALEY: Can I talk to her outside a
19  second? It might --
20         THE WITNESS: No, it's fine. I'm reading it
21  now --
22         ATTORNEY LIGHTMAN: No, no, no. We're already
23  almost done.
24         ATTORNEY HEALEY: No, it might clear a lot of

Page 71

1  things up.
2  BY ATTORNEY LIGHTMAN:
3      Q. Okay. Ready? If you look at --
4      A. No. The way this started -- stop for a second.
5  The way this started was as though I prepared this in my
6  mind. At least that's the way the question was
7  presented. So when I'm looking at these two, I'm
8  thinking that doesn't --
9      Q. Okay. These are documents that your -- you
10  produced for us.
11     A. I produced this?
12     Q. Yes. It's labeled Zekaria 1, 2 --
13         ATTORNEY HEALEY: That's why --
14     Q. -- 3 --
15         ATTORNEY HEALEY: Let me --
16     Q. -- 4, and 5. No, I can clear it up on the
17  record. See at the bottom Zekaria 1, 2, 3, 4, and 5?
18  These are documents that you produced in discovery in
19  this case.
20     A. Okay. I gave you --
21         ATTORNEY HEALEY: Well, let me talk to her
22  outside a second. It might clear it all up.
23         ATTORNEY LIGHTMAN: You can say it on the
24  record if you want to clear it up.

Page 72

1         ATTORNEY HEALEY: No, I can't because I want to
2  talk to her outside --
3         (Overlapping speakers.)
4         (Off the record.)
5  BY ATTORNEY LIGHTMAN:
6      Q. Your counsel asked to speak with you outside.
7  Did he clear something up for you?
8      A. He did.
9      Q. Okay.
10     A. I sent him just, like, a whole forward of a
11  WhatsApp group. I didn't -- so when I looked at this
12  document -- I apologize to you, Mr. Lightman. Because
13  when I'm wrong, I'm wrong. I didn't -- I didn't
14  recognize the font or everything that came as a result of
15  it. So I guess what you did counsel, Mr. Healey, is you
16  took it and this is how it prints. I didn't know that.
17     Q. So DZ-9, the documents labeled Zekaria 1 --
18     A. It's --
19     Q. -- through 5 is a printout of what you forwarded
20  to your attorney?
21     A. Is what I'm told.
22     Q. Okay.
23     A. I haven't compared it to what I forwarded but
24  what I'm told is what I forwarded, which I remembered

Page 73

1  doing, printout that looks like this.
2      Q. Okay. And if you look at DZ-10 again --
3      A. So then this would be a screenshot of something
4  within it.
5      Q. Part of it? Okay.
6      A. Yeah.
7      Q. If you look at DZ-10 right above what we talked
8  about where Sam Gross -- that's Shlomi in this, right?
9      A. Mm-hmm. Right.
10     Q. You recognize Shlomi as Sam Gross --
11     A. I recognize this group.
12     Q. Okay. Right above it, there's cutoff and the
13  green part at the top of DZ-10 says --
14     A. Additional --
15         (Overlapping speakers.)
16     Q. -- for my additional fees? See that? On DZ-10?
17         ATTORNEY HEALEY: On DZ-10, yeah.
18         (Overlapping speakers.)
19         THE COURT REPORTER: One at a time. Guys, I
20  cannot take you both down at the same time. I need you
21  to slow down --
22         (Overlapping speakers.)
23         THE COURT REPORTER: This is sort of a last
24  warning. I'm still trying to give instructions.

19 (Pages 70 to 73)

Page 74

1      ATTORNEY LIGHTMAN:  Okay.  Got it.  Start
2  again.
3      THE WITNESS:  Where are we?
4      ATTORNEY LIGHTMAN:  Let me -- listen to me.
5      ATTORNEY HEALEY:  He's on DZ-10 --
6      (Overlapping speakers.)
7      Q.  If you look at DZ-10 at the top, see where it
8  says in green "rest for my" --
9      A.  Yes.
10     Q.  -- "additional fees?" question mark?  And if you
11  go to DZ-9, right above where the Shlomi Sam Gross --
12     A.  Yeah, yeah, yeah.
13     Q.  -- 3:37 email is, it says "rest for my
14  additional fees."
15     A.  Right.
16     Q.  See that?
17     A.  Yes.
18     Q.  And you wrote right above that where Gary Weiss
19  wrote "Please confirm," you wrote "It's my understanding
20  that I'm about to receive an additional wire of 250,000
21  which is 130,000 to Gary Weiss and the rest for my
22  additional fees?" question mark.  Do you see that?
23     A.  Yes, I do.
24     Q.  So at 3:37 you wrote to that -- you wrote in

Page 75

1  this WhatsApp that you're going to get an additional wire
2  of 250 and that 130 is to go to Gary and the rest is for
3  your additional fees.  Do you see that?
4      A.  I do.
5      Q.  And do you see Gary Weiss -- excuse me -- Sam
6  Gross then wrote "Gary, please confirm to her 250K is
7  coming and she is waiting for it.  And 130 is yours."  Do
8  you see that?
9      A.  Wait.  I don't see that.  Sorry.  Where is
10  the -- wait.  Where -- oh, please confirm to her.  It's
11  just the way it's -- the way it prints.  Meaning I was
12  waiting for the --
13     Q.  I'll start again.
14     A.  No, no, no.  I'm reading it now.  Just give me,
15  like, a hot second so I can -- and then it's Gary --
16  (reading sotto voce.)  Yeah.  Okay.
17     Q.  So Shlomi -- Sam Gross -- writes to you "Gary,
18  please confirm to her 250K is coming in.  She's waiting
19  for it.  And a 130 is yours."  Do you see --
20     A.  Yes.
21     Q.  And then Gary writes back "Gary Weiss:  Hi,
22  Daphna.  That is correct.  You're sending me 130.
23  Thanks."
24     A.  Right.

Page 76

1      Q.  And then you write "awesome," right?
2      A.  Well, because I was sending him 130.  I --
3  yeah --
4      Q.  You wrote -- you wrote "awesome" here, right?
5  And then you wrote "Daphna:  Thanks for the confirmation
6  and opportunity to represent you."  Do you see that?
7      A.  Yes, I do.  I agree --
8      Q.  So according to this email exchange
9  February 15th, you're getting a wire from Manfred of 250.
10  You're giving 130 to Gary Weiss.  And you're keeping 120
11  as your fee according to this right here; correct?
12     A.  According to this, that's how it looks.  But
13  that's not what wound up happening because there was no
14  litigation as a result.  If there were to be litigation,
15  then I would have enforced that.  Because --
16     Q.  Does it say in here --
17     A.  I wish I did enforce that honestly --
18     Q.  Does it say in here "I'm going to give you back
19  the 130" anywhere in this email exchange?
20     A.  What was -- what was significant at that moment
21  was giving him 130.  I wound up not using the -- I
22  believe it was 120.  I have to look at the retainer
23  agreement.  And when I find it, I will be able to resolve
24  because I think the original retainer agreement called

Page 77

1  for a significant amount that I didn't take.
2      And then there was another case that we discussed
3  that I also didn't take any money up front.  So somehow
4  whatever I may have gotten paid would have just covered
5  some time spent on the two cases.  But not 130 or 120.
6      Q.  It's 120 according to your -- the writing here.
7  Is there anywhere in this text exchange that says "I'm
8  giving you back the 120"?
9      A.  Well, at that moment no.  But there were
10  subsequent conversations with them where I said, "I'm
11  working for you for free.  Why don't you answer these
12  people?  Why don't you participate in this case?"  I
13  mean, honestly, they should have participated in this
14  before it got to this.  I said it back when you first
15  called me.  I said it to Gary.  I said it to Sam.  I said
16  it at the time that Mr. Napolitano called me.
17     Q.  So there's nothing in writing that --
18     A.  It was phone calls.
19     Q.  Could you please -- let --
20     (Overlapping speakers.)
21     ATTORNEY HEALEY:  Let him --
22     (Overlapping speakers.)
23     A.  No, there isn't that I have now --
24     ATTORNEY HEALEY:  Let him answer the question.

Page 78

1   BY ATTORNEY LIGHTMAN:
2       Q. There's nothing in writing to document that you
3   gave them back the 120 that you acknowledged and that
4   they acknowledged on February 15th you were keeping as
5   your fee?
6       A. I'm not sure.
7       Q. Is there anything in here --
8       A. In this particular exchange, no.
9       Q. Is there any documentation in any of the 37
10  documents that you produced that confirms you gave them back
11  the 120,000?
12      A. I don't know.
13          ATTORNEY LIGHTMAN: All right. This is a good
14  break for lunch.
15          (Off the record.)
16  BY ATTORNEY LIGHTMAN:
17      Q. Ms. Zekaria, have you ever met Sam Gross
18  personally before this morning?
19          ATTORNEY HEALEY: Gary Weiss.
20      Q. Gary Weiss. Excuse me. Have you ever met Gary
21  Weiss --
22      A. No. No.
23      Q. This is the first time --
24      A. Yes.

Page 79

1       Q. -- in person though? Okay. Let's go back to
2   DZ-9, the transcript of the text message, the WhatsApp
3   text messages.
4       A. Where is this? I don't -- oh. Is this the same
5   one that we were looking at?
6           ATTORNEY HEALEY: Yes.
7           THE WITNESS: Okay.
8       Q. So it starts at the top --
9       A. No, it's just because I'm still not used to
10  the --
11      Q. Format?
12      A. Yeah.
13      Q. Okay. So it starts in at the top on
14  February 4th in the afternoon --
15      A. Started a call. Yeah.
16      Q. -- Gary Weiss started -- or Shlomo, Sam Gross,
17  created the group iHealth. Then he added you. Then Gary
18  Weiss started a call. And Sam says at 4:54 "Gary, please
19  confirm to Daphna here from the 1.9 million 65 percent is
20  yours. The rest is mine. Thanks." Do you see that?
21      A. Yes, I do.
22      Q. And that --
23      A. You don't need to read to me. Just tell me what
24  to --

Page 80

1       Q. I'm making a record.
2       A. Okay.
3       Q. And at February 4th at 5:02, Gary Weiss writes
4   to you "Hi, Daphna. I confirm 35 percent of the
5   million-nine going to Sam and 65 percent of the
6   million-nine to me, Gary Weiss." Do you see that?
7       A. Yes, I do and I literally gave you this
8   information.
9       Q. Why is Sam getting 35 percent of the
10  million-nine transfer?
11      A. I don't know.
12      Q. You don't know? Did you confirm or write to --
13  did you notify Manfred "Hey, I know you're wiring a
14  million-nine. My client says he gets 65 percent of it
15  and 35 percent goes to Sam. Is that okay?"
16      A. It wasn't a requirement to ask Manfred how and
17  what to do with the money once it was available for
18  release on behalf of Mr. Weiss. I mean, I just needed
19  Mr. Weiss's approval.
20      Q. I thought you said you needed Manfred's
21  approval?
22      A. I needed Mr. Weiss's approval how to release his
23  portion. From my perspective all of it was his unless
24  otherwise determined.

Page 81

1       Q. Okay.
2       A. He according to them or what I understood owed
3   Sam some money from a prior transaction. Whether that's
4   true or not, I don't know. But they did business with
5   each other in the past. And it's not that out of the
6   1.9, it was Sam's money per se. It was Gary's money and
7   Gary was giving 35 percent of it presumably to even up
8   some accounting between them. I don't know if that's
9   true. All I know is that I represented Mr. Weiss, and
10  Mr. Weiss was to get the 1.9. To do anything but that
11  needed his consent. And that's why I guess this
12  happened.
13      Q. So Manfred was the one that you needed
14  authorization from to release --
15      A. That I needed, yeah.
16      Q. -- to release the 1.9 million from escrow; Gary
17  Weiss is the person that told you how to distribute that
18  once Manfred approved?
19      A. Correct. Because but for this, I was given 1.9
20  to Gary Weiss.
21      Q. Okay. So all you needed --
22      A. All of it.
23      Q. All you needed to get Manfred Sternberg's
24  confirmation is that the masks were loaded on a truck for

21 (Pages 78 to 81)

Page 82

1  delivery?
2      A. All I needed to get Manfred Sternberg's
3  confirmation was Manfred saying "You may release it."
4      Q. Okay.
5      A. And that's what he did.
6      Q. Okay. He confirmed you can release the
7  million-nine?
8      A. Yes. And he in fact is confirming it in
9  multiple documents that I was not at fault, that he, if
10  anything, authorized it. I think I've seen it somewhere.
11      Q. Where are the documents?
12      A. Well, he wrote to the disciplinary committee. I
13  saw at some point in one of the motions. The bottom line
14  is I don't think he's disputing that he gave me authority
15  to release it. He never told me to hold onto it.
16  There's a problem.
17      Q. As an escrow agent holding the million-nine, you
18  need some writing as an attorney to authorize you to
19  release --
20      A. Well, he did send an email --
21          (Overlapping speakers.)
22      Q. Please --
23      A. Jesus Christ. I'm telling you that all I needed
24  was him to say go ahead. I don't have an agreement with

Page 83

1  Mr. Scully saying you are an escrow agent. All I was was
2  the place to park the money until Mr. Weiss put goods on
3  a truck. There was no other requirement other than to
4  get Mr. Sternberg's go ahead and green light. That's it.
5      I didn't need Mr. Scully's. I didn't even know
6  who he was. I didn't know who he was until months later
7  when I was called by an investigator. I couldn't answer
8  the investigator because I have an attorney-client
9  relationship as far as this goes with Mr. Weiss. I
10  couldn't just talk about it. But instead of -- and my
11  thanks for not talking about it is I was dragged into a
12  case I believe that was commenced by someone that he
13  defaulted in an agreement with as a result of whatever
14  was going on here.
15      Again I didn't have anything to do with this
16  case. Manfred negotiated it. Manfred had whatever
17  contract he had with these people. And it's my
18  understanding that it's not limited to this amount of
19  money, that there's something more at stake here. Again,
20  not something I negotiated. I negotiated one piece which
21  was a retainer agreement with Mr. Weiss to hold money
22  until he put goods on a truck.
23      Q. Please, please, pretty please with a cherry on
24  top --

Page 84

1      A. And sugar and whipped cream? Yeah. What?
2      Q. Let me finish my questions, please.
3      A. I do.
4      Q. No. You said there's other things. There's
5  other victims that have claimed that they were similarly
6  defrauded?
7      A. I'm not saying there's other victims. Don't --
8  please don't put --
9      Q. Other purchasers of goods --
10      A. And don't put words in my mouth. I really
11  resent that. I'm saying there's another case where
12  everybody's involved that's involved here by I don't know
13  who it is. But it's someone that I believe that if you
14  want to call them a victim, they would be Safety House's
15  victims because Safety House didn't deliver based on
16  whatever they did or did not do here.
17      It's my understanding that Safety House was
18  delivered to. At least that's what I'm told by Manfred,
19  by Mr. Weiss, by Mr. Gross. I don't know that they were
20  or they weren't. What I'm hearing is that they weren't
21  from Mr. Scully, from you.
22      Q. Is the other victim VRC Medical Supplies?
23      A. Objection. I don't know if they're a victim.
24      Q. Is the other purchaser that has raised similar

Page 85

1  claims VRC Medical Supplies?
2      A. Objection. I don't know that they are a
3  purchaser. I just know that there's a lawsuit brought by
4  someone named VRC.
5      Q. And you're named as a defendant in that
6  lawsuit --
7      A. I was later joined in.
8      Q. And your law firm is also named as a defendant,
9  right?
10      A. Well, yeah.
11      Q. And they claimed that they wired 2.4 million to
12  Manfred --
13      A. Not to me.
14      Q. -- to Manfred; and that that in turn was wired
15  to you and they never got their good or their money,
16  right?
17      A. I -- I don't know. I -- what I'm saying is is
18  that there is another lawsuit. And I don't know what
19  funds Manfred used to pay Mr. Weiss. I just know that it
20  resulted in these two lawsuits.
21      Q. Okay. Why are you saying that the goods that
22  were supposed to be delivered to Mr. Scully's company
23  were masks?
24      A. Because it was -- I was told that it was either

Page 86

1  masks or COVID test kits. I'm not sure which one. I
2  didn't have anything to do with the delivery.
3   Q. Why did you say under oath --
4   A. Because it --
5   Q. -- at today's deposition that it was masks that
6  were supposed to --
7   A. I believe it was masks. I don't know for sure
8  because I told you also under oath I wasn't on the truck.
9   Q. Okay. Let's go back to DZ-9.
10  A. I know that it was COVID-related items.
11  Q. Let's go to -- so you may have been not telling
12 the truth when you said masks --
13  A. No, I didn't say that. I said I believe. I
14 didn't ever say I know. And I in fact recall saying that
15 I don't know for sure because I wasn't, A, on the truck;
16 B, I didn't see the items; C, I didn't know who owned
17 what. I believed it was COVID-related, either masks or
18 whatever.
19  Q. Go to DZ-9 --
20  A. I don't know -- I don't know what's in the truck
21 even at the time that he sent the picture of himself in
22 front of a truck.
23  Q. Go to DZ --
24  A. I expected that Manfred would have confirmed it.

Page 87

1   ATTORNEY HEALEY: Just -- go to -- he's asking
2  you a question.
3   A. Yes. DZ-9.
4   Q. Go to DZ-9, please.
5   A. What is the contract -- (reading sotto voce.)
6  I'm reading it myself. Go ahead.
7   Q. So if you go -- after Gary Weiss writes "I
8  confirm 35 percent of the 1.9 million is going to Sam and
9  65 percent to me," you wrote "Okay, no problem," right?
10 5:16 on February 4th?
11  A. Oh, you want me to answer that now?
12  Q. Yeah. Okay.
13  A. Yes, no problem.
14  Q. Then on February 6th, you write at 10:58 a.m.
15 "Daphna: I will draft a formal agreement on who I
16 represent and an escrow authorization that mirrors the
17 terms of the disbursement that we texted about. What's
18 your current email address?" Do you see that?
19  A. Yeah.
20  Q. And then he writes -- or you write -- Daphna,
21 you write later on at two minutes later "I will speak to
22 Shlomi" -- that's Sam -- "again before sending
23 everything. I will let you know if I have more
24 questions. It's 11 now. I anticipate being ready with

Page 88

1  some of this by one or so." Do you see that?
2   A. I see it, yes.
3   Q. Then you wrote at a minute later "The documents
4  will be dated on February 4th."
5   A. Yes, because I believe that's when we started
6  negotiating this outcome.
7   Q. Okay. So two days later on February 6th you're
8  talking about drafting a document and backdating it to
9  February 4th; correct?
10  A. No. The retainer agreement could be dated as of
11 the date. It doesn't really matter what date is what I'm
12 saying. I'm saying it would be as of 2/4 because I
13 believe I started drafting it that day.
14  Q. But you're talking about "I will draft."
15  A. Will finish drafting.
16  Q. No, no, you don't -- at 10:58 you write "I will
17 draft a formal agreement." You don't write "I'm drafting
18 it and I need to finish it" --
19  A. I believe I had started --
20  Q. You wrote, quote "I will draft a formal
21 agreement." Do you see that --
22  A. Between them. Not between anyone else.
23  Q. On --
24  A. Regarding the three-point -- I'm sorry -- the 35

Page 89

1  and the 65 but also in a retainer agreement to
2  contemplate what I'm doing for him.
3   Q. You write on February 6th not "I'm in the
4  process." Not it's -- you wrote "I will draft a formal
5  agreement." They're your words, right?
6   A. Yeah, I don't remember if I had started it or I
7  was finishing it. But, yes, those are my words.
8   Q. You wrote "I will draft," right?
9   A. That's --
10  Q. And then you wrote one, two --
11  A. And he gave a retainer --
12  Q. -- three, four -- four lines later on
13 February 6th you write that the documents will be dated
14 two days earlier on --
15  A. Okay. And?
16  Q. -- February 4th, right? Correct? That's what
17 you wrote --
18  A. Correct. That's what it says.
19  Q. And then you wrote "And it will be my pleasure
20 to represent you in the future," right?
21  A. Yes.
22  Q. Then a minute later you write "Just need the
23 business name that contracted with Manfred, et cetera,"
24 right?

23 (Pages 86 to 89)

Page 90

1    A. Yeah.
2    Q. And that would be Mr. Scully's company,
3    right? He's the --
4    A. No.
5    Q. Well, who contracted with Manfred?
6    A. I need the business name that contracted with
7    Manfred. That was to both of them. It could have -- I
8    think it was Charlton Holdings that ultimately contracted
9    through Manfred.
10    Q. Okay.
11    A. It had nothing to do with Mr. Weiss. It's not
12    my understanding that Asolar contracted with Mr. Scully.
13    I said I would like to know who's involved in this
14    negotiation.
15    Q. Then you wrote two minutes later at 1:03 on
16    February 6th "My fee," in quotes, "will include all
17    negotiations and litigation if necessary that may arise
18    from this transaction" --
19    A. Yeah. I -- because I contemplated waiving my
20    fee because I didn't anticipate a problem.
21    Q. Why did you write "My fee," in quotes, "will
22    include litigation if necessary." Did you think that
23    litigation may possibly be necessary?
24    A. No because I also had a companion litigation

Page 91

1    that was going to come up, and that's why it was
2    laughable because I never got paid for anything here.
3    Q. But you didn't write from the companion
4    transaction. You wrote --
5    A. But I included --
6    Q. Please let me finish. You wrote "My fee" in
7    quotes --
8    A. Yes.
9    Q. -- "will include all negotiations and litigation
10    if necessary that may arise from this transaction" --
11    A. Correct. I anticipated that they'd be suing
12    each other. Or Manfred.
13    Q. So Gary and Sam agreed to a 65-35 split of a
14    million-nine and you anticipated -- and both of them said
15    yes, but you anticipated --
16    A. It's not --
17    Q. -- them suing each other?
18    A. I anticipated a problem from Manfred potentially
19    where we couldn't release the money to Mr. Weiss. And
20    then there would be litigation as a result of that
21    between Charlton and Asolar potentially. Or between
22    Asolar and Manfred. I didn't think that Manfred would
23    say yes right away. I in fact couldn't believe that he
24    did.

Page 92

1    Q. The wire that you got, the million-nine, was
2    wired before February 6th --
3    A. No, I don't believe it was.
4    ATTORNEY HEALEY: If it was, it was.
5    A. I don't know. I don't know. But I know that I
6    was not releasing it without an agreement between them.
7    Q. I'm going to show you what's been marked as --
8    A. Wait. Hold on. I'm looking at here. Because
9    this is where --
10    ATTORNEY HEALEY: He's going to show you
11    documents, Daphna.
12    THE WITNESS: Okay. That's fine.
13    ATTORNEY HEALEY: Let him show you the
14    documents.
15    BY ATTORNEY LIGHTMAN:
16    Q. Manfred Deposition Exhibit 19. When does it --
17    when does it show --
18    A. Wait. Can you just --
19    Q. I apologize.
20    A. -- stop it for a second. Don't hand me a
21    document and then speak like we're in a classroom. I am
22    an adult. I'm trying to -- oh, so is this the second
23    one?
24    ATTORNEY HEALEY: No, here's --

Page 93

1    THE WITNESS: Wait. I don't --
2    ATTORNEY HEALEY: -- he's asking you about
3    this.
4    A. Yeah, I don't know what he's asking me about.
5    Q. I'm saying I will represent to you that
6    Deposition Exhibit Manfred Sternberg exhibit --
7    A. Oh, wait this is --
8    Q. Please stop --
9    ATTORNEY HEALEY: Stop --
10    (Overlapping speakers.)
11    THE WITNESS: I'm talking to you.
12    ATTORNEY HEALEY: But you don't -- don't.
13    Just --
14    THE WITNESS: I'm talking to you while I go
15    through this. I don't need his voice telling me what
16    I'm reading. I can read.
17    Q. Okay. Well, tell me when you're ready.
18    A. So take me a --
19    Q. My apologies.
20    A. It was sent on the 4th.
21    ATTORNEY HEALEY: Okay. Let him ask the
22    question.
23    A. Okay. Go ahead.
24    Q. I'm showing you Manfred Sternberg Deposition

Page 94

Exhibit 19 which is a page from the Sternberg defendant's answers to interrogatories. And it says that on February 4th, one million nine hundred and eleven thousand nine hundred and sixty thousand dollars was wired from the Sternberg IOLTA account to the Sokolski JP Morgan Chase account. Do you see that?

**A. I see it.**

Q. I have a wire transfer confirmation from Mr. Sternberg's attorney escrow account showing that wire was made on February 4th --

**A. Can you just take your voice down a notch?**

Q. I'm not yelling. This is my normal tone of voice --

(Overlapping speakers.)

**A. No, you're being a jerk right now. Just yes, do you have it? Great.**

Q. Okay. So assume that he -- Sternberg wired you the money February 4th. Why are you saying "In case Sternberg doesn't wire us the money"?

(Overlapping speakers.)

**THE COURT REPORTER:** One at a time.

Q. I need my, quote, unquote, fee --

**A. I didn't have it on the fourth. It was, like, I believe a Friday. I went back and looked. I believe it**

Page 95

**was a Friday. I didn't know about it until Monday first of all. I believe we went over this.**

Q. So they --

**ATTORNEY HEALEY:** He's asking you questions.

THE WITNESS: Yeah. I --

Q. They told you that a wire had been made?

**A. Telling me and doing it are two different things. He needed to confirm that the goods were on the truck. That I knew as well.**

Q. So why are you writing -- if you knew there was a wire in the works, why are you writing I need in case we have to sue Mr. Sternberg from this transaction?

**A. Or each other.**

**ATTORNEY HEALEY:** Objection. That's not what she said --

(Overlapping speakers.)

**A. That's not what I said.**

**ATTORNEY HEALEY:** That's not what's written.

**A. All right. Can we move on?**

**ATTORNEY HEALEY:** He -- just answer his question.

(Overlapping speakers.)

Q. No. I want to know why you're writing "My fee will include litigation as a result of this transaction"

Page 96

when you were told the wire was made and the wire had --

**A. No, I don't believe that I was told that any wire was made at the time that this was written in fact. Let me see. Where am I -- (reading sotto voce.) I just lost it. Can you point to it?**

**ATTORNEY HEALEY:** What are you looking for?

**A. The current -- that statement. I'm just -- oh, right here.**

**ATTORNEY HEALEY:** 103. Down to 103 --

THE WITNESS: No, no, no.

Q. Two six -- on DZ-9 it's the entry on February --

(Overlapping speakers.)

Q. -- 6th at 1:03 --

**A. Yeah, I don't think I had the money yet or had any evidence that the money came to me yet.**

Q. Okay. So you did get subsequently the 1.9 in --

**A. Subsequently. And then I did --**

Q. So there was no need for you to sue --

(Overlapping speakers.)

**THE COURT REPORTER:** Guys, again, I can't take this down anymore. I'm really sorry. This is not working. I cannot certify the transcript.

(Off-the-record discussion regarding unreportable conduct of proceedings.)

Page 97

**ATTORNEY LIGHTMAN:** The court reporter has indicated that because of the continuing interruptions that she can't certify the record as an accurate record. I have asked you numerous times --

**ATTORNEY HEALEY:** Well --

**ATTORNEY LIGHTMAN:** Please. You can make a statement afterwards, please. I've asked you numerous times to please let me finish my questions. It's apparent that you have not done so, and the record will speak for itself.

So here's what I'm going to request. Since she's not going to certify the record, we're going to need to redo this and I'm going to request that the deposition be recommenced in Judge Younge's courtroom so that he can listen to what's going on and make instant rulings on the record. Do you agree to that or am I going to need to make --

(Overlapping speakers.)

**ATTORNEY HEALEY:** No, we're not going to agree to that because a lot -- some of the interruptions were due to you also, Gary. You weren't exactly always waiting for her to finish her answer before you asked a question. There's -- and I don't like your client sitting here shaking his head. He's not on the record.

Page 98

1  If he wants to be on the record during things, he can be
2  on the record. He can't make any statements on the
3  record here. If we're going to reconvene, we can
4  reconvene, but it's -- there's fault on both sides.
5      ATTORNEY LIGHTMAN: So you're refusing to do it
6  in front of Judge Younge and in his court --
7      THE WITNESS: I'm refusing to do it in front of
8  Judge Younge. We can reconvene at another time and do
9  the deposition not in the courtroom.
10     ATTORNEY LIGHTMAN: It's not going to work
11 because I have asked her countless times to stop
12 interrupting me, and she refuses to do that.
13     ATTORNEY HEALEY: And you haven't been all --
14 you haven't been innocent in this game either.
15     ATTORNEY LIGHTMAN: I think you can count on
16 one hand the times that I've interrupted her. But I
17 think --
18     (Overlapping speakers.)
19     THE COURT REPORTER: You're doing it right now.
20 Excuse me. I'm sorry. That's it. The statements have
21 been made. If you want to put anything else on the
22 record, it will be one at a time and then I'm leaving.
23 Thank you.
24     ATTORNEY LIGHTMAN: I think that you can count

Page 99

1  on one hand the times I may have interrupted her but I
2  think you would need the hands and fingers of everyone
3  in this courtroom -- in this room to count the number of
4  times that she's interrupted. So I'm asking --
5      THE WITNESS: Are you --
6      (Overlapping speakers.)
7      ATTORNEY LIGHTMAN: -- I'm going to make a
8  motion if you don't agree. I think when the judge sees
9  this transcript, he's going to order it but you can save
10 some time and some money.
11     ATTORNEY HEALEY: Well, you know you can make
12 all the statements you want. I've been in other
13 depositions where you've mischaracterized testimony and
14 evidence. I'm not going to get into it right now. But
15 I think there's fault on both sides. We would agree to
16 come back at another time to be deposed. We're not just
17 going to roll over and decide, like, oh, yeah, you want
18 to do it in front of Judge Younge in his courtroom. No.
19     THE WITNESS: I'm happy to come back. I'm
20 happy to continue now --
21     ATTORNEY HEALEY: Stop. Daphna, stop. That's
22 it.
23     ATTORNEY LIGHTMAN: Before we go --
24     THE WITNESS: I'm leaving.

