**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| American Environmental Enterprises, | : | |
| Inc. d/b/a **THESAFETYHOUSE.COM** | : | |
| *Plaintiff,* | : | |
| v. | : | CIVIL ACTION |
| | : | No. 2022-CV-00688 |
| **Manfred Sternberg, Esquire; Manfred** | : | (JMY) |
| **Sternberg & Associates, PC; Charlton** | : | |
| **Holdings Group, LLC; Samuel Gross;** | : | |
| **Gary Weiss; A. Solar, LLC; Daphna** | : | |
| **Zekaria, Esq.; Sokolski & Zekaria, PC,** | : | |
| *Defendants* | : | |

**DEFENDANTS MANFRED STERNBERG, ESQUIRE AND MANFRED STERNBERG
& ASSOCIATES, P.C.'S RESPONSE TO PLAINTIFF'S STATEMENT OF
UNDISPUTED MATERIAL FACTS AND COUNTER-STATEMENT OF FACTS
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendants Manfred Sternberg, Esquire and

Manfred Sternberg & Associates, P.C.  ("the Sternberg Defendants") submit the following Response to

Plaintiff's Statement of Undisputed Facts along with their "Counterstatement of Facts," which consists of a

recitation of the Statement of Undisputed Material Facts they submitted along with their Motion for Summary

Judgment [198-1].

1.      Plaintiff instituted this action on February 23, 2022 [ECF 1]. **RESPONSE:**

Undisputed. *See also Sternberg SUMF at ¶1* and citations therein.

2.      SAFETY HOUSE claims in this case that it was the victim involving a significant financial

fraud perpetrated upon plaintiff by and between the Defendants, wherein TSH was induced to purchase

151,200 boxes of iCovid Kits (the "COVID Test Kits" or "Test Kits") for $1,965,600.00 — plaintiff

wired the $1,965,600.00 purchase price to the Sternberg Defendants, but did not receive the COVID

Test Kits, and TSH has not gotten back the purchase price it paid for those COVID Test Kits. Instead, defendants divided up the $1,965,600 paid by TSH amongst themselves *See generally,* First Amended Complaint, [ECF 80] (a copy of which pleading is marked as Exhibit P-36 accompanying this Motion ; *see also,* Certification of Daniel Scully (the "Scully Certification") accompanying this Motion. **RESPONSE:** Undisputed that this accurately summarizes what Plaintiff *claims. See also Sternberg SUMF at ¶ 2* and citations therein.

3. Plaintiff served Requests for Admission (sometimes referred to as the "RFAs") upon each of the defendants on June 17, 2024, a copy of which Requests for Admission with exhibits is marked as Exhibit P-1 and Exhibits RFA-1 through RFA-5 accompanying this Motion. *See* Certification of Gary Lightman (the "Lightman Certification") accompanying this Motion, at ¶ 9, and Exhibits P-1 and RFA-1 through RFA-5. **RESPONSE:** Undisputed that Plaintiff issued a relatively unprecedented 172 RFAs upon each of the defendants. It is noteworthy that Plaintiff repeatedly relies upon the Sternberg Defendants' responses to the RFAs herein yet, in a separate motion, seeks to strike and/or deem admitted those very responses.

4. Exhibit P-1 accompanying this Motion is a true and correct copy of Plaintiff's Rule 36 Requests for Admission that were served upon each of the defendants on June 17, 2024. *Id.* at ¶4. **RESPONSE:** Undisputed that this exhibit is the RFAs issued in this matter.

5. Exhibits RFA-1 through RFA-5 are true and correct copies of the documents that accompanied the Requests for Admission served on each of the defendants on June 17, 2024. *Id.* at ¶¶ 5-9. **RESPONSE:** Undisputed.

6. The Gross Defendants failed to serve responses to Plaintiff's Requests for Admission, either within 30 days of service of the RFAs upon them, or to date. Lightman Certification, at ¶10. **RESPONSE:** Undisputed.

7.      The Zekaria Defendants failed to serve responses to Plaintiff's Requests for Admission, either within thirty (30) days of service of the RFAs upon them, or to date. Lightman Certification, at ¶ 11. **RESPONSE:** Undisputed.

8.      Pursuant to Rule 36 of the Federal Rules, each of the Requests for Admission are deemed admitted, as against the Gross Defendants and as against the Zekaria Defendants. Rule 36, Fed.R.Civ.P. **RESPONSE:** Undisputed that a court may deem admitted unanswered RFAs.

9.      The Gross Defendants and the Zekaria Defendants each have made the following admissions (as a result of their failure to respond at all to Plaintiff's Rule 36 Requests for Admission): **RESPONSE:** Undisputed that a court may deem admitted unanswered RFAs. By way of further answer, see the Sternberg Defendants full and complete responses to each of the RFAs, a copy of which is appended as *Exhibit "2."*

10.      Plaintiff filed for a default against defendants Gary Weiss and ASOLARDOIAMOND, LLC, a/k/a ASOLAR, LLC, on December 21, 2023 [ECF 141]; Lightman Certification at ¶12. **RESPONSE:** Undisputed.

11.      Plaintiff filed for a default against defendants Daphna Zekaria, Esquire, and Sokolski & Zekaria, PC, on August 13, 2024 [ECF 190]; Lightman Certification at ¶13. **RESPONSE:** Undisputed.

12.      Plaintiff filed for a default against defendants Samuel Gross, a/k/a Shlomo Gross, and Charlton Holdings Group, LLC, on August 31, 2023 [ECF 100]; Lightman Certification at ¶ 14. **RESPONSE:** Undisputed.

13.      Plaintiff is entitled to a Judgment in favor of plaintiff, against defendants Daphna Zekaria, Esquire, and Sokolski & Zekaria, PC, and Samuel Gross, a/k/a Shlomo Gross, and Charlton Holdings Group, LLC, for compensatory damages in the amount of $1,965,600.00, based upon their admissions,

as set forth in Nos. 8 and 9, above. **RESPONSE:** Undisputed that a court may deem unanswered RFAs admitted which may entitle Plaintiff to a judgment in its favor and against the Zekaria Defendants and/or the Gross Defendants.

14.     Plaintiff is entitled to a Judgment in favor of plaintiff, against defendants Daphna Zekaria, Esquire, and Sokolski & Zekaria, PC, and Samuel Gross, a/k/a Shlomo Gross, and Charlton Holdings Group, LLC, and Gary Weiss, and ASOLARDIAMOND, LLC, a/k/a ASOLAR, LLC, for compensatory damages in the amount of $1,965,600.00, based upon the defaults filed by plaintiff against said defendants, as set forth in Nos. 10-12, above. **RESPONSE:** Undisputed that Plaintiff may be entitled to a default judgment in its favor and against certain defendants excluding the Sternberg Defendants.

15.     Plaintiff is entitled to a Judgment in favor of plaintiff, against defendants Daphna Zekaria, Esquire, and Sokolski & Zekaria, PC, and Samuel Gross, a/k/a Shlomo Gross, and Charlton Holdings Group, LLC, and Gary Weiss, and ASOLARDIAMOND, LLC, a/k/a ASOLAR, LLC, for punitive damages, based upon the aforesaid undisputed material facts, which establish by clear and convincing evidence as a matter of law that the conduct of said defendants was egregious and in bad faith. **RESPONSE:** Undisputed that Plaintiff may be entitled to a judgment in its favor and against certain defendants excluding the Sternberg Defendants.

