REC'D NOV 1 3 2026

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**CIVIL ACTION**

**No.2022-cv-00688 (JMY)**

**AMERICAN ENVIRONMENTAL ENT**
**D/b/a The safetyhouse.com**
**Plaintiff**
**vs.**
**Manfred Sternberg, Esquire**
**Sam Gross, CHG**
**GARY WEISS. Pro-Se**
**DAFNA ZEKARIA**
**Defendants**

RE Document 245 ( ECF )
(#254) ORDER THAT AN ASSESSMENT OF DAMAGES HEARING SHALL BE HELD ON TUESDAY, NOVEMBER 10, 2026, AT 11 A.M. AT THAT TIME, PLAINTIFF SHALL PROVIDE EVIDENCE IN SUPPORT OF THE DAMAGES IT ATTRIBUTES TO THE REMAINING DEFENDANTS, WHO SHALL BE GIVEN THE OPPORTUNITY TO CONTEST THOSE DAMAGES. SIGNED BY DISTRICT JUDGE JOHN M. YOUNGE ON 9/15/26

To The Honorable Judge John M. Younge

The Hearing on November 12, 2026 the Plaintiff FAILED to bring forth any Damages that the Plaintiff, The Safety House Suffered, not even $1 United States Dollar, in my Documents that I brought to the court, I described in detail why not, however I did not have the time to read it to the Court, and Contest the Allegation the Plaintiff Alleges, in Quotes from the Discovery, which I answered in detail at the Discovery Period, I will submit those Pages addressing the “Damages” to The Safety House, which did not occur.
Also, the Plaintiff, TSH refused several attempts for refund by Defendant Sam Gross, Charlton Holding Company, the last one was offered in May of 2024.

Also, the Plaintiff The Safety House, Dan Scully, refused delivery of the order of Covid-19 Test Kits on 29 March, 2022, a truck full of Test Kits, Covid-19 arrived to his warehouse at his place of business in Pennsylvania, after the first pallet was unloaded, received by his Warehouse manager at the time, Mr. Scully arrived & ordered the driver to load back the first Pallet and "Go Away", if not than he, Mr. Scully, will call the police, all documented in Mr. Scully's Deposition.

Also, it is documented that I Defendant Gary Weiss gave a full refund of the monies paid to me by my buyer, Defendant Sam Gross, Charlton Holding Group, and does not have any benefit from that DEAL.

Also, the Defendant Sam Gross was not present in Court to give his side as for his attempts to Deliver the merchandise on 29 March, 2022, and his numerous offers of refund to the Plaintiff ,The Safety House, Dan Scully, the last offer of refund was on May of 2024, however Plaintiff The Safety House & Defendant Sam Gross, Charlton Holding Group, could not agree on the amounts and terms of the refund.

Also, the Defendant Zekaria did ignore this hearing and did not appear.

Also, I am not in the KNOW about the settlement between Defendant Manfred Sternberg & Plaintiff The Safety House, Manfred still holds over 1.8 Million Dollars that were never given his Attorney at the time Manfred Sternberg , paid into his Escrow account for the benefit of Sam Gross, Charlton Holding Group. Refusing to give that money to Sam gross, Charlton Holding group.

I will submit to the Court, the Honorable Judge John M. Younge, those documents, Exhibits which are pages from the transcript of Dan Scully's Deposition, The Safety House, which I brought to the Hearing, but did not have "OPPURTUNITY TO CONTEST", however the Plaintiff The Safety House Failed to demonstrate dammages.

Exhibit 1, Scully's deposition page 383, lines 20-24, The Safety House, Plaintiff, never was in the business of selling any Covid-19 Test kits, therefore his Business could not " suffer" any Dammages related to this transaction.