Page 100

1      ATTORNEY HEALEY: Stop.
2      ATTORNEY LIGHTMAN: You can leave, but before
3  you go --
4      THE WITNESS: I'm leaving. This is enough.
5  This is abusive already.
6      ATTORNEY LIGHTMAN: I'd like this marked as --
7      THE WITNESS: Can we close the record --
8      (Overlapping speakers.)
9      ATTORNEY HEALEY: Daphna, sit and let me talk.
10     ATTORNEY LIGHTMAN: I'd like this marked as
11 Daphna DZ-11.
12     THE WITNESS: What is that?
13     ATTORNEY HEALEY: Stop.
14     ATTORNEY LIGHTMAN: I'd like this marked.
15     ATTORNEY HEALEY: I'm going to object to any
16 marking of exhibits since the court reporter said she
17 can't certify the transcript --
18     ATTORNEY LIGHTMAN: She doesn't need to --
19     ATTORNEY LAVER: I join that objection.
20     ATTORNEY HEALEY: Yeah. And if there are --
21     THE WITNESS: Can you --
22     ATTORNEY LIGHTMAN: Stop. Stop. Daphna, stop.
23     ATTORNEY LIGHTMAN: Mark these as 11 and 12.
24     ATTORNEY HEALEY: I will object to their

Page 101

1  admission because she said she can't certify the
2  transcript.
3      ATTORNEY LAVER: I join.
4      ATTORNEY HEALEY: Okay. And you're also -- I
5  object to the admission of DZ-11 because it is a court
6  order. It's already filed. It's on the docket. Your
7  motion got granted. It doesn't need to be attached as
8  an exhibit. And we would object to any --
9      GARY WEISS: Can I ask one question?
10     ATTORNEY LIGHTMAN: Hold on. I need to create
11 my record.
12     ATTORNEY HEALEY: Well, you can't create the
13 record. We don't have a court reporter that's going to
14 certify it.
15     ATTORNEY LIGHTMAN: This is -- I don't need it
16 certified. This is 12 and 13.
17     (Exhibits DZ-12 and DZ-13 were marked for
18     identification.)
19     THE WITNESS: But we have no --
20     ATTORNEY HEALEY: Stop. Stop.
21     GARY WEISS: Can I ask one question, please?
22     ATTORNEY LIGHTMAN: Not yet. Mr. Healey, I've
23 handed you three documents. The first document marked
24 as DZ-11 is a copy of Judge Younge's order dated

26 (Pages 98 to 101)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 102

1  April 1, 2024, docket number ECF158 that grants
2  plaintiff's motion to compel discovery from defendants
3  Daphna Zekaria, Esquire, and Sokolski and Zekaria P.C.
4  and directs in paragraph two within ten days from the
5  date of this order, which is April 1st, each of the
6  Zekaria defendants shall deliver to plaintiff full and
7  complete verified answers to plaintiff's interrogatories
8  addressed to them without objections.
9    Paragraph three of Judge Younge's April 1st order
10 says within ten days of the date hereof, each of the
11 Zekaria defendants shall produce and deliver to
12 plaintiff their written responses together with all
13 documents responsive to plaintiff's request for
14 production of documents addressed to them without
15 objections.
16   DZ-12 is a copy of the responses and objections of
17 the defendants Daphna Zekaria, Esquire, to plaintiff's
18 --
19      **ATTORNEY HEALEY:** Which one?  Twelve?
20      **ATTORNEY LIGHTMAN:** -- twelve -- plaintiff's
21 first request for production of documents.
22      **ATTORNEY HEALEY:** Twelve is the
23 interrogatories.
24      **ATTORNEY LIGHTMAN:** I'm sorry.  Twelve is the

Page 103

1  interrogatories.  My apologies.
2      **ATTORNEY HEALEY:** No problem.
3      **ATTORNEY LIGHTMAN:** Twelve is the responses and
4  objections of defendants Daphna Zekaria, Esquire, and
5  Sokolski and Zekaria P.C. to plaintiff's first -- to
6  plaintiff's interrogatories.  And for each of the -- I'm
7  sorry -- the verification's dated March 29 and this was
8  sent to me I believe on March 30th.  Each of the
9  questions starts out -- each of the responses of the
10 Zekaria defendants starts out, quote, "objection," end
11 quote.  The --
12      **ATTORNEY HEALEY:** Well, there's more to it than
13 that but --
14      **ATTORNEY LIGHTMAN:** I'm just creating a record.
15 You'll have your chance.
16   The document marked as DZ-13 is the responses and
17 objections of defendants Daphna Zekaria, Esquire, and
18 Sokolski and Zekaria P.C. to plaintiff's first request
19 for production of documents.  Again, this was dated
20 March 29, 2024.  I believe we got it on March 30th.
21 Each of the requests for production of documents -- or
22 I'm sorry.  Not each of them but most of them asserts
23 objections.
24   I also note for the record that many of the

Page 104

1  questions -- or the responses.  Excuse me.  Many of the
2  responses of the Zekaria defendants to the
3  interrogatories states that after the objection and that
4  it's over broad and unduly burdensome and beyond the
5  scope.  And it also says as it -- quote, "as it deals
6  with matters protected by the attorney-client
7  privilege," end quote.
8    I note for the record that there was no privilege
9  lock produced by the Zekaria defendants that identified
10 any of the documents or any of the areas that allegedly
11 are protected by the attorney-client privilege contrary
12 to not only the instructions accompanying these
13 discovery requests but the rules of court.  I would note
14 for the record that the responses of the Zekaria
15 defendants dated March 29 and produced March 30th are
16 not in compliance with Judge Younge's April 1st order.
17   I note for the record in fairness to Mr. Healey that
18 they were produced before Judge Younge issued his order.
19 I would respectfully request on the record that DZ-12
20 and DZ-13 be amended and that in the supplemental
21 responses that there's full and complete compliance with
22 Judge Younge's order.
23      **THE WITNESS:** What's 12 and 13?
24      **ATTORNEY HEALEY:** Stop.

Page 105

1      **THE WITNESS:** No.  I'm just --
2      **ATTORNEY HEALEY:** It's our discovery responses.
3      **THE WITNESS:** Okay.
4      **ATTORNEY HEALEY:** The discovery responses were
5  sent to you prior to the judge's order so I don't know
6  how they cannot be in compliance with the order because
7  the order wasn't issued until after they were produced.
8  I will tell you we will be in compliance with any court
9  order issued.
10      **ATTORNEY LIGHTMAN:** That's all I needed to
11 hear.
12      **ATTORNEY HEALEY:** I will also note that this is
13 kind of a little bit of grandstanding here since we
14 can't -- the court reporter is not certifying the
15 record.  So it's --
16      **THE WITNESS:** I mean --
17      **ATTORNEY HEALEY:** -- kind of a -- stop.
18 Daphna, stop.
19      **THE WITNESS:** No, I don't think she said that
20 yet really.
21      **ATTORNEY LAVER:** She has.  And I'm --
22      **THE WITNESS:** No, I mean on the record.
23      **ATTORNEY HEALEY:** Stop.
24      **ATTORNEY LAVER:** I'll point out that I reserve

27 (Pages 102 to 105)

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 106

1   my right to question the witness whenever we reconvene.
2       ATTORNEY LIGHTMAN:  And I will talk to Mr.
3   Healey about reconvening amicably.  But I am not going
4   to go through this a second time.  I have asked over a
5   dozen times for Ms. Zekaria to stop interrupting me.
6   She refused to do so.  So I think the appropriate remedy
7   is to do it in court, and we will have further
8   discussion about it --
9       ATTORNEY HEALEY:  Yeah, but like I said, you
10  weren't exactly innocent in this game.  But we can
11  discuss it amicably --
12      (Overlapping speakers.)
13      ATTORNEY HEALEY:  -- we have in the past.
14      ATTORNEY LIGHTMAN:  I think it's comparing a
15  kindergartner versus a high school graduate, and she's a
16  high school graduate of interruption compared to --
17      ATTORNEY HEALEY:  Yeah, well, we've long
18  graduated high school --
19      (Overlapping speakers.)
20      THE COURT REPORTER:  Okay.  I'm off the record.
21
22  (Whereupon at 2:23 p.m. the deposition was suspended.)
23
24

Page 107

1          S T A T E M E N T
2
3       I, CAYCE KILEY, a Certified Court Reporter and
4   Notary Public of the State of New Jersey, am unable to
5   certify that the foregoing is a true and accurate
6   transcript of the testimony as taken at the place and on
7   the date hereinbefore set forth due to the unreportable
8   conduct of the proceedings.  The deposition was suspended
9   due to continuing difficulties with overlapping speakers
10  despite several warnings.  The testimony was transcribed
11  to the best of my ability given these limitations.
12
13
14
15
16  _____
    /s/ Cayce Kiley
17  Certified Court Reporter
    License No. 30XI00243600
18
19
20
21
22
23
24

28 (Pages 106 to 107)

(856) 983-8484                          Tate & Tate, Inc.                          (800) 636-8283
                         825 Route 73 North, Suite G, Marlton, New Jersey 08053

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 639 of 749

USDC, ED of PA                American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT        April 2, 2024

Page 108

**A**

**a.m** 87:14
**A/K/A** 1:10,11
**ability** 7:23 107:11
**able** 4:22 8:20 9:24
10:1 17:23 20:7
32:12 37:1 42:9
52:8 53:19,22
76:23
**above-entitled** 1:16
**absent** 20:17,18
64:8
**absolute** 11:2 12:24
**absolutely** 51:18
54:10
**abusive** 100:5
**access** 12:17
**accommodating**
6:10
**accompanying**
104:12
**account** 4:19 42:5
94:5,6,9
**accounting** 64:15
81:8
**accurate** 97:3 107:5
**accused** 40:8,24
**acknowledged** 78:3
78:4
**ACTION** 1:2
**actual** 23:15 27:21
29:7 34:10 60:14
**Ad** 24:11
**add** 12:8,10,10,11
**added** 79:17
**addition** 65:6
**additional** 4:19 42:5
73:14,16 74:10,14
74:20,22 75:1,3
**address** 4:12,14 5:2
27:19 37:14,16,19
38:8,13,20,22,24
39:13 47:9 87:18
**addressed** 102:8,14
**addresses** 4:13 38:9
38:15,17
**admission** 101:1,5
**adult** 92:22
**adversely** 14:4
**affect** 7:23
**affiliation** 22:2
**afield** 32:1
**afternoon** 6:16
79:14
**agent** 49:1 82:17

83:1
**aggressive** 55:6
**ago** 9:5 19:3 20:11
20:12,13,15,16
21:13 27:17,20,20
**agree** 67:14,17 70:5
76:7 97:16,19
99:8,15
**agreed** 91:13
**agreement** 43:15,19
43:23 44:4,5 49:9
51:22,24 52:10,15
53:1,2,5,6 55:9,24
57:1 59:12 64:8
65:7,8,19 76:23
76:24 82:24 83:13
83:21 87:15 88:10
88:17,21 89:1,5
92:6
**ahead** 82:24 83:4
87:6 93:23
**aid** 12:7
**alarm** 5:12
**allege** 24:21
**allegedly** 104:10
**amazing** 49:18
**amended** 3:8 18:8
104:20
**Amendment** 11:3
13:2,3,9,11,24
14:2,12,16,18
33:20
**American** 1:4 6:19
**amicably** 106:3,11
**amount** 54:23 77:1
83:18
**and/or** 60:1
**answer** 7:5,8,11,13
7:19 10:16 11:10
11:24 13:1,24
14:1,5,10 17:11
19:9 22:14 24:4,6
26:5 27:3,10 28:9
29:7 31:24 32:4,9
32:16,20,23 33:2
33:8,9,10,18,19
33:21 34:1,7
35:12 37:8 39:24
41:12,18 52:12
55:16 62:7 68:7
77:11,24 83:7
87:11 95:20 97:22
**answered** 12:2
18:17 22:11 37:24
61:6

**answering** 10:17
33:1 36:6 38:19
42:13
**answers** 11:17 19:4
94:2 102:7
**anticipate** 87:24
90:20
**anticipated** 91:11
91:14,15,18
**anybody** 61:23
**anymore** 96:21
**Anyway** 57:4
**apologies** 93:19
103:1
**apologize** 5:7 20:8
45:18 48:12 72:12
92:19
**apparent** 97:9
**apparently** 34:17
**appearance** 27:22
**appointment** 6:10
**appreciate** 5:15
**appropriate** 106:6
**approval** 52:16
80:19,21,22
**approved** 14:24
81:18
**approximately** 5:19
**approximation**
20:10
**April** 1:18 3:14
102:1,5,9 104:16
**areas** 104:10
**arose** 4:9 33:16
**arrangements** 11:24
**article** 3:9 40:21
41:14 66:13,14
**asked** 12:1 18:17
22:11 33:1 52:22
56:13 60:21 62:14
68:19 72:6 97:4,7
97:22 98:11 106:4
**asking** 6:24 20:3
30:20 36:6 67:9
67:20 68:21 69:14
70:1 87:1 93:2,4
95:4 99:4
**Asolar** 1:11 23:12
23:13,13,14,15,15
23:17,18 65:20
90:12 91:21,22
**ASOLARDIAM...**
1:11
**assent** 19:10
**assert** 13:8,10,24

14:2
**assertion** 14:6
**asserts** 103:22
**assistants** 29:9
**associate** 28:14,15
**associates** 1:9 2:12
28:19,23 29:1,8
**assortment** 20:20
**assume** 10:16 39:24
67:18 94:17
**attached** 51:3 101:7
**attorney** 3:3 4:17
5:17 6:4,8,13 8:10
8:14 9:13,14 10:4
10:8,12,20 11:6
12:6 13:5,7,14,16
13:20,22 15:10
16:11,13,18 17:12
17:13 18:1,11
19:7 20:9 21:19
24:23 25:5,8,12
25:16,20,23 26:2
26:8,10,12,16
27:7,10,12,14,17
29:8 30:21 31:2,4
32:2,4,8,15,18
33:3,6,8,11,13
39:16,18 40:23
41:4,18 42:2,17
43:3,5 47:1,3,13
47:16,18 48:11
52:9 55:20,22
56:24 57:22,23
58:16,18,22,24
59:2,3,6,8 60:1,11
61:6 63:22 64:14
65:2,5 66:3,6,8,9
66:10,11,14,17,19
66:21 67:20 68:14
68:20 69:15 70:18
70:22,24 71:2,13
71:15,21,23 72:1
72:5,20 73:17
74:1,4,5 77:21,24
78:1,13,16,19
79:6 82:18 87:1
92:4,10,13,15,24
93:2,9,12,21 94:9
95:4,14,18,20
96:6,9 97:1,5,6,19
98:5,10,13,15,24
99:7,11,21,23
100:1,2,6,9,10,13
100:14,15,18,19
100:20,22,23,24

101:3,4,10,12,15
101:20,22 102:19
102:20,22,24
103:2,3,12,14
104:24 105:2,4,10
105:12,17,21,23
105:24 106:2,9,13
106:14,17
**attorney-client**
11:20 14:17 24:23
24:24 27:4 33:20
50:6 83:8 104:6
104:11
**authority** 15:4,5,5
35:19 36:3 56:12
56:16 61:4,8,12
61:18 64:18,23
82:14
**authorization** 57:17
60:22 81:14 87:16
**authorize** 56:11,17
56:22,23 57:3
62:9 64:13 82:18
**authorized** 56:8
63:19,23 82:10
**auto** 50:16,18
**available** 59:20
80:17
**aware** 6:18,24 10:23
11:1 52:17
**awesome** 76:1,4

**B**

**B** 3:6 86:16
**back** 5:24 12:23
21:1,21 22:16
44:9 46:8 47:19
48:15 49:9 50:23
56:12 59:3 75:21
76:18 77:8,14
78:3,10 79:1 86:9
94:24 99:16,19
**backdating** 88:8
**bad** 30:7 59:23
**badge** 11:15
**balance** 5:13
**bank** 44:9 57:13,15
**based** 34:16 57:16
63:13,14 84:15
**basically** 20:19
**basis** 56:3
**Bates** 67:11
**behalf** 4:20 42:5
45:22 47:20 50:3
80:18

Case 2:22-cv-00688-JMY    Document 201-1    Filed 10/01/24    Page 640 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 109

**believe** 21:15 23:12
25:2 29:12,15
30:6,10 31:15
35:2 39:4 44:10
46:12,20 50:4
52:20 53:14,18
57:13 58:3 63:11
63:12,13 76:22
83:12 84:13 86:7
86:13 88:5,13,19
91:23 92:3 94:24
94:24 95:2 96:2
103:8,20
**believed** 86:17
**Bell** 1:18 2:16
**beneficiary** 35:17
60:12
**best** 59:9 107:11
**better** 55:8
**beyond** 11:13 14:20
33:4 44:18 104:4
**bit** 58:3 105:13
**blameworthy** 15:1
**blaming** 8:6
**Blue** 1:18 2:16 26:8
26:20 66:17
**Bluestone** 1:17
**Boehms** 1:18
**boring** 13:19
**bottom** 68:10,18,22
71:17 82:13
**bought** 37:5
**brand** 9:17
**break** 43:1,3 65:2
78:14
**broad** 104:4
**brought** 4:24 42:11
85:3
**Bullion** 26:20
**burdensome** 104:4
**business** 6:20 21:4
22:20 39:15 45:9
53:22 81:4 89:23
90:6

**C**

**C** 1:15,15 2:1 86:16
**call** 23:14 79:15,18
84:14
**called** 5:20,24 11:20
46:21 56:18 76:24
77:15,16 83:7
**calls** 50:3 77:18
**cancel** 5:21
**capacity** 49:1

**car** 8:9
**Career** 16:2
**case** 3:10 6:19 11:16
21:7 22:18,23
26:20,21,23,24
28:2,7,13 33:5,7
41:6 66:10 71:19
77:2,12 83:12,16
84:11 94:18 95:11
**cases** 20:23 21:9
22:9,24 77:5
**cash** 44:20
**Cayce** 1:16 107:3,16
**cell** 38:3,4
**Center** 30:14 45:20
**certified** 1:17,21
101:16 107:3,17
**certify** 10:1 32:12
96:22 97:3,12
100:17 101:1,14
107:5
**certifying** 105:14
**cetera** 89:23
**chance** 103:15
**changed** 21:3,5
46:20
**changing** 27:16
**charged** 4:17 40:22
42:2
**charges** 4:23 41:5
42:11
**Charlton** 1:10 34:13
34:14,24 35:8,10
35:16 36:1 48:16
53:13 60:11 90:8
91:21
**Chase** 94:6
**check** 35:15 51:5
57:9
**checking** 62:20
**checks** 34:9,12 35:1
35:7,8,13,19
36:24 44:21
**cherry** 83:23
**child** 31:17
**Christ** 82:23
**Church** 1:18
**city** 30:5 45:5,20
49:4,4
**civil** 1:2 41:23
**claim** 36:16
**claimed** 84:5 85:11
**claims** 85:1
**clarify** 16:11 39:17
**classroom** 92:21

**cleaning** 43:20
**clear** 7:4 10:7 70:24
71:16,22,24 72:7
**clearly** 7:24
**client** 4:21 6:21
12:12,22 34:11
36:2,3,5 42:7 45:7
64:16 80:14 97:23
**client's** 4:23 11:11
42:10
**clients** 22:6 40:23
**close** 100:7
**club** 1:17 55:18
**collected** 4:20 42:6
**column** 4:16,17 41:1
41:2,10,11,14
42:1,1
**combination** 56:20
**come** 54:22 64:6
91:1 99:16,19
**coming** 11:16 68:9
69:18 75:7,18
**commenced** 83:12
**commencing** 1:18
**comment** 62:7
**comments** 31:2
**committee** 82:12
**companion** 90:24
91:3
**company** 36:8 37:4
61:21 85:22 90:2
**compare** 67:18
68:14
**compared** 72:23
106:16
**comparing** 106:14
**compel** 102:2
**compensation** 43:24
44:2,24
**complaint** 27:22
28:1,18 29:11
**complete** 102:7
104:21
**completed** 63:7
**completely** 7:9
**compliance** 104:16
104:21 105:6,8
**comply** 11:10
**computer** 51:2,6,8
51:11,22
**concerned** 62:23
**conclusion** 57:2
**concoct** 14:16
**conditions** 20:21
**conduct** 96:24 107:8

**confirm** 68:9 69:1,3
69:18 74:19 75:6
75:10,18 79:19
80:4,12 87:8 95:8
**confirmation** 76:5
81:24 82:3 94:8
**confirmed** 82:6
86:24
**confirming** 82:8
**confirms** 78:10
**confused** 41:8
**connection** 23:2,5
24:8,16 51:16
**consent** 81:11
**consult** 20:23
**consulted** 20:19
**contact** 5:22 46:13
**contacted** 56:18
**contemplate** 89:2
**contemplated** 54:24
55:24 56:4 90:19
**contemplating** 21:9
**contention** 43:6
**continually** 41:22
**continue** 37:20 64:7
99:20
**continuing** 97:2
107:9
**contract** 56:16
62:11 63:13 83:17
87:5
**contracted** 89:23
90:5,6,8,12
**contrary** 104:11
**conversations** 44:14
77:10
**convicted** 40:6
**cooperate** 50:5
**copies** 35:8
**copy** 3:13 18:8
52:10,15 101:24
102:16
**corporate** 34:17,18
34:20
**corporation** 18:23
19:1
**correct** 18:8 24:10
53:10 69:20 75:22
76:11 81:19 88:9
89:16,18 91:11
**counsel** 3:22 60:10
60:16 72:6,15
**count** 98:15,24 99:3
**countless** 98:11
**country** 1:17 55:18

**County** 11:6 12:6
26:19
**couple** 19:2 37:2
**court** 1:1,17,21 6:7
7:6 8:17,19 9:21
9:24 10:6,10 17:6
17:16,17,22 20:6
21:19 26:7,19
32:11,15 38:12
42:21,24 48:8
52:3,7 64:5 66:5
73:19,23 94:21
96:20 97:1 98:6
98:19 100:16
101:5,13 104:13
105:8,14 106:7,20
107:3,17
**courtesy** 19:9 41:23
**courtroom** 97:14
98:9 99:3,18
**courts** 15:23 16:13
**covered** 77:4
**COVID** 20:24 21:8
63:15 86:1
**COVID-related**
86:10,17
**crap** 54:3
**cream** 84:1
**create** 12:8 101:10
101:12
**created** 27:20 79:17
**creating** 103:14
**crime** 4:15 40:6,8,10
**criminal** 11:7
**CROSS** 3:2
**culminate** 20:16
**current** 87:18 96:7
**currently** 15:12
46:15
**cut** 36:4,11 51:5
57:9
**cutoff** 73:12
**cutting** 31:9

**D**

**D** 1:15 3:1 4:1,5 5:1
**D-a-v-i-e-s** 30:1
**D/B/A** 1:4
**DA** 11:16
**Dan** 6:21
**Dan's** 55:16
**Daniel** 2:21
**Daphna** 1:8,12 2:18
3:3,15,18 13:5,14
13:20 17:12 18:3

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 641 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 110

18:7,9 19:7 30:21
32:2 33:3,6,8
39:16 40:17 42:17
61:6 69:15 75:22
76:5 79:19 80:4
87:15,20 92:11
99:21 100:9,11,22
102:3,17 103:4,17
105:18
**date** 20:11 24:13
88:11,11 102:5,10
107:7
**dated** 3:14 88:4,10
89:13 101:24
103:7,19 104:15
**dates** 29:8
**daughter** 35:2
**daughter's** 35:4
**Davies** 28:14,22
29:6,10,23
**day** 57:14 88:13
**days** 57:15 88:7
89:14 102:4,10
**deal** 23:21 24:9
43:14,14,24 49:24
55:11 59:7
**deals** 43:11 104:5
**decide** 99:17
**deed** 49:2
**defaulted** 83:13
**defendant** 19:13
85:5,8
**defendant's** 94:1
**defendants** 1:13
2:11,17 3:15,18
6:23 102:2,6,11
102:17 103:4,10
103:17 104:2,9,15
**defended** 17:4,7
**defense** 11:8 55:1
**definitely** 53:8,14
53:17 54:2,2
**defrauded** 84:6
**defunct** 38:20
**delay** 5:8,23
**delaying** 5:15
**delete** 50:7,14,16,18
50:20
**deleted** 51:10,15,15
51:18 53:21
**deliver** 45:1 46:12
48:17,24 49:5
59:18 62:12 84:15
102:6,11
**delivered** 56:6,7

62:5 84:18 85:22
**delivering** 60:7
**delivery** 49:2 62:12
82:1 86:2
**deposed** 99:16
**deposition** 1:7 3:8
5:21,23 6:17
11:15 13:21 17:14
17:17 18:9 45:15
57:19 86:5 92:16
93:6,24 97:13
98:9 106:22 107:8
**depositions** 15:20
16:1,20 17:4
99:13
**DESCRIPTION** 3:7
4:2
**designated** 18:21
19:12 39:20 46:11
**desk** 51:3
**desktop** 53:24
**despite** 107:10
**detective** 12:6
**determination** 64:8
**determined** 80:24
**Diamond** 23:13,15
23:18
**diamonds** 44:23
45:3,20,24
**difference** 39:23,23
**different** 28:24 41:4
42:19 58:4,5 95:7
**difficult** 43:22
**difficulties** 107:9
**diligence** 62:19
**direct** 3:2 6:13
48:22 55:11
**directed** 14:23
35:15 45:5 55:8
**directive** 11:11,12
**directly** 36:7 37:3
48:14
**directs** 102:4
**disability** 7:23
**disbursement** 65:10
87:17
**disciplinary** 82:12
**disclose** 25:9,13,21
37:18
**discovery** 11:14
71:18 102:2
104:13 105:2,4
**discuss** 106:11
**discussed** 8:11 77:2
**discussion** 96:23

106:8
**dispute** 4:9 33:16
44:6
**disputing** 82:14
**distanced** 55:5
**distribute** 57:10,11
81:17
**distributed** 43:7
**distributions** 36:17
**district** 1:1,1 11:5
12:6
**divvied** 36:12
**docket** 101:6 102:1
**doctor** 9:1
**document** 21:14,16
21:20,23 40:12
53:24 65:12,15
67:5,11 68:8
72:12 78:2 88:8
92:21 101:23
103:16
**documentation**
65:19,24 78:9
**documents** 3:20
18:10 34:22 59:7
67:1,10 71:9,18
72:17 78:10 82:9
82:11 88:3 89:13
92:11,14 101:23
102:13,14,21
103:19,21 104:10
**doing** 6:19 9:7 65:11
73:1 89:2 95:7
98:19
**dollars** 12:22 54:24
94:4
**Douglas** 41:6
**dozen** 106:5
**draft** 28:8 51:22,24
52:16 87:15 88:14
88:17,20 89:4,8
**drafted** 27:18 29:10
**drafting** 28:17 88:8
88:13,15,17
**dragged** 83:11
**drama** 12:8
**drives** 51:1
**drugs** 7:21
**due** 8:5 62:19 97:21
107:7,9
**duly** 5:3
**duties** 65:9,18
**DZ** 68:3 70:5 86:23
**DZ-1** 3:8 18:4
**DZ-10** 3:12 66:23

67:2,11 68:1,4,8
69:6,11,17,20
70:8 73:2,7,13,16
73:17 74:5,7
**DZ-11** 3:13 100:11
101:5,24
**DZ-12** 3:15 101:17
102:16 104:19
**DZ-13** 3:18 101:17
103:16 104:20
**DZ-2** 3:9 40:14
**DZ-8** 3:10 25:5,6
26:15,18 66:4
**DZ-9** 3:11 66:6,23
67:2,4,14 68:11
68:16 70:9 72:17
74:11 79:2 86:9
86:19 87:3,4
96:11

————————
**E**
**E** 1:15,15 2:1,1,20
2:20 3:1,6 4:1,1,1
4:5,5 5:1 107:1,1
**earlier** 89:14
**eastern** 1:1 16:15
**easy** 49:20,21
**ECF158** 102:1
**effect** 50:16
**Eight** 66:10,11,17
**either** 34:24 35:8
58:20 62:9 85:24
86:17 98:14
**eleven** 94:3
**email** 4:13 27:19
38:8,9,13,15,17
38:20,22 47:7,9
50:13,15 51:4,19
52:11 53:20,21,24
54:5,8 74:13 76:8
76:19 82:20 87:18
**emailed** 53:6,10,13
**emails** 50:7,11,12
51:10,15,15,18
**embarrassed** 8:4
**enforce** 76:17
**enforced** 76:15
**entered** 55:19 63:14
**Enterprises** 1:4 6:19
**entire** 55:9
**entities** 23:10,24
**entitled** 14:3
**entity** 23:11 44:21
**entry** 27:21 68:12
96:11

**Environmental** 1:4
6:19
**escrow** 4:19 42:5
49:1 65:8,18
81:16 82:17 83:1
87:16 94:9
**Esquire** 1:9,12 2:3,9
2:11,15 3:16,19
18:9 102:3,17
103:4,17
**essentially** 59:22
63:5 64:5
**et** 89:23
**evaluated** 45:4
**events** 7:24 22:18
**everybody's** 84:12
**evidence** 96:15
99:14
**evidencing** 21:14
65:20
**exactly** 44:3 64:10
97:21 106:10
**EXAMINATION**
6:13
**examined** 5:4
**example** 11:2 13:9
68:1
**exchange** 76:8,19
77:7 78:8
**excuse** 34:18 35:20
75:5 78:20 98:20
104:1
**exhibit** 3:7,8,9,10,11
3:12,13,15,18
18:4 25:6 40:14
92:16 93:6,6 94:1
101:8
**exhibits** 3:22 66:23
100:16 101:17
**expected** 86:24
**extent** 60:12

————————
**F**
**F** 1:15 4:1
**fact** 14:5 20:16 50:4
52:19 55:15 62:2
62:21 82:8 86:14
91:23 96:3
**fairness** 104:17
**familiar** 17:8,14
**far** 22:21 32:1 37:1
62:19 83:9
**fault** 82:9 98:4
99:15
**favor** 45:4

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 642 of 749

USDC, ED of PA        American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT        April 2, 2024

Page 111

February 22:17
76:9 78:4 79:14
80:3 87:10,14
88:4,7,9 89:3,13
89:16 90:16 92:2
94:3,10,18 96:11
federal 15:21 16:13
17:16,17
fee 49:13 55:2 76:11
78:5 90:16,20,21
91:6 94:22 95:23
fees 37:1 73:16
74:10,14,22 75:3
felt 55:8
fence 31:11
fifteen 55:20
fifth 11:3,4,13 13:1
13:3,9,11,24 14:2
14:12,15,18 33:20
fight 39:6
figured 56:24 58:24
62:18
file 54:7
filed 27:22 28:1
101:6
files 12:17
filing 54:6
find 37:1 54:1,1
68:12 76:23
fine 6:1 10:19 70:20
92:12
fingers 99:2
finish 13:4 19:6
22:13 32:24 35:11
41:20 68:6 69:13
69:15 84:2 88:15
88:18 91:6 97:8
97:22
finished 12:19 15:7
50:1
finishing 89:7
firm 20:14,15,17
30:3 85:8
firm's 4:19 42:4
first 3:20 4:16 5:3
7:2 10:16 24:11
41:10,14 42:1
77:14 78:23 95:1
101:23 102:21
103:5,18
five 5:11 68:22
floor 5:2 54:3
focus 13:20
follows 5:5
font 67:24 72:14

force 64:5
foreclosure 31:12
foregoing 107:5
foregone 57:2
forget 30:16
formal 87:15 88:17
88:20 89:4
formalize 20:12
format 21:2 67:8,23
79:11
formation 34:18,18
34:22
former 36:5 40:23
forth 55:24 65:8,15
107:7
forward 72:10
forwarded 72:19,23
72:24
found 26:19 40:22
four 5:11 45:20,24
46:1 48:1,3,4,4
55:14 68:22 89:12
89:12
fourth 94:23
free 77:11
Friday 94:24 95:1
front 51:7 62:15
77:3 86:22 98:6,7
99:18
full 102:6 104:21
fully 7:9
funds 4:23 40:24
42:10 49:10,12
51:5 52:23 56:17
59:20 63:20,23
64:1,14,21 65:10
65:21 85:19
further 106:7
future 89:20