16.     Paragraph 4 of the SPA clearly states that "The product lots may be located in more than one (1) location or warehouse in various locales in the United States." Exhibit P-3, the SPA, at ¶ 4. **RESPONSE:** Undisputed that this language exists in the SPA.

17.     On January 21, 2022, the date of the SPA, none of the defendants had any COVID Test Kits, let alone "product lots" that were located in any location or warehouse, as was represented to TSH to induce them to enter into the SPA. RFA Nos. 23, 24, and 47; Exhibits P-9 and P-10.

**RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect, maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.* Further, there is no evidence that the Sternberg Defendants "induced" Plaintiff's conduct at any time particularly given the reality that there was no dialog between them before Plaintiff executed the SPA. *See also, Sternberg SUMF at ¶¶ 49-50* and citations therein.

18.    Paragraph 4 of the SPA clearly states that "Immediately after delivering a Purchase Order, Buyer [TSH] agrees to authorize a wire be made to Seller [Gross Defendants] through the Seller's Attorney [the Sternberg Defendants'] Escrow Account identified in Exhibit B for the actual number of product in the Purchase Order." Exhibit P-3, the SPA, at ¶4. **RESPONSE:** Disputed because Plaintiff's selective quotation appears intended to imply a meaning different from that of the complete text of ¶ 4 of the SPA, which actually states: "Immediately after delivering a Purchase Order, Buyer agrees to authorize a wire be made to Seller through the Seller's Attorney Escrow Account identified in Exhibit B for the actual number of boxes of product contained in the Purchase Order." *See, Ex. P-3, SPA, ¶4; see also, Sternberg SUMF at ¶¶ 39, 54-56, and 71* and citations therein.

19.    Paragraph 5 of the SPA clearly states that "Seller agrees to sell 151,200 boxes of 2 count iHealth COVID 19 home test kits. The Buyer shall transfer the aforementioned funds to the Seller's Attorney [the Sternberg Defendants'] Escrow Account listed in Exhibit B...." Exhibit P3, the SPA, at ¶ 4; Sternberg RFA #3. **RESPONSE:** Disputed because Plaintiff's selective quotation appears intended to imply a meaning different from that of the complete text of ¶ 5 of the SPA, which states that "As per the invoice below (EXHIBIT C), Seller agrees to sell 151,200 boxes of 2 count iHealth COVID 19 home test kits. The Buyer shall transfer the above-mentioned funds to the Seller's Attorney Escrow Account listed in Exhibit B as per each invoice." *See, Ex. P.3, SPA, ¶5; see also, Sternberg SUMF at ¶¶ 56 and 71* and citations therein.

20.    Exhibit B included in the SPA had the following header, and contained wire instructions for a wire transfer into Sternberg's trust account (emphasis in original):

"Exhibit "B" — Escrow Account
**Manfred Sternberg Jr. Attorney at Law IOLTA —
Trust Account Wire Instructions"**

Exhibit P-2, at p. 5 of 7. **RESPONSE:** Disputed. The "header" of the SPA is:



EXHIBIT "B" - ESCROW ACCOUNT
**Manfred Sternberg Jr. Attorney at Law IOLTA-Trust
Account Wire Instructions**

*See, Ex. P.3, SPA; see also Sternberg SUMF at ¶¶ 39, 48 and 55 and citations therein.*

21.    On January 21, 2022, SAFETY HOUSE wired the $1,965,600.00 Purchase Price to Sternberg's attorney trust account, and submitted TSH's Purchase Order #18315 for the purchase of the 151,200 COVID Test Kits, which clearly and unambiguously had a "Deliver by" date of January 25, 2022. Exhibit P-2. **RESPONSE:** Disputed. On January 21, 2022, without any dialog between them, Plaintiff effectuated the wire of $1,965,600 into the Sternberg Defendants' attorney trust account. The Purchase Order, which does not contain an "authorized signature," does not include a "Deliver by" date. *See, Ex. P-2; see also, Sternberg SUMF* at ¶ 39 and citations therein.

22.    Sternberg is identified as the "vendor" in TSH's Purchase Order. Sternberg RFA #8; Exhibit P-2. **RESPONSE:** Disputed. The Sternberg Defendants are not identified as the "vendor."

Rather, Defendant CHG is identified as the "vendor" in the Purchase Order. *See, Ex. P-2 and Sternberg SUMF at* ¶ 39 and citations therein.

23.     As late as March 18, 2022, Sternberg did not have a copy of the SPA executed by his client, Gross. Sternberg RFA #18. **RESPONSE:** Undisputed that the Sternberg Defendants did not have a fully executed copy of the SPA on March 18, 2022.

24.     Paragraph 6 of the SPA clearly states that a "BILL OF SALE (EXHIBIT D) shall be provided, and Seller will deliver the Goods to a common carrier with instructions to deliver the Goods to the location(s) as directed by Buyer. Title transfer shall happen contemporaneously with funds being released to Seller." Exhibit P-3, the SPA, at ¶4. **RESPONSE:** Disputed because Plaintiff's selective quotation appears intended to imply a meaning different from that of the complete text of ¶ 6 of the SPA, which states that: "Once the transferred funds have cleared in the Seller's account, BILL OF SALE (EXHIBIT D) shall be provided, and Seller will deliver the Goods to a common carrier with instructions to deliver the Goods to the location(s) as directed by Buyer. Title transfer shall happen contemporaneously with funds being released to Seller. Exhibit E attached hereto is incorporated herein as Seller's agreed upon Standard Operating Procedure." *See also Sternberg SUMF* at ¶¶ 31, 43 and 55 and citations therein.

25.     The SPA drafted by Sternberg states in paragraph 8 that "The Seller agrees to coordinate and pay for common carrier transportation to deliver the Goods from the Seller's warehouse(s) to Buyer at Seller's cost and is included in the purchase price paid to Seller by Buyer hereunder" but the Seller did not have any warehouses and did not own any COVID Test Kits. Exhibit P-3, at ¶ 8; Exhibit P-37, Sternberg deposition transcript, at Tr. 106:4-107:14; RFA #28. **RESPONSE:** Disputed. The contracting parties, Plaintiff and the Gross Defendants, agreed that the Sternberg Defendants would draft the SPA for Plaintiff's input and consideration. Plaintiff executed the SPA

without consulting with its counsel or proposing any edits. The Sternberg Defendants' response to RFA 28 states that "the Sternberg Defendants never had possession of any test kits purchased by Plaintiff, nor did they represent to anyone otherwise." Furthermore, the Sternberg Defendants dispute Plaintiff's implication that they had any obligations whatsoever under the SPA. *Ex. P-3, SPA*; *see also Sternberg SUMF at ¶ 43* and citations therein.