Exhibit 2, pages 412-413, in page 413, lines 1-15, Dan Scully in his deposition, describes that prior to him wiring the Money, 1.9 million to Sam gross, Charlton Holding group, all solicitation and decision to do the deal was made through BROKERS, never with anybody else, nor with Gary Weiss, Defendant, which was not known to Dan Scully the Safety

House, as per his testimony, Till mr. Weiss was named Third Party Defendant, which was 6 months later, Page 435 , lines 4-11.

Exhibit 3, The Plaintiff, The Safety House, made the deal only because of Attorney Manfred Sternberg, ( not Gary Weiss ) page 396, lines 1-10.

Exhibit 4, lines 6-11, Never lost profit, never demonstrated damages, ( Refund was offered, Delivery on 29 March, 2022 was refused ). Also, The Safety House's money was not given to me, Gary Weiss, only to Defendant to Sam Gross through His Lawyer's Escrow account, Sam Gross's order to me of those 151,000 Test kits that TSH, Dan Scully ordered, Sam Gross ordered from me were valued at $6 per kit, amounted to $906,000.00, not 2 million.

Exhibit 5, page 553 lines 1-7, the customer( s ) continued to do business withe the Safety House, never lost customers or business due to his transaction.

Exhibit 6a & 6b, the SALE AND PURCHASE AGREEMENT, Exhibit P-4 in the hearing on November 12, 2026, Hearing for damages, ( also agreed upon prior to the Safety House's purchase of merchandise ) Paragraph 11 of SPA, Buyer, the Plaintiff, The Safety House, Dan Scully, agreed that no liability will be upon the seller, or it's Agents, as per Paragraph 15, agree to hold harmless " it's agents, servants, employees, contractors and affiliates". That includes Gary Weiss, Defendant.

Exhibit 7, Plaintiff Dan Scully , The Safety House, read the SPA, Sale and Purchase Agreement, over 10 times and had it in his position over 2 weeks before he signed it and wired the purchase price, $1,965,500.00 for the purchase of the Covid-19 Test kits.

This case was initiated as a FRAUD case, which plaintiff could NOT establish, and agreed upon before purchasing the merchandise, that the TSH, dan Scully will hold harmless anybody but himself.

**PLAINTIFF CLAIMING THAT GARY WEISS HAS ANY OBLIGATION TO THE SAFETY HOUSE, D/B/A AMERICAN ENVIRONMENTAL ENT, DNIED BY GARY WEISS PRO-SE IN RESPONSE TO ECF 251**

Gary Weiss has no contractual relationship with Plaintiff American Environmental, The safety House. Plaintiff never paid even $1 to Gary Weiss or any company that plaintiff claims that is affiliated with me.

**Defendant Dan Scully himself on behalf of The Safety House, refused several deliveries made in March of 2022 to his warehouse, deliveries he admitted arrived with a truck full with Covid-19 test Kits, admission he made in his deposition.**

Only plaintiff Dan Scully was engaged throughout this lawsuit on behalf of himself and The Safety House D/b/a American Environmental Ent. Nobody else, not even his that appeared in the hearing, nor anybody appeared in testimony for the Safety House, he is the only witness for the Safety House in this case, NOBODY ELSE from The safety House EVER testified on behalf of The Safety House.

**Defendant Dan Scully himself on behalf of The Safety House, refused several deliveries made in March of 2022 to his warehouse, deliveries he admitted arrived with a truck full with Covid-19 test Kits, admission he made in his deposition.**

**Attorney Manfred Sternberg & Sam Gross, CHG, and till today, the plaintiff The Safety House FAILED, did not establish FRAUD.**

**5. Your honor Judge John M. Younge scheduled a conference for October 10, 2026, which Attorney for the plaintiff is trying to avoid.**
**Your Honor in his order, Order , Document 145 dated January 8, 2024 ordered that a hearing will be held after liability of OTHER defendants has been determined. The plaintiff had a responsibility and title to the merchandise as of February 7, 2022, after it was placed on the truck, that is as per the Sale and purchase agreement, agreed between Plaintiff and defendant Sam Gross, Charlton Holding Group, and NOT Gary Weiss or anybody else.**