**G**

G 1:21
game 98:14 106:10
Gary 1:11 2:3,22
6:17,23 19:16
23:3,4,9,11,16,19
24:9,11,14,16
25:11,15,22 26:1
26:4,9 29:16 33:5
36:2,3 39:17
47:12,15 49:10
51:4 52:1,11,20
52:20 53:7,9
61:21,24 62:23
63:1,18,20 64:20

65:19 67:15 69:3
69:18 74:18,21
75:2,5,6,15,17,21
75:21 76:10 77:15
78:19,20,20 79:16
79:17,18 80:3,6
81:7,16,20 87:7
91:13 97:21 101:9
101:21
Gary's 81:6
garylightman@li...
2:5
gemologist 45:14
gems 44:22,22 45:3
general 17:15
generic 9:11,18
Germantown 2:4
getting 44:14 50:3
76:9 80:9
give 10:16 11:22
19:8 20:10 21:23
33:9,9,22 48:22
49:7 55:20 58:20
61:1 73:24 75:14
76:18
given 12:14 81:19
107:11
giving 19:9 29:7
37:15 38:21 46:17
76:10,21 77:8
81:7
go 13:15 21:21 36:8
36:16 47:19 49:9
50:19 51:1 56:11
56:15 59:3 64:5
68:18,21 74:11
75:2 79:1 82:24
83:4 86:9,11,19
86:23 87:1,4,6,7
93:14,23 99:23
100:3 106:4
God 49:20
goes 32:1 41:7 49:2
80:15 83:9
going 4:10 6:24 8:3
8:12,20 9:13
10:16 11:14,23
12:3 17:23 20:7
21:10 22:5 23:17
23:19 24:20,21,21
30:24 31:9,24
32:3,12 33:9,23
37:8,11,20 39:6
40:16 42:18 45:10
46:8 47:16 52:7

54:16,22 55:16
57:18 59:19 65:2
67:1 69:21 75:1
76:18 80:5 83:14
87:8 91:1 92:7,10
97:11,12,12,13,15
97:16,19 98:3,10
99:7,9,14,17
100:15 101:13
106:3
GOLDBERG 2:8
good 6:14,15,16
12:9 15:12 39:7
49:2,24 59:23
78:13 85:15
goods 12:23 56:6,14
56:20,21 58:1
59:17,18 60:7,17
61:1,15,19,20,21
61:23,24 62:4,12
62:21 63:2,5
65:20 83:2,22
84:9 85:21 95:8
gotten 77:4
graduate 106:15,16
graduated 16:6
106:18
grandstanding
105:13
granted 101:7
grants 102:1
great 50:2 94:16
green 73:13 74:8
83:4
grit 41:21
Gross 1:10,11 23:7
23:20 29:17 35:2
35:18,24 36:4,4
36:17,17 45:2
46:12,17,18 48:24
49:5 52:16,18
53:10 59:22,24
67:16 73:8,10
74:11 75:6,17
78:17 79:16 84:19
Gross's 23:23 31:15
grounds 14:13
33:19 34:1
group 1:10 72:11
73:11 79:17
growl 36:12 41:21
growling 41:22
guess 37:5 59:20
72:15 81:11
guys 8:19 9:21

32:12 48:9 49:24
52:3 73:19 96:20

**H**

H 3:6 5:1
hand 17:9 18:2 67:1
92:20 98:16 99:1
handed 101:23
hands 99:2
happen 11:14 55:5
happened 20:12,13
45:6 49:3 50:2,12
50:14 61:2 81:12
happening 11:8
54:8 64:10,11
76:13
happy 11:24 12:4
99:19,20
hard 50:24
harder 21:7
head 97:24
Healey 2:15 5:20
6:8 8:10 9:14 10:4
10:21 13:5,14,20
16:11,13 17:12
19:7 24:23 26:16
27:7,10 30:21
31:2 32:2,4 33:3,6
33:8,11 39:16
41:18 42:17 58:9
58:16,18,22 59:2
61:6 66:19 68:14
68:20 69:15 70:18
70:24 71:13,15,21
72:1,15 73:17
74:5 77:21,24
78:19 79:6 87:1
92:4,10,13,24
93:2,9,12,21 95:4
95:14,18,20 96:6
96:9 97:5,19
98:13 99:11,21
100:1,9,13,15,20
100:22,24 101:4
101:12,20,22
102:19,22 103:2
103:12 104:17,24
105:2,4,12,17,23
106:3,9,13,17
hear 38:12 105:11
heard 34:4
hearing 84:20
held 1:17 60:20
help 12:11,12 28:17
50:14

Case 2:22-cv-00688-JMY    Document 201-1    Filed 10/01/24    Page 643 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)    Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 112

**hereinbefore** 107:7
**hereof** 102:10
**hey** 57:6 80:13
**Hi** 75:21 80:4
**high** 106:15,16,18
**hiring** 4:18 42:3
**hit** 20:24 21:8
**hold** 64:7 82:15
83:21 92:8 101:10
**holding** 4:21 42:7
82:17
**Holdings** 1:10 34:13
34:14 35:10 36:1
90:8
**home** 20:20 21:7
48:14
**honestly** 16:16
76:17 77:13
**honor** 10:3
**hope** 54:15,15
**hopefully** 12:18
**hospital** 18:13
**hospitalized** 8:5,8
9:3
**hot** 75:15
**hour** 5:12,14,14
**House** 6:20 62:11
84:15,17
**House's** 84:14
**hundred** 54:24 56:2
94:3,4
**Huntington** 5:3
48:15
**husband** 4:11 19:16
19:23 37:12

**I**

**identification** 18:5
25:7 40:15 66:24
101:18
**identified** 104:9
**identify** 27:13
**iHealth** 79:17
**immediately** 46:8
57:7,11
**impact** 8:9
**impacted** 21:4
**impacts** 9:16
**impression** 60:13
63:21
**include** 34:19 90:16
90:22 91:9 95:24
**included** 91:5
**includes** 64:4
**independent** 60:16

**indicated** 97:2
**indicates** 26:21
69:20
**individually** 18:21
19:12 40:3
**individuals** 4:22
42:9
**infer** 14:4
**influence** 7:21
**information** 46:13
52:23 80:8
**innocent** 98:14
106:10
**insanity** 60:23
**instance** 35:15
**instant** 97:15
**instructions** 10:18
73:24 104:12
**intend** 14:14
**interrogatories** 3:17
94:2 102:7,23
103:1,6 104:3
**interrupted** 68:7
98:16 99:1,4
**interrupting** 41:23
98:12 106:5
**interruption** 19:9
106:16
**interruptions** 97:2
97:20
**introduce** 66:19
**investigated** 34:3
**investigating** 11:6
**investigation** 12:7
55:4
**investigative** 11:16
**investigator** 14:19
83:7,8
**investigators** 34:4
50:3
**investing** 4:21 42:8
**investor** 60:2
**involved** 43:16,18
49:20 64:4 84:12
84:12 90:13
**involvement** 29:16
**IOLTA** 94:5
**iPad** 50:20,23
**Island** 46:8
**issue** 64:6
**issued** 104:18 105:7
105:9
**issues** 20:21
**items** 86:10,16

**J**

**January** 4:9 22:17
29:2 32:22 33:15
33:15
**jerk** 94:15
**Jersey** 1:17,22 5:4
107:4
**Jesus** 82:23
**JMY** 1:2
**join** 100:19 101:3
**joined** 85:7
**JP** 94:5
**judge** 3:13 97:14
98:6,8 99:8,18
101:24 102:9
104:16,18,22
**judge's** 105:5
**jurisdictions** 15:18
**jury** 14:4

**K**

**K** 4:5 5:1
**keep** 30:20 31:9
41:22 46:5 69:14
**keeping** 76:10 78:4
**keeps** 30:23
**KELLY** 2:14
**kept** 21:10
**Kiley** 1:17 107:3,16
**kind** 21:10 30:16,19
105:13,17
**kindergartner**
106:15
**kits** 86:1
**knew** 45:12 48:19
55:9 56:10 95:9
95:10
**know** 6:5 7:3 9:1,8
9:10 10:10 11:5,8
12:8,13 14:10,18
15:3,4 16:16,23
17:1,3 19:19
25:18 29:4,6,7
30:6 31:11,21,23
32:5 34:3,3,9
37:15,16 39:9,24
40:19 44:12,17
45:2,7,8,12 46:21
47:23 48:17,20
49:16 50:1,18
51:2,3 53:11,11
55:7,12,16 56:7,8
56:12,19 58:15,21
59:20,24 60:2
61:7,10 62:20

63:5,9,14 64:5,17
67:3,17 69:12,22
69:22 72:16 78:12
80:11,12,13 81:4
81:8,9 83:5,6
84:12,19,23 85:2
85:3,17,18,19
86:7,10,14,15,16
86:20,20 87:23
90:13 92:5,5,5
93:4 95:1,23
99:11 105:5
**knowledge** 60:14
**Kuby** 37:1

**L**

**L** 2:20
**labeled** 69:24,24
71:12 72:17
**landlord** 21:1
**larceny** 41:5
**large** 4:22 8:5 42:8
**late** 5:13,16
**laughable** 91:2
**Laver** 2:9 6:22 47:1
57:22 66:8,10,17
100:19 101:3
105:21,24
**law** 13:1 16:6 22:4,7
22:16,19 30:3
39:17 85:8
**laws** 21:3
**lawsuit** 25:1,3 27:18
29:18 34:6,7
66:18 85:3,6,18
**lawsuits** 85:20
**lawyer** 11:8 41:7
**lawyers** 40:19,22
**leave** 40:16 62:8
100:2
**leaving** 98:22 99:24
100:4
**left** 10:21 20:14,15
30:6,7 41:1 48:13
**legal** 4:9 29:9 33:14
37:1
**let's** 13:20 32:2
47:19 49:9 66:22
79:1 86:9,11
**letting** 11:7,14
14:13,19
**License** 107:17
**licensed** 15:14,16
22:19 56:24
**life** 12:9,9 49:21

**light** 83:4
**Lightman** 2:3,3 3:3
5:17 6:4,8,13,18
8:7,14 10:8,12
13:7,16,22 16:18
17:13 18:1 20:9
21:19 25:5,8,12
25:16,20,23 26:2
26:8,10,12 27:12
31:4 32:8,15,18
33:13 39:18 43:3
43:5 47:3,13,16
47:18 48:11 52:9
55:20,22 57:23
58:18,24 59:3,6,8
65:2,5 66:3,6,9,11
66:14,21 70:22
71:2,23 72:5,12
74:1,4 78:1,13,16
92:15 97:1,6 98:5
98:10,15,24 99:7
99:23 100:2,6,10
100:14,18,23
101:10,15,22
102:20,24 103:3
103:14 105:10
106:2,14
**limitations** 107:11
**limited** 83:18
**line** 4:2,6 82:13
**lines** 68:22,23 89:12
**linked** 27:18
**list** 36:24
**listed** 69:8
**listen** 74:4 97:15
**literally** 8:22 80:7
**litigation** 55:1,1
56:4 76:14,14
90:17,22,23,24
91:9,20 95:24
**little** 11:15 58:3
105:13
**live** 4:11 5:14 37:9
37:11
**lived** 4:14 38:23
**LLC** 1:10,11,12
26:8,20,21
**load** 61:23 63:4
**loaded** 62:5,17
81:24
**locate** 43:20 53:19
**lock** 104:9
**logically** 7:24
**long** 4:14 15:9 30:3
37:6 38:23 46:8

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 644 of 749

USDC, ED of PA            American Environmental Ent. v. Manfred Sternberg, Esq., et al.        Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT              April 2, 2024

Page 113

50:22,24 54:7
  106:17
**long-term** 21:4
**longer** 31:3
**look** 26:13,15,16
  27:13 43:21 46:24
  59:1,2,3 68:1,3,4
  68:7,10 70:17
  71:3 73:2,7 74:7
  76:22
**looked** 72:11 94:24
**looking** 12:5 25:19
  68:4 71:7 79:5
  92:8 96:6
**looks** 67:19 73:1
  76:12
**lost** 96:5
**lot** 8:5 45:9 70:4,24
  97:20
**lottery** 4:18 40:24
  42:3
**love** 54:1
**lump** 55:23
**lunch** 65:3 78:14

_____ M _____

**M** 4:1,5 107:1
**Madam** 32:15
**Mahoney** 46:9,10
  46:14,20 47:15
  48:15,18 49:6
**Main** 5:2
**making** 4:18 10:6
  42:3 80:1
**Manfred** 1:9,9 2:11
  2:12 14:24,24
  15:2 23:8 24:2,3
  29:17 34:11 43:7
  49:12 50:1 53:15
  53:18 55:8,13
  56:21 57:19 61:8
  62:8,16 63:17,22
  64:4,15,16,18,21
  64:21,24 76:9
  80:13,16 81:13,18
  81:23 82:2,3
  83:16,16 84:18
  85:12,14,19 86:24
  89:23 90:5,7,9
  91:12,18,22,22
  92:16 93:6,24
**Manfred's** 60:22
  80:20
**MANOCHI** 2:3
**March** 18:12 22:17

103:7,8,20,20
  104:15,15
**mark** 21:20 25:5
  28:14,22 29:6,10
  32:16 74:10,22
  100:23
**marked** 17:9 18:2,4
  25:6 40:13,14
  57:18 66:4,22,23
  67:2,4,11 92:7
  100:6,10,14
  101:17,23 103:16
**Market** 2:9
**marking** 100:16
**Marlton** 1:22
**married** 19:21 37:6
**masks** 62:4,4,18,24
  63:8,10,16,18
  81:24 85:23 86:1
  86:5,7,12,17
**matter** 1:16 4:9
  25:13,14,15 31:5
  33:15 88:11
**matters** 25:9 31:8
  104:6
**mean** 8:1 17:10 28:5
  29:6 33:7 39:14
  43:22 45:13 49:22
  68:19 77:13 80:18
  105:16,22
**meaning** 35:23,24
  62:12 75:11
**mechanisms** 57:2
**medical** 20:21 84:22
  85:1
**medication** 5:9 8:8,9
  8:15 9:2,5,7 10:10
  10:13
**medications** 7:22
**meet** 45:22 46:16
**meeting** 2:4 45:4
**memorized** 24:13
**mental** 7:22
**message** 69:10 79:2
**messages** 3:11,12
  67:15 79:3
**messed** 5:9
**met** 15:2 45:16,19
  46:9 47:20 78:17
  78:20
**middle** 12:15
**Midtown** 37:3
**million** 12:21 79:19
  81:16 85:11 87:8
  94:3

**million-nine** 80:5,6
  80:10,14 82:7,17
  91:14 92:1
**mind** 71:6
**Mindspring** 51:20
  51:21
**mine** 58:3 79:20
**minute** 42:24 53:3
  67:13 88:3 89:22
**minutes** 55:21 87:21
  90:15
**mirrors** 87:16
**mischaracterized**
  99:13
**missed** 5:20
**misspeak** 29:3
**Mm-hmm** 29:24
  73:9
**moment** 22:9 69:22
  76:20 77:9
**moments** 57:8
**Monday** 95:1
**money** 4:21 11:11
  11:18,24 12:1,13
  12:22 14:20,21,23
  15:6 36:6,7,8,9
  37:2,5,21 40:23
  42:7 43:6,10,15
  43:16 44:7,9,12
  44:15,16,16,20,20
  45:1 49:19 56:9
  56:13 57:3 60:20
  60:20 62:1,8 77:3
  80:17 81:3,6,6
  83:2,19,21 85:15
  91:19 94:18,19
  96:14,15 99:10
**month** 9:5,6 50:2
**months** 19:2 20:11
  21:13 83:6
**Morgan** 94:6
**morning** 5:8,11,19
  6:14,15 78:18
**mother** 31:17
**motion** 99:8 101:7
  102:2
**motions** 82:13
**mouth** 65:17 84:10
**move** 95:19
**Moving** 30:17
**multiple** 33:19 34:1
  82:9

_____ N _____

**N** 1:15,15 2:1,20 3:1

4:1,1,5 5:1 107:1
**N95** 63:8,10,18
**name** 6:17 9:8,10,17
  10:9 25:14 26:1,4
  27:23,23 29:22
  39:12 47:21 89:23
  90:6
**named** 85:4,5,8
**Napolitano** 50:4
  77:16
**nature** 21:4
**necessarily** 20:22
  45:7
**necessary** 7:4 90:17
  90:22,23 91:10
**need** 12:9 17:23
  37:13 42:24 52:4
  56:23 60:24 73:20
  79:23 82:18 83:5
  88:18 89:22 90:6
  93:15 94:22 95:11
  96:18 97:12,17
  99:2 100:18 101:7
  101:10,15
**needed** 56:16 60:16
  61:4,8 63:1 80:18
  80:20,22 81:11,13
  81:15,21,23 82:2
  82:23 95:8 105:10
**needs** 31:3 54:18
**negotiate** 64:3
**negotiated** 55:9
  57:1 63:22 83:16
  83:20,20
**negotiating** 59:21
  88:6
**negotiation** 34:10
  90:14
**negotiations** 90:17
  91:9
**never** 11:19 12:14
  15:2 17:17,20
  18:6,14 43:24
  44:15,20 51:15,15
  82:15 85:15 91:2
**New** 1:17,22 4:18
  5:4 15:14 26:19
  30:5 42:3 107:4
**newspaper** 66:13,14
**night** 57:12
**nine** 94:3,4
**noon** 6:1,10
**Nope** 66:1
**normal** 94:12
**normally** 5:10

**Norristown** 2:15
**North** 1:21
**Notary** 1:17 5:4
  107:4
**notch** 94:11
**note** 103:24 104:8
  104:13,17 105:12
**notes** 1:16
**notice** 3:8 18:8
**notify** 80:13
**number** 38:7 46:21
  46:21,23 47:4,5
  99:3 102:1
**numerous** 97:4,7
**NY** 5:3
**NYSCEF** 27:18

_____ O _____

**O** 2:20 4:1,1,5
**o'clock** 5:12
**oath** 10:23 86:3,8
**object** 11:5 24:21
  32:5 37:20 100:15
  100:24 101:5,8
**objecting** 14:12
  45:11
**objection** 14:15,17
  33:10,17 37:10,17
  38:18 39:1,14
  40:11 41:12,16
  42:12,16 43:12,13
  57:22 84:23 85:2
  95:14 100:19
  103:10 104:3
**objections** 3:15,18
  102:8,15,16 103:4
  103:17,23
**obstructionist** 33:24
**obtain** 65:23
**occasion** 20:20
  35:21
**odd** 37:4
**Off-the-record**
  96:23
**offered** 49:19
**office** 43:20 51:7
  53:23 54:14,17
**official** 4:3 21:13
**oh** 10:22 39:22
  40:18 44:5 67:12
  69:7,7 70:10
  75:10 79:4 87:11
  92:22 93:7 96:7
  99:17
**okay** 5:17 6:14 7:10

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 645 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 114

7:21 8:2,15 9:4
10:13,18,23 11:2
12:21 15:3,5,9,14
17:2,8,20 18:20
19:9,15 22:7,14
22:15,22 23:4,20
26:9,10,11 28:4,9
29:10 30:8 32:6
35:19,21 37:6,14
37:23 38:3,6,23
39:5 40:12,18
46:4 47:23 49:9
51:4,13,17,21
53:2,12,16 56:14
58:5 60:9 61:2,15
61:17,20 62:21
63:10 65:18,18
66:2,3 67:6,13
68:1 70:2,10,17
71:3,9,20 72:9,22
73:2,5,12 74:1
75:16 79:1,7,13
80:2,15 81:1,21
82:4,6 85:21 86:9
87:9,12 88:7
89:15 90:10 92:12
93:17,21,23 94:17
96:16 101:4 105:3
106:20
**old** 9:6 46:23 47:4
54:5
**once** 52:18 61:18
63:17,22 80:17
81:18
**online** 26:19 40:22
**open** 50:19 57:13
**opportunity** 76:6
**Oral** 1:7
**order** 3:14 56:22
65:3 99:9 101:6
101:24 102:5,9
104:16,18,22
105:5,6,7,9
**organized** 12:17
**original** 76:24
**originally** 54:22
**outcome** 64:3 88:6
**outside** 14:5 20:22
70:18 71:22 72:2
72:6
**overlapping** 6:6
7:17 8:16,18,24
9:20,23 10:5
13:13 14:9,11
16:14 17:5,21

20:1,5 22:8 24:5
26:6 27:9 28:11
31:1 32:10,14
38:10 41:19 42:20
42:23 43:2 47:17
48:7,10 52:2,6
58:17 66:12,16
72:3 73:15,18,22
74:6 77:20,22
82:21 93:10 94:14
94:20 95:16,22
96:12,19 97:18
98:18 99:6 100:8
106:12,19 107:9
**owe** 36:7,7,9
**owed** 37:2,5 81:2
**owned** 61:21,24
63:3,19 86:16

___

**P**

**P** 1:15 2:1,1,3,20 5:1
**P.C** 1:12 2:12,17
3:16,19 18:10
19:13 39:21 102:3
103:5,18
**p.m** 1:18 68:23
69:17 106:22
**PA** 2:4,10,16
**package** 48:1
**page** 3:7 4:2,6 18:19
27:13 68:11,16
94:1
**paid** 12:22 36:14
37:3 44:4 49:11
56:6 60:7,17 77:4
91:2
**Panagakos** 4:8 30:8
30:11 31:14 32:21
33:14 34:5 35:6
35:12,13
**paper** 54:17
**paragraph** 102:4,9
**parentheses** 69:19
**park** 83:2
**part** 4:16 8:5 19:1
34:13 35:10 36:1
41:1,10,14 42:1
44:18 53:4 63:14
65:12 73:5,13
**participate** 12:7
55:7 77:12
**participated** 77:13
**particular** 45:2 78:8
**parties** 46:11 64:4
**partner** 63:4

**party** 15:1
**Patrick** 2:15 5:19
10:21
**pay** 36:18,20,22
85:19
**payment** 55:23
**payments** 54:20
**PC** 1:10
**penalties** 10:24
**Penn** 5:14
**Pennsylvania** 1:1,18
**people** 8:6 12:2 37:2
38:22 77:12 83:17
**percent** 22:24 36:4
36:4,11,13,14,16
79:19 80:4,5,9,14
80:15 81:7 87:8,9
**period** 50:22
**perjury** 7:13 10:24
**person** 6:20 7:8
18:23 24:8 41:7
47:19 64:13 79:1
81:17
**personal** 38:22
**personally** 39:20
78:18
**perspective** 80:23
**Pertaining** 50:9
**pertains** 40:1
**phealey@rebarke...**
2:17
**Philadelphia** 2:10
**phone** 15:3 38:4
46:20,21,23 56:19
77:18
**phones** 38:4
**physical** 7:22
**pick** 48:23
**picture** 4:4 57:4,5
57:19 58:1,4,5,7
58:11 62:15 86:21
**pictures** 45:6
**piece** 54:16 83:20
**Pike** 2:4
**piles** 54:13
**place** 57:3 83:2
107:6
**plaintiff** 1:6 2:6 6:18
28:6,13 61:5 62:5
102:6,12
**plaintiff's** 3:16,19
27:14 102:2,7,13
102:17,20 103:5,6
103:18
**plan** 5:11

**plea** 52:4
**plead** 11:3
**pleading** 11:4,13
28:8
**please** 7:2,5,8 9:12
13:4,4,17 14:8
19:6 20:7 22:10
22:13 25:5 26:4
26:15 32:15,24
35:11 39:24 41:17
41:23 68:9 69:1,3
69:13,18 74:19
75:6,10,18 77:19
79:18 82:22 83:23
83:23,23 84:2,8
87:4 91:6 93:8
97:6,7,8 101:21
**pleasure** 89:19
**plenty** 28:24
**Plymouth** 2:4
**pocketbook** 9:9
**point** 30:12 31:23
45:1 55:12 82:13
96:5 105:24
**Pointing** 58:9
**portion** 4:19,20
35:17 42:4,5 70:8
80:23
**possible** 7:10
**possibly** 90:23
**potentially** 12:8
14:18 56:5 91:18
91:21
**practice** 12:16 16:3
16:19 21:2 54:5
**practiced** 21:12
**practicing** 15:9 22:4
22:7,16,19
**prepare** 69:23 70:16
**prepared** 71:5
**present** 29:2
**presented** 71:7
**presumably** 81:7
**presume** 61:11,12
**presuming** 56:15
**pretty** 83:23
**primarily** 21:1
64:17
**principal** 6:21 34:14
34:19
**print** 43:21 54:6
**printed** 54:2 69:6
**printing** 54:4,9,11
**printout** 72:19 73:1
**prints** 72:16 75:11

**prior** 21:6 83:1
105:5
**privilege** 11:21
14:17 24:23,24
27:5 33:20 50:6
104:7,8,11
**probably** 6:2 22:24
**problem** 11:18,19
11:20 12:14,14
44:6 62:11 70:3
82:16 87:9,13
90:20 91:18 103:2
**procedures** 17:15
**proceeding** 31:12
**proceedings** 1:16
96:24 107:8
**process** 89:4
**produce** 21:16
58:11,19 63:1
102:11
**produced** 58:23
67:10 71:10,11,18
78:10 104:9,15,18
105:7
**production** 3:20
18:10 102:14,21
103:19,21
**promises** 4:18 42:3
**prompting** 5:10
**proof** 14:21,22
56:14,20,21 61:1
61:19 62:14,17
**prosecutor** 14:13
**protected** 104:6,11
**protection** 21:3 60:3
60:4,6
**provide** 59:11,17
**provider** 51:19
**Public** 1:17 5:4
107:4
**purchase** 65:20
**purchased** 12:23
**purchaser** 84:24
85:3
**purchasers** 84:9
**purpose** 45:2
**purposes** 54:17
**pursuant** 11:11,12
56:16
**pursue** 30:7
**put** 8:3 54:6,6,20
57:6 59:19 63:6
83:2,22 84:8,10
98:21
**putting** 59:18 65:17

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 646 of 749

USDC, ED of PA      American Environmental Ent. v. Manfred Sternberg, Esq., et al.      Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT      April 2, 2024

Page 115

## Q

q-u-e-t-i-a-p-i-n-e 9:15
Queens 48:14
question 4:6 7:3,4,5 7:9,12,18,19 10:15,17 12:24,24 13:8,17,23 14:1,3 14:5 19:8,19 20:7 22:13,14 24:4 27:2,11,11 32:24 33:9,12 35:11,12 36:15 37:21 41:20 42:13 47:12 61:22 68:6,21 69:16 71:6 74:10,22 77:24 87:2 93:22 95:21 97:23 101:9 101:21 106:1
questions 7:1 11:10 27:3 31:24 32:4 37:24 41:13 84:2 87:24 95:4 97:8 103:9 104:1
Quetiapine 9:14
quicker 13:15
quite 20:24
quote 88:20 94:22 103:10,11 104:5,7
quotes 90:16,21 91:7

## R

R 1:15,15,15 2:1,20 4:1,1,5 5:1
raining 13:10,18,24 14:5
raised 84:24
read 40:20 41:3 67:18 69:17 79:23 93:16
reading 70:20 75:14 75:16 87:5,6 93:16 96:4
ready 71:3 87:24 93:17
reality 56:7
realized 18:6
really 18:13 21:12 43:16,17 49:20 84:10 88:11 96:21 105:20
reason 33:22 50:13
REBAR 2:14
recall 7:11,12,24

31:10 48:3 54:19 65:11,16 86:14
recalling 43:12
receipt 46:2,3 48:2 65:9
receive 18:18 34:12 44:12,22 74:20
received 14:21 18:16,19,20 34:9 43:24 44:1,13,15 44:15,20,24,24 45:1 56:13
recipient 60:2
recognize 67:23 72:14 73:10,11
recollection 59:9 65:13
recommenced 97:14
reconvene 98:3,4,8 106:1
reconvening 106:3
record 5:16,17,18 6:16 8:3 16:11 27:17 43:4 47:1,2 47:19 65:4 67:2,4 71:17,24 72:4 78:15 80:1 97:3,3 97:9,12,16,24 98:1,2,3,22 100:7 101:11,13 103:14 103:24 104:8,14 104:17,19 105:15 105:22 106:20
records 12:15 44:9
recover 50:13
recovered 50:21
RECROSS 3:2
REDIRECT 3:2
redo 97:13
refer 23:18,19
reference 4:23 42:10
referred 58:2
referring 39:19
reflect 5:19 6:17
reflected 70:9
refusal 14:4
refuse 13:1 14:1 32:20,23 33:2,24
refused 49:19 106:6
refuses 32:8,16 98:12
refusing 33:18,19 33:21 37:18 38:1 98:5,7

regarding 88:24 96:23
regret 43:17
regularly 49:4
regulations 21:2
relationship 59:23 83:9
release 15:6 51:5 56:9,17,22 57:3 57:10 60:20,23 61:13,14 62:1,9 63:20,23 64:14 80:18,22 81:14,16 82:3,6,15,19 91:19
released 57:16 64:1 65:21
releasing 92:6
relevant 27:8
remedy 106:6
remember 7:10,11 7:12,13,18,19 23:14 28:3 30:20 30:22 44:3 47:21 47:24 54:9,11 56:1 57:12,14 89:6
remembered 72:24
renewal 16:17
renewed 16:16
reporter 1:17 6:7 7:6 8:17,19 9:21 9:24 10:6,10 17:6 17:22 20:6 21:20 26:7 32:11,16 38:12 42:21,24 48:8 52:3,7 66:5 73:19,23 94:21 96:20 97:1 98:19 100:16 101:13 105:14 106:20 107:3,17
Reporters 1:21
represent 4:8 6:18 18:7 24:14 26:18 28:15 30:8,13 32:19,21 33:14 40:21 60:15 76:6 87:16 89:20 93:5
representative 18:22 19:12,14 39:20 48:16,23
represented 4:7 10:20 23:16 24:3 24:16 31:5,19

81:9
representing 2:6,11 2:17 23:1,4,7,9,20 23:23 24:2,7,8,11 28:6,12 52:20
represents 6:22
request 3:20 21:16 21:20 58:11 59:4 97:11,13 102:13 102:21 103:18 104:19
requested 5:21
requests 18:10 103:21 104:13
require 65:19
required 65:23
requirement 62:2,3 62:3,6 80:16 83:3
requires 62:11
reschedule 6:11
resent 84:11
reserve 105:24
residence 4:12,14 37:14,18 38:23
resident 37:16
residual 49:17
resignation 4:3 21:13
resolve 76:23
respectfully 104:19
response 14:2 54:6
responses 3:15,18 102:12,16 103:3,9 103:16 104:1,2,14 104:21 105:2,4
responsibilities 65:9
responsive 102:13
rest 36:8 74:8,13,21 75:2 79:20
result 72:14 76:14 83:13 91:20 95:24
resulted 85:20
retain 43:10
retained 3:22 25:9 49:13
retainer 43:15,19,23 44:4,5 49:9,11 51:22,24 52:10,15 52:24 53:2,5,6 54:9,11,21 55:24 59:12 65:6 76:22 76:24 83:21 88:10 89:1,11
review 52:16
revised 11:23

ridiculous 13:12 54:23
right 6:21,23 10:3 10:15 11:3 12:24 14:2,2,7,15 15:23 17:9,10 19:21,23 21:16 22:22 23:3 23:11,17 25:17,20 29:5 36:2 41:1 42:14 45:18 46:19 47:11 50:11,21 53:24 58:14 66:14 69:2,4,10 73:7,8,9 73:12 74:11,15,18 75:24 76:1,4,11 78:13 85:9,16 87:9 89:5,8,16,20 89:24 90:3 91:23 94:15 95:19 96:8 98:19 99:14 106:1
rights 13:9,11 14:1
River 26:8,20 66:17
Road 1:18 2:15
Robert 4:3 19:16,23 21:23 22:1 27:15 27:21,23 28:6,8 28:12 37:6
Robert's 28:17
Rockefeller 30:14
role 59:14,15,16,17 61:15 63:17 64:12
roll 99:17
rolled 7:20
Ron 37:1
room 55:19 99:3
rotating 28:24
Route 1:21
ruined 49:21
rules 104:13
rulings 97:15