26.     The Bill of Sale that was provided to TSH, dated 1/21/22, is fraudulent. *See* Nos. 31-32, *infra.,* and cites therein. **RESPONSE:** Disputed. *See, Nos. 31-32, infra.*

27.     No Bill of Lading for the 151,200 COVID Test Kits ever was provided to TSH. Exhibit P-19, 2/16/24 Weiss deposition, at Tr. 169:6-173:7; *see* Nos. 33-35, *infra,* and cites therein. **RESPONSE:** Undisputed.

28.     When TSH wired the $1,965,600 purchase price for the Test Kits into escrow, to the attorney escrow account of the Sternberg Defendants, Sternberg agreed not to release the funds from escrow until the conditions of the SPA (paragraphs 4, 5 and 6) were satisfied. Exhibit P-3, the SPA, at ¶¶ 4, 5, and 6. **RESPONSE:** Disputed. The Sternberg Defendants are not parties to the SPA. The Sternberg Defendants, who had no duty to Plaintiff at any time, met their obligations to their clients, the Gross Defendants as supported by unrebutted expert testimony. Per the contracting parties' agreement, title transfer occurred once Plaintiff's funds cleared the Gross Defendants' account. As such, title transfer and the Gross Defendants' obligation to involve a common carrier did not occur until after the Sternberg Defendants provided their client with the purchase funds per the explicit terms of the SPA. *See, Ex. P-3, SPA, and Sternberg SUMF* at ¶55 and citations therein.

29.     The Sternberg Defendants released funds from their attorney trust account on February 1, 2022 ($219,240.00 wired directly to the Weiss Defendants), and again on February 4, 2022 ($1,911,960 wired to the Zekaria Defendants), *before* TSH had any goods or title to any goods, and

*before* SAFETY HOUSE received a Bill of Sale, and *before* TSH received a Bill of Lading from a recognized common carrier evidencing that the good were in transit to TSH, and *before* any goods were with a common carrier en route for delivery to TSH. *See* cites in Nos. 2931, *infra,* and RFA Nos. 7, 41 and 45. **RESPONSE:** Undisputed that the Sternberg Defendants released funds at the direction of their client on February 1, 2022 and on February 4, 2022. This process was consistent with the terms of the SPA that provided for title transfer after the purchase funds cleared the Gross Defendants' account, all of which first necessitated the Sternberg Defendants' transfer of those funds. *Id., see also Sternberg SUMF* at ¶¶ 56-57 and 59 and citations therein.

30.     Defendants failed to deliver the 151,200 iHealth Covid-19 test kits purchased by TSH, either by the 1/25/22 "deliver by" date set forth in TSH's 1/21/22 Purchase Order, or at any time prior to TSH canceling the Order and filing this lawsuit. Scully Certification, at ¶¶ 13-18; RFA #37, 41, and 45. **RESPONSE:** Disputed. The Sternberg Defendants had no obligation to provide Plaintiff with any product at any time. Moreover, the Purchase Order does not include a "Deliver by" date. Plaintiff rejected the Gross Defendants' delivery attempts. *See, Ex. L to Sternberg Defendants' MSJ, and Sternberg SUMF* at ¶ 43 and citations therein.

31.     Defendants provided TSH with a fraudulent Bill of Sale. **RESPONSE:** Disputed. There is no evidence that the Sternberg Defendants provided Plaintiff with any Bill of Sale, let alone a "fraudulent" document. The Sternberg Defendants had no obligation to provide Plaintiff with anything at any time. *See, Ex. P-3, SPA,* ¶ 6.

(a)     TSH received a Bill of Sale dated January 21, 2022. Exhibits P-2, P-5, P-5a). **RESPONSE:** Undisputed.

(b)     Sternberg attached that 1/21/22 Bill of Sale to the Motion to Dismiss that the Sternberg Defendants filed in this case on April 1, 2022 [ECF 13-9, at p. 9 of 10]. Exhibit P5 a. **RESPONSE:** Undisputed.

(c)     On January 21, 2022, none of the defendants owned or had possession of any COVID Test Kits — the first time that defendants claim they had COVID Test Kits is Gary Weiss's claim that he purchased 365,790 COVID Test Kts on February 6, 2022. Exhibit P-19, Gary Weiss 2/16/24 deposition transcript at Tr. 78:7-12, 82:6-21; Exhibit P-9; Sternberg RFA # 22; *see* RFA #22 generally (not disputed by other defendants). **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect, maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.*

(d)     At no time from January 21, 2022 through the present [June 17, 2024], did the Sternberg Defendants or the Gross Defendants have possession of the 151,200 Test Kits purchased by Plaintiff. Sternberg RFAs #23, #24, #28, and #57 *see* RFAs #23, #24, #28, and #57 generally (not disputed by other defendants). **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect, maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.* In their responses to the RFAs, the Sternberg Defendants admitted "only that the Sternberg Defendants never had possession of any test kits purchased by Plaintiff, nor did they represent to anyone otherwise." *See also Sternberg SUMF at ¶ 43 and citations therein.*

(e)     The Sternberg Defendants and Gross Defendants claim that they bought COVID Test Kits on January 26, 2022, from the Weiss Defendants, and rely upon an invoice dated January 26, 2022, that Gary Weiss sent to them, billing them for the COVID Test Kits. Exhibit P-10. **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect,

maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.*

(f)     But when Gary Weiss sent the Sternberg Defendants and the Gross Defendants his 1/26/22 invoice, neither Weiss nor his LLC owned or had possession of any COVID Test Kits, let alone the 151,200 COVID Test Kits that TSH paid to purchase. Exhibit P19, Gary Weiss 2/16/24 deposition transcript at Tr. 78:7-12, 82:6-21; Sternberg RFA #73 and #74; *see generally* RFA #73 and #74 (not disputed by defendants). **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect, maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.* In their responses to the RFAs, the Sternberg Defendants stated that they are "unable to admit or deny this request," as they have no independent knowledge of the timing or sequence of Weiss' ownership of the subject test kits.

(g)     The Sternberg Defendants did not physically inspect the COVID Test Kits that the Weiss Defendants claim they purchased, and the Sternberg Defendants failed to undertake any due diligence to confirm the existence of the COVID Test Kits; other than Sternberg merely relying on Gross (a felon convicted of embezzlement) telling him that he saw the goods at Weiss's warehouse. Exhibit P-37, Sternberg Deposition, at Tr. 183:3-184:22; RFA Nos. 75-76. **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to inspect, maintain, provide, procure or otherwise "have" Test Kits. The Sternberg Defendants are not parties to the SPA. *See, Ex. P-3, SPA.* The Sternberg Defendants were under no obligation to perform "due diligence," and even if they were, that evaluation would have been in their role as counsel for the Gross Defendants. Plaintiff was exclusively responsible for performing its own due diligence especially, perhaps, when effectuating a near $2 million transaction with a "felon convicted of embezzlement." Furthermore, the Sternberg

Defendants had the right to rely upon the reasonable representations of their client. *See, Ex. P-37, Sternberg Deposition, at Tr. 183:3-184:12 and see also Sternberg SUMF at ¶ 18, and citations therein.*

(h)      But the Gross Defendants did not physically inspect the alleged COVID Test Kits at any time. Exhibit P-19, 2/16/24 Weiss deposition transcript, at Tr. 72:17-23. **RESPONSE:** Undisputed.