**It was established that full refund was given by Gary Weiss to defendant Sam Gross, CHG, and his lawyer Manfred Sternberg, on their payment to Gary Weiss on the order they placed with Gary Weiss, already by March of 2022, Sam Gross confirmed the full refund on several occasions, and the lawyer Manfred Sternberg also confirmed the refund, and advised that he and Sam Gross are selling the collateral, merchandise, as a full refund. All monies paid to defendant Gary Weiss were returned to the payers Charlton Holding Group, Sam Gross. Weiss has no obligation to deliver to The Safety**

House any merchandise, it never promised to the Safety House to deliver anything. Gary Weiss did benefit from this transaction.

Defendant Dan Scully himself on behalf of The Safety House, refused several deliveries made in March of 2022 to his warehouse, deliveries he admitted arrived with a truck full with Covid-19 test Kits, admission he made in his deposition.

The safety House, through Dan Scully contracted with Charlton Holding Group and its lawyer, Manfred sternbeg Esq. to supply Covid-19 test kits, not with Gary Weiss, nor did they outlined in the SPA, Sales and Purchase Agreement that Weiss or Asolar will ship them any merchandise. That SPA was made before Dan Scully placed an order with CHG, Sam Gross and paid for the order many days before Sam Gross agreed to buy Covid-19 Test Kits from Gary Weiss, and pay Gary Weiss for CHG's order. Gary Weiss dis not benefit from the money The Safety House paid to Sam Gross, CHG, through its lawyer Iolta, escrow account. Money that was not given in full to Sam Gross, and Plaintiff claims that that money was released before it should have been released, a decision by Attorney Manfred Sternberg, with intentions to defraud the Plaintiff.

The plaintiff's main and only witness , Dan Scully, has passed away, has refused subsequent delivery attempt at his warehouse, which Dan Scully admitted in his deposition, delivery attempt that was made by Sam Gross, CHG, after the failed initial delivery the first time.

**12. Sam Gross also offered a Full refund to Plaintiff several times, last time in the middle of 2024, however Plaintiff refused each time to negotiate on the final amount of refund and the manner which it will take place.**

**The Safety House , Dan Scully initiated the lawsuit on February 23, 2026, claiming FRAUD by Attorney Manfred Sternberg and defendant Sam Gross, Till Today The Safety House FAILED to prove fraud. The Safety House did not establish that Gary Weiss committed any unlawful act against The Safety House, American Environmental ENT, Weiss never agreed to supply the Safety House or Dan Scully any merchandise.**

**The Safety House lost it's main witness, a witness that tried to defraud the Government by taking a $2,000,000.00 loan and never paying it back, actually 2 loans from the government, using the Covid era, where the Government gave loans on legitimate orders to companies that supplied Covid related services, the Safety House claimed they have an order from a school district for 151,000 test kits, order they never had, and once Scully paid to Sam Gross, he Dan Scully already asked for a refund, and cancel the order, this whole case started by Dan Scully of the Safety House trying to obtain a government load with Fraudulant intentions.**

**Defendant Dan Scully himself on behalf of The Safety House, refused several deliveries made in March of 2022 to his warehouse, deliveries he admitted arrived with a truck full with Covid-19 test Kits, admission he made in his deposition.**

GARY WEISS, DEFENDANT PRO-SE
NOVEMBER, 13, 2026, [signature]

A. I think it was put on there recently.
Q. Do you know roughly --
A. Within the last six months. So the answer to your question is no to 2020.
Q. When did you decide to start selling COVID-19 test kits?
A. When one of my customers requested if I could get them for him.
Q. So it was a preexisting customer that asked you --
A. That's right.
Q. -- do you have these or can you get these?
A. Yep.
Q. And when was that?
A. When did I wire the money? January of '22.
Q. 2022?
A. Yeah, the -- January 21, 2022, is when I wired the money, so, you know, three weeks prior to that.
Q. So The Safety House didn't sell any test kits in 2020, for COVID-19?
A. No.
Q. What about 2021?
A. No.