## S

S 1:15 2:1,20,20 3:6 4:1,5,5 107:1
s/ 107:16
Safety 6:20 62:11 84:14,15,17
SafetyHouse 29:17
Sam 3:7,20,23 29:17 31:15 35:24 36:17 49:5 52:16 52:17 53:10 67:16 73:8,10 74:11 75:5,17 77:15 78:17 79:16,18

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 647 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 116

80:5,9,15 81:3
87:8,22 91:13
**Sam's** 81:6
**SAMUEL** 1:10
**sanctioned** 12:4
**sat** 67:19
**satisfied** 57:8 63:18
**save** 53:23 99:9
**saw** 41:8 82:13
**saying** 4:20 7:7 8:7
8:23 14:10 33:24
42:6 44:10,11,12
51:4 53:4 68:5
82:3 83:1 84:7,11
85:17,21 86:14
88:12,12 93:5
94:18
**says** 40:19 41:5,6
68:8,11,16,19,23
68:24 73:13 74:8
74:13 77:7 79:18
80:14 89:18 94:2
102:10 104:5
**schedule** 5:9
**school** 16:6 106:15
106:16,18
**scope** 14:20 104:5
**screenshot** 58:13,14
69:10,20 70:8
73:3
**Scully** 2:21 6:21
50:3 56:8,11,23
57:1 61:9,13 64:5
83:1 84:21 90:12
**Scully's** 83:5 85:22
90:2
**se** 81:6
**search** 26:18
**seated** 6:20 10:21
**second** 4:17 5:2 6:2
7:5 10:17 26:10
26:24 41:7,10
42:1 68:11 70:19
71:4,22 75:15
92:20,22 106:4
**section** 26:22
**secure** 60:17
**security** 59:19
**see** 5:24 6:4 9:12
18:12 21:11 34:20
56:10 68:11 71:17
73:16 74:7,16,22
75:3,5,8,9,19 76:6
79:20 80:6 86:16
87:18 88:1,2,21

94:6,7 96:4
**seen** 18:14,15 40:18
45:5 82:10
**sees** 99:8
**SEGALLA** 2:8
**send** 35:22 52:24
54:5 57:4 62:8
82:20
**sending** 75:22 76:2
87:22
**sense** 49:23
**sent** 51:4,24 52:10
52:15,17,20,23
57:20 58:1 62:15
62:18 67:12 72:10
86:21 93:20 103:8
105:5
**separate** 41:5,6 65:8
65:11
**series** 7:1
**served** 18:11
**server** 53:20 55:18
**service** 55:3
**services** 54:20 59:11
**set** 5:12 27:16 55:24
107:7
**Seth** 2:9 6:22
**sets** 65:8,15
**seven** 38:21 68:22
**shaking** 97:24
**shifted** 5:13
**Shlomi** 68:24 73:8
73:10 74:11 75:17
87:22
**Shlomo** 1:10 68:8
69:17 79:16
**short** 50:24
**show** 40:12 41:23
57:5,18 92:7,10
92:13,17
**showing** 93:24 94:9
**shown** 44:14 69:11
**shut** 20:24 21:10
**shutting** 12:16 21:8
21:9
**sick** 20:19,20
**sides** 98:4 99:15
**sign** 28:1 46:2 60:21
60:24
**signed** 48:2 52:20
53:9
**significant** 43:24
76:20 77:1
**silence** 19:10
**similar** 84:24

similarly 84:5
**simply** 21:10
**simultaneous** 24:18
**sit** 100:9
**sitting** 7:6 51:4 54:2
54:19 62:9 97:24
**six** 5:12 68:22,23
96:11
**sixty** 94:4
**slaver@goldbergs...**
2:11
**sleeping** 5:9
**slow** 17:23 48:9 52:4
73:21
**Sokolski** 1:12 2:17
3:16,19 4:3 18:9
18:24 19:13,15,15
19:16,16,18,23
20:4 22:1,2,20
27:15,19 28:6,8
28:12,19,23 29:13
37:7 39:21 40:4
94:5 102:3 103:5
103:18
**Sokolski** 5:12 27:23
**Sokolski.zekaria**
38:9
**Sokolski.zekaria...**
38:14
**somewhat** 60:1
**soon** 32:12 40:16
41:3
**sorry** 7:14 9:21
15:15,21 17:6,22
19:17 26:17 45:17
45:17 46:24 48:8
66:6 67:13,22
75:9 88:24 96:21
98:20 102:24
103:7,22
**sort** 55:5 73:23
**sotto** 75:16 87:5
96:4
**source** 63:6
**southern** 16:16
**speak** 9:22 20:22
32:13 72:6 87:21
92:21 97:10
**speakers** 6:6 7:17
8:16,18,24 9:20
9:23 10:5 13:13
14:9,11 16:14
17:5,21 20:1,5
22:8 24:5 26:6
27:9 28:11 31:1

32:10,14 38:10
41:19 42:20,23
43:2 47:17 48:7
48:10 52:2,6
58:17 66:12,16
72:3 73:15,18,22
74:6 77:20,22
82:21 93:10 94:14
94:20 95:16,22
96:12,19 97:18
98:18 99:6 100:8
106:12,19 107:9
**speaking** 8:22 11:4
11:5 64:17
**specific** 68:21
**speculation** 44:18
**Speeding** 30:15
**spell** 26:1,4 29:22
**spelling** 10:8
**spent** 77:5
**split** 14:22 91:13
**spoke** 8:9 15:2
48:16 55:15
**spoken** 11:7 55:13
**spot** 49:3
**Stacey** 4:7,8 30:11
30:13 31:6,14,20
32:19,21 33:4,14
34:5 35:1,4,13,16
35:20 36:20,23
**stack** 54:3,13
**stake** 83:19
**stamp** 67:11
**standing** 15:12
**stands** 37:4
**Starbucks** 45:6,16
45:20 47:20 48:24
**start** 6:1 8:22 16:5
24:11 74:1 75:13
**started** 5:16 6:17
50:2 55:4 71:4,5
79:15,16,18 88:5
88:13,19 89:6
**starts** 79:8,13 103:9
103:10
**state** 1:17 4:10,18
5:4 15:23,23
37:11 40:24 42:3
107:4
**statement** 51:14
53:17 96:7 97:7
**statements** 98:2,20
99:12
**states** 1:1 104:3
**Stating** 5:2

**Station** 5:14
**stay** 52:8
**Stealing** 40:23
**stenographic** 1:16
**Sternberg** 1:9,9
2:11,12 6:23 24:2
24:3 29:17 43:7
49:12 56:10,13
57:7,19,20,21,24
59:21,22,24 60:1
60:11,15 61:12,18
64:15,16 93:6,24
94:1,5,17,19
95:12
**Sternberg's** 11:12
57:16 81:23 82:2
83:4 94:9
**stones** 45:1 46:1,3,4
48:1,13,17 49:5
**stop** 27:10 39:16
42:17 45:10 68:20
71:4 92:20 93:8,9
98:11 99:21,21
100:1,13,22,22,22
101:20,20 104:24
105:17,18,23
106:5
**story** 50:24
**Street** 2:9 5:2
**strong** 53:17
**studied** 18:15
**subject** 10:24 29:18
34:6
**subsequent** 64:17
65:10 77:10
**subsequently** 96:16
96:17
**sue** 95:12 96:18
**suffering** 7:22
**sufficient** 62:20
**Suffolk** 11:6 12:6
**sugar** 84:1
**suggest** 6:11
**suing** 91:11,17
**Suite** 1:21 2:4,9,15
**sum** 55:23
**summary** 3:10
26:20,21
**supplemental**
104:20
**Supplies** 84:22 85:1
**supposed** 59:11
63:10 65:7,7,13
85:22 86:6
**supposedly** 70:12

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 648 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 117

**sure** 7:2 8:1 10:6 24:17 30:4 44:11 48:3 49:16 51:1 54:18 78:6 86:1,7 86:15
**suspended** 106:22 107:8
**swiping** 50:21
**sworn** 5:3
**System** 26:19

**T**

**T** 1:15,15,15 2:20 3:6 4:1,1,5 107:1 107:1,1
**table** 6:22
**take** 5:22 6:2 8:20 10:1 17:23 19:10 22:6 31:2 42:24 43:14,15 44:7,9 55:2 65:2 69:21 73:20 77:1,3 93:18 94:11 96:20
**taken** 1:16 15:20 16:1,19 17:7,17 45:13 107:6
**talk** 7:7,7,8 12:21 43:23 70:18 71:21 72:2 83:10 100:9 106:2
**talked** 73:7
**talking** 8:19 26:14 39:14 41:4,11 68:13 69:21 83:11 88:8,14 93:11,14
**talks** 4:17 42:2
**task** 63:7
**TATE** 1:20,20
**Taylor** 30:8 31:18 35:4,6,12,20 36:18,23
**teeth** 41:21
**tell** 5:22 7:19 8:10 35:13 36:20,22 37:16 47:13 49:5 59:9 62:10 79:23 93:17 105:8
**telling** 9:2 39:2 82:23 86:11 93:15 95:7
**tells** 9:19
**ten** 19:2 20:17 21:6 42:19 102:4,10
**tenant** 21:1,2,3
**terminating** 22:1

**terms** 30:7 54:20 87:17
**test** 86:1
**testified** 5:5 45:15 45:19
**testifying** 18:20 19:11
**testimony** 99:13 107:6,10
**Texas** 56:24
**text** 3:12 4:6 56:19 69:10 77:7 79:2,3
**texted** 52:21 87:17
**thank** 5:18 6:8,9 10:11 22:16 32:6 32:24 41:24 98:23
**thanks** 75:23 76:5 79:20 83:11
**THESAFETYHO...** 1:5
**they'd** 91:11
**thing** 16:17 69:14
**things** 8:5 11:20 12:16 14:19 30:7 53:23 64:2 71:1 84:4 95:8 98:1
**think** 6:3,10 7:23 8:1 9:2 16:15 19:3 21:13 31:10,12,24 56:4 57:14 58:8 76:24 82:10,14 90:8,22 91:22 96:14 98:15,17,24 99:2,8,15 105:19 106:6,14
**thinking** 71:8
**thirty** 16:8
**thought** 37:4 67:12 70:10 80:20
**thousand** 54:24 56:2 94:4,4
**three** 5:10 55:14 57:14 68:22 89:12 101:23 102:9
**three-point** 88:24
**ticket** 30:14,15,16 30:19
**till** 57:15
**time** 4:7 6:2,7 7:8 8:17,20 9:22 10:2 11:3 17:6,22 18:14 21:12,20 22:17 26:7 28:15 28:15,16 30:3 31:19 32:8,11,13

32:16,21 42:21,22 43:21 48:8 49:22 50:5,22,23 51:2 52:3,5,22 54:5,7 57:12 69:23 73:19 73:20 77:5,16 78:23 86:21 94:21 96:3 98:8,22 99:10,16 106:4
**times** 15:3 55:14,15 97:4,8 98:11,16 99:1,4 106:5
**Timmy** 47:8
**Timothy** 46:9,10 47:15 48:15,18 49:6,7
**title** 41:9 62:24 63:2
**titled** 40:22
**today** 6:1 7:1 10:20 11:9 18:16,18,19 18:21 19:4,11 54:19
**today's** 86:5
**told** 5:20 21:22 34:23 35:1,6,7 36:18 43:14 44:5 44:11,13 48:5,21 60:19 61:16,17,18 62:8 63:1,4,17 72:21,24 81:17 82:15 84:18 85:24 86:8 95:6 96:1,2
**tone** 94:12
**top** 73:13 74:7 79:8 79:13 83:24
**total** 4:20 42:6
**touch** 49:8 55:13
**town** 31:12
**Trading** 26:21
**train** 5:13,20,22
**transaction** 23:2,5 24:15,17,17,19,20 34:11 59:14,15 60:3,12 63:15,22 64:13 81:3 90:18 91:4,10 95:12,24
**transactions** 4:21 29:17 34:6 42:7
**transcribe** 7:6
**transcribed** 69:11 107:10
**transcript** 32:12 70:14 79:2 96:22 99:9 100:17 101:2 107:6

**transcription** 67:6 67:14
**transfer** 80:10 94:8
**transferred** 49:10
**transfers** 4:22 42:8
**transpiring** 22:18
**travel** 5:13
**tray** 54:6
**trouble** 27:16 70:6
**truck** 56:14,22 57:5 57:6 58:1 59:18 59:19 60:18 61:1 61:19,20,23 62:5 62:13,15,17,20,22 62:24 63:2,5,6,9 63:18 81:24 83:3 83:22 86:8,15,20 86:22 95:9
**true** 13:10,18,23 18:8 42:15 51:14 81:4,9 107:5
**truth** 86:12
**truthfully** 7:9
**try** 12:5
**trying** 31:10 43:19 50:13 68:6 73:24 92:22
**Tuesday** 1:18
**turn** 85:14
**twelve** 102:19,20,22 102:24 103:3
**twenty** 33:15
**two** 12:18,21 21:11 21:11 40:19,22 55:14 57:14 67:1 68:22 71:7 77:5 85:20 87:21 88:7 89:10,14 90:15 95:7 96:11 102:4

**U**

**U** 1:15 4:1,5
**Uber** 5:23
**ultimately** 90:8
**unable** 107:4
**uncertain** 22:6
**understand** 7:2 11:21 33:11 61:22 67:8
**understanding** 34:16 55:10 60:15 64:12 74:19 83:18 84:17 90:12
**understood** 10:17 34:15 41:3 63:7

81:2
**unduly** 104:4
**unfortunately** 64:6
**UNITED** 1:1
**unpunished** 49:2
**unquote** 94:22
**unreportable** 96:24 107:7
**unsure** 22:5
**use** 50:22 55:6 57:9

**V**

**Valente** 41:6
**verbally** 7:5
**verification's** 103:7
**verified** 102:7
**version** 9:11 12:17
**versus** 26:20 54:8 106:15
**victim** 84:14,22,23
**victims** 84:5,7,15
**violation** 30:17
**voce** 75:16 87:5 96:4
**voice** 93:15 94:11,13
**VRC** 84:22 85:1,4
**vs** 1:7

**W**

**wait** 17:11 19:7 20:6 39:14,16,22 68:13 75:9,10 92:8,18 93:1,7
**waited** 64:1
**waiting** 64:22 68:9 69:19 75:7,12,18 97:22
**waived** 25:2
**waivers** 11:21
**waiving** 90:19
**wake** 5:10,11
**walk** 12:4
**want** 6:8 11:17 12:5 15:6 29:3 36:6,13 41:12 43:23 49:20 55:6 56:20 59:5 64:10,20 71:24 72:1 84:14 87:11 95:23 98:21 99:12 99:17
**wanted** 5:7,15,21 6:9,11 11:10 37:3 60:3,4,6,10 64:7,8
**wants** 22:6 56:21 98:1
**warning** 73:24

Case 2:22-cv-00688-JMY   Document 201-1   Filed 10/01/24   Page 649 of 749

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)   Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 118

**warnings** 107:10
**wasn't** 20:14 54:4 55:2 60:21 63:9 80:16 86:8,15 105:7
**watch** 37:3,5
**watched** 67:20
**way** 6:16 48:14 53:22 58:20 71:4 71:5,6 75:11,11
**ways** 42:19
**we'll** 6:4 36:10 53:2 59:7 66:21
**we're** 11:22 15:5 23:17,19 43:3 52:19 63:17 66:5 70:22 92:21 97:12 97:19 98:3 99:16
**we've** 12:14 29:8 106:17
**website** 39:8,12,17 40:3
**week** 54:16
**weeks** 12:18 21:11
**weird** 20:3
**Weiss** 1:11 2:22 6:23 11:22 14:21 23:3,4,11,16,19 24:9,12,14,16 25:8,11,15,22 26:1,4,9 29:16 33:5 36:2,3,14 44:8 45:15,19 47:12,15,20 48:5 48:22 49:11 52:11 53:7,9 56:18 57:4 57:10,11,16 58:4 59:17 60:5,16,16 61:21,24 62:14,15 62:24 63:1,18,20 64:20 65:20 67:15 74:18,21 75:5,21 76:10 78:19,20,21 79:16,18 80:3,6 80:18 81:9,10,17 81:20 83:2,9,21 84:19 85:19 87:7 90:11 91:19 101:9 101:21
**Weiss's** 23:9 80:19 80:22
**went** 11:11,18,24 12:13 14:20,23 37:22 94:24 95:2
**weren't** 23:20,23

24:2,7 62:23 84:20,20 97:21 106:10
**WhatsApp** 3:11 52:21,24 67:15 72:11 75:1 79:2
**whipped** 84:1
**wife** 31:15,18
**willing** 12:12 49:21
**wind** 43:15
**winner** 4:18 40:24 42:3
**winnings** 4:19 42:4
**wire** 52:22 74:20 75:1 76:9 92:1 94:8,9,19 95:6,11 96:1,1,3
**wired** 43:7 44:19 49:12 64:21 85:11 85:14 92:2 94:5 94:17
**wires** 44:13,14,15 44:21 53:3
**wiring** 80:13
**wish** 44:3 76:17
**withdraw** 20:4
**Withdrawn** 43:13
**withdrew** 19:2
**withhold** 4:18 42:4
**witness** 3:2 5:7 6:3,5 6:9 8:12 10:3 16:15 20:8 25:18 30:23 33:10 42:18 59:1,5 66:13 70:20 74:3 79:7 92:12 93:1,11,14 95:5 96:10 98:7 99:5,19,24 100:4 100:7,12,21 101:19 104:23 105:1,3,16,19,22 106:1
**woke** 5:12
**woman** 47:22,24 48:12
**word** 55:6
**words** 17:10 52:22 56:5 57:9 65:17 69:9,23 70:1,4 84:10 89:5,7
**work** 11:16 17:15 21:6 28:16 49:4 98:10
**worked** 21:5 48:19
**working** 20:14

22:20 29:13 77:11 96:22
**works** 17:8 95:11
**worry** 59:6
**wouldn't** 55:6 57:7 57:13 60:14,20 63:24 64:7,10,18 67:17
**wound** 44:5 76:13 76:21
**write** 34:23 35:1,6,7 35:13,19 76:1 80:12 87:14,20,21 88:16,17 89:3,13 89:22 90:15,21 91:3
**writes** 75:17,21 80:3 87:7,20
**writing** 69:18 77:6 77:17 78:2 82:18 95:10,11,23
**written** 35:9,16 95:18 96:3 102:12
**wrong** 31:13 72:13 72:13
**wrote** 74:18,19,19 74:24,24 75:6 76:4,4,5 82:12 87:9 88:3,20 89:4 89:8,10,17,19 91:4,6
**www.tate-tate.com** 1:23

**X**

**X** 3:1,6

**Y**

**yeah** 12:20 15:8,22 16:9,9,21 29:12 51:9,23 54:15 58:6 61:7 65:1,17 73:6,17 74:12,12 74:12 75:16 76:3 79:12,15 81:15 84:1 85:10 87:12 87:19 89:6 90:1 90:19 93:4 95:5 96:14 99:17 100:20 106:9,17
**year** 20:12,13,15,16
**years** 16:3,10,12,19 19:2 20:17 21:6 21:11 27:17,20,20 28:24 38:21 46:22

**yelling** 94:12
**York** 4:18 15:14 26:19 30:5 42:3
**Younge** 98:6,8 99:18 104:18
**Younge's** 3:13 97:14 101:24 102:9 104:16,22
**Yup** 38:16 40:9

**Z**

**Z** 5:1
**Zekaria** 1:8,12,12 2:17,18 3:3,15,16 3:18,19 18:3,7,9 18:10 19:13 22:2 22:20 27:19 28:19 29:13 39:21 40:4 40:17 65:6 67:5 68:8 71:12,17 72:17 78:17 102:3 102:3,6,11,17 103:4,5,10,17,18 104:2,9,14 106:5
**Zekaria000001** 67:5
**Zekaria000011** 67:11

**0**

**08053** 1:22

**1**

**1** 3:14 4:9,16 18:3,7 29:2 32:22 33:15 71:12,17 72:17 102:1
**1.9** 79:19 81:6,10,16 81:19 87:8 96:16
**1:03** 90:15 96:13
**10** 4:15 66:22 69:24
**10:58** 87:14 88:16
**100** 3:13
**101** 3:15,18
**103** 96:9,9
**11** 4:4,10 68:8 87:24 100:23
**11743** 5:3
**12** 100:23 101:16 104:23
**12:07** 1:18 6:17
**120** 76:10,22 77:5,6 77:8 78:3
**120,000** 78:11
**13** 101:16 104:23
**130** 68:10 69:19

75:2,7,19,22 76:2 76:10,19,21 77:5
**130,000** 74:21
**14** 4:8,12
**1418** 2:9
**15th** 76:9 78:4
**16** 4:3 57:19
**17** 4:13 16:10
**1700** 2:9
**18** 3:8 16:10
**19** 4:7 92:16 94:1
**19103-3907** 2:10
**19422** 2:4,16
**1997** 15:11
**1st** 102:5,9 104:16

**2**

**2** 27:13 40:17 68:16 71:12,17
**2.4** 85:11
**2/15** 68:23
**2/4** 88:12
**2:22-CV-0688** 1:2
**2:23** 106:22
**20** 16:12
**201** 2:15
**2019** 21:3
**2022** 4:9 22:7,17 29:2,14 32:22 33:15
**2024** 1:18 3:14 18:12 102:1 103:20
**21** 4:3
**215** 2:5
**23** 4:14
**230,000** 4:20 42:6
**25** 3:10 27:17
**250** 75:2 76:9
**250,000** 74:20
**250K** 68:9 69:18 75:6,18
**267** 2:10 5:2
**27** 16:19 27:20
**29** 103:7,20 104:15
**2nd** 1:18

**3**

**3** 66:19 71:14,17
**3:37** 68:12 69:17 74:13,24
**3:37:39** 68:23
**30** 16:3,4 27:20
**30th** 103:8,20 104:15

USDC, ED of PA          American Environmental Ent. v. Manfred Sternberg, Esq., et al.          Tuesday
No. 2:22-CV-0688 (JMY)  Deposition of Daphna Zekaria - UNCERTIFIED TRANSCRIPT          April 2, 2024

Page 119

**30XI00243600**
   107:17
**31** 4:7
**33** 4:8
**344-5340** 2:16
**35** 36:4,10,13,16
   80:4,9,15 81:7
   87:8 88:24
**37** 4:10,12 78:9
**38** 4:13,14

---
**4**

**4** 66:20 67:5 71:16
   71:17
**4:54** 79:18
**40** 3:9 4:15
**400** 2:4
**402-9872** 47:6
**42** 4:16
**470** 2:15
**4747** 26:8,20
**484** 2:16
**4th** 79:14 80:3
   87:10 88:4,9
   89:16 93:20 94:3
   94:10,18

---
**5**

**5** 71:16,17 72:19
**5,000** 49:17
**5:02** 80:3
**5:16** 87:10
**50** 16:24
**516** 47:6
**519-6800** 2:10
**58** 4:4

---
**6**

**6** 3:3
**600** 2:4
**636-8283** 1:22
**65** 36:4,14 79:19
   80:5,14 87:9 89:1
**65-30** 36:10
**65-35** 14:22 91:13
**66** 3:11,12
**6th** 87:14 88:7 89:3
   89:13 90:16 92:2
   96:13

---
**7**

**7:30** 5:19
**711** 1:18
**73** 1:21
**760-3000** 2:5

---
**8**

**8** 66:6
**800** 1:22
**825** 1:21
**856** 1:22
**8th** 18:12

---
**9**

**9** 66:5,22 69:24
**95** 22:24
**96** 16:6
**97** 16:7 37:8
**983-8484** 1:22

# EXHIBIT N

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**



Joseph Ross | Associate
Direct 609-986-1370 | jross@goldbergsegalla.com

August 16, 2024

*Via Email:  garylightman@lightmanlaw.com*
Gary P. Lightman, Esquire
Lightman & Manochi
156 Inverness Drive
Blue Bill, PA  19422

**Re:**   **American Environmental Enterprises, Inc., d/b/a THESAFETYHOUSE.COM v. Manfred Sternberg, Esquire and Manfred Sternberg & Associates, PC, and Charlton Holdings Group, LLC, and Samuel Gross**
**US District Court for the Eastern District of PA  2:22-cv-00688**
**GS File No.:  8925.0007**

Dear Mr. Lightman:

This letter and accompanying enclosures supplement the Rule 26(a) disclosures of our clients, defendants Manfred Sternberg, Esquire and Manfred Sternberg & Associates, PC ("Sternberg Defendants"). Specifically, with respect to Rule 26(a)(2), *Disclosure of Expert Testimony,* you will find:

- Report and CV of Joseph W. Lesovitz, CPA/ABV/CFF, CFA, CFE; and
- Report and CV of Steven E. Angstreich, Esquire.

Very truly yours,

**GOLDBERG SEGALLA LLP**

*Joseph Ross*
Joseph Ross

**OFFICE LOCATION** 1700 Market Street, Suite 1418, Philadelphia, PA 19103-3907  |  **PHONE** 267-519-6800  |  **FAX** 267-519-6801  |  **www.goldbergsegalla.com**
CALIFORNIA | CONNECTICUT | FLORIDA | ILLINOIS | NEW JERSEY | NEW YORK | NORTH CAROLINA | MARYLAND | MISSOURI | PENNSYLVANIA
IMANAGE\8925\0007\40687942.v1-5/23/24

# EXHIBIT O

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**



1339 CHESTNUT STREET • SUITE 500

PHILADELPHIA, PA 19107

(215) 665-8181

(215) 665-8464 FAX

WGPLLP.com

Steven E. Angstreich                                                          Direct Dial (215) 241-7741
Member of PA and NJ Bars                                          E-mail: sangstreich@wgpllp.com

August 16, 2024

Seth L. Laver, Esquire
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103

Re: American Environmental Enterprises, Inc. d/b/a The SafetyHouse.Com v. Manfred
Sternberg, Esquire and Manfred Sternberg & Associates, PC et al

Dear Mr. Laver:

You have requested that I provide you with an opinion as to whether Manfred Sternberg,
Esquire and his law firm Manfred Sternberg & Associates, P.C. owed any duty to American
Environmental Enterprises, Inc. d/b/a The Safety House.Com ("Plaintiff" or "Purchaser"), and if
so, whether they breached that duty. In order to resolve those questions, I reviewed the following
documents:

- First Amended Complaint, dated July 31, 2023;
- Answer of Defendants Manfred Sternberg, Esq. and Manfred Sternberg &
  Associates, PC to Plaintiff's Amended Complaint and Crossclaims against all Co-
  Defendants, dated August 23, 2023;
- Plaintiff's Objections and Responses to Defendants Charleton Holdings Group and
  Sam Gross' First Set of Interrogatories;
- Plaintiff's Objections and Responses to Defendants' Manfred Sternberg, Esquire'
  and Manfred Sternberg & Associates, P.C.'s First Set of Interrogatories;
- Answers and Objections of Defendants Manfred Sternberg, Esquire and Manfred
  Sternberg & Associates, P.C. to Plaintiff's Interrogatories with Supplemental
  Response;
- Manfred Sternberg Deposition dated February 7, 2024, and exhibits Sternberg 1-
  Sternberg 39;

Seth L. Laver, Esquire
August 16, 2024
P a g e | **2**

- Gary Weiss Deposition dated February 16, 2024, and exhibits and dated July 16, 2024 and Exhibits referenced;
- Daniel Scully Deposition dated July 23, 2024 and exhibits;
- P0001-P0592 produced by Plaintiff in discovery;
- Engagement Letter dated April 5, 2021 between Mr. Sternberg  and Charlton Holdings Group, LLC and Gross; and
- Sternberg: Phone Text Forensic Search spreadsheet.

## **INTRODUCTION**

From my review, Sternberg's client, Charlton Holdings Group, LLC ("Charlton") entered into a sale transaction with the Plaintiff in which Plaintiff agreed to purchase Covid test kits from Charlton and its principal Shlomo "Sam" Gross. Pursuant to the Sale and Purchase Agreement, the purchase funds were to be wired to the Seller's law firm's IOLTA account. Sternberg's IOLTA account received the funds and, at the direction of his client, Charlton, the funds were released to the supplier of the product to Plaintiff. You have asked me to determine whether Sternberg and the law firm owed any duty to Plaintiff and if so, whether they breached that duty by releasing the funds from the IOLTA account before the product was delivered to Plaintiff, the buyer.

Based upon that review, and in particular Sternberg's engagement letter, the Declaration of Mr. Gross (Exhibit F to Exhibit 6), the transactional documents relating to Plaintiff's purchase of product, deposition testimony and the absence of a written escrow agreement between Sternberg, his law firm and the Plaintiff, it is my opinion that (i) no duty arose as a result of the law firm's receipt in its IOLTA account of the purchase funds and (ii) neither Sternberg nor the law firm breached  any duty owing to Plaintiff when the funds were released.

The opinions expressed herein are to a reasonable degree of legal certainty. My opinions are subject to change or modification should additional documents or facts become available for

Seth L. Laver, Esquire
August 16, 2024
P a g e | **3**

review. The opinions are based upon my understanding of the facts as applied to the transaction at issue- the obligations of an attorney to follow his client's instructions to release funds held in his law firm's IOLTA account in the absence of any signed agreement imposing duties to act as an escrow agent. My opinions are further based upon the knowledge gained from my education, work experience and continued legal education. I was admitted to practice in the Commonwealth of Pennsylvania in 1970 and have been primarily engaged in the handling of complex commercial litigation for more than 53 years. For over 35 years, I have been handling legal malpractice actions, primarily for plaintiffs and have been retained as an expert for both plaintiffs and defendants during that time. I have lectured for the Philadelphia Bar Association, Pennsylvania Bar Institute, American Bar Association, National Institute Section on Tort and Insurance Practice and for NJICLE.

I am being compensated at my regular hourly rate of $625. I have no financial interest in the outcome of this litigation and payment for my time is not contingent. A current curriculum vitae is attached.

## **BACKGROUND FACTS**

On April 5, 2021, Sam Gross, on behalf of Charlton retained Sternberg and his law firm to provide legal representation on various PPE transactions, escrow services, strategic counsel and other matters as specifically directed by the client. (*See* Engagement Letter) Sternberg and his firm were to be compensated at their prevailing rates at the time(s) services were provided and to be reimbursed for all reasonable expenses incurred in such matters as retained. Monthly billings were to be submitted to the client.