32.      TSH was supposed to receive a Bill of Sale, as well as a Bill of Lading from a recognized common carrier evidencing that the goods were in transit to TSH, before Sternberg could release the $1,965,600 funds wired by Plaintiff to Sternberg's trust account for the purchase of the goods, but Stenberg released the funds from his attorney trust account before those documents were supplied to TSH: Exhibit P-3, at ¶ 6; Scully Certification, at ¶¶ 5-10. **RESPONSE:** Disputed. Plaintiff's citation to its own self-serving Certification is insufficient to refute the facts. To the contrary, the controlling document – the SPA – required that title transfer occurred only once the funds cleared the Gross Defendants' account, which first necessitated the Sternberg Defendants' transfer of those funds from their account to the Gross Defendants. Plaintiff's chronology is inaccurate. *See Sternberg SUMF at ¶¶ 31-33 and citations therein.*

33.      TSH never received a bona fide Bill of Lading for the151,200 COVID Test Kits purchased by TSH. Scully Certification, at ¶¶ 13-15; Exhibit P-19, 2/16/24 Weiss deposition, at Tr. 169:6-173:7, 236:9-238:2. **RESPONSE:**  Undisputed.

34.      Defendants failed to deliver a Bill of Lading to SAFETY HOUSE evidencing that the 151,200 COVID Test Kits were with a recognized common carrier en route to TSH. Scully Certification, at ¶¶ 13-15. **RESPONSE:** Disputed. Plaintiff repeatedly and consistently seeks to expand the scope of the Sternberg Defendants' role in this transaction. The Sternberg Defendants acted as scrivener to the SPA and as counsel to the Gross Defendants. They obtained funds from

Plaintiff and distributed those funds at the direction of their client. The Sternberg Defendants are not partiers to the SPA, and they had no obligation to provide Plaintiff with anything at any time.

35.    Sternberg was not supposed to release the $1,965,600.00 from his attorney trust account until SAFETY HOUSE received assurances that TSH had purchased the COVID Test Kits and that they were en route to TSH, by TSH's receipt of a Bill of Sale for the COVID Test Kits, as well as a Bill of Lading from a recognized common carrier that they were being delivered to TSH. Exhibit P-3; Scully Certification at ¶¶ 3-8. **RESPONSE:** Disputed. Plaintiff's citation to its own self-serving Certification is insufficient to refute the facts. To the contrary, the controlling document – the SPA – required that title transfer occurred only once the funds cleared the Gross Defendants' account, which first necessitated the Sternberg Defendants' transfer of those funds from their account to the Gross Defendants. Plaintiff's chronology is inaccurate. *See Sternberg SUMF* at ¶¶ 31-33 and citations therein.

*36*.    Sternberg made transfers out of escrow from his attorney trust account, totaling at least $2,131,200.00, before any let alone 151,200 Test Kits were purchased by any Defendants. *See* No. 28 above, and cites therein; *see also* Sternberg RFAs #58 and #59; *see generally* RFAs #58-59 (not disputed by defendants). **RESPONSE:** Disputed. There are several inaccuracies herein. First, the Sternberg Defendants were under no obligation to inspect, evaluate, review, obtain, provide or purchase test kits. There can be no meaningful dispute that the Sternberg Defendants are not parties to the SPA and had no obligation to provide Plaintiff with anything. Next, the Sternberg Defendants transferred funds out of their account at the direction of their clients and consistent with the terms of the SPA. The contracting parties agreed that title transfer occurred once the funds cleared the Gross Defendants' account, which first necessitated the Sternberg Defendants' transfer of those funds. *See Sternberg SUMF* at ¶¶ 56 and 59 and citations therein.

37.     Defendants did not deliver the 151,200 COVID Test Kits to SAFETY HOUSE. Scully Certification, at ¶ 13. **RESPONSE:** Disputed. Here we go again. The Sternberg Defendants were under no obligation to deliver anything to Plaintiff at any time.

38.     Defendants also failed to return TSH's $1,965,600.00 Purchase Price to TSH. Scully Certification, at ¶¶ 13, 54, and 58. **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to provide Plaintiff with anything at any time. Likewise, the Sternberg Defendants were under no obligation to "return" funds to which they had no authority nor control. *See Sternberg SUMF* at ¶¶ 41-42 and 60 and citations therein.

39.     Instead, defendants kept all of TSH's $1,965,600.00 Purchase Price and divided TSH's money up amongst themselves. Exhibits P-7 and P-31. **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to provide Plaintiff with anything at any time. Likewise, the Sternberg Defendants did not maintain any of Plaintiff's funds as proven through uncontradicted expert testimony. Moreover, the evidence makes clear that the Sternberg Defendants timely distributed all purchase funds out of their IOLTA account. There was nothing left to divide "amongst themselves." *See, Ex. P-7, and Sternberg SUMF* at ¶¶ 41-42 and 60 and citations therein.

40.     Not only did TSH receive a fraudulent 1/21/22 Bill of Sale for COVID Test Kits (that the defendants in fact did not own at the time), but throughout the relevant time, defendants made numerous misrepresentations to TSH, including about the delivery of the COVID Test Kits (which were not delivered as promised): **RESPONSE:** Disputed. Plaintiff's ongoing narrative that the "defendants" collectively engaged in misconduct is unsupported and inaccurate as to the Sternberg Defendants. Each of the parties had distinct and relatively narrow obligations. As for the Sternberg Defendants, their role was to draft the SPA, and act as counsel for the Gross Defendants (no issue

there) and distribute the purchase funds at the Gross Defendants' direction. The Sternberg Defendants met their obligations. *Ex. P-3* at ¶ 6 *and Sternberg SUMF* at ¶ 49 and citations therein.

(a)    The Sternberg Defendants made repeated misrepresentations about the purported delivery of the COVID Test Kits to TSH, and when Sternberg made his repeated representations to TSH that the COVID Test Kits were en route for delivery to TSH, Sternberg knew or should have known that his representations were false, since no Bill of Lading had been obtained by them or sent to SAFETY HOUSE, and no COVID Test Kits were delivered to TSH as Sternberg represented. Exhibit P-19, 2/16/24 Gary Weiss deposition transcript, at Tr. 90:13-19, 239:5-19; Scully Certification at ¶¶ 13-15, 41-44; Exhibits P-13 and P-27. **RESPONSE:** Disputed. The Sternberg Defendants had no communication with Plaintiff before the contracting parties executed the SPA. Thereafter, once the contracting parties effectuated the SPA and Plaintiff issued its wire, the Sternberg Defendants communicated with Plaintiff and the Gross Defendants regarding the status and location of the subject test kits. The Sternberg Defendants appropriately relied upon their clients at all times. Notably, in its self-serving, unsupported Certification, Plaintiff makes no mention of the Sternberg Defendants at ¶¶ 13-15, and at ¶¶41-44 mischaracterizes a February 15, 2022 email which reads: "I am told the product will be arriving tomorrow …." *Ex. P-3 and Sternberg SUMF* at ¶ 43 and citations therein.