COVID-19 BEFORE
PLACING THAT ORDER
SO, NO DAMAGES COULD
OCCUR, DID NOT
INTERUPT A GOING ON
BUSINESS
PAGE 383 20-24

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT 1

Case 2:22-cv-00688-JMY Document 201-1 Filed 10/01/24 Page 413 of 749

saying? There was no direct e-mail from Manfred. Everything was through the brokers.

BY MR. ROSS:

Q. Or a phone call?

A. Excuse me?

Q. What about phone calls?

A. No phone calls.

Q. What about text messages?

A. No texts.

Q. What about WhatsApp or any other app -- phone app?

A. No. The only correspondence was through e-mail and texts ~~through the~~ brokers, prior to me wiring the money.

MR. LIGHTMAN: And the SPA that he got.

BY MR. ROSS:

Q. Did you -- setting aside protecting the communications with other parties to the transaction and the lawsuit, did -- did you have a particular delivery date that you promised to your --

A. Yeah.

Q. -- customer?

AND SCULLY PLANNED THE FRAUD, TO GET THE LOAN

3 1-15 12-24
E DEAL WAS "MADE"
LY WITH BROKERS
ICK GRAY
RIS CORTESE
EY WERE NOT DEPOSED, THEY
RANGED THE "SALE"
GET LOAN



EXHIBIT 2A

e-mails and texts that confirm it.

BY MR. ROSS:

Q. And how do you know -- well, strike that.

And he made no representations to you before you wired the money, directly? He made no direct representations to you before you wired the money? It's a yes or no.

MR. LIGHTMAN: Objection.

THE WITNESS: Wait. Manfred, you're saying?

BY MR. ROSS:

Q. Manfred.

A. The only direct representations he made was e-mailing over the SPA, sales and purchase agreement.

Q. Okay. That was an e-mail when?

A. It was a week before I wired the money.

Q. All right. He e-mailed you?

A. Through the brokers.

Q. What representations did Manfred Sternberg make directly to you that involved no brokers or other intermediaries prior to you wiring the money?

MR. LIGHTMAN: Objection.

THE WITNESS: Directly, you're



EXHIBIT 2b

PAGE 435 4-11
NEVER KNEW IS TILL 6 MONTHS LATER

MR. LIGHTMAN: Objection.
THE WITNESS: Yes.
BY MR. ROSS:
Q. Did you allege dishonest conduct by him in your complaint?
A. No.
MR. LIGHTMAN: Objection.
BY MR. ROSS:
Q. You didn't?
A. I didn't know Mr. Weiss existed until they filed a third-party complaint against him.
MR. LIGHTMAN: In the amend -- in the complaint, I don't think he was named. I think in the amended complaint.
BY MR. ROSS:
Q. All right. That's where I was going. The amended complaint, the --
A. Yeah.
Q. -- he's a direct defendant now?
A. Right. Right. We brought him on in the amended complaint.
Q. Is it fair to say that, at least from your perspective -- I'm sure he would disagree -- that you found evidence to support the claim that he lied



EXHIBIT 2c

THE WITNESS: Manfred was -- he was the golden boy. He -- he was the only reason I did the deal. The only --

BY MR. ROSS:

Q. What do you mean?

A. -- reason I did the transaction is of Manfred Sternberg being represented as -- because we did due diligent on Manfred, and he was an attorney in Texas. That's the only reason why I did the deal.

Q. Did you understand Mr. Sternberg to be an attorney representing The Safety House in connection with this deal?

A. I -- I thought Manfred Sternberg was the escrow agent. And now, as it comes to be, Manfred Sternberg was counsel for Sam Gross, and Manfred Sternberg was also Sam Gross's partner, who was profiting from the transactions. I didn't find that out till later, but obviously, it's out there.

Q. And how do you know that he profited?

A. Through the bank records.

Q. The bank records? What woul

you learned that he didn't make any p

from this transaction?