Seth L. Laver, Esquire
August 16, 2024
P a g e | **4**

One of the matters for which Sternberg was retained was the sale by Charlton to Plaintiff of 151,200 iHealth Covid Test Kits ("Test Kits") in January 2022. As part of his engagement, Sternberg drafted the Sale and Purchase Agreement ("SPA") for the Test Kits to be sold to Plaintiff. Pursuant to that SPA, Plaintiff, as purchaser, was to wire to Charlton's [Seller's] Attorney Trust Account the sum of $1,965,600.00 in payment for the product. Upon receipt of the funds, risk of loss transferred to the Plaintiff (Buyer) [and the title transfer shall happen contemporaneously with the funds being released to Seller]. According to the Gross Declaration, Gross had inspected the product that he was reselling to Plaintiff with his supplier, Gary Weiss, prior to instructing his attorney, Sternberg, to release the funds to Weiss. Following inspection and confirmation of the product, Gross directed Sternberg to release the funds.

Specifically, after Plaintiff initiated the purchase of the Test Kits by issuing a purchase order to Charlton, Sternberg provided wire instructions to his IOLTA Trust Account. (*See* Exhibit "B" to Plaintiff's Complaint) Plaintiff thereafter wired the purchase funds to the IOLTA Trust Account as was required by the SPA. (*See* Exhibit "C" to Plaintiff's Complaint)  Once Plaintiff wired the funds to the law firm's IOLTA Trust Account, Sternberg, at his client's instructions, released the funds to Charlton's supplier, Gary Weiss ("Weiss") so that the product could then be shipped by Weiss to Plaintiff. However, when the product was not received by Plaintiff, Plaintiff attempted to rescind the transaction, requesting a return of the funds. As the funds had already been released at the direction of Charlton and in accordance with Sternberg's understanding of the SPA, Sternberg was in no position to return Plaintiff's funds without input from Weiss and/or Gross. Further, Charlton attempted delivery of a portion of the Test Kits ordered but Plaintiff refused to accept delivery.

4

Seth L. Laver, Esquire
August 16, 2024
P a g e | **5**

Plaintiff seeks to hold Sternberg and his firm liable despite no attorney-client relationship and no contractual duty.  Apparently, Plaintiff's claim is based upon Sternberg's release of the purchase funds deposited into his IOLTA Trust Account which Plaintiff contends is a breach of some duty or obligation that Sternberg owed to Plaintiff *vis-à-vis* the purchase monies. The SPA states that it is to be governed by the laws of the State of Texas (¶ 13). It also provides that venue is to be exclusively in the Texas State District Courts of Harris County, Texas or other Seller designated venue. The present action is pending in the United States District Court for the Eastern District of Pennsylvania. Since venue is not as provided in the SPA, I am not certain whether the law of Texas or the Commonwealth of Pennsylvania will be applied in this case. Consequently, I have reviewed the law of both jurisdictions in rendering my opinions.

<u>**APPLICABLE LEGAL STANDARD**</u>

The question presented is whether Sternberg and his law firm breached any duty, contractual or otherwise owing to the Plaintiff for which they are liable.

**1.** <u>**Duty Arising Out of Attorney-Client Relationship**</u>

Plaintiff's principal, Daniel Scully was recently deposed. During his deposition, he acknowledged – as he must - that Sternberg was not engaged to represent Plaintiff as its legal counsel in connection with the SPA, that he never received a bill from Sternberg and never paid a fee to him. The fact that Sternberg was not acting as counsel for Plaintiff is further confirmed by Scully's statement to that effect he made to Gary Weiss. (Weiss Dep. at 92:9-18)

Thus, Sternberg's role in the transaction at issue was as attorney for the seller, Charlton. (*See* Engagement Letter and Gross Declaration.) While Scully admitted that he did not retain any

Seth L. Laver, Esquire
August 16, 2024
P a g e | **6**

attorney to review the contract for the purchase of the Test Kits on Plaintiff's behalf, during his

deposition he attempted to portray Sternberg as Plaintiff's counsel;

> Q: Was he [Sternberg] representing you?
> A: As escrow agent.
>         ****
> Q: Did any attorney on behalf of the Safety House House,…, review the
> sale and purchase agreement?
> A: No.
> Q: Why not?
> A: Because I had Manfred Sternberg. (Scully Dep. 57:3-12)

He conceded that there is no document that describes Sternberg or his law firm as having that role

for anyone other than the seller. It is my opinion that, in the absence of an express attorney-client

relationship, Sternberg owed no duty to Plaintiff.

Although no duty arose from an attorney-client relationship, both Pennsylvania and Texas

case law recognizes that an attorney can be liable to a non-client where he makes an affirmative

representation to the non-client that is untrue and the non-client relies on it to its detriment. Here

again, Scully testified that Sternberg fraudulently induced him to enter into the SPA because he

was "acting as this professional attorney with this agreement to sign." (Scully Dep. 57:14-17)

However, for liability to exist under this theory, there must be an affirmative representation made

by the attorney to the non-client. Here, Scully admits that he never spoke with Sternberg prior to

executing the SPA and there was no writing provided to him by Sternberg other than the SPA.

Scully acknowledges that the SPA was not sent to him by Sternberg but by the Seller's agent.

Even assuming the SPA were sent by Sternberg, a review of the SPA reveals that Sternberg

is not a signatory or named party to the agreement, and that the only possible reference to him is

found in Exhibit B to the SPA following "Buyer agrees to authorize a wire be made to Seller

through Seller's Attorney Escrow Account identified in Exhibit B…." (SPA ¶ 4). Neither in

6

Seth L. Laver, Esquire
August 16, 2024
P a g e | **7**

paragraph 4 nor in Exhibit B is there any affirmative representation made by Sternberg upon which Plaintiff could rely and which was false at the time made.

It is well-settled that an attorney's duty is to his or her own client, so an attorney owes no fiduciary duty to parties with whom he does not have any attorney-client relationship.[1] *Burns v. Stratos*, 581 F. Supp. 3d 687 (E.D. Pa. 2022), *aff'd*, No. 22-1319, 2023 WL 4014474 (3d Cir. June 15, 2023); *Smith v. Griffiths*, 327 Pa. Super. 418, 426 476 A.2d 22 (1984) ("the law is clear that the attorney owes no duty of care to the adverse party but only to his own client.") Further,

> To impose upon an attorney a duty of care to the adverse party would place the attorney in a position where his own interest would conflict with the interests of his client and prevent him from exerting a maximum effort on behalf of the client. It would place an undue burden on the profession and would diminish the quality of the legal services rendered to and received by the client.

*Smith* at 426-27.

However, Restatement of the Law Third Governing Lawyers provides in Section 51 that a lawyer owes a duty of due care to a non-client when and to the extent that: (a) the lawyer or the lawyer's client invites the non-client to rely on the lawyer's opinion or the provision of other legal services and the non-client relies thereon or if the lawyer knows that his client intends that the lawyer's services is also for the benefit of the non-client. That principle has been upheld in *Motorup Corp. v. Galland, Kharasch & Garfinkle*, P.C. 2001 WL 34368760 (E.D.Pa.) citing *Harad v. The Aetna Casualty and Surety Co.*, 839 F.2d 979, 983 n.5 (3d Cir. 1988).

In Texas, the courts have developed a comprehensive affirmative defense protecting attorneys from liability to non-clients. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex.

---

[1] With the exception of duties to a third party beneficiary as in *Guy v. Liederbach* which are not applicable here.

Seth L. Laver, Esquire
August 16, 2024
P a g e | **8**

2015). "[A]n attorney is immune from liability to nonclients for conduct within the scope of his representation of his clients." *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) (citing *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015)). "Put differently, an attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer." *Id.* (citing *Cantey* at 481)

Further, an attorney can be liable to a non-party for misrepresentations, despite an absence of privity, but only in limited circumstances. First, the attorney must have made a knowing false representation. The mere drafting and transmission of the SPA did not constitute a representation by Sternberg. *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571 (Tex.App. 2007) Further, the attorney must be aware of the non-client's reliance on the misrepresentation and the attorney's intention that the non-client so rely. There is no testimony from Scully to support such a conclusion. *Id.*

Second, the non-client must have relied upon the false representation. To determine whether a non-client justifiably relied on a material fact, one must consider the nature of the relationship between the attorney, client, and non-client. Reliance is generally not justified when the representation takes place in an adversarial context. Thus, an attorney's conduct is not independently actionable by an opposing party to the suit if the conduct is part of the discharge of the lawyer's duties in representing his or her client. An attorney is not, however, shielded from liability when his actions constitute a fraudulent act outside the scope of his client's legal representation.

Any fraud claim must be based on a knowing falsity or recklessness as to whether it is true or false. Generally, an attorney may rely upon facts as provided by his client rather than conducting

Seth L. Laver, Esquire
August 16, 2024
P a g e | **9**

an independent investigation of those facts. A reasonably prudent counsel is entitled to rely on the

representations of his client. *See, e.g., Reis v. Barley, Snyder, Senft & Cohen LLC*, 667 F.Supp.2d

471, 489 (E.D. Pa. 2009) ("An attorney is entitled to rely in good faith upon the statement of facts

made to him by his client, and is not under a duty to institute an inquiry for the purpose of verifying

his statement before giving advice thereon.")

The law is well established that "an attorney is entitled to rely in good faith upon the

statement of facts made to him by his client, and is not under a duty to institute an inquiry for the

purpose of verifying his statement before giving advice thereon." 52 Am.Jur.2d Malicious

Prosecution § 64 (1970). If the client falsifies the facts, there may be a liability which attaches to

the client, but the lawyer is not liable if, without more, he acts in good faith upon the facts stated

by the client. *Meiksin v. Howard Hanna Co.*, 404 Pa. Super. 417, 424, 590 A.2d 1303, 1306 (1991)

Here, Plaintiff cannot point to any representation made by Sternberg directly to Plaintiff.

The SPA, although drafted by Sternberg, contains only the express representations of the Seller.

Plaintiff, therefore, could not have relied on any representation made by Sternberg and  under

either state's law, it is my opinion that there was no duty owing to Plaintiff that arose out of

Sternberg and his firm's representation of Charlton or from any "misrepresentation" that he

allegedly made to Plaintiff. Thus, the release by Sternberg of the funds from the law firm's IOLTA

account at the direction his client did not constitute a breach of duty or impose liability on

Sternberg or his firm.

2.        **Duty Arising from Acting as "Escrow Agent"**

Turning from liability predicated upon an attorney-client relationship express or implied,

a duty to Plaintiff *could* arise from the receipt of the purchase funds in Sternberg's law firm's

Seth L. Laver, Esquire
August 16, 2024
P a g e | **10**

IOLTA account *if* at the time the deposit was made, Sternberg (and/or the law firm) was acting as an escrow agent.

Throughout Scully's deposition, he repeatedly testified that Sternberg was acting as an escrow agent and that as such, he owed a duty to both Charlton *and* Plaintiff. Although there is no formal escrow agreement, Plaintiff claims that the SPA was the escrow agreement. (Scully Dep. at 60:23-24) Further, he claims that Sternberg as escrow agent was holding the funds for both Plaintiff and Charlton. (*Id*. 76:17-77:6) He testified that Sternberg's role was to hold the money until the product was received. (*Id*. 125:20-24). I disagree.

While that is Scully's testimony, it is not supported by any provision of the SPA. Rather, the SPA has no provision identifying an escrow agent or stating what duty, if any, is owed by that agent to the buyer or seller. The SPA is not signed by Sternberg in any capacity. And, of significance is ¶ 9 of the SPA which provides that the risk of loss transferred to the buyer when the product was paid for and, at which time, the seller was released from all loss guarantees. Despite those facts, Scully insists that Sternberg was the escrow agent.

Although Scully had the agreement at least a week before he wired the funds and read ¶ 9, he testified he was baffled by the provisions and the term "risk of loss" but did not seek clarification or consult with an attorney of his choosing. This was Plaintiff's largest transaction to date, and was in the midst of his admittedly desperate attempt to locate test kits, yet he executed the transaction without independent evaluation or expected due diligence. His alleged lack of understanding of the express language of ¶ 9 at the time he wired the funds does not offer Plaintiff relief from the legal import of that language.

Seth L. Laver, Esquire
August 16, 2024
P a g e | **11**

Pennsylvania law makes clear that an escrow agent "is generally considered to be an agent (or trustee) for both parties—a special agency whose authority must be strictly construed, and who is bound by the terms of the escrow agreement." *McCloskey v. Talarico,* 276 A.3d 247, *3 (Pa. Super. Ct.), *appeal denied sub nom. William C. McCloskey, Fam. Ltd. P'ship v. Talarico,* 285 A.3d 597 (Pa. 2022) (citing *Janson v. Cozen & O'Connor,* 450, Pa. Super. 415, 424, 676 A.2d 242, 247 (Pa. Super. 1996) (citations omitted)).

An escrow agent's fiduciary duties arise pursuant to an escrow agreement, and courts do not find a breach of fiduciary duty where **no** valid escrow agreement exists. *Symphony FS Ltd. v. Thompson,* 2018 WL 6715894, *13 (E.D. Pa. Dec. 20, 2018); *Struck v. Binns,* 1995 WL 5748, *3 (E.D. Pa. Feb. 10, 1995) (an escrow agent's powers "are strictly limited to those stipulated in the escrow agreement"). It is impossible to determine the scope of the [fiduciary] duty [owed by an escrow agent] without some indication of the terms of the escrow agreement. *McCloskey* at 3. To establish the existence of an escrow relationship, a plaintiff must establish that an agreement existed between the parties, i.e., the buyer and seller, the conditions of which were communicated to the depositary (escrow agent), who accepted its terms and agreed to be bound by them. *Struck* at *3 (citing Pennsylvania state law). A depositary without knowledge of an escrow agreement has no duty to conform to its terms. *Struck* at *4.

Under some limited circumstances, however, an agent or attorney of one of the parties may act as the escrow holder. *Janson,* at 424. An attorney of the grantor may act as escrow agent as long as the attorney's duties as escrow holder do not conflict with their duties to their client and so long as the condition of the escrow is not made dependent upon the client's volition. *Id.* at 426. However, "as a general rule, an instrument or funds cannot be deposited as an escrow with an

Seth L. Laver, Esquire
August 16, 2024
P a g e | **12**

agent or attorney of the grantor or obligor, because the possession of the instrument by such agent or attorney is equivalent to possession of it by the grantor or obligor and is revocable by him." *Id.* at 425. Therefore, under Pennsylvania law, in the absence of a written escrow agreement, no duty arose.

Texas law is consistent with the above. An attorney for one party to a transaction may be appointed as the escrow agent for the transaction. *See Jones v. Blume*, 196 S.W.3d 440, 448 (Tex. App. 2006); *see also Chapman Children's Tr. v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 438 (Tex. App. 2000). "In Texas, an escrow agent is appointed through a specific written instrument which imparts a legal obligation." *Chapman Children's Tr.* at 438. Absent such a written agreement specifying the appointment of a particular party as an escrow agent, courts will find no duty to act as an escrow agent. *Id.*; *Jones* at 448 ("An escrow agent must be appointed through a specific legal document that imparts a specific legal obligation.").

Despite Scully's tortuous construction of the SPA in his effort to make Sternberg the parties' escrow agent, the SPA does not name Sternberg as escrow agent, it is silent as to any duties or obligations placed upon Sternberg, and Sternberg never signed the SPA or voluntarily agreed to act in the capacity of an escrow agent. Consistent with the above referenced law, in the absence of a written and signed escrow agreement imposing duties upon the agent, Sternberg owed no duty to Plaintiff. Thus, when he followed his client's direction and wired the funds from his attorney IOLTA Trust Account to the supplier of the goods that were to be shipped to Plaintiff, Sternberg owed no duty to Plaintiff, only to his client.

The facts in *Janson v. Cozen & O'Connor, supra* are analogous to the facts here. Defendant's attorney was holding in his attorney trust account proceeds from the sale of the

Seth L. Laver, Esquire
August 16, 2024
P a g e | **13**

plaintiff's stock which, according to the attorney was to be turned over to plaintiff at the conclusion of the litigation. Although acknowledging the purpose of the funds and his holding in his attorney trust account, there was no signed agreement between the attorney, his client and plaintiff imposing any specific duty on him. When the attorney, at the direction of his client, turned the funds over to his client (and not plaintiff), the court held that, in the absence of a written agreement, the attorney owed no duty to plaintiff and was not liable to her for releasing the funds contrary to her expectations. Similarly, it is my opinion that Sternberg owed no duty to Plaintiff arising out of the SPA or any other document.

## **CONCLUSION**

Based upon the foregoing, it is my opinion to a reasonable degree of legal certainty that neither Mr. Sternberg nor the law firm breached any duty to Plaintiff, and neither is liable to Plaintiff for the loss of the funds.

Very truly yours,

Steven E. Angstreich

SEA/ey

## **CURRICULUM VITAE**

**NAME**:                              STEVEN E. ANGSTREICH, ESQUIRE

**ADDRESS:**                         1212 Heron Road
                                           Cherry Hill, New Jersey 08002
                                           (609) 429-5121

**BIRTH:**                             August 29, 1945
                                           Bronx, New York

**MARITAL STATUS**:            Married, 3 children, six grandchildren

**EDUCATION:**                     **UNIVERSITY OF PENNSYLVANIA**
                                           Wharton School    1967
                                           B.S. Economics

                                           **TEMPLE UNIVERSITY**
                                           School of Law        1970
                                           Juris Doctor

**PROFESSIONAL**
**EXPERIENCE:**
                                           **WEIR GREENBLATT PIERCE LLP**
                                           Philadelphia, Pennsylvania, January, 2022
                                           Partner

                                           **WEIR & PARTNERS LLP**
                                           Philadelphia, Pennsylvania, January, 2009
                                           Partner

                                           **LEVY, ANGSTREICH, FINNEY, BALDANTE,**
                                           **RUBENSTEIN & COREN, P.C.**
                                           Philadelphia, Pennsylvania, 1974-2008
                                           Shareholder

                                           **MANN & UNGAR**
                                           Philadelphia, Pennsylvania, 1971-1974
                                           Associate

                                           **GOODIS, GREENFIELD, NARIN & MANN**
                                           Philadelphia, Pennsylvania, 1970-1971

**MEMBER:**                        Admitted to practice in Pennsylvania in 1970 and in New Jersey in 1979

                                           American Bar Association, Pennsylvania Bar Association, Philadelphia
                                           Bar Association, Camden County Bar Association, New Jersey State Bar
                                           Association, Philadelphia Trial Lawyers

                                           Drafted Civil Litigation Manual - Philadelphia Bar Young Lawyers

325639-1

Section and lectured from 1971 through 1974.   Lectured on Civil Practice and Procedure.

Faculty Member and author of "The Liability of Predecessor or Successor Counsel", "Limitations of Actions and The Prematurity Defense" and "Screening A Case for Plaintiff" for the Philadelphia Bar Institute Continuing Legal Education:  "Litigating the Legal Malpractice Case" (1986); 1997 Pennsylvania Bar Institute, course planner and faculty member for the "Litigating the Legal Malpractice Case"; Faculty Member and author of "Anatomy of A Legal Malpractice Case" for the Pennsylvania Bar Institute Continuing Legal Education "Anatomy of The Legal Malpractice Case" (2001) and Litigating the Legal Malpractice Case 2017; 2020 Legal Malpractice Update3-28-2020 (Statute of Limitations and Duties to Non-clients) NJICLE; Lecturer at Family Law Section, Baltimore, Maryland on legal malpractice in matrimonial matters; and American Bar Association, National Institute Section on Tort and Insurance Practice:  "Legal Malpractice Litigation: Trial and Avoidance of Claims"

**ADMISSIONS:**               Admitted to practice before the United States Supreme Court, Second, Third, Fourth, Seventh, Eighth, Ninth Circuit Court of Appeals and the United States Court of Appeals for the Federal Circuit , Federal and State Courts in the Commonwealth of Pennsylvania and the State of New Jersey.

**EXPERT TESTIMONY:**         Has handled and tried numerous malpractice actions on behalf of plaintiffs and defendants.  I have been retained as an expert witness in: legal malpractice cases in Pennsylvania and New Jersey: *Gorski v. Jenkins, et al.,* Court of Common Pleas, Montgomery County, No. 94-04001; *Belmont Industries, Inc., et al v. Bituminous Casualty Corp., et al*; *Jean F. Frottier v. Edward Aruda, et al*; *National Penn Bank v. Jestyn Payne, et al.* Court of Common Pleas, Berks County, Docket No. 4401-92; *Chemical Bank New Jersey National Association v. Ocean City Yacht Sales, Inc., et al* Superior Court of New Jersey, Cape May County, Docket No. 11685-90; *Klauder & Nunno Enterprises v. Stagliano & Deweese, P.A., et al*, United States District Court, District of New Jersey Docket No. 93cv4167; *Caplan & Luber v. Frances Sessa*, Superior Court of Connecticut (legal malpractice matter involving Pennsylvania law); *Murray Bilker, et al v. Aaron Friedmann, et al*, Court of Common Pleas, Philadelphia County, December Term 1996, No. 0072*; Paul A. Dengler, et al vs. Byron R. LaVan, P.C., a Pennsylvania Professional Corporation, and Byron R. LaVan, Esquire,* Court of Common Pleas, Montgomery County, Civil Action No. 94-19480; *Ella Riley-Turley v. Michael A. Paul, Esquire*, et al., Superior Court of New Jersey, Burlington County, Docket No. BUR-L-531-01; *Marshall v. Fenstermacher*, U.S.D.C (E.D. Pa.), Docket No. 2:04-cv-03477-GP.  *Leff v. Morgan Lewis*, tried before the Honorable Diane M. Welsh (Ret.).  In 2017, I testified as an expert in Northern International Remail & Express, Co. v. Coffey & Associates, et. al. Superior Court of New Jersey, Morris County MRS-1187-14 and was deposed.

I have been retained as an expert in Dragonetti actions: *Keystone Freight Corp. v. Gamburg*, Court of Common Pleas of Philadelphia County November Term 2011and Dollar Tree Stores, Inc. v. Houston Harbaugh, P.C.et al, Court of Common Pleas of Allegheny County No. GD-08-3576 In both cases, I prepared an expert report and testified as an expert witness. *Chasan v. Corcoran*, Court of Common Pleas of Philadelphia County, August Term 2022, No. 220802425; *Carmen Enterprises, Inc. v. Fox Rothschild, LLP*, February Term 2021, No. 01913

**CUSTOMARY HOURLY RATE:**

My customary hourly rate as of January 1, 2023 is $595 and $6,000 per day for deposition or trial testimony based upon a seven (7) hour day, or *pro rata* per hour.

# EXHIBIT P

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Confidential

| | | |
|---|---|---|
| American Environmental Enterprises, Inc., d/b/a Thesafetyhouse.com, | ) ) ) ) | |
|    Plaintiff, | ) ) | |
|    v. | ) ) | Docket No.: 19-CV-05435 |
| Manfred Sternberg, Esquire, and Manfred Sternberg & Associates, PC, and Charlton Holdings Group, LLC, and Shlomo Gross a/k/a Samuel Gross, and Gary Weiss, and A.Solar, LLC, and Daphna Zekaria, Esquire and Sokolski & Zekaria, P.C. | ) ) ) ) ) ) ) | |
|    Defendants. | ) ) ) | |

Expert Report
By
Joseph W. Lesovitz, CPA/ABV/CFF, CFA, CFE

August 16, 2024

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................ 3

   A.  OVERVIEW OF ENGAGEMENT ........................................................................................ 3

   B.  SUMMARY OF OPINIONS .............................................................................................. 3

   C.  QUALIFICATIONS ......................................................................................................... 4

   D.  DOCUMENTS CONSIDERED .......................................................................................... 5

II.  BACKGROUND ................................................................................................................ 5

   A.  PARTIES ..................................................................................................................... 5

      1.  MANFRED STERNBERG ........................................................................................... 5

      2.  MANFRED STERNBERG & ASSOCIATES, PC ............................................................. 5

      3.  AMERICAN ENVIRONMENTAL ENTERPRISES, INC., d/b/a THE SAFETYHOUSE.COM ....... 6

      4.  CHARLTON HOLDING GROUP LLC ......................................................................... 6

      5.  SHLOMO GROSS .................................................................................................... 6

      6.  GARY WEISS ......................................................................................................... 6

      7.  A.SOLAR, LLC ...................................................................................................... 6

      8.  DAPHNA ZEKARIA, ESQUIRE ................................................................................... 7

      9.  SOKOLSKI & ZEKARIA, P.C. ................................................................................... 7

   B.  COMPLAINT ................................................................................................................ 7

   C.  TIMELINE OF EVENTS .................................................................................................. 8

III.  ANALYSIS ..................................................................................................................... 9

   A.  iHEALTH TEST KITS PURCHASED BY TSH ................................................................... 9

      1.  CASH INFLOW FROM BUYER (TSH) ......................................................................... 9

      2.  CASH OUTFLOW TO SELLER .................................................................................. 10

      3.  SUMMARY .......................................................................................................... 11

IV.  CONCLUSION ............................................................................................................... 11

# I.    INTRODUCTION

## A.    OVERVIEW OF ENGAGEMENT

I have been engaged by the law firm Goldberg Segalla LLP ("Counsel") on behalf of Manfred Sternberg, Esquire ("Mr. Sternberg") in the above referenced matter. At Counsel's request, I have prepared a report of my opinions to be expressed at trial in connection with American Environmental Enterprises, Inc.'s, d/b/a The SAFETYHOUSE.com ("Safety House", "TSH" or the "Plaintiff") lawsuit against Mr. Sternberg.

The scope of my retention is to provide an opinion on damages only; I have not been engaged to provide any opinion on liability and therefore offer no such opinion or analysis. However, an assumption of some liability on the part of Mr. Sternberg is a necessary basis for my analyses and opinion on damages for the purposes of this report. Notably, Mr. Sternberg denies any such liability and intends to establish their defenses at trial, as necessary. I have reviewed pleadings, deposition transcripts and documents produced in the course of discovery from this case to aid my assessment and support my opinions. I reserve the right to amend my report should additional or updated information become available.  All of my opinions, as well as the bases for my opinions, as stated herein, are offered to a reasonable degree of professional certainty.

It is my understanding that the Plaintiff may file an expert report. I reserve the right to update my analysis and provide any rebuttal opinions to the Plaintiff's expert report.

## B.    SUMMARY OF OPINIONS

In summary, it is my opinion that Mr. Sternberg did not unjustly benefit from the Plaintiff's funds and these funds are not held in the Trust Account;[1] therefore, there are no damages attributable to Mr. Sternberg.

---

[1] The Trust Account, defined in a subsequent section of this report, is the MSA's IOLTA Bank of America Account x2143.

C.    QUALIFICATIONS

The analyses and opinions in this report are based upon the information and documentation identified to date, my education, and my experience in performing similar financial analyses and economic damage calculations.  I am a Partner in Citrin Cooperman Advisors LLC's Forensic, Litigation & Valuation Services Group.  Citrin Cooperman Advisors LLC is an accounting and consulting firm that, among other things, provides business, economic, financial, and damages consulting services to clients in a variety of industries.  I have been qualified as an expert and presented testimony in depositions and at trial in federal court, state court, and arbitration proceedings. In addition, I have served as a neutral accounting arbitrator in various post-acquisition disputes related to working capital adjustments, earn-out disputes, and other financial related disputes.

I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner (CFE"), Accredited in Business Valuation ("ABV"), and Certified in Financial Forensics ("CFF").  In addition, I hold the Chartered Financial Analyst designation and have a Master's Degree in Business Administration with a concentration in Accounting.  I am an adjunct professor at the Villanova University School of Law where I currently teach a course on economic damages and litigation strategy and previously taught a course on accounting and business valuation. I am a recipient of the American Institute of Certified Public Accountants ("AICPA") 2016 Standing Ovation Award for contributions to the areas of forensic accounting and business valuation.  I also previously served on the AICPA's CFF Credential Exam Task Force.  My curriculum vitae is attached as Exhibit A.

My firm is being compensated at $625 per hour for my time. My firm's compensation is not contingent upon the outcome of this litigation.

D.    DOCUMENTS CONSIDERED

My analysis is based on the documentation and information produced by the parties as listed in Exhibit B.  The documents and information utilized in my report are the types of documents and information upon which experts in my field typically rely when performing such analyses.

I, or others working under my direct supervision, performed the analysis based on the documentation and information available to date.  Additional information may come to my attention during this litigation, which may affect my analysis.  I reserve the right to amend my analysis and this report should additional or updated information become available.  In addition, I reserve the right to prepare additional supplemental materials such as summaries, exhibits or charts for trial, as well as to provide opinions and other materials in response to any expert opinions provided on behalf of the Plaintiff.

## II.    BACKGROUND

A.    PARTIES

### 1.    Manfred Sternberg

Mr. Sternberg is a citizen of the State of Texas.[2] Mr. Sternberg is a practicing attorney in good standing under the laws of Texas.[3]

### 2.    Manfred Sternberg & Associates, PC

Manfred Sternberg & Associates, PC ("MSA") is a Texas professional corporation with a principal place of business in Houston, Texas.[4] Mr. Sternberg is the founder of MSA.[5]

---

[2] First Amended Complaint, dated July 31, 2023 ("Complaint"), ¶ 8.
[3] Complaint, ¶ 8.
[4] Complaint, ¶ 9.
[5] https://www.manfredlaw.com/manfred-sternberg, visited May 10, 2024.

CONFIDENTIAL                                                                 **Page 6**

3.      *American Environmental Enterprises, Inc., d/b/a The SAFETYHOUSE.com*

American Environmental Enterprises, Inc., d/b/a The SAFETYHOUSE.com ("Safety House") is a Pennsylvania corporation with a principal place of business in Glen Mills, Pennsylvania. Safety House operates as a supplier of personal protection and abatement equipment.[6]

4.      *Charlton Holding Group LLC*

Charlton Holding Group LLC ("CHG") is a New York limited liability company with a principal place of business in Rockville Centre, New York.[7]

5.      *Shlomo Gross*

Mr. Gross is a citizen of the State of New York residing in Rockville Centre, New York.[8]

6.      *Gary Weiss*

Mr. Weiss is a citizen of the State of New Jersey residing in Elizabeth, New Jersey.[9]

7.      *A.Solar, LLC*

A.Solar, LLC ("A.Solar") is a New Jersey limited liability company with a principal place of business in Elizabeth, New Jersey.[10]

---

[6] Complaint, ¶ 7.
[7] Complaint, ¶ 12.
[8] Complaint, ¶ 14.
[9] Complaint, ¶ 16.
[10] Complaint, ¶ 16.

8.     *Daphna Zekaria, Esquire*

Ms. Zekaria is a citizen of the State of New York with a principal place of business in New York, New York. Ms. Zekaria is admitted to practice law in the State of New York,[11] although I understand that her license may be in jeopardy.