41.    The Gross Defendants and Sternberg Defendants lied to SAFETY HOUSE about TSH canceling the transaction and getting a full refund: **RESPONSE:** Disputed. The Sternberg Defendants did not lie to Plaintiff at any time. The Sternberg Defendants never, at any point in time, told Plaintiff it could cancel the transaction and get a full refund. *See Sternberg SUMF* at ¶ 50 and citations therein.

(a)    The Gross Defendants told TSH on 2/15/22 that SAFETY HOUSE could cancel the transaction and then notify the Sternberg Defendants to get a full refund of the $1,965,600.00

purchase price that TSH wired to the Sternberg Defendants. Exhibit P-12, and Exhibits RFA-1 through RFA-4; Scully Certification, at ¶¶ 48-50. **RESPONSE:** Disputed. The Sternberg Defendants never received any instructions from their clients to refund Plaintiff at any time, let alone during that short window when the purchase funds were in the Sternberg Defendants' account. *See Sternberg SUMF* at ¶ 50 and citations therein.

(b)     The Gross Defendants on 2/15/22 told TSH to contact the Sternberg Defendants for the refund because TSH wired the money to Sternberg, and Sternberg had the money. *Id.* **RESPONSE:** Disputed. The Sternberg Defendants never received any instructions from their clients to refund Plaintiff at any time, let alone during that short window when the purchase funds were in the Sternberg Defendants' account. *See Sternberg SUMF* at ¶ 50 and citations therein.

(c)     TSH then canceled the transaction on 2/16/22 after being told by the Gross Defendants that TSH could do so, and TSH requested a full refund of the $1,965,600.00 Purchase Price. Exhibits P-14 and P-15; Scully Certification, at ¶¶ 48-50. **RESPONSE:** The Sternberg Defendants never received any instructions from their clients to refund Plaintiff at any time, let alone during that short window when the purchase funds were in the Sternberg Defendants' account. *See Sternberg SUMF* at ¶ 50 and citations therein.

*42.*     After TSH canceled the transaction and contacted Sternberg for a full refund, the Stenberg Defendants simply ignored what their client (the Gross Defendants) had represented, and instead the Sternberg Defendants continued to disburse the funds amongst the defendants. Exhibits P-7 and P-12; Scully Certification, at ¶¶ 52-54. **RESPONSE:** Disputed. The Sternberg Defendants were under no obligation to respond to Plaintiff's demands or inquiries. Rather, they were duty bound only to their clients, the Gross Defendants, who never instructed the Sternberg Defendants to refund Plaintiff's money. Plaintiff did not timely cancel the transaction and, in any event, the Sternberg

Defendants timely distributed the purchase funds per their clients' instructions. Exhibit P-7 proves that the Sternberg Defendants had disbursed all of Plaintiff's funds on or before February 4, 2022. *Scully Certification, at ¶ 52 and SPA at ¶ 6 and Sternberg SUMF at ¶ 50 and citations therein.*

43.    The terms of the Sale and Purchase Agreement (the "SPA") do not allow defendants to keep the $1,965,600.00 Purchase Price and also not deliver the test kits. Exhibit P-3, at ¶ 11 -but even that that damages limitation (in paragraph 11 of the SPA) is not applicable because in the instant case, it was defendants who breached the SPA (by failing to deliver the COVID Test Kits). **RESPONSE:** Disputed. The Sternberg Defendants were not parties to the SPA. The Sternberg Defendants did not keep any of Plaintiff's funds as proven through unrebutted expert testimony. The Sternberg Defendants had no obligation to deliver anything to Plaintiff at any time. *See, Ex. P-7 and Sternberg SUMF* at ¶ 50 and citations therein.

44.    The terms of the Sale and Purchase Agreement (the "SPA") do not allow defendants to keep the $1,965,500 Purchase Price and also not deliver the test kits. Exhibit P-3; RFA #93. **RESPONSE:** Disputed. The Sternberg Defendants were not parties to the SPA. The Sternberg Defendants did not keep any of Plaintiff's funds as proven through unrebutted expert testimony. The Sternberg Defendants had no obligation to deliver anything to Plaintiff at any time. *See, Ex. P-7 and Sternberg SUMF* at ¶ 50 and citations therein.

45.    There is no agreement that would allow Gross and Sternberg to retain TSH's $1,965,600.00 purchase price, and also not make delivery of the COVID Test Kits to TSH. Sternberg RFA #93. **RESPONSE:** Disputed. The Sternberg Defendants were not parties to the SPA. The Sternberg Defendants did not keep any of Plaintiff's funds as proven through unrebutted expert testimony. The Sternberg Defendants had no obligation to deliver anything to Plaintiff at any time. *See, Ex. P-7 and Sternberg SUMF* at ¶ 50 and citations therein.

46.     The Sternberg Defendants continued to make distributions from the Sternberg attorney trust account after Sternberg expressly was put on notice not to make any further disbursements. Exhibits P-7 and P-16. **RESPONSE:** Disputed. The Sternberg Defendants timely and appropriately distributed all of Plaintiff's funds on or before February 4, 2022 at the direction of their clients. *See, Ex. P-7.* The Sternberg Defendants were not parties to the SPA. The Sternberg Defendants did not keep any of Plaintiff's funds as proven through unrebutted expert testimony. The Sternberg Defendants had no obligation to deliver anything to Plaintiff at any time. *See, Ex. P-7 and Sternberg SUMF* at ¶ 50 and citations therein. There is no evidence that the "Sternberg Defendants continued to make distributions from the Sternberg attorney trust account after Sternberg expressly was put on notice not to make any further disbursements," but instead the evidence proves the opposite. Before Plaintiff "demanded a refund," and perfectly in line with the SPA ¶ 6 and generally, the Sternberg Defendants' IOLTA account did not contain any of Plaintiff's funds as of February 4, 2022. *See, Ex. P-7 and 16 and Sternberg SUMF* at ¶ 50 and citations therein.

47.     VRC Medical Supplies has sued the Sternberg Defendants and the Gross Defendants, alleging in their lawsuit the same fraud scheme that is the subject of TSH's lawsuit in the instant case -- that said defendants defrauded VRC out of the $2,449,440.00 that VRC wired to the Sternberg Defendants for VRC's purchase of 204,120 COVID Test Kits; similar to what TSH has alleged in this lawsuit, VRC alleges in its Complaint that the Sternberg Defendants kept VRC's $2,449,440 funds and failed to deliver the 204,120 Test Kits that VRC wired to Sternberg for the purchase of those Test Kits. Exhibit P-35; *see also,* Sternberg RFAs #55, #56. **RESPONSE:** Disputed. An unrelated lawsuit involving distinct parties, allegations, contracts and facts has no bearing on this proceeding.

48.     Sternberg made the following admissions in response to the 6/17/24 Requests for Admission: **RESPONSE:** Disputed, as follows.

(a)     The Sternberg Defendants were unable to admit whether Weiss purchased 365,790 Test Kits from Mask & Eldiven. Sternberg RFA #47. **RESPONSE:** Disputed. The Sternberg Defendants fully and completely responded that they "are unable to admit or deny this request. See responses to Plaintiff's Requests for Admissions provided by Defendant Weiss." That response does not constitute an admission.