EXHIBIT 3

THE ONLY REASON SCULLY DID THE DEAL IS MANFRED

MR. WEISS: You can --

THE WITNESS: He's allowed to ask questions.

MR. WEISS: -- argue in court whatever you have to argue.

MR. LIGHTMAN: Mr. Weiss, he's not claiming the lost profit on the sales to the school district as part of his damages. He's claiming that you took $2 million from him, you didn't give him his money, you didn't give him his test kits. He's got interest on this loan.

BY MR. WEISS:

Q. Did you give me any money ever? You gave me one penny?

MR. LIGHTMAN: Yes --

THE WITNESS: Indirectly.

MR. LIGHTMAN: -- yes, you got $2 million from the -- from the money. Let me ask some questions.

BY MR. LIGHTMAN:

Q. You had said earlier that -- Mr [illegible] you that Manfred Sternberg -- did Manfre[illegible] reasonably rely upon representations. I[illegible]

Weiss $ Reply 6-11



EXHIBIT 4

CUSTOMER(S)





Q. Yeah. Did anybody sue The Safety House for the failure to deliver test kits?
A. No.
Q. Did that customer, though they canceled that order, did they do business with The Safety House at some other later point in time?
A. Yes.
Q. What was the name of the attorney that assisted in the formation of American Environmental Enterprises?
MR. LIGHTMAN: Objection.
THE WITNESS: I have
That's funny. I don't remembe
BY MR. ROSS:
Q. Do you have documents regardin
formation --
A. I do.
Q. -- in your possession?
A. Yeah, I do.
Q. All right. I'm going to request those too.
Do you have any communications between yourself and any of the defendants, as far as you know, that you haven't produced yet?
A. No.

... TO DO BUSSINESS WITH CUSTOMER IN FUTURE

EXHIBIT 5

Case 2:22-cv-00688-JMY Document 196-10 Filed 09/30/24 Page 2 of 8

CHARLTON HOLDING GROUP, LLC

P-4

## SALE AND PURCHASE AGREEMENT

January 21, 2022

THIS AGREEMENT IS FOR THE SALE AND PURCHASE OF the product identified on the Purchase Order attached hereto and marked as Exhibit A attached hereto (the "Goods"). This Sale and Purchase Agreement is referred to herein as (this "Agreement").

**Seller:** Charlton Holdings Group, LLC, 78 Buckminster Road - Rockville Center, New York 11570, USA (the "Seller") AND

**Buyer:** Safety House, 99 Aldan Avenue, Suite 5, Glen Mills, PA 19342 (the "Buyer") (each hereafter as "Party" and together as the "Parties")

For good and valuable consideration, the Parties agree:

1. Seller shall provide Buyer the Goods listed in Exhibit A for the Purchase Price, provided that Buyer complies with the conditions of this Agreement.
2. Seller agrees to sell to Buyer 151,200 boxes of 2 count iHealth COVID 19 home test kits shall be provided to the Buyer by the Seller for each lot of boxes available for payment as they are ready to be delivered.
3. The Buyer agrees to pay the Seller @ $13.00(USD) per box. Payment upon invoice as the product lots are ready for delivery, total cost **$1,965,600.00**.
4. The product lots may be located in more than one (1) location or warehouse in various locales in the United States. Immediately after delivering a Purchase Order, Buyer agrees to authorize a wire be made to Seller through the Seller's Attorney Escrow Account identified in Exhibit B for the actual number of boxes of product contained in the Purchase Order.
5. As per the invoice below (EXHIBIT C), Seller agrees to sell **151,200 boxes** of 2 count iHealth COVID 19 home test kits . The Buyer shall transfer the above-mentioned funds to the Seller's Attorney Escrow Account listed inExhibit B as per each invoice.
6. Once the transferred funds have cleared in the Seller's account, BILL OF SALE (EXHIBIT D) shall be provided, and Seller will deliver the Goods to a common carrier with instructions to deliver the Goods to the location(s) as directed by Buyer. Title transfer shall happen contemporaneously with funds being released to Seller. Exhibit E attached hereto is incorporated herein as Seller's agreed upon Standard Operating Procedure.
7. Seller agrees to pay commissions, if any, included with rolls and extensions for the duration of this Agreement as per separate written agreement.
8. The Seller agrees to coordinate and pay for common carrier transportation to deliver the Goods from the Seller's warehouse(s) to Buyer at Seller's cost and is included in the purchase price paid to Seller by Buyer hereunder.