9.     *Sokolski & Zekaria, P.C.*

Sokolski & Zekaria, P.C. ("S & Z") is a New York professional corporation with a principal place of business in New York, New York.[12]

B.     COMPLAINT

The Plaintiff filed a Complaint on July 31, 2023 alleging the following claims against the Defendants:[13]

- Count I: Fraud in the Inducement (Against the Gross Defendants and Sternberg Attorney Defendants)
- Count II: Fraud (Against the Gross and Sternberg Attorney Defendants)
- Count III: Fraud (Against the Weiss and Zekaria Defendants)
- Count IV: Wrongful Civil Conspiracy (Against all Defendants)
- Count V: Piercing the Corporate Veil (Against Gross and CHG)
- Count VI: Piercing the Corporate Veil (Against Weiss and A Solar)
- Count VII: Participation Theory (Against Shlomo Gross and Sternberg)
- Count VIII: Unjust Enrichment/Quantum Meruit (Against the Gross and Sternberg Attorney Defendants)
- Count IX: Intentional Interference with Existing Contractual Relations (Against All Defendants)

---

[11] Complaint, ¶ 19.
[12] Complaint, ¶ 20.
[13] Complaint, ¶¶ 65-167.

- Count X: Intentional Interference with Prospective Economic Advantage (Against All Defendants)
- Count XI: Unjust Enrichment/Quantum Meruit (Against Weiss and A Solar)

## C.    TIMELINE OF EVENTS

The following represents my understanding of certain events that transpired between the parties according to the documents exchanged during the course of discovery.

- "On or about January 21, 2022, Safety House agreed to purchase 151,200 iHealth Covid-19 Antigen Rapid two-pack test kits (the "Covid Test Kits") from CHG and its managing member, Defendant Gross, (the "Order") for a payment of $1,965,600.00 (the "Purchase Price").[14]

- "The Order was supposed to be accomplished through a Sale and Purchase Agreement (the 'Agreement'),"[15] and a trust arrangement involving the Plaintiff and an attorney trust account held by the Sternberg Attorney Defendants.

- "The Agreement required Plaintiff to issue a Purchase Order to CHG for the Covid Test Kits and thereafter to deposit the $1,965,600.00 Purchase Price into the [Trust Account] of the Sternberg Attorney Defendants…"[16]

- "…on or about January 21, 2022, SAFETY HOUSE issued its Purchase Order No. 18315."[17]

- "In further reliance on upon the representations of the Gross Defendants and the Sternberg Attorney Defendants, Plaintiff wired the $1,965,600.00 Purchase Price into the [Trust Account] of the Sternberg Attorney Defendants."[18]

- "…Sternberg Attorney Defendants have claimed that they wire transferred a sum greater than $1,965,600 to Defendants Weiss and Zekaria."[19]

---

[14] Complaint, ¶ 23.
[15] Complaint, ¶ 25.
[16] Complaint, ¶ 26.
[17] Complaint, ¶ 28.
[18] Complaint, ¶ 30.
[19] Complaint, ¶ 55.

## III.   ANALYSIS

At Counsel's request, I prepared this report detailing my opinions with respect to my understanding of the alleged damages claimed by the Plaintiff. It is my opinion that Mr. Sternberg did not unjustly benefit from the Plaintiff's funds and these funds are not held in the Trust Account; therefore, there are no damages attributable to Mr. Sternberg. My observations, analysis, and opinions regarding the Plaintiff's alleged damages are detailed in the following sections.

### A.   iHEALTH TEST KITS PURCHASED BY TSH

On or about January 21, 2022 TSH purchased iHealth Covid 19 home test kits ("Test Kits") from CHG. This section examines the cash flows into and out MSA's IOLTA Bank of America Account x2143 (the "Trust Account") from January 1, 2022 to April 30, 2022 related to this TSH purchase.

#### 1.   Cash Inflow from Buyer (TSH)

TSH purchased 151,200 boxes of Test Kits from CHG for a total of $1,965,600.[20] TSH wired the $1,965,600 to the Trust Account on January 21, 2022.[21]  See Table 1 below.

**Table 1:  Payments from Buyer [22]**

| Date | Amount |
|------|--------|
| 1/21/2022 | $1,965,600 |

---

[20] Sternberg Deposition, Exhibit 20.
[21] Exhibit 1.1.
[22] Exhibit 1.1.

### 2. *Cash Outflow to Seller*

On January 26, 2022, CHG purchased 365,400 Test Kits from A.Solar for $2,192,400.[23] Funds were wired to Gary Weiss / ASolar, LLC and Sokolski & Zakaria IOLA AC between February 1, 2022 and February 25, 2022 totaling $2,571,200 from the Trust Account.[24] See Table 2 below.

**Table 2:  Payments to Seller [25]**

| Seller | Date | Amount |
|---|---|---|
| Gary Weiss ASolar, LLC | 2/1/2022 | $(219,240) |
| Sokolski & Zakaria | 2/4/2022 | (1,911,960) |
| Sokolski & Zakaria | 2/15/2022 | (250,000) |
| Sokolski & Zakaria | 2/25/2022 | (190,000) |
| Total | | $(2,571,200) |

I understand the payments on February 15, 2022 and February 25, 2022 were additional funds paid to the seller in order to receive the already purchased goods.[26] Related to the table above including funds disbursed by Mr. Sternberg to Ms. Zekaria and funds subsequently disbursed by Ms. Zekaria to Mr. Weiss, Mr. Weiss testified to the following:

- Mr. Weiss knew Mr. Sternberg "wired the money" [27] to Ms. Zekaria and that Ms. Zekaria "had the money to pay me."[28]

- Mr. Weiss identified the next payment came in when the arrangements were made for Available Movers to pick up the product on Monday, February 7.[29]

- Mr. Weiss acknowledged that Ms. Zekaria had transferred him $1,246,960 on February 7 and then another $130,000 on February 15.[30]

---

[23] Sternberg Deposition, Exhibit 6.
[24] Exhibit 1.1.
[25] Exhibit 1.1.
[26] Based on conversations with Mr. Sternberg.
[27] Deposition of Gary Weiss dated July 16, 2024 (the "Weiss Deposition"), pg. 93.
[28] Weiss Deposition, pg. 93.
[29] Weiss Deposition, pg. 94.
[30] Weiss Deposition, pgs. 159-161.

### 3. *Summary*

Based on the activity in the Trust account, disbursements for the Test Kits exceeded amounts received from TSH for the Test Kits. See Table 3 below.

**Table 3:  Summary of Activity[31]**

| Description | Amount |
|---|---|
| Receipts for Test Kits | $1,965,600 |
| Payments for Test Kits | (2,571,200) |
| Difference | $(605,600) |

## IV.   CONCLUSION

In summary, Mr. Sternberg did not unjustly benefit from the Plaintiff's funds and these funds are not held in the Trust Account. In fact, Mr. Sternberg did not benefit at all as it appears Mr. Sternberg incurred a loss as a result of the TSH transaction. Therefore, there are no damages attributable to the alleged actions of Mr. Sternberg.

---

[31] Exhibit 1.0.

\*     \*     \*     \*     \*     \*

The procedures performed were limited to those described herein based on the documents provided to date and other information obtained. Information obtained subsequent to the date of this report may affect this analysis and this effect may be material. I reserve the right to supplement and/or amend my analysis and this report should additional or updated information become available. In addition, I may be required to prepare additional supplemental materials such as summaries, exhibits or charts for trial, as well as to provide opinions and other materials in response to any expert opinions provided on behalf of the Plaintiff. If requested, I will update my analysis. My procedures were performed solely with respect to the above referenced litigation. This report is not to be reproduced, distributed, disclosed or used for any other purpose.

Joseph W. Lesovitz CPA/ABV/CFF, CFA, CFE

## Index of Exhibits

| Number | Exhibit Title |
| --- | --- |
| A | Curriculum Vitae |
| B | Documents Considered |
| 1.0 | Summary of Transactions (TSH) |
| 1.1 | MSA IOLTA BOA Account Cash Inflow and Outflow Related to IHealth Test Kits |
| 1.2 | Bank of America Acct. x2143 Activity |

# EXHIBIT A



**Citrin Cooperman Advisors LLC**

1800 JFK Boulevard
Philadelphia, PA 19103
**T** 215.545.4800 **F** 215.545.4810
citrincooperman.com

## Curriculum Vitae of
## Joseph W. Lesovitz, CPA/ABV/CFF, CFA, CFE

Joseph Lesovitz is a Partner in the Forensic, Litigation and Valuation Services Group where he specializes in calculating damages in complex commercial litigation and in providing financial consulting and forensic accounting services to attorneys, public and private corporations, insurance companies, and governmental agencies. Mr. Lesovitz has provided consulting and litigation services for cases involving complex commercial damages, economic damage calculations, lost profits analysis, intellectual property infringements, business valuations, and forensic investigations. He has served as a neutral accounting arbitrator in various post-acquisition disputes related to working capital adjustments, earn-out disputes, and other financial related disputes. Mr. Lesovitz has been qualified as an expert and presented testimony in depositions and trials in federal court, state court, and arbitration. He has provided consulting and litigation services for clients in many industries including healthcare, financial services, technology, manufacturing, construction, real estate, retail, telecommunications, franchise, and insurance.

Mr. Lesovitz is an adjunct professor at the Villanova University School of Law where he teaches a course on economic damages and litigation strategy, and previously taught a course on introduction to accounting and business valuation. He has presented seminars on topics including lost profits damages, the effective use of financial experts, and intellectual property damages. Prior to joining Citrin Cooperman, Mr. Lesovitz held senior positions at leading global accounting and professional services firms and at a global investment management firm. He is a recipient of the American Institute of Certified Public Accountants 2016 Standing Ovation Award for contributions to the areas of forensic accounting and business valuation. Mr. Lesovitz also previously served on the AICPA's CFF Credential Exam Task Force.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

**Professional Experience**

**Citrin Cooperman Advisors LLC** – Forensic, Litigation and Valuation Services Group, Partner, (2015 - )

**Villanova University School of Law** - Adjunct Professor: Economic Damages and Litigation Strategy (2015 - ); and Introduction to Accounting and Business Valuation (2016 - 2018)

**EisnerAmper LLP** – Forensic, Litigation and Valuation Services Group, Partner/Director, (2012-2015)

**ParenteBeard LLC** - Forensic Accounting & Litigation Services, Senior Manager/Senior Associate, (2005-2012)

**Vanguard Group** – Financial Reporting, Supervisor/Senior Associate, (2000-2005)

## EDUCATIONAL BACKGROUND AND CREDENTIALS

- Certified Public Accountant in Pennsylvania (CPA)
- Chartered Financial Analyst (CFA)
- Accredited in Business Valuation (ABV)
- Certified in Financial Forensics (CFF)
- Certified Fraud Examiner (CFE)
- Bachelor of Science (Accounting) – Villanova University
- Master of Business Administration (Accounting) – Saint Joseph's University

## PROFESSIONAL MEMBERSHIPS

- American Institute of Certified Public Accountants (AICPA)
- Pennsylvania Institute of Certified Public Accountants (PICPA)
- CFA Society of Philadelphia (CFAP)
- Association of Certified Fraud Examiners (ACFE)
- Philadelphia VIP Finance Committee Member (2015 - )
- Waldron Mercy Academy Finance Committee Member (2014 - 2017)

## PUBLICATIONS

- "Quantifying Damages in a Franchise Case," International Franchise Association (May 2022)
- "Don't Make These Mistakes in Protecting Your Intellectual Property," Philadelphia Magazine (September 2021)

- "Litigation Expected to Surge:  Commercial Damages in the Wake of an Economic Restart," Philadelphia Business Journal (August 2020)

- "Understanding the Defend Trade Secrets Act and Available Remedies," The Legal Intelligencer (January 2017)

- "Analyzing Commercial Economic Damages/Lost Profits," in *Effective Deposition of Financial and Economic Experts,* Pennsylvania Bar Institute (April 2014)

- "Lost Profits Damages in Commercial Litigation," Lorman Education Services (December 2013)


### LECTURES

- "Understanding the Financial Implications of Commercial Litigation Matters," Association of Corporate Counsel Business Skills Institute (November 2023)

- "Quantifying Lost Profits Damages in Commercial Litigation Matters," myLawCLE (October 2022)

- "The Evolving Landscape of Corporate Transactions From a Diligence, Valuation and Dispute Perspective," Association of Corporate Counsel Business Skills Institute (September 2022)

- "Lost Profits in Commercial Litigation: Proving and Defending Damages," Strafford Publications, Inc. (March 2022)

- "The Infringement and the Damage Done – How Damage Experts and Litigators Put a Number on Music Industry Infringements, Breaches and Other Unauthorized Usages," New York State Bar Association (November 2021)

- "Preparing for Battle; Preparing Your Company in the Age of the Hacker," Association of Corporate Counsel Business Skills Institute (October 2021)

- "CARES Act and the Potential Fraud Implications," Association of Corporate Counsel Business Skills Institute (October 2020)

- "Insurance Coverage and Claims Preparation Resulting from COVID-19," Lorman Education Services (May 2020)

- "COVID-19 Legal and Financial Implications of Business Interruption Insurance Coverage," Clear Law Institute (April 2020)

- "Financial Implications of Books and Records Inspections," Association of Corporate Counsel, Delaware Legal Hot Topics (February 2020)

- "Introduction to Accounting for Lawyers," Association of Corporate Counsel Business Skills Institute (September 2019)

- "Cost Behavior Analysis in Lost Profits Damages," Strafford (March 2019)
- "Legal and Financial Aspects of Lost Profits Damages in Commercial Litigation," Lorman Education Services (January 2019)
- "How to Effectively Prove and Defend Lost Profits Damages," The Knowledge Group (September 2018)
- "Recent Updates in Labor and Employment Damages: From the Perspective of Forensic Accountants," Association of Corporate Counsel In House Counsel Annual Conference (April 2018)
- "Emerging Issues for Litigators Working with Accountants," Association of Corporate Counsel Litigation CLE Institute (February 2018)
- "Quantifying Damages in Commercial Litigation," Clear Law Institute (July 2017)
- "The New Trade Secrets Act: Overview and Remedies" Clear Law Institute (January 2017)
- "Trends and Challenges in Commercial Damage Matters" AICPA Forensic and Valuation Services Annual Conference (November 2016)
- "Use of Experts and Trends in Class Action Suits" AICPA Forensic and Valuation Services Annual Conference (November 2016)
- "From Defense Costs to Damages: What Drives Professional Liability Claim Value," ExecuSummit Annual Errors and Omissions Liability Conference (June 2016)
- "Effective Use of Financial Experts in Commercial Litigation," Clear Law Institute (March 2016)
- "Effective Use of a Financial Expert," Lorman Education Services (February 2016)
- "Current Issues in IP Litigation," AICPA Forensic and Valuation Services Annual Conference (November 2015)
- "Quantifying Lost Profits Damages," Clear Law Institute (March 2015, September 2015)
- "Quantifying and Protecting the Value of Trade Secrets," DELVACCA (April 2015)
- "Understanding and Managing Cybersecurity Risk," DELVACCA (March 2015)
- "Business Interruption Losses," Liberty Mutual Group (February 2015)
- "Lost Profits Damages in Commercial Litigation," Lorman Education Services (July 2012, January 2013, December 2013, June 2014, December 2014)
- "Future Economic Impacts When Entering License Agreements," DELVACCA (July 2014)
- "Effective Depositions of Financial and Economic Experts," Pennsylvania Bar Institute (April 2014)
- "Trends in IP Damages," DELVACCA In-House Counsel Conference (April 2014)

- "Economic Damages and Intellectual Property," New Jersey NACVA Annual Conference (September 2013)
- "Damages in Intellectual Property Litigation," Lorman Education Services (August 2013)
- "The Art of Financial Statements, Terms and Documentation," DELVACCA (May 2013)
- "Key Ratio Analysis of Financial Statements," Lorman Education Services (January 2011)
- "Financial Statement Analysis," Lorman Education Services (2010)

## <u>Testimony</u>

2024 Deposition

American Arbitration Association, Commercial Arbitration Tribunal

440 Park Avenue Owner Associates, LLC, Dakotah Travel Co. LLC, MP 46 East 57th Street LLC, and Harry Macklowe v. 56th and Park (NY) Holdings, LLC (f/k/a/ CIM/56th Street (NY), LLC)

2024 Deposition

Superior Court of the State of Delaware

JanCo FS 2, LLC and JanCo FS 3, LLC v. ISS Facility Services, Inc.; ISS C&S Building Maintenance Corporation; ISS TMC Services, Inc.; and ISS Facility Services California, Inc.

2024 Deposition

United States District Court for the Eastern District of New York

Steve Fleming and Old Blackthorn Inn v. Village of Rockville Centre; Francis X. Murray; Paul W. Pope Jr. and "John/Jane Does" 1 through 10

2024 Deposition

Commercial Division of the Supreme Court of the State of New York

Yasemin Tekiner and Zeynep Tekiner against Bremen House Inc., Bremen House Texas, German News Company, Inc., German News Texas, Inc., 254-258 W. 35th St. LLC, Berrin Tekiner, Gonca Tekiner, and Billur Akipek

2023 Trial

United States District Court for the District of New Jersey

Newborn Bros. Co., Inc. v. Albion Engineering Company


2023 Trial

Court of Chancery of the State of Delaware

International Rail Partners, LLC v. American Rail Partners, LLC, Rail USA, LLC and Newco SBS Holdings, LLC


2023 Trial

United States Bankruptcy Court for the Eastern District of New York

Robert Mercer and ESB Labs, Inc. v. Ira Lee and Helen Koh Lee


2023 Deposition

United States District Court for the District of New Jersey

Newborn Bros. Co., Inc. v. Albion Engineering Company


2023 Deposition

Court of Chancery of the State of Delaware

International Rail Partners, LLC v. American Rail Partners, LLC, Rail USA, LLC and Newco SBS Holdings, LLC


2023 Deposition

United States District Court for the Southern District of Indiana

TyTek Medical Inc. v. Biomerics ATL, LLC


2023 Trial

Court of Common Pleas for Montgomery County, Pennsylvania

Steven Paik vs. David I. Dubin, Esquire and Law Offices of David I. Dubin

2022 Deposition

United States District Court for the Northern District of Georgia

Card Isle Corporation v. Tariq Farid, Edible Arrangements, LLC, and Netsolace, Inc.


2022 Deposition

Superior Court for Los Angeles County, California

Andrew Yong Ahn vs. VolumeCocomo Apparel, Inc., Christopher Chang, and Sue Chang


2022 Deposition

Supreme Court for New York County, New York

Willis Ent., Inc. v. Cumberland Farms, Inc. and PMG Northeast LLC


2022 Arbitration

American Arbitration Association, New York

34 Prince Equities LLC v. Tetra Tech Engineers P.C. d/b/a Cosentini Associates


2022 Trial

Court of Common Pleas for Bucks County, Pennsylvania

Printfly Corporation v. Jordan Nemeroff, et al.


2021 Trial

United States District Court for the Northern District of Georgia

North Avenue Group Holdings, LLC, et al. v. Lasalle Capital Group II-A, L.P., et al.


2021 Arbitration

American Arbitration Association, California

TSI Investment Group, Inc. v. CarePatrol Franchise Systems, LLC


2021 Deposition

United States District Court for the District of Arizona

ReBath, LLC v. HD Solutions, LLC and Jason Hicks

2021 Deposition

American Arbitration Association, California

TSI Investment Group, Inc. v. CarePatrol Franchise Systems, LLC


2021 Trial

Superior Court of New Jersey for Mercer County

Jaime G. Williamsberg v. Aparri, LLC and Jan R. Weinberg


2021 Deposition

United States District Court for the District of Delaware

John B. Davie and KMAFB, Inc. v. Institutional Processing Services, LLC and Aramark Services, Inc.


2020 Deposition

United States District Court for the District of New Jersey

Emerson Radio Corporation v. Emerson Quiet Kool Co. Ltd., and Home Easy Ltd.


2020 Arbitration

International Centre for Dispute Resolution

Canada Water Ice Company, Ltd. v. Rita's Franchise Company, LLC


2020 Deposition

United States District Court for the Northern District of Georgia

North Avenue Group Holdings, LLC, et al. v. Lasalle Capital Group II-A, L.P., et al.


2019 Deposition

Superior Court for Mercer County, New Jersey

Lauderdale Holdings I, LLC, et al. v. Sunrise Detoxification Center, LLC, et al.


2019 Deposition

Montgomery County, Maryland

Robert N. Herman, et al. v. Elizabeth Pal

2019 Deposition

United States District Court for the Northern District of Georgia

North Avenue Group Holdings, LLC, et al. v. Lasalle Capital Group II-A, L.P., et al.


2019 Deposition

Superior Court of District of Columbia

Watergate Hotel, LLC, et al. v. Grunley Construction Co., Inc., et al.


2019 Deposition

Superior Court for Monmouth County, New Jersey

J. Maughan Company, LLC, et al. v. Vaspro, LLC, et al.


2019 Arbitration

FINRA Dispute Resolution

Ira and Robin Adelman v. Oppenheimer and Company, Inc., et al.


2018 Arbitration

American Arbitration Association, New York, New York

Joseph Stapleton v. RIVCO Construction, LLC, Patrick Costigan, and Brian Costigan


2018 Deposition

United States District Court for the Eastern District of Pennsylvania

National Chemical Laboratories, Inc. v. Tyco Fire Products, L.P.


2018 Arbitration

American Arbitration Association, Philadelphia, Pennsylvania

Thomas Finn v. The Executor/Executrix/Administrator of the Estate of Gennaro R. Schiavo, Jr.


2018 Trial

Court of Common Pleas for Bucks County, Pennsylvania

Off the Wall Company, LLC (OTW) v. John Kutsop

2017 Trial

United States District Court for the District of New Jersey

David Keezer and Scott Pasch v. Errol Copilevitz, Esquire and Copilevitz & Canter, LLC


2017 Trial

Court of Common Pleas for Philadelphia County, Pennsylvania

Bruno J. Pasceri vs. Michael A. Karp


2016 Deposition

Superior Court for Middlesex County, New Jersey

Justin DeSalvo v. Sean M. McDonough, Esq.


2016 Deposition

Superior Court of the State of Delaware

The Chemours Company TT, LLC v. ATI Titanium LLC


2016 Deposition

United States District Court for the District of New Jersey

Newborn Bros. Co., Inc. v. Albion Engineering Company


2015 Deposition

Fourth Judicial Court for the State of Minnesota

C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., et al.


2015 Arbitration

Superior Court for the Commonwealth of Massachusetts

Evan Ehrlich v. Selmark Associates, Inc., Marathon Sales, Ltd. and David Elofson


2014 Trial

United States District Court for the District of Kansas

Boardwalk Apartments, L.C. vs. State Auto Property and Casualty Insurance Company

2014 Deposition

United States District Court for the District of Kansas

Boardwalk Apartments, L.C. vs. State Auto Property and Casualty Insurance Company

2013 Deposition

United States District Court for the District of Kansas

Boardwalk Apartments, L.C. vs. State Auto Property and Casualty Insurance Company

2010 Arbitration

Court of Common Pleas for Lehigh County, Pennsylvania

Michael Beani, William Grace and American Recreational Stove & Warehouse, Inc. v.
David A. Eisenberg, Esq., et al.

# EXHIBIT B

**Exhibit B**

## Documents Considered

---

**Description**

---

**Pleadings:**

First Amended Complaint, dated July 31, 2023

Answer of Defendants Manfred Sternberg, Esq. and Manfred Sternberg & Associates, PC to Plaintiff's Amended Complaint and Crossclaims against all Co-Defendants, dated August 23, 2023.

Answers and Objections of Defendants Manfred Sternberg, Esq and Manfred Sternberg & Associates, PC To Plaintiff's Interrogatories with Supplemental Responses, dated September 8, 2023.

**Documents:**

Bank of America Attorney at Law/IOLTA Account x2143 January 2022 to April 2022 Statements.

Bank of America Account x2143 Wire Transfer Advice, dated February 4, 2022.

Bank of America MSA IOLTA Account Activity Transaction Detail, dated February 15, 2022.

Bank of America MSA IOLTA Account Activity Transaction Detail, dated February 25, 2022.

Transaction Detail (Redacted) for Bank of America Account x2143 from January 1, 2022 through April 29, 2022.

**Depositions:**

Deposition and Exhibits of Manfred Sternberg, dated February 7, 2024.

Deposition of Gary Weiss, dated July 16, 2024.

Deposition of Daniel Scully, dated July 23, 2024.

**Research:**

https://www.manfredlaw.com/manfred-sternberg.

# EXHIBIT 1

**Exhibit 1.0**

**American Environmental Enterprises, Inc., d/b/a
TheSafetyHouse.com v. Manfred Sternberg, Esquire, et. al.
Summary of Transactions (TSH)**

| | Description | Amount |
|---|---|---|
| 1 | Receipts for Test Kits | $ 1,965,600 |
| 2 | Payments for Test Kits | (2,571,200) |
| 3 | Difference | $  (605,600) |

**Notes:**

1  See Exhibit 1.1.
2  See Exhibit 1.1.
3  Sum of Lines 1 and 2.

Exhibit 1.1

**American Environmental Enterprises, Inc., d/b/a TheSafetyHouse.com v.
Manfred Sternberg, Esquire, et. al.**

**MSA IOLTA BOA Account Cash Inflow and Outflow Related to IHealth Test
Kits**

**Cash Inflow from Buyer**

| Buyer | Date | | Amount |
|-------|------|---|--------|
| TSH | 1/21/2022 | $ | 1,965,600 |

**Cash Outflows to Seller**

| Seller | Date | | Amount |
|--------|------|---|--------|
| Gary Weiss | 2/1/2022 | $ | (219,240) |
| Sokolski & Zakaria | 2/4/2022 | | (1,911,960) |
| Sokolski & Zakaria | 2/15/2022 | | (250,000) |
| Sokolski & Zakaria | 2/25/2022 | | (190,000) |
| Total | | $ | (2,571,200) |

*Source: Bank of America Account x2143 January to April 2022 Statements*

American Environmental Enterprises, Inc., d/b/a TheSafetyHouse.com v. Manfred Sternberg, Esquire, et. al.
Bank of America Acct. x2143 Activity
January 1, 2022 to April 30, 2022

| Date | Type | Bank Account Description | Third Party | Amount | Reference |
|------|------|--------------------------|-------------|--------|-----------|
| 1/4/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,600.18) | |
| 1/5/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,500.36) | |
| 1/6/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,500.54) | |
| 1/7/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,500.00) | |
| 1/10/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (3,600.00) | |
| 1/11/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,700.18) | |
| 1/12/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (6,100.00) | |
| 1/12/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,418.18) | |
| 1/13/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (9,518.18) | |
| 1/13/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,300.36) | |
| 1/14/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (6,300.18) | |
| 1/14/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (5,900.36) | |
| 1/14/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,600.54) | |
| 1/18/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,700.54) | |
| 1/18/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,500.18) | |
| 1/18/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,800.36) | |
| 1/18/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (1,018.00) | |
| 1/19/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER ID:SAMROSINC | Samros Inc | (2,500.36) | |
| 1/20/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220120 TIME:1551 | Taylor Panagakos | (20,000.00) | |
| 1/20/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (9,500.00) | |
| 1/20/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (4,800.36) | |
| 1/21/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (5,500.00) | |
| 1/21/2022 | Deposits and other credits | WIRE TYPE:WIRE IN DATE: 220121 TIME:1543 | American Environmental En | 1,965,600.00 | |
| 1/24/2022 | Deposits and other credits | WIRE TYPE:WIRE IN DATE: 220124 TIME:0415 | Taylor Panagakos | 10,000.00 | |
| 1/26/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (135.51) | |
| 2/1/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220201 TIME:1149 | Gary Weiss Asolar, LLC | (219,240.00) | Inv#4 Charlton iHealth kits /ACC/, PH |
| 2/4/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220204 TIME:1618 | Sokolski & Zakaria  IOLA AC | (1,911,960.00) | Attn Dafna Zekaria RE Char |
| 2/15/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220215 TIME:1601 | Sokolski & Zakaria  IOLA AC | (250,000.00) | Attn Dafna Zekaria Esq RE |
| 2/17/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220217 TIME:1630 | Innovative Graphics, LTD | (77,000.00) | Refund in full Charlto |
| 2/25/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220225 TIME:1642 | Sokolski & Zakaria  IOLA AC | (190,000.00) | Attn Dafna Zekaria Esq RE |
| 3/10/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220310 TIME:1047 | GKM Supply LLC DBA Indutex | (41,500.00) | Escrow Refund in full Charlton /ACC/ |
| 3/16/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220316 TIME:1152 | Charlton Holding Group LLC | (72,000.00) | Per Sam Gross /ACC/, PHN/Charlton Hol |
| 3/16/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220316 TIME:1648 | Charlton Holding Group LLC | (204,120.00) | Rami purchase LA /ACC/, PHN/Charlton |
| 3/17/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220317 TIME:1609 | Charlton Holding Group LLC | (68,000.00) | Per Sam Gross /ACC/, PHN/Charlton Hol |
| 3/21/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220321 TIME:1325 | Charlton Holding Group LLC | (185,000.00) | Rami 4 pallets Carlsbad CA /ACC/, PHN |
| 3/22/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220322 TIME:1129 | Charlton Holding Group LLC | (140,000.00) | iHealth Test kits Rami /ACC/, PHN/Cha |
| 3/22/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220322 TIME:1633 | Charlton Holding Group LLC | (69,500.00) | iHealth Test kits Rami /ACC/, PHN/Cha |
| 3/23/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220323 TIME:1241 | Charlton Holding Group LLC | (68,972.36) | iHealth Test kits Rami /ACC/, PHN/Cha |
| 3/23/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220323 TIME:1543 | Charlton Holding Group LLC | (69,100.18) | Romeo Inv 2022/17 /ACC/, PHN/Charlton |
| 3/24/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220324 TIME:1552 | Charlton Holding Group LLC | (72,500.36) | 2022/18 Romeo V 4P /ACC/, PHN/Charlto |
| 3/25/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220325 TIME:1621 | Charlton Holding Group LLC | (56,700.36) | Final lot $7.50 box /ACC/, PHN/Charlt |
| 3/30/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220330 TIME:0917 | Charlton Holding Group LLC | (71,018.00) | Invoice 10089/22 /ACC/, PHN/Charlton |
| 3/31/2022 | Withdrawals and other debits | WIRE TYPE:BOOK OUT DATE:220331 TIME:1231 | Texas IOLTA Trust | (25,000.00) | Charlton Settlement in full 2022-00084 /ACC/, |
| 4/4/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220404 TIME:1418 | Charlton Holding Group LLC | (78,036.00) | Romeo Valentino Inv 2022/18-18/2 /ACC |
| 4/4/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | | (5,818.39) | |
| 4/5/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220405 TIME:1358 | Charlton Holding Group LLC | (52,018.18) | Inv 2022/18-29/4-1 /ACC/, PHN/Charlto |
| 4/5/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220405 TIME:1643 | Charlton Holding Group LLC | (41,518.00) | Gazuz22-22/01C /ACC/, PHN/Charlton Ho |
| 4/7/2022 | Deposits and other credits | WIRE TYPE:WIRE IN DATE: 220407 TIME:1025 | | 7,000.00 | |
| 4/7/2022 | Withdrawals and other debits | WIRE TYPE:WIRE OUT DATE:220407 TIME:1325 | Charlton Holding Group LLC | (26,000.36) | Naftali2022-01 /ACC/, PHN/Charlton Ho |
| 4/15/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (5,000.00) | |
| 4/20/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (6,718.18) | |
| 4/27/2022 | Withdrawals and other debits | PAYPAL DES:INST XFER | Taylor Panagakos | (5,936.36) | |

*Source: Bank of America Account x2143 January to April 2022 Statements*

# EXHIBIT Q

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**MANFRED STERNBERG & ASSOCIATES, P.C.**
ATTORNEYS AT LAW
1700 POST OAK BLVD, SUITE 600
HOUSTON, TEXAS 77056
manfred@manfredlaw.com

MANFRED STERNBERG, JR.
DANA L. KIRKPATRICK
* Board Certified Consumer Law
Also admitted in Louisiana

TELEPHONE: (713)622-4300
FACSIMILE: (713)622-9899

April 5, 2021

Mr. Sam Gross
Charlton Holdings Group, LLC
78 Buckminster Road
Rockville Center, New York 11570

RE:   Engagement Letter for legal representation of Sam Gross and Charlton Holdings Group, LLC
      (the "Client") and Manfred Sternberg & Associates, PC (the "Firm") for legal counsel on
      various PPE transactions, escrow services, strategic counsel and other matters as specifically
      assigned by Client.