(b)     The Sternberg Defendants were unable to admit whether the 2/6/22 M&E document that Weiss produced was the document that Weiss claimed evidenced his purchase of 365,790 Test Kits from Mask & Eldiven (Sternberg RFA #48). **RESPONSE:** Disputed. The Sternberg Defendants fully and completely responded that they "are unable to admit or deny this request. Any and all documents speak for themselves. Moreover, see responses to Plaintiff's Requests for Admissions provided by Defendant Weiss." That response does not constitute an admission.

(c)     The Sternberg Defendants were unable to admit whether the document marked as Weiss Deposition Exhibit 5 was a copy of the 2/6/22 M&E document (Sternberg RFA #49), or anything else about the 2/6/22 M&E document. (Sternberg RFAs #48-#54). **RESPONSE:** Disputed. The Sternberg Defendants fully and completely responded to the RFAs. Such responses do not constitute admissions.

## COUNTER-STATEMENT OF FACTS
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In the interest of consistency, the Sternberg Defendants reassert herein their Statement of Undisputed Facts set forth in their Motion for Summary Judgment.

**1.   THE PARTIES**

1.      In this civil action, a plaintiff seeks to recover from a series of defendants for the alleged failure to provide COVID-19 test kits during the global pandemic. *See, Ex. A, First Amended Complaint* ("Complaint").

2.      In its Complaint, Plaintiff American Environmental Enterprises, Inc. d/b/a THESAFETYHOUSE.COM ("Plaintiff") purports to plead ten causes of action against the following sets of defendants: (i) the seller of the test kits – Defendant Charlton Holdings Group, LLC ("CHG") and its president, Defendant Samuel Gross; (ii) CHG's supplier of the test kits – Defendant Gary Weiss ("Weiss"); Weiss' attorney in the transaction – Defendant Daphna Zekaria, Esq. ("Zekaria"); and, finally (iv) the Sternberg Defendants, whose sole role in the transaction was as counsel for CHG. *See, id.*

   A.  **Plaintiff** *(the Buyer)*

3.      Plaintiff is a Pennsylvania S corporation, solely owned by its president, Daniel J. Scully, in the business of supplying personal protection and abatement equipment (PPE). *Id and Ex. L, 07/23/24, Deposition of Daniel J. Scully ("Scully Dep.")* at 36:12-22.

4.      Scully has independently and exclusively operated Plaintiff since opening the business in approximately 1993. *Id.* at 40:12-15.

5.      Plaintiff employs ten individuals, including Scully. *Id.,* at 50:9-10.

6.      Per its website, Plaintiff's "headquarters and main shipping facility" in West Chester, Pennsylvania "is positioned to service the Northeast corridor with [its] own fleet of delivery trucks." *See, Plaintiff's Website:* https://thesafetyhouse.com/about-us.

7.      Plaintiff boasts that it can ship PPE equipment "anywhere in the United States and surrounding countries." *Id.*

8.      In January 2022, Plaintiff executed a contract with CHG to purchase 151,200 iHealth COVID-19 test kits for an agreed upon purchase price of $1,965,600. *See Ex. A, Compl.,* at ¶ 1.

   B.  **CHG** *(the Seller)* **and Weiss** *(the Supplier)*

9.      CHG is a New York limited liability company, owned and operated by Gross. Id. at ¶¶12-14.

10.      As alleged, Gross enlisted his longtime ally, Weiss, to procure the test kits necessary to fulfill Gross' contract with Plaintiff. *See Ex. J, 02/16/24 Deposition of Gary Weiss ("Weiss Dep. 1") at 46:12-21 and 49:13-23.*

11.      Weiss and Gross enjoyed a professional and personal relationship spanning over 20 years since the early 2000s when they first collaborated in the diamond sales industry. *See Ex. J, Weiss Dep. 1*, at 20:3-9.

12.      Weiss and Gross first discussed the concept of PPE sales early in the pandemic, but Weiss initially declined to participate in such a venture. *Id.* at 43:1-22.

13.      It was not until 2021 or 2022, when Weiss coincidentally learned of an opportunity to purchase COVID-19 PPE equipment through a non-party vendor who inquired whether Weiss knew of anyone interested in such products. *Id* at 41:18-42-20.

14.      Knowing of Gross' previous interest in PPE sales, Weiss solicited Gross on January 24, 2022 to determine whether he remained in the market for COVID-19 products. *Id.* at 45:1-11.

   **C.  Zekaria (*Weiss' Counsel*)**

15.      Zekaria was licensed to practice law in New York until her recent suspension (which is unrelated to the allegations in this proceeding). *See Ex. H, 06/16/24 Grievance Decision.*

16.      Weiss engaged Zekaria to represent him in connection with the contemplated transaction between Plaintiff and CHG. *See Ex. J, Weiss Dep. 1* at 117:4-10.

17.      Zekaria provided legal counsel to Weiss and utilized her attorney IOLTA account to collect CHG's funds earmarked for Plaintiff's product. *See Ex. J, Weiss Dep. 1, at 116:23-117:5.*

   **D.  The Sternberg Defendants (*CHG's Counsel*)**

18.      Sternberg Law is a Texas professional corporation with a principal place of business in Houston, Texas. *See Ex. A, Compl.,* at ¶ 9; *see also Ex. I, 02/07/24 Deposition of Manfred Sternberg* at 12:5-9.

19.     Sternberg is a member in good standing of the Texas bar and is "board certified… in consumer and commercial law." *See,* https://www.manfredlaw.com-/manfred-sternberg.

20.     Sternberg is involved in public policy representing the consumer, and was initial Chairman for the Texas Health Services Authority, appointed by Texas Governor Rick Perry. *Id.* He has nearly 40 years of experience practicing law and representing businesses. *Id.*

21.     Sternberg and his wife have two adult children. *See, Ex. I, Sternberg Depo* at 21:8-10, 20:15-19, and 251:14-20.

22.     On August 23, 2023, the Sternberg Defendants timely filed an Answer to Plaintiff's First Amended Complaint with Crossclaims. *See, Ex. G, Sternberg Answer.*

### E.   The Depositions

23.     Weiss was deposed twice; February 16, 2024 and July 16, 2024.

24.     Scully, individually and in his capacity as president of Plaintiff, was deposed on July 23, 2024. *See Ex. L, 07/23/24 Scully Deposition.*

25.     Zekaria was deposed on April 2, 2024. *See Ex. M, 04/02/24 Uncertified Zekaria Deposition* at 96:20 - 97:3. Unfortunately, however, the court reporter refused to certify the transcript due to alleged lack of professionalism exhibited by the witness and by Plaintiff's counsel. *Id.*

26.     Sternberg was deposed individually and on behalf of Sternberg Law on February 7, 2024. *See Ex. I, 02/07/24 M. Stenberg Dep.,* at 12:5-9.