EXHIBIT 6

CHARLTON HOLDING GROUP, LLC

9. Risk of loss shall transfer to Buyer at the point the product is paid for by Buyer and the Seller is released of all loss guarantees.
10. The Goods shall be sold with the manufacturer's warranty only. Seller makes a warranty of Title to product only when it is paid for by Buyer. Seller makes no other warranty of any kind, express or implied, and any warranty by Seller is expressly disclaimed.
11. Neither Buyer nor Seller shall be liable to the other for any consequential damages, lost profits, cover costs, or punitive or exemplary damages arising out of or related to this Agreement; however if Buyer in any way attempts to circumvent Seller, Seller will be entitled to liquidated damages of $50,000 from Buyer or if Buyer terminates this contract without cause, Seller will be entitled to liquidated damages of $25,000 from Buyer.
12. Seller may terminate this Agreement if Seller determines, in its sole discretion, that Buyer does not have the funds to purchase the Goods, or the Goods become unavailable and all funds deposited with Seller, if any, shall be returned to Buyer.
13. This Agreement shall be governed by the laws of the State of Texas and the Parties agree on the Texas State District Courts of Harris County, Texas, or other Seller designated venue which shall have exclusive jurisdiction of any dispute arising out of or related to this Agreement.
14. Buyer warrants and represents this transaction is in full compliance with all applicable laws and regulations, including but not limited to Executive Order No. 13224, as amended, the Patriot Act (Public Law 107 56), and any other law relating to the prevention and detection of terrorism and money laundering
15. Buyer agrees to indemnify, defend, and hold harmless the Seller, its agents, servants, employees, contractors, and affiliates (the "Indemnified Parties"), from and against all damages, losses, costs, and expenses (including reasonable attorneys' fees) which they may incur by reason of any breach of the representations and warranties made by Buyer in this Agreement, or any false or misleading representation or warranty in this Agreement or other document provided by Buyer to Seller.
16. Seller and Buyer are independent contracting Parties and nothing in this Agreement shall make either Party the agent, employee, or legal representative of the other.
17. The terms of this Agreement are confidential and may only be disclosed as required by law or to complete the transaction.
18. This constitutes the entire agreement of the Parties and may only be modified by a writing signed by the Parties. Neither Party is relying upon any representation not contained in this Agreement.

***We, the undersigned, with full legal and corporate responsibility accept the agreement this date:***

Signing Page

Agreed and Signed By:



EXHIBIT 6b

Case 2:22-cv-00688-JMY Document 201-1 Filed 10/01/24 Page 538 of 749

READ AGREEMENT 10 TIMES, 2 WEEKS

PAGE 538, LINES 10-20

Q. -- all four, and you ment
including my name.

MR. LIGHTMAN:
Manfred, you were the bi
Mr. Weiss.

BY MR. WEISS:

Q. You wired the money on January 21st?

A. Correct.

Q. You said that you saw the SPA presented to you, the sale and purchase agreement, for about a week before that?

A. Maybe two weeks, maybe three. I don't remember.

Q. Okay. When the SPA was presented to you, you read it?

A. Yeah.

Q. Okay. How many times did you think -- do you think you read it?

A. Ten times.

Q. Okay.

A. Guess. That's a guesstimate.

MR. LIGHTMAN: Don't guess.

THE WITNESS: I don't know.

BY MR. WEISS:



EXHIBIT 7