Dear Sam:

Pursuant to our telephone conversations, please let this letter confirm the engagement of the Firm by the
Client to provide you with professional legal services for the matter referenced above which you have
requested our Firm to assist you to accomplish in a favorable legal and economic manner.

In return for such professional services, Client agrees to pay Firm reasonable attorney's fees computed on an
hourly basis at the Firm's prevailing rates at the time such services are rendered or otherwise as the parties
may agree in writing.   Currently the hourly rates for professional services are: Partners from $400 to
$550/hr. and Associates from $350 to $450/hr.; and Paralegals from $75 to $100/hr., dependent upon a
variety of factors, such as experience, knowledge, skill and expertise.  The primary attorneys assigned to
this matter are Manfred Sternberg at the billable rate of $550/hr. and Dana Kirkpatrick at a billable rate of
$450/hr.  The Firm waives the requirement of an initial retainer.

In addition to such fees, you agree to reimburse Firm for all reasonable expenses incurred in such matter,
including large photocopying orders, postage, long distance calls, courier and special delivery services, and
any other out-of-pocket expense incurred in connection with such matters.  It is Firm policy not to charge
the Client for normal photocopying, telecopy and other normal administrative services.  Further, Client
agrees to reimburse the Firm, or provide in advance if requested by Firm, all expenses related to filing fees,
governmental charges and taxes.

We will render monthly statements to you detailing the work done during the prior month, the amount
charged for such work, all expenses incurred, and all amounts debited against the deposit.  You agree to

**FEE AGREEMENT APRIL 5, 2021**                                    **PAGE 1 OF 2**

make full and immediate payment to us in the amount indicated on such statement. In the event USA tax
law requires the addition of sales tax, such amount shall be added to all invoices.

If the outstanding balance of any statement is not paid in full within thirty (30) days, a service charge of
1.5% per month on the outstanding balance may be imposed.  If you have any disagreement about the
amount of the invoice, you must advise us in writing within ten (10) days following receipt of the invoice.

The interpretation and enforcement of this Agreement shall be consistent with the laws of the State of
Texas, and the exclusive venue for any such action for enforcement shall be in Houston, Harris County,
Texas.  The prevailing party in any litigation shall be entitled to recovery of its reasonable attorney fees,
costs, interest and other expenses if it is found that the other party breaches this Agreement.

It is further agreed and understood that the execution of this Agreement constitutes no warranty of
recovery, and it is further understood that Firm makes no representation as to the likelihood of recovery
or positive outcome.  If this letter accurately reflects our agreement in connection with the engagement of
the Firm, please sign this Engagement Letter and return it to us.  We look forward to the opportunity to
work with you on this important matter.

STERNBERG-APR24-000029

$450/hr.  The Firm waives the requirement of an initial retainer.

**2 of 2**

...ch fees, you agree to reimburse Firm for all reasonable expenses incurred in such matter, ...hotocopying orders, postage, long distance calls, courier and special delivery services, and ...pocket expense incurred in connection with such matters.  It is Firm policy not to charge ...ormal photocopying, telecopy and other normal administrative services.  Further, Client agrees to reimburse the Firm, or provide in advance if requested by Firm, all expenses related to filing fees, governmental charges and taxes.

We will render monthly statements to you detailing the work done during the prior month, the amount charged for such work, all expenses incurred, and all amounts debited against the deposit.  You agree to

FEE AGREEMENT  APRIL 5, 2021                                            PAGE 1 OF 2

---

make full and immediate payment to us in the amount indicated on such statement.  In the event USA tax law requires the addition of sales tax, such amount shall be added to all invoices.

If the outstanding balance of any statement is not paid in full within thirty (30) days, a service charge of 1.5% per month on the outstanding balance may be imposed.  If you have any disagreement about the amount of the invoice, you must advise us in writing within ten (10) days following receipt of the invoice.

The interpretation and enforcement of this Agreement shall be consistent with the laws of the State of Texas, and the exclusive venue for any such action for enforcement shall be in Houston, Harris County, Texas.  The prevailing party in any litigation shall be entitled to recovery of its reasonable attorney fees, costs, interest and other expenses if it is found that the other party breaches this Agreement.

It is further agreed and understood that the execution of this Agreement constitutes no warranty of recovery, and it is further understood that Firm makes no representation as to the likelihood of recovery or positive outcome.  If this letter accurately reflects our agreement in connection with the engagement of the Firm, please sign this Engagement Letter and return it to us.  We look forward to the opportunity to work with you on this important matter.

AGREED TO AND ACCEPTED:

**MANFRED STERNBERG & ASSOC. P.C.**

By: _____
        Manfred Sternberg, Esq.

**CLIENT**

By: _____
        Mr. Sam Gross
        Charlton Holdings Group, LLC

FEE AGREEMENT  APRIL 5, 2021                                            PAGE 2 OF 2

STERNBERG-APR24-000030

# EXHIBIT R

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMERICAN ENVIRONMENTAL** : | |
| **ENTERPRISES, INC., d/b/a** : | |
| **THESAFETYHOUSE.COM** : | |
| : | **CIVIL ACTION** |
| **Plaintiff,** : | |
| : | **No. 2022-cv-00688 (JMY)** |
| **v.** : | |
| : | |
| **MANFRED STERNBERG, ESQUIRE** : | |
| **and MANFRED STERNBERG &** : | |
| **ASSOCIATES, PC, and CHARLTON** : | |
| **HOLDINGS GROUP, LLC, and** : | |
| **SAMUEL GROSS** : | |
| : | |
| **Defendants.** : | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT
MANFRED STERNBERG, ESQUIRE AND MANFRED STERNBERG
& ASSOCIATES, PC'S FIRST SET OF INTERROGATORIES**

American Environmental Enterprises, Inc., d/b/a The Safety House.Com ("plaintiff" or "TSH"), plaintiff herein, through its counsel Lightman, & Manochi, hereby files its Objections and Responses to Defendant Manfred Sternberg, Esquire and Manfred Sternberg Associates, PC's First Set of Interrogatories (collectively, the "Sternberg defendants") Directed to Plaintiff (the "Sternberg Defendants' Interrogatories").

**I.      GENERAL OBJECTIONS**

1.      Plaintiff objects to the Sternberg defendants' "definitions" and "instructions" to the extent that they attempt to impose any obligations beyond those required by the Federal Rules of Civil Procedure.  Plaintiff will respond to defendant's interrogatories in accordance with the Federal Rules of Civil Procedure.

2.      In addition, plaintiff objects to all "definitions" and usage of language and words other than their plain meaning and their meaning as defined by the Federal Rules of Civil Procedure.

3.     Plaintiff objects to each of the Sternberg Defendants' Interrogatories (the "Interrogatories") on the grounds that said discovery requests are overly broad, remote, and unduly burdensome and oppressive, and not calculated to lead the discovery of admissible evidence or of information relevant to the subject of this action, especially to the extent that said discovery requests are indefinite at this time, and without reasonable limitation in their scope, and to the extent that said discovery requests place an unwarranted burden and expense upon plaintiff.

4.     Plaintiff objects to each of the Interrogatories to the extent that any responses requested pursuant to the Interrogatories are privileged from disclosure under the attorney-client privilege or the work-product doctrine, or are protected from disclosure on the basis on some other privilege or other grounds.

5.     Plaintiff objects to each of the Interrogatories to the extent that the Interrogatories call for the production of documents which constitute trade secrets or confidential financial or business information or other documents of a sensitive or proprietary business or personal nature, or the disclosure of which may violate the privacy rights of plaintiff and/or applicable regulatory laws or regulations.

6.     Plaintiff objects to the Interrogatories to the extent that Defendants served Interrogatories on plaintiff that exceed the 25 maximum limit prescribed by the Federal Rules, and are duplicative of interrogatories served on plaintiff by the Gross defendants.

7.     Plaintiff reserves and does not waive the right to claim protection of any applicable privilege or doctrine, and to raise any other objections with respect to documents sought by any of the Interrogatories, to which plaintiff objects on the grounds of vagueness, ambiguity, undue burden, overbreadth, and/or failure to describe documents with reasonable particularity.

2

8.      Plaintiff's responses to the Sternberg Defendants' Interrogatories are without a waiver of, and with express reservations of: (a) all objections as to competency, relevancy, materiality, and admissibility of any and all said information and/or documents, and/or the subject matter thereof as evidence, for any purpose in any further proceedings in this action (including trial of this action) or any other action; (b) the right to object to the use of any such information and/or documents, and/or the subject matter thereof, on any ground in any further proceedings in this action (including trial of this action) or any other action; (c) the right to object on any ground at any time to a demand or request for further production of information and/or documents, or other discovery proceedings; (d) all privileges (including the attorney-client privilege and work-product doctrine); and (e) the right to move for a protective order or other protective relief to protect the confidentiality and/or restrict the use of disclosure or further dissemination of any information and/or documents produced or information contained therein.

9.      Plaintiff's responses to the Interrogatories are based upon his initial investigation, which plaintiff believes in good faith to be relevant and responsive.   Plaintiff states that plaintiff's discovery and investigation in this matter is continuing.   Plaintiff reserves the right to amend and/or further supplement the following responses or production made pursuant thereto based upon any further investigation and discovery in this case, and to introduce at trial any and all evidence which relates to matters covered by the Interrogatories.

10.      Plaintiff objects to the extent that the Interrogatories seek information which is in the power, control or possession of the Sternberg defendants or any other information which the Sternberg defendants have equal access to.

11.      Plaintiff objects to the extent that the Interrogatories seek information which has already been produced by any other party to this litigation.

3

12.     Plaintiff incorporates by reference each and every of the foregoing general objections into each and every response and specific objection stated below, to the Sternberg defendants' Interrogatories, as if such general objections were set forth in full.

## II.     OBJECTIONS AND RESPONSES TO INTERROGATORIES

1.     Identify all Person(s) with knowledge or information of the allegations in the Complaint. For each Person, please provide the name of the Person, the Person's address, and a summary of the subject matter of the Person's knowledge.

**RESPONSE**: <u>OBJECTION</u>.   This Interrogatory is duplicative another Interrogatory of the Gross Defendants.  Without waiving any objections, *see* plaintiff's response to Interrogatory 1 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

2.     Identify all custodians of Documents relevant to the allegations in the Complaint. For each Person, please provide the name of the Person, the Person's address, and a description of the Documents in the Person's possession, custody and control.

**RESPONSE**: <u>OBJECTION</u>.   Without waiving any objections, *see* plaintiff's response to Interrogatory 22 of the Gross Defendants First Set of Interrogatories, which response is incorporated herein by reference.

3.     Identify all persons who participated in the preparation (including the gathering of information for such preparation) of responses to these Interrogatories.

**RESPONSE**: <u>OBJECTION</u>.  Without waiving any objections, Dan Scully.  Plaintiff's counsel assisted Mr. Scully in preparing the responses.

4.     Provide a detailed calculation of all damages you alleged to have suffered as a result of the allegations in the Complaint.

**RESPONSE:** <u>OBJECTION</u>.   Without waiving any objections, *see* plaintiff's response to Interrogatory 19 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

5.     Describe all litigation to which the Plaintiff or its principals have ever been a party, including but not limited to, all actions ever brought by the Plaintiff for itself or its principals or as an assignee. Such description should include the case name, the court where filed (identify the court by level, location, and state), the case or action number, identification of all plaintiffs and defendants, identification of respective counsel, a description of the nature of that litigation and the issues involved therein, and the current status or final result/outcome of such litigation.

4

**RESPONSE:** Without waiving any objections, plaintiff has been involved in miscellaneous collection actions, overwhelmingly as a plaintiff (with two exceptions, well over ten years ago). Plaintiff has never sued anybody for fraud before this lawsuit, and has never been sued for fraud. All of said collection lawsuits involve information which is not relevant or material or designed to lead to the discovery of relevant information, and this question also is overly broad in terms of time period.

6.    Identify in complete detail every communication in writing or verbal that you contend you received from Sternberg defendants.

**RESPONSE:** <u>OBJECTION</u>.  This Interrogatory requests information which is subject to the attorney-client and/or work-product privileges.  Without waiving any objections, TSH directs the Sternberg defendants to the documents produced, and to be produced, by plaintiff pursuant to defendants' document requests.  By way of further response, plaintiffs' investigation is ongoing and plaintiffs will supplement this response as appropriate.

7.    Identify in complete detail all fact witnesses you intend to call at trial in this matter and provide detail as to subject matter of each witnesses' anticipated testimony.  For each witness, please provide the name of the witness, the witnesses' address, and a description of the documents in the witnesses' possession, custody and control.

**RESPONSE:** <u>OBJECTION</u>.  Without waiving any objections, plaintiff has not yet determined the fact witnesses it intends to call at trial or the subject matter of any witness' anticipated testimony.  By way of further response, plaintiff states that it intends to comply with the Federal Rules of Civil Procedure and applicable case management orders concerning the disclosure of fact witnesses and anticipated trial testimony.  *See also* Plaintiff's response to Interrogatory 1 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

8.    Identify in complete detail all expert witnesses you intend to call at trial in this matter and provide detail as to the subject matter of each witnesses' anticipated testimony.  For each witness, please provide the name of the witness, the witnesses' address, and a description of the documents in the witnesses' possession, custody and control.

**RESPONSE**: <u>OBJECTION</u>.  Without waiving any objections, *see* plaintiff's response to Interrogatory 2 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

9.    Do you contend that the Sternberg defendants were responsible for ensuring delivery of the Covid Test Kits to plaintiff by an agreed upon date? If so, set forth any and all facts to support your contention including identification of the contractual language that supports your position.

**RESPONSE**: <u>OBJECTION</u>.  Without waiving any objections, yes. The date of "January 25, 2022" was set forth as the "deliver by" date for the iCovid Test kits.  *See* Complaint, Exhibit "1." The fact that the Sternberg defendants interacted with Plaintiff concerning payment of the purchase price for the Test Kits, and advised plaintiff as to the 1/25/22 delivery date for the Test

Kits shows that one or more of the Sternberg defendants was acting as an agent for the principal, the Gross defendants.

10.     Set forth and describe in detail your understanding of the role of the Sternberg defendants in connection with your agreement to purchase Covid Test Kits from CHG.

**RESPONSE**:  The Stenberg defendants were to hold Plaintiff's $1,965,600 in the Sternberg attorney escrow account, and not release any of those funds until the goods purchased by plaintiff were in transit to plaintiff, i.e., the funds were only to be released contemporaneously with plaintiff's goods being delivered to a common carrier with instructions to deliver the goods to plaintiff's location, and an executed Bill of Sale as well as a Bill of Lading were delivered to plaintiff.

11.     Identify and describe in detail any and all due diligence you performed prior to agreeing to purchase Covid Test Kits from CHG.

**RESPONSE**:  Plaintiff confirmed that Sternberg was a licensed Texas attorney with no disciplinary record, and relied upon Sternberg's agreement to hold plaintiff's funds in his attorney escrow account until the goods purchased by plaintiff in fact were with a common carrier for delivery to plaintiff.

12.     After consummating the agreement to purchase Covid Test Kits from CHG, identify any and all steps you took to track the delivery.  Include in your response whatever you relied upon the Sternberg defendants for tracking purposes.

**RESPONSE**: Plaintiff attempted numerous times to text and/or call and/or email Sternberg, and Gross, and Chris Cortese and other brokers. Sternberg did not respond until after plaintiff's attorney became involved, and then made additional misrepresentations (e.g., that the goods in fact were in transit (but that was not true), and that he (Sternberg) still had substantial funds of Plaintiff in the Sternberg escrow account).  Defendant Gross informed Plaintiff (on February 15, 2022, via text message), that Plaintiff could get a complete refund of Plaintiff's money back (which never happened).  *See* 2/15/22 2:20 pm text message from Gross to Dan Scully.  That same day, 2/15/22, at 7:08 pm, Sternberg emailed plaintiff's counsel that the goods "will be delivered tomorrow" to plaintiff (which also never happened). *See also* documents being produced by plaintiff.

13.     Do you dispute that the Sternberg Defendants served as counsel for CHG and, as such, owed you no professional duty?  If not, set forth any and all facts to support your contention including in your responses, identification of all written and/or verbal agreements between you and Sternberg defendants.

**RESPONSE**:  Yes.  The Sternberg defendants agreed to act as escrow agent for purposes of holding the $1,965,600 which plaintiff wire-transferred to the Sternberg escrow account, and which was not supposed to be released from escrow until the goods purchased by plaintiff were being delivered to plaintiff. *See also* plaintiff's response to Interrogatories 10 through 12 above, which responses are incorporated herein by reference.

14.     Identify and describe in detail any and all representation allegedly made by the Sternberg defendants upon which you relied to your detriment.  Include in your response the date of the representation, why you relied upon it, the nature of the representation, and how it allegedly caused you harm.

**RESPONSE**:  Without waiving any objections, *see* paragraphs 13-41 of Plaintiff's Complaint. *See also* plaintiff's response to Interrogatories 10 through 13 above, which responses are incorporated herein by reference.

15.     On what date did plaintiff first retain the services of Attorney Gary P. Lightman to represent plaintiff to provide counsel to Plaintiff on the facts and legal issues contained in plaintiff's Complaint?

**RESPONSE**:  Plaintiff first retained Lightman & Manochi on or about February 15, 2022.

16.     Identify in complete detail all facts, documents, or other items supporting your allegation that the Sternberg defendants "formed CHG merely as a front" as alleged in Paragraph 2 of the Complaint.

**RESPONSE**:  The facts to support plaintiff's fraud and other claims against the Sternberg defendants are set forth in detail in paragraphs 13-41 of Plaintiff's Complaint.   *See also* plaintiff's response to Interrogatories 10 through 13 above, which responses are incorporated herein by reference.

17.     Identify in complete detail all facts, documents, or other items supporting your allegation that the Sternberg Defendants "misrepresented to plaintiff the Covid Test Kits were on route" as alleged in Paragraph 32 of the Complaint.

**RESPONSE**:  Without waiving any objections, in an email dated February 15, 2022, the Sternberg defendants advised plaintiff that the order would be delivered on February 16, 2022. No product was received by Plaintiff on that day, or any time thereafter through the time plaintiff filed the instant lawsuit. *See also* Plaintiff's response to Interrogatories 10 through 13 above, which responses are incorporated herein by reference. *See also* plaintiff's response to Interrogatory 13 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

18.     Identify in complete detail all facts, documents, or other items supporting your allegation that the Sternberg Defendants "wrongfully and improperly and prematurely released plaintiff's $1,965,600.00 Purchase Price from escrow, without confirming that CHG purchased the Covid Tests Kits" as alleged in Paragraph 46 of the Complaint.

**RESPONSE**:  Without waiving any Objections, *see* plaintiff's response to Interrogatories 10 through 13 above, which responses are incorporated herein by reference. *See also* plaintiff's response to Interrogatory 13 of the Gross Defendants' First Set of Interrogatories, which response is incorporated herein by reference.

19.    Set forth the factual basis upon which Plaintiff intends to rely in support of its cause of action against each and every defendant for Fraud in Inducement (Count I of the Complaint), Fraud (Count II of the Complaint), Civil Conspiracy (Count III of the Complaint), Piercing the Corporate Veil (Count IV of the Complaint, Participation Theory (Count V of the Complaint), Breach of Contract (VI of the Complaint), and Unjust Enrichment/Quantum Meruit (Count VII of the Complaint).

**RESPONSE**:    OBJECTION.    Without waiving any objections, see paragraphs 13-41 of Plaintiff's Complaint.    *See also* plaintiff's responses to Interrogatories 11 through 17 of the Gross Defendants' First Set of Interrogatories, which responses are incorporated herein by reference.

LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE
GLENN A. MANOCHI, ESQUIRE
W. LYLE STAMPS, ESQUIRE
PA Identification Nos. 28529, 64423 & 94909
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Telephone: 215-545-3000
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com
wlstamps@lightmanlaw.com

Date:  September 29, 2022            Attorneys for plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the date shown below he caused to be served a true and correct copy of Plaintiff's Objections and Responses to the Sternberg Defendants' First Set of Interrogatories via ECF, U.S. first class mail and/or email upon the following:

Aaron Schlesinger Esquire                       Seth Laver, Esquire
Peckbar & Abramson, P.C.                       Jason Kaner, Esquire
70 Grand Avenue                               Goldberg Segall
River Edge, NJ  07661                          1700 Market Street, Suite 1418
aschlesinger@pecklaw.com                      Philadelphia, PA 19103-3907
                                              slaver@goldbergsegalla.com
                                              jkaner@goldbergsegalla.com


                                              LIGHTMAN & MANOCHI

                                              BY: /s/ Gary P. Lightman
                                              GARY P. LIGHTMAN, ESQUIRE
                                              GLENN A. MANOCHI, ESQUIRE
                                              W. LYLE STAMPS, ESQUIRE
                                              600 W. Germantown Pike, Suite 400
                                              Plymouth Meeting, PA 19462
                                              Telephone: 215-545-3000
                                              garylightman@lightmanlaw.com
                                              gmanochi@lightmanlaw.com
                                              wlstamps@lightmanlaw.com

Date:  September 29, 2022                      Attorneys for plaintiff

D:\SCULLY\DISCOVERY\22-9-29 P RESP STERNBERG ROGS.DOC

9

**<u>VERIFICATION</u>**

      Daniel J. Scully, an authorized representative of Plaintiff, herby verifies, under penalty of perjury, that the facts set forth in the foregoing document are true and correct, to the best of his knowledge, information and belief.

<div align="right">

Daniel J. Scully
Authorized representative of Plaintiff
American Environmental Enterprises, Inc.,
d/b/a The Safety House.Com

</div>

Date:   <u>September 29, 2022</u>

# EXHIBIT S

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMERICAN ENVIRONMENTAL** : | |
| **ENTERPRISES, INC., d/b/a** : | |
| **THESAFETYHOUSE.COM** : | |
| : | **CIVIL ACTION** |
| **Plaintiff,** : | |
| : | **No. 2022-cv-00688 (JMY)** |
| **v.** : | |
| : | |
| **MANFRED STERNBERG, ESQUIRE** : | |
| **and MANFRED STERNBERG &** : | |
| **ASSOCIATES, PC, and CHARLTON** : | |
| **HOLDINGS GROUP, LLC, and** : | |
| **SAMUEL GROSS** : | |
| : | |
| **Defendants.** : | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT MANFRED
STERNBERG, ESQUIRE AND MANFRED STERNBERG & ASSOCIATES, PC'S
FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

American Environmental Enterprises, Inc., d/b/a The Safety House.Com ("plaintiff" or "TSH"), plaintiff herein, through his counsel Lightman, & Manochi, hereby serves its Objections and Responses to Defendant Manfred Sternberg, Esquire and Manfred Sternberg Associates, PC's (collectively, the "Sternberg defendants") First Request for Production of Documents Directed to Plaintiff ("Document Requests").

## I.  GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY REQUESTS

1.     Plaintiff objects to producing the documents in the form and manner requested by defendants.  Plaintiff intends to produce all non-objectionable documents at the Plymouth Meeting law offices of counsel for plaintiff, at a mutually convenient date and time and in the form they are kept in the usual course of plaintiff's business (hereinafter, "Objection – Production Form").

2.     Plaintiff objects to the Document Requests to the extent that the Document Requests impose a greater burden upon plaintiff than required by the Rules of Court, and to the

extent that said Document Requests are overly broad, remote, and unduly burdensome and oppressive, and not calculated to lead to the discovery of admissible evidence or of information relevant to the subject of this action, especially to the extent that said requests are indefinite as to time, and without reasonable limitation as to scope, and to the extent that said requests place an unwarranted burden and expense upon plaintiff (hereinafter, "Objection-Undue Burden and Overbroad").

3.      Plaintiff objects to the Document Requests to the extent that any Document Request asks information that is privileged from disclosure under the attorney-client privilege or the work-product doctrine or is protected from disclosure on the basis of some other privilege or other grounds (hereinafter, "Objection-Privilege").

4.      Plaintiff objects to the Document Requests to the extent that the Document Request asks for information that is not in plaintiff's possession, custody or control or from persons who are not parties to this litigation (hereinafter, "Objection-Access").

5.      Plaintiff objects to the Document Requests to the extent that defendants already possess or have equal access to any of the documents sought in the Document Requests (hereinafter, "Objection-Equal Access").

6.      Plaintiff objects to the Document Requests to the extent that the Document Request demands that plaintiff produces any documents or provide information and the Sternberg defendants do not agree to enter into an appropriate Stipulation and Protective Order regarding the use and confidentiality of such documents. Any Document Request requiring plaintiff to produce documents and all documents produced therein, are subject to the condition that the parties entitled to receive said documents enter into such a Stipulation and Protective Order (hereinafter, "Objection-Confidentiality").

7.      Plaintiff objects to the extent that the Document Requests seek information which has already been produced by any other party to this litigation

8.      The responses of plaintiff are based upon plaintiff's initial review of information currently available to plaintiff, after reasonable and diligent investigation, which plaintiff believes in good faith to be relevant and responsive. Plaintiff reserves the right to amend and/or further supplement the following responses based upon further investigation and discovery in this case, and to introduce at trial any and all evidence which relates to matters covered by the Document Requests.

9.      Plaintiff reserves and does not waive the right to claim protection of any applicable privilege or doctrine, and to raise any other objection with respect to the Document Requests including on the grounds of vagueness, ambiguity, undue burden and/or overbreadth.

10.     Plaintiff responses and objections herein are made without a waiver of, and with express reservation of: (a) all objections as to competency, relevancy, materiality, and admissibility of any and all documents, and/or the subject matter thereof as evidence, for any purpose in any further proceedings in this action (including trial of this action) or any other action; (b) the right to object to the use of any such Document Request and responses, and/or the subject matter thereof, on any ground in any further proceedings in this action (including trial of this action) or any other action; (c) the right to object on any ground at any time to any further Document Requests, or other discovery proceedings; (d) all privileges (including the attorney-client privilege and work-product doctrine); and (e) the right to move for a protective order or other protective relief to protect the confidentiality and/or restrict the use or disclosure or further dissemination of any information requested pursuant to the Document Requests.

11.     Plaintiff incorporates by reference each and every of the foregoing general objections into each and every response and specific objection stated below, to the Sternberg defendants' Document Requests, as if such general objections were set forth in full.

## II.     OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

1.     All documents and communication, including electronic messages and voice recordings, between You and any Defendant.

**RESPONSE:**   Without waiving any objections, Plaintiff agrees to produce all non-privileged documents in its possession and control concerning this lawsuit.

2.     All non-privileged documents and communications between You and any person regarding this lawsuit.

**RESPONSE**: Objection.  In addition to the foregoing general objections, Plaintiff objects to the information requested to the extent that it is protected by the attorney-work product privilege or other applicable privilege, and to the extent that the requested documents are not relevant or material to any of the claims involved in this lawsuit. Without waiving any objections, the non-privileged documents in plaintiff's possession which are responsive to this request will be produced.  This includes the disciplinary complaint and documents submitted by plaintiff to the State Bar of Texas, and the submissions made by the Sternberg defendants in response thereto—while such material ordinarily should be maintained as confidential and not disclosed, Sternberg through his counsel waived such confidentiality by disclosing the disciplinary complaint and its disposition to the Court and other third parties at the Rule 16 conference conducted on September 7, 2022.

3.     All documents relied on to respond to or referenced in the Interrogatories served concurrently herewith.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents in its possession or control in which it relied on to respond to the Sternberg Defendants' Interrogatories.

4.     All documents that You intend to use, rely upon, or offer to the court in any filings evidentiary hearing, or at trial in this action.

**RESPONSE**:  OBJECTION.  Plaintiff has not yet determined the documents it intends to use, rely upon, or offer to the Court in any proceeding in this action and states that it intends to comply with its obligations with regard to providing documents as required by the Federal Rules of Civil Procedure.

5.     All documents relating in any way to the allegations contained with Your Complaint.

4

**RESPONSE**:  Without waiving any objections, Plaintiff agrees to produce all non-privileged documents in its possession or control which relate to the allegations in the Complaint.

6.     All filings, discovery responses, deposition and/or trial transcripts and correspondence in any lawsuits in which plaintiff was a named party or in which plaintiff provided in any way testimony for the previous ten years.

**RESPONSE**:  <u>OBJECTION</u>.  This request is overly broad, and requests documents that re not relevant or material or designed to lead to the discovery of relevant information.  Without waiving any objections, Plaintiff has been involved in miscellaneous collection actions, overwhelmingly as a plaintiff (with two exceptions, well over ten years ago).  Plaintiff has never sued anybody for fraud before this lawsuit, and has never been sued for fraud.   All of said collection lawsuits involve information which is not relevant or material or designed to lead to the discovery of relevant information, and this question also is overly broad in terms of time period.

7.     All documents or communications that support your claim for damages in this action.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents and communications in its possession or control which support plaintiff's claims for damages.

8.     All documents that support your claim in this action.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents and communications in its possession or control which support plaintiff's claims in this action.

9.     All documents that constitute or memorialize any complaints or charges made against You by any regulatory or law enforcement agency, including but not limited to any record of arrest or criminal charges.

**RESPONSE**:  <u>OBJECTION</u>.  This request is overly broad, and requests documents that are not relevant or material or designed to lead to the discovery of relevant information.  Without waiving any objections, plaintiff has not been the subject of complaints or charges made against plaintiff by any regulatory or law enforcement agency.

10.     All documents that constitute or memorialize Your investigation and/or search for attorneys to represent You in this action.

**RESPONSE**:  <u>OBJECTION</u>.  This request is for information that is privileged.

11.     All documents relied on by any expert retained by Plaintiff.

**RESPONSE**:  <u>OBJECTION</u>.  Plaintiff has not yet determined if it will intend to rely on an expert retained in this action.  To the extent is does, plaintiff intends to comply with its obligations under the Federal Rules of Civil Procedure.