### II.   THE CONTRACT

28.     On January 21, 2022, Plaintiff agreed to purchase from CHG 151,200 iHealth Covid-19 Antigen Rapid two-pack test kits (the "Test Kits") for $1,965,600. *See Ex. A, Compl. at ¶ 23* and See *Ex. B, SPA,* at ¶¶ 2-3.

29.     Plaintiff and CHG memorialized the terms of their agreement in a contract entitled the "Sale and Purchase Agreement" ("SPA"). *See Ex. A, Compl. at ¶¶ 23. 25* and *Ex. B, SPA,* generally.

30.     Scully - on behalf of Plaintiff/buyer - and Gross – on behalf of CHG/seller, executed the SPA. *See, Ex. B. SPA.*

31.     The SPA explicitly incorporated CHG's Standard Operating Procedure ("SOP"). *See Ex. B, SPA,* at ¶ 6 and p. 8.

32.     The SOP provides a systematic list of "how Seller engages with Buyers," as follows:

1.  Buyer to provide Purchase Order to Seller.
2.  Seller's Attorney to draft and provide Buyer with Seller form of Sale and Purchase Agreement. ("SPA").
3.  Buyer and Seller execute SPA and Buyer wires Seller's Attorney the total purchase price called for in the Purchase Order.
4.  Purchase price funds released to Seller.
5.  Title Transfer to Goods to Buyer per SPA.
6.  Goods delivered to common carrier by Seller per SPA for delivery to Buyer.
7.  Seller to provide Buyer with BOL(s) and executed Bill of Sale for Goods shipped
8.  Buyer and its agents agree not to speak to anyone other than Seller or Seller's representative regarding this transaction.  Any discussions with Seller's vendors will be considered attempted circumvention.

*See Ex. B*, SPA, at p. 8.

33.     Thus, Plaintiff agreed to be bound by these all-important terms in the following order: (i) the Sternberg Defendants, as counsel for CHG, would provide Plaintiff with the SPA; (ii) upon execution of the SPA, Plaintiff would wire the purchase price to the Sternberg Defendants; (iii) the Sternberg Defendants would release those funds to CHG; (iv) and then title for the test kits would transfer from CHG to Plaintiff. *Id.*

34.     Although this was the largest agreed upon purchase price of any transaction in Plaintiff's history, and it had previously relied upon attorneys for assistance, Plaintiff negotiated this transaction without independent counsel. *See, Ex. L, Scully Dep.* at 77:7-14, 56:14-20, and 82:20-23.

35.     When pressed why Plaintiff did not engage an attorney to negotiate any aspect of the SPA, Plaintiff's president testified that he had "been doing this forever," and was comfortable negotiating directly with vendors without any independent due diligence. *Id.* at 58:22-59:16.

36.     During its evaluation process, Plaintiff did not request, propose or suggest any revisions to the SPA. *Id.,* at 97:22-98:2 and 177:10-20.

37.     For its part, CHG engaged the Sternberg Defendants to provide CHG with "legal counsel on various PPE transactions, escrow services, strategic counsel and other matters as specifically assigned by Client." *See Ex. Q, CHG-Sternberg Fee Agreement.*

38.     As agreed upon by the parties per the SOP, the Sternberg Defendants drafted the SPA. *Ex. B, SPA,* at p. 8.

39.     Next, on January 21, 2022, Plaintiff delivered a purchase order and effectuated a wire transfer of $1,965,500 to "Seller's Attorney" into the Sternberg Defendants' IOLTA account, as set forth in the SPA. *See Ex. A, Compl. at ¶ 140*; Ex. B, SPA, at ¶ 4; and *Ex. L, Scully Dep.*, at 65:15-19.

40.     Thus, per the SPA, title transfer and the risk of loss associated with the test kits transferred to Plaintiff on January 21, 2022. *See Ex. B, SPA*, at ¶ 9.

41.     On February 1, 2022, at CHG's direction, the Sternberg Defendants transferred an initial installment of $219,240 to Weiss via the IOLTA account maintained by Weiss' attorney, Zekaria. *See Ex. I, Sternberg Dep.* at 176:18-23, 178:8-12 and 184:1-12. *See also Ex. P, Lesovitz Report, at p. 10.*

42.     Subsequently, at CHG's direction, the Sternberg Defendants transferred the balance of the purchase price from CHG to Zekaria on February 4, 2022. *Id.*

43.     As of February 4, 2022, it was incumbent upon CHG to deliver the test kits to a common carrier with instructions to execute deliveries as directed by the Plaintiff since the funds had now cleared CHG's account as contemplated in the SPA. *See Ex. B, SPA*, at ¶ 6.

44.     In an ongoing effort to effectuate the delivery of the test kits to Plaintiff, Weiss demanded and CHG authorized the Sternberg Defendants to effectuate an additional wire of $250,000 to Weiss via Zekaria's IOLTA account on February 15, 2022. *See Ex. I, Sternberg Dep.* at 178:13-179:1.

45.     Although the $250,000 transfer was not initially contemplated by any of the interested parties, Weiss demanded this increase to address unforeseen delays and purportedly to expedite delivery. *Id.*

46.     When Weiss still had not provided the test kits by February 25, 2022, he again demanded more funds, this time $190,000, which the Sternberg Defendants wired to Zekaria's IOLTA account at the direction of their client, CHG. *See, Ex. I, Sternberg Dep.* at 180:5-16.

47.     As its counsel, the Sternberg Defendants issued a warning regarding Weiss' continued demands for payments in excess of their agreement and cautioned that it may constitute Weiss' "fraud in the inducement." *Id.* at 180:17-181:3.

48.     Still, the Sternberg Defendants complied with the requests of their client and exhausted their IOLTA account of all funds provided by Plaintiff. *Id.* at 181:4-14.

49.     As expected, given their role as counsel only to CHG, the Sternberg Defendants had *no* dialog or other exchange of any kind with Plaintiff prior to the parties' execution of the SPA, the January 21, 2022 wire transfer or the disbursements of Plaintiff's funds made at CHG's instruction. *See, Ex. L, Scully Dep.,* at 20:16-22 and 85:1-6.

50.     It was not until February 16, 2022 when Plaintiff first communicated with the Sternberg Defendants by way of a demand for a refund. *See Ex. F, 02/16/22 Email re Refund.* A refund was impossible given that the Sternberg Defendants had complied with the SPA and with their client's requests by distributing Plaintiff's funds nearly two weeks earlier. *Id.*

51.     Plaintiff filed suit the following week, on February 23, 2022.

### III.     THE STERNBERG DEFENDANTS' LIMITED RESPONSIBILITIES UNDER THE CONTRACT

52.     Plaintiff's theories are creative, albeit unsupported, in that it has alleged that despite the lack of an engagement letter, retainer payment, or invoice of any kind between them, Plaintiff somehow had a right to rely upon the Sternberg Defendants – CHG's counsel - as if they entered into an attorney-client relationship. *Ex. L, Scully Dep.,* at 77:18-78:10.

53.     Nonetheless, Plaintiff conceded, as it must, that he fully understood the Sternberg Defendants' role as counsel only to CHG and that Plaintiff was unrepresented in the transaction. *Id.,* at 89:13-22 and 62:13-14.