12.     All documents or materials to be used as trial exhibits or demonstrative exhibits in this action.

**RESPONSE**:  <u>OBJECTION</u>.  Plaintiff has not yet determined the documents or materials it intends to use as exhibits or demonstrative exhibits at trial in this action.  Plaintiff intends to comply with its obligations under the Federal Rules of Civil Procedure and applicable case management orders in this regard.

13.     All documents and communications supporting Your allegation that the Sternberg Defendants "formed CHG merely as a front" as alleged in Paragraph 2 of the Complaint.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents and communications in its possession or control which support plaintiff's claims that the Sternberg defendants "formed CHG merely as a front" as alleged in Paragraph 2 of the Complaint.

14.     All documents and communications supporting Your allegation that the Sternberg Defendants "misrepresented to Plaintiffs the Covid Test Kits were on route" as alleged in Paragraph 32 of the Complaint.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents and communications in its possession or control which support plaintiff's claims that the Sternberg Defendants "misrepresented to plaintiffs the Covid Test Kits were on route" as alleged in Paragraph 32 of the Complaint, including Sternberg's 2/15/22 email to plaintiff's counsel.

15.     All documents and communications supporting Your allegation that the Sternberg Defendants "wrongfully and improperly and prematurely released Plaintiff's $1,965,600.00 Purchase Price from escrow, without confirming that CHG purchased the Covid Test Kits" as alleged in Paragraph 46 of the Complaint.

**RESPONSE**:  Without waiving any objections, plaintiff agrees to produce all non-privileged documents and communications in its possession or control which support plaintiff's claims that the Sternberg defendants "wrongfully and improperly and prematurely released plaintiff's $1,965,000.00 Purchase Price from escrow, without confirming that CHG purchased Covid Test Kits" as alleged in Paragraph 46 of the Complaint.

16.     All documents and communications between Plaintiff or counsel for Plaintiff with FBI Agent Russell Stoner from January 1, 2022 to date.

**RESPONSE**:  There are no responsive documents.

LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE
GLENN A. MANOCHI, ESQUIRE
W. LYLE STAMPS, ESQUIRE
PA Identification Nos. 28529, 64423 & 94909
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Telephone: 215-545-3000
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com
wlstamps@lightmanlaw.com

Date:  September 29, 2022                    Attorneys for plaintiff

7

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned hereby certifies that on the date shown below he caused to be served a true and correct copy of Plaintiff's Objections and Responses to the Sternberg defendants' First Request for the Production of Documents via email upon the following at the following email addresses:

Aaron Schlesinger Esquire
Peckbar & Abramson, P.C.
70 Grand Avenue
River Edge, NJ  07661
aschlesinger@pecklaw.com

Seth Laver, Esquire
Jason Kaner, Esquire
Goldberg Segall
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
slaver@goldbergsegalla.com
jkaner@goldbergsegalla.com


LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE
GLENN A. MANOCHI, ESQUIRE
W. LYLE STAMPS, ESQUIRE
PA Identification Nos. 28529, 64423 & 94909
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Telephone: 215-545-3000
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com
wlstamps@lightmanlaw.com

Date:  September 29, 2022

Attorneys for plaintiff

D:\SCULLY\DISCOVERY\22-9-29 P RESP STERNBERG RPD.DOC

8

## **VERIFICATION**

Daniel J. Scully, an authorized representative of Plaintiff, herby verifies, under penalty of perjury, that the facts set forth in the foregoing document are true and correct, to the best of his knowledge, information and belief.

Daniel J. Scully
Authorized representative of Plaintiff
American Environmental Enterprises, Inc.,
d/b/a The Safety House.Com

Date:   September 29, 2022

1

# EXHIBIT T

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMERICAN ENVIRONMENTAL ENTERPRISES, INC., d/b/a THESAFETYHOUSE.COM** : : : | |
| : | **CIVIL ACTION** |
| **Plaintiff,** : | |
| : | **No. 2022-cv-00688 (JMY)** |
| **v.** : | |
| : | |
| **MANFRED STERNBERG, ESQUIRE,** : | |
| **and MANFRED STERNBERG &** : | |
| **ASSOCIATES, PC, and CHARLTON** : | |
| **HOLDINGS GROUP, LLC, and** : | |
| **SAMUEL GROSS a/k/a SHLOMO** : | |
| **GROSS, and GARY WEISS,** : | |
| **and ASOLARDIAMOND, LLC a/k/a,** : | |
| **ASOLAR. LLC, and DAPHNA** : | |
| **ZEKARIA, ESQUIRE, and SOKOLSKI** : | |
| **& ZEKARIA, P.C.** : | |
| : | |
| **Defendants.** : | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT MANFRED
STERNBERG, ESQUIRE AND MANFRED STERNBERG & ASSOCIATES, PC'S
THIRD SET OF INTERROGATORIES**

American Environmental Enterprises, inc., d/b/a The SafetyHouseCom ("plaintiff" or

"TSH"), plaintiff herein, through its counsel Lightman, & Manochi, hereby files his Objections

and Responses to the Third Set of Interrogatories propounded upon plaintiff by defendants

Manfred Sternberg, Esquire and Manfred Sternberg & Associates, PC (collectively the

"Sternberg Defendants").

I.   **GENERAL OBJECTIONS**

1.    Plaintiff objects to the Sternberg Defendants' "definitions" and "instructions" to

the extent that they attempt to impose any obligations beyond those required by the Federal

Rules of Civil Procedure.  Plaintiff will respond to defendant's Interrogatories in accordance

with the Federal Rules of Civil Procedure.

2.    In addition, plaintiff objects to all "definitions" and usage of language and words

other than their plain meaning and their meaning as defined by the Federal Rules of Civil Procedure.

3.      Plaintiff objects to each of the Interrogatories) on the grounds that said discovery requests are overly broad, remote, and unduly burdensome and oppressive, and not calculated to lead the discovery of admissible evidence or of information relevant to the subject of this action, especially to the extent that said discovery requests are indefinite at this time, and without reasonable limitation in their scope, and to the extent that said discovery requests place an unwarranted burden and expense upon Plaintiff.

4.      Plaintiff objects to each of the Interrogatories to the extent that any responses requested pursuant to the Interrogatories are privileged from disclosure under the attorney-client privilege or the work-product doctrine, or are protected from disclosure on the basis on some other privilege or other grounds.

5.      Plaintiff objects to each of the Interrogatories to the extent that the Interrogatories call for the production of documents which constitute trade secrets or confidential financial or business information or other documents of a sensitive or proprietary business or personal nature, or the disclosure of which may violate the privacy rights of Plaintiff and/or applicable regulatory laws or regulations.

6.      Plaintiff reserves and does not waive the right to claim protection of any applicable privilege or doctrine, and to raise any other objections with respect to documents sought by any of the Interrogatories, to which plaintiff objects on the grounds of vagueness, ambiguity, undue burden, overbreadth, and/or failure to describe documents with reasonable particularity.

7.      Plaintiff's responses to the Sternberg Defendants' Interrogatories are without a waiver of, and with express reservations of: (a) all objections as to competency, relevancy,

materiality, and admissibility of any and all said information and/or documents, and/or the subject matter thereof as evidence, for any purpose in any further proceedings in this action (including trial of this action) or any other action; (b) the right to object to the use of any such information and/or documents, and/or the subject matter thereof, on any ground in any further proceedings in this action (including trial of this action) or any other action; (c) the right to object on any ground at any time to a demand or request for further production of information and/or documents, or other discovery proceedings; (d) all privileges (including the attorney-client privilege and work-product doctrine); and (e) the right to move for a protective order or other protective relief to protect the confidentiality and/or restrict the use of disclosure or further dissemination of any information and/or documents produced or information contained therein.

8.    Plaintiff's responses to the Interrogatories are based upon its initial investigation, which Plaintiff believes in good faith to be relevant and responsive.  Plaintiff states that Plaintiff's discovery and investigation in this matter is continuing.  Plaintiff reserves the right to amend and/or further supplement the following responses or production made pursuant thereto based upon any further investigation and discovery in this case, and to introduce at trial any and all evidence which relates to matters covered by the Interrogatories.

9.    Plaintiff objects to the extent that the Interrogatories seek information which is in the power, control or possession of the Sternberg Defendants or any other information which the Sternberg defendants have equal access to.

10.    Plaintiff objects to the extent that the Interrogatories seek information which has already been produced by any other party to this litigation.

11.    Plaintiff incorporates by reference each and every of the foregoing general objections into each and every response and specific objection stated below, as if such general objections were set forth in full therein.

## II.    <u>RESPONSES TO INTERROGATORIES</u>

1.      Identify the full name, address and title of all persons who participated in preparing the answers to these Interrogatories along with each and every person having any knowledge of the relevant facts of this Action. As to each such person, set forth the facts of which that person has knowledge and set forth the basis for that person's knowledge of those facts.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

2.      Identify and describe in detail the nature of Plaintiff's business as well as each of its employees, officers, directors and owners and his/her title and responsibility.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.  Plaintiff

also objects to this Interrogatory because it seeks information which is not relevant or

material to any of the issues in this lawsuit, and is not calculated to lead to the discovery

of admissible evidence, and because it constitutes harassment.

3.      Identify specifically all of the things you contend the Sternberg Defendants did, which should not have been done with respect to the subject matter of this lawsuit as well as all of the things you contend the Sternberg Defendants did not do, which should have been done, relating to the subject matter of this lawsuit.  Set forth in specific detail the factual basis for each such contention, identifying each and every witness relating to your contention.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

4.      Identify specifically all of the things you contend Defendants Charlton Holdings Group, LLC and/or Samuel Gross (hereinafter the "Gross Defendants"), did which should not have been done with respect to the subject matter of this lawsuit. Set forth in specific detail the factual basis for each such contention, identifying each and every witness relating to your contention.

   **RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

   number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

   number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.


5.      Identify and describe in detail the scope of the Sternberg Defendants duty to you, if any, with respect to the contemplated transactions to purchase 151,200 iHealth Covid-19 Antigen Rapid two-pack test kits (the "Test Kits") as you contend in Plaintiff's Complaint. Include in your response what you understood to be the Sternberg Defendants' role in the transactions, if any. If you contend that the Sternberg Defendants breached said duty, if any, include any and all facts to support that contention. Include in your response whether you dispute that the Sternberg Defendants acted as attorney for the Gross Defendants and did not act as your counsel.

   **RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

   number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

   number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.


6.      Is it your contention that the Sternberg Defendants were obligated to provide you with Test Kits? If so, set forth all facts to support your contention and produce a copy of the pertinent document(s).

   **RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total

   number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

   number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

7.    Identify and describe in detail your understanding of the scope of the Sternberg Defendants' duty to the Gross Defendants, if any, with respect to the contemplated transactions to purchase Test Kits.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

8.    If you relied on the Sternberg Defendants for any purpose with respect to the contemplated transactions to purchase Test Kits, set forth any and all statements and/or conduct upon which you relied, whether the Sternberg Defendants misrepresented any fact upon which you later learned was inaccurate, and upon what basis you believed you were entitled to rely upon the Sternberg Defendants.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

9.    Does Plaintiff contend that it was the responsibility of the Sternberg Defendants to perform any due diligence on its behalf before Plaintiff wired any funds intended for the purchase of Test Kits? Set forth any and all facts to support your contention including all communications wherein the Sternberg Defendants indicated they had completed any due diligence on Plaintiff's behalf.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

10.    For all times relevant hereto, describe with particularity all due diligence and/or vetting steps utilized by Plaintiff to ensure itself that the Gross Defendants could effectuate the contemplated transaction prior to Plaintiff's execution of the January 21, 2022 Sale and Purchase Agreement appended to Plaintiff's Complaint. In your response, identify any and all natural persons, businesses, consultancies, law enforcement agencies, banks, and law firms consulted with during such diligence, including the full name of any individuals whom Plaintiff consulted, discussed, or otherwise conducted due diligence on any of parties associated with the Test Kits, and describe with particularity each and every instance any such person or party raised concerns about any of the aforementioned parties both before and after you executed the SPA as detailed

in Plaintiff's Complaint.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

11.     With reference to the SPA, do you dispute that title of the Test Kits transferred to you immediately upon your wire of the purchase price funds into the Sternberg Defendants' escrow account? Set forth any and all facts to support your contention and include in your response any support for your allegation that the Sternberg Defendants' release of purchase funds to the Gross Defendants was somehow premature and/or improper.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

12.     Is it your contention that you never received any Test Kits from the Gross Defendants? If so, set forth any and all facts to support your contention including whether you ever refused delivery of Test Kits for any reason and include in your response your understanding of why you never received the product you intended to purchase. What was the basis of your refusal to accept delivery of any Test Kits?

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

13.     Do you accept any responsibility for never receiving the Test Kits you attempted to purchase? Set forth any and all facts to support your position.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

14.     Identify the following individuals including your relationship to him and his involvement in these proceedings and/or your attempts to receive Test Kits: Ed Nepalitano and Russell Stoner.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

15.     With reference to ¶28 of Plaintiff's Complaint, detail any alleged representations of the Sternberg Defendants upon which you relied in issuing Purchase Order No. 18315, being sure to describe the alleged representation(s) in detail including date, manner, the contents of said misrepresentation(s).

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

16.     Set forth any and all facts to support your contention that the Sternberg Defendants represented to you "that the $1,965,600.00 purchase price would not be released from the attorney escrow account … unless and until the Covid Test Kits had been delivered to a common carrier…" as you contend in ¶39 of Plaintiff's Complaint.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

17.     Do you dispute that the Sternberg Defendants wire transferred in excess of the "purchase price" to an escrow account held by Defendant Sokolski & Zekaria, PC ("S&Z") in anticipation of Defendant Gary Weiss delivering to Plaintiff the contemplated Test Kits? Set forth any and all facts to support your position.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

18.     Identify and describe in detail the circumstances upon which you began any business relationship with the Gross Defendants. Include in your response any prior business dealings, how you met, and any and all individuals with whom you consulted to assure yourself that the Gross Defendants were legitimate and capable business partners.

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25 number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

19.     As to each proposed expert witness who may testify on your behalf at trial, set forth in detail the following:

    a. The individual's name, address, qualifications and educational background;

    b. The subject matter about which the individual is expected to testify;

    c. The substance of the facts and opinions to which the individual is expected to testify;

    d. A summary of the grounds for any opinion to which the individual is expected to testify;

    e. Attach hereto a true copy of each written expert report rendered by any proposed expert witness(es); and

    f. Set forth verbatim the content of any oral report rendered by any proposed expert witness(es).

**RESPONSE:** <u>OBJECTION</u>.  Plaintiff objects to this Interrogatory because the total number of Interrogatories propounded by the Sternberg Defendants exceeds the 25

number limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE
GLENN A. MANOCHI, ESQUIRE
Identification Nos. 28529 & 64423
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Telephone: 215-545-3000
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com

Date:  April 22, 2024                    Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned hereby certifies that on the date shown below he caused to be served a true and correct copy Plaintiff's Objections and Responses to Sternberg Defendants' Third Set of Interrogatories via ECF, and/or email upon the following:

Seth Laver, Esquire
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
slaver@goldbergsegalla.com

Gary Weiss
437 1st Avenue
Elizabeth, NJ 07206
wgary4109@gmail.com
monipair@aol.com


Samuel Gross
a/k/a Shlomo Gross
78 Buckminster Road
Rockville Centre, NY 11570
charltonholdinggroupllc@aol.com
publicdiamonds@gmail.com
Scg1212@gmail.com
Samrosinc@icloud.com

Patrick Healey, Esquire
Cathleen Kelly Rebar, Esquire
Rebar Kelly
Blue Bell Executive Campus
470 Norristown Road, Suite 201
Blue Bell, PA  19422
phealey@rebarkelly.com
crebar@rebarkelly.com


     LIGHTMAN & MANOCHI

     BY: /s/ Gary P. Lightman
     GARY P. LIGHTMAN, ESQUIRE

Date :  April 22, 2024    Attorneys for Plaintiff

11

# EXHIBIT U

**To Motion for Summary Judgment of Defendants**

**Manfred Sternberg, Esquire and**

**Manfred Sternberg & Associates, PC**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERICAN ENVIRONMENTAL** | : | |
| **ENTERPRISES, INC., d/b/a** | : | |
| **THESAFETYHOUSE.COM** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 2022-cv-00688 (JMY)** |
| **v.** | : | |
| | : | |
| **MANFRED STERNBERG, ESQUIRE,** | : | |
| **and MANFRED STERNBERG &** | : | |
| **ASSOCIATES, PC, and CHARLTON** | : | |
| **HOLDINGS GROUP, LLC, and** | : | |
| **SAMUEL GROSS a/k/a SHLOMO** | : | |
| **GROSS, and GARY WEISS,** | : | |
| **and ASOLARDIAMOND, LLC a/k/a,** | : | |
| **ASOLAR. LLC, and DAPHNA** | : | |
| **ZEKARIA, ESQUIRE, and SOKOLSKI** | : | |
| **& ZEKARIA, P.C.** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO
THIRD REQUEST FOR PRODUCTION OF DOCUMENTS OF DEFENDANTS
MANFRED STERNBERG, ESQUIRE AND MANFRED
STERNBERG & ASSOCIATES, PC**

American Environmental Enterprises, inc., d/b/a The SafetyHouse.Com ("plaintiff" or "TSH"), plaintiff herein, through its counsel Lightman, & Manochi, hereby files his Objections and Responses to the Third Request for Production of Documents propounded to plaintiff by defendants Manfred Sternberg, Esquire and Manfred Sternberg Associates, PC (collectively the "Sternberg Defendants").

**I.   GENERAL OBJECTIONS**

1.      Plaintiff objects to Defendant's "definitions" and "instructions" to the extent that they attempt to impose any obligations beyond those required by the Federal Rules of Civil Procedure.   Plaintiff will respond to the Sternberg Defendants' Document Requests in accordance with the Federal Rules of Civil Procedure.

2.      In addition, Plaintiff objects to all "definitions" and usage of language and words other than their plain meaning and their meaning as defined by the Federal Rules of Civil Procedure.

3.      Plaintiff objects to each of the Document Requests on the grounds that said discovery requests are overly broad, remote, and unduly burdensome and oppressive, and not calculated to lead the discovery of admissible evidence or of information relevant to the subject of this action, especially to the extent that said discovery requests are indefinite at this time, and without reasonable limitation in their scope, and to the extent that said discovery requests place an unwarranted burden and expense upon Plaintiff.

4.      Plaintiff objects to each of the Document Requests to the extent that any responses requested pursuant to the Requests are privileged from disclosure under the attorney-client privilege or the work-product doctrine, or are protected from disclosure on the basis on some other privilege or other grounds.

5.      Plaintiff objects to each of the Document Requests to the extent that the Requests call for the production of documents which constitute trade secrets or confidential financial or business information or other documents of a sensitive or proprietary business or personal nature, or the disclosure of which may violate the privacy rights of Plaintiff and/or applicable regulatory laws or regulations.

6.      Plaintiff reserves and does not waive the right to claim protection of any applicable privilege or doctrine, and to raise any other objections with respect to documents sought by any of the Document Requests, to which Plaintiff objects on the grounds of vagueness, ambiguity, undue burden, overbreadth, and/or failure to describe documents with reasonable particularity.

7.      Plaintiff's responses to the Sternberg Defendants' Document Requests are without a waiver of, and with express reservations of: (a) all objections as to competency, relevancy, materiality, and admissibility of any and all said information and/or documents, and/or the subject matter thereof as evidence, for any purpose in any further proceedings in this action (including trial of this action) or any other action; (b) the right to object to the use of any such information and/or documents, and/or the subject matter thereof, on any ground in any further proceedings in this action (including trial of this action) or any other action; (c) the right to object on any ground at any time to a demand or request for further production of information and/or documents, or other discovery proceedings; (d) all privileges (including the attorney-client privilege and work-product doctrine); and (e) the right to move for a protective order or other protective relief to protect the confidentiality and/or restrict the use of disclosure or further dissemination of any information and/or documents produced or information contained therein.

8.      Plaintiff's responses to the Document Requests are based upon its initial investigation, which Plaintiff believes in good faith to be relevant and responsive.  Plaintiff states that Plaintiff's discovery and investigation in this matter is continuing.  Plaintiff reserves the right to amend and/or further supplement the following responses or production made pursuant thereto based upon any further investigation and discovery in this case, and to introduce at trial any and all evidence which relates to matters covered by the Document Requests.

9.      Plaintiff objects to the extent that the Document Requests seek information which is in the power, control or possession of Defendants or any other information to which Defendant has equal access.

10.      Plaintiff objects to the extent that the Document Requests seek information which has already been produced by plaintiff and/or any other party to this litigation.

3

11.     Plaintiff incorporates by reference each and every of the foregoing general objections into each and every response and specific objection stated below, as if such general objections were set forth in full therein.

## II.    RESPONSES TO DOCUMENT REQUESTS

1.     All correspondence, contracts, drafts, memos, reports and documents from Plaintiff used in or related to the subject transactions detailed in the Complaint.

**RESPONSE:**   OBJECTION.   This Request is vague and ambiguous, and also overly broad. Without waiving any objections, and as plaintiff understands this request, plaintiff responds as follows:   Plaintiff believes that non-privileged responsive documents already have been produced.

2.     All documents concerning, relating to and/or evidencing Plaintiff's claimed losses or damages as a result of the incident.

**RESPONSE**:   Plaintiff believes that non-privileged responsive documents already have been produced.

3.     All communications, including but not limited to email and text messages, between or amongst Plaintiff and any party to these proceedings or concerning these proceedings.

**RESPONSE**:   OBJECTION.    Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged.  This Request also is vague and ambiguous, and also overly broad.  Without waiving any objections, plaintiff responds as follows:   Plaintiff believes that non-privileged responsive documents already have been produced.   Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

4.     All documents exchanged amongst or between Plaintiff and any party to these proceedings.

**RESPONSE**:   OBJECTION.    This Request is duplicative of Request No. 3 above, and plaintiff's response to No. 3 is incorporated herein by reference, as if set forth at length.

5.     All documents authored by Mr. Sternberg.

4

**RESPONSE**:  <u>OBJECTION</u>.   Plaintiff objects to this Request to the extent that it seeks information which already is in the possession of the Sternberg Defendants.  Without waiving any objections, plaintiff responds as follows:  Plaintiff believes that non-privileged responsive documents already have been produced.

6.      All documents authored by Mr. Gross.

**RESPONSE**:  <u>OBJECTION</u>.   Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:   Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

7.      All documents authored by Mr. Weiss.

**RESPONSE**:  <u>OBJECTION</u>.   Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:   Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

8.      All documents authored by Ms. Zekaria.

**RESPONSE**:  <u>OBJECTION</u>.   Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:   Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

9.      All documents authored by Mr. Scully which refer or relate to these proceedings

and/or the allegations in Plaintiff's Complaint.

**RESPONSE**:  <u>OBJECTION</u>.   This Request is duplicative of Request Nos. 1 and 2 above, and plaintiff's responses to Nos. 1 and 2 are incorporated herein by reference, as if set forth at length.

10.     All documents in your possession which refer or relate to the contemplated

transactions to purchase 151,200 iHealth Covid-19 Antigen Rapid two-pack test kits (the "Test

Kits") as you contend in Plaintiff's Complaint.

**RESPONSE**:  <u>OBJECTION</u>.    This Request is duplicative of Request No. 1 above, and plaintiff's response to No. 1 is incorporated herein by reference, as if set forth at length.

      11.    All contracts and/or agreements, including drafts, which refer or relate to the Test

Kits.

**RESPONSE**:  Plaintiff believes that non-privileged responsive documents already have been produced.

      12.    All documents in your possession obtained from any party or witness to these

proceedings.

**RESPONSE**:  <u>OBJECTION</u>.    Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:    Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

      13.    All correspondence amongst or between Gary Lightman, Esquire, or anyone

acting on his behalf, and any defendant in these proceedings.

**RESPONSE**:  <u>OBJECTION</u>.    Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:    Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

      14.    All correspondence amongst or between Gary Lightman, Esquire, or anyone

acting on his behalf, and any non-party to these proceedings concerning or related to the Test

Kits.

**RESPONSE**:  <u>OBJECTION</u>.    Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged. Without waiving any objections, plaintiff responds as follows:    Plaintiff believes that non-privileged responsive documents already have been produced.  Plaintiff will again search its records and produce non-privileged responsive documents that have not already been produced.

15.     All documents and communications reflecting, referring, or relating in any way to your refusal to accept delivery of Test Kits.

**RESPONSE**:  <u>OBJECTION</u>.  Plaintiff canceled the purchase on February 16, 2022, and there were no deliveries of any test kits on or before that date.  Someone on behalf of defendants attempted delivery of a small portion of test kits in March, but (a) plaintiff's purchase already was canceled, and (b) the test kits that someone tried to deliver contained a known fraudulent identification number for those iHealth test kits, and (c) had expiration dates within a few weeks after the date that delivery was attempted.  Plaintiff does not have any responsive documents, but believes that the FBI has documents as well as pictures (Elizabeth Becker, from the FBI, was present when the delivery was attempted).

16.     All documents which refer or relate to gemstones purportedly provided by Mr. Weiss to Mr. Gross.

**RESPONSE**:  Plaintiff believes that non-privileged responsive documents already have been produced—plaintiff does not have any documents other than the documents provided by those defendants.

17.     Any recorded conversation in your possession which refers or relates to the Test Kits, including those collected lawfully or otherwise during any deposition taken in these proceedings.

**RESPONSE**:  Plaintiff believes that there are no responsive documents in plaintiff's possession.

18.     Any and all text messages which refer or relate to the Test Kits.

**RESPONSE**:  <u>OBJECTION</u>.   This Request is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.

19.     All documents and communications reflecting, referring, or relating in any way to the due diligence you performed before entering into any contract with Defendants Charlton Holdings Group, LLC and/or Samuel Gross (hereinafter the "Gross Defendants").

**RESPONSE**:  Plaintiff believes that non-privileged responsive documents already have been produced, including the plaintiff's 1/21/22 Purchase Order #18315 (which clearly and

unequivocally states "deliver by 1/25/22") and the 1/21/22 SPA (which clearly and unequivocally states, in paragraph 6, that "Title transfer shall happen contemporaneously with funds being released to Seller." Plaintiff relied upon the involvement of the Sternberg Defendants to act as the escrow agent to insure Seller's compliance with that provision of paragraph 6 of the SPA and the 1/25/22 delivery date.

20.    All correspondence and/or documents which refer or relate to any non-party that claims to be a "victim" of the Gross Defendants.

**RESPONSE**:  Non-privileged documents have been or will be produced. *See also*, Plaintiff's Supplemental Rule 26 Disclosures.

21.    Any and all documents attached or identified in Plaintiff's responses to Interrogatories or Rule 26 disclosures.

**RESPONSE**:  Non-privileged documents have been or will be produced.

22.    Any and all memoranda, reports, analyses or other assessments which refer or relate to the subject transactions detailed in the Complaint.

**RESPONSE**:  <u>OBJECTION</u>.   This Request is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.

23.    Any and all notes taken by Dan Scully during the deposition of any party to these proceedings, including but not limited to, Mr. Sternberg and/or Mr. Weiss.

**RESPONSE**:  <u>OBJECTION</u>.  The responsive documents are privileged.

24.    Any and all relevant documents which refer or relate to Ed Nepalitano.

**RESPONSE**:  Plaintiff does not believe that he has any documents responsive to this Request.

25.    Any and all relevant documents which refer or relate to Russell Stoner.

**RESPONSE**:  Plaintiff does not believe that he has any documents responsive to this Request.

8

26.     Any and all documents which support your claimed damages against any party to these proceedings.

**RESPONSE**:   OBJECTION.    This Request is duplicative of Request No. 2 above, and plaintiff's response to No. 2 is incorporated herein by reference, as if set forth at length.

27.     All documents you intend to rely upon at trial in this matter.

**RESPONSE**:   OBJECTION.   This Request is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.   Further, plaintiff has not yet determined the documents or materials it intends to use as exhibits or demonstrative exhibits at trial in this action.   Plaintiff intends to comply with its obligations under the Federal Rules of Civil Procedure and applicable case management orders in this regard.

28.     Any and all written statements, transcriptions from any recorded statement, recordings of any oral statements, and summaries of all interviews directly or indirectly concerning the above captioned litigation made by any of the parties to this litigation or of any witnesses to the events set forth in Plaintiff's Complaint.

**RESPONSE**:   OBJECTION.   This Request is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.   Further, this Request is objectionable to the extent that it requests documents (such as deposition transcripts) that plaintiff is precluded by applicable law from copying and providing to the Sternberg Defendants.

29.     Any and all copies of reports, correspondence, memoranda and writings rendered by any expert witness employed or consulted by Plaintiff or anyone acting on your behalf concerning this matter.

**RESPONSE**:   OBJECTION.   This Request is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.   Further, plaintiff has not yet determined if it will intend to rely on an expert retained in this action.   To the extent Plaintiff does retain an expert, Plaintiff intends to comply with its obligations under the Federal Rules of Civil Procedure, and/or any deadlines set forth in the Case Management Order entered in this case.

30.     Any and all documents in the possession, custody and/or control of each and every person with knowledge of any of the events and/or circumstances that may be relevant to any of the allegations set forth in Plaintiff's Complaint, or otherwise responsive to any of the requests herein, not specifically produced in response to the above.

**RESPONSE**:   OBJECTION.   Plaintiff objects to this Request to the extent that it seeks information which is work-product and/or otherwise privileged.  This Request also is vague and ambiguous, and also overly broad.  This Request also is duplicative of one or more prior Requests, and plaintiff's responses to said Requests are incorporated herein by reference, as if set forth at length.

LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE
GLENN A. MANOCHI, ESQUIRE
Identification Nos. 28529 &, 64423
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Telephone: 215-545-3000
garylightman@lightmanlaw.com
gmanochi@lightmanlaw.com

Date:  April 22, 2024                    Attorneys for Plaintiff

10

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date shown below he caused to be served a true and correct copy Plaintiff's Objections and Responses to Sternberg Defendants' Third Request for Production of Documents via ECF, U.S. and/or email upon the following:

Seth Laver, Esquire
Joseph Ross, Esquire
Goldberg Segalla
1700 Market Street, Suite 1418
Philadelphia, PA 19103-3907
slaver@goldbergsegalla.com
jross@goldbergsegalla.com

Gary Weiss
437 1st Avenue
Elizabeth, NJ 07206
monipair@aol.com
wgary4109@gmail.com

Samuel Gross
a/k/a Shlomo Gross
78 Buckminster Road
Rockville Centre, NY 11570
charltonholdinggroupllc@aol.com
publicdiamonds@gmail.com
Scg1212@gmail.com
Samrosinc@icloud.com

Patrick Healey, Esquire
Cathleen Kelly Rebar, Esquire
Rebar Kelly
Blue Bell Executive Campus
470 Norristown Road, Suite 201
Blue Bell, PA  19422
phealey@rebarkelly.com
crebar@rebarkelly.com

LIGHTMAN & MANOCHI

BY: /s/ Gary P. Lightman
GARY P. LIGHTMAN, ESQUIRE

Date :  April 22, 2024            Attorneys for Plaintiff