54.     The Sternberg Defendants' exclusive role with respect to the SPA was that of "Seller's Attorney." *See. Ex. B, SPA, at ¶¶ 4 and 5.*

55.     As such, the Sternberg Defendants were expected to (i) draft the SPA, (ii) to collect funds from Plaintiff using its IOLTA account, and (iii) to release such funds at the direction of CHG. *See Ex. B, SPA,* at ¶ 6 and p. 8, ¶ 4-7.

56.     As agreed upon by the contracting parties, the Sternberg Defendants were to release the purchase price funds at the direction of CHG which then triggered CHG's duty to provide the test kits and also triggered the risk of loss from CHG to Plaintiff. *See Ex. B, SPA,* at ¶¶ 4-6, 9 and p. 8 at ¶¶ 3-5. The applicable contracts do not contain any conditions prerequisite to the release of the purchase funds to CHG.

57.     The SPA is completely devoid of any responsibility on the Sternberg Defendants to warrant, secure, verify or provide test kits to Plaintiff or anyone. *See Ex. B, SPA, ¶¶ 1-8 and p. 1-8.*

58.     The SPA and SOP consistently reference the "Seller's Attorney." *See Ex. B, SPA,* at ¶¶ 4-5 and p. 8 at ¶¶ 2-3 but there is no mention of a "Buyer's Attorney."

59.     The SPA and SOP contained no terms explicitly governing the conduct of the Sternberg Defendants other than the expectation that the "Seller's Attorney" would accept Plaintiff's wire and, in turn, distribute those funds to CHG.

60.     The Sternberg Defendants had no responsibility of any kind once they transferred the balance of the purchase price funds from Plaintiff per CHG's instructions on February 4, 2022. *See* Ex. I, Sternberg. Dep. at 176:18-23, 178:8-12 and 184:1-12. *See also Ex. P, Lesovitz Report, at p. 10.*

IV.     **THE FAILURE TO DELIVER**

61.     Although the SPA does not specify an agreed upon delivery date, Plaintiff testified that it anticipated delivery on January 25, 2022, a few days after effectuating the wire. *Ex. L, Scully Dep.* at 96:7-12.

62.     CHG did not deliver test kits to Plaintiff on January 25, 2022. *Id.*, at 98:3-17.

63.     Ultimately, after several weeks of unexplained delays, Weiss allegedly grew impatient with his common carrier and planned to personally deliver the test kits earmarked for Plaintiff and other CHG customers. *Ex. J, Weiss Dep. 1,* at 102:6-20.

64.     Unbelievably, however, in or about March 2022 – after Plaintiff initiated this action - Weiss claimed that the test kits he previously inspected personally had mysteriously and inexplicably been replaced by bags of rice. *See Ex. J, Weiss Dep. 1,* at 106:15-1-7:22 *and Ex. K, 07/06/24 Transcript of Weiss' Second Deposition,* at 138:1-9.

65.     Weiss did not notify the Sternberg Defendants or Plaintiff, or any insurance agency used to insure the kits as required by contract, nor any law enforcement agency of this unexpected development. *Ex. K, Weiss Dep. 2*, at 194:4-24.

V.      **THE CIVIL ACTION COMPLAINT**

66.     Plaintiff initiated this litigation on February 23, 2022 via a Complaint. *See ECF No. 1.*

67.     Plaintiff filed a First Amended Complaint on July 31, 2023. *See Ex. A and ECF No. 80.*

68.     Plaintiff seeks to recover from the Sternberg Defendants pursuant to the following theories:

    a.  Count I: fraud in the inducement,
    b.  Count II: fraud,
    c.  Count IV: civil conspiracy,
    d.  Count VII: participation theory,
    e.  Count VIII: unjust enrichment/quantum meruit,
    f.  Count IX: intentional interference with existing contractual relations, and

g. Count X: intentional interference with prospective economic advantage.
*See Ex. A* at pp. 11, 13, 16, 20, 23, 24 and 25, respectively.

69. As alleged, the Sternberg Defendants "fraudulently induce[d] Plaintiff to make the wire transfer to them, the Gross and Sternberg Attorney Defendants represented that the $1,965,600.00 Purchase Price would remain in the attorney escrow account of the Sternberg Attorney Defendants, and that the $1,965,600.00 Purchase Price would not be released [...]." *See, Ex. A, Complaint* at ¶ 39.

70. Plaintiff also alleges that "the Sternberg Attorney Defendants wrongfully and improperly and prematurely released Plaintiff's $1,965,600.00 Purchase Price from escrow, without confirming that the Covid Test Kits were purchased, and without confirming that the Covid Test Kits were delivered to a recognized common carrier for delivery to Plaintiff." *Id.* at ¶ 69.

71. Plaintiff's allegations are inconsistent with the facts and conflict with the agreed upon terms set forth in the SPA. *See Ex. B, SPA*, at ¶¶ 4-6, 9 and p. 8 at ¶¶ 3-5.

**VI. THE STERNBERG DEFENDANTS' UNREFUTED EXPERT SUBMISSIONS**

72. Summary judgment is warranted in favor of the Sternberg Defendants as evidenced, in part, by the expert submissions timely disclosed on August 16, 2024. *See Ex. N, Rule 26 Supplement*.

73. Steven Angstreich, Esquire, a partner at Weir Greenblatt Pierce LLP, has been licensed to practice law in Pennsylvania for more than 50 years, and has handled actions involving allegations against attorneys. *See Ex. O, Angstreich Report*, at pp. 3, 14.

74. Angstreich concluded that "to a reasonable degree of legal certainty that neither Mr. Sternberg nor the law firm breached any duty to Plaintiff, and neither is liable to Plaintiff for the loss of the funds." *Id.*, at p.13.

75. The Sternberg Defendants' position is also bolstered by the opinions of Joseph W. Lesovitz, a Forensic, Litigation and Valuation Services Group partner in Eisner Amper where he specializes in calculating damages in complex commercial litigation and in providing financial consulting and forensic accounting services. *See, Ex. P, Lesovitz Report*, at p. 15.

76.     Lesovitz is a Certified Public Accountant and a Certified Fraud Examiner. *Id.*, at p. 4.

77.     Lesovitz reviewed the pertinent evidence of record and concluded that the Sternberg Defendants did not withhold any of Plaintiff's funds nor otherwise financially benefit from the contemplated transaction. *Id.*, at p. 11.

78.     Plaintiff produced no timely expert reports to either affirmatively support its unsubstantiated claims as to liability and damages, or to rebut the opinions of the Sternberg Defendants' experts.

79.     The Sternberg Defendants submit this statement of undisputed material facts in support of their motion for summary judgment and in opposition of Plaintiff's Motion.

**GOLDBERG SEGALLA LLP**

Date: October 30, 2024          By:     /s/ *Joseph Ross*
_____

Seth L. Laver, Esq. (PA ID #094518)
Joseph Ross, Esq. (PA ID #318039)
1700 Market Street-Suite 1418
Philadelphia, PA 19103-3907
Telephone: 267-519-6800
*Attorneys for Defendants Manfred Sternberg, Esquire and Manfred Sternberg & Associates, P.C.*

43076088.